Daniel C. Girard (State Bar No. 114826)
Jordan Elias (State Bar No. 228731)
Adam E. Polk (State Bar No. 273000)
Dylan Hughes (State Bar No. 209113)
**GIRARD GIBBS LLP**
601 California Street, Suite 1400
San Francisco, California 94108
Tel.: (415) 981-4800
dcg@girardgibbs.com
je@girardgibbs.com
aep@girardgibbs.com
dsh@classlawgroup.com

Joseph G. Sauder (*pro hac vice* forthcoming)
Matthew D. Schelkopf (*pro hac vice* forthcoming)
**SAUDER SCHELKOPF LLC**
555 Lancaster Avenue
Berwyn, Pennsylvania 19312
Tel.: (610) 200-0580
jgs@sstriallawyers.com
mds@sstriallawyers.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| R.E., individually and on behalf of all others similarly situated, | Case No. 3:18-cv-01586-JSC |
| Plaintiff, | **AMENDED CLASS ACTION COMPLAINT** |
| v. | 1. Negligence and/or Gross Negligence; |
| PACIFIC FERTILITY CENTER and PRELUDE FERTILITY, INC., | 2. Premises Liability; 3. Breach of Contract; 4. Bailment; and |
| Defendants. | 5. Violation of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq*. |
| | **DEMAND FOR JURY TRIAL** |

Plaintiff R.E. ("Plaintiff"), on behalf of herself and all other similarly situated individuals, files this action against Defendants Pacific Fertility Center ("Pacific Fertility") and Prelude Fertility, Inc. ("Prelude") (collectively, "Defendants") and alleges as follows.

## NATURE OF THE ACTION

1.      This is a class action on behalf of individuals who contracted with Defendants to securely store their frozen eggs and embryos to preserve their future reproductive choices.  Defendants breached that agreement and committed gross negligence by failing to keep the human tissue under its care frozen, resulting in its permanent loss.

2.      Plaintiff entrusted Defendants with maintaining and preserving her frozen eggs indefinitely.  But on March 11, 2018, Plaintiff received an email from Pacific Fertility providing notice of "a very unfortunate incident."  The email stated that "earlier this week" the cryo-storage tank containing her frozen eggs "lost liquid nitrogen for a brief period of time," which may have resulted in the loss of the eggs.  The email clarified that a "preliminary analysis" suggested only some of the human tissue in the affected tank was destroyed.  Hundreds of other patients with eggs and embryos stored with Defendants received the same email as Plaintiff.

3.      Plaintiff seeks relief on behalf of the other individuals whose eggs or embryos were stored in the same tank as hers when Defendants allowed it to become compromised.

## JURISDICTION AND VENUE

4.      The Court has subject matter jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because (a) Plaintiff is a citizen of a state different from Prelude, (b) the amount in controversy exceeds $5,000,000, excluding interest and costs, (c) the proposed class consists of more than 100 individuals, and (d) none of the exceptions under the subsection applies to this action.

5.      This Court has personal jurisdiction over Defendants.  They conduct substantial business in this District and intentionally availed themselves of the laws and markets of this District.  A significant portion of the acts and omissions complained of occurred in the District, and Plaintiff and many class members suffered harm in the District.

6.      Venue is proper in this District under 28 U.S.C § 1391 because a substantial part of the

-1-

events or omissions giving rise to the claims occurred in this District.

**INTRADISTRICT ASSIGNMENT**

7.     Assignment to the San Francisco Division is proper under Local Rule 3-2(c) because a substantial part of the events or omissions giving rise to the claims occurred in San Francisco County.

**PARTIES**

8.     At all relevant times, Plaintiff was a citizen and resident of San Francisco County, California.  Plaintiff is using her initials in this litigation to protect her privacy, and if required by the Court, will seek permission to proceed under this pseudonym.

9.     At all relevant times, Defendant Prelude Fertility, Inc. was a Delaware corporation headquartered in Florida.  Prelude was launched in October 2016 and runs a network of fertility clinics across the country.

10.     Defendant Pacific Fertility Center is a private unincorporated entity located at 55 Francisco Street, Suite 500, San Francisco, California 94133.

11.     At all relevant times, Prelude owned and operated Pacific Fertility Center.

**FACTUAL ALLEGATIONS**

A.     **Defendants' Services and Their Consequences for Patients**

12.     Defendants market and provide intrauterine insemination (IUI), in vitro fertilization (IVF), cryo-preservation of a woman's eggs and embryos, and genetic testing of embryos, among other fertility services.

13.     Human eggs, also known as oocytes, are a limited resource.[1]  A woman is born with a finite number of eggs, and that number steadily decreases over the course of a woman's fertile years. By their early-to-mid 40s, women typically can no longer conceive a child.

14.     Individuals and couples experiencing infertility often feel severe stress, depression and despair.  For many such individuals and couples, Defendants' cryo-preservation services represented their best and only hope of having a child.  Patients who use Defendants' cryo-preservation services

---

[1] https://www.pacificfertilitycenter.com/fertility-preservation/reproductive-facts#limited (last visited March 23, 2018).

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01586-JSC

typically make an enormous emotional investment, enduring painful and invasive treatments and procedures, financial stress, and the strain the process puts on their mental health and relationships with others, all in the hopes that one day they will be able to have their own child.

15.     The process of creating and storing eggs and embryos is difficult, expensive, and "emotionally trying."[2]  Patients take drug and hormone cocktails and injections over several weeks to stabilize the womb lining, stimulate ovaries into producing follicles, and stop these ovary follicles from releasing eggs.  Then, after an ovulation trigger injection, eggs are collected under sedation or a general anesthetic.  A patient may be subjected to multiple painful injections each day, resulting in bruising, swelling, and overall discomfort.  The drug and hormone therapy may also trigger other side effects, such as tiredness, nausea, headaches, and blood clots, as well as negative emotions.  The harvest itself is also painful and hard to endure, requiring insertion of a thick needle through the vaginal wall to drain the ovary follicles of their fluid.  After the procedure, patients often experience residual pain for around a week.

16.     Embryos are created by fertilizing the eggs.  The frozen eggs first must be thawed, after which sperm must be injected directly into an egg with a needle to fertilize it, in a process known as intracytoplasmic sperm injection.  Where the thawing and fertilization process is successful, an embryo is created.  The embryo can also be stored through freezing.  (Pacific Fertility stores many frozen embryos.)  Once a woman is ready for pregnancy, the embryo is transferred into her uterus.

17.     In part because of the difficult nature of the lengthy process and experiences described above, many patients form strong emotional attachments to their eggs and embryos.

18.     For most patients, the loss of an egg or embryo gives rise to the fear that having a child is no longer possible, provoking feelings of devastation and despair.

**B.    Prelude Fertility**

19.     Prelude Fertility operates a nationwide network of fertility clinics offering IVF, genetic testing, and egg and embryo freezing, storage, and donation services.  Prelude announced the addition

---

[2] https://www.pacificfertilitycenter.com/treatment-care/patient-support (last visited March 22, 2018).

of San Francisco-based Pacific Fertility to its network of fertility clinics on September 25, 2017.

20.     Prelude emphasizes the safety of its egg storage services: "Eggs have been safely stored and then thawed after many years with the same success as eggs that are fresh or frozen for a short time.  There is currently no evidence that suggests that frozen eggs deteriorate with time."[3]  Prelude advises its customers to "[s]et it and forget it until you're ready"—once a customer is ready to start a family, "frozen eggs are thawed and combined with sperm to create embryos."[4]  According to Prelude, "[e]ggs can be safely stored as long as you need them."[5]

21.     Prelude directs those who visit its website to Pacific Fertility for egg and embryo freezing services, specifying that its "services" are available in San Francisco.[6]

        **C.      Pacific Fertility Center**

22.     Pacific Fertility offers egg and embryo freezing services as a means of preserving "a precious resource, limited to just a few years of your life" and states that freezing reproductive tissue "can increase your chances of conception by 5 to 10 times."

23.     The purpose of egg freezing is to allow women to preserve their own eggs so that they may be fertilized and implanted at a later time.

24.     Eggs and embryos are preserved through a rapid freezing process called vitrification, which Pacific Fertility describes as a "technology that is used in the embryo and egg freezing process so that they can be stored for later use."  The eggs are to remain frozen indefinitely, until the woman decides to fertilize them.  Pacific Fertility states that its customers' "[e]ggs remain frozen until you need them" and that "there is no limit to how long cells remain viable in the frozen state."[7]  It also touts the newer vitrification process as safer than earlier slow-freezing technologies, which could lead to crystallization threatening the viability of frozen tissue.  "Avoiding ice formation in this way,"

---

[3] https://www.preludefertility.com/freeze-eggs (last visited March 22, 2018).

[4] *Id.*

[5] https://www.preludefertility.com/faq (last visited March 22, 2018).

[6] *Id.*

[7] https://www.pacificfertilitycenter.com/treatment-care/sperm-and-embryo-freezing (last visited March 23, 2018).

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01586-JSC

Pacific Fertility represents, "successfully protects the embryos from damage and allows them to be warmed later giving survival rates consistently above 90%."

25.    Pacific Fertility's egg-freezing services are not cheap.  One cycle of freezing and retrieval, including storage for a year, costs $8,345.  A second cycle costs $6,995.  Additional costs arise from other of Pacific Fertility's services, such as new patient consultations, lab work, and continuing tissue storage, as well as from needed medications.  Pacific Fertility charges an annual fee of $600 for storing human reproductive tissue.  Embryo creation and freezing services similarly involve significant costs, above and beyond the costs of stimulating and harvesting the eggs.

26.    The value of the eggs and embryos that Plaintiff and other class members entrusted to Defendants—and for which Defendants accepted legal responsibility to store, preserve, and protect— is substantial.  For most families who use them, these fertility services provide their only opportunity to conceive a child.

27.    Like Prelude, Pacific Fertility emphasizes its services are safe: "At Pacific Fertility Center, the egg recovery rate after vitrification and later thawing is 83 percent, and fertilization rate is 84 percent."[8]  Regarding frozen embryo services, Pacific Fertility specifies that "there is no limit to how long cells remain viable in the frozen state.  We have had some patients return to thaw embryos after more than 10 years and the embryos were no different tha[n] when they were frozen."[9]

**D.    Plaintiff Purchases Egg Storage Services From Pacific Fertility Center**

28.    Plaintiff first contacted Pacific Fertility about the possibility of having her eggs frozen in or around late November 2012.

29.    In or around December 2012, Plaintiff contracted with Pacific Fertility to have her eggs preserved for potential future use.

30.    During February 2013, Plaintiff underwent procedures to prepare for egg freezing.  Before the retrieval procedure, she underwent two months of treatment and injections.  Pacific Fertility

---

[8] https://www.pacificfertilitycenter.com/fertility-preservation/my-eggs#success (last visited March 13, 2018).

[9] https://www.pacificfertilitycenter.com/treatment-care/sperm-and-embryo-freezing (last visited March 13, 2018).

ultimately retrieved and froze approximately 16 of her eggs.

31.     At all relevant times thereafter, Plaintiff's eggs were under Pacific Fertility's protection, custody, and control.

32.     Defendants kept Plaintiff's eggs within a steel storage tank—Tank 4—at their San Francisco laboratory facility on Francisco Street.  Rather than mitigating the risk of tank failure by spreading Plaintiff's eggs among several tanks, Defendants stored all of Plaintiff's eggs in the same tank.

33.     Frozen eggs and embryos belonging to many hundreds of other people were stored in the same tank as Plaintiff's.  Tank 4 housed up to 15 percent of Pacific Fertility's total frozen tissue, consisting of several thousand eggs and embryos.  Like Plaintiff, the majority of people with reproductive tissue stored in Tank 4 had all of their eggs and/or embryos stored in that single tank.

34.     Plaintiff has paid approximately $17,000 to Defendants for procedures, medications, and storage of her eggs.

E.     **Defendants' Storage Tank Fails**

35.     In their advertising, Defendants emphasized that a patient's eggs and embryos would be safe in their care.  Pacific Fertility claimed that liquid nitrogen "is very stable and easy to work with." Pacific Fertility further stated that all eggs and embryos would be stored in vacuum-lined liquid nitrogen tanks—"like a large thermos flask"—that "are computer controlled and monitored 7 days a week with a dedicated alarm system."[10]  According to Pacific Fertility, each tank is equipped with various sensors to monitor temperature increases above −196°C, or a drop in the level of liquid nitrogen.  The sensors "are connected to a telephone alarm system that will alert staff to an alarm condition outside of normal working hours," Pacific Fertility stated.  "The alarm system is tested weekly and continues to run on battery power in the event of a power failure.  The alarm system can also be checked remotely."  When a tank alarm goes off, the on-call embryologist is supposed to arrive within 30 minutes regardless of time of day, and must conduct a physical inspection of the tank before

---

[10] https://www.pacificfertilitycenter.com/treatment-care/sperm-and-embryo-freezing (last visited March 23, 2018).

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01586-JSC

the alarm can be turned off.

36.     Pacific Fertility further claimed that, in addition to being constantly monitored, each tank "gets a physical inspection daily, looking for problems or signs of problems" and that the amount of nitrogen in the tank "is assessed as a means of monitoring for a possible slow leak or an impending tank failure."[11]  Each tank also is supposed to receive a daily refill of nitrogen because the nitrogen in the tanks continuously evaporates at a slow rate.

37.     On or around March 4, 2018, Plaintiff's frozen eggs were irreplaceably damaged due to a loss of liquid nitrogen in the tank in which they were being stored.

38.     On March 11, 2018, Pacific Fertility advised Plaintiff via email that the tank containing her eggs had lost liquid nitrogen (the "Incident").  The email stated, "[w]e are incredibly sorry that this happened and for the anxiety that this will surely cause.  We are heartbroken by this situation and our thoughts are with each of you who may have been touched by this event."  Pacific Fertility also stated that it had "hired independent experts and launched an in-depth investigation of the matter."

39.     Receiving this email and learning that her eggs had been in the affected tank caused Plaintiff to feel extreme shock, anguish, anxiety, and serious emotional distress.

40.     Several hundred other people received this email.  Thousands of frozen eggs and embryos belonging to other people were destroyed in the Incident.

41.     The Incident's root cause has not yet been definitively identified.  Experts suspect a leak in the tank's seal.[12]

42.     Whatever the cause, electronic tank monitoring sensors, coupled with adequate staff and protocols to address any alarm, should have detected the rise in temperature and alerted staff to the problem with enough time to prevent the loss of the stored material.  As one storage facility operator noted, "It is standard to have a monitoring system that alarms locally when level or temperature are out of acceptable range and that calls out to staff following a 'call tree' structure."[13]

---

[11] *Id.*

[12] https://www.mercurynews.com/2018/03/12/fertility-center-failures-would-oversight-help/ (last visited March 13, 2018).

[13] *Id.*

43.   The American Society for Reproductive Medicine announced that it plans to review the Incident with other clinics and their equipment suppliers.

**CLASS ACTION ALLEGATIONS**

44.   Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiff seeks certification of a class defined as:

> All individuals whose eggs or embryos were stored in Tank 4 at Pacific Fertility Center's San Francisco laboratory as of March 4, 2018.

45.   Excluded from the class are Defendants, their affiliates and subsidiaries, and their officers, directors, partners, employees, and agents; class counsel, their immediate family members, and employees of their firms; counsel for Defendants, their immediate family members, and employees of their firms; and judicial officers assigned to this case and their staffs and immediate family members.

46.   <u>Numerosity</u>.  The members of the class are so numerous that their individual joinder is impracticable.  There are at least 400 class members, whose names and addresses are readily available from Defendants' records.

47.   <u>Existence and Predominance of Common Questions of Fact and Law</u>.  This action involves common questions of fact and law that predominate over any questions affecting individual class members, including, without limitation:

a.   Whether the March 4, 2018, loss of liquid nitrogen at a tank in Defendants' San Francisco facility resulted from Defendants' negligence or other wrongful conduct;

b.   Whether Defendants failed to take adequate and reasonable measures to ensure that their systems were protected;

c.   Whether Defendants failed to take adequate and reasonable measures to ensure that Plaintiff's and class members' reproductive tissue was not exposed to risk from a potential tank failure;

d.   Whether Defendants failed to take available steps to ensure that liquid nitrogen levels in their storage tanks would remain sufficient;

e.   Whether Defendants owed a duty to Plaintiff and class members to protect the

-8-

eggs and embryos entrusted to Defendants' care;

      f.    Whether Defendants breached their duties to protect the eggs and embryos that Plaintiff and class members entrusted to their care;

      g.    Whether Defendants breached their contracts with Plaintiff and class members;

      h.    Whether Defendants' conduct violated the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*; and

      i.    Whether Plaintiff and class members suffered harm as a result of Defendants' violations and, if so, the appropriate measure of damages, restitution, or rescission.

    48.   <u>Typicality</u>.  Plaintiff's claims are typical of the other class members' claims because Plaintiff and class members were subjected to the same wrongful conduct and damaged in the same manner.

    49.   <u>Adequacy of Representation</u>.  Plaintiff is an adequate class representative.  Her interests do not conflict with the interests of the other class members.  She has retained counsel competent and experienced in complex class action litigation, and she intends to prosecute this action vigorously. Plaintiff and her counsel will fairly and adequately pursue and protect the interests of the class.

    50.   <u>Superiority</u>.  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages suffered by Plaintiff and the other class members are relatively small compared to the burden and expense that would be required to individually litigate these claims.  As a result, it would be impracticable for class members to seek redress individually.  Individualized litigation would also create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

    51.   <u>Particular Issues</u>.  The claims of class members involve common issues that may be fairly and efficiently adjudicated on a classwide basis under subdivisions (b)(3) and (c)(4) of Federal Rule of Civil Procedure 23.

**FIRST CLAIM FOR RELIEF**
**Negligence and/or Gross Negligence**

52.     Plaintiff incorporates the above allegations by reference.

53.     Defendants owed Plaintiff and class members a duty to exercise the highest degree of care when maintaining, inspecting, monitoring, and testing the liquid nitrogen storage tanks used for the preservation of eggs and embryos at Defendants' San Francisco laboratory.

54.     Defendants breached these duties and acted with negligence and gross negligence in at least the following respects:

        a.      failing to adequately maintain, inspect, monitor, and/or test their liquid nitrogen storage tanks, in accordance with industry standards, including through (i) a functional electronic tank monitoring system capable of detecting a rise in temperature or a drop in liquid nitrogen levels and promptly alerting staff to the immediate problem, and (ii) adequate staff to address any such alarm in a timely manner;

        b.      permitting a leakage to occur from one of their liquid nitrogen storage tanks containing human eggs and embryos;

        c.      failing to properly safeguard the human reproductive tissue in its care;

        d.      failing to mitigate the foreseeable risk of harm, including by failing to divide an individual's reproductive tissue among multiple tanks so that a failure of one tank would not result in destruction of all of an individual's reproductive tissue; and

        e.      failing to follow accepted scientific and laboratory procedures for safeguarding the human reproductive tissue in its care.

55.     Defendants' acts and omissions constitute gross negligence because they constitute an extreme departure from what a reasonably careful person would do in the same situation to prevent foreseeable loss of human reproductive tissue.

56.     Defendants acted willfully, wantonly, and with conscious and reckless disregard for the rights and interests of Plaintiff and class members.  Defendants' acts and omissions had a great probability of causing significant harm and in fact did.

57.     As a direct and proximate result of Defendants' negligence and gross negligence,

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01586-JSC

Plaintiff and class members suffered damage in an amount to be determined at trial.

58.     Defendants' negligence and gross negligence will directly and proximately cause class members—including Plaintiff, if she is unable to conceive naturally—to pay for new reproductive services and specialists.  The economic harm that class members will incur to replace or remedy their compromised eggs and embryos was a foreseeable consequence of Defendants' negligence and gross negligence.

59.     The policy of preventing future harm strongly disfavors application of the economic loss rule, particularly given the moral blame associated with reckless or negligent treatment of human reproductive material.  Defendants were in a special relationship with Plaintiff and class members by virtue of the sensitive nature of the reproductive services Defendants provided.  Plaintiff and class members were the intended beneficiaries of Defendants' egg- and embryo-freezing and other services. There is a high degree of certainty that Plaintiffs and class members suffered injuries, and those injuries were both highly foreseeable to Defendants and closely connected to their negligent and grossly negligent failure to protect Plaintiff's and class members' eggs and embryos.

60.     As a direct and proximate result of Defendants' negligence and gross negligence, Plaintiff and class members experienced mental anguish, grief, shock, anxiety, serious emotional distress, humiliation, and feelings of helplessness and despair that a reasonable person would be unable to cope with.

**SECOND CLAIM FOR RELIEF**
**Premises Liability**

61.     Plaintiff incorporates the above allegations by reference.

62.     At all relevant times, Defendants owned, occupied, and controlled the cryo-preservation equipment—including tanks used for storing eggs and embryos—located at 55 Francisco Street, Suite 500, San Francisco, California, 94133.

63.     Defendants owed Plaintiff and class members a duty to exercise the highest degree of care in maintaining, inspecting, monitoring, and testing the liquid nitrogen storage tanks used for the preservation of human eggs and embryos.

64.     Defendants breached these duties and were negligent in the ownership, management, control, inspection, and maintenance of the above-described premises, resulting in foreseeable

permanent damage to Plaintiff's and class members' eggs and embryos.

65.     As a direct and proximate result of Defendants' negligence in the ownership, management, control, maintenance, inspection, and monitoring of these premises, Plaintiff and class members suffered harm in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
**Breach of Contract**

66.     Plaintiff incorporates the above allegations by reference.

67.     Defendants entered into contracts with Plaintiff and each of the other Class members, under which Defendants agreed to collect, store, and preserve their eggs or embryos.

68.     Defendants' form contract provides, in part, that "[e]ggs are stored in a tank of liquid nitrogen and maintained at low temperatures until utilized."  More specifically, "[a]t a later date, when pregnancy using the cryopreserved eggs is desired, the eggs are thawed and the remaining steps in IVF are resumed."

69.     Defendants utilized the same vitrification technology and processes to collect, store, and preserve embryos.  Defendants' form contract states that "PFC uses a process called vitrification to cryopreserve eggs and excess viable embryos."

70.     In consideration of Defendants' promises, including to keep these eggs and embryos safe and secure, Plaintiff and class members agreed to pay, and did pay, substantial sums for the services rendered.

71.     Plaintiff and class members performed all of the terms and conditions required of them under their contracts.

72.     By reason of the conduct described herein, Defendants breached their contracts with Plaintiff and class members.

73.     As a direct and proximate result of Defendants' breach of contract, Plaintiff and class members suffered harm in an amount to be determined at trial.

### FOURTH CLAIM FOR RELIEF
**Bailment**

74.     Plaintiff incorporates the above allegations by reference.

75.     Plaintiff and class members delivered to Defendants for safekeeping personal property to be safely and securely kept for the benefit of Plaintiff and class members, and to be redelivered to them upon demand.

76.     Defendants received eggs and embryos from Plaintiff and class members on this condition.

77.     Plaintiff and class members agreed to pay, and did pay, substantial sums in exchange for Defendants' promise to safeguard their eggs and embryos for the benefit of Plaintiff and class members.

78.     Defendants had a duty to exercise care in maintaining, preserving, and protecting Plaintiff's and class members' eggs and embryos that were delivered to Defendants.  Further, Defendants had a duty to return the eggs and embryos, undamaged, to the individuals to whom they belonged.

79.     Defendants invited the general public, including Plaintiff and class members, to entrust eggs and embryos to Defendants' care by holding out Pacific Fertility as a competent, capable, and established reproductive and storage facility able to handle and care for eggs and embryos in a safe and satisfactory manner.

80.     Because of Defendants' wrongful conduct, as set forth herein, the property of Plaintiff and class members was irreplaceably damaged, precluding its redelivery to them as provided for under the bailment contract.

81.     Defendants breached their duty to exercise care in the safekeeping of Plaintiff's and class members' eggs and embryos delivered to Defendants and to return the eggs and embryos, undamaged, to Plaintiff and class members.

82.     As a direct and proximate result of Defendants' breach of bailment contract, Plaintiff and class members have been deprived of the opportunity to use the eggs and embryos they entrusted to Defendants, and have suffered damages in an amount to be determined at trial.

### FIFTH CLAIM FOR RELIEF
**Violation of the Unfair Competition Law ("UCL"),**
**Cal. Bus. & Prof. Code § 17200 *et seq*.**

83.     Plaintiff incorporates the above allegations by reference.

84.     The UCL prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice."

85.     Defendants' conduct set forth herein is unlawful because it constitutes negligence, gross negligence, premises liability, breach of contract, and bailment.

86.     Defendants' conduct is unfair because it is immoral, unethical, unscrupulous, oppressive, and substantially injurious.  The gravity of the harm resulting from Defendants' conduct far outweighs any conceivable utility of that conduct.  There are reasonably available alternatives that would further Defendants' legitimate business interests, such as taking all necessary steps to guarantee the continued protection of the human reproductive tissue in their custody and control.

87.     Plaintiff and class members could not have reasonably avoided injury from Defendants' unfair conduct.  Plaintiff and class members did not know, and had no reasonable means of learning, that Defendants were not ensuring the continued protection of the human reproductive tissue in their custody and control.

88.     As a direct and proximate result of Defendants' unlawful and unfair conduct, Plaintiff and class members have suffered injuries in fact and seek appropriate relief under the UCL.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the class defined above, respectfully requests that the Court:

A.     Certify this action as a class action under Rule 23 of the Federal Rules of Civil Procedure, appoint Plaintiff as class representative, and appoint the undersigned counsel as class counsel;

B.     Award Plaintiff and class members compensatory, restitutionary, rescissory, general, consequential, punitive and/or exemplary damages in an amount to be determined at trial;

C.     Award pre-judgment interest as permitted by law;

D.     Enter appropriate equitable relief;

E.     Award reasonable attorneys' fees and costs, as provided for by law; and

F.     Grant such other and further relief as the Court deems just and proper.

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01586-JSC

# DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated:  March 23, 2018

Respectfully submitted,

**GIRARD GIBBS LLP**

By:   /s/ *Adam E. Polk*

Daniel C. Girard (State Bar No. 114826)
Jordan Elias (State Bar No. 228731)
Adam E. Polk (State Bar No. 273000)
Dylan Hughes (State Bar No. 209113)
601 California Street, Suite 1400
San Francisco, California 94108
Tel.: (415) 981-4800

Joseph G. Sauder (*pro hac vice* forthcoming)
Matthew D. Schelkopf (*pro hac vice* forthcoming)
**SAUDER SCHELKOPF LLC**
555 Lancaster Avenue
Berwyn, Pennsylvania 19312
Tel.: (610) 200-0580

*Counsel for Plaintiff*

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01586-JSC