Daniel C. Girard (State Bar No. 114826)
Steven M. Tindall (State Bar No. 187862)
Jordan Elias (State Bar No. 228731)
Adam E. Polk (State Bar No. 273000)
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dcg@girardgibbs.com
smt@classlawgroup.com
je@girardgibbs.com
aep@girardgibbs.com

Adam B. Wolf (State Bar No. 215914)
Tracey B. Cowan (State Bar No. 250053)
**PEIFFER WOLF CARR & KANE,**
**A PROFESSIONAL LAW CORPORATION**
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Tel: (415) 766-3545
Fax: (415) 402-0058
awolf@pwcklegal.com
tcowan@pwcklegal.com

Elizabeth J. Cabraser (State Bar No. 083151)
Lexi J. Hazam (State Bar No. 224457)
Sarah R. London (State Bar No. 267083)
Tiseme G. Zegeye (State Bar No. 319927)
**LIEFF CABRASER HEIMANN &**
**BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111
Tel: (415) 956-1000
Fax: (415) 956-1008
ecabraser@lchb.com
lhazam@lchb.com
slondon@lchb.com
tzegeye@lchb.com

*Counsel for Plaintiffs and Interim Class Counsel*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| IN RE PACIFIC FERTILITY CENTER LITIGATION | Case No. 3:18-cv-01586-JSC <br><br> **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** <br><br> DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

NATURE OF THE ACTION ........................................................................................................1

JURISDICTION AND VENUE ...................................................................................................2

INTRADISTRICT ASSIGNMENT..............................................................................................3

PARTIES ......................................................................................................................................3

      A.     Plaintiffs .................................................................................................3

      B.     Defendants ..............................................................................................4

           1.     Prelude .......................................................................................4

           2.     Pacific Fertility............................................................................5

           3.     Chart ...........................................................................................6

FACTUAL ALLEGATIONS .......................................................................................................7

   I.     Plaintiffs Entrusted Prelude and Pacific Fertility with Keeping their Eggs and Embryos Safe and Secure. .......................................................................................7

      A.     Defendants market their cryopreservation services as an insurance policy that unwinds the biological clock, preserving the opportunity to have children when the time is right.........................................................................7

      B.     Defendants market their cryopreservation and storage services to people struggling with infertility. .........................................................................9

      C.     Defendants promised to keep Plaintiffs' eggs and embryos safe in a state-of-the-art facility.................................................................................10

   II.    Precision and Care Are Required in the Cryopreservation and Storage of Eggs and Embryos. ............................................................................................................13

      A.     The process of retrieving and storing eggs and embryos is demanding, time consuming, and expensive. .......................................................................13

      B.     The loss of eggs and embryos results in emotional trauma. .............18

      C.     Successful cryopreservation depends on strict adherence to protocols. ...........19

   III.   Defendants Caused Irreparable Harm to Plaintiffs by Failing to Protect Their Eggs and Embryos. .......................................................................................................21

      A.     Prelude and Pacific Fertility should have had systems and processes in place to ensure that Plaintiffs' eggs and embryos were not damaged.........................21

i

B.  Chart recalled cryostorage tanks for vacuum seal defects after the Tank 4 incident...................................................................................................22

C.  Multiple investigations were opened after the Tank 4 incident.........................22

D.  Defendants' failure to keep Plaintiffs' eggs and embryos safe and secure has caused irreparable harm. .......................................................................23

E.  Pacific Fertility and Prelude's communications regarding the incident have compounded the harm. ........................................................................26

PLAINTIFF-SPECIFIC ALLEGATIONS ...................................................................29

CLASS ACTION ALLEGATIONS ...........................................................................34

CLAIMS FOR RELIEF ...........................................................................................37

FIRST CAUSE OF ACTION
Negligence and/or Gross Negligence (Against All Defendants) ................................37

SECOND CAUSE OF ACTION
Breach of Contract (Against Pacific Fertility and Prelude) ......................................40

THIRD CAUSE OF ACTION
Bailment (Against Pacific Fertility and Prelude)...................................................40

FOURTH CAUSE OF ACTION
Premises Liability (Against Pacific Fertility and Prelude) .......................................41

FIFTH CAUSE OF ACTION
Breach of Fiduciary Duty – Failure to Use Reasonable Care
(Against Pacific Fertility and Prelude) ...............................................................42

SIXTH CAUSE OF ACTION
Violations of the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*
(Against All Defendants)..................................................................................43

SEVENTH CAUSE OF ACTION
Violations of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.*
(Against Pacific Fertility and Prelude) ...............................................................45

EIGHTH CAUSE OF ACTION
Deceit and Fraudulent Concealment (Against Pacific Fertility and Prelude)...............47

NINTH CAUSE OF ACTION
Strict Products Liability – Failure to Warn (Against Chart)......................................49

TENTH CAUSE OF ACTION
Strict Products Liability – Manufacturing Defect (Against Chart)..............................50

ii

ELEVENTH CAUSE OF ACTION
Strict Products Liability — Design Defect — Consumer Expectations Test (Against Chart) ...50

TWELFTH CAUSE OF ACTION
Strict Products Liability – Design Defect – Risk-Utility Test (Against Chart) ........................51

THIRTEENTH CAUSE OF ACTION
Negligent Failure to Recall (Against Chart) ...............................................................51

PRAYER FOR RELIEF ................................................................................................52

DEMAND FOR JURY TRIAL .....................................................................................53

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01586-JSC

Plaintiffs A.B., C.D., E.F., G.H., I.J., K.L., M.N., and O.P. ("Plaintiffs"), individually and on behalf of all others similarly situated, file this Consolidated Class Action Complaint against Defendants Pacific Fertility Center ("Pacific Fertility" or "PFC"), Prelude Fertility, Inc. ("Prelude"), and Chart Industries ("Chart") (collectively, "Defendants") and allege as follows:

## NATURE OF THE ACTION

1. Prelude and Pacific Fertility market and sell egg and embryo cryopreservation services. They liken these services to an insurance policy for women and families, claiming the services provide peace of mind to those who wish to defer having children and relief to those seeking to overcome a diagnosis of infertility. Cryopreservation involves preservation of tissue—here, human eggs and embryos—using cooling techniques. In the 1980s, facilities began using a cryopreservation technique known as "slow freezing" to preserve human reproductive tissue. Cryopreservation became more prevalent after the advent in the early 2000s of vitrification, a process by which tissue is cooled more quickly, resulting in higher egg and embryo survival rates. Eggs or embryos frozen through cryopreservation are stored in specially designed metal tanks.

2. Recognizing that the eggs and embryos entrusted to their care are irreplaceable, Prelude and Pacific Fertility promise their clients, including Plaintiffs, that they will use state-of-the-art laboratory equipment and protocols to ensure the safekeeping of the eggs and embryos. Safe storage requires backup redundancies to guard against a catastrophic failure, daily inspections of the tanks, and alarm systems to immediately notify staff of a potential failure.

3. On March 4, 2018, Pacific Fertility discovered that the liquid nitrogen levels in a tank known as "Tank 4" had dropped to an unsafe level for an undetermined period of time, destroying or jeopardizing the eggs and embryos stored in the tank, including those belonging to Plaintiffs. Chart manufactured Tank 4.

4. Pacific Fertility's first notification of the failure of Tank 4 was via an email sent at four in the morning Pacific time on Sunday, March 11, 2018. Pacific Fertility described the failure as "a very unfortunate incident" in which the storage tank containing Plaintiffs' cryopreserved eggs and embryos "lost liquid nitrogen for a brief period of time," and stated that a "preliminary analysis" suggested some of the eggs and embryos in the tank may have been destroyed.

1

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01586-JSC

5.     Over a month later, on April 19, 2018, Pacific Fertility again wrote to Plaintiffs, notifying them that an investigation had shown the incident resulted from "a failure of the tank's vacuum seal."  Four days later, Chart recalled several of its cryopreservation tanks, citing "reports of a vacuum leak or failure that could compromise the product."

6.     Pacific Fertility and Prelude were responsible for monitoring Tank 4's performance for fluctuations in temperature or liquid nitrogen levels, which could endanger the enclosed eggs and embryos, and to maintain safety systems to mitigate a tank failure.  Pacific Fertility and Prelude failed in that responsibility, committed gross negligence, and breached their agreement by failing to safely preserve the eggs and embryos under their care.

7.     To Plaintiffs' shock and dismay, Pacific Fertility and Prelude did not separate their eggs or embryos into different tanks to ensure that at least some tissue would be safe if one tank failed.

8.     As a result of Defendants' failures, Plaintiffs and the proposed class have suffered harm. Learning that their reproductive tissue was compromised has caused them devastation, panic, and distress.  For many, the tissue in Tank 4 represented their last and only chance for a biological child. Pacific Fertility and Prelude have informed Plaintiffs that it is not possible to know whether their eggs or embryos are viable until they are warmed, and even then, the full extent of the damage cannot be known without attempting a pregnancy.  These messages have cast a cloud of uncertainty over women and families, causing anguish and despair.

9.     Plaintiffs, individually and on behalf of the class, seek appropriate relief through this action.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because (a) Plaintiffs are citizens of states different from Prelude and Chart, (b) the amount in controversy exceeds $5,000,000, excluding interest and costs, (c) the proposed class consists of more than 100 individuals, and (d) none of the exceptions under the subsection applies to this action.

11.     This Court has personal jurisdiction over Defendants.  They conduct substantial business in California and intentionally availed themselves of the laws and markets of this state.  A significant

portion of the acts and omissions at issue occurred in California, and Plaintiffs and many class members suffered harm in California.  Plaintiffs' claims against Defendants are meaningfully connected to California in that: (1) each Plaintiff had eggs and embryos stored at Pacific Fertility, which is located in California and within the Prelude network; and (2) each Plaintiff had eggs and embryos stored in Chart's tank, which was physically located at Pacific Fertility's San Francisco facility, and which failed, resulting in damage to Plaintiffs.

12.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## INTRADISTRICT ASSIGNMENT

13.     Assignment to the San Francisco Division is proper under Local Rules 3-2(c) and (d) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in San Francisco.

## PARTIES

**A.     Plaintiffs**

14.     Plaintiff A.B. is a citizen and resident of Sacramento County, California.

15.     Plaintiff C.D. is a citizen and resident of Sacramento County, California.

16.     Plaintiff E.F. is a citizen and resident of San Francisco County, California.

17.     Plaintiff G.H. is a citizen and resident of San Francisco County, California.

18.     Plaintiff I.J. is a citizen and resident of San Francisco County, California.

19.     Plaintiff K.L. is a citizen and resident of San Francisco County, California.

20.     Plaintiff M.N. is a citizen and resident of San Francisco County, California.

21.     Plaintiff O.P. is a citizen and resident of San Mateo County, California.

22.     Given the sensitive nature of their claims and the services they purchased from Pacific Fertility and Prelude, Plaintiffs are using initials in this litigation to protect their privacy.  If required by the Court, Plaintiffs will seek permission to proceed under these pseudonyms.

**B.**   **Defendants**

    **1.**   **Prelude**

    23.    At all relevant times, Defendant Prelude Fertility, Inc. was a Delaware corporation headquartered in Florida.  Prelude owns and runs a network of fertility clinics and egg and embryo storage facilities—including Pacific Fertility Center—across the country.

    24.    Prelude was founded in 2016 by startup entrepreneur Martin Varsavsky with a $200 million investment by New York-based Lee Equity Partners.  Prelude's stated business plan is to create a national network of fertility clinics, as well as egg and embryo cryopreservation and storage centers "all delivered with the highest level of personalized care by the nation's leading reproductive endocrinologists and practitioners."[1]  According to Varsavsky, "What Prelude does is bridge the gap, it makes people's biology meet their psychology" through "The Prelude Method": "You freeze your gametes when fertile, thaw them and create embryos when ready, genetically sequence the embryos, and then transfer one embryo at a time.  And you continue to do this until you achieve your desired number of children."[2]

    25.    Included within the Prelude network is MyEggBank, which Prelude claims has the largest and most diverse selection of egg donors in the country.  Prelude also claims that its embryo survival rates are greater than 90% and that women who use eggs from MyEggBank have a 90% pregnancy success rate within three cycles.[3]

    26.    Prelude acquired Pacific Fertility in September 2017 as part of Prelude's business plan to build its national network.  Prelude directs potential clients to Pacific Fertility via its website and its network of fertility clinics.  Prelude also provides financing plans for services at Pacific Fertility.

---

[1] *A Modern Approach to Family*, Prelude Fertility, https://www.preludefertility.com/about (last visited May 18, 2018).

[2] Martin Varsavsky, *Why I founded Prelude Fertility: Background on vision and bringing on the team to make it thrive* (Mar. 7, 2017), http://vator.tv/news/2017-03-07-why-i-founded-prelude-fertility (last visited May 30, 2018).

[3] *Have Questions?*, Prelude Fertility, https://preludefertility.com/faq (last visited May 18, 2018).

4

27.     Prelude represents that Pacific Fertility is one of "Our Clinics."[4]  It represents that Pacific Fertility's clients are "Our" clients.[5]

28.     In its press release announcing the addition of Pacific Fertility to its network of fertility clinics, Prelude described "egg freezing, in vitro fertilization (IVF), genetic screening of embryos, and donor egg matching" as part of "Prelude's comprehensive services."[6]

29.     Prelude owns the laboratory, storage facility, and tanks at Pacific Fertility.  It owned Tank 4 at the time of the March 4, 2018, incident.

30.     The employees responsible for performing daily monitoring and maintenance of the tanks, including Tank 4, are employees of Prelude.

### 2.     Pacific Fertility

31.     Defendant Pacific Fertility Center is a private unincorporated entity located at 55 Francisco Street, Suite 500, San Francisco, California 94133.

32.     Pacific Fertility was founded in 1999 and provides a full range of fertility services, including egg cryopreservation, IVF, genetic testing, "cutting-edge laboratory techniques and technology such as . . . vitrification," and storage of cryopreserved eggs and embryos.[7]

33.     At all relevant times, Pacific Fertility's on-site San Francisco laboratory has cryopreserved and stored eggs and embryos, including those belonging to Plaintiffs.[8]

34.     At the time of the March 4, 2018, incident, Tank 4 was located at Pacific Fertility Center's laboratory in San Francisco.

---

[4] *Options Preserved, Our Clinics*, Prelude Fertility, https://www.preludefertility.com/freeze-eggs (last visited May 18, 2018).

[5] *Pacific Fertility Center: San Francisco*, Prelude Fertility, https://www.preludefertility.com/clinic/pacific-fertility-center (last visited May 18, 2018).

[6] *Prelude Fertility Expands Network with Pacific Fertility Center in San Francisco*, Prelude Fertility, https://www.prnewswire.com/news-releases/prelude-fertility-expands-network-with-pacific-fertility-center-in-san-francisco-300524534.html (last visited May 18, 2018).

[7] *Prelude Fertility Expands Network with Pacific Fertility Center in San Francisco*, Prelude Fertility, https://www.preludefertility.com/press-release/prelude-fertility-expands-network-pacific-fertility-center-san-francisco (last visited May 20, 2018).

[8] *Sperm and Embryo Freezing*, Pacific Fertility Center, https://www.pacificfertilitycenter.com/treatment-care/sperm-and-embryo-freezing (last visited May 18, 2018).

### 3.   Chart

35.   Defendant Chart Industries, Inc. is a Delaware corporation headquartered in Georgia.[9]

36.   Founded in 1992, Chart is a publicly traded global manufacturer of equipment used in the production, storage, and application of industrial gases.  Chart produces a variety of cryogenic equipment.  On its website, Chart states that its "focus is cryogenics."[10]  Chart claims that its products "utilize our proprietary vacuum and insulation technologies, including storage equipment," and that "[o]ur industry-proven core-competency provides the highest insulation thermal performance in cryogenics[.]"[11]  Chart touts itself as "a recognized global brand for the design and manufacture of highly engineered cryogenic equipment" and a "leading global manufacturer of vacuum insulated products and cryogenic systems."[12]

37.   In its annual report for 2017, Chart described itself as a "leading diversified global manufacturer of highly engineered equipment, packaged solutions, and value-add services used throughout the gas to liquid cycle in all industries that require gases as cryogenic liquids or alternative equipment for gas generation, generally for the industrial gas, energy, and biomedical industries."[13]

38.   Through its MVE brand, Chart sells a line of cryogenic equipment that includes freezers and metal storage tanks.  Chart claims that its cryogenic products "are engineered for reliability and durability"[14] and that its MVE brand "is the benchmark for biological storage systems, used for the cryogenic preservation of human . . . tissues."[15]

---

[9] Plaintiffs only recently discovered the identity of the manufacturer—Defendant Chart—of the cryostorage tank in which Plaintiffs' and class members' eggs and embryos were stored at Pacific Fertility.  Chart is being served concurrently with the filing of this Consolidated Amended Complaint.

[10] *About Chart*, Chart Industries, http://www.chartindustries.com/About-Chart (last visited May 20, 2018).

[11] *Cryogenics*, Chart Industries, http://www.chartindustries.com/Industry/Markets-Served/Cryogenics (last visited May 20, 2018).

[12] *MVE Cryopreservation for Life Science*, Chart Industries, http://files.chartindustries.com/Cryopres%20Catalog%20ML-CRYO0009%20K%203b.pdf (last visited May 20, 2018).

[13] *SEC Form 10-K*, Chart Industries, http://ir.chartindustries.com/Cache/392303934.pdf (last visited May 20, 2018).

[14] *Life Sciences*, Chart Industries, http://www.chartindustries.com/Life-Sciences (last visited May 20, 2018).

[15] *About Chart*, Chart Industries, http://www.chartindustries.com/About-Chart (last visited May 20, 2018).

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01586-JSC

39.     Chart's BioMedical segment accounted for around 20% of its total sales.  Its "cryobiological storage products include vacuum insulated containment vessels for the storage of biological materials."[16]  Chart describes the competition for cryobiological storage products as "significant" and notes that "competition in this field is focused on design, reliability, and price."[17]

40.     Chart designed and manufactured the storage tank in which Plaintiffs' eggs and embryos were stored on the date of the subject incident.

## FACTUAL ALLEGATIONS

**I.     Plaintiffs Entrusted Prelude and Pacific Fertility with Keeping their Eggs and Embryos Safe and Secure.**

41.     Defendants Prelude and Pacific Fertility have partnered to offer cryopreservation and storage of eggs and embryos, among other fertility services.

42.     Prelude claims that it is "on a mission" to provide "the best options, science, and care so everyone can have the opportunity to be a mom or dad when they are ready."[18]

43.     Pacific Fertility states that it has one goal: to help clients build a healthy family.[19]

**A.     Defendants market their cryopreservation services as an insurance policy that unwinds the biological clock, preserving the opportunity to have children when the time is right.**

44.     Human eggs, also known as oocytes, are a limited resource.  According to Pacific Fertility, a woman has about 600,000 eggs at birth, and this supply diminishes at the rate of about 1,000 per month, beginning at her birth.[20]  This decline is part of the natural aging process and is commonly referred to as a woman's biological clock.  The loss of oocytes from the ovaries is relentless and

---

[16] *SEC Form 10-K*, Chart Industries, http://ir.chartindustries.com/Cache/392303934.pdf (last visited May 20, 2018).

[17] *Id.*

[18] *A Modern Approach to Family*, Prelude Fertility, https://www.preludefertility.com/about (last visited May 18, 2018).

[19] *Pacific Fertility Center*, Pacific Fertility Center, https://www.pacificfertilitycenter.com/the-center/infertility-center (last visited May 28, 2018).

[20] *Egg Freezing in Northern California*, Pacific Fertility Center, https://www.pacificfertilitycenter.com/treatment-care/fertility-preservation-egg-freezing (last visited May 27, 2018).

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01586-JSC

continues even in the absence of menstrual cycles, and even when women are pregnant, nursing, or taking oral contraceptives.  In addition, as Pacific Fertility acknowledges, egg quality diminishes with time, with miscarriages and chromosomal abnormalities occurring more frequently the older a woman is at the time of pregnancy.  By their early-to-mid 40s, women typically can no longer conceive a child naturally.[21]

45.     The purpose of egg cryopreservation is to allow women and their reproductive partners to preserve eggs so that they may be fertilized and implanted at a later time.  Both Pacific Fertility Center and Prelude emphasize that their cryopreservation and storage services allow for flexibility in their clients' family planning, freeing women, for example, to wait for the right person and to focus on their careers during their most fertile years.

46.     Prelude advertises its cryopreservation and storage services as providing women with "peace of mind" and more control over their childbearing choices.[22]  In marketing its cryopreservation and storage services, Prelude specifically appeals to women's declining fertility and limited eggs: "Age Matters . . . We're born with all the eggs we'll ever have—and their quantity and quality decrease as we age.  If you think you might want a baby someday, but aren't ready right now, freezing your eggs keeps your options open."[23]  Prelude likewise states that young women cryopreserve eggs "to have the option—an insurance policy that unwinds the biological clock and lets women pursue career advancement as freely as men without having to compromise in their choice of partner."[24]

47.     In large type, Prelude states on its website, "Options Preserved," and proceeds to advertise multiple benefits from cryopreservation and storage:

---

[21] *Id.*

[22] *Meet Prelude Fertility, The $200 Million Startup That Wants To Stop The Biological Clock*, Forbes (Oct. 17, 2016), https://www.forbes.com/sites/miguelhelft/2016/10/17/prelude-fertility-200-million-startup-stop-biological-clock/#d05688c7260f.

[23] *Options Preserved*, Prelude Fertility, https://www.preludefertility.com/freeze-eggs (last visited May 18, 2018).

[24] *Meet Prelude Fertility, The $200 Million Startup That Wants To Stop The Biological Clock*, Forbes (Oct. 17, 2016), https://www.forbes.com/sites/miguelhelft/2016/10/17/prelude-fertility-200-million-startup-stop-biological-clock/#d05688c7260f.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01586-JSC

> Find that right person.  Focus on your career.  Finish your education.  The age
> of your eggs (not you) is the number one cause of infertility.  Freeze your eggs
> to preserve your option to build a family when you're ready.[25]

Prelude goes on to describe the storage process as hassle free: "Set it and forget it until you're ready."[26]

48.     Pacific Fertility offers egg cryopreservation services as a means of preserving "a precious resource, limited to just a few years of your life[,]" and states that cryopreserving eggs and embryos "can increase your chances of conception by 5 to 10 times."[27]

49.     Pacific Fertility touts similar benefits from its fertility preservation services:

> 6 Reasons to Preserve Your Fertility Today! (1) For a future family . . . (2) To
> allow for educational pursuits . . . (3) To have time to develop a business or
> career . . . (4) To give your relationship time to mature . . . (5) To reduce the
> risk of medical treatments that might impact fertility . . . (6) To achieve
> control over your future.[28]

**B.      Defendants market their cryopreservation and storage services to people
struggling with infertility.**

50.     Defendants also promote their egg and embryo cryopreservation and storage services to people diagnosed with infertility.

51.     Infertility is defined as the inability to conceive after one year of unprotected intercourse if a woman is under the age of 35, or after six months if a woman is 35 or older.

52.     Pacific Fertility states that it sees infertility as a "workable challenge." [29]

53.     Similarly, Prelude states: "we're here to help you become a parent.  We'll use all of our training, science, technology, lab skills, and most importantly, human-kindness skills, to fully support you through every step of the process."[30]

---

[25] *Options Preserved*, Prelude Fertility, https://www.preludefertility.com/freeze-eggs (last visited May 18, 2018).

[26] *Id.*

[27] *Should I freeze my eggs?*, Pacific Fertility Center, https://www.pacificfertilitycenter.com/fertility-preservation/my-eggs (last visited May 18, 2018).

[28] *6 Reasons to Preserve Your Fertility Today!*, Pacific Fertility Center (June 30, 2017), https://www.pacificfertilitycenter.com/fertility-preservation/blog/6-reasons-to-preserve-your-fertility-today.

[29] *Pacific Fertility Center*, https://www.pacificfertilitycenter.com/the-center/infertility-center (last visited May 20, 2018).

[30] *Let's Make a Baby*, Prelude Fertility, https://www.preludefertility.com/ivf (last visited May 27, 2018).

9

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01586-JSC

54.     For many individuals and couples experiencing infertility, Defendants' embryo cryopreservation services represented their best and only hope of having a biological child or of having children who are biological siblings.

**C.     Defendants promised to keep Plaintiffs' eggs and embryos safe in a state-of-the-art facility.**

55.     Defendants emphasize that eggs and embryos will be safely stored, indefinitely, for future family planning.

56.     Prelude's marketing messages recognize the importance of proper egg storage for those who use its services.  A Prelude spokesperson, Allison Johnson, said: "If you know that your eggs are safe and sound, what decisions would you make about your life? . . .  Go pursue that graduate degree. Wait for your soul mate.  Go travel the world.  Your eggs are waiting for you.  For me that's as liberating for women as the pill was in the 60s."[31]

57.     Pacific Fertility states that its clients' "[e]ggs remain frozen until you need them"[32] and that "there is no limit to how long cells remain viable in the frozen state."[33]

58.     Regarding embryos, Pacific Fertility similarly reassures its clients that some "have come back after 10-15 years and the embryos have been thawed successfully and created healthy babies."[34]

59.     Pacific Fertility claims that its laboratory is state of the art, meeting a "gold standard,"[35] and that it has a large and experienced laboratory staff dedicated to the "care and well being of eggs, embryos and sperm."[36]

---

[31] *Meet Prelude Fertility, The $200 Million Startup That Wants To Stop The Biological Clock*, Forbes (Oct. 17, 2016), https://www.forbes.com/sites/miguelhelft/2016/10/17/prelude-fertility-200-million-startup-stop-biological-clock/#d05688c7260f.

[32] What is the process?, Pacific Fertility Center, https://www.pacificfertilitycenter.com/fertility-preservation/my-eggs#treatment (last visited May 18, 2018).

[33] *Sperm and Embryo Freezing*, Pacific Fertility Center, https://www.pacificfertilitycenter.com/treatment-care/sperm-and-embryo-freezing (last visited May 18, 2018).

[34] *Id*.

[35] *Pacific Fertility Center*, https://www.pacificfertilitycenter.com/the-center/infertility-center (last visited May 20, 2018).

[36] *IVF Laboratory Team*, Pacific Fertility Center, https://www.pacificfertilitycenter.com/fertility-specialists/ivf-laboratory-team (last visited May 20, 2018).

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01586-JSC

60.     Since the advent of cryopreservation, the main techniques to cryopreserve eggs and embryos have been slow freezing and vitrification.  With slow freezing—first used in 1986—it takes about two hours for eggs to reach final storing temperature.  Starting in the mid-2000s, eggs and embryos began to be preserved through a rapid cryopreservation process called vitrification.

61.     Vitrification is a more advanced and reliable technology that Pacific Fertility describes as being "used in the embryo and egg freezing process so that they can be stored for later use."[37] Pacific Fertility states the newer vitrification process is safer than earlier slow-freezing technologies, which could lead to crystallization threatening the viability of cryopreserved tissue. "Avoiding ice formation in this way," Pacific Fertility represents, "successfully protects the embryos from damage and allows them to be warmed later giving survival rates consistently above 90%."[38]

62.     Pacific Fertility further states that all eggs and embryos would be stored in vacuum-lined liquid nitrogen tanks—"like a large thermos flask"—that "are computer controlled and monitored 7 days a week with a dedicated alarm system."[39]

63.     Pacific Fertility claims that liquid nitrogen "is very stable and easy to work with" and that each tank is equipped with numerous sensors to monitor temperature increases above −196°C or a drop in the level of liquid nitrogen.[40]  Pacific Fertility also claims that the sensors "are connected to a telephone alarm system that will alert staff to an alarm condition outside of normal working hours. . . . The alarm system is tested weekly and continues to run on battery power in the event of a power failure.  The alarm system can also be checked remotely."  When a tank alarm goes off, the on-call embryologist is supposed to arrive within 30 minutes regardless of time of day and must conduct a physical inspection of the tank before the alarm can be turned off.[41]

---

[37] *Vitrification, Oocyte and Embryo Vitrification*, Pacific Fertility Center, https://www.pacificfertilitycenter.com/treatment-care/vitrification (May 18, 2018).

[38] *Id.*

[39] *Sperm and Embryo Freezing*, Pacific Fertility Center, https://www.pacificfertilitycenter.com/treatment-care/sperm-and-embryo-freezing (last visited Mar. 23, 2018).

[40] *Id.*

[41] *Id*

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01586-JSC

64.     Pacific Fertility further claims that, in addition to being constantly monitored, each tank "gets a physical inspection daily, looking for problems or signs of problems," and that the amount of nitrogen in the tank "is assessed as a means of monitoring for a possible slow leak or an impending tank failure."[42]

65.     Each tank is also supposed to receive a daily refill of nitrogen because the nitrogen in the tanks continuously evaporates at a slow rate.[43]  It is standard in the egg and embryo storage industry for facilities to equip their tanks with autofilling mechanisms to refill the liquid nitrogen when the system detects that levels are low.

66.     Pacific Fertility advertises the durability of its tanks and storage facility on its website, stating:

> The storage tanks require no power and would not be impacted by a power failure or blackout.  They are made of metal and would probably survive a small or moderate fire.  If the tanks were not physically damaged or knocked over in a disaster, they should survive intact.  Even if no one was able to physically check the tanks, or if we were unable to obtain liquid nitrogen, the tanks should still maintain their temperature for several days.[44]

67.     Pacific Fertility represents that its egg and embryo cryopreservation and freezing services are highly successful, with egg survival rates of 83%[45] and embryos survival rates consistently above 90%.[46]

68.     Prelude also touts "greater than 90%" egg and embryo survival rates.[47]

---

[42] *Id.*

[43] *Id*

[44] *Lab FAQs*, Pacific Fertility Center, https://www.pacificfertilitycenter.com/the-center/lab-faq (May 20, 2018).

[45] *What are your success rates?*, Pacific Fertility Center, https://www.pacificfertilitycenter.com/fertility-preservation/my-eggs#success (last visited May 20, 2018).

[46] *Vitrification, Oocyte and Embryo Vitrification*, Pacific Fertility Center, https://www.pacificfertilitycenter.com/treatment-care/vitrification (May 18, 2018).

[47] *Have Questions?, What are the chances of pregnancy with frozen embryos?*, Prelude Fertility, https://www.preludefertility.com/faq (last visited May 27, 2018).

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01586-JSC

## II.  Precision and Care Are Required in the Cryopreservation and Storage of Eggs and Embryos.

### A.  The process of retrieving and storing eggs and embryos is demanding, time consuming, and expensive.

69.     People who use Defendants' cryopreservation services typically make an enormous emotional investment.  They endure painful and invasive procedures, financial stress, and the strain the process puts on their mental health and relationships with others, all in the hopes that one day they will be able to have a child.

70.     Women take drug and hormone cocktails and injections over several weeks to stabilize the uterine lining, stimulate ovaries into producing follicles, and stop these ovary follicles from releasing eggs.  Then, after an ovulation trigger injection, eggs are collected under sedation or a general anesthetic.  A woman may be subjected to multiple painful injections each day, resulting in bruising, swelling, and overall discomfort.  The drug and hormone therapy may also trigger other side effects, such as tiredness, nausea, headaches, and blood clots, as well as negative emotions.  Many women also undergo acupuncture sessions, recommended by Pacific Fertility, to improve IVF outcomes.  The process can limit travel and other activities, and often requires time off from work.  The harvesting procedure itself can be painful and hard to endure, requiring insertion of a thick needle through the vaginal wall to drain the ovary follicles of their fluid.  After the procedure, a woman often experiences residual pain for about a week and may need bed rest for several days.  Some women suffer significant side effects, such as ovarian hyperstimulation syndrome, requiring hospitalization.

71.     Undergoing egg retrieval is "emotionally trying" as well as physically demanding.[48] Pacific Fertility acknowledges that feelings of anxiousness, depression, isolation, and helplessness are common among clients undergoing IVF services, and that strained and stressful relations with spouses, partners, and other loved ones are also common.  IVF typically causes those undergoing treatment to

---

[48] *Patient Support*, Pacific Fertility Center, https://www.pacificfertilitycenter.com/treatment-care/patient-support (last visited May 27, 2018).

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01586-JSC

rely heavily on friends and significant others for support, including, for example, with coping with stress and providing rides to and from appointments.[49]

72.     According to Pacific Fertility's website, "the time and energy that is needed, both physically and emotionally can drain even the staunchest crusader."[50]

73.     According to one research study, half of women seeking IVF services described infertility as the most upsetting experience of their lives.[51]  Other studies show that infertility causes anguish similar to that accompanying a cancer diagnosis or the loss of a loved one.[52]  Infertility is associated with anger, depression, anxiety, marital problems, and loss of self-esteem among prospective parents experiencing infertility.[53]  Pacific Fertility warns clients that they may experience intense anger, despair, and guilt, and that it is "is very common to experience symptoms of anxiety and depression as a result of this experience."[54]

74.     The cryopreservation process compounds these emotions and stresses.  For many, this process represents their last hope for having children.  Each cycle can produce anxiety and fear that there won't be enough eggs retrieved, or that the eggs retrieved won't be of a high enough quality. Multiple cycles are often required.  Many women experience and express strong feelings of anxiety, failure, hopelessness, and disappointment during this process.

75.     Prelude acknowledges its clients' vulnerability during the cryopreservation process and trains its staff on how to empathize with clients:

---

[49] *Resources at Your Fingertips*, Pacific Fertility Center (Nov. 22, 2004), https://www.pacificfertilitycenter.com/blog/fertility-resources-your-fingertips.

[50] *Id.*

[51] *The psychological impact of infertility and its treatment*, Harvard Medical School (May 2009), https://www.health.harvard.edu/newsletter_article/The-psychological-impact-of-infertility-and-its-treatment.

[52] A.D. Domar et al., *The psychological impact of infertility: a comparison with patients with other medical conditions*, Journal of Psychosomatic Obstetrics & Gynecology (1993), https://www.massgeneral.org/bhi/assets/pdfs/publications/Domar%201993%20J%20Psychosom%20Obstet%20 Gynaecol.pdf; C. A. Bryson, *Post IVF syndrome? Psychological implications of failed IVF*, The Obstetrician & Gynaecologist (2002), https://obgyn.onlinelibrary.wiley.com/doi/pdf/10.1576/toag.2002.4.4.201.

[53] P.K. Dekar et al., *Psychological aspects of infertility*, British Journal of Medical Practitioners (2010), http://www.bjmp.org/content/psychological-aspects-infertility.

[54] *Coping Strategies*, Pacific Fertility Center, https://www.pacificfertilitycenter.com/treatment-care/coping-strategies (last visited May 20, 2018).

Fertility is such an incredibly personal and vulnerable subject.  The World Health Organization has designated infertility as the 'third biggest global epidemic,' and yet as a society, we hardly even talk about it . . . until it gets personal.  As more people delay childbirth past their peak fertility years to pursue careers, advanced degrees, or the right life partner, the chances of having a baby the old fashioned way start to decline.[55]

\* \* \*

As women, mothers, sisters, and daughters we make it a priority to educate and support all of our staff on how it feels to go through these journeys and how much it means.[56]

76.    "The emotional part is driving what we are trying to do," Prelude's chief revenue officer said.  She further noted that a number of Prelude's own employees have been touched by infertility.[57]

77.    "Emotional health" and "well being" are central to Pacific Fertility's stated mission:

We are dedicated to a whole patient approach.  We recognize that fertility treatment may impact all corners of our patient's lives, including work, personal relationships and financial concerns.  When designing their treatment course, our physicians, nurses and counselors work with them to accommodate all of these considerations.

Our support is integrated.  Emotional health and well being are central to our patient's care.  Our clinic's services include acupuncture and an array of Mind/Body and stress reduction workshops, seminars and support groups.  Our in-house family therapist is available to any patient and will also gladly provide referrals to other qualified professionals.[58]

78.    Pacific Fertility recognizes the need to address clients' "emotional and even spiritual needs" during the "emotional ups and downs" of infertility:

At PFC, we know that the physical demands and emotional ups and downs of

---

[55] *A Modern Approach to Family*, Prelude Fertility, https://www.preludefertility.com/about (last visited May 20, 2018).

[56] *Id.*

[57] *Meet Prelude Fertility, The $200 Million Startup That Wants To Stop The Biological Clock*, Forbes (Oct. 17, 2016), https://www.forbes.com/sites/miguelhelft/2016/10/17/prelude-fertility-200-million-startup-stop-biological-clock/#d05688c7260f.

[58] *Fertility Treatment and Care*, Pacific Fertility Center, https://www.pacificfertilitycenter.com/treatment-care/fertility-treatment-and-care (last visited May 27, 2018).

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01586-JSC

infertility experience can impact life at home, at work and with family.  This is a path that one likely did not anticipate and, while there is much reason for hope, the treatment process can also be emotionally trying.  The well being of our patients is a crucial aspect of fertility treatment, and we encourage our patients to take advantage of the many resources we have developed to address the emotional and even spiritual needs they may have as a part of their journey.

PFC's extensive support system includes a devoted patient care team, experienced clinical coordinators and educators and an in-house marriage and family therapist who has long specialized in fertility and third party parenting issues.[59]

79.     Acknowledging the stress and challenges those contending with infertility face, Pacific Fertility promises its clients that it will be "by their side every step of the way":

A diagnosis of infertility can feel overwhelming and stressful for individuals and couples who always assumed that pregnancy would come easily.  At Pacific Fertility Center, we see infertility as a workable challenge. . . .

We feel strongly that the physical well being is tied to emotional well being, and we take into account all of the challenges[,] . . . [including d]iagnosis, treatment and the inevitable 'waiting game' as well as financial stress . . . . We are by their side every step of the way to help address each and all of these needs.[60]

80.     Pacific Fertility and Prelude's services are costly.  Clients pay more than $8,000 for a single cycle of egg cryopreservation, which includes clinical monitoring, egg retrieval, cryopreservation, and one year of egg storage.  Additional cycles cost $6,995 each.  Pacific Fertility recommends storing more eggs than a woman typically produces in a single cycle.[61]  It is not uncommon for women to undergo three or more egg cryopreservation cycles.

---

[59] *Patient Support*, Pacific Fertility Center, https://www.pacificfertilitycenter.com/treatment-care/patient-support (last visited May 27, 2018).

[60] *Pacific Fertility Center*, https://www.pacificfertilitycenter.com/the-center/infertility-center (last visited May 20, 2018).

[61] *How many eggs do I need to freeze?*, Pacific Fertility Center, https://www.pacificfertilitycenter.com/fertility-preservation/ask-us#how-many (last visited May 21, 2018); *How Many Eggs Should I Freeze?*, Southern California Reproductive Center, https://blog.scrcivf.com/how-many-eggs-should-i-freeze (last visited May 21, 2018).

16

81.     The costs incurred to cryopreserve embryos are even higher.  Pacific Fertility charges $11,595 for basic IVF, including clinical monitoring, egg retrieval, lab processing, and embryo transfer.[62]  If a client chooses to use Comprehensive Chromosome Screening to select the healthiest embryo to transfer, Pacific Fertility's basic IVF costs rise to $16,085.[63]

82.     The above amounts do not include the costs of in-person consultations ($375), pre-cycle lab work, egg cryopreservation medications ($2,000–6,000), embryo transferring ($2,845–4,460), embryo transfer medications ($300–600), and continuing charges for egg and embryo storage ($600 per year).[64]  Clients typically also pay thousands of dollars for fertility drugs leading up to egg retrieval, and often spend hundreds of dollars on acupuncture and other recommended services to improve outcomes.  The entire process often costs many tens of thousands of dollars.

83.     Most insurance plans do not cover egg cryopreservation and other fertility services.[65]  A 2017 study by Mercer found that only 26% of companies with over 500 employees cover IVF.[66]  As a result, people seeking fertility services have taken out home equity loans, borrowed from their 401(k) accounts, tapped their lines of credit, and moved in with their parents.[67]

84.     In part because of these challenging processes, costs, and experiences, many clients form strong emotional attachments to their eggs and embryos.  It is not unusual for women and their reproductive partners to think about their eggs or embryos every day.

---

[62] *In-Vitro Fertilization (IVF) Costs*, Pacific Fertility Center, https://www.pacificfertilitycenter.com/financing-fees/vitro-fertilization-ivf-costs (last visited May 21, 2018).

[63] *Id.*

[64] *Id.*

[65] *Fertility treatments are becoming a financial and physical risk for many Americans*, CNBC (Nov. 20, 2017), https://www.cnbc.com/2017/11/17/most-patients-getting-ivf-arent-covered-by-insurance.html; M. Inhorn et al., *Medical egg freezing: How cost and lack of insurance cover impact women and their families*, Reproductive Biomedicine & Society Online (Jan. 21, 2018), https://www.sciencedirect.com/science/article/pii/S2405661818300017.

[66] *Fertility treatments are becoming a financial and physical risk for many Americans*, CNBC (Nov. 20, 2017), https://www.cnbc.com/2017/11/17/most-patients-getting-ivf-arent-covered-by-insurance.html.

[67] *Id.*; *Infertility Treatment Grants and Scholarships*, RESOLVE, https://resolve.org/what-are-my-options/making-infertility-affordable/infertility-treatment-grants-scholarships/ (last visited May 21, 2018).

**B.**     **The loss of eggs and embryos results in emotional trauma.**

85.     Prelude and Pacific Fertility are well aware of the lengths to which people go to obtain eggs and embryos, how much these eggs and embryos mean to their clients, the clients' emotional investment in the survival of the eggs and embryos, and the clients' expectations that great care will be taken to preserve and protect the eggs and embryos to avoid irreparable, devastating harm.

86.     Eggs and embryos are precious.  They offer the opportunity to fulfill one of the most fundamental human urges: to become a parent and create one's own family when the time is right. Even for those who have already met their family planning goals, their remaining eggs and embryos retain emotional value.  Many opt to continue storing their eggs and embryos for years after they have successfully had children.  Some hold funeral ceremonies for embryos.[68]  Others who no longer plan to use their eggs and embryos hope to donate them to a family member or other couple struggling with infertility, or toward beneficial research.

87.     Eggs and embryos are irreplaceable.  As women age, their egg quantity and quality diminish.  The most determinative factor in IVF success is the woman's age at the time her eggs were extracted.  At some point, usually around her mid-40s, a woman can no longer produce viable eggs. Even if additional eggs can be retrieved, one cannot replace 35-year-old eggs with 42-year-old eggs and expect the same result.  When eggs and embryos are damaged or compromised, it may be impossible for clients to have their own biological children.  There is no possibility of creating substitute embryos for cancer survivors or those whose spouses have died.  Likewise, those who used donor eggs or sperm to create embryos may find it impossible to retrieve additional material from the same donors.  Thus, donor-users who already have children may be prevented from having additional children who are biologically related to their siblings.

88.     At the time of their freezing, most of the eggs and embryos that Pacific Fertility stored were viable rather than being compromised or incapable of successful fertilization or implantation.

---

[68] J. Fraga, *After IVF, Some Struggle With What To Do With Leftover Embryos*, NPR (Aug. 20, 2016), https://www.npr.org/sections/health-shots/2016/08/20/489232868/after-ivf-some-struggle-with-what-to-do-with-leftover-embryos.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01586-JSC

Most of the embryos that Pacific Fertility stored had been tested and found free of chromosomal abnormalities.

89.     The success or failure of egg and embryo cryopreservation and storage services has emotional and psychological ramifications for those seeking to become parents.  Losing an egg or embryo provokes the fear that having a child is no longer possible, causing feelings of devastation and despair.  Many experience grief and anguish when fertility treatment does not result in pregnancy or when they lose fertility choices.[69]  Pacific Fertility's website itself provides coping strategies and techniques for reducing stress.[70]

C.     **Successful cryopreservation depends on strict adherence to protocols.**

90.     Eggs and embryos are fragile.  It is critical that they be handled and stored carefully.  Cooling, warming, and the removal of cryoprotectants must follow precise, controlled protocols.  Failure to adhere to these protocols can kill the egg or embryo, impair implantation and viability, and introduce chromosomal abnormalities.

91.     Egg and embryo cryopreservation entails preserving the reproductive material at subzero temperatures.  A key goal of cryopreservation is to reduce cell damage caused by the formation of ice crystals and the expansion of water as cryopreserved material cools to subzero temperatures.  According to Pacific Fertility, "[t]he key to successful egg freezing is determining a technique that will not damage the fragile chromosomes of the egg"; this is because "the chromosomes of the egg are vulnerable to damage, including damage from the exertion of the freezing and thawing process."[71]

92.     As noted above, two primary cryopreservation technologies have emerged.  Both rely upon cryoprotectants, which are solutions added to the cells that reduce cell damage by displacing water in a manner similar to antifreeze.  The first technology, slow freezing (also known as slow programmable freezing), utilizes specialized laboratory equipment that lowers the temperature of

---

[69] C. A. Bryson, *Post IVF syndrome? Psychological implications of failed IVF*, The Obstetrician & Gynaecologist (2002), https://obgyn.onlinelibrary.wiley.com/doi/pdf/10.1576/toag.2002.4.4.201.

[70] *When to See a Therapist*, Pacific Fertility Center, https://www.pacificfertilitycenter.com/treatment-care/when-to-see-a-therapist (last viewed May 20, 2018).

[71] *New Clinical Study: New Technique for Egg Freezing*, Pacific Fertility Center (Feb. 25, 2006), https://www.pacificfertilitycenter.com/blog/new-clinical-study-new-technique-egg-freezing.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01586-JSC

embryos conditioned with cryoprotectants in a slow, controlled manner to –190°C.  The second and newer technology, vitrification, refers to any process resulting in "glass formation"—that is, the transformation from a liquid to a hardened liquid with minimal crystallization (ice crystals).  According to Pacific Fertility, vitrification "cools the cells in the embryo at rates close to 5,000 degrees per minute[,]" and "embryos that are vitrified are exposed to 5-10 times more cryoprotectant than slow frozen embryos."[72]  The ultra-rapid nature of this process minimizes (1) the formation of ice crystals and (2) toxicity damage to the cells that cryoprotectants can cause during longer exposure to warmer temperatures.

93.     The process of warming eggs and embryos that have been preserved through cryopreservation is also precise and dependent on specialized techniques and chemical solutions.  Pacific Fertility states that "embryos coming out of the freezer (at –196°C) are warmed to room temperature in a maximum of three seconds.  This rapid warming method minimizes damage to the embryo from ice crystals that can form during warming."[73]  A key part of the warming procedure is the careful dilution and eventual replacement of the toxic cryoprotectant fluid with a solvent compatible with cytoplasmic fluid.  Pacific Fertility states that it "incubat[es] the embryo in decreasing concentrations of the antifreeze, and increasing concentrations of water.  Over a period of 15 minutes, the embryo is stepped through 3 different solutions, until finally the antifreeze is gone and all the water has been replaced."[74]

94.     For slow-frozen tissue, the failure to thaw slowly can result in cells over-expanding, rupturing, and dying.  For vitrification, it is important to warm quickly to avoid ice formation.  Thus, it is critical that tissue cryopreserved through slow freezing be thawed slowly, and that tissue cryopreserved through vitrification be warmed quickly.[75]  An uncontrolled rise in temperature, like the one at issue here, can have catastrophic consequences for eggs and embryos.

---

[72] *Vitrification, Oocyte and Embryo Vitrification*, Pacific Fertility Center, https://www.pacificfertilitycenter.com/treatment-care/vitrification (May 18, 2018).

[73] *Lab FAQs*, Pacific Fertility Center, https://www.pacificfertilitycenter.com/the-center/lab-faq (May 20, 2018).
[74] *Id.*

[75] *Vitrification, Oocyte and Embryo Vitrification*, Pacific Fertility Center, https://www.pacificfertilitycenter.com/treatment-care/vitrification (May 18, 2018).

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01586-JSC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**III.** **Defendants Caused Irreparable Harm to Plaintiffs by Failing to Protect Their Eggs and Embryos.**

95.    On March 4, 2018, Pacific Fertility discovered a loss of a substantial amount of liquid nitrogen in one of its cryogenic storage tanks, Tank 4, manufactured by Chart.  This incident affected thousands of cryopreserved eggs and embryos and more than 400 individuals and families.

**A.**    **Prelude and Pacific Fertility should have had systems and processes in place to ensure that Plaintiffs' eggs and embryos were not damaged.**

96.    Liquid nitrogen in cryopreservation tanks evaporates at a slow rate.  Absent extreme circumstances, even when a leak occurs it should take days for a tank to warm enough to cause damage to the enclosed eggs and embryos.

97.    Egg and embryo storage facilities have developed and implemented a variety of systems and processes to protect against liquid nitrogen levels dropping to levels low enough to endanger clients' eggs and embryos.  These systems and processes include daily tank inspections, multiple alarm systems that detect and send alerts regarding low liquid nitrogen levels, and autofillers that detect and automatically replenish low liquid nitrogen levels.

98.    Pacific Fertility promised its clients that its laboratory was state of the art, including that its tanks were equipped with around-the-clock monitoring, alarm systems, and response protocols as well as daily walk-throughs.  But no alarms or phone alerts notified Pacific Fertility or Prelude of the March 4 malfunction.  Instead, an embryologist discovered the problem during a routine walk-through.  Staff then had to manually replenish liquid nitrogen levels in the tank.

99.    Pacific Fertility and Prelude have not explained why they did not detect the problem during prior walk-throughs or why they did not have a functional autofilling mechanism to replenish the low liquid nitrogen levels.  Pacific Fertility and Prelude also lacked monitoring, alarm, and response systems and processes sufficient to detect and prevent harm from a dangerous temperature rise in Tank 4.  Pacific Fertility and Prelude further failed to mitigate risk by failing to implement a policy and practice of storing multiple eggs and embryos belonging to a given client in separate vials and tanks.

100.    *Wired* interviewed one laboratory director who noted preventive measures Pacific Fertility and Prelude should have taken:

21

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01586-JSC

"It's really quite sad the samples weren't split up," says Nahid Turan, who directs laboratory operations at the Coriell Institute for Medical Research, one of the oldest and largest biobanks in the US.  "They were literally putting all the eggs in one basket."  In addition to having samples in multiple tanks at their New Jersey facility, Coriell also has back-up sites in multiple locations around the country.  And its software engineers built real-time monitoring systems to flag any tanks trending in a troubling direction *before* they fail.[76]

101.    Cryopreserved eggs and embryos belonging to many hundreds of other people were stored in the same tank as Plaintiffs'.  Tank 4 housed up to 15% of Pacific Fertility's total cryopreserved tissue, consisting of thousands of eggs and embryos.

102.    Most people with eggs and embryos stored in Tank 4 had all of their eggs and embryos stored in that single tank.  Pacific Fertility has expressed regret to clients affected by the March 4 incident for not mitigating the risk by spreading their eggs and embryos across multiple tanks.

**B.    Chart recalled cryostorage tanks for vacuum seal defects after the Tank 4 incident.**

103.    On April 23, 2018, Chart, the manufacturer of Tank 4, recalled certain cryostorage tanks, stating in its recall notice: "Chart is presently investigating the possible cause of the **VACUUM LEAK AND/OR FAILURE** which may be due to inadequate adhesion of the composite neck to the aluminum unit" (emphasis in original).  Chart added that the "issue appears to be an isolated occurrence involving the machine and binding agent used during the manufacturing process."

104.    Chart announced the recall four days after Pacific Fertility revealed the conclusion of "independent experts" that the March 4 incident "likely involved a failure of the tank's vacuum seal."

**C.    Multiple investigations were opened after the Tank 4 incident.**

105.    Various government entities and trade groups have responded to the March 4, 2018, incident.  The College of American Pathologists (CAP) opened and is conducting a formal investigation into the incident, as is the State of California.  The American Society for Reproductive Medicine also is studying the incident and intends to make recommendations to its members based on its findings.[77]

---

[76] M. Molteni, *What Keeps Egg-Freezing Operations From Failing?*, Wired (Mar. 13, 2018), https://www.wired.com/story/what-keeps-egg-freezing-operations-from-failing/.

[77] A. E. Cha, *FAQ: Are my frozen embryos safe? Everything you need to know about the freezer malfunctions*, The Washington Post (Mar. 14, 2018), https://www.washingtonpost.com/news/to-your-

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01586-JSC

**D.     Defendants' failure to keep Plaintiffs' eggs and embryos safe and secure has caused irreparable harm.**

106.    As a result of Defendants' conduct, Plaintiffs have suffered emotional trauma, including anxiety, hopelessness, fear, depression, devastation, and grief.  Plaintiffs lost the very peace of mind they sought when availing themselves of Pacific Fertility's services, and the time, energy, and cost associated with storing their eggs and embryos have been lost as well.

107.    Pacific Fertility asserts that the embryos in Tank 4 must be fully thawed to determine whether they remain viable after the incident.  But, because of the risks associated with re-freezing embryos, a family must be prepared before thawing to transfer the affected embryo into a woman's uterus and attempt a pregnancy if the embryo is deemed viable.  Pacific Fertility also asserts that the eggs in Tank 4 must be fully thawed and fertilized to determine whether they remain viable after the incident.

108.    Pacific Fertility has agreed in some instances to thaw eggs or embryos from Tank 4, check their viability, and then refreeze the eggs or embryos.  In those instances, however, Pacific Fertility has made clear that the added cycle of thawing and refreezing—resulting from its own mishandling of the eggs and embryos—creates further risks to their ultimate viability.  Although this procedure would not be needed absent Defendants' failures, Pacific Fertility requires clients to sign forms purporting to waive their legal rights merely to check the viability of their tissue.

109.    Some of Defendants' affected clients have decided to thaw tissue in Tank 4, and this process confirmed that their eggs or embryos are no longer viable.  Many families and individuals have lost their best or only chance of having a child.  They have suffered despair, depression, and heartbreak.  Those who can undergo additional retrievals face a greater risk that those eggs or embryos will not lead to a successful pregnancy, as the age at which a woman's eggs are retrieved is the dominant factor for rates of success or failure.

---

health/wp/2018/03/14/faq-are-my-frozen-embryos-safe-everything-you-need-to-know-given-two-fertility-clinics-recent-problems/?utm_term=.86e4c34f31f3.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01586-JSC

110.     While Pacific Fertility has not shared the data it has collected regarding the number of Tank 4 eggs and embryos that have been thawed and resulting outcomes, the survival rates for these eggs and embryos is lower than it would have been had the incident not occurred.

111.     Pacific Fertility has not provided a comprehensive analysis of the risks of attempting a pregnancy with any of the tissue from Tank 4, including the risks that the drop in nitrogen levels may have caused chromosomal or other defects that would not be detected from a thaw alone.

112.     Nevertheless, Pacific Fertility has advised Plaintiffs A.B., C.D., and others with affected eggs and embryos to attempt pregnancies with Tank 4 tissue.  Before undergoing an embryo or egg thaw, embryo transfer, or egg fertilization, Pacific Fertility requires clients to sign a consent statement acknowledging that the risks are uncertain and waiving any liability on the part of Pacific Fertility arising out of the thaw, transfer, or fertilization procedure.

113.     As a result of the Tank 4 incident, Plaintiffs are being asked to make significant reproductive decisions now—depriving them of the very freedom and flexibility they sought when placing their eggs or embryos in Defendants' care.  Pacific Fertility has counseled affected clients to thaw and immediately fertilize eggs, and to transfer embryos to a woman's uterus, to determine whether their tissue remains viable.  Yet the purpose of cryopreservation was to allow these clients to make reproductive choices on their own timelines.  Many clients do not yet have a partner with whom they wish to fertilize their eggs, or are not ready to move forward with a sperm donor, much less try to get pregnant now or arrange for a surrogate.  Others were busy with their lives when the incident occurred—finishing graduate school, planning for international travel, or even preparing to welcome a new baby—making it impossible or highly inconvenient to attempt a pregnancy now, especially one fraught with more risk and potential heartache than normal.

114.     People affected by the March 4 incident have described being thrust into a state of limbo, as the "insurance policy" they paid for has vanished.  To restore their future fertility options, some are attempting additional retrieval cycles at an older age, with lower-quality eggs, and at considerable cost, burden, and disruption to their lives, subjecting them to substantial physical and emotional strain.  These additional retrieval cycles also involve medical risks and potential complications.  Many class members completed these cycles only to learn they were incapable of

24

producing sufficient or any viable eggs or embryos.  Other class members, for whom additional retrievals are not possible or recommended, have been left to fear the worst—that they will be childless.

115.    The National Infertility Association recognized the negative impact of the March 4 incident on women and families, stating that it was "shocked" to hear of this "unprecedented traged[y]" for "the entire family building community.  Our hearts break for each person impacted.  We know first-hand what someone goes through to have eggs or embryos to freeze, and to have this outcome is devastating for everyone."[78]

116.    In response to a similar incident in Ohio, clinical psychologists advised that the loss of eggs and embryos should be acknowledged like any other death, and suggested grief counseling and organization of a memorial in response.[79]

117.    In sum, those with eggs and embryos in Tank 4 are devastated, and have compared the resulting feeling of powerlessness to that caused by a natural disaster.  Many of those who had saved eggs and embryos report having lost their only chance to have biologically related children.  In some cases, those affected have avoided telling family, knowing their loved ones would be "heartbroken" not to have siblings or grandchildren.[80]  One couple, who had gone through the process after a cancer diagnosis, described their emotions:

> My heart just sank and I felt physically ill.  I felt just sick to my stomach.  The world of infertility is a very isolating world, it's very lonely[,] it's a complete loss of control.
>
> * * *

[78] *Statement on Storage Tank Malfunction Impacting Hundreds of Patients*, RESOLVE (Mar. 12, 2018), https://resolve.org/about-us/news-and-press-releases/statement-on-storage-tank-malfunction-at-university-hospitals-fertility-center-in-cleveland-oh/.

[79] J. Washington, *Experts recommend counseling & support for UH patients who lost eggs, embryos*, The Plain Dealer (Mar. 21, 2018), http://www.cleveland.com/healthfit/index.ssf/2018/03/uh_patient_who_lost_eggs_embry.html.

[80] D. Kapp, *What It's Like to Be a Victim of a 'Fertility Disaster'*, The Cut (Mar. 15, 2018), https://www.thecut.com/2018/03/pacific-fertility-center-clinic-disaster-cleveland-university-hospital.html; S. Steimle, *Patients at Troubled San Francisco Fertility Clinic Mull Legal Action*, CBS SF Bay Area (Mar. 14, 2018), http://sanfrancisco.cbslocal.com/2018/03/14/patients-san-francisco-fertility-clinic-mull-legal-action/.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01586-JSC

> For some this is their last hope, I mean they physically, financially, mentally can't put themselves through that again. I've gone from anger, I've gone through just feeling a sense of loss, grief, I think right now I'm angry to be honest.[81]

118.   Given the sensitive nature of the eggs and embryos entrusted to their care, as well as their familiarity with the deeply emotional aspects of their services, Pacific Fertility and Prelude were aware of the devastating consequences for their clients that would result from a failure to keep their eggs and embryos safe and secure.

**E.   Pacific Fertility and Prelude's communications regarding the incident have compounded the harm.**

119.   Pacific Fertility first attempted to notify its clients of the March 4 incident a week after it occurred.

120.   At approximately 4 a.m. Pacific time on March 11, 2018, Pacific Fertility sent its clients an email stating:

> Earlier this week, a single piece of equipment lost liquid nitrogen for a brief period of time. The remainder of the equipment and cryo-storage facility was not affected. As soon as the issue was discovered, our most senior embryologists took immediate action to secure all tissue in that single cryo-storage tank. The tank was immediately retired, and the facility is operating securely.
>
> We have hired independent experts and launched an in-depth investigation of the matter. We felt it was imperative to advise you that your tissue was stored in the affected tank and *may* have been impacted. Based on our preliminary analysis, the good news is that we do expect that some of the tissue from that tank remains viable. We are continuing to gather information but wanted to share these developments with you directly.

121.   The email further stated, "[w]e are incredibly sorry that this happened and for the anxiety that this will surely cause. We are heartbroken by this situation and our thoughts are with each of you who may have been touched by this event."

---

[81] *Mother felt "physically ill" after hearing embryos possibly destroyed at fertility center*, CBS Evening News (Mar. 9, 2018), https://www.cbsnews.com/news/mother-felt-physically-ill-after-hearing-embryos-possibly-destroyed-at-fertility-center/.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01586-JSC

122.    The email invited Plaintiffs and other families with eggs and embryos stored in Tank 4 to call to discuss the incident with their fertility specialists.  But the call center has been overwhelmed, and the information provided over the phone and in person has been vague and often inconsistent. Different Pacific Fertility staff members have provided clients with conflicting information.

123.    Pacific Fertility did not provide further written information until over a month later, on April 19, 2018, when Pacific Fertility wrote to its clients with "several updates following the tank failure that occurred in the embryology lab on March 4, 2018."

124.    Pacific Fertility stated that "independent experts have been investigating the incident" and preliminarily determined that it "likely involved a failure of the tank's vacuum seal."

125.    Pacific Fertility also stated that it had implemented new protocols—"re-inspection of onsite storage tanks, the purchase of several emergency tanks beyond our standard back-up tanks, and an extra layer of redundancy in our warning systems"—to avoid future loss of eggs and embryos, steps it should have taken before the incident.

126.    Pacific Fertility initially told some clients definitively that their tissue was destroyed in the incident.  It told other clients it could not determine whether their tissue survived unless they thawed and fertilized their eggs, or thawed and transferred their embryos.  Pacific Fertility also refused to tell many other people whether their tissue was even stored in Tank 4, instead stating simply that an incident had occurred at its facility that may have impacted certain clients' tissue.  In post-incident calls, Pacific Fertility stated that it assumed that many were not going to use the tissue stored in Tank 4—so clients "should just let it go."  Similarly, on March 11, 2018, a Pacific Fertility employee told ABC News that a large number of families with eggs and embryos stored at the facility were "people who won't use them anyway."  Other clients with eggs and embryos in Tank 4 were billed for storage fees after the incident occurred and before it was disclosed to them.

127.    Pacific Fertility has offered some of its clients a free additional cycle for egg retrieval. Pacific Fertility's proposed remedy is inadequate.  The mishandling of client eggs and embryos is devastating and irreparable.  Many can no longer undergo additional retrievals.  Older women are generally not able to produce as many eggs of as high a quality as when they were younger, and in many cases go through the entire process only to learn they were unable to produce any viable eggs.

Even where some eggs can be retrieved, women confront a greater risk that those eggs will not lead to a successful transfer and pregnancy.  Moreover, additional retrievals are time consuming, expensive, and physically and emotionally exhausting and burdensome, and typically require time away from work. Even two or three cycles may not fully replenish the number of viable eggs or embryos lost.

128.    Pacific Fertility's April 19, 2018, email blaming the tank failure on Chart left clients with more questions than answers.  Pacific Fertility did not say why the remedial steps mentioned in the email, like adding redundancies, were not in place before the incident.  Clients were not told why an alarm did not alert Pacific Fertility staff, why a backup system (e.g., an autofill function or additional generator) did not engage, or why the problem went undiscovered until someone walked through the lab during a routine check.

129.    Pacific Fertility states that tanks can go without power or liquid nitrogen for "several days" without compromising the enclosed reproductive tissue.  It is unclear why Pacific Fertility failed to detect the problem with Tank 4 until it was too late.

130.    Pacific Fertility's April 19 email also raised false hopes, stating that Pacific Fertility "can report several early pregnancies" from thawed and transferred embryos, and had "successfully thawed a limited number of eggs[,] confirm[ing] that there is viable tissue from the tank."  Pacific Fertility failed to mention that there is also *unviable* tissue from the tank.  Pacific Fertility indiscriminately notified all people with tissue in Tank 4 that their eggs and embryos might be "viable" despite knowing this was *not* true for many of these people.

131.    Clients who were devastated upon learning, in the days and weeks after Pacific Fertility's first mass email, that their tissue was not viable have been doubly devastated by the insensitivity of Pacific Fertility's second mass email.

132.    Pacific Fertility executives and employees were well aware that the March 4 incident would cause significant distress.  Nevertheless, even though Pacific Fertility has a counselor on staff, it offered no additional support services or counseling to those affected by the incident.

133.    Pacific Fertility's failure to offer compassionate support services and to communicate clearly and consistently with victims of the incident has caused them further confusion, pain, and distrust.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **PLAINTIFF-SPECIFIC ALLEGATIONS**

### **Plaintiffs A.B. and C.D.**

134.    Plaintiffs A.B. and C.D. first contacted Pacific Fertility in or around January 2015 about the possibility of creating embryos and having their embryos frozen.

135.    In January 2015, Plaintiffs A.B. and C.D. contracted with Pacific Fertility to create and have their embryos preserved for future use.

136.    Plaintiffs A.B. and C.D. conducted extensive research concerning IVF and fertility centers and chose Pacific Fertility based on the belief that it provided high-quality services that were state of the art.  Before having their embryos cryopreserved with Pacific Fertility, Plaintiffs A.B. and C.D. saw representations about Pacific Fertility's services on Pacific Fertility's website, including Pacific Fertility's claims that it provided high-quality services.  Plaintiffs A.B. and C.D. also had a consultation session with Dr. Carl M. Herbert, who told them about Pacific Fertility's care, professionalism, and state-of-the-art facilities.

137.    In early 2015, Plaintiffs A.B. and C.D. underwent procedures to prepare for embryo creation and cryopreservation.  Before the egg retrieval procedure in March 2015, Plaintiff A.B. underwent a month of treatment and injections.  Pacific Fertility ultimately retrieved approximately 21 of her eggs, which were then fertilized with Plaintiff C.D.'s sperm.  After the fertility treatment ended, the embryos Pacific Fertility created were cryopreserved for storage.  At the time of the March 4, 2018, incident, Plaintiffs A.B. and C.D. had eight viable cryopreserved embryos.

138.    At all relevant times, Plaintiffs A.B. and C.D.'s embryos were under Pacific Fertility's protection, custody, and control.

139.    Defendants kept Plaintiffs A.B. and C.D.'s embryos within a metal storage tank—Tank 4—at their San Francisco laboratory facility on Francisco Street.  Rather than mitigating the risk of tank failure by spreading Plaintiffs A.B. and C.D.'s embryos among several tanks, Defendants stored all of Plaintiffs A.B. and C.D.'s embryos in the same tank.

140.    Plaintiffs A.B. and C.D. have paid approximately $21,105.78 for the creation and storage of their embryos.  They experienced severe emotional distress when they learned of the March 4, 2018, incident and in the weeks that followed.

29

**Plaintiff E.F.**

141.    Plaintiff E.F. first contacted Pacific Fertility in or around May 2016 about the possibility of having her eggs frozen.

142.    In or around June 2016, Plaintiff E.F. contracted with Pacific Fertility to have her eggs retrieved and preserved for potential future use.

143.    Before having her eggs cryopreserved with Pacific Fertility, Plaintiff E.F. saw representations about Pacific Fertility's services on Pacific Fertility's website, including claims regarding the qualifications of Pacific Fertility's staff and the science behind the clinic's procedures. Plaintiff E.F. also met with Dr. Carolyn Givens, who told her about Pacific Fertility's use of cutting-edge technology and assured her that her eggs would be there for as long as she needed them.

144.    In the summer of 2016, Plaintiff E.F. underwent procedures to prepare for egg cryopreservation.  Before the retrieval procedure, she underwent two months of treatment and injections.  Pacific Fertility ultimately retrieved and cryopreserved approximately nine of her eggs.

145.    At all relevant times thereafter, Plaintiff E.F.'s eggs were under Pacific Fertility's protection, custody, and control.

146.    Defendants kept Plaintiff E.F.'s eggs within a metal storage tank—Tank 4—at their San Francisco laboratory facility on Francisco Street.  Rather than mitigating the risk of tank failure by spreading Plaintiff E.F.'s eggs among several tanks, Defendants stored all of her eggs in the same tank.

147.    Plaintiff E.F. has paid approximately $11,000 for the retrieval and storage of her eggs. She experienced severe emotional distress when she learned of the March 4, 2018, incident and in the weeks that followed.

**Plaintiff G.H.**

148.    Plaintiff G.H. first contacted Pacific Fertility in or around February 2016 about the possibility of having her eggs frozen.

149.    In or around April 2016, Plaintiff G.H. contracted with Pacific Fertility to have her eggs retrieved and preserved for potential future use.

150.    Before having her eggs cryopreserved with Pacific Fertility, Plaintiff G.H. saw representations about Pacific Fertility's services on Pacific Fertility's website, including claims about

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01586-JSC

the reputable quality of their services.  Plaintiff G.H. also met with Dr. Carolyn Givens, who provided information regarding Pacific Fertility's services.

151.    In the spring of 2016, Plaintiff G.H. underwent procedures to prepare for egg cryopreservation.  Before the retrieval procedure, she underwent two months of treatment and injections.  Pacific Fertility ultimately retrieved and cryopreserved approximately two of her eggs.

152.    At all relevant times thereafter, Plaintiff G.H.'s eggs were under Pacific Fertility's protection, custody, and control.

153.    Defendants kept Plaintiff G.H.'s eggs within a metal storage tank—Tank 4—at their San Francisco laboratory facility on Francisco Street.  Rather than mitigating the risk of tank failure by spreading Plaintiff G.H.'s eggs among several tanks, Defendants stored all of her eggs in the same tank.

154.    Plaintiff G.H. has paid approximately $14,500 for the retrieval and storage of her eggs. She experienced severe emotional distress when she learned of the March 4, 2018, incident and in the weeks that followed.

### Plaintiff I.J.

155.    Plaintiff I.J. first contacted Pacific Fertility in or around November 2012 about the possibility of having her eggs frozen.

156.    In or around December 2012, Plaintiff I.J. contracted with Pacific Fertility to have her eggs preserved for potential future use.

157.    Before having her eggs cryopreserved with Pacific Fertility, Plaintiff I.J. saw representations about Pacific Fertility's services in Pacific Fertility's brochure, including claims that Pacific Fertility "had a very strong embryo freezing program" and that its clients "can avoid high order multiple pregnancies by transferring fewer fresh embryos and successfully freezing the remaining embryos."  Plaintiff I.J. also saw representations that Pacific Fertility "devoted considerable time and effort into assembling one of the most highly trained teams in the country."  Plaintiff I.J. met with staff at Pacific Fertility who assured that her eggs would be there for as long as she needed them.

158.    In February 2013, Plaintiff I.J. underwent procedures to prepare for egg cryopreservation.  Before the retrieval procedure, she underwent two months of treatment and injections.  Pacific Fertility ultimately retrieved and cryopreserved approximately 17 of her eggs.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01586-JSC

159.    At all relevant times thereafter, Plaintiff I.J.'s eggs were under Pacific Fertility's protection, custody, and control.

160.    Defendants kept Plaintiff I.J.'s eggs within a metal storage tank—Tank 4—at their San Francisco laboratory facility on Francisco Street.  Rather than mitigating the risk of tank failure by spreading Plaintiff I.J.'s eggs among several tanks, Defendants stored all of her eggs in the same tank.

161.    Plaintiff I.J. has paid approximately $17,000 to Defendants for procedures, medications, and storage of her eggs.  She experienced severe emotional distress when she learned of the March 4, 2018, incident and in the weeks that followed.

**Plaintiff K.L.**

162.    Plaintiff K.L. first contacted Pacific Fertility on or around June 3, 2010, about the possibility of having her eggs cryopreserved.

163.    In or around December 2015, Plaintiff K.L. contracted with Pacific Fertility to have her eggs preserved for potential future use.

164.    Before having her eggs frozen with Pacific Fertility, Plaintiff K.L. saw representations about Pacific Fertility's services on Pacific Fertility's website, including Pacific Fertility's claims that the clinic and its services were safe and reliable, and that eggs could be stored until the right time for the client.  Plaintiff K.L. also saw Pacific Fertility's representations that the process was quick and easy for clients and had a very high likelihood of success.  In addition, Plaintiff K.L. met with Dr. Eldon Schriock, who told her that storage at Pacific Fertility was safe.

165.    In February 2016, Plaintiff K.L. underwent procedures to prepare for egg freezing.  Before the retrieval procedure, she underwent months of treatment and injections.  She also had to take several days off from work and could not travel for work for two weeks.  Pacific Fertility ultimately retrieved and froze five of her eggs.

166.    At all relevant times thereafter, Plaintiff K.L.'s eggs were under Pacific Fertility's protection, custody, and control.

167.    Defendants kept Plaintiff K.L.'s eggs from her first cycle within a metal storage tank— Tank 4—at their San Francisco laboratory facility on Francisco Street.  Rather than mitigating the risk

of tank failure by spreading Plaintiff K.L.'s eggs from that cycle among several tanks, Defendants stored all of her eggs in the same tank.

168.     Plaintiff K.L. has paid approximately $12,000 to Defendants for procedures (approximately $9,300), medications (approximately $1,200), and storage (approximately $600 per year) of her eggs.  She experienced severe emotional distress when she learned of the March 4, 2018, incident and in the weeks that followed.

**Plaintiffs M.N. and O.P.**

169.     Plaintiff M.N. first contacted Pacific Fertility in or around September 2011 about the possibility of having her eggs frozen.

170.     In or around late 2011, Plaintiff M.N. contracted with Pacific Fertility to have her eggs preserved for potential future use.

171.     Before having her eggs frozen with Pacific Fertility, Plaintiff M.N. saw representations about Pacific Fertility's services on its website, including claims regarding its success rates and ability to help couples and single people have a family and plan for the future.  Plaintiff M.N. also met with Dr. Eldon Schriock, who told her about Pacific Fertility's statistics and success rates.

172.     In January 2012, Plaintiff M.N. underwent procedures to prepare for egg freezing.  She went through months of invasive and time-consuming treatments, including injections, blood tests, and ultrasounds.  She underwent approximately three retrieval cycles, resulting in approximately 37 eggs.

173.     In 2016, Plaintiff M.N. contracted with Defendants to fertilize half of her eggs with a sperm donor, resulting in three high-quality embryos.  Her remaining 15 eggs were stored in Tank 4.

174.     At all relevant times thereafter, Plaintiff M.N.'s remaining eggs were under Pacific Fertility's protection, custody, and control.

175.     Defendants kept Plaintiff M.N.'s eggs within a metal storage tank—Tank 4—at their San Francisco laboratory facility on Francisco Street.  Rather than mitigating the risk of tank failure by spreading Plaintiff M.N.'s eggs among several tanks, Defendants stored all of her eggs in the same tank.

176.     After Plaintiff M.N. finally met the right partner, O.P., they decided to move ahead with fertilizing the rest of her eggs.  Plaintiffs M.N. and O.P. are in a committed relationship and plan to

33

raise children together.  O.P. also became a client of Pacific Fertility in December 2017, when he and M.N. consulted with Pacific Fertility to begin the process of fertilizing M.N.'s remaining eggs with O.P.'s sperm.  In consultation with Pacific Fertility specialists, M.N. and O.P. decided to proceed with the fertilization by mid-2018.

177.    Plaintiff M.N. has paid more than $25,000 to Defendants for procedures, medications, and storage of her eggs.  The process was mentally and physically draining: Plaintiff M.N. had approximately 70 blood tests, 30 ultrasounds, and numerous injections and prescriptions.  The process was also time consuming and required her to take time off from work.  Plaintiffs M.N. and O.P. experienced severe emotional distress when they learned of the March 4, 2018, incident and in the weeks that followed.

\* \* \*

178.    As described above, each Plaintiff encountered specific representations by Pacific Fertility and/or Prelude regarding their egg and embryo storage services.  All Plaintiffs encountered materially similar pre-treatment materials provided by Pacific Fertility.

179.    At all relevant times before the incident, the oral representations and promotional and contractual materials regarding egg and embryo cryopreservation services that Plaintiffs and, inferentially, the class members received, were standardized, common, and essentially uniform.

180.    Despite (1) knowledge that their electronic monitoring and alarms, and accompanying response systems and/or processes, were inadequate to protect against damage to Plaintiffs' eggs and embryos, and (2) multiple opportunities to inform Plaintiffs of the true condition of such systems and processes before Plaintiffs purchased and used their storage services, Pacific Fertility and Prelude uniformly failed to disclose to any Plaintiff that their systems were inadequate.

181.    Had Defendants disclosed that their storage monitoring and alarm systems were deficient, nonfunctional, and/or incapable of protecting eggs and embryos during a tank failure, Plaintiffs would not have purchased and used Defendants' egg and embryo storage services.

## CLASS ACTION ALLEGATIONS

182.    Plaintiffs propose that the Court streamline the determination of common claims or issues in this case, as Defendants' misconduct leading to a single incident—the failure in Tank 4—has

34

affected hundreds of people at once.  To facilitate such efforts through the joint trial of common questions, Plaintiffs propose certification of the following class, pursuant to Rule 23 of the Federal Rules of Civil Procedure:

> All individuals, and their reproductive partners, who had eggs, embryos, or other material in Tank 4 at Pacific Fertility Center in San Francisco, California on March 4, 2018.

Excluded from this class are Defendants, their affiliates and subsidiaries, and their officers, directors, partners, employees, and agents; class counsel, employees of class counsel's firms, and class counsel's immediate family members; defense counsel, their employees, and their immediate family members; and any judicial officer who considers or renders a decision or ruling in this case, their staff, and their immediate family members.

183.  <u>Numerosity</u>.  The members of the class are so numerous that their individual joinder is impracticable.  There are at least 400 class members, whose names and addresses are readily available from Defendants' records.

184.  <u>Existence and Predominance of Common Questions of Fact and Law</u>.  This action involves common questions of law and fact that predominate over any questions affecting individual class members, including, without limitation:

a.  Whether Tank 4 was defective;

b.  Whether Defendants owed a duty to Plaintiffs and class members to protect the eggs and embryos they entrusted to Defendants' care;

c.  Whether that duty was non-delegable;

d.  Whether Defendants breached their duties to protect the eggs and embryos that Plaintiffs and class members entrusted to their care;

e.  Whether the March 4, 2018, loss of liquid nitrogen in a tank at Defendants' San Francisco facility resulted from Defendants' negligence or other wrongful conduct;

f.  Whether Defendants failed to take adequate and reasonable measures to ensure that their systems were protected;

g.      Whether Defendants failed to take available steps to ensure that liquid nitrogen levels in their storage tanks would remain sufficient;

h.      Whether Defendants breached their contracts with Plaintiffs and class members;

i.      Whether Defendants fraudulently concealed material information regarding their laboratory practices and procedures;

j.      The type(s) and measure(s) of compensable and other redressable injury incurred by Plaintiffs and class members as a result of Defendants' conduct alleged herein; and

k.      What measures are necessary to ensure that eggs and embryos stored at Pacific Fertility are properly safeguarded in the future.

185.    Typicality.  Plaintiffs' claims are typical of the other class members' claims because Plaintiffs and class members were subjected to the same wrongful conduct and damaged in the same way by having their eggs and embryos destroyed, damaged, or jeopardized.

186.    Adequacy of Representation.  Plaintiffs are adequate class representatives.  Their interests do not conflict with the interests of the other class members they seek to represent.  Plaintiffs have retained counsel competent and experienced in complex class action litigation, as well as in matters concerning egg and embryo loss, and they intend to prosecute this action vigorously.  Plaintiffs and their counsel will fairly and adequately pursue and protect the interests of the class.

187.    Superiority.  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The highly sensitive and private nature of the facts involved here, as well as the fear that bringing an individual suit could affect future treatment at Pacific Fertility, counsels toward providing a class vehicle to adjudicate these claims.  The damages or other financial detriment suffered by Plaintiffs and the other class members are relatively small compared to the burden and expense that would be required to individually litigate these claims.  As a result, it would be impracticable for class members to seek redress individually.  Individualized litigation would also create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management

difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CLAIMS FOR RELIEF

188.    Plaintiffs bring each of the following claims under California law.

189.    None of Plaintiffs' claims involves any allegation of medical malpractice.

## FIRST CAUSE OF ACTION
### Negligence and/or Gross Negligence
### (Against All Defendants)

190.    Plaintiffs incorporate the above and below allegations by reference.

191.    Defendants owed Plaintiffs a duty to exercise the highest degree of care when maintaining, inspecting, monitoring, and testing the liquid nitrogen storage tanks used for the preservation of eggs and embryos at Defendants' San Francisco laboratory.

192.    Defendants owed a duty of care to Plaintiffs to act reasonably in all aspects of the storage of Plaintiffs' eggs and embryos so as to avoid destroying them, damaging them, or jeopardizing their viability given that doing so would inevitably lead to emotional distress.

193.    Defendants assumed that duty of care through communications with actual and prospective clients and by reason of Defendants' special relationship with Plaintiffs arising from the sensitive services Defendants undertook to perform: human egg and embryo cryopreservation and storage.

194.    Plaintiffs' harms occurred in the course of specified categories of activities, undertakings, or relationships in which negligent conduct is especially likely to cause serious harm.  As Pacific Fertility states in its marketing, fertility services, including those relating to cryopreserved egg and embryo storage, can be stressful and overwhelming for those who use them.

195.    It was reasonably foreseeable to Defendants that Plaintiffs would experience severe emotional distress as a result of Defendants' breach of their duty of care.

196.    Defendants' carelessness and negligence directly and foreseeably damaged Plaintiffs. Plaintiffs entrusted Defendants with preserving and storing their eggs and embryos, and Defendants' mishandling of those eggs and embryos, and their subsequent mishandling of communications,

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01586-JSC

naturally and foreseeably caused mental anguish and emotional distress, among other injuries, to Plaintiffs.

197.    There was a close connection between Defendants' conduct and Plaintiffs' injuries. Plaintiffs' emotional distress and other harms occurred because of Defendants' failure to act reasonably in all aspects of the storage of Plaintiffs' eggs and embryos.

198.    Plaintiffs entrusted Defendants to use reasonable care to safeguard their eggs and embryos to preserve their reproductive options.  Defendants' carelessness with this precious material, and ultimately, with the affected families' careful plans for parenthood, is reprehensible.

199.    Imposing a duty on Defendants to avoid causing emotional distress would promote the policy of preventing future harm, insofar as they will be motivated to: (1) in the case of Prelude and Pacific Fertility, implement more effective processes and systems to ensure that eggs and embryos are safeguarded and properly stored going forward; and (2) in the case of Chart, take steps to ensure that tanks it designs to hold eggs and embryos are free from defects capable of destroying, damaging, or jeopardizing their contents.  Imposing a duty on Defendants to avoid causing emotional distress also furthers the community's interest in ensuring that reliable fertility services are available to those who wish to become parents.

200.    The burden on Defendants from a duty to avoid causing emotional distress is fair and appropriate, in light of the importance of the eggs and embryos they voluntarily agreed to protect, at considerable cost to Plaintiffs.

201.    Defendants owed Plaintiffs a non-delegable duty of care with respect to the maintenance and protection of the eggs and embryos entrusted to their care.

202.    Defendants breached these duties and acted with negligence and gross negligence in at least the following respects:

    a.    failing to adequately design, manufacture, maintain, inspect, monitor, and/or test their liquid nitrogen storage tanks, including through a functional electronic tank monitoring system capable of detecting a rise in temperature or a drop in liquid nitrogen levels and promptly alerting staff to the immediate problem;

1          b.      permitting a leakage or tank failure to occur with respect to one of their liquid

2   nitrogen storage tanks—Tank 4—containing human eggs and embryos;

3          c.      failing to inspect and/or adequately inspect Tank 4 on a daily basis;

4          d.      failing to establish, maintain, and properly activate alarms;

5          e.      failing to establish, maintain, and properly activate autofill devices and/or

6   generator systems;

7          f.      failing to disclose that it did not have appropriate processes and systems in place

8   to protect clients' eggs and embryos;

9          g.      failing to properly safeguard the eggs and embryos in its care; and

10         h.      failing to follow reasonable scientific and laboratory procedures for safeguarding

11   the eggs and embryos in their care.

12        203.    Defendants' acts and omissions constitute gross negligence, because they constitute an

13   extreme departure from what a reasonably careful person would do in the same situation to prevent

14   foreseeable loss of eggs and embryos.

15        204.    Defendants acted willfully, wantonly, and with conscious and reckless disregard for the

16   rights and interests of Plaintiffs.  Defendants' acts and omissions had a great probability of causing

17   significant harm and in fact did.

18        205.    Defendants' failure to appropriately handle and safeguard Plaintiffs' eggs and embryos

19   has caused severe emotional distress, regardless of whether it is ever determined conclusively that the

20   eggs and embryos in Tank 4 are not viable.  Defendants' misconduct has irreparably breached trust and

21   caused uncertainty, anxiety, and fear among Plaintiffs and other affected families over how to proceed

22   without being informed as to the long-term effects from an egg or embryo's presence in Tank 4 during

23   the incident.

24        206.    As a proximate result of Defendants' negligence and/or gross negligence, Plaintiffs

25   suffered harm in an amount to be determined at trial, including severe emotional distress consisting of

26   shock, fright, horror, anguish, suffering, grief, anxiety, nervousness, embarrassment, humiliation, and

27   shame.  A reasonable person would be unable to cope with the losses suffered by Plaintiffs.

28

## SECOND CAUSE OF ACTION
**Breach of Contract**
**(Against Pacific Fertility and Prelude)**

207.    Plaintiffs incorporate the above allegations by reference.

208.    Defendants entered into contracts with Plaintiffs, under which Defendants agreed to store and preserve their eggs and embryos or those obtained on their behalf, and under which Defendants assumed a non-delegable duty of care to ensure such safekeeping and preservation.

209.    A contract involving egg and embryo storage and preservation is highly personal and implicates vital concerns regarding parenthood, procreation, and assisting others in achieving their family plans.

210.    In consideration of Defendants' promises, including to keep the eggs and embryos safe and secure by following practices and protocols, including as outlined on their websites and in other marketing materials, Plaintiffs agreed to pay, and did pay, substantial sums for the services rendered.

211.    Plaintiffs performed all of the terms and conditions required of them under their contracts with Defendants.

212.    Based on the conduct described herein, Defendants breached their contracts with Plaintiffs, including the incorporated contractual covenant of good faith and fair dealing.  Defendants' failure to safely store and preserve Plaintiffs' eggs and embryos violated commercial norms, deprived Plaintiffs of the fruits of the contracts, and contravened their objectively reasonable expectations under the contracts.

213.    A contract whereby a fertility clinic undertakes to store human eggs and embryos is one as to which it is reasonably foreseeable that breach thereof will cause mental anguish to the person or persons who entrusted the clinic with such material.

214.    As a direct and proximate result of Defendants' breach of contract, Plaintiffs suffered harm, including mental anguish, in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
**Bailment**
**(Against Pacific Fertility and Prelude)**

215.    Plaintiffs incorporate the above allegations by reference.

40

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01586-JSC

216.    Plaintiffs delivered to Defendants for safekeeping irreplaceable personal property to be safely and securely kept for the benefit of Plaintiffs, and to be redelivered to them upon demand.

217.    Defendants received eggs and embryos from Plaintiffs on this condition.

218.    Plaintiffs agreed to pay, and did pay, substantial sums in exchange for Defendants' promise to safeguard their eggs and embryos for the benefit of Plaintiffs.

219.    Defendants had a duty to exercise care in maintaining, preserving, and protecting Plaintiffs' eggs and embryos that were delivered to Defendants.  Further, Defendants had a duty to return the eggs and embryos, undamaged, to Plaintiffs, to whom the eggs and embryos belonged.

220.    Defendants invited the general public, including Plaintiffs, to entrust eggs and embryos to Defendants' care by holding out Pacific Fertility as a competent, capable, and established reproductive and storage facility able to handle and care for eggs and embryos in a safe and satisfactory manner, and in a manner specified on their websites.

221.    Because of Defendants' wrongful conduct, as set forth herein, the irreplaceable property of Plaintiffs was irreplaceably damaged, precluding its redelivery to them as provided for under the bailment contract.

222.    Defendants breached their duty to exercise care in the safekeeping of Plaintiffs' eggs and embryos delivered to Defendants and to return the eggs and embryos, undamaged, to Plaintiffs.

223.    As a direct and proximate result of Defendants' breach of bailment contract, Plaintiffs have been deprived of the opportunity to use the eggs and embryos they entrusted to Defendants, and have suffered damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### Premises Liability
### (Against Pacific Fertility and Prelude)

224.    Plaintiffs incorporate the above allegations by reference.

225.    At all relevant times, Pacific Fertility and Prelude owned, leased, and/or occupied the property, premises, machinery, and equipment, including Tank 4, on the premises at 55 Francisco Street, Suite 500, San Francisco, California 94133.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01586-JSC

226.     At all relevant times, Pacific Fertility and Prelude had a duty to use reasonable care to keep Plaintiffs' irreplaceable personal property in a reasonably safe condition and free from defects that would cause injury or harm to Plaintiffs' stored eggs and embryos.

227.     At all relevant times, Pacific Fertility and Prelude knew, or by reasonable inspection and monitoring should have known, of the defective condition of the premises, and specifically of Tank 4.

228.     At all relevant times, Pacific Fertility and Prelude were careless and negligent in the ownership, management, control and maintenance of the aforementioned real property, such that Plaintiffs, whose cryopreserved eggs and embryos were entrusted to Pacific Fertility and Prelude's care, were harmed.

229.     By reason of the foregoing, and as a direct and legal cause thereof, Plaintiffs have suffered injury, loss, harm, and damages.

**FIFTH CAUSE OF ACTION**
**Breach of Fiduciary Duty – Failure to Use Reasonable Care**
**(Against Pacific Fertility and Prelude)**

230.     Plaintiffs incorporate the above allegations by reference.

231.     At all times herein mentioned, Pacific Fertility and Prelude were the fiduciaries of Plaintiffs because they agreed to store, safeguard, secure, maintain, and account for Plaintiffs' eggs and embryos and because they represented that they were experts in the field of maintenance and protection of eggs and embryos.

232.     Pacific Fertility and Prelude acted on Plaintiffs' behalf for purposes of the maintenance and protection of Plaintiffs' eggs and embryos.

233.     Pacific Fertility and Prelude failed to act as a reasonably careful fiduciary would have acted under the same or similar circumstances with respect to the maintenance and protection of the eggs and embryos entrusted to their care.

234.     Pacific Fertility and Prelude's breach of fiduciary duty was a substantial factor in causing harm to Plaintiffs.

### SIXTH CAUSE OF ACTION
### Violations of the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*
### (Against All Defendants)

235.    Plaintiffs incorporate the above allegations by reference.

236.    The UCL prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice."

237.    Defendants' conduct set forth herein is unlawful because it constitutes negligence, gross negligence, breach of contract, bailment, breach of fiduciary duty, deceit, and strict products liability.

238.    Defendants' conduct is unfair because it is immoral, unethical, unscrupulous, oppressive, and substantially injurious.  Plaintiffs entrusted Defendants with their eggs and embryos to preserve their options for procreation, parenting, or assisting others experiencing infertility. Defendants breached that trust by, among other things:

      a.    failing to adequately design, manufacture, maintain, inspect, monitor, and/or test their liquid nitrogen storage tanks, including through a functional electronic tank monitoring system capable of detecting a rise in temperature or a drop in liquid nitrogen levels and promptly alerting staff to the immediate problem;

      b.    permitting a leakage or tank failure to occur with respect to one of their liquid nitrogen storage tanks—Tank 4—containing human eggs and embryos;

      c.    failing to inspect and/or adequately inspect Tank 4 on a daily basis;

      d.    failing to establish, maintain, and properly activate alarms;

      e.    failing to establish, maintain, and properly activate autofill devices and/or generator systems;

      f.    failing to disclose that it did not have appropriate processes and systems in place to protect clients' eggs and embryos;

      g.    failing to properly safeguard the eggs and embryos in its care; and

      h.    failing to follow reasonable scientific and laboratory procedures for safeguarding the eggs and embryos in their care.

239.    The gravity of the harm resulting from Defendants' conduct far outweighs any conceivable utility of this conduct.  There are reasonably available alternatives that would further Defendants' legitimate business interests, such as implementing reasonable protocols and procedures, as promised, to prevent a catastrophic failure.

240.    Plaintiffs could not have reasonably avoided injury from Defendants' unfair conduct. Plaintiffs did not know, and had no reasonable means of learning, that Defendants were not adequately safeguarding the eggs and embryos in their custody and control.

241.    Defendants' conduct also is fraudulent in violation of the UCL because it is likely to deceive a reasonable consumer.

242.    Defendants knowingly and intentionally concealed from Plaintiffs that their electronic monitoring and alarm and response systems and processes, and other equipment, including the storage tank, were inadequate to protect against damage to Plaintiffs' eggs and embryos.

243.    Defendants volunteered specific information to Plaintiffs through advertising, on websites, and in documents that their storage services were high quality, including representing that a tank could go without power or liquid nitrogen for "several days" without damaging the tissue it contained.  Plaintiffs viewed and relied upon Defendants' representations that their storage services were high quality, safe, and reliable.

244.    Defendants made these specific representations despite knowing their systems were inadequate to protect against damage to Plaintiffs' eggs and embryos.

245.    Defendants had ample means and opportunities to alert Plaintiffs to the fact that their electronic monitoring and alarm and response systems and processes were inadequate to protect against damage to Plaintiffs' eggs and embryos.  Defendants failed to disclose such inadequacies to Plaintiffs. Had Defendants disclosed such inadequacies to Plaintiffs, Plaintiffs would not have purchased Defendants' egg and embryo storage services.

246.    Defendants were under a duty to disclose that their storage systems and processes were inadequate given their exclusive knowledge of the inadequacies and because they made partial representations about their storage services without disclosing the inadequacies.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01586-JSC

247.   As a direct and proximate result of Defendants' unlawful and unfair conduct, Plaintiffs have suffered injuries in fact and seek appropriate relief under the UCL, including injunctive relief and restitution.

248.   The requested injunction under the UCL will primarily benefit the interests of the general public.  It will have the primary purpose and effect of prohibiting unlawful acts that threaten injury to members of the public who have placed, or who in the future will place, reproductive tissue under Defendants' care.

### SEVENTH CAUSE OF ACTION
**Violations of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.***
**(Against Pacific Fertility and Prelude)**

249.   Plaintiffs incorporate the above allegations by reference.

250.   Pacific Fertility and Prelude are "persons" as defined by Civil Code §§ 1761(c) and 1770 and have provided "services" as defined by Civil Code §§ 1761(b) and 1770.

251.   Plaintiffs are "consumers" as defined by Civil Code §§ 1761(d) and 1770 and have engaged in "transaction[s]" as defined by Civil Code §§ 1761(e) and 1770.

252.   Pacific Fertility and Prelude's acts and practices were intended to and did result in the sale of services to Plaintiffs, and those acts and practices violated Civil Code § 1770, including by:

      a.   representing that their services had characteristics, uses, and benefits that they did not have;

      b.   representing that their services were of a particular standard, quality, or grade, when they were not;

      c.   advertising services with intent not to sell them as advertised; and

      d.   representing that the subject of a transaction had been supplied in accordance with a previous representation when it had not.

253.   Pacific Fertility and Prelude's acts and practices violated the Consumers Legal Remedies Act by failing to disclose information in the context of transactions.

254.    Pacific Fertility and Prelude knew that their equipment, systems, and processes, including Defendants' storage tank, electronic monitoring, alarm, and response systems and processes, were inadequate to safely store Plaintiffs' eggs and embryos.

255.    Pacific Fertility and Prelude were under a duty to disclose that their equipment, systems, and processes were inadequate because they actively concealed this information and because they had exclusive knowledge, not known or reasonably accessible to Plaintiffs, of the inadequacy of their equipment, systems, and processes.  They were also subject to a duty to disclose because the information they failed to disclose was contrary to partial representations they made concerning the adequacy of their equipment, systems, and processes.

256.    Pacific Fertility and Prelude had ample means and opportunities to alert Plaintiffs to the fact that their equipment, systems, and processes were inadequate, including in person when meeting with Plaintiffs before egg and embryo storage.  Despite their opportunities to do so, Pacific Fertility and Prelude failed to disclose to Plaintiffs, and actively concealed, that Defendants' equipment, systems, and processes were inadequate to safely store human reproductive tissue.

257.    Pacific Fertility and Prelude's omissions were material because reasonable consumers would consider important, and would want to be told, information about the inadequacy of Defendants' equipment, systems, or processes connected to their ability to safely store Plaintiffs eggs and embryos

258.    As a direct and proximate result of this conduct, Plaintiffs have suffered damage.  Had Defendants not misrepresented the adequacy of, and concealed the inadequacy of, their equipment, systems, and processes, Plaintiffs would not have purchased Defendants' services and would not have gone through the time and emotional investment to store their reproductive tissue with Defendants.  In the meantime, Pacific Fertility and Prelude generated more revenue than they otherwise would have, unjustly enriching themselves.

259.    Plaintiffs are entitled to equitable relief, reasonable attorneys' fees and costs, declaratory relief, and a permanent injunction enjoining Pacific Fertility and Prelude from their unlawful, fraudulent, and deceitful activity.

260.    Pursuant to Cal. Civ. Code § 1782(a), Plaintiffs will send letters to Defendants notifying them of their CLRA violations and providing them with the opportunity to correct their business

46

practices.  If Pacific Fertility and Prelude do not correct their business practices, Plaintiffs will amend (or seek leave to amend) the complaint to add claims for monetary relief, including for actual, restitutionary, emotional distress, and punitive damages under the CLRA.

261.    The conduct of Pacific Fertility and Prelude set forth herein was reprehensible and subjected Plaintiffs to cruel and unjust hardship in conscious disregard of their rights, constituting oppression, for which Pacific Fertility and Prelude must be punished by punitive and exemplary damages in an amount according to proof.  Pacific Fertility and Prelude's behavior evidences a conscious disregard for the safety of the eggs and embryos entrusted to them, and by extension, those who placed the eggs and embryos in their care, including Plaintiffs.  Pacific Fertility and Prelude's conduct was and is despicable conduct and constitutes malice under Section 3294 of the California Civil Code.  An officer, director, or managing agent of Pacific Fertility and Prelude personally committed, authorized, and/or ratified the reprehensible conduct set forth herein.  Plaintiffs are entitled to an award of punitive damages sufficient to punish and make an example of these Defendants.

## EIGHTH CAUSE OF ACTION
### Deceit and Fraudulent Concealment
### (Against Pacific Fertility and Prelude)

262.    Plaintiffs incorporate the above allegations by reference.

263.    Defendants marketed and promoted their services and made representations to the public and to Plaintiffs that they were experts in cryopreservation, had state-of-the-art facilities, and would safely preserve and store Plaintiffs' eggs and embryos in liquid nitrogen according to certain protocols and standards until they were ready to use them.

264.    Defendants' representations were false, and Defendants either knew the truth or made the representations without regard for the truth.

265.    Defendants intended for Plaintiffs to rely on their representations and engage Defendants to perform services to preserve Plaintiffs' eggs and embryos, and Plaintiffs reasonably relied on Defendants' representations when availing themselves of Defendants' services for egg and embryo storage.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01586-JSC

266.     Defendants intentionally suppressed and concealed material facts concerning the adequacy of its storage systems and processes.  Defendants knew or reasonably should have known their electronic monitoring and alarm storage systems and processes were inadequate to protect against damage to Plaintiffs' eggs and embryos. Though it is standard in the industry to do so, Defendants did not equip Tank 4 with a liquid nitrogen autofilling system sufficient to replenish declining liquid nitrogen levels.  Defendants willfully omitted to disclose the inadequate nature of its storage systems and processes to Plaintiffs.

267.     Plaintiffs had no reasonable means of knowing Defendants' storage systems and processes were inadequate, or that Defendants' representations about such systems were incomplete, false, or misleading in that they failed to disclose such inadequacies.  Plaintiffs did not and reasonably could not have discovered Defendants' deception prior to purchasing their storage services.

268.     Defendants had ample means and opportunities to alert Plaintiffs to the fact that their electronic monitoring and alarm and response systems and processes were inadequate to protect against damage to Plaintiffs' eggs and embryos.  Defendants willfully failed to disclose such inadequacies to Plaintiffs.  Had Defendants disclosed the inadequacies to Plaintiffs, they would not have purchased Defendants' egg and embryo storage services.

269.     Defendants were under a duty to disclose that their storage systems and processes were inadequate given their exclusive knowledge of the inadequacies and because they made partial representations about their storage services without disclosing the inadequacies.

270.     Plaintiffs reasonably relied to their detriment upon Defendants' material omissions regarding the adequacy of their storage systems and processes.  Plaintiffs were unaware of the omitted material facts and would not have acted as they did had these facts been disclosed.  Had Plaintiffs known that Defendants' storage systems and processes were inadequate to protect against damage to their eggs and/or embryos, they would not have purchased such services.

271.     Plaintiffs sustained damage as a direct and proximate result of Defendants' deceit and fraudulent concealment.

272.     The foregoing acts and omissions of Defendants were committed maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights,

48

interests, and well-being to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## NINTH CAUSE OF ACTION
### Strict Products Liability – Failure to Warn
### (Against Chart)

273.    Plaintiffs incorporate the above allegations by reference.

274.    Chart manufactured, distributed, and/or sold the cryogenic equipment used at Pacific Fertility, including Tank 4.

275.    The cryogenic storage tank at issue had potential risks that were known or knowable in light of the scientific and medical knowledge that was generally accepted in the scientific and medical community at the time of the manufacture, distribution, or sale of the cryogenic storage Tank 4.

276.    The cryogenic storage Tank 4 was defective and unreasonably dangerous when it left Chart's possession because it did not contain adequate warnings, including warnings concerning certain risks, including the risk of defective seals that may result in catastrophic nitrogen loss, the risk of nitrogen loss and prevalence of this occurrence, the risk of a rise in temperature and the fact that the tanks are not equipped with sufficient alarms to notify users of catastrophic nitrogen loss or a rise in temperature that can damage and/or cause destruction of eggs or embryos, the rate of failure of the cryogenic storage tanks in the preservation of eggs or embryos or other human tissue, and the need for maintenance, inspection, and/or replacement of the cryogenic storage tanks.

277.    The potential risks presented a substantial danger when the cryogenic storage tank at issue was used or misused in an intended or reasonably foreseeable way.

278.    The ordinary consumer would not have recognized the potential for risks.

279.    Chart had constructive notice or knowledge and knew, or in the exercise of reasonable care, should have known that the cryogenic storage Tank 4 was dangerous, had risks, and/or was defective in manufacture and/or design, including that it could cause nitrogen loss and would damage and/or cause the destruction of cryopreserved materials, including eggs or embryos.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01586-JSC

280.     Chart failed to adequately warn or instruct concerning the potential risks of the cryogenic storage tank.

281.     It was foreseeable to Chart that failure to adequately warn about the risks of its cryogenic storage tank would cause irreparable harm to those whose eggs and embryos were cryopreserved therein, including the types of emotional distress suffered by Plaintiffs.

282.     As a result of Chart's failures to adequately warn, Plaintiffs were harmed as described herein, regardless of whether it is ever determined conclusively that certain eggs and embryos in Tank 4 are not viable.  The lack of sufficient instructions and warnings was a substantial factor in causing Plaintiffs' harm.

## TENTH CAUSE OF ACTION
### Strict Products Liability – Manufacturing Defect
### (Against Chart)

283.     Plaintiffs incorporate the above allegations by reference.

284.     Chart manufactured, distributed, and/or sold the cryogenic storage Tank 4.

285.     The cryogenic storage tank contained a manufacturing defect when it left Chart's possession.

286.     Chart had constructive notice or knowledge and knew, or in the exercise of reasonable care, should have known that the cryogenic storage tanks were dangerous, had risks, and/or were defective in manufacture, including that they could cause nitrogen loss and would damage and/or cause the destruction of cryopreserved materials, including eggs or embryos.

287.     As a result of Chart's conduct, Plaintiffs were harmed as described herein, regardless of whether it is ever determined conclusively that certain eggs and embryos in Tank 4 are not viable.

288.     The defective nature of the cryogenic storage tank was a substantial factor in causing Plaintiffs' harm.

## ELEVENTH CAUSE OF ACTION
### Strict Products Liability — Design Defect — Consumer Expectations Test
### (Against Chart)

289.     Plaintiffs incorporate the above allegations by reference.

290.     Chart manufactured, distributed, and/or sold the cryogenic storage Tank 4.

291.     The cryogenic storage tank did not perform as safely as an ordinary consumer would have expected it to perform when used in an intended or reasonably foreseeable way.

292.     Chart had constructive notice or knowledge and knew, or in the exercise of reasonable care, should have known that the cryogenic storage tanks were dangerous, had risks, and/or were defective, including in design, including that they could result in nitrogen loss and would damage and/or cause the destruction of cryopreserved materials, including eggs or embryos.

293.     As a result of Chart's conduct, Plaintiffs were harmed as described herein, regardless of whether it is ever determined conclusively that certain eggs and embryos in Tank 4 are not viable.

294.     The cryogenic storage tank's failure to perform safely was a substantial factor in causing Plaintiffs' harm.

## TWELFTH CAUSE OF ACTION
### Strict Products Liability – Design Defect – Risk-Utility Test
### (Against Chart)

295.     Plaintiffs incorporate the above allegations by reference.

296.     Chart manufactured, distributed, and/or sold the cryogenic storage Tank 4.

297.     The benefits of this tank's design are not outweighed by its risks, considering the gravity of the potential harm resulting from the use of the tank, the likelihood that the harm would occur, the feasibility of an alternative safer design at the time of manufacture, and the disadvantages of an alternative design.

298.     Chart had constructive notice or knowledge and knew, or in the exercise of reasonable care, should have known that the cryogenic storage tanks were dangerous, had risks, and/or were defective in design, including that they could result in nitrogen loss and would damage and/or cause the destruction of cryopreserved materials, including eggs or embryos.

299.     Plaintiffs were harmed because the tank lost liquid nitrogen.

300.     Chart's design of the tank was a substantial factor in causing Plaintiffs' harm.

## THIRTEENTH CAUSE OF ACTION
### Negligent Failure to Recall
### (Against Chart)

301.     Plaintiffs incorporate the above allegations by reference.

51
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01586-JSC

302.    Chart acted negligently by failing to recall, prior to the incident of March 4, 2018, the line of tanks that included Tank 4.

303.    Chart manufactured, distributed, and/or sold this line of tanks.

304.    Chart knew or reasonably should have known that, when used as intended, Tank 4 presented or was likely to present a danger to eggs and embryos.  Chart knew or reasonably should have known that the vacuum seal on Tank 4 was vulnerable to breach, and that upon such breach liquid nitrogen levels would drop, causing the eggs and embryos stored inside the tank to reach dangerously elevated temperatures.

305.    After Chart sold Tank 4 to Pacific Fertility and before March 4, 2018, Chart knew or reasonably should have known that the tank was susceptible to its vacuum seal breaking.  Nevertheless, at no point during this time period did Chart recall, repair, or warn of the danger posed by the tank.

306.    A reasonable manufacturer, distributor, or seller facing the same or similar circumstances as Chart would have recalled Tank 4 to ensure eggs and embryos were not endangered.

307.    Chart's failure to timely recall Tank 4 was a substantial factor in causing harm to Plaintiffs.  Had Chart recalled Tank 4 before the incident, the other Defendants would not have used it, and it would not have failed while Plaintiffs' eggs and embryos were stored within it.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the class defined above, respectfully request that the Court:

A.    Certify the class under Fed. R. Civ. P. 23(a), (b)(1), (b)(2), (b)(3), and/or (c)(4), as appropriate; appoint Plaintiffs as representatives of the class; and appoint the undersigned counsel as class counsel;

B.    Award Plaintiffs compensatory, restitutionary, rescissory, general, consequential, punitive and/or exemplary damages in an amount to be determined at trial;

C.    Award prejudgment interest as permitted by law;

D.    Enter an injunction against Defendants and their officers, agents, successors, employees, representatives, assigns, and any and all persons acting in concert with them, to ensure Defendants' compliance with California Business and Professions Code section 17200 *et seq*.;

1         E.      Enter an injunction against Defendants and their officers, agents, successors,

2 employees, representatives, assigns, and any and all persons acting in concert with them, mandating

3 that Defendants cease engaging in unfair competition as set forth above;

4         F.      Appoint a monitor to ensure Defendants comply with the injunctive provisions of

5 any decree of this Court;

6         G.     Retain jurisdiction over this action to ensure Defendants comply with such a

7 decree;

8         H.     Enter other appropriate equitable relief;

9         I.      Award reasonable attorneys' fees and costs, as provided for by law; and

10        J.      Grant such other and further relief as the Court deems just and proper.

11                   **<u>DEMAND FOR JURY TRIAL</u>**

12     Plaintiffs demand a trial by jury on all issues so triable.

13

14 Dated: May 30, 2018                      Respectfully submitted,

15

16                            By:   /s/ *Adam E. Polk*
                             Daniel C. Girard (State Bar No. 114826)

17                            Steven M. Tindall (State Bar No. 187862)
                             Jordan Elias (State Bar No. 228731)

18                            Adam E. Polk (State Bar No. 273000)

19                             **GIRARD GIBBS LLP**
                             601 California Street, 14th Floor

20                            San Francisco, CA 94108

21                            Tel: (415) 981-4800
                            Fax: (415) 981-4846

22                            dcg@girardgibbs.com

23                            smt@classlawgroup.com
                            je@girardgibbs.com

24                            aep@girardgibbs.com

25                            By:   /s/ *Adam B. Wolf*

26                            Adam B. Wolf (State Bar No. 215914)
                            Tracey B. Cowan (State Bar No. 250053)

27                            **PEIFFER WOLF CARR & KANE,**
                            **A PROFESSIONAL LAW CORPORATION**

28                            4 Embarcadero Center, Suite 1400
                            San Francisco, CA 94111

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01586-JSC

Tel: (415) 766-3545
Fax: (415) 402-0058
awolf@pwcklegal.com
tcowan@pwcklegal.com

By:    /s/ *Sarah R. London*
Elizabeth J. Cabraser (State Bar No. 083151)
Lexi J. Hazam (State Bar No. 224457)
Sarah R. London (State Bar No. 267083)
Tiseme G. Zegeye (State Bar No. 319927)
**LIEFF CABRASER HEIMANN &**
**BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111
Tel: (415) 956-1000
Fax: (415) 956-1008
ecabraser@lchb.com
lhazam@lchb.com
slondon@lchb.com
tzegeye@lchb.com

*Interim Class Counsel*

Joseph G. Sauder (*pro hac vice*)
**SAUDER SCHELKOPF LLC**
555 Lancaster Avenue
Berwyn, Pennsylvania 19312
Tel: (610) 200-0580
jgs@sstriallawyers.com

*Plaintiffs' Counsel*

## **ATTESTATION**

I, Adam E. Polk, am the ECF User whose identification and password are being used to file this Consolidated Amended Class Action Complaint.  Pursuant to Civil L.R. 5-1(i)(3), I attest under penalty of perjury that concurrence in this filing has been obtained by all counsel listed above.

Dated:  May 30, 2018                                    */s/ Adam E. Polk*
                                                              Adam E. Polk

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01586-JSC