Dena C. Sharp (State Bar No. 245869)
Jordan Elias (State Bar No. 228731)
Adam E. Polk (State Bar No. 273000)
Amy Zeman (State Bar No. 273100)
**GIRARD GIBBS LLP**
601 California Street, Suite 1400
San Francisco, California 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
chc@girardgibbs.com
je@girardgibbs.com
aep@girardgibbs.com
amz@classlawgroup.com

Adam B. Wolf (State Bar No. 215914)
Tracey B. Cowan (State Bar No. 250053)
**PEIFFER WOLF CARR & KANE, A
PROFESSIONAL LAW CORPORATION**
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Tel: (415) 766-3545
Fax: (415) 402-0058
awolf@pwcklegal.com
tcowan@pwcklegal.com

Elizabeth J. Cabraser (State Bar No. 083151)
Lexi J. Hazam (State Bar No. 224457)
Sarah R. London (State Bar No. 267083)
Tiseme G. Zegeye (State Bar No. 319927)
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Tel: (415) 956-1000
Fax: (415) 956-1008
ecabraser@lchb.com
lhazam@lchb.com
slondon@lchb.com
tzegeye@lchb.com

*Counsel for Plaintiffs and Interim Class Counsel*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| *IN RE PACIFIC FERTILITY CENTER LITIGATION* | Case No. 3:18-cv-01586-JSC <br><br> <u>**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**</u> <br><br> **PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION AND JOINDERS** <br><br> Date:   November 8, 2018 <br> Time:  9:00 a.m. <br> Ctrm:  F, 15th Floor <br> Judge: Hon. Jacqueline S. Corley |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

RELEVANT BACKGROUND ............................................................................................. 2

    I.      PFC provides fertility services and advertises safe, long-term storage services. ............... 2

    II.     The storage freezer containing Plaintiffs' tissue malfunctioned, and they have received conflicting information. ....................................................................................................... 3

    III.    Prelude and its subsidiary MSO are the companies that maintain the storage freezers, and they are not medical companies. ..................................................................................... 5

    IV.    To the extent Plaintiffs signed arbitration agreements, those agreements were with PFC and its doctors, not with Prelude, MSO, or Chart. ........................................................... 6

LEGAL STANDARD ........................................................................................................... 7

ARGUMENT ........................................................................................................................ 8

    V.     Plaintiffs' Claims Should Proceed Against Each Defendant in This Court, Not in Arbitration. ........................................................................................................................ 8

        A.     Non-signatories Chart and Prelude cannot enforce the arbitration agreements..... 8

            1.     Prelude has not carried its burden of establishing agency or third party beneficiary status......................................................................................9

                a.     Prelude is not an agent in any relevant respect……...…………...9

                b.     Prelude is not an intended third-party beneficiary……………....11

            2.     Defendants Prelude and Chart cannot invoke the arbitration agreement under principles of equitable estoppel…………………………………..12

                a.     The claims against Prelude and Chart are not intimately founded in or intertwined with the underlying contract…………………..........12

                b.     Allegations of a relationship between Defendants, including interdependent and concerted misconduct, are insufficient to support equitable estoppel………………………………......…...14

        B.     All of Plaintiffs' claims all fall outside the scope of the arbitration provision..... 15

            1.     Plaintiffs' claims do not arise from the rendition of medical services..…..15

i

2.      Plaintiffs' product liability, and fraud claims bear not resemblance to a medical malpractice theory…………………………………………….......18

VI.     All of Plaintiffs' nonarbitrable claims should be litigated without delay. ........................ 20

A.     Where some claims are arbitrable and some are not, the FAA requires bifurcated proceedings. ...................................................................................... 20

B.     A stay of any nonarbitrable claims would be inappropriate. ................................ 21

VII.    Plaintiffs C.D. and O.P. cannot be compelled to arbitrate their claims as they did not sign the arbitration agreement. ................................................................................. 23

CONCLUSION .................................................................................................................... 24

CONSOLIDATED OPPOSITION TO MOTION TO COMPEL ARBITRATION AND JOINDERS
CASE NO. 3:18-CV-01586-JSC

**TABLE OF AUTHORITIES**

**Cases**

*Arthur Andersen LLP v. Carlisle*,
    556 U.S. 624 (2009) ................................................................................................................. 8

*Ashbey v. Archstone Prop. Mgmt.*,
    785 F.3d 1320 (9th Cir. 2015) ............................................................................................... 9

*Baker v. Acad. of Art Univ. Found.*,
    No. 17-cv-03444-JSC, 2017 WL 4418973 (N.D. Cal. Oct. 5, 2017) ................................. 15

*Baker v. Birnbaum*,
    202 Cal. App. 3d 288 (1988) ............................................................................................... 24

*Britton v. Co-Op Banking Group*,
    4 F.3d 742 (9th Cir. 1993) ................................................................................................... 11

*Buckner v. Tamarin*,
    98 Cal. App. 4th 140 (2002) ............................................................................................... 23

*Bush v. Horizon W.*,
    205 Cal. App. 4th 924 (2012) ............................................................................................. 23

*Casa del Caffe Vergnano S.P.A. v. ItalFlavors, LLC*,
    816 F.3d 1208 (9th Cir. 2016) ...................................................................................... 15, 23

*Central Pathology Serv. Med. Clinic, Inc. v. Superior Court*,
    3 Cal. 4th 181 (1992) ..................................................................................................... 18, 19

*Dean Witter Reynolds, Inc. v. Byrd*
    470 U.S. 213 (1985) ...................................................................................................... 20, 21

*DeMartini v. Johns*,
    No. 3:12-CV-03929-JCS, 2012 WL 4808448 (N.D. Cal. Oct. 9, 2012) ............................. 7

*Goldman v. KPMG, LLP*,
    173 Cal. App. 4th 209 (2009) ............................................................................................. 14

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
    561 U.S. 287 (2010) ............................................................................................................. 15

*Howard v. Ferrellgas Partners, L.P.*,

   748 F.3d 975 (10th Cir. 2014) ............................................................................................. 23

*Jimenez v. Menzies Aviation Inc.*,

   No. 15-cv-02392-WHO, 2015 WL 5591722 (N.D. Cal. Sept. 23, 2015) ........................... 23

*JNK Entm't v. SP Sales & Entm't*,

   No. 15-cv-01908-RGK, 2015 WL 13283845 (C.D. Cal. Sept. 2, 2015) ........................ 21, 22

*Kilgore v. KeyBank, Nat'l Ass'n*,

   718 F.3d 1052 (9th Cir. 2013) .............................................................................................. 8

*Knox v. Ameriquest Mortg.*,

   No. 05-cv-00240-SC, 2005 WL 1910927 (N.D. Cal. Aug. 10, 2005) ................................ 15

*Kramer v. Toyota Motor Corp.*,

   705 F.3d 1122 (9th Cir. 2013) ..................................................................................... passim

*Letizia v. Prudential Bache Secs.*,

   802 F.2d 1185 (9th Cir. 1986) ............................................................................................ 11

*Mazza v. Am. Honda Motor Co.*,

   666 F.3d 581 (9th Cir. 2012) .............................................................................................. 19

*McLellan v. Fitbit, Inc.*,

   No. 3:16-cv-00036-JD, 2017 WL 4551484 (N.D. Cal. Oct. 11, 2017) .......................... 22, 23

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,

   460 U.S. 1 (1983) ............................................................................................................... 21

*Murphy v. DirectTV*

   724 F.3d 1218 (9th Cir. 2013) ..................................................................................... passim

*Perez v. Maid Brigade, Inc.*,

   No. 07-cv-3473-SI, 2007 WL 2990368 (N.D. Cal. Oct. 7, 2007) ........................................ 7

*Richards v. Jefferson Cty., Ala.*,

   517 U.S. 793 (1996) ........................................................................................................... 22

*Roes v. SFBSC Mgmt.*,

   656 F. App'x 828 (9th Cir. 2016) ................................................................................... 9, 10

*Smith v. Bayer Corp.*,
  564 U.S. 299 (2011) ..................................................................................................... 22

*Smith v. Ben Bennett, Inc.*,
  133 Cal. App. 4th 1507 (2005)...................................................................................... 19

*Swift v. Zynga Game Network*,
  805 F. Supp. 2d 904 (N.D. Cal. 2011) ..................................................................... 10, 11

*Switch, LLC v. Ixmation, Inc.*,
  No. 15-cv-01637-MEJ, 2015 WL 4463672 (N.D. Cal. July 21, 2015)................................ 7

*Titolo v. Cano*,
  157 Cal. App. 4th 310 (2007)................................................................................ 17, 18, 20

*Tracer Research Corporation v. National Environmental Services Company*
  42 F.3d 1292 (9th Cir. 1994)...................................................................................... 20, 21

*United Commc'ns Hub, Inc. v. Qwest Commc'ns, Inc.*,
  46 F. App'x 412 (9th Cir. 2002)........................................................................................ 21

*Victoria v. Superior Court*,
  40 Cal. 3d 734 (1985).......................................................................................................... 18

*Whitworth v. Solarcity Corp.*, Case No. 16-cv-01540-JSC,
  2016 WL 677862 (N.D. Cal. Nov. 16, 2016) ...................................................................... 8

*Witt v. Yale-New Haven Hosp.*,
  977 A.2d 779 (Conn. Super. Ct. 2008) ............................................................................. 17

**Statutes**

Cal. Code Civ. P. § 1295................................................................................................ 19

California Code of Civil Procedure section 1295(a)................................................................ 18

**INTRODUCTION**

Plaintiffs entrusted their frozen eggs and embryos to Pacific Fertility Center, based on promises that the clinic's long-term freezer storage services were safe and secure. They were told their eggs and embryos would be preserved for at least a decade, and that the clinic had state-of-the-art technology in place that would prevent any of the freezers from failing and provide automatic alerts immediately if any problem arose. Discovery to date has shown that ███████████████████████████ ████████████████████████████████████████████████████ to Prelude Fertility, Inc., a separate company ████████████████████████████████████.

In early March 2018, ████████████████████████. Despite PFC's claims about state-of-the-art technology, the malfunction went unnoticed and the temperature of the eggs and embryos rose to unsafe levels. This class action seeks to hold Defendants accountable to Plaintiffs and the many other would-be parents who were affected. Plaintiffs also seek transparency about the status of their eggs and embryos, and what measures will be taken to prevent this type of catastrophe from occurring again. Defendants' Motion and Joinders reflect their responses to this crisis: evasion and delay.

Prelude and Chart Industries, Inc., the manufacturer of the failed storage freezer, seek to compel arbitration even though neither is a party to the arbitration agreement between Plaintiffs and PFC's doctors. Non-signatories generally cannot invoke arbitration agreements, and Prelude and Chart cannot shoehorn this case into the narrow exceptions to that rule. Prelude, for example, relies on a supposed agency relationship between itself and PFC. But discovery shows that PFC and Prelude ██████ ████████████████████████████████████. Equally meritless are Prelude's and Chart's claims that Plaintiffs should be estopped from litigating their claims in court. The equitable doctrine of estoppel applies only when a plaintiff's suit *relies* on the contractual terms in the arbitration agreement. Plaintiffs' claims against Prelude and Chart arise from statutes and under common law — not from any contract — so there is no basis for equitable estoppel. In sum, neither Prelude nor Chart can invoke the arbitration agreement; Plaintiffs' claims against them should move forward in this Court.

Nor can PFC compel arbitration of Plaintiffs' claims. The arbitration agreement by its express terms applies only to "medical malpractice" disputes. None of PFC's medical services are at issue here. Long-term freezer storage is the only service at issue, and that service is not medical in nature. Although PFC provides other, unrelated medical services, those services are not at issue. Instead, at this point, based on the discovery available, PFC is a Defendant in this case primarily because of its misrepresentations and omissions about the security of long-term egg and embryo storage, not because of any medical services it provided. As no aspect of Plaintiffs' case takes issue with medical services, the medical malpractice arbitration provision simply does not apply.

Even if the Court were to send some small portion of the case to arbitration, all remaining claims should proceed before this Court unstayed. Staying nonarbitrable claims is disfavored, and a stay would make little sense here given (1) the time exigencies and (2) the discrete nature of the alleged liabilities stemming from (a) Prelude's grossly negligent storage practices, (b) Chart's design and manufacture of a defective storage freezer, and (c) PFC's misrepresentations and omissions. These liability theories are sufficiently distinct that no benefit would result from staying some claims just because others are being arbitrated.

In view of the record developed in discovery, and for the reasons explained in greater depth below, the Court should deny PFC's motion and disallow Prelude's and Chart's joinders.

## RELEVANT BACKGROUND

**I.**     <u>**PFC provides fertility services and advertises safe, long-term storage services.**</u>

Pacific Fertility Center ("PFC") is ███████████████████████████████████ ███████████████████. PFC employs ███████████████████████████ ███████████████████████████████████████. (Declaration of Adam E. Polk ("Polk Decl."), Ex. 1 (PRELUDE000327).) The medical services that PFC doctors provide includes hormone treatment, ovarian stimulation, and egg retrieval. (Polk Decl., Ex. 3 (PRELUDE000297).) As PFC puts it, its "focus is on getting our patients pregnant and seeing them through the initial stages of pregnancy." (Polk Decl., Ex. 2 at 1.)

When patients engage PFC, PFC also tells them they can store their eggs and embryos at the clinic, but also advises that they consider outside storage facilities. (Polk Decl., Ex. 3

(PRELUDE000302, 314).) Accordingly, many people entrust their eggs and embryos to other freezer storage facilities around the country. Those facilities are typically run and managed by non-physicians and are non-medical in nature.

PFC's website and marketing materials have for years included a host of claims about the safety of storing frozen eggs and embryos, including that the clinic boasts "survival rates consistently above 90%." (ECF No. 44 (Consol. Amend. Class Action Compl. ("CAC") at ¶¶ 59, 61-64.) Those materials emphasize the reliable and state-of-the-art storage system at the clinic, saying:

- The freezers "are computer controlled and monitored 7 days a week with a dedicated alarm system,"
- They are equipped with "numerous sensors" to detect dangerous drops in liquid nitrogen,
- The sensors "are connected to a telephone system that will alert staff to an alarm condition outside of normal working hours," and
- Each freezer "gets physical inspection daily, looking for problems or signs of problems," including looking for liquid nitrogen leaks or other signs of tank failure.

(CAC at ¶¶ 40, 59, 61-64.)

## II.  The storage freezer containing Plaintiffs' tissue malfunctioned, and they have received conflicting information.

On March 4, 2018, staff at the clinic's lab discovered a loss of a substantial amount of liquid nitrogen in one of its storage freezers (which PFC refers to as Tank 4). This incident affected thousands of cryopreserved eggs and embryos and more than 400 individuals and families. (CAC at ¶ 95.)

In an email to affected clients on March 11, 2018, PFC described the failure as "a very unfortunate incident" in which the storage freezer containing Plaintiffs' cryopreserved eggs and embryos "lost liquid nitrogen for a brief period of time," and disclosed that a "preliminary analysis" indicated that some of the eggs and embryos in the freezer may have been destroyed. (CAC at ¶ 4.)

Learning that their reproductive tissue had been compromised caused Plaintiffs devastation, distress, and panic. (CAC at ¶¶ 8, 107.) For many, the reproductive tissue had represented their last and only chance for a biological child. (CAC at ¶¶ 8, 107.) PFC informed Plaintiffs that it is not possible to know whether their particular eggs or embryos are viable until they are warmed, and even then, the full

1   extent of the damage cannot be known without attempting a pregnancy. (CAC at ¶¶ 8, 107). These

2   messages have added to the uncertainty and anguish for affected women and families. (CAC at ¶¶ 8,

3   107.)

4           PFC asserts in its arbitration motion that it has since confirmed that "there is viable tissue from

5   the [freezer]," (Mot. at 1), but neglects to mention that there is also *unviable* tissue from the freezer.

6   (CAC at ¶ 130.) PFC's reference to "encouraging results," (Mot. at 1), rings hollow for families who

7   have thawed their material, only to learn that it cannot ever be used. (CAC at ¶¶ 109, 131). Other

8   families were initially told without qualification that their tissue was destroyed. (CAC at ¶ 126.)

9           Compounding its mixed messages, PFC now claims "several early pregnancies and successful

10  thaws of eggs that had been stored in that [freezer]" (Mot. at 1) — yet Defendants have provided no

11  further information on these matters to Plaintiffs. Plaintiffs do not know, for example, how many thaws

12  have been attempted or how many of those attempted thaws have been successful. (CAC at ¶ 110.) Nor

13  do Plaintiffs know whether the successful thaws came from only one part of the freezer or whether their

14  material is at a greater or lesser risk because of where it was located. (CAC at ¶ 110.) Defendants have

15  not provided any information about additional potential risks to the eggs and embryos, such as

16  chromosomal abnormalities, resulting from the uncontrolled temperature change. (CAC at ¶ 111.) Nor

17  have Defendants produced any information regarding the temperature data from the freezer that

18  malfunctioned so that Plaintiffs may seek an outside genetic expert opinion to inform them of the risks

19  associated with a potential transfer or pregnancy. (CAC at ¶ 111-12.) For those who confront difficult

20  choices as to whether to undergo additional retrievals, or whether to try to implant their eggs and

21  embryos, PFC's statements are meaningless without data. (*E.g.*, CAC at ¶ 114.)

22          As Plaintiffs and the other affected families wait for critical data regarding the status of their

23  tissue and the risks posed by the incident, they find themselves stuck in limbo, losing egg quality, egg

24  quantity, and reproductive choices. (CAC at ¶¶ 44, 46, 87, 114). For Plaintiffs and class members, time

25  is of the essence.

26

27

28

CONSOLIDATED OPPOSITION TO MOTION TO COMPEL ARBITRATION AND JOINDERS
CASE NO. 3:18-CV-01586-JSC

1  **III.**   **Prelude and its subsidiary MSO are the companies that maintain the storage freezers, and**

2        **they are not medical companies.**

3        PFC is ███████████████████████████████████. (Polk Decl., Ex. 1

4  (PRELUDE000327).) During discovery limited to the subject of arbitration, Defendants ███████

5  ██████████████████████████████████████████████████████████████████████████

6  ███████████████████████████████ PFC admitted in a sworn discovery response that it employs

7  none of the personnel involved in egg and embryo storage. (Polk Decl., Ex. 4 (Resp. to Interrog. No.

8  10).) ████████████████████████████████████████████████████████████████

9  ████████████. (Polk Decl., Ex. 5 (PRELUDE000369).) Prelude, which runs a national network of

10  egg and embryo storage facilities, added PFC to its network in September 2017. (CAC at ¶¶ 23, 26.)

11  ██████████████████████████████████. (Polk Decl., Ex. 1 (PRELUDE000327).) ██████

12  ██████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████

14  ██████████████████████████████████████████████

15  ██████████ (Polk Dec., Ex. 6 at ¶ 3 (PRELUDE000478).) Thus, ██████████████████

16  ███████████████████████████████

17        1.   The ██████████████████████████████████████████████████

18  ████████████████████████████████████████████

19  ██████████████████████████████████████ (Polk Decl., Ex. 5 at ¶ 1(d).

20  (PRELUDE000369).) ██████████████████████████████

21  ██████████████████████████████████████████████████████

22        (*Id.* at ¶ 2(b) (emphasis added).)

23        2.   Next, ███████████████████████████████████████████

24  █████████████████████████████████████████████

25  █████████████████████████████ (Polk Decl., Ex. 7 at ¶ 1(d) (PRELUDE000427).)

26  █████████████████████████████████████████████████████

27  █████████████████████████████████████████████

28        ██████████████ (*Id.* at ¶ 2(b) (emphasis added).)

5

3.      Finally, ███████████████████████████████

███████████████████████████████████

███████      (Polk Decl., Ex. 1 at Recital ¶ D & ¶ 5 (PRELUDE000327, 334-335.) ██

███████████████████████████████████████

███████████████████      (*Id.* at ¶ 8.8 (PRELUDE000342.)

**IV.    To the extent Plaintiffs signed arbitration agreements, those agreements were with PFC and its doctors, not with Prelude, MSO, or Chart.**

Of the eight named Plaintiffs, only six signed arbitration agreements. (*See* Schultz Decl. ¶ 3, Exs. A through S.) All six of those agreements are between Plaintiffs ███████████. (*Id.*) ████████████████████████████████████████

████████████████████████ (*Id.* emphasis added).) ████████████████████

█████████████████████████████████████████████

████████████████████████████████████ (*Id.* at Article 1 (emphasis added).)

The arbitration agreements ████████████████████████████████████████

████████████████████████████████████████████

██████████████████ (*Id.* at Article 2.) As noted, PFC ████████████████████

███████

The arbitration agreements ███████████████████████. (*Id.*) ████████████

████████████████████████████████████████

██████ (*Id.*) ████████████████████████████████

██████████████████████████████████████████

██████  for instance, state that:

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

6

(Polk Decl., Ex. 5 at ¶ 6 (PRELUDE000371), Ex. 7 at ¶ 6 (PRELUDE000429) (emphases added).)

Similarly, ███████████████████████████████████████████████

███████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████

(Polk Decl., Ex. 1 at ¶ 13.1(a) (PRELUDE000346) (emphasis added).)

Defendants █████████████████████ in response to discovery requests Plaintiffs propounded on the subject of arbitration. (Polk Decl., ¶ 2.) All three Defendants have indicated that they have produced all documents in their possession, custody, and control that may be relevant to the pending motion. (*Id.*) Defendants have produced no evidence showing an agency relationship between PFC or its doctors, on the one hand, and Prelude or MSO, on the other. (*Cf.* Polk Decl., Ex. 5 at ¶ 6 (PRELUDE000371), Ex. 7 at ¶ 6 (PRELUDE000429), Ex. 1 at ¶ 13.1(a) (PRELUDE000346).)

Finally, Chart is the company that designed and manufactured the freezers ████████████ ██████████████ including the freezer that malfunctioned and gave rise to this lawsuit. (Polk Decl., Ex. 8 at 3.) Chart, through a distributor, provided that freezer well before any Plaintiff decided to do business with PFC. (*Id.*) Chart has admitted that none of its work relating to the freezer constituted medical services. (Polk Decl., Ex. 9 (Resp. to RFA No. 2).)

### LEGAL STANDARD

A "summary judgment-like" standard governs a motion to compel arbitration. *See Switch, LLC v. Ixmation, Inc.*, No. 15-cv-01637-MEJ, 2015 WL 4463672, at *3 (N.D. Cal. July 21, 2015) (citing *Perez v. Maid Brigade, Inc.*, No. 07-cv-3473-SI, 2007 WL 2990368 at *3 (N.D. Cal. Oct. 7, 2007)). The court construes "all facts and reasonable inferences that can be drawn from those facts in a light most favorable to the non-moving party." *DeMartini v. Johns*, No. 3:12-CV-03929-JCS, 2012 WL 4808448, at *4 (N.D. Cal. Oct. 9, 2012). Arbitration is appropriate only where the court determines: (1) that a valid arbitration agreement exists; and (2) that the agreement encompasses the dispute at issue.

7

*Whitworth v. Solarcity Corp.*, Case No. 16-cv-01540-JSC, 2016 WL 677862, at *2 (N.D. Cal. Nov. 16, 2016) (citing *Kilgore v. KeyBank, Nat'l Ass'n*, 718 F.3d 1052, 1058 (9th Cir. 2013)).

**ARGUMENT**

**V.**     **Plaintiffs' Claims Should Proceed Against Each Defendant in This Court, Not in Arbitration.**

      Prelude and Chart are non-signatories to the arbitration agreements entered into between Plaintiffs and their PFC doctors, so they cannot avail themselves of these agreements. Prelude's and Chart's efforts to link these agreements to Plaintiffs' claims against them lack merit. Prelude is neither an agent of PFC, nor an intended third-party beneficiary, and equitable estoppel does not apply where none of Plaintiffs' claims against Prelude or Chart is contractual in nature. As for PFC, it cannot enforce an arbitration provision limited in scope to medical malpractice disputes where the long-term freezer storage service at issue here is non-medical. Accordingly, Plaintiffs' nonarbitrable claims should proceed in this Court without further delay.

      **A.**     **Non-signatories Chart and Prelude cannot enforce the arbitration agreements.**

      Prelude and Chart concede that they did not sign the arbitration agreements at issue. For its part, Prelude asserts that arbitration is nevertheless appropriate based on three theories, asserting that (1) it is an agent of PFC; (2) it is a third-party beneficiary of the medical malpractice arbitration agreements PFC's doctors entered into with their patients; and (3) Plaintiffs are equitably estopped from avoiding arbitration. Chart, by contrast, seeks to compel arbitration based solely on equitable estoppel grounds.

      The general rule is that non-signatories to arbitration agreements cannot enforce them. *See Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1126 (9th Cir. 2013); *see also Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 632 (2009)). In addition, because the question is whether any agreement to arbitrate exists at all between Plaintiffs and Prelude or Chart, the federal policy favoring arbitration places no thumb on the scale in answering that question. *Kramer*, 705 F.3d at 1126 ("[t]he strong public policy in favor of arbitration does not extend to those who are not parties to an arbitration agreement.") (quotation omitted). For the reasons that follow, both Prelude and Chart have failed to carry their

burden of establishing that they should be able to invoke an arbitration agreement to which neither is a party. Plaintiffs' claims against these entities belong in court, not in arbitration.[1]

### 1. Prelude has not carried its burden of establishing agency or third-party beneficiary status.

#### a. Prelude is not an agent in any relevant respect.

Prelude contends that it can invoke the arbitration agreements as an agent of PFC and the clinic's doctors. The relevant language in the agreement states that ██████████████████ ████████████████████ (*See* Schultz Decl. ¶ 3, Exs. A through S.) The agreement never mentions Prelude, though, and certainly does not identify Prelude as an agent of PFC or its doctors. Prelude thus bears the burden of establishing its purported agency relationship. *See Roes v. SFBSC Mgmt.*, 656 F. App'x 828, 829 (9th Cir. 2016) (citing *Ashbey v. Archstone Prop. Mgmt.*, 785 F.3d 1320, 1323 (9th Cir. 2015)). Prelude cannot carry that burden.

In an attempt to carry its burden, Prelude resorts mostly to citing the amended complaint. While Prelude cites various paragraphs of the complaint, none actually alleges that Prelude is an agent of PFC or its doctors. (Prelude's Br. at 5-6 (citing CAC at ¶¶ 23-30, 41, 192-93).) And after Plaintiffs filed their amended complaint, they obtained discovery that reveals ████████████████████



1) ███████████████████████████████████
███████████████ (Polk Decl., Ex. 5.) ████████████████
███████████████████████████████████████
████ (*Id.* at ¶ 6 (PRELUDE000371) (emphasis added).)

2) ███████████████████████████████
██████████████████████████ (Polk Decl., Ex.
7.) ███████████████████████████

---

[1] Plaintiffs do not contest PFC's ability to invoke the arbitration agreement as a general matter, but as discussed below in Argument Section V.B, all of Plaintiffs' claims against PFC are outside the scope of the arbitration provision in question and therefore nonarbitrable.

CONSOLIDATED OPPOSITION TO MOTION TO COMPEL ARBITRATION AND JOINDERS
CASE NO. 3:18-CV-01586-JSC

1    ████████████████████████████████████████████████ (*Id.* at ¶ 6

2    (PRELUDE000429).)

3    3)   █████████████████████████████████████

4    ████████████████ (Polk Decl., Ex. 1 (PRELUDE000327).) ██████████

5    ███████████████████████████████████████

6    ████████████████████████████████████████

7    ██████████████████████ (*Id.* at ¶ 13.1 (PRELUDE000346).)

8    Post-complaint discovery, ████████████████, that rules out an agency relationship is

9    dispositive; it outweighs mere allegations to the contrary. *See Roes v. SFBSC Mgmt.*, 656 F. App'x 828,

10   829-31 (9th Cir. 2016) (collecting cases)). In *Murphy v. DirectTV*, the Ninth Circuit was presented with

11   just that situation. 724 F.3d 1218, 1232-33 (9th Cir. 2013). A third party had moved to enforce an

12   arbitration agreement as an agent, but the key contract expressly disavowed agency. *Id.* The Ninth

13   Circuit not only held that the third party was "not entitled to compel arbitration as [an] agent," but also

14   remanded so the district court could consider "whether sanctions are an appropriate response to

15   counsel's apparent violations of the duty of candor." *Id.* at 1232-33, 1233 n.9 (citing Model Rule of

16   Prof'l Conduct 3.3(a)). Other courts in this circuit have similarly declined to compel arbitration where

17   post-complaint discovery revealed an independent contractor relationship, rather than agency. *See, e.g.*,

18   *Swift v. Zynga Game Network*, 805 F. Supp. 2d 904, 916-17 (N.D. Cal. 2011).

19   Prelude offers just one additional piece of evidence in its attempt to prove an agency

20   relationship: a short three-paragraph declaration from one of its executives. (ECF No. 56-1.) Prelude

21   claims this declaration establishes that Prelude is an agent of PFC in connection with PFC's "tissue

22   storage operation and the care provided by the doctors." (Prelude Br. at 5.) But the declaration is far

23   narrower; it says only that PFC delegates authority to Prelude to provide "billing and collection

24   services." (ECF No. 56-1 at ¶¶ 2-3.) That is consistent ████████████████████████

25   ████████████████████████████████████████ (*E.g.*, Polk Decl.,

26   Ex. 1 at ¶ 8.8 (PRELUDE000346).) An agency relationship limited to billing and collections does not

27   allow Prelude to invoke an arbitration clause limited to medical malpractice disputes. Instead, the

28   agency doctrine only allows non-signatories to invoke arbitration agreements when "the wrongful acts

10

1  … for which they are sued relate to their behavior as agents or their capacities as agents." *Swift*, 805 F.

2  Supp. 2d at 916 (citing *Letizia v. Prudential Bache Secs.*, 802 F.2d 1185 (9th Cir. 1986)). This lawsuit

3  bears no connection to Prelude's billing and collection services. Prelude cannot invoke the agreement

4  here as an agent.

5        One other aspect of Prelude's brief also requires correction. The brief includes a sentence that

6  strongly implies that Prelude (rather than PFC) is the entity that employs the fertility clinic's

7  physicians. It states, "Plaintiffs' allegations … against ***Prelude*** are all based on the alleged agency

8  relationship with ***its doctors***." (Prelude's Br. at 6 (emphasis added).) But by all accounts, including

9  Prelude's sworn discovery responses, Prelude does *not* employ the facility's physicians. Instead, PFC

10  employs the physicians. (Polk Decl., Ex. 4 (Resp. to Interrogs. No. 2 (admitting that the doctors are

11  employed by PFC), No. 10 (admitting that Prelude does not employ anyone responsible for storing

12  reproductive tissue).) This contradiction between Prelude's brief and Prelude's discovery responses

13  appears to stem from Prelude having simply copied the sentence in question (along with several others)

14  verbatim from PFC's brief, changing only the word "PFC" to "Prelude." (*Compare* Mot. at 13:17-18

15  (referring to PFC and "its doctors"), *with* Prelude's Br. at 6:6-7 (referring to Prelude and "its doctors").)

16  With the suggestion that Prelude employs the clinic's physicians unsupported by any evidence, it too

17  cannot carry Prelude's burden of establishing agency. *See Murphy*, 724 F.3d at 1232-33.

**b.    Prelude is not an intended third-party beneficiary.**

19        Prelude next claims it can enforce the arbitration agreements as an intended third-party

20  beneficiary. As Prelude's brief confirms, however, this argument is wholly derivative of its agency

21  argument, hinging on the incorrect notion that there is a relevant "agency relationship" between Prelude

22  and PFC or PFC's doctors. (Prelude's Br. at 5.) Because Prelude is not an agent in any relevant respect,

23  the Court should reject Prelude's third-party beneficiary argument on that basis alone.

24        Independently, the third-party beneficiary doctrine requires proof that the parties to an

25  agreement expressly intended to benefit the non-signatory in question. *Murphy*, 724 F.3d at 1233-34;

26  *Britton v. Co-Op Banking Group*, 4 F.3d 742, 745 (9th Cir. 1993) ("If the parties to the contract had no

27  intention to benefit a third party, that third party has no rights under the contract."). Prelude offers no

28  evidence that Plaintiffs or their doctors intended to benefit Prelude — a venture-backed egg and

11

CONSOLIDATED OPPOSITION TO MOTION TO COMPEL ARBITRATION AND JOINDERS
CASE NO. 3:18-CV-01586-JSC

embryo freezing startup formed in late 2016 — back when they signed their contracts. Nor is such evidence likely to exist. After all, Prelude did not acquire PFC until September 2017, CAC ¶¶ 24, 26, which is well *after* all of the arbitration agreements had already been executed. (*See* Schultz Decl. Exs. A through S.) The fact that Prelude had no connection to the fertility clinic or its doctors when the agreements were executed undermines the notion that every signatory intended for the agreement to benefit Prelude. In any event, mere ambiguity as to the intent of signatories "militates against concluding that [the non-signatory] is a third-party beneficiary." *Murphy*, 724 F.3d at 1234. Prelude has not established that it was an intended third-party beneficiary of the agreements in question.

### 2.  Defendants Prelude and Chart cannot invoke the arbitration agreement under principles of equitable estoppel.

Defendants' equitable estoppel arguments omit the full legal standard that applies in this context. (PFC Br. at 14-15; Prelude Br. at 2-4; Chart Br. at 2-3.) The Ninth Circuit has made clear equitable estoppel rarely provides legitimate grounds on which to compel arbitration, holding that "[b]ecause generally only signatories to an arbitration agreement are obligated to submit to binding arbitration, equitable estoppel of third parties *in this context is narrowly confined*." *Murphy*, 724 F.3d at 1229 (emphasis added). Accordingly, a party is equitably estopped from avoiding arbitration "only under *two very specific conditions*…. (1) when a signatory must rely on the terms of the written agreement in asserting its claims against the non-signatory or the claims are intimately founded in and intertwined with the underlying contract, and (2) when the signatory alleges substantially interdependent and concerted misconduct by the non-signatory and another signatory and the allegations of interdependent misconduct are founded in or intimately connected with the obligations of the underlying agreement." *Id*.

Prelude and Chart have not established that these necessary conditions are satisfied.

### a.  The claims against Prelude and Chart are not intimately founded in or intertwined with the underlying contract.

California law directs courts to asks two questions in this context. First, would the plaintiff "have a claim independent of the existence of the [contract]?" *Kramer*, 705 F.3d at 1131-32.  Second, are "the causes of action against the nonsignatory … intimately founded in and intertwined with the

underlying contract obligations[?]" *Id.* The "emphasis of the case law is unmistakably on the claim itself." *Id.* at 1132.

Plaintiffs' claims against Prelude and Chart exist independently of the contracts between Plaintiffs and PFC's physicians, and are not intimately founded in any contractual terms. Plaintiffs have brought suit against Prelude and Chart exclusively under tort and property law doctrines. They need not — and do not — rely on any contractual terms to assert those claims. (*See* CAC ¶¶ 190–206 (negligence), ¶¶ 215–23 (bailment), ¶¶ 224–29 (premises liability); ¶¶ 230–34 (breach of fiduciary duty); ¶¶ 235–48 (UCL); ¶¶ 249–61 (CLRA); ¶¶ 262–72 (deceit); ¶¶ 273–307 (products liability claims against Chart).) Claims under statutes and common law, not premised on any particular contractual terms, do not allow for application of estoppel. *See Kramer*, 705 F.3d at 1132 (declining to apply equitable estoppel to consumer protection and warranty claims because the duties giving rise to those claims arise independently of any contract); *accord Murphy*, 724 F.3d at 1231 ("causes of action, which … largely arose under California consumer protection law, were not sufficiently intertwined with [written contracts] to trigger equitable estoppel").

Initially, Plaintiffs pled a breach of contract claim against Prelude based on representations including those on the Pacific Fertility Center website. (Polk Decl., Ex. 10.) Plaintiffs ███████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████ (Polk Decl., Ex. 1 (PRELUDE000327), Ex. 5 (PRELUDE000369), Ex. 7 (PRELUDE000427).) Consequently, ████████████████████████████████████████████ ██████████████████████ and Plaintiffs have voluntarily dismissed their breach of contract claim against Prelude. (ECF No. 107.) None of the pending claims against Prelude (or Chart) relies on any term of any contract.

Defendants, relying in part on *Murphy*, nevertheless argue that Plaintiffs' non-contract claims are intertwined with contracts they entered into with PFC and its doctors because the complaint acknowledges the existence of those contracts and thus "*referenced* contracts … contain[ing] binding arbitration provisions." (Prelude Br. at 3 (emphasis added).) But *Murphy* recognizes that "[e]ven if [Defendant] is correct that Plaintiffs' claims on some abstract level require the existence of the [contract], the law is clear that this is not enough for equitable estoppel." 724 F.3d at 1230. California

CONSOLIDATED OPPOSITION TO MOTION TO COMPEL ARBITRATION AND JOINDERS
CASE NO. 3:18-CV-01586-JSC

1    courts accordingly reject the very logic that Defendants try to apply here — that referencing the

2    contract is enough for a finding that the claims are intertwined with the contract. *Goldman v. KPMG,*

3    *LLP*, 173 Cal. App. 4th 209, 218 (2009). "[M]erely making reference to an agreement with an

4    arbitration clause is not enough." *Id.* Instead, the claims must wholly rely on the written terms of that

5    contract. *See id.* ("The difference between 'reference' … and 'reliance' … is significant.").

6         Here, the claims against Chart and Prelude do not rely on any obligations imposed by contract.

7    Plaintiffs' lawsuit therefore is not "'contrary to equity,' and there is no basis in equity for requiring

8    them to arbitrate with parties with whom they have no arbitration agreement." *Goldman*, 173 Cal. App.

9    4th at 221.

10             **b.      Allegations of a relationship between Defendants, including**
                         **interdependent and concerted misconduct, are insufficient to support**
11                       **equitable estoppel.**

12        Prelude and Chart suggest that, even if Plaintiffs' claims against them are not actually

13   intertwined with the contract between Plaintiffs and PFC's doctors, equitable estoppel can still apply by

14   reason of the "relationship among the parties." (Prelude Br. at 3-4; Chart Br. at 3.) The Ninth Circuit

15   held otherwise in *Kramer*. There, the defendant argued for equitable estoppel on the basis that the

16   complaint alleged collusion and interdependent misconduct between a non-signatory defendant and the

17   signatory. 705 F.3d at 1132-33. The Ninth Circuit held that "California state contract law does not

18   allow a nonsignatory to enforce an arbitration agreement based upon a mere allegation of collusion or

19   interdependent misconduct between a signatory and nonsignatory." *Id*. Instead, allegations of a close

20   relationship are not enough: "the allegations of interdependent misconduct [still] must be founded in or

21   intimately connected with the obligations of the underlying agreement." *Id.* at 1133 (quoting *Goldman*,

22   173 Cal. App. 4th at 219). Thus, "[e]ven where a plaintiff alleges collusion, '[t]he *sine qua non* for

23   allowing a nonsignatory to enforce an arbitration clause based on equitable estoppel is that the claims

24   the plaintiff asserts against the nonsignatory are dependent on or inextricably bound up with the

25   contractual obligations of the agreement containing the arbitration clause.'" *Murphy*, 724 F.3d at 1232

26   (quoting *Goldman*, 173 Cal. App. 4th at 229); *accord Kramer*, 705 F.3d at 1132-33.

27        As discussed, Plaintiffs' claims against Prelude and Chart are not founded in, or intimately

28   connected with, the contract between Plaintiffs and PFC's doctors — which alone is dispositive of

---

14

CONSOLIDATED OPPOSITION TO MOTION TO COMPEL ARBITRATION AND JOINDERS
CASE NO. 3:18-CV-01586-JSC

Prelude's and Chart's equitable estoppel arguments. *Kramer*, 705 F.3d at 1131, 1133. Plaintiffs do not allege conspiracy. And ███████████████████████████████

███████████████ (Polk Decl., Ex. 5 at ¶ 6 (PRELUDE000371) ████████████████

████████████████████████████████████████████████████████████████████████

As such, Defendants' own authorities require rejection of their equitable estoppel argument. *See, e.g., Murphy*, 724 F.3d at 1232 (non-signatory unable to enforce arbitration agreement where it cannot establish that the claims against it are intertwined with written agreement containing the arbitration provision); *Baker v. Acad. of Art Univ. Found.*, No. 17-cv-03444-JSC, 2017 WL 4418973, at *5 (N.D. Cal. Oct. 5, 2017) (unlike here, there was an undisputed agency relationship between defendants relating to the alleged underlying violations); *compare* Section V.A.1.a, *supra*.

Because neither prong of the equitable estoppel test is met, Prelude's and Chart's attempt to rely on that doctrine to force arbitration is foreclosed.

**B.      All of Plaintiffs' claims all fall outside the scope of the arbitration provision.**

Arbitration cannot be compelled when the arbitration agreement's scope does not encompass the subject matter of the litigation. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010); *Casa del Caffe Vergnano S.P.A. v. ItalFlavors, LLC*, 816 F.3d 1208, 1211 (9th Cir. 2016). Plaintiffs' claims here all fall outside the scope of the arbitration provision in question. As a result, none of their claims can be compelled to arbitration.

**1.      Plaintiffs' claims do not arise from the rendition of medical services.**

The arbitration clause that Defendants invoke is expressly limited to "any issue of *medical malpractice*." (*See* Schultz Decl. ¶ 3, Exs. A, C, E, G, I, M (emphasis added).) Of the three Defendants, only PFC devoted space in its brief to addressing whether this suit raises "issues of medical malpractice." (Mot. at 8-10.) But even PFC assumes its own conclusion, saying Plaintiffs' "entire complaint is based on the core allegation of medical malpractice." (*Id.* at 8.)

PFC has misread the complaint. "A plaintiff is master of his complaint and may choose which causes of action to bring from the relevant possibilities." *Knox v. Ameriquest Mortg.*, No. 05-cv-00240-SC, 2005 WL 1910927, at *4 (N.D. Cal. Aug. 10, 2005). Here, Plaintiffs' complaint states unequivocally: "None of Plaintiffs' claims involves any allegation of medical malpractice." (CAC at ¶

15

CONSOLIDATED OPPOSITION TO MOTION TO COMPEL ARBITRATION AND JOINDERS
CASE NO. 3:18-CV-01586-JSC

189.) The fact that PFC relies exclusively on the allegations of the complaint, yet cannot identify any allegations within the complaint that assert liability based on medical malpractice, mandates that PFC's motion (as well as Prelude's and Chart's joinders) be denied.

Under the arbitration agreement in question, a case will not raise an issue of medical malpractice unless it arises from the manner in which "medical services" were "rendered." In this case, Plaintiffs' claims do not arise from the rendering of medical services. They arise instead from a defective long-term storage freezer, the negligence of the non-medical personnel responsible for the freezer, and the false representations that reliable technology was in place to prevent the type of catastrophic freezer failure that occurred. (CAC at ¶¶ 3, 63-64, 98.) Plaintiffs' claims, in other words, do not stem from the rendition of medical services and thus fall outside the scope of the arbitration agreements.

This is not to suggest that PFC provides no medical services at all. PFC is a healthcare provider and does provide medical services, ranging from hormone treatment to prenatal care. But none of those services gave rise to Plaintiffs' claims. And while PFC markets egg and embryo long-term storage as an option for customers to consider once other services are finished, ███████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████ (Polk Decl., Ex. 5, ¶ 2(b) (PRELUDE000369).) In fact, the storage freezers at issue are marketed primarily for use in the "breeding industry." (Polk Decl., Ex. 11.)

When patients engage PFC to perform in vitro fertilization, PFC ████████████████

███████████████████████████████████████████████████████

██████████████ (Polk Decl., Ex. 3 (PRELUDE000302, 314).) Accordingly, many people entrust their eggs and embryos to other freezer storage facilities around the country. Those facilities, like Prelude, are run and managed by non-physicians and are non-medical in nature. The fact that Plaintiffs happened to elect to store their eggs and embryos in the same physical location as where they previously received medical services, instead of somewhere else, does not convert long-term freezer storage into medical care.

CONSOLIDATED OPPOSITION TO MOTION TO COMPEL ARBITRATION AND JOINDERS
CASE NO. 3:18-CV-01586-JSC

Although some actions by physicians may fall within the scope of medical services even if not treatment related, *see generally Titolo v. Cano*, 157 Cal. App. 4th 310, 320-22 (2007), there still must be some allegation that a physician is taking or supervising the key actions. In *Titolo*, the court held that "communications between a physician and his or her patient's disability insurer" constituted the rendering of medical services. *Id.* at 322. But the court emphasized that the conduct was "regarding the diagnosis and/or treatment of the patient *by th[e] physician*." *Id.* at 318 (emphasis added); *see also id.* (emphasizing that "the present case was based on [defendant's] *actions and services as a physician* and arose out of actions related to [his] medical treatment of [the plaintiff]") (emphasis added). Unlike in *Titolo*, when the storage freezer containing Plaintiffs' tissue failed, there was no physician responsible for maintaining that freezer. The freezer was not under a physician's supervision, even indirectly, nor was it under the care of a hospital or medical corporation. The freezer was ███████████████████ ████████████████████████████████████████████████████████████ ████████████ (Polk Decl., Ex. 5, ¶ 2(b) (PRELUDE000369).) Thus, long-term freezer storage is *not* a "medical service" and falls outside the scope of the arbitration provision Defendants seek to invoke.

At least one court has already held that claims arising from improperly discarded reproductive material do not sound in medical malpractice. *Witt v. Yale-New Haven Hosp.*, 977 A.2d 779, 782 n.1 (Conn. Super. Ct. 2008) (finding that "the standards governing ordinary negligence appl[ied]" to claims that a hospital "discarded ovarian tissue that was supposed to remain cryogenically stored; no medical treatment or procedure was occurring at the time…."). In *Witt*, even though the defendant was sued in its capacity as a medical provider, the court held the standards governing ordinary negligence applied because the alleged negligence "did not require professional judgment[,] the performance of any particular medical skill," or "medical expertise." *Id.*; *see also* Polk Decl., Ex. 12 (*Penniman v. Univ. Hosps. Health Sys.*, No. 894396, ¶¶ 6, 8 (Ohio Ct. of Common Pleas, May 18, 2018) (denying motion to dismiss and holding defendants accused of negligence in connection with "the *storage* of the woman's eggs or of an embryo *prior to implantation* . . . . have not established that the plaintiffs' claims sound in medical malpractice") (emphasis in original)). Similarly, here, Defendants cannot show that the maintenance and monitoring of long-term storage freezers requires medical expertise or skill. Indeed, Defendants ████████████████████████████████████████████████████████████████

CONSOLIDATED OPPOSITION TO MOTION TO COMPEL ARBITRATION AND JOINDERS
CASE NO. 3:18-CV-01586-JSC

(Polk Decl., Ex. 1 (PRELUDE000327) ████████████████████

████████████████████████████████████████████████████████

████████████████████████ As such, there is no basis for holding the negligence at issue

here sounds in medical malpractice.

Therefore, because the arbitration provision is expressly limited to the rendering of medical

services and all of Plaintiffs' claims fall outside that scope, Defendants cannot compel Plaintiffs to

arbitrate their claims.

> **2.     Plaintiffs' product liability and fraud claims bear no resemblance to a medical malpractice theory.**

At a minimum, the allegations underlying Plaintiffs' claims numbered 6 through 13 are too

distinct from a medical malpractice theory to be subject to the arbitration clause in question. The claims

are for (i) misrepresentations and concealment by PFC and Prelude, and (2) unique product-specific

claims against Chart.

The arbitration clause that PFC invokes borrows its language from California Code of Civil

Procedure section 1295(a).[2] The California Supreme Court has confirmed that this language is "clear

and unmistakable" such that the arbitration clause "applies *only* to actions for medical malpractice."

*Victoria v. Superior Court*, 40 Cal. 3d 734, 746 (1985) (emphasis added).

Whether a claim is one for malpractice does not turn on how the claim is styled. For example, a

claim of battery can arise in the malpractice context (e.g., a doctor opting to exceed her authority during

a procedure) or outside the malpractice context (e.g., a doctor engaging in assault during a routine

exam). Therefore, whether a legal claim constitutes a "dispute as to medical malpractice" depends, not

on the cause of action itself (e.g., negligence or battery), but on the alleged basis for liability. *Titolo*,

157 Cal. App. 4th at 320.

Moreover, arbitration may be compelled only if the allegations show that *both* the nature *and*

the cause of the injury were "directly related" to the manner in which medical services were provided.

---

[2] While Defendants obliquely refer to MICRA in their Motion and Joinders, the question of whether
Plaintiffs' claims are subject to any MICRA provisions has not been presented here.  Plaintiffs reserve
the right to address those issues if and when they are properly before the Court.

CONSOLIDATED OPPOSITION TO MOTION TO COMPEL ARBITRATION AND JOINDERS
CASE NO. 3:18-CV-01586-JSC

*Id.* (citing *Central Pathology Serv. Med. Clinic, Inc. v. Superior Court*, 3 Cal. 4th 181, 192 (1992)). But if either the injury's nature or its cause is not directly related to how medical services were rendered, the dispute is outside the scope of the medical clause and, hence, arbitration cannot be compelled. *Id.*; *accord Smith v. Ben Bennett, Inc.*, 133 Cal. App. 4th 1507, 1525-26 (2005) (only a legal theory that effectively "aris[es] out of a professional negligence claim" is subject to arbitration under Cal. Code Civ. P. § 1295).

Other than the UCL claims for unlawful and unfair conduct, causes of action 6 through 8 arise solely from Defendants' alleged fraud and concealment. (CAC at ¶¶ 235-72.) These claims relate to misstatements and omissions about the nature of the facilities and equipment used to store Plaintiffs' eggs and embryos. For example, Plaintiffs allege that Defendants:

- advertised that their storage freezers could go without power or liquid nitrogen for "several days" (CAC at ¶ 243);
- concealed that they had not equipped the storage freezer with an adequate liquid nitrogen auto-filling system (CAC at ¶ 266); and
- failed to disclose the inadequate electronic monitoring, alarm, and response systems (CAC at ¶ 268).

Plaintiffs' injuries for purposes of these claims were caused not by subsequently rendered services but, rather, by Defendants' pre-incident misrepresentations and omissions. *See, e.g.*, *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012) (noting that "the last events necessary for liability" in an action for consumer fraud are "communication of the advertisements to the claimants and their reliance thereon"). Further, the "nature" of the injury under these claims — including lost money and time — is different from the nature of the injury under medical malpractice claims. Plaintiffs were injured, in other words, by being duped into giving Defendants their business in the first place. (*E.g.*, CAC at ¶ 258 ("Had Defendants not misrepresented the adequacy of, and concealed the inadequacy of, their equipment, systems, and processes, Plaintiffs would not have purchased Defendants' services and would not have gone through the time and emotional investment to store their reproductive tissue with Defendants.").)

Similar points hold true for causes of action 9 through 13, which focus on the defective manner in which Chart designed or manufactured the storage freezer, and Chart's failure to recall the freezer or even warn people about its deficiencies. (*Id.* at ¶¶ 273-307.) The alleged failure to design and manufacture a functional storage freezer (and to refrain from later recalling it or issuing corrective warnings) is a "cause" that bears no resemblance to a medical malpractice theory. (Polk Decl., Ex. 9 (Resp. to RFA Nos. 2, 6) (admitting that Chart's provision of cryogenic storage tanks to PFC do not constitute medical services or medical procedures, and that Chart "is not licensed to provide medical services").)

Thus, the alleged misconduct underlying claims 6 through 13 does not relate to the manner in which medical services were rendered, and these claims lie outside the scope of the arbitration clause. *Titolo*, 157 Cal. App. 4th at 320. At a minimum, therefore, the medical malpractice arbitration provision cannot be used to compel arbitration of causes of action 6 through 13.[3]

## VI.   All of Plaintiffs' nonarbitrable claims should be litigated without delay.

### A.   Where some claims are arbitrable and some are not, the FAA requires bifurcated proceedings.

Even if the Court determines that some, but not all, of Plaintiffs' claims are subject to arbitration, settled precedent dictates that the remainder of the case should proceed in this forum.

In *Dean Witter Reynolds, Inc. v. Byrd*, the Supreme Court held that Congress' "preeminent concern" in enacting the FAA — "to enforce private agreements into which parties had entered" — "requires that we rigorously enforce agreements to arbitrate, even if the result is 'piecemeal' litigation, at least absent a countervailing policy manifested in another federal statute." 470 U.S. 213, 221 (1985). Thus, the parties' agreement controls even if it results in "bifurcated proceedings." *Id*. at 217-21. The Supreme Court reiterated this point in *KPMG LLP v. Cocchi*, holding that "when a complaint contains both arbitrable and nonarbitrable claims, the Act requires courts to 'compel arbitration of pendent arbitrable claims when one of the parties files a motion to compel, even where the result would be the

---

[3] For the reasons discussed in the preceding section, the Court should deny arbitration as to all of Plaintiffs' claims, including claims 1 through 5, as none of the claims are based on how medical services were rendered.

CONSOLIDATED OPPOSITION TO MOTION TO COMPEL ARBITRATION AND JOINDERS
CASE NO. 3:18-CV-01586-JSC

1   possibly inefficient maintenance of separate proceedings in different forums.'" 565 U.S. 18, 22 (2011)

2   (quoting *Dean Witter*, 470 U.S. at 217). Similarly, in *Tracer Research Corporation v. National*

3   *Environmental Services Company*, the Ninth Circuit concluded that a trade secret misappropriation

4   claim was not arbitrable and therefore "should be tried in the district court," even after a panel of

5   arbitrators had issued an injunction against the defendants. 42 F.3d 1292, 1295 (9th Cir. 1994). The

6   court explained that "[w]e cannot expand the parties' agreement to arbitrate in order to achieve greater

7   efficiency. The Federal Arbitration Act '*requires* piecemeal resolution when necessary to give effect to

8   an arbitration agreement.'" *Id.* at 1294 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr.*

9   *Corp.*, 460 U.S. 1, 20 (1983) (emphasis in original)).

10          Under the same principle, if this Court determines that arbitration should be compelled for some

11   or all of Plaintiffs' claims against PFC but for none of their claims against Prelude or Chart, the

12   nonarbitrable claims against those defendants should proceed in this Court. In *Moses H. Cone*, the

13   Supreme Court was untroubled by the possibility that a hospital might have to litigate against a

14   construction company and an architect in different forums, reasoning that arbitration agreements must

15   be enforced according to their terms: "[A]n arbitration agreement must be enforced notwithstanding the

16   presence of other persons who are parties to the underlying dispute but not to the arbitration agreement.

17   If the dispute between Mercury and the Hospital is arbitrable under the Act, then the Hospital's two

18   disputes will be resolved separately — one in arbitration, and the other (if at all) in state-court

19   litigation." 460 U.S. at 20 (emphasis omitted).

20          **B.    A stay of any nonarbitrable claims would be inappropriate.**

21          PFC requests a stay in the event that part of its motion is granted. (Mot. at 15.) But when only

22   part of a lawsuit is subject to arbitration, there is a "heavy presumption" that "the arbitration and the

23   lawsuit will each proceed in its normal course." *Dean Witter*, 470 U.S. at 225 (White, J., concurring).

24   Accordingly, "when feasible, it is preferable to proceed with litigation of the nonarbitrable claims."

25   *JNK Entm't v. SP Sales & Entm't*, No. 15-cv-01908-RGK, 2015 WL 13283845, at *5 (C.D. Cal. Sept.

26   2, 2015) (citing *United Commc'ns Hub, Inc. v. Qwest Commc'ns, Inc.*, 46 F. App'x 412, 415 (9th Cir.

27   2002)). Courts in this Circuit recognize that a stay under the Federal Arbitration Act may not be

28   "[e]xpand[ed]" to cover nonarbitrable claims unless (1) "the outcome of the nonarbitrable claims will

21

CONSOLIDATED OPPOSITION TO MOTION TO COMPEL ARBITRATION AND JOINDERS
CASE NO. 3:18-CV-01586-JSC

depend upon the arbitrator's decision" or (2) "the arbitrable claims predominate." *JNK Entm't*, 2015 WL 13283845, at *5.

Proceeding with litigation of Plaintiffs' nonarbitrable claims is both feasible and important. For example, the class claims against Prelude and Chart would be unaffected by the outcome of any individual arbitration against PFC. There could be no preclusion as to non-claimant Plaintiffs and class members because they would be neither joined nor represented in the arbitration. *See Richards v. Jefferson Cty., Ala.*, 517 U.S. 793, 798 (1996) (rule against nonparty preclusion); *Smith v. Bayer Corp.*, 564 U.S. 299, 315-17 (2011) (judgment prior to class certification does not preclude claims of absent class members).

Further, any arbitration against PFC or Prelude would not determine the outcome of Plaintiffs' separate claims against Chart for the additional reason that those claims depend on unique products liability doctrines and violations. *See, e.g.*, *JNK Entm't*, 2015 WL 13283845, at *6 (declining to stay nonarbitrable claims that were not premised on the same alleged violations at issue in the arbitrable claims, and rejecting the defendant's argument that there would be overlapping discovery); *see also McLellan v. Fitbit, Inc.*, No. 3:16-cv-00036-JD, 2017 WL 4551484, at *5 (N.D. Cal. Oct. 11, 2017) (denying motion to stay the claims of a plaintiff who opted out of arbitration where the defendant failed to show that the outcome of the arbitration would have any effect on the court's consideration of the plaintiff's claims).

Nor could it be fairly said on this record that any arbitrable claims against PFC — and Plaintiffs contend there are none — predominate. To the contrary, ███████████████████ ████████████████████████████████████████████████████████ ███████████████ (Polk Decl., Ex. 4 (Resp. to Interrog. No. 10); Ex. 5 (PRELUDE000371) ████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ███████████████████████████ *accord* Polk Decl., Ex. 7 (PRELUDE000429) ████████████ ██████████████████████████████████████████. Given that discovery has

CONSOLIDATED OPPOSITION TO MOTION TO COMPEL ARBITRATION AND JOINDERS
CASE NO. 3:18-CV-01586-JSC

1 shown ████████████████████, it would make little sense to stay all proceedings in

2 this forum if only claims against PFC are determined to be arbitrable.

3     It is similarly undisputed that Chart designed and manufactured the freezer at issue. (Polk Decl.,

4 Ex. 8 at 3.) Chart, through its distributor, provided PFC with the freezer well before any Plaintiff signed

5 their agreements with PFC. Chart has admitted that its provision of the freezer to PFC does not

6 constitute medical services or medical procedures and that it is not licensed to provide medical services.

7 Thus, as with Plaintiffs' claims against Prelude, Plaintiffs' product liability claims against Chart are

8 independent from their omissions-based fraud, negligence, and other claims against PFC.

9     A stay would be particularly unwarranted because Plaintiffs and class members urgently need

10 information about the status of their frozen eggs and embryos to guide the reproductive choices they

11 now face. *See* Background Section II, *supra*; *Jimenez v. Menzies Aviation Inc.*, No. 15-cv-02392-WHO,

12 2015 WL 5591722, at *1 (N.D. Cal. Sept. 23, 2015) (denying a stay request in light of "the impact on

13 plaintiffs and the potential loss of evidence occasioned by the delay."). Plaintiffs and the other members

14 of the proposed class are not only distraught but they also need prompt answers to be able to make

15 important family-planning decisions.

16 **VII.   Plaintiffs C.D. and O.P. cannot be compelled to arbitrate their claims as they did not sign**

17 **the arbitration agreement.**

18     Finally, PFC's filing concedes that Plaintiffs C.D. and O.P. did not sign an arbitration

19 agreement. (*See* Schultz Decl. (ECF No. 52-2) Exs. 1A, 1M.) For this reason, these Plaintiffs cannot be

20 compelled to arbitrate their claims against any of the Defendants.

21     The Ninth Circuit has made clear that a "party cannot be required to submit to arbitration any

22 dispute which he has not agreed so to submit." *Casa del Caffe Vergnano*, 816 F.3d at 1211 (citation

23 omitted). California law likewise recognizes the general rule that "a party cannot be compelled to

24 arbitrate a dispute that he has not agreed to resolve by arbitration." *Buckner v. Tamarin,* 98 Cal. App.

25 4th 140, 142 (2002); *see also Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 977 (10th Cir. 2014)

26 (Gorsuch, J.) ("Everyone knows the Federal Arbitration Act favors arbitration. But before the Act's

27 heavy hand in favor of arbitration swings into play, the parties themselves must *agree* to have their

28 disputes arbitrated…. [E]ven under the FAA it remains a 'fundamental principle' that 'arbitration is a

23

matter of contract,' not something to be foisted on the parties at all costs.") (emphasis in original) (citation omitted).

Plaintiffs C.D. and O.P. did not sign the arbitration agreement, and their claims exist independently of their reproductive partners' claims. Consequently, these Plaintiffs' claims must proceed in this Court. *See, e.g.*, *Bush v. Horizon W.*, 205 Cal. App. 4th 924, 926-27 (2012), *as modified* (Apr. 30, 2012) (plaintiff brought claims "in her own right" for emotional distress arising from alleged elder abuse of her mother, and therefore was not bound to her mother's agreement to arbitrate medical malpractice disputes); *see also Baker v. Birnbaum*, 202 Cal. App. 3d 288, 291 (1988) (holding that a spouse who signs an agreement to arbitrate her medical malpractice claims does not bind a non-signatory spouse to arbitration when the medical services for which the signatory spouse contracted were for herself only).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the motion to compel arbitration in full. To the extent the Court grants any part of the motion, it should exercise its discretion to permit the remainder of the suit to proceed unstayed.

Dated: September 13, 2018                    Respectfully submitted,

**GIRARD GIBBS LLP**

By: _/s/ Dena C. Sharp_

Dena C. Sharp
Jordan Elias
Adam E. Polk
Amy Zeman
601 California Street, Suite 1400
San Francisco, California 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
chc@girardgibbs.com
je@girardgibbs.com
aep@girardgibbs.com
amz@classlawgroup.com

CONSOLIDATED OPPOSITION TO MOTION TO COMPEL ARBITRATION AND JOINDERS
CASE NO. 3:18-CV-01586-JSC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Adam B. Wolf
Tracey B. Cowan
**PEIFFER WOLF CARR & KANE, PLC**
4 Embarcadero Center, Suite 1400
San Francisco, CA  94111
Tel: (415) 766-3545
Fax: (415) 402-0058
awolf@pwcklegal.com
tcowan@pwcklegal.com

Elizabeth Cabraser
Lexi J. Hazam
Sarah R. London
Tiseme Zegeye
**LIEFF CABRASER HEIMANN**
**& BERNSTEIN, LLP**
275 Battery Street, Fl. 29
San Francisco, CA 94111
Tel:  (415) 956-1000
Fax:  (415) 956-1008
ecabraser@lchb.com
lhazam@lchb.com
slondon@lchb.com
tzegeye@lchb.com

*Counsel for Plaintiffs and Interim Class Counsel*

CONSOLIDATED OPPOSITION TO MOTION TO COMPEL ARBITRATION AND JOINDERS
CASE NO. 3:18-CV-01586-JSC