PAGES 1 - 25

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JACQUELINE SCOTT CORLEY

IN RE PACIFIC FERTILITY CENTER      )
LITIGATION.                          ) NO.  18-CV-01586 JSC
                                     )
                                     )
                                     )  SAN FRANCISCO, CALIFORNIA
                                     )  WEDNESDAY
_____ )  OCTOBER 17, 2018


**TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND**

**RECORDING  9:33 A.M. - 10:04 A.M.**

**APPEARANCES:**

**FOR PLAINTIFFS**          GIRARD SHARP, LLP
                            601 CALIFORNIA STREET, SUITE 1400
                            SAN FRANCISCO, CALIFORNIA 94108
                    BY:  **DENA C. SHARP, ESQUIRE**
                         **AMY MARIE ZEMAN, ESQUIRE**


                            LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                            275 BATTERY STREET, 29TH FLOOR
                            SAN FRANCISCO, CALIFORNIA 94111
                    BY:  **SARAH R. LONDON, ESQUIRE**


                            PEIFFER WOLF CARR & KANE,
                            4 EMBARCADERO CENTER, SUITE 1400
                            SAN FRANCISCO, CALIFORNIA 94111
                    BY:  **TRACY B. COWEN, ESQUIRE**


(FURTHER APPEARANCES ON FOLLOWING PAGE)

*TRANSCRIBED BY:  JOAN MARIE COLUMBINI, CSR #5435, RPR*
                 *RETIRED OFFICIAL COURT REPORTER, USDC*

**APPEARANCES (CONTINUED):**

**FOR DEFENDANT PRELUDE**      MORRISON & FOERSTER LLP
**FERTILITY, INC.**            425 MARKET STREET
                              SAN FRANCISCO, CALIFORNIA 94105
                    **BY:  ERIN M. BOSMAN, ESQUIRE**


**FOR DEFENDANT PACIFIC**      GALLOWAY, LUCCHESE, EVERSON & PICCHI
**FERTILITY CENTER**           2300 CONTRA COSTA BLVD., SUITE 350
                              PLEASANT HILL, CALIFORNIA 94523
                    **BY:  JOSEPH S. PICCI, ESQUIRE**
                    **AARON T. SCHULTZ, ESQUIRE**


**FOR DEFENDANT CHART**         MORGAN LEWIS & BOCKIUS, LLP
**INDUSTRIES, INC.**            ONE MARKET
                              SPEAR STREET TOWER
                              SAN FRANCISCO, CALIFORNIA 94105
                    **BY:  MOLLY MORIARTY LANE, ESQUIRE**

```
1    WEDNESDAY, OCTOBER 17, 2018                    9:33 A.M.

2    (TRANSCRIBER'S NOTE: DUE AT TIMES TO COUNSELS' FAILURE TO

3    IDENTIFY THEMSELVES WHEN SPEAKING, CERTAIN SPEAKER

4    ATTRIBUTIONS ARE BASED ON EDUCATED GUESS.)

5                          ---oOo---

6                         PROCEEDINGS

7          THE CLERK:  CALLING CIVIL ACTION C 18-1586, IN RE;

8    PACIFIC FERTILITY CENTER LITIGATION.

9          THE COURT:  GOOD MORNING.  THIS IS JUDGE CORLEY.

10         SO I UNDERSTAND THE PARTIES WISH TO DISCUSS A

11   QUESTION REGARDING DISCOVERY FOR THE PURPOSES, FOR AT LEAST IN

12   ADVANCE OF MEDIATION, AS WELL AS THE MEDIATION DATE.

13         SO IF I COULD HAVE COUNSEL FOR THE PLAINTIFFS SORT

14   OF -- I HAVE READ YOUR EMAIL, AND I GUESS WHAT I'M WONDERING IS

15   I SORT OF NEED AN EXPLANATION OF THE DISPUTE AS TO WHETHER YOU

16   HAVE SUFFICIENT INFORMATION OR NOT.

17         MS. SHARP:  SURE.  THANK YOU, YOUR HONOR.  THIS IS

18   DENA SHARP FOR THE PLAINTIFFS.  FIRST OF ALL, WE APPRECIATE THE

19   COURT TAKING TIME OF ITS BUSY SCHEDULE FOR US THIS MORNING.

20         AS YOUR HONOR NOTES, THERE'S -- THERE ARE REALLY TWO

21   RELATED ISSUES THAT WE WISH TO RAISE THIS MORNING.  THE FIRST

22   RELATES TO THE PRODUCTION OF TISSUE VIABILITY DATA, WHICH I

23   THINK WE CAN ALL AGREE IS IMPORTANT IN THIS LITIGATION FOR

24   REASONS THAT WE DISCUSSED WHEN WE WERE IN FRONT OF THE COURT

25   BACK IN AUGUST, BUT, REALLY, THE SCOPE AND GRANULARITY OF THAT
```

1    DATA TO BE PRODUCED.

2            AND AS WE TRIED TO ALLUDE TO IN THE EMAIL THAT WE

3    SENT THE COURT LAST NIGHT, THE CORE OF THE DAYLIGHT BETWEEN THE

4    PARTIES THAT THE POINT, AS WE PERCEIVE IT, YOUR HONOR, IS

5    WHETHER THE PLAINTIFF SHOULD HAVE ACCESS TO WHAT WE ARE SORT OF

6    THINKING OF AS THE RAW DATA RELATING TO TISSUE VIABILITY.

7            AND, TO BE CLEAR, WHEN WE'RE TALKING ABOUT VIABILITY,

8    WE'RE REFERRING TO THE SUCCESS AND FAILURE RATES FOR THAWING,

9    FERTILIZING, AND IMPLANTING EGGS AND EMBRYOS THAT WERE IN

10   TANK 4 AT THE TIME OF THE INCIDENT.

11           SO, REALLY, THE CRUX OF THE ISSUE COMES DOWN TO THIS,

12   WHICH IS WE HAVE BEEN WORKING COOPERATIVELY WITH OUR

13   COUNTERPARTS ON THE DEFENSE SIDE TO TRY TO FIGURE OUT THE BEST

14   MEANS OF PRODUCING THIS INFORMATION.  AND WE HAD A COUPLE OF

15   FALSE STARTS IN WHICH WE RECEIVED AGGREGATE DATA THAT, FROM OUR

16   PERSPECTIVE AND FROM THE PERSPECTIVE OF OUR EXPERT WHO IS AN

17   EMBRYOLOGIST, RAISED MORE QUESTIONS THAN ANSWERS.  AND WE CAN

18   EXPLAIN A LITTLE BIT ABOUT WHY THAT IS, BUT --

19           **THE COURT:**  SO CAN YOU -- CAN YOU EXPLAIN TO ME WHAT

20   IS THE AGGREGATE DATA?

21           **MS. SHARP:**  CERTAINLY.  SO MAYBE IT WOULD BE HELPFUL

22   IF I ILLUSTRATE WHAT WE HAVE PROVIDED TO THE DEFENDANTS AND

23   THEN WHAT THEY'VE PROVIDED TO US, JUST TO SHOW EXACTLY WHAT THE

24   DIFFERENCE IS.

25           SO WHAT WE GOT FROM THE DEFENDANTS LAST WEEK, MOST

1    RECENTLY, IS -- I AM LOOKING AT IT.  IT'S A ONE-PAGE DOCUMENT

2    THAT HAS TWO CHARTS ON IT, AND ONE SAYS -- ONE INCLUDES

3    INFORMATION ABOUT EMBRYO THAWS WITH INTENT TO TRANSFER, AND ONE

4    INCLUDES INFORMATION ABOUT OF OOCYTE THAWS -- AND OOCYTES ARE

5    EGGS -- WITH INTENT TO CREATE EMBRYOS.

6              ON THE OTHER END OF THE SPECTRUM, WHAT WE HAD ASKED

7    THE DEFENDANTS TO GIVE US WAS TO POPULATE A SPREADSHEET THAT

8    HAS, YOU KNOW, A DOZEN OR MAYBE TWO DOZEN COLUMNS OF

9    INFORMATION THAT WOULD REALLY REPRESENT THE RAW DATA THAT WOULD

10   APPEAR IN LAB REPORTS.

11             AND WHAT WE HAVE HEARD BACK FROM THE DEFENDANTS IS:

12   WE CAN'T POPULATE THAT CHART BECAUSE IT IS TOO GRANULAR AND IT

13   INCLUDES INFORMATION THAT WOULD IMPLICATE PRIVACY CONCERNS.

14   WHAT WE HAVE ASKED FOR REPEATEDLY IS AN EXPLANATION OF HOW THAT

15   WOULD DO THAT, BECAUSE WE HAVE BEEN AS CLEAR AS WE CAN BE THAT

16   WE DO NOT WANT INDIVIDUALLY IDENTIFYING INFORMATION.  WE DO NOT

17   WANT INFORMATION THAT WOULD IN ANY WORLD ALLOW ANYBODY TO

18   CONNECT THE DOTS TO FIGURE OUT WHO THESE FOLKS ARE.  AND,

19   FRANKLY, WE HAVEN'T BEEN ABLE TO FIGURE OUT HOW SOMEONE WOULD

20   DO THAT ANYWAY.  AND SO THAT IS REALLY THE DIFFERENCE BETWEEN

21   WHERE WE ARE AND WHERE THEY ARE.  THE PROBLEM WITH --

22             **THE COURT:**  OKAY.  CAN YOU -- CAN YOU, MS. SHARP, CAN

23   YOU EXPLAIN TO ME, SO THE AGGREGATE DATA THAT YOU GOT, DID IT

24   NOT HAVE -- YOU WANTED SORT OF SUCCESS AND FAILURE RATES.  SO

25   FOR THE EMBRYO WITH -- EMBRYO THAWS WITH INTENT TO TRANSFER,

1    WERE YOU THEN GIVEN A SUCCESS AND A FAILURE RATE?

2              **MS. SHARP:**  WELL, WE WERE, YOUR HONOR, BUT LET ME

3    EXPLAIN A COUPLE OF THE PROBLEMS THAT CAME BACK FROM IT FOR US

4    TO ILLUSTRATE.

5              NOW, AS I SAID, THERE'S A HEADING ON THIS AGGREGATE

6    DATA WE GOT THAT SAYS, "FOR EMBRYO THAWS WITH INTENT TO

7    TRANSFER."  NOW, IT JUST SO HAPPENS THAT WE ASKED A QUESTION

8    WHEN WE WERE HAVING THE MEET AND CONFER:  WHAT ABOUT EMBRYO

9    THAWS THAT OCCURRED NOT WITH AN INTENT TO TRANSFER, BUT THAT

10   WERE CONDUCTED BY THE CLIENTS WHO ARE DOING WHAT WE'RE ALL

11   REFERRING TO AS TEST THAWS?  IN OTHER WORDS, PEOPLE WHO ARE

12   TRYING TO FIGURE OUT IF THEIR EMBRYOS ARE STILL VIABLE OR NOT,

13   WHICH OF COURSE IS --

14             **THE COURT:**  YEAH.

15             **MS. SHARP:**  -- THE THRUST OF WHAT WE'RE TRYING TO GET

16   AT.

17             AND WHAT CAME OUT AFTER WE ASKED THAT, THE NEXT DAY

18   WE GOT A SUBSEQUENT EMAIL FROM DEFENSE COUNSEL THAT SAYS, OH,

19   NOW WE UNDERSTAND THAT YOU'RE ALSO LOOKING FOR THAT, AND WHAT

20   WE CAN TELL YOU IS THAT THERE ARE AN ADDITIONAL 259 EMBRYOS

21   THAT WERE SUBJECT TO TEST THAWS.  THOSE WERE EXCLUDED FROM THE

22   AGGREGATE DATA THAT WE GOT, AND THAT IS EXACTLY THE KIND OF

23   INFORMATION AND THE KIND OF UNCERTAINTY THAT WE ARE VERY

24   CONCERNED ABOUT HERE, BECAUSE WE -- AND WE'RE NOT, YOU KNOW,

25   SUGGESTING THAT THERE'S EVEN BAD FAITH IN PLAY HERE.  WHAT

1    WE'RE SAYING, AS WE'VE ALL EXPERIENCED, WHEN WE'RE WORKING WITH

2    EXPERTS AND WE'RE WORKING WITH DATA, THERE ARE ALWAYS MANY WAYS

3    TO INTERPRET IT, MANY WAYS TO SLICE AND DICE IT.

4         WHAT WE HAVE TRULY ENDEAVORED TO DO IS GET THE RAW

5    DATA BECAUSE, OF COURSE, EVERYBODY IS GOING TO SLICE IT

6    DIFFERENT WAYS.  SO THAT'S ONE EXAMPLE OF THE TYPES OF CONCERNS

7    WE HAVE WITH THE AGGREGATION OF DATA.

8         HERE'S ANOTHER ONE, YOUR HONOR, FROM AN EARLIER

9    ATTEMPT WE HAD WITH GETTING THIS INFORMATION FROM THE

10   DEFENDANTS.  WHEN WE WERE PROVIDED WITH INFORMATION ABOUT,

11   QUOTE/UNQUOTE, PREGNANCIES, IT WAS ONLY AFTER WE MET AND

12   CONFERRED WITH THEM THAT WE LEARNED THAT, INCLUDED UNDER THE

13   UMBRELLA TERM "PREGNANCIES," WERE BOTH CLINICAL PREGNANCIES

14   WHICH QUALIFIED, YOU KNOW, WITH A HEARTBEAT AND ALL THE GOOD

15   THINGS PARENTS LOOK FOR, AND CHEMICAL PREGNANCIES WHICH ARE

16   EFFECTIVELY EARLY MISCARRIAGES.  SO USING THE TERM "PREGNANCY"

17   FOR BOTH OF THOSE CATEGORIES OF INFORMATION IS, OF COURSE, VERY

18   PROBLEMATIC FOR US.

19        AND TO STEP BACK, YOUR HONOR, THE REASON WE'RE

20   RAISING THIS NOW IS BECAUSE IT'S NOT LIKE THIS IS THE ONLY TIME

21   WE'RE GOING TO ASK FOR THIS DATA.  THIS IS DATA THAT IS GOING

22   TO BE CRITICAL FOR THE LITIGATION GOING FORWARD, WHETHER WE'RE

23   LOOKING AT WAYS TO RESOLVE IT OR WHETHER WE'RE LOOKING AT WAYS

24   TO LITIGATE IT.

25        WHAT WE HAVE FOUND -- AND I'M SURE YOUR HONOR HAS

1  FOUND THE SAME THING -- IS THAT IF WE DON'T GET OFF ON THE

2  RIGHT FOOT WITH THIS KIND OF DATA AND WE ONLY FIND OUT SIX

3  MONTHS OR A YEAR DOWN THE ROAD THAT WHAT WE ARE COMPARING ARE

4  APPLES AND ORANGES, WE ARE GOING TO HAVE A VERY TOUGH TIME

5  CLOSING THE GAP BETWEEN US.

6        **THE COURT:**  SO WHAT IS -- WHAT IS THE DATA -- WHAT

7  ARE THE COLUMNS THAT YOU HAVE?  I MEAN, I HEAR WHAT YOU'RE

8  SAYING, AND PART OF IT JUST SEEMS IT'S MORE LIKE AN EXPLANATION

9  OF HOW THEY GOT THERE, OR THERE MIGHT BE AN ADDITIONAL

10  AGGREGATE DATA ABOUT THE TEST THAWS.  SO BUT -- BUT WHAT IS

11  THE -- WHAT IS THE -- BUT THAT DOESN'T SOUND TO ME LIKE RAW

12  DATA, MORE THAT YOU NEED TO KNOW WHAT WENT INTO THE AGGREGATE

13  DATA, AND THERE MAY BE ADDITIONAL AGGREGATE DATA.  SO WHAT ARE

14  ARE THE COLUMNS THAT YOU'RE SEEKING THE RAW DATA?

15        **MS. SHARP:**  SURE, SURE.  I'M HAPPY TO WALK THROUGH

16  IT, YOUR HONOR, AND WE'D BE PLEASED TO SUBMIT THE TEMPLATE

17  SPREADSHEET, TOO, IF THAT'S HELPFUL.

18        FOR EXAMPLE, WITH REGARD TO THE EGG DATA, THE FIRST

19  COLUMN IS PATIENT IDENTIFIER.  AND, OF COURSE, WHAT WE WANT

20  THERE IS A UNIQUE I.D. THAT DOESN'T INDIVIDUALLY IDENTIFY

21  ANYBODY, YOU KNOW, HIPAA COMPLIANT AND ALL THE REST OF IT.

22        THE NEXT COLUMN IS THE DATE OF THE OOCYTE THAW, OR

23  WARMING, AND WE HAVE TOLD THE DEFENDANTS THAT IF THEY ARE

24  CONCERNED WITH THINGS LIKE DATES OR TIMES, TO THE EXTENT THOSE

25  INDICATE OR MAY IMPLICATE PERSONALLY IDENTIFIABLE INFORMATION,

1   WE CAN WORK WITH THAT, JUST PROVIDED THAT WE CAN PULL APART THE

2   INFORMATION AND KNOW WHAT HAPPENED WHEN.  TOTAL NUMBER OF

3   OOCYTES WARMED ON THE DATE; OOCYTE IDENTIFIER IN ORDER OF

4   WARMING ON THAT DATE; PREVITRIFICATION IMAGE OF THE OOCYTE, IS

5   THAT A YES OR A NO.  SO, IN OTHER WORDS, THAT TELLS US IS THERE

6   ANY IMAGE OF THAT OOCYTE BEFORE IT WAS FROZEN.  AND, LIKEWISE,

7   THE NEXT COLUMN, IS THERE AN IMAGE OF IT AFTER.  AND SO ON.

8       SO THESE ARE, AGAIN, WHAT OUR EXPERT TELLS US ARE

9   VERY BASIC DATA POINTS THAT WOULD BE INCLUDED IN, YOU KNOW,

10   BASICALLY ANY LAB REPORT THAT WOULD BE RUN.

11       **THE COURT:**  OKAY.

12       **MS. SHARP:**  AND, AGAIN, WE'RE HAPPY TO PRODUCE -- YOU

13   KNOW, TO PROVIDE THIS INFORMATION TO THE COURT IF IT'S USEFUL.

14       **THE COURT:**  SO LET ME HEAR FROM THE DEFENDANT,

15   DEFENDANTS.

16       **MS. BOSMAN:**  YES, YOUR HONOR.  THIS IS ERIN BOSMAN.

17       LET ME JUST START BY SAYING THAT WE HAVE CONTINUED TO

18   WORK WITH PLAINTIFF.  I THINK WE ALL AGREE THAT WE WANT TO BE

19   COLLABORATIVE HERE AND MAKE THIS SOMETHING THAT WE ALL CAN

20   COOPERATE AND GET TO THE RESULT WE WANT, WHICH IS BEING READY

21   TO SIT DOWN FOR MEDIATION.

22       OF COURSE, WE STILL HAVE A MOTION TO COMPEL

23   ARBITRATION THAT IS PENDING.  THIS IS DISCOVERY THAT WE ARE

24   DOING IN ANTICIPATION OF MEDIATION.  AND THE INFORMATION THAT

25   WE HAVE DISCUSSED IN AUGUST THAT WE WOULD BE WILLING TO PROVIDE

1    AND THAT WE FELT WE COULD DO SO WITHOUT RUNNING AFOUL OF ANY

2    FEDERAL OR STATE PRIVACY LAWS WAS PROVIDING THEM WITH THE

3    NUMBER OF EMBRYOS THAWED, THE SURVIVAL RATE, THE NUMBER OF

4    TRANSFERS ATTEMPTED, THE PREGNANCY NUMBERS.

5            ALSO, LET ME THERE DEAL WITH THE BIOCHEMICAL ISSUE.

6    THE REASON FOR PROVIDING THESE BIOCHEMICAL NUMBERS, AS WELL AS

7    PERCENTAGE, IS BECAUSE THAT IS THE FIRST PIECE OF INFORMATION

8    THAT THE CLINIC AND THE LAB RECEIVED, IS THAT THERE'S A

9    BIOCHEMICAL PREGNANCY.  THEY THEN WILL LEARN LATER WHETHER OR

10   NOT THAT DEVELOPS INTO AN ACTUAL PREGNANCY.  SO THE BIOCHEMICAL

11   NUMBERS, THAT IS STILL A RELEVANT NUMBER, AND I WOULD THINK

12   THAT IS SOMETHING THAT THE PLAINTIFFS WANT TO HAVE SO THAT THEY

13   KNOW WHICH ONES FIRST SHOWED BIOCHEMICAL, BUT THEN DID NOT

14   DEVELOP INTO A PREGNANCY.  SO WE PROVIDED THAT ALSO.  WE

15   PROVIDED THE RAW NUMBERS.  WE ALSO PROVIDED THE PERCENTAGE

16   NUMBERS.

17           PLAINTIFFS' COUNSEL BROUGHT UP THE FACT THAT WHEN WE

18   FIRST PROVIDED THIS THESE CHARTS THAT IS SET FOR EMBRYO THAWS

19   WITH INTENT TO TRANSFER, WE ALSO PROVIDED FOR THE EGG DATA.  IT

20   WAS THAWS WITH INTENT TO CREATE EMBRYOS.  THAT WAS DONE BECAUSE

21   THIS IS THE EXACT DATA THAT THE LAB IS MAINTAINING; THESE ARE

22   THEIR CHARTS.  THERE IS NOTHING WE DID TO THEM.  WE WENT TO

23   THEM TO FIGURE OUT WHAT EXACTLY -- WHAT DATA DO YOU HAVE, AND

24   WE TURNED IT OVER TO PLAINTIFFS.  WHEN THEY RAISED THE ISSUE

25   WITH US THIS ONLY INVOLVED INTENT TO TRANSFER, WITHIN THAT SAME

1    24-HOUR PERIOD, WE GOT THEM THAT INFORMATION.  AND I AGREE,

2    THAT IS SOMETHING THAT OBVIOUSLY THEY NEEDED.

3          AGAIN, THAT TELLS US EXACTLY HOW MANY PATIENTS HAVE

4    DONE EMBRYO TEST THAWS.  IT TELLS THEM HOW MANY EMBRYOS WERE

5    THAWED, HOW MANY SURVIVED, WHAT THE PERCENTAGE IS.

6          SO, WE FEEL THAT WE HAVE PROVIDED EXACTLY WHAT WE

7    AGREED TO PROVIDE IN ORDER TO SIT DOWN TO MEDIATION.  AGAIN,

8    THIS ISN'T FULL-BLOWN DISCOVERY YET AT THIS POINT.

9          THE OTHER THING THAT WE NEED REMEMBER IS THAT

10   DEFENDANTS WOULD BE SUBJECTED TO POTENTIALLY LEGAL LIABILITY

11   FOR NONCOMPLIANCE WITH FEDERAL AND STATE MEDICAL PRIVACY LAWS.

12   WE DID PROVIDE AN ANALYSIS OF THAT TO PLAINTIFF'S COUNSEL

13   YESTERDAY AFTER WE WERE GOING BACK AND FORTH WITH OUR ISSUES TO

14   DISCUSS WITH YOU.  IT'S SOMETHING THAT WE HAD DISCUSSED THROUGH

15   VARIOUS MEET AND CONFER CALLS, BUT WE DID LAY IT OUT IN WRITING

16   SO THAT THEY COULD SEE OUR CONCERNS AS TO WHERE WE WOULD RUN

17   AFOUL OF PRIVACY LAWS IF WE WERE TO PROVIDE THE DATA THAT THEY

18   ARE SEEKING.

19          BUT THE BOTTOM LINE IS TO SIT DOWN TO MEDIATION, WHAT

20   WE ALL AGREED WE NEEDED WAS AN ABILITY TO UNDERSTAND THE DATA

21   AS TO HOW -- HOW MANY EMBRYOS ARE SURVIVING OR NOT SURVIVING,

22   AND THEY HAVE THAT INFORMATION.

23          **THE COURT:**  YEAH, I GUESS, MS. SHARP, WHY DO YOU NEED

24   TO KNOW WHETHER AN IMAGE WAS TAKEN OR NOT AT THIS POINT FOR THE

25   PURPOSES OF MEDIATION?  I GET WHY YOU -- YOUR EXPERT MIGHT NEED

1    IT DOWN THE LINE, BUT WHY DO YOU NEED TO KNOW THAT?

2              **MS. SHARP:**  WELL, IT'S FAIR QUESTION, YOUR HONOR, AND

3    ONE THAT I'VE ASKED, TOO.  AND THE REASON IS BECAUSE EACH OF

4    THE CELLS THAT WE HAVE INCLUDED -- AND, YOU KNOW, WE HAVE BEEN

5    MINDFUL ABOUT NOT TRYING TO GET THE MOON AND STARS HERE --

6    FEEDS INTO THE QUESTION OF, FOR EXAMPLE, THE HEALTH OF THAT

7    EMBRYO BEFORE IT EVER WENT INTO THE TANK AND THE VIABILITY OF

8    THAT EMBRYO BEFORE IT EVER WENT INTO THE TANK, AND, FRANKLY, A

9    WHOLE HOST OF OTHER CELL AND MEDICAL CRITERIA THAT WOULD BE

10   IMPORTANT TO AN EMBRYOLOGIST TO SAY, OKAY, STATISTICALLY, THIS

11   PIECE OF THIS EMBRYO TRANSFER IS SIGNIFICANT BECAUSE IT

12   REFLECTS THAT THERE WAS SOME DEGRADATION IN THE CELL QUALITY

13   AFTER IT CAME OUT OF TANK 4 AFTER THE INCIDENT, FOR EXAMPLE.

14             **THE COURT:**  YEAH, BUT THAT SEEMS TO BE A VERY GRANULE

15   CAUSATION-TYPE ARGUMENT THAT I CAN'T SEE THAT YOU'RE GOING TO

16   GET INTO AT MEDIATION, RIGHT?

17             **MS. SHARP:**  I TEND TO AGREE WITH THAT, TOO, YOUR

18   HONOR, BUT THE ISSUE THAT COMES UP FOR US, THOUGH, IS THAT --

19   YOU KNOW, THE EXAMPLE THAT I ARTICULATED ABOUT THE FULL

20   UNIVERSE OF EMBRYOS AND THE LEAVING OUT OF THE TEST THAWS --

21   AGAIN, I DON'T DISAGREE WITH MS. BOSMAN.  I THINK THAT WE ARE

22   WORKING TO THE SAME GOAL IN TRYING TO FIGURE THESE THINGS OUT.

23   BUT WHEN OUR EXPERT LOOKED AT THE DATA THAT WE GOT, SHE HAS A

24   NUMBER OF QUESTIONS.  AND, FRANKLY, WE ARE UNCOMFORTABLE BEING

25   IN THE POSITION OF BEING THE ONES WHO ARE PUT IN THE ROLE OF

1   SAYING, HEY, DID YOU LEAVE OUT THIS, IS THIS LEFT OUT, AND

2   TRYING TO PLAY A GAME, FRANKLY, OF 20 QUESTIONS, WHEN WHAT'S

3   UNCLEAR TO US IS WHAT IS THE DENOMINATOR.

4          WE NOW, YOU KNOW, ARE STARTING TO GET A SENSE OF WHAT

5   THE NUMERATOR IS IN TERMS OF EITHER SUCCESS OR FAILURES IN THE

6   PREGNANCIES, AND IN THE TRANSFERS, AND IN THE THAWS.  BUT WHAT

7   CONCERNS US IS THE INABILITY TO REALLY SLICE THE DATA AND

8   UNDERSTAND WHAT THE FULL UNIVERSE IS.

9          AND SO, YOU KNOW, I E-MAILED MS. BOSMAN THIS MORNING

10   AND SUGGESTED THAT WE CAN COLLAPSE A FEW MORE OF THE DATA

11   POINTS THAT ARE IN OUR SPREADSHEET TO TRY TO SIMPLIFY THE

12   PROCESS.  BUT I THINK THE CONCERN FROM OUR STANDPOINT AT A VERY

13   BASIC LEVEL IS GETTING SOMETHING THAT HAS ALREADY BEEN WORKED

14   OVER -- AND I DON'T MEAN THAT IN A PEJORATIVE SENSE -- BY THE

15   CLIENT OR BY WHOMEVER IS LOOKING AT THE DATA, AS OPPOSED TO

16   JUST SIMPLY GETTING THE RAW DATA.

17          AND IF I MAY ADDRESS THE PRIVACY POINT, WE DID

18   RECEIVE A WRITING YESTERDAY EVENING THAT ARTICULATES, FOR THE

19   FIRST TIME THAT WE HAVE SEEN, THE BASIS FOR THE PRIVACY

20   CONCERNS THAT HAVE BEEN STATED.  AND, FRANKLY, WE HAVE A VERY

21   TOUGH TIME SEEING HOW THERE ARE PRIVACY CONCERNS THAT ARE

22   IMPLICATED HERE FOR A COUPLE OF REASONS.  THE FIRST --

23          **THE COURT:**  I'M GOING TO STOP YOU, MS. SHARP, BECAUSE

24   I CAN'T ADDRESS THAT HERE, RIGHT?  SO THAT'S SOMETHING THAT I

25   HAVE TO ADDRESS AND -- RIGHT, I CAN'T SAY THAT HERE.  GIVEN THE

1    IMPORTANCE OF THE ISSUE, I CAN'T ADDRESS THAT ONE WAY OR THE

2    OTHER.  WHAT I CAN -- WHAT I CAN SAY IS, AGAIN, THE DATA ABOUT

3    THE DATE OF THE THAW WARMING, AGAIN, I UNDERSTAND WHY, IF YOU

4    DON'T -- CAN'T WORK SOMETHING OUT OR WHY THAT EVENTUALLY MIGHT

5    BE IMPORTANT.

6         I DON'T UNDERSTAND WHY IT'S IMPORTANT FOR AN EARLY

7    MEDIATION, RIGHT, IN PARTICULAR -- NOW, IF THERE'S ANY DATA

8    THAT THE DEFENDANT IS GOING TO RAISE AT A MEDIATION AS SOME

9    SORT OF A DEFENSE, THEN IT HAS TO BE DISCLOSED.  RIGHT?  THAT

10   SEEMS TO ME SORT OF THE DATA YOU'RE LOOKING AT WHERE, IF THE

11   DEFENDANT IS GOING TO SAY, WELL, THERE WAS A PROBLEM WITH THE

12   EGG EVEN BEFORE THE TANK FAILED, THEY CAN'T RAISE THAT.  THEY

13   CAN'T SAY THAT BECAUSE THEY HAVEN'T PROVIDED YOU THE EVIDENCE

14   OF THAT.

15        BUT, OF COURSE, YOU CAN HAVE A DISCUSSION IN WHICH

16   YOU SAY FOR X, YOU KNOW, CLIENTS, THAT THIS IS THE PROBLEM,

17   THIS IS WHAT THE RESULT IS, RIGHT?  THAT THIS IS WHAT THE

18   RESULT IS, WITHOUT HAVING -- KNOWING WITH MUCH CERTAINTY

19   WHETHER THAT'S THE RESULT.

20        WHAT I DON'T WANT TO DO IS -- AND I CAN TALK TO YOU

21   ABOUT A FEW DAYS -- DELAY THIS MEDIATION BECAUSE, QUITE

22   HONESTLY, I THINK THERE IS SOME URGENCY WITH RESPECT TO THE

23   CLASS.  I THINK THAT'S THE MOST IMPORTANT THING, TO AT LEAST

24   GET TOGETHER AND SEE IF THERE IS SOMETHING, SOME PATH THAT YOU

25   CAN WORK OUT.

 1            AND I CAN'T ADDRESS THE PRIVACY INFORMALLY BY WAY OF

 2    THIS PHONE CALL WITHOUT GIVING THE DEFENDANTS THE OPPORTUNITY

 3    TO RAISE IT.  ALTHOUGH I WILL TELL DEFENDANTS I CERTAINLY KNOW,

 4    YOU KNOW, THAT MEDICAL INSTITUTIONS DO ALL SORTS OF ANALYSIS

 5    ALL THE TIME THAT COMPLIES WITH HIPAA AND THEY'RE ABLE TO GET

 6    GRANULAR RAW DATA AND DO IT.  SO I KNOW THERE IS A WAY OF DOING

 7    IT.  AND IT MAY BE THAT YOU DON'T HAVE THAT EXPERIENCE, AND SO

 8    MAYBE YOU NEED TO CONSULT WITH THESE INSTITUTIONS THAT DO IT

 9    ALL THE TIME.  AND IF THEY DIDN'T DO IT, WE WOULDN'T HAVE ANY

10    SCIENCE OR MEDICAL DEVELOPMENTS, OR AT LEAST BE ABLE TO TEST.

11    SO I THINK THERE PROBABLY IS A WAY, BUT I CAN'T SAY THAT FOR

12    CERTAIN HERE ON THE CALL.

13            BUT WHAT I WANT YOU TO DO, AND IT SOUNDS LIKE YOU'RE

14    DOING IT, IS -- I THINK WHAT THE DEFENDANTS SHOULD DO IS THEY

15    SHOULD SIT DOWN WITH YOU AND TELL YOU AND MAYBE DO IT -- TELL

16    YOU AND WHOEVER CREATED IT, WHOEVER THEIR EXPERT IS OR GOT

17    IT -- THIS IS WHAT WE DID -- AND HAVE YOUR EXPERT ON THE CALL

18    IF YOU WANT -- THIS IS WHAT WE DID TO GATHER THIS DATA.  SO, AS

19    MS. SHARP SAID, THEY SHOULDN'T BE HAVING TO DO 20 QUESTIONS.

20    DEFENDANTS SHOULD FIRST DISCLOSE:  THIS IS WHAT WE DID.  AND

21    THEN YOUR EXPERT CAN SAY, AH, YOU EXCLUDED THE TEST THAWS.

22            WELL, OF COURSE, AS DEFENDANT ADMITTED, THAT IS

23    INFORMATION THAT YOU NEEDED.  AND SO THERE MAY BE MORE

24    GRANULARITY THAT YOU NEED AND YOU DO IT, BUT I'M NOT PREPARED

25    TO SAY THAT ALL THE GRANULARITY THAT YOU'RE LOOKING FOR IS

```
 1   SOMETHING THAT YOU NEED IN ADVANCE OF MEDIATION, OR THAT I CAN
 2   SAY THE PRIVACY CONCERNS THAT THEY RAISE -- ALTHOUGH I'M PRETTY
 3   CERTAIN THEY CAN BE ADDRESSED, I CAN'T SAY THAT INFORMALLY
 4   WITHOUT GIVING THEM AN OPPORTUNITY TO PRESENT IT MORE FORMALLY
 5   TO ME.  THAT'S THE SITUATION THAT WE'RE IN.  SO I DON'T KNOW.
 6   THAT'S PROBABLY NOT HELPFUL AT ALL, BUT --
 7            MS. SHARP:  WELL, IT IS, YOUR HONOR, IN THE SENSE
 8   THAT I THINK THAT A DIALOGUING IN A MEANINGFUL SENSE IS USEFUL
 9   TO US, BUT THE CONCERN THAT YOU'VE RAISED IS -- IS ONE THAT WE
10   SHARE, WHICH IS WE CAN'T REALLY FEEL LIKE WE'RE BIDDING AGAINST
11   OURSELVES WITHOUT THE BENEFIT OF AS CLOSE TO PERFECT
12   INFORMATION AS WE CAN GET IN TERMS OF VIABILITY BECAUSE -- YOU
13   KNOW, IN TERMS OF VALUING OUR CLIENTS' CLAIMS AND PUTTING THOSE
14   ON ANY KIND OF SPECTRUM, AND, CANDIDLY, THAT IS WHAT IS LIKELY
15   TO HAVE TO HAPPEN FOR US TO FIGURE OUT ANY WAY FOR US TO
16   STRUCTURE A RESOLUTION HERE, IT'S REALLY --
17            THE COURT:  RIGHT.  BUT YOU CAN -- CAN'T YOU, LIKE --
18   LIKE, WHETHER IT IS, IN FACT, VIABLE, RIGHT, YOU CAN -- YOU CAN
19   STRUCTURE SOMETHING THAT SAYS, IF IT'S NOT, THIS IS WHAT YOU
20   GET, AND THEN HERE'S OUR PATH, AND THEN TO FIGURE THAT OUT AS
21   IT IS.
22            IN OTHER WORDS, I DON'T KNOW THAT YOU NEED TO KNOW --
23   IF YOU'RE DOING IT, FRANKLY, IT SHOULD BE, I THINK, ON A PER
24   CLIENT BASIS ANYWAY.  I DON'T KNOW THAT YOU NEED TO KNOW THE
25   EXACT NUMBER.
```

1          I UNDERSTAND WHY YOU WOULD NEED TO KNOW SOME

2     AGGREGATE NUMBERS, BECAUSE YOU WANT TO SHOW WHAT YOU BELIEVE,

3     WHICH IS BECAUSE OF THE TANK FAILURE, THERE ARE GOING TO BE

4     MORE UNVIABLE, RIGHT, OR LESS SUCCESS BECAUSE OF IT, SO YOU

5     NEED TO KNOW THAT NUMBER, BUT I DON'T KNOW THAT YOU NEED TO

6     KNOW SORT OF THE, YOU KNOW, THE DATE OF THE THAW WARNING.

7          CERTAINLY THERE COULD BE SOME ARGUMENT THAT IT WAS

8     MORE SUCCESSFUL LATER, OR SOONER, OR SOMETHING LIKE THAT.  I

9     DON'T KNOW THAT YOU NEED THAT FOR A MEDIATION RIGHT AWAY,

10    UNLESS, OF COURSE, THE DEFENDANT IS GOING TO RAISE THAT AS AN

11    ISSUE.

12          ANYTHING THE DEFENDANT IS GOING TO RAISE AS AN ISSUE

13    IN THE MEDIATION, THE DATA HAS TO BE PRODUCED IN ADVANCE.  SO

14    THE DISCUSSION HAS TO BE BASED SOLELY ON THE DATA THAT'S

15    PRODUCED.  AND THAT'S WHAT, OF COURSE, WE DON'T WANT TO SEE

16    HAPPEN.  I UNDERSTAND, MS. SHARP, THAT'S WHAT YOU'RE TRYING TO

17    PREVENT FROM HAPPENING, IS YOU GET TO MEDIATION AND ALL OF A

18    SUDDEN WELL, LIKE, KNOW THIS, WELL, WE DIDN'T KNOW THIS.

19          **MS. SHARP:**  THAT'S -- I'M SORRY TO INTERRUPT, YOUR

20    HONOR.

21          **THE COURT:**  YEAH.

22          **MS. SHARP:**  THAT'S EXACTLY RIGHT.  I MEAN, THE MAJOR

23    CONCERN FROM OUR PERSPECTIVE ALSO IS THAT THE NUMBERS WE GET

24    ARE SKEWED IN WAYS THAT WE DON'T EVEN UNDERSTAND BECAUSE, OF

25    COURSE, WE HAVE A LOT LESS PERFECT ACCESS TO THE INFORMATION

```
 1    THAN OUR ADVERSARIES DO.

 2              THE COURT:  NO, NO, NO --

 3         MS. SHARP:  AND SO.

 4         THE COURT:  SO I THINK THAT --

 5         MS. BOSMAN:  YOUR HONOR?

 6         THE COURT:  YES.  GO AHEAD.

 7              MS. BOSMAN:  THIS IS ERIN BOSMAN.

 8              I JUST WANTED TO MAKE CLEAR THAT ONE OF THE THINGS

 9    THAT I HAD EXPLAINED TO MS. SHARP, AND I KNOW SOME OF MY OTHER

10    COLLEAGUES WHEN THEY HAVE SPOKEN WITH OTHER PLAINTIFFS' COUNSEL

11    IN MEET AND CONFER, HAVE EXPLAINED WE WANT TO PROVIDE THEM WITH

12    ALL OF THE DATA WE CAN PROVIDE ON AN AGGREGATE BASIS.

13              SO, AGAIN, THIS NOT AT FIRST HAVING GIVEN THE TEST

14    THAWS, THAT WAS SOMETHING THAT WAS JUST MISSED, LIKE I SAID,

15    BECAUSE WE WERE AT THAT POINT HANDING OVER EXACTLY WHAT THE

16    LAB -- WHAT THEY WERE MAINTAINING, THE CHARTS THEY WERE

17    UPDATING.

18              SO AT THIS POINT, THOUGH, THEY HAVE ALL OF THE

19    INFORMATION ABOUT THAWS THAT HAVE OCCURRED.

20              NOW, OBVIOUSLY, MORE THAWS CONTINUE TO OCCUR.

21    CLEARLY, WE ARE HAPPY TO CONTINUE TO UPDATE THAT DATA.  WHAT WE

22    ARE OBJECTING TO IS BREAKING THIS DOWN BY A PATIENT.  THEY WANT

23    US TO PROVIDE ALL OF THE INFORMATION FOR PATIENT A, PATIENT B,

24    PATIENT C.  THAT IS WHAT WE CANNOT DO AT THIS POINT.

25              HOWEVER, IF THEY WANT TO, FOR THEIR OWN CLIENTS,
```

1    ANYONE WHO HAS RETAINED ONE OF THE PLAINTIFFS' ATTORNEYS, THEY

2    WOULD LIKE US TO BREAK DOWN DATA FOR THEIR PATIENT, HAPPY TO DO

3    SO.  I'LL BREAK DOWN ANYTHING THEY WANT ON PATIENTS, BECAUSE

4    THEN I KNOW THAT THAT PATIENT HAS CONSENTED.

5            WE HAVE PATIENTS THAT ARE PREGNANT THAT HAVE MADE

6    VERY CLEAR WE ARE NOT TO GIVE OUT THEIR INFORMATION.  THEY DO

7    NOT WANT TO BE INCLUDED.  AND WE ARE TRYING TO GO THROUGH THAT

8    FINE LINE, THAT WE DO NOT RUN AFOUL OF OUR PATIENTS' -- THEIR

9    PRIVACY AND OUR DIFFERENT OBLIGATIONS.

10           BUT AGGREGATE DATA AS -- YOU KNOW, MS. SHARP IS

11   SAYING THEY JUST DON'T KNOW THE REALM OF THE NUMBERS AT ISSUE,

12   BUT THEY DO.  THEY KNOW EXACTLY HOW MANY EMBRYOS HAVE BEEN

13   THAWED TO DATE.

14           **THE COURT:**  BUT WHEN YOU SAY, MS. BOSMAN, THAT THOSE

15   PATIENTS DON'T WANT TO BE INCLUDED, YOU'RE NOT SAYING THEY'RE

16   NOT -- THEY ARE INCLUDED IN THE AGGREGATE DATA?

17           **MS. BOSMAN:**  CORRECT.

18           **THE COURT:**  OKAY.

19           **MS. BOSMAN:**  YES, ABSOLUTELY.

20           **THE COURT:**  OKAY.  ALL RIGHT.

21           SO THIS IS WHAT I THINK WE NEED TO DO, THOUGH, IS I

22   DO THINK, TO THE EXTENT MS. SHARP WANTS TO SIT DOWN AND HAVE A

23   CONVERSATION WITH WHOEVER IT IS THAT CREATED YOUR DATA SO THAT

24   THEY CAN ASK QUESTIONS AS TO WHAT WENT INTO CREATING THE

25   AGGREGATE DATA, I THINK THAT'S APPROPRIATE, AND MAYBE TO SOME

1   EXTENT YOU'VE ALREADY HAD IT, SO THAT SHOULD BE CONTINUED SO

2   THEY KNOW EXACTLY HOW THAT DATA WAS CREATED.  SO YOU'RE NOT

3   GIVING ANY INDIVIDUAL PATIENT -- EVEN IF IT'S ANONYMOUS --

4   INFORMATION, YOU'RE JUST SAYING:  THIS IS WHAT WE DID TO CREATE

5   THIS DATA.  SO THEY KNOW.

6           **MS. SHARP:**  THANK YOU, YOUR HONOR.  THAT'S HELPFUL.

7           **THE COURT:**  ALL RIGHT.  NOW, YOU HAD ANOTHER ISSUE

8   WHICH WAS -- NOW, OF COURSE, TO THE EXTENT THERE'S ANY FURTHER

9   DISPUTE, YOU CAN PRESENT IT TO ME MORE FORMALLY BY WAY OF

10  LETTER BRIEF, BUT HOPEFULLY --

11          **MS. BOSMAN:**  YES, YOUR HONOR, I DID WANT TO CLARIFY

12  ONE POINT.

13          IN TALKING THROUGH HOW THIS DATA WAS CREATED, I WOULD

14  AGREE THAT THE LAWYER THAT WORKED DIRECTLY WITH THE LAB IN

15  PULLING THIS INFORMATION SHOULD ANSWER ALL QUESTIONS.  I JUST

16  WANT TO MAKE SURE THAT WE'RE IN AGREEMENT THAT WE'RE NOT HAVING

17  THE PLAINTIFF'S COUNSEL GO AND SIT DOWN WITH ANY OF THE ACTUAL

18  EMBRYOLOGISTS AT THE LAB TO GET INTO THIS, BECAUSE, REALLY,

19  THAT IS A MINI DEPOSITION.

20          **THE COURT:**  WELL, HERE'S THE THING:  IF THE LAWYER

21  DIDN'T CREATE THE DATA, THEN THERE'S A PROBLEM THERE, RIGHT?

22  WHY CAN'T THE PERSON SIT THERE?  I MEAN, MAYBE IT IS -- IT'S

23  NOT -- MS. SHARP WOULDN'T USE IT AS A MINI DEPOSITION, BUT IT

24  IS A CIVIL CASE, AND SO -- BY THE WAY, IT'S ALL SUBJECT TO RULE

25  408, SO IT'S NOT ADMISSIBLE IN ANY EVENT, BUT THE PROBLEM IS

1    THE LAWYER DIDN'T CREATE THE DATA.  SO THAT'S ACTUALLY EXACTLY

2    WHAT I AM TRYING TO --

3              **MS. BOSMAN:**  OKAY.

4              **THE COURT:**  -- AVOID, IS HAVE IT THERE.

5              THE LAWYER, OF COURSE, CAN BE THERE, AND IF YOU THINK

6    A QUESTION IS INAPPROPRIATE, IT'S INAPPROPRIATE, BUT IT'S JUST:

7    WHAT DID YOU DO TO CREATE THE -- HOW DID YOU CREATE THIS

8    AGGREGATE DATA?  THIS IS WHAT I DID; I DID X, Y, Z.  THAT

9    SHOULDN'T BE A SECRET.

10             **MS. BOSMAN:**  YES.  AND, YOUR HONOR, I WOULD JUST

11   PROPOSE, IF WE COULD AGREE, THAT IF WE COULD DO THAT IN A -- IN

12   A WRITTEN FORMAT SO THAT WE SEE THE QUESTIONS --

13             **THE COURT:**  NO.

14             **MS. BOSMAN:**  -- AND THEN WE CAN PROVIDE --

15             **THE COURT:**  THAT'S WHAT I'M TRYING TO AVOID, AND

16   THAT'S THE PROBLEM.  IF YOU COULD DO IT THAT WAY, YOU GUYS

17   WOULD HAVE ACTUALLY BEEN ABLE TO RESOLVE THIS WITHOUT BEING

18   HERE TODAY, BUT SO MUCH MORE GETS RESOLVED WHEN WE ACTUALLY SIT

19   LIKE PEOPLE AND HAVE CONVERSATIONS.  THEN IT'S DYNAMIC AND

20   THINGS LIKE THAT, AS OPPOSED TO WRITING.  AND, BY THE WAY, IT'S

21   A HUNDRED TIMES FASTER AND MORE EFFECTIVE THAT WAY AS WELL.

22   AND IT'S ALL SUBJECT TO RULE 408.

23             IT SHOULDN'T BE A SECRET.  IT'S A CIVIL CASE, NOT A

24   CRIMINAL CASE.  IT'S JUST A CIVIL CASE.

25             **MS. BOSMAN:**  THAT'S FINE.  THANK YOU, YOUR HONOR.

1              ONE ADDITIONAL QUESTION THAT I COULD ASK?  COULD WE

2     HAVE AN AGREEMENT THAT PLAINTIFFS' COUNSEL HAVE ONE COUNSEL

3     THAT IS GOING TO SIT DOWN AND TALK WITH THE EMBRYOLOGIST, AS

4     OPPOSED TO -- I JUST DON'T WANT SOMETHING WHERE WE HAVE TEN

5     PLAINTIFFS' COUNSEL.

6              **THE COURT:**  I THINK MS. SHARP -- I THINK TWO WOULD

7     PROBABLY BE SUFFICIENT BECAUSE SHE'S GOING TO WANT TO CONFER

8     WITH SOMEONE, RIGHT?

9              **MS. BOSMAN:**  THAT WOULD BE FINE.  THANK YOU, YOUR

10    HONOR.

11             **THE COURT:**  YEAH.  I MEAN, I EVEN LIKE TO HAVE

12    SOMEBODY WITH ME.

13             **MS. SHARP:**  I WAS GOING TO SAY, SOMEBODY NEEDS TO DO

14    THE REAL WORK, AND USUALLY THAT'S SOMEBODY OTHER THAN THE

15    PERSON DOING THE TALKING, AS WE ALL KNOW.

16             **THE COURT:**  WELL, THE PERSON DOING THE TALKING SHOULD

17    BE THE PERSON WHO DID THE REAL WORK, ACTUALLY.

18             **MS. SHARP:**  I'M JOKING, YOUR HONOR, BUT IT'S ALWAYS

19    HELPFUL TO HAVE SOME BACKUP.

20             **THE COURT:**  OKAY.  SO NOW LET'S TALK ABOUT -- SO

21    GIVEN THIS, IS THERE A CHANCE WE COULD STICK TO YOUR MEDIATION

22    DATE?

23             **MS. SHARP:**  WELL, IT'S A FAIR QUESTION, YOUR HONOR.

24    I SUPPOSE THAT PART OF THAT DEPENDS ON HOW QUICKLY WE CAN SIT

25    DOWN AND FEEL THAT WE AND OUR EXPERT REALLY CAN GET OUR ARMS

1    AROUND THAT DATA.

2            NOW, THERE'S A RELATED MEET AND CONFER THAT IS

3    ONGOING.  AS YOUR HONOR MAY RECALL, AT THE LAST HEARING WE

4    REALLY HAD TWO CATEGORIES OF INFORMATION THAT WE THOUGHT WERE

5    OF THE UTMOST IMPORTANCE.  THE FIRST WAS THIS VIABILITY DATA

6    AND THE SECOND IS THE ROOT CAUSE; IN OTHER WORDS, GETTING TO

7    THE BOTTOM OF WHAT ACTUALLY HAPPENED TO THE TANK.

8            NOW WE HAVE HAD AN INSPECTION OF THE TANK THAT, AS

9    YOUR HONOR CAN IMAGINE, WAS ENLIGHTENING IN SOME REGARDS AND

10   RAISED A HOST OF OTHER QUESTIONS THAT THE PARTIES ARE WORKING

11   THROUGH, I WOULD SAY, COLLABORATIVE.

12           AND, YOU KNOW, THERE ARE SOME ] ASSERTIONS THAT ARE

13   BEING RAISED IN TERMS OF THE ANALYSES THAT HAVE BEEN CONDUCTED,

14   LIKE WORK PRODUCT AND SO FORTH, THAT WE HAVE SOME CONCERNS

15   ABOUT], BUT ARE WORKING THROUGH.

16           I THINK IT WOULDN'T BE A STATE SECRET TO SAY THERE'S

17   LIKELY GOING TO BE SOME FINGER POINTING AMONG THE DEFENDANTS

18   ABOUT WHO IS ACTUALLY TO BLAME ABOUT THE TANK FAILURE.  AND SO

19   FROM OUR PERSPECTIVE, TO HAVE AT LEAST A BIT MORE TIME TO ALLOW

20   THAT PROCESS TO PLAY OUT WOULD BE VERY USEFUL AND I THINK

21   PRODUCTIVE.

22           I DON'T THINK THERE IS ANYTHING STANDING IN THE WAY

23   OF MS. BOSMAN AND MYSELF AND A HANDFUL OF OTHERS SITTING DOWN

24   AND STARTING TO TALK ABOUT STRUCTURE FOR ANY MEDIATION, BUT IT

25   SEEMS TO ME THAT WHAT WOULD PROMOTE THE MOST EFFECTIVE START TO

1    THAT PROCESS UNDER THE AUSPICES OF A MEDIATOR WOULD BE TO

2    PROVIDE AT LEAST A BIT MORE TIME FOR US TO GET THROUGH THE

3    VIABILITY AND THE ROOT CAUSE DATA.

4           NOW WHAT WE WERE GOING TO SUGGEST BEFORE GETTING ON

5    THE PHONE WITH YOUR HONOR WAS TO GIVE US SOMEWHERE IN THE REALM

6    OF 60 DAYS, MAYBE NOT A DEADLINE RIGHT AT NEW YEAR'S, TO DO THE

7    MEDIATION.  BUT OUR THOUGHT WAS THAT AT LEAST A LITTLE BIT MORE

8    TIME WILL HELP US SHAPE THESE ISSUES A BIT BETTER SO THAT WE

9    ARE REALLY READY TO ROLL OUR SLEEVES UP AND GET TO WORK.

10          **THE COURT:**  SO CAN I ASK, WHAT IS THE PARTIES'

11   POSITION THEN WITH RESPECT TO HEARING THE MOTION TO COMPEL AND

12   THE TIMING OF MEDIATION?

13          **MS. SHARP:**  WE HAVE NOT DISCUSSED PUTTING THAT OFF,

14   AND WE'RE PREPARED TO PROCEED ON THAT MOTION, AND SO WE WOULD

15   SEE THEM AN OBVIOUSLY RELATED --

16          **THE COURT:**  SEPARATE.

17          **MS. SHARP:**  -- BUT SEPARATE ISSUES.

18          **THE COURT:**  ALL RIGHT.  SO THIS IS WHAT I WOULD THEN

19   SAY AS TO THE MEDIATION, BECAUSE THE PARTIES KNOW WHETHER

20   YOU'RE IN A POSITION FOR IT TO BE PRODUCTIVE.  IT DOESN'T NEED

21   TO BE SUCCESSFUL AT THE FIRST SECTION; IT JUST NEEDS TO BE

22   PRODUCTIVE.  AND IF THE PARTIES ALL STIPULATE AND AGREE, THEN

23   I'M HAPPY TO GO ALONG WITH THAT.

24          I WOULD JUST SAY THAT, YOU KNOW, THE PERFECT IS THE

25   ENEMY OF THE GOOD, AND I KNOW YOU KNOW, MS. SHARP, BECAUSE I

```
1   KNOW YOU ARE CONCERNED ABOUT THAT.  IT DOES SEEM TO ME THAT

2   GETTING SOMETHING GOING SOONER RATHER THAN LATER COULD BE

3   PRODUCTIVE HERE.  BUT THE PARTIES, I KNOW, HAVE BEEN WORKING ON

4   THAT.

5            THAT'S A LONG WAY OF SAYING, IF THE PARTIES AGREE,

6   I'LL AGREE TO IT.  JUST SUBMIT ME A STIPULATION.

7            MS. SHARP:  WE APPRECIATE IT, YOUR HONOR.  WITH THAT

8   SAID, OUR CLIENTS AND WE REMAIN VERY INTERESTED IN MOVING THIS

9   AS QUICKLY AS WE CAN.  SO I DON'T WANT THE COURT TO BE LEFT

10  WITH THE IMPRESSION THAT WE'RE DOING ANYTHING BUT MOVING AS

11  QUICKLY AS WE CAN.

12           THE COURT:  NO, NO.  YOU'VE ALL BEEN WORKING VERY

13  COOPERATIVELY TOGETHER.  I JUST DON'T WANT TO DO ANYTHING THAT

14  MUCKS ANYTHING UP.

15           MS. SHARP:  WE APPRECIATE THAT.

16           THE COURT:  OKAY.  ALL RIGHT.  WELL, HOPEFULLY, THAT

17  WAS HELPFUL.

18           MS. BOSMAN:  THANK YOU, YOUR HONOR.

19           MS. SHARP:  VERY WELL.  THANK YOU, YOUR HONOR.

20           UNIDENTIFIED SPEAKER:  THANK YOU, YOUR HONOR.

21           UNIDENTIFIED SPEAKER:  THANK YOU, YOUR HONOR.

22           (PROCEEDINGS ADJOURNED AT 10:04 A.M.)

23

24

25
```

1                **CERTIFICATE OF TRANSCRIBER**

2

3          I CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

4     TRANSCRIPT, TO THE BEST OF MY ABILITY, OF THE ABOVE PAGES OF

5     THE OFFICIAL ELECTRONIC SOUND RECORDING PROVIDED TO ME BY THE

6     U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, OF THE

7     PROCEEDINGS TAKEN ON THE DATE AND TIME PREVIOUSLY STATED IN THE

8     ABOVE MATTER.

9          I FURTHER CERTIFY THAT I AM NEITHER COUNSEL FOR,

10    RELATED TO, NOR EMPLOYED BY ANY OF THE PARTIES TO THE ACTION IN

11    WHICH THIS HEARING WAS TAKEN; AND, FURTHER, THAT I AM NOT

12    FINANCIALLY NOR OTHERWISE INTERESTED IN THE OUTCOME OF THE

13    ACTION.

14

15

16                    JOAN MARIE COLUMBINI

17                     OCTOBER 25, 2018

18

19

20

21

22

23

24

25