1

2

3

4                           UNITED STATES DISTRICT COURT

5                          NORTHERN DISTRICT OF CALIFORNIA

6

7     R. E., et al.,                                 Case No.18-cv-01586-JSC

8                     Plaintiffs,

9            v.                                       **ORDER RE: MOTION TO COMPEL
                                                      ARBITRATION**
10    PACIFIC FERTILITY CENTER, et al.,
                                                      **RE: DKT. NO. 52**
11                    Defendants.

12

13          Plaintiffs filed this putative class action against Pacific Fertility Center ("Pacific

14    Fertility"), Prelude Fertility, Inc. ("Prelude"), and Chart Industries ("Chart"), following

15    notification that the liquid nitrogen levels in a cryopreservation tank storing their eggs and

16    embryos had dropped to an unsafe level for an undetermined period of time potentially damaging

17    the eggs and embryos.  Pacific Fertility filed a motion to compel arbitration, in which Prelude and

18    Chart joined.  (Dkt. Nos. 52, 56, 67.)  At the hearing on November 9, 2018, Plaintiffs requested

19    and were granted leave to file an amended complaint and the Court ordered the parties to submit

20    supplemental briefing on the motion to compel arbitration.  (Dkt. No. 133.)  Plaintiffs thereafter

21    filed their First Amended Complaint which added Pacific Fertility MSO, LLC, a Prelude

22    subsidiary, as a defendant[1] (Dkt. No. 143), and the parties supplemented their briefing on the

23    motion to compel arbitration.  Having had the benefit of oral argument on November 9, 2018 and

24    March 12, 2019, the Court GRANTS Pacific Fertility's motion to compel arbitration, but DENIES

25    Prelude, Pacific Fertility MSO, and Chart's request to compel arbitration.   The Court also declines

26    to stay proceedings in this Court pending the arbitration.

27    _____

28    [1] All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. §
      636(c).  (Dkt. Nos. 11, 19, 23, 26, 65, 150.)

United States District Court
Northern District of California

**BACKGROUND**

Pacific Fertility markets and sells egg and embryo cryopreservation services. (Dkt. No. 174-3, First Amended Consolidated Amended Class Action Complaint ("FAC") at ¶ 1.) Cryopreservation involves preservation of tissue using cooling techniques. (*Id.* at ¶ 1.) Plaintiffs engaged Pacific Fertility's services to cryopreserve their eggs and embryos between 2010 and 2016. (*Id.* at ¶ 4.)

When Plaintiffs signed up with Pacific Fertility they executed two different agreements relevant to the present motions. First, A.B., E.F., G.H., I.J., and K.L. signed a medical malpractice arbitration agreement.[2] Article 1 of the agreement states:

> It is understood that any dispute as to medical malpractice, that is, as to whether any medical services rendered under this contract were unnecessary or unauthorized or were improperly, negligently or incompetently rendered, will be determined by submission to arbitration as provided by California law, and not by a lawsuit or resort to court process except as California law provides for judicial review of arbitration proceedings.

(Dkt. No. 51-3 at 5, 9, 13, 17, 21, 29.[3]) Article 2.b. Treatment Covered states: "Patient understands and agrees that any dispute of the sort described in Article 1 between Provider and Patient will be subject to compulsory, binding arbitration." (*Id.*) Further, immediately above each Plaintiff's' signature the following appears:



(*Id.*)

Second, Plaintiffs signed a Cryopreservation and Storage Informed Consent Agreement

---

[2] All Plaintiffs signed arbitration agreements containing the same language.

[3] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

which includes two dispute resolution provisions.[4]   The relevant provisions state:

> **Dispute Resolution: Medical Claims.**  It is understood that any dispute as to medical malpractice, that is, as to whether any medical services rendered under this contract were unnecessary or unauthorized or were improperly, negligently or incompetently rendered, will be determined by submission to arbitration as provided in a separate arbitration agreement signed by the parties.
>
> **Dispute Resolution: Other Claims.**  Any other disputes relating to this agreement which cannot be resolved by the parties in good faith discussions shall be submitted to mediation in the County of San Francisco, California, administered by a person mutually agreeable to the parties or if there is no mutual agreement, at the request of either party the matter shall be submitted to the American Arbitration Association ("AAA") for mediation. Mediation before an AAA mediator shall proceed and continue until such time as the matter is either resolved or the mediator finds or the parties agree that mediation should not continue.  The parties shall share equally the costs of any mediation, and each party shall bear its or her own costs in connection therewith.  If the parties cannot resolve the dispute through the mediation process detailed above, the matter shall be settled by binding arbitration in San Francisco, California, in accordance with the then-current rules of the AAA, and judgment upon the award entered by the arbitrators shall be entered in any Court having jurisdiction hereof.  Any and all claims brought forth subject to mediation and/or arbitration pursuant to this Agreement may only be brought in a party's individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding in any forum.  Any claim as to whether this Agreement should be subject to arbitration or the enforceability of any provision of this Section 13 shall be resolved by arbitration conducted in accordance with this Section.  The prevailing party in any arbitration under this Section, or in any court proceeding brought to enforce an arbitration award after it is rendered by the arbitrator, shall be entitled to its costs, including reasonable attorneys' fees.  Said arbitration shall be conducted in the English language and the award rendered in the United States dollars.  Service of the Petition to Confirm the Award of the Arbitrator shall be complete on personal delivery or the deposit of the Petition and notice in the United States Mail.  Should one party either dismiss or abandon the claim or counterclaim before hearing thereon, the other party shall be deemed the "prevailing party" pursuant to this Agreement.  Should both parties receive judgment or award on their respective claims, the arbitrator shall determine which of the parties shall be deemed the "prevailing party" for purposes of this Agreement.

(Dkt. Nos. 51-4 at 23-24 (Ex. B: Informed Consent for In Vitro Fertilization); 56-57 (Ex. D: Informed Consent for Oocyte Stimulation, Egg Harvesting, Cryopreservation and Storage); 86-87 (Ex. F: Informed Consent for Oocyte Stimulation, Egg Harvesting, Cryopreservation and Storage); 116 (Ex. H: Informed Consent and Agreement to Perform Egg Cryopreservation); 146-147 (Ex. J: Informed Consent for Oocyte Stimulation, Egg Harvesting, Cryopreservation and Storage);  175-176 (Ex. K: Informed Consent for Oocyte Stimulation, Egg Harvesting, Cryopreservation and Storage); 204-205 (Ex. L: Informed Consent for Oocyte Stimulation, Egg Harvesting, Cryopreservation and Storage).) [5]

---

[4] Because all Plaintiffs signed agreements containing the same language, for ease of reference the Court refers to these agreements collectively as "the Informed Consent Agreement."

[5] In the parties' initial papers there had been a dispute as to whether Defendants could compel arbitration as to Plaintiffs C.D. and O.P.—the partners of A.B. and M.N., respectively—because they did not sign the medical malpractice arbitration agreement.  However, Plaintiffs O.P. and M.N. have since dismissed their claims and Plaintiff C.D. signed the Informed Consent Agreement that includes the at-issue arbitration provision, so there is no dispute that the arbitrability of C.D.'s

1    In 2017, unbeknownst to Plaintiffs, Prelude took over operation of Pacific Fertility's egg

2    and embryo storage facilities through its operating subsidiary Pacific MSO.  (Dkt. No. 174-3 at ¶

3    5.)  Prelude operates a national network of egg and embryo long-term freezer storage facilities.

4    (*Id.*)

5    On March 4, 2018, Prelude "discovered that the liquid nitrogen levels in a tank known as

6    'Tank 4' had dropped to an unsafe level for an undetermined period of time, destroying or

7    jeopardizing the eggs and embryos stored in the tank, including those belonging to Plaintiffs."  (*Id.*

8    at ¶ 6.)  Plaintiffs were notified of this incident via an email on March 11, 2018, which stated that

9    a "preliminary analysis" suggested some of the eggs and embryos in the tank may have been

10   destroyed.  (*Id. at ¶* 7.)  A month later, Pacific Fertility again emailed Plaintiffs, advising them

11   that an investigation had shown the incident resulted from "a failure of the tank's vacuum seal."

12   (*Id. at ¶* 8.)  Shortly thereafter, Chart—who manufactured the at-issue tank, Tank 4—recalled

13   several of its cryopreservation tanks, citing "reports of a vacuum leak or failure that could

14   compromise the product."  (*Id.* at ¶ 8.)  "Pacific Fertility and Prelude have informed Plaintiffs that

15   it is not possible to know whether their eggs or embryos are viable until they are warmed, and

16   even then, the full extent of the damage cannot be known without attempting a pregnancy."  (*Id.* at

17   ¶ 10.)

18   Following receipt of the March 11 email, Plaintiff S.M. filed this putative class action

19   against Pacific Fertility and Prelude alleging various state law claims.  (Dkt. No. 1.)  Ten days

20   later, Plaintiff filed an amended class action complaint substituting in a new plaintiff—R.E.—and

21   adding an additional claim.  (Dkt. No. 7.)

22   The parties then stipulated to consolidate this action with two other actions pending in the

23   Northern District of California: *Bauer, et al. v. Pacific Fertility Center, et al.*, No. 3:18-cv-01634

24   (N.D. Cal. filed Mar. 15, 2018) and *A.B., et al. v. Pacific Fertility Center, et al.*, No. 3:18-cv-

25   02298 (N.D. Cal. Filed April 17, 2018).  (Dkt. No. 17.)  Plaintiffs A.B., C.D., E.F., G.H., I.J.,

26   K.L., M.N., and O.P then filed a Consolidated Amended Class Action Complaint which added

27

28
---
claims rises and falls on the same analysis as for the other plaintiffs.

4

United States District Court
Northern District of California

1    Chart as a defendant and again pled various state law claims. (Dkt. No. 44.)

2         A month later, Pacific Fertility filed a motion to compel arbitration in which Prelude and

3    Chart joined.  (Dkt. Nos. 52, 56, 67.)  The motion to compel arbitration first came before the Court

4    for a hearing on November 9, 2018.  At that hearing, Plaintiffs requested leave to amend their

5    complaint to reflect information learned through discovery.  The Court granted Plaintiffs' request

6    and ordered the parties to file supplemental briefing related to the motion to compel arbitration.

7    (Dkt. No. 133.)  Plaintiffs thereafter filed the First Amended Consolidated Complaint which added

8    Pacific MSO, Prelude's subsidiary, as a defendant and pled the following 11 claims for relief: (1)

9    negligence and/or gross negligence as to Prelude and Pacific MSO; (2) negligent failure to recall

10   as to Chart; (3) bailment as to Prelude and Pacific MSO; (4) premise liability as to Prelude and

11   Pacific MSO; (5) violation of the UCL as to all Defendants; (6) violation of California's

12   Consumer Legal Remedies Act (CLRA), Cal. Civ. Code § 1750 et seq. as to Pacific Fertility,

13   Prelude, and Pacific MSO; (7) fraudulent concealment as to Pacific Fertility, Prelude, and Pacific

14   MSO; (8) strict products liability-failure to warn as to Chart; (9) strict products liability-

15   manufacturing defect as to Chart; (10) strict products liability-design defect-consumer

16   expectations test as to Chart; and (11) strict products liability-design defect-risk utility test as to

17   Chart.  (Dkt. No. 174-3, First Amended Consolidated Class Action Complaint ("FAC").)

18        Plaintiffs M.N. and O.P. thereafter voluntarily dismissed their claims.  (Dkt. No. 163.)

19        The parties then filed two joint requests to amend the briefing schedule on the arbitration

20   motion which the Court granted.  (Dkt. Nos. 149, 162.)  Following completion of the briefing, the

21   Court heard renewed argument on March 12, 2019.

22                                **LEGAL FRAMEWORK**

23        Federal law governs interpretation of the agreements to arbitrate because the agreements

24   evidence transactions involving interstate commerce.  *See Turtle Ridge Media Group, Inc. v.*

25   *Pacific Bell Directory*, 140 Cal. App. 4th 828, 832 (2006); *see also* 9 U.S.C. § 2.  The Federal

26   Arbitration Act ("FAA"), 9 U.S.C. §§ 2-16, provides that arbitration agreements "shall be valid,

27   irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation

28   of any contract."  Under the FAA, "arbitration agreements [are] on an equal footing with other

contracts," and therefore courts are required to enforce arbitration agreements according to their terms. *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 66 (2010). The court must direct parties to proceed to arbitration should it determine: (1) that a valid arbitration agreement exists, and (2) that the agreement encompasses the dispute at issue. *Kilgore v. KeyBank, Nat'l Ass'n*, 718 F.3d 1052, 1058 (9th Cir. 2013).

## DISCUSSION

Defendants move to compel arbitration of Plaintiffs' claims on the grounds that the claims fall squarely within the agreement requiring arbitration of medical malpractice claims and, if not that agreement, then within the "other disputes" arbitration provision of the Informed Consent Agreement. Although not parties to the Arbitration Agreement or the Informed Consent Agreement, Chart, Prelude, and Pacific MSO contend that they, too, can force Plaintiffs into arbitration based on either of two theories: equitable estoppel or as third-party beneficiaries.[6]

## I.   Plaintiffs' Claims Against Pacific Fertility are Subject to Arbitration

Pacific Fertility insists that Plaintiffs' claims against it fall within the medical malpractice arbitration agreement and the arbitration provisions of the Informed Consent Agreement. Because Plaintiffs do not dispute that their claims against Pacific Fertility fall within the "Dispute Resolution: Other Claims" provision in the Informed Consent Agreement (hereinafter referred to as the "Arbitration Agreement") (Dkt. No. 51-4 at 23-24), the Court need not determine whether Plaintiffs' claims would also fall under the medical malpractice arbitration provisions.

## II.   Prelude and Chart Cannot Invoke the Arbitration Agreement

The contractual right to compel arbitration "may not be invoked by one who is not a party to the agreement and does not otherwise possess the right to compel arbitration." *Britton v. Co-op Banking Grp.*, 4 F.3d 742, 744 (9th Cir. 1993). Accordingly, "[t]he strong public policy in favor of arbitration does not extend to those who are not parties to an arbitration agreement." *Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1287 (9th Cir. 2009) (internal citation omitted).

Prelude and Chart advance overlapping theories in support of their argument that despite

---

[6] Prelude and Pacific MSO filed their motion jointly and the Court thus refers to them collectively as "Prelude."

United States District Court
Northern District of California

their status as non-signatories to the Informed Consent Agreement containing the Arbitration

Agreement, they otherwise possess the same right as Pacific Fertility to compel arbitration.  First,

they argue that equitable estoppel compels arbitration of their claims.  Second, Prelude insists that

even if equitable estoppel does not apply, it is entitled to compel arbitration as a third-party

beneficiary of Plaintiffs' Informed Consent Agreement with Pacific Fertility.

### A. Equitable Estoppel

"The United States Supreme Court has held that a litigant who is not a party to an

arbitration agreement may invoke arbitration under the FAA if the relevant state contract law

allows the litigant to enforce the agreement."  *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122,

1128 (9th Cir. 2013).  The question, then, is whether under California contract law the non-

signatory defendants may compel Plaintiffs to arbitration based on equitable estoppel.  *Murphy v.*

*DirecTV, Inc.*, 724 F.3d 1218, 1229 (9th Cir. 2013).  "Because generally only signatories to an

arbitration agreement are obligated to submit to binding arbitration, equitable estoppel of third

parties in this context is narrowly confined."  *Id.*  (citing *Mundi v. Union Sec. Life Ins. Co.*, 555

F.3d 1042, 1046 (9th Cir.2009)).  Under California law:

> Where a nonsignatory seeks to enforce an arbitration clause, the
> doctrine of equitable estoppel applies in two circumstances: (1)
> when a signatory must rely on the terms of the written agreement in
> asserting its claims against the nonsignatory or the claims are
> intimately founded in and intertwined with the underlying contract,
> and (2) when the signatory alleges substantially interdependent and
> concerted misconduct by the nonsignatory and another signatory and
> the allegations of interdependent misconduct are founded in or
> intimately connected with the obligations of the underlying
> agreement.

*Kramer*, 705 F.3d at 1129 (quoting *Goldman v. KPMG LLP*, 173 Cal. App. 4th 209, 219, 221

(2009) (internal alteration and quotation marks omitted).

### 1) Chart Cannot Invoke Equitable Estoppel

Plaintiffs plead claims for negligent failure to recall, violation of the UCL, and products

liability against Chart.  (FAC ¶¶ 202-208, 226-32, 269-295.)  Chart insists that because each of

these claims is "intimately founded in and intertwined with" Plaintiffs' Informed Consent

Agreement with Pacific Fertility and because Plaintiffs allege that Chart engaged in

United States District Court
Northern District of California

1   interdependent misconduct with Pacific Fertility, Chart has satisfied both prongs of the equitable

2   estoppel test.

3                                   **a) Reliance on the underlying contract**

4            To determine whether a plaintiff's claims rely on an arbitration agreement, the court must

5   "look[] to whether the claims that the nonsignatory sought to arbitrate were 'intimately founded in

6   and intertwined with the underlying contract obligations.'" *Kramer*, 705 F.3d at 1129 (quoting

7   *Goldman*, 173 Cal. App. 4th at 221). "This requirement comports with, and indeed derives from,

8   the very purposes of the doctrine: to prevent a party from using the terms or obligations of an

9   agreement as the basis for his claims against a nonsignatory, while at the same time refusing to

10   arbitrate with the nonsignatory under another clause of that same agreement." *Goldman*, 173 Cal.

11   App. 4th at 221.

12           Chart maintains that "each of Plaintiffs' claims presumes the existence of a contract for the

13   storage of eggs, and Plaintiffs rely upon those contracts in asserting their claims." (Dkt. No. 124

14   at 3: 15-16.) In particular, Chart argues that the cryopreservation and egg storage at the heart of

15   Plaintiffs' claims against Chart are "inherently intertwined with, and integral to, the services that

16   [Pacific Fertility] provided." (*Id.* at 3:11-14.) In its supplemental brief, Chart asserts—without

17   explanation—that "Plaintiffs would not have received any services from PFC—and would not

18   have had their eggs and embryos stored in the subject tank ("Tank 4")—unless they had executed

19   the contracts containing their respective agreements to arbitrate." (Dkt. No. 159 at 10:16-18.)

20   And in its supplemental reply, Chart goes so far as to say that "Plaintiffs could not have asserted

21   claims against Chart had they not executed their respective agreements." (Dkt. No. 166 at 4:2-3.)

22           It is not enough that Plaintiffs' complaint references the existence of a contract between

23   Plaintiffs and Pacific Fertility. "[M]erely 'mak[ing] reference to' an agreement with an arbitration

24   clause is not enough. Equitable estoppel applies 'when the signatory to a written agreement

25   containing an arbitration clause "must rely on the terms of the written agreement in asserting [its]

26   claims" against the nonsignatory.'" *Goldman*, 173 Cal. App. 4th at 218 (quoting *MS Dealer Serv.*

27   *Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999)). That is, the claims must allege a violation

28   of a "duty, obligation, term or condition" imposed by the Informed Consent Agreement. *See In re*

United States District Court
Northern District of California

United States District Court
Northern District of California

*Henson*, 869 F.3d 1052, 1060 (9th Cir. 2017). Chart does not--because it cannot--argue that the claims against it arise from a duty, obligation, term or condition imposed by the Informed Consent Agreement. Even absent the Agreement, Plaintiffs could plead their negligent failure to recall claim against Chart based on Chart's duty to exercise reasonable care in the storage of their eggs and embryos—a duty which arises independent of any contract. *See, e.g, Williams v. Beechnut Nutrition Corp.*, 185 Cal. App. 3d 135, 141 (1986) ("A manufacturer/seller of a product is under a duty to exercise reasonable care in its design so that it can be safely used as intended by its buyer/consumer."). Likewise, Plaintiffs' UCL consumer protection claim regarding Chart's alleged failure "to adequately maintain, inspect, monitor, and/or test their liquid nitrogen storage tanks, including through a functional electronic tank monitoring system capable of detecting a rise in temperature or a drop in liquid nitrogen levels and promptly alerting staff to the immediate problem" does not rely on Plaintiffs' agreements with Pacific Fertility. (Dkt. No. 174-3, FAC at ¶ 228.a.) The same is true for Plaintiffs' product liability claims which are pled only against Chart and in no way reference the agreements with Pacific Fertility. As in *Henson*, Plaintiffs' "claims against [Chart] are not based on the [Informed Consent] Agreement. [Plaintiffs'] complaint is replete with allegations of wrongdoing against [Chart] that have nothing to do with the [Informed Consent] Agreement." *Id.* at 1061.

Chart is arguing, in effect, that but-for Plaintiffs' written agreement with Pacific Fertility, Pacific Fertility would never have stored Plaintiffs' eggs and embryos, and thus no claim against Chart would have arisen. This factual but-for argument, however, is contrary to the law as it ignores that the duty allegedly violated must arise from the agreement containing the arbitration clause. In *Kramer*, for example, the plaintiffs brought suit against Toyota under various California consumer protection laws based on alleged misrepresentations regarding their vehicles' braking system. Toyota sought to compel arbitration based on arbitration clauses within the purchase agreements the plaintiffs had signed with the third-party dealers, arguing that the plaintiffs' claims were intertwined with the purchase agreements. 705 F.3d at 1130. In rejecting Toyota's arguments, the Ninth Circuit concluded that the plaintiffs' claims "merely reference[d]" the agreements and did not "intimately rely on the existence" of the agreements. *Id*. at 1132. It was

9

United States District Court
Northern District of California

1    not enough that the plaintiffs' "claims presume a transaction involving a purchase of a Class

2    Vehicle" given that the claims did not "rely upon the existence of a Purchase Agreement." *Id.*  By

3    way of illustration, the court noted that a plaintiff who had purchased a vehicle in cash without a

4    purchase agreement would still be able to state a claim for relief under the consumer protection

5    statutes against Toyota; therefore, the plaintiffs' claims "arose independently of the terms of the

6    agreements containing arbitration provisions." *Id.* at 1132;[7] *see also Henson,* 869 F.3d at 1069

7    (stating that in *Kramer* the Ninth Circuit "expressly rejected Toyota's argument that the plaintiffs'

8    claims were necessarily based on the Purchase Agreements merely because the lawsuit was

9    predicated on the bare fact that a vehicle purchase occurred").

10           Similarly, in *Ratimany v. T-Mobile*, the plaintiffs would not have had claims against

11   Subway for encouraging T-Mobile to spam message its customers with Subway sandwich deals

12   but-for the plaintiffs' agreements with T-Mobile, agreements that included arbitration provisions.

13   717 F. App'x 752 (9th Cir. April 5, 2018).  The Ninth Circuit quickly dispatched Subway's

14   equitable estoppel attempt to enforce T-Mobile's arbitration agreement against the plaintiffs

15   because the plaintiffs' claims against Subway did not arise from a violation of any duty,

16   obligation, term or condition imposed by the plaintiffs' agreements with T-Mobile. *Id.* at 753.  So

17   too here.  So long as Plaintiffs' eggs and embryos were stored in a Chart tank, regardless of how

18   that came to be, they would still be able to state claims against Chart for negligent failure to recall,

19   violation of the UCL, and product liability.  At the very least Chart has not identified any legal

20   authority that would preclude such claims absent Plaintiffs' agreements with Pacific Fertility.

21           Chart's reliance on *Mance v. Mercedes-Benz USA*, CV 11-03717 LB, 2012 WL 4497369

22   (N.D. Cal. Sept. 28, 2012), is unpersuasive.  The *Mance* court reasoned that because the plaintiff's

23   claims made reference to or presumed the existence of an underlying contract, Mercedes-Benz's

24   duty to comply with the warranty arose when the plaintiff bought the car; therefore, had the

25   plaintiff not signed the contract he would not have received the warranty, and thus the warranty

26

27   _____
     [7] The Ninth Circuit was not suggesting, as Defendants imply, that if the plaintiffs had been
     required to sign a purchase agreement to buy a Toyota that the result would be different.  The
28   example of the cash purchaser merely illustrated how Toyota's legal duty arose independent of the
     agreement containing the arbitration clause.

1    claim arose out of the contract.  *Id.* at 1157.  This reasoning, however, has since been rejected by

2    the Ninth Circuit.  *See Kramer,* 705 F.3d at 1132; *Henson*, 869 F.3d at 1061; *Ratimany*, 717 F.

3    App'x at 753.  Chart has not met its burden of demonstrating that Plaintiffs' claims against it arise

4    from or are otherwise intertwined with Plaintiffs' agreements with Pacific Fertility.

5                    **b)  Substantial interdependence founded in underlying agreement**

6              Under the second prong, the doctrine of equitable estoppel applies "when the signatory

7    alleges substantially interdependent and concerted misconduct by the nonsignatory and another

8    signatory and the allegations of interdependent misconduct [are] founded in or intimately

9    connected with the obligations of the underlying agreement."  *Kramer*, 705 F.3d at 1128-29 (citing

10   *Goldman*, 173 Cal. App. 4th at 219, n. 4).

11                  [M]ere allegations of collusive behavior between signatories and
                    nonsignatories to a contract are not enough to compel arbitration
12                  between parties who have not agreed to arbitrate: those allegations
                    of collusive behavior must also establish that the plaintiff's claims
13                  against the nonsignatory are intimately founded in and intertwined
                    with the obligations imposed by the contract containing the
14                  arbitration clause. It is the relationship of the claims, not merely the
                    collusive behavior of the signatory and nonsignatory parties, that is
15                  key.

16   *Goldman,* 173 Cal. App .4th at 223 (internal alteration and quotation marks omitted).

17             Chart insists that this circumstance is likewise satisfied because "Plaintiffs' claims raise

18   questions as to the interplay of the performance, operation, and maintenance of the subject tank,

19   which inquiries turn upon the actions and omissions of all the named Defendants" and that the

20   "alleged interdependent misconduct" with respect to the eggs and embryos is "undeniably

21   connected with the obligations of the underlying agreements."  (Dkt. No. 124 at 5:20-24.)  Thus,

22   "to adjudicate Plaintiffs' claims against Chart, the Court or an arbitrator will be required to

23   determine whether the [Pacific Fertility] Defendants properly used and maintain the tank."  (Dkt.

24   No. 159 at 11:26-28.)

25             Chart's argument fails because Plaintiffs' claims against Chart are neither founded in nor

26   intimately connected with the obligations of the underlying agreements.  Even if the Court

27   accepted Chart's characterization that Plaintiffs have pled that Defendants' collective mishandling

28   of Plaintiffs' eggs and embryos gives rise to their claims, allegations of collusive behavior

United States District Court
Northern District of California

United States District Court
Northern District of California

standing alone are not enough.  "Even where a plaintiff alleges collusion, '[t]he *sine qua non* for allowing a nonsignatory to enforce an arbitration clause based on equitable estoppel is that the claims the plaintiff asserts against the nonsignatory are dependent on or inextricably bound up with the contractual obligations of the agreement containing the arbitration clause.'"  724 F.3d at 1232 (quoting *Goldman*, 173 Cal. App. 4th at 213-14).  Indeed, "no principle of law—and certainly not the doctrine of equitable estoppel—allows us to decide that a plaintiff who did not agree to arbitrate with a defendant must do so simply because he alleges a conspiracy, and without regard to whether his conduct 'renders assertion of [his right to a judicial forum] contrary to equity.'"  *Goldman*, 173 Cal. App. 4th at 234 (quoting *Metalclad Corp. v. Ventana Envtl. Organizational P'ship*, 109 Cal. App. 4th 1705, 1713 (2003)) (noting that "[w]hile . . . federal policy favors arbitration, that policy simply does not apply to parties who have not agreed to arbitrate."); *see also Kramer*, 705 F.3d at 1133 ("even if Toyota were correct that Plaintiffs allege a pattern of concealment between Toyota and the dealerships, these allegations are not connected to the Purchase Agreements.").

***

Because Plaintiffs' claims against Chart are not "dependent on or inextricably bound up" or "intimately connected" with the obligations under their agreements with Pacific Fertility, equitable estoppel does not apply.  Accordingly, Chart's motion to compel arbitration is DENIED.

### 2) Equitable Estoppel as to Prelude

As a threshold matter, the Court must address Prelude's attempt to shift the burden to Plaintiffs to demonstrate that equitable estoppel does not apply.  (Dkt. No. 160 at 15 (stating that Plaintiffs must meet a "high standard" to avoid arbitration pursuant to equitable estoppel).) Prelude bears the burden of demonstrating that equitable estoppel applies.  *See In re Carrier IQ, Inc. Consumer Privacy Litig.*, No. C-12-MD-2330 EMC, 2014 WL 1338474, at *4 (N.D. Cal. Mar. 28, 2014) ("Defendants have the burden of establishing equitable estoppel."); *Crestline Mobile Homes Mfg. Co. v. Pac. Fin. Corp.*, 54 Cal.2d 773, 778 (1960) (stating that under California law the party relying on equitable estoppel doctrine has burden to show it applies); *see also Rajagopalan v. Noteworld, LLC*, 718 F.3d 844, 847 (9th Cir. 2013) (explaining that the

12

1    liberal federal policy regarding scope of arbitration does not apply to the question "whether a

2    particular party is bound by the arbitration agreement").

3                          **a) Reliance on the underlying contract**

4            Again, to determine whether Plaintiffs' claims rely on the written agreement, the Court

5    "look[s] to whether the claims that the nonsignatory sought to arbitrate were 'intimately founded

6    in and intertwined with the underlying contract obligations.'"  *Kramer*, 705 F.3d at 1129 (quoting

7    *Goldman*, 173 Cal. App. 4th at 221).  In its initial moving papers, Prelude insisted that "Plaintiffs'

8    suit is inextricably 'intertwined' with their agreements to arbitrate, and the [Complaint] alleges

9    that [Pacific Fertility] and Prelude both acted together to violate obligations that arise from those

10    agreements." (Dkt. No. 122-4 at 5:9-11.)  In its supplemental brief, Prelude maintains that

11    because the FAC repeatedly refers to the services and associated payment obligations in the

12    Informed Consent Agreement, as well as the parties' duties and obligations under that Agreement,

13    Plaintiffs' claims are intertwined with the Agreement.

14            Plaintiffs plead claims for negligence/gross negligence, bailment, premises liability,

15    violation of the UCL and CLRA, and fraudulent concealment against Prelude.  (FAC at ¶¶ 185-

16    201, 209-268.)  According to the FAC, Prelude—which owns and runs a national network of

17    fertility clinics and egg and embryo storage facilities—took over Pacific Fertility's egg and

18    embryo storage operation in 2017.  (FAC at ¶ 5.)  Neither Pacific Fertility nor Prelude advised

19    Plaintiffs of this transaction or the change in storage management.  Plaintiffs' claims against

20    Prelude are thus not based on their contracts with Pacific Fertility, but rather, arise from Prelude's

21    role as the owner and operator of the facility where the cryopreservation of their eggs and embryos

22    occurred.  Indeed, it was Pacific Fertility—not Plaintiffs—who contracted to "delegate[] the

23    authority to provide certain non-clinical services in support of [Pacific Fertility's] tissue storage

24    operation." (Dkt. No. 56-1 at ¶ 2 (Hertzberg Decl.).)  Plaintiffs' claims against Prelude can hardly

25    rest on their contracts with Pacific Fertility when Plaintiffs (a) had no relationship with Prelude,

26    (b) were unaware that Prelude had taken over the tissue storage operation, and (c) Pacific Fertility

27    did not have a relationship with Prelude at the time Plaintiffs entered into the agreements.

28            The authority cited by Prelude in its moving papers does not suggest otherwise.  In *Letizia*

United States District Court
Northern District of California

13

United States District Court
Northern District of California

*v. Prudential Bache Sec., Inc.*, the Ninth Circuit held that the customers' claims against individual brokerage firm employees were subject to arbitration based on the customer agreement between the brokerage firm and the customers.  802 F.2d 1185, 1188 (9th Cir. 1986).  In reaching this conclusion, the Ninth Circuit noted that "[a]ll of the individual defendants' allegedly wrongful acts related to their handling of [plaintiff's] securities account."  *Id.*  Here, in contrast, Plaintiffs' claims do not arise from Prelude's handling of their embryos and eggs under the contract, but rather from Prelude's duty—independent of any contractual obligation—to exercise reasonable care in the handling of the eggs and embryos stored in their facility; that is, as with Plaintiffs' claims against Chart, even if Plaintiffs had no agreement with Pacific Fertility, as a legal matter they could still plead the claims made here against Prelude.  *See Kramer*, 705 F.3d at 1132.

For the same reason, Prelude's reliance on *Uptown Drug Co., Inc. v. CVS Caremark Corp.*, 962 F. Supp. 2d 1172 (N.D. Cal. 2013), is misplaced.  There, the court held that defendants CVS Caremark, CVS Pharmacy, and Caremark Rx could enforce an arbitration clause to which they were not a party because the plaintiff's claims were predicated on misappropriation of customer information and "the question of whether Caremark was to any extent barred from disclosing or using Uptown's customer data must be answered by looking at the terms of the Caremark Provider Agreement, because that contract explicitly governs the collection and use of such information and because it provides the underlying basis for Uptown's disclosure of such information."  *Id.* at 1185.  Here, in contrast, the Court need not look to the Informed Consent Agreement to adjudicate the claims against Prelude for negligence/gross negligence, bailment, premise liability, violation of the UCL and CLRA, and fraudulent concealment—these claims are independent of Pacific Fertility's contractual obligations regarding tissue storage.[8]

Prelude's reliance on *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942 (11th Cir. 1999), is likewise misplaced.  There, although the plaintiff's claims were not based on the agreement

---

[8] Prelude's reliance on *Coast Plaza Doctors Hosp. v. Blue Cross of California*, 83 Cal. App. 4th 677, 684 (2000), as modified (Sept. 7, 2000), is even less availing as it does not even discuss equitable estoppel and instead addresses whether an arbitration clause could be enforced against a party even if that party had terminated the parties' service agreement containing the arbitration clause prior to filing suit.

14

containing the arbitration clause, they were based on a fee charged under a service contract that was incorporated by reference into the agreement containing the arbitration clause.  The plaintiff sued MS Dealer—a nonsignatory to either agreement—who was obligated to provide services under the service contract.  *Id*. at 948.  The court concluded that the plaintiff's claims were "intimately founded in and intertwined with the obligations imposed by" the agreement containing the arbitration agreement because "her fraud and conspiracy claims depend[ed] entirely upon her contractual obligation to pay $990.00 for the service contract" and her obligation to "pay the $990.00 charge arose under the [agreement containing the arbitration clause]."  *Id*.

Plaintiffs do not need to rely on the Informed Consent Agreement in asserting their claims against Prelude, and as such, Plaintiffs' claims are not "dependent on or inextricably bound up with the" obligations of their agreements with Plaintiffs' Informed Consent Agreement with Pacific Fertility.

### b)  Substantial interdependence founded in underlying agreement

In the alternative, Prelude insists that Plaintiffs' claims against it are based on Pacific Fertility's "own conduct before September 2017 and on the service relationships that Prelude and Pacific MSO have with [Pacific Fertility]" because "[t]he FAC alleges that Prelude and Pacific MSO 'exercised control over the [Pacific Fertility] egg and embryo storage operation at the time of the Tank 4 incident.  At the time of the incident, the employees responsible for performing regular monitoring and maintenance of Tank 4 were employees of Prelude or Pacific MSO, LLC.'"  (Dkt. No. 160 at 18:3-8 (quoting FAC at ¶ 30).)  In addition, Prelude contends that because Plaintiffs have included allegations that Pacific Fertility and Prelude failed to disclose that Prelude had taken over the tissue storage operation and that there were inadequate processes in place to protect Plaintiffs' tissue, this too shows that the claims are based on "substantially interdependent" misconduct.  *See Kramer*, 705 F.3d at 1128-29.

Again, even if the Court agreed that these allegations show substantially interdependent conduct—which they do not—Prelude still would not have met its burden to show that equitable estoppel applies under the second prong because, as discussed above, it has not demonstrated that Plaintiffs' claims against it are intimately connected with the Informed Consent Agreement.  *See*

*Kramer,* 705 F.3d at 1132–33 ("California state contract law does not allow a nonsignatory to enforce an arbitration agreement based upon a mere allegation of collusion or interdependent misconduct between a signatory and nonsignatory.").

***

At oral argument Prelude asserted that its "best case" for equitable estoppel is the district court decision in *Tamsco Properties, LLC v. Langemeir*, No. 09-03086 GEB-EFB, 2013 WL 246782 (E.D. Cal. Jan. 22, 2013). *Tamsco,* however, involved a defendant attempting to enforce its own arbitration agreement against non-signatory plaintiffs. The plaintiff LLCs' agents had signed the arbitration agreement. *Id.* at *5. The district court compelled the plaintiff LLCs to arbitrate their claims and the Ninth Circuit affirmed on the grounds that the plaintiff LLCs were bound by their agents' agreement to arbitrate on the plaintiffs' behalf. 597 F. App'x 428 (9th Cir. March 13, 2015). Here, it is undisputed that Pacific Fertility was not Prelude's agent: there was no relationship between Pacific Fertility and Prelude at the time Plaintiffs entered into the Informed Consent Agreement. The Tissue Transfer Agreement governing Pacific Fertility's transfer of the tissue storage responsibilities to Prelude emphasizes that Prelude is an independent contractor and not Pacific Fertility's agent. (Dkt. No. 108-7 at ¶ 6.) *Tamsco* does not apply.

Because Plaintiffs do not allege "substantially interdependent and concerted misconduct by the nonsignatory and another signatory and, even if they did, such allegations are not "founded in or intimately connected with the obligations of the [Informed Consent Agreement]," *Goldman*, 173 Cal. App. 4th at 219, equitable estoppel does not apply.

**B.  Prelude is Not an Intended Third-Party Beneficiary**

Next, Prelude argues that it is entitled to invoke the Arbitration Agreement under a third-party beneficiary theory.[9] "In California, 'exceptions in which an arbitration agreement may be

---

[9] In its initial motion to compel arbitration, Prelude contended that it was a third-party beneficiary of Plaintiffs' contract with Pacific Fertility because it was acting as Pacific Fertility's agent. However, given that the contracts between Pacific Fertility and Prelude disavow any such relationship, Prelude appears to have abandoned this argument. (Dkt. No. 108-7 at 4, ¶ 6 (Ex. 5: Pacific Fertility and Prelude's Sept. 13, 2017 Tissue Storage Management Services Agreement); *see also* Dkt. No. 108-9 at 4, ¶ 6 (Ex. 7: Pacific Fertility and Prelude's Sept. 13, 2017 Initial Embryo Storage Management Services Agreement); Dkt. No. 108-5 at 21, Art. 13.1(a) (Ex. 1: Pacific Fertility and Prelude's Sept. 13, 2017 Management Services Agreement)). *See Murphy v.*

enforced by or against nonsignatories include where a nonsignatory is a third party beneficiary of the agreement.'" *Murphy*, 724 F.3d at 1233 (quoting *Nguyen v. Tran*, 157 Cal. App. 4th 1032, (2007)). "'The mere fact that a contract results in benefits to a third party does not render that party a third party beneficiary; rather, the parties to the contract must have expressly intended that the third party would benefit.'" *Id.* at 1234 (quoting *Matthau v. Super*. Ct., 151 Cal. App. 4th 593, 602 (2007)).

Prelude argues three different bases for allowing it to compel arbitration of Plaintiffs' claims against it as a third-party beneficiary: (1) as a successor-in-interest; (2) as an assignee; or (3) as designated staff.  Prelude bears the burden of proving their third-party beneficiary status. *Jones v. Jacobson*, 195 Cal. App. 4th 1, 15 (2011), as modified (June 1, 2011) ("[W]hen a nonsignatory seeks to enforce an arbitration agreement/provision against a signatory . . . the nonsignatory bears the burden to establish he or she is a party to the arbitration agreement/provision covering the dispute." (emphasis removed)).  As discussed below, Prelude has failed to establish that any of these bases affords it third-party beneficiary status.

### 1)  Prelude is not a Successor-in-Interest

Prelude insists that it is a successor-in-interest because the Tissue Storage Management Services Agreement and Initial Embryo Storage Management Services Agreement describe how Prelude succeeded Pacific Fertility "in the provision of various services in support of PFC's tissue operation."  (Dkt. No. 160 at 21:24-26.)  It relies upon the Hertzberg declaration, but that only attests that "by agreement between Prelude and PFC, Prelude is delegated the authority to provide certain non-clinical services in support of PFC's tissue storage operation."  (Dkt. No. 56-1 at ¶ 2.) A successor-in-interest is "[o]ne who follows another in ownership or control of property . . . In case of corporations, the term 'successor in interest' ordinarily indicates statutory successor as, for instance, when corporation changes its name but retains same property."  *California Concrete Co.*

*DirecTV, Inc*., 724 F.3d 1218, 1233 (9th Cir. 2013) (to determine the agency relationship the court looked to whether "the record contains any *evidence* that is probative of the nature of the arrangement between the two companies" and found that what evidence there was suggested "that an agency relationship was expressly disavowed by DirecTV and Best Buy in the [parties'] "Independent Retailer Agreement.") (emphasis added).

17

1    *v. Beverly Hills Sav. & Loan Ass'n*, 213 Cal. App. 3d 207 (1989) (internal quotation marks and

2    citation omitted).  That Prelude succeeded Pacific Fertility in the "provision of various services"

3    falls well below this showing.  Further, Prelude fails to cite any case that suggests that an

4    independent contractor to whom a company outsources certain responsibilities is a successor-in-

5    interest and thus a third-party beneficiary of a contract entered into long before the outsourcing

6    occurred absent some language in the contract providing such status.  This omission is

7    unsurprising as a third-party beneficiary may only enforce a contract made for *its* benefit.  *See*

8    *Hess v. Ford Motor Co.*, 27 Cal. 4th 516, 524 (2002) (internal citation omitted).  That is, "[a]

9    putative third party's rights under a contract are predicated upon the contracting parties' intent to

10   benefit" it.  *Id.*  (internal citation and quotation marks omitted).  Pacific Fertility's subsequent

11   outsourcing of its tissue storage services to Prelude does not evidence an intent to have Prelude

12   benefit from a contract Pacific Fertility entered into with Plaintiffs years earlier.

13         On reply, Prelude advances another successor-in-interest theory: that Prelude is a "mere

14   continuation" of Pacific Fertility's tissue storage operation.  (Dkt. No. 168-4 at 14:9-26.)  Prelude

15   offers no reason why it could not have advanced this argument in one of its many prior briefs and

16   the Court is tempted to reject it on this basis alone.  *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th

17   Cir. 2007) (holding that the court "need not consider arguments raised for the first time in a reply

18   brief.").  However, the Court will briefly address it on the merits as it fails on that basis regardless.

19         Under the "mere continuation" theory of successorship, a purchasing corporation is a mere

20   continuation of the seller and thus assumes the seller's liabilities.  *See Cleveland v. Johnson*, 209

21   Cal. App. 4th 1315, 1327 (2012).  "California decisions holding that a corporation acquiring the

22   assets of another corporation is the latter's mere continuation and therefore liable for its debts have

23   imposed such liability only upon a showing of one or both of the following factual elements: (1)

24   no adequate consideration was given for the predecessor corporation's assets and made available

25   for meeting the claims of its unsecured creditors; (2) one or more persons were officers, directors,

26   or stockholders of both corporations."  *Ray v. Alad Corp.*, 19 Cal. 3d 22, 29 (1977).

27         Prelude relies on the Declaration of Alden Romney, Chief Executive Officer of Pacific

28   MSO, who attests that "PFC distributed, assigned, transferred, and delivered PFC's various assets

United States District Court
Northern District of California

18

United States District Court
Northern District of California

involved in cryostorage…to Pacific MSO" and that the same individuals who exclusively owned Pacific Fertility now hold a less than 20% collective ownership interest in Pacific MSO.  (Dkt. No. 168-6 at ¶¶ 2-4.)  Notwithstanding the careful wording of the declaration that Pacific Fertility transferred "various assets involved in cryostorage," the Tissue Storage Management Services Agreement between Pacific Fertility and Prelude belies any such transfer which could give rise to liability under a mere continuation theory:

> (b)    Upon written notice to PFC, Prelude may initiate all actions necessary to transition the Tissue Storage Operation, and any or all assets of the Tissue Operation, to the ownership of Prelude or any affiliate of Prelude, provided that Prelude will (i) assume all liabilities incurred following the effective date of such transition and hold PFC harmless from any liabilities associated with the Tissue Storage Operation incurred following the effective date of such transition; (ii) be responsible for obtaining all required licenses, permits and consents for the transfer of ownership of the Tissue Storage Operation; and (iii) obtain the prior written consent for the transfer from all persons who have agreements with PFC for storage of frozen tissues in the Tissue Storage Operation that require such consent. The above requirements will also apply to any decision by Prelude to move the Tissue Storage Operation to another location, regardless of whether the relocation will require a change of ownership of the Tissue Storage Operation.

(Dkt. No. 108-7 at 5, ¶ 8(b).)  There is no evidence, however, that any transfer of assets in accordance with the Tissue Storage Management Agreement occurred.  For example, there is no evidence that Plaintiffs were provided with the required notice, nor is there evidence of notice having been presented to any other Pacific Fertility clients.  Further, the "mere continuation" theory cited by Prelude holds defendants liable for the debts of the corporation to which it is a "mere continuation"; hence the requirement of no adequate consideration for the transfer of assets. That requirement does not make any sense in the context of allowing the "mere continuation" corporation to enforce an arbitration agreement to which it is not a party.  This Court declines to be the first court to apply the mere continuation theory of successor-in-interest standing to permit a non-signatory to enforce an arbitration agreement, especially under the minimal showing made here.

### 2)  Prelude and Pacific MSO are not Assignees

Next, Prelude argues that it is an assignee to Pacific Fertility's rights under the Informed Consent Agreement.  In general, an "assignment must describe the subject matter of the assignment with sufficient particularity to identify the rights assigned." *Mission Valley E., Inc. v.*

19

1    *Cty. of Kern*, 120 Cal. App. 3d 89, 96–97 (1981).  "For an assignment to be effective, it is

2    essential that the owner of the right to be transferred manifest an intention to transfer the right, and

3    the burden of proving an assignment lies with the party asserting the rights thereunder."  *Cobb v.*

4    *San Francisco Residential Rent Stabilization & Arbitration Bd*., 98 Cal. App. 4th 345, 352–53

5    (2002), as modified (May 9, 2002).

6           Prelude has not met its burden of showing that Pacific Fertility assigned Prelude its rights

7    under the Informed Consent Agreement.  Prelude's conclusory assertion that "[t]he Tissue Storage

8    Management Services Agreement and Initial Embryo Storage Management Services Agreement

9    show that PFC transferred the provision of certain services to Prelude, to be performed by

10   Prelude's qualified subsidiary Pacific MSO" fails to demonstrate that Pacific Fertility assigned its

11   rights under the Informed Consent Agreement to Prelude.  Critically, Prelude fails to identify a

12   *contractual* provision which assigns it any of Pacific Fertility's rights.

13          Rather than identifying assigning contractual language, on reply Prelude instead quotes

14   from the complaint allegations which discuss the parties' obligations under their agreement.  (Dkt.

15   No. 168-4 at 15-16 (quoting FAC ¶¶ 68, 69).)  None of those allegations, however, identify

16   contractual language assigning Pacific Fertility's rights under the Informed Consent Agreement to

17   Prelude, and in any event, Prelude has not identified any such contractual provisions.  "[T]o prove

18   an effective assignment, the assignee must come forth with evidence that the assignor meant to

19   assign rights and obligations under the contracts."  *Britton v. Co-op Banking Grp*., 4 F.3d at 746.

20   Prelude has failed to do so.

21                  **3)  Prelude is not an Intended Beneficiary as Designated Staff**

22          Finally, Prelude insists that in the Informed Consent Agreement Plaintiffs authorized

23   "designated staff" to perform cryopreservation and storage services and because the same staff

24   that provided those services for Pacific Fertility now provide those services for Prelude, this

25   "designated staff" is an intended beneficiary of the Informed Consent Agreement.

26          "The test for determining whether a contract was made for the benefit of a third person is

27   whether an intent to benefit a third person appears from the terms of the contract."  *Jensen v. U-*

28   *Haul Co. of California*, 18 Cal. App. 5th 295, 301 (2017), review denied (Feb. 21, 2018) (internal

United States District Court
Northern District of California

20

citation and quotation marks omitted). Prelude insists that the reference to designated staff in the Informed Consent Agreement "shows an intent to benefit the embryologists who worked on freezing and storing Plaintiffs' eggs and embryos." (Dkt. No. 168-4 at 16:25-26.) But Prelude fails to explain how mere reference to this "designated staff" evidences an "express intent to confer the benefit." *Jensen*, 18 Cal. App. 5th at 302. Indeed, the "mere fact that a contract results in benefits to a third party does not render that party a 'third party beneficiary.'" *Id.* (internal citation and quotation marks omitted). In *Suh v. Superior Court*, the court held that hospital and medical group defendants could not compel non-signatory doctors to arbitrate their claims because at the time the arbitration agreement was signed, the doctors were no longer receiving work at the hospital and there was no evidence that the doctors received benefits under the agreement. 181 Cal. App. 4th 1504, 1513-14 (2010). So too here—there is no evidence that these "designated staff" members received any benefit under the agreements.

Further, the evidence, and, in particular, the agreement between Pacific Fertility and Prelude, undermines any argument that Pacific Fertility intended to confer a benefit on this "designated staff." To the contrary, the agreement states in relevant part that "Prelude will, at Prelude's own expense, employ or engage the services of those employees, subcontractors, partners or agents, as Prelude deems necessary to perform the Services (collectively, the "Personnel"). The Personnel will not be employees of PFC, and Prelude will be solely responsible for the performance of the Services by the Personnel." (Dkt. No. 108-7 at 4, ¶ 5; *see also* Dkt. No. 108-7 at 4, ¶ 6; Dkt. No. 108-9 at 4, ¶ 6.)

***

Prelude has failed to establish a basis by which it could compel arbitration of Plaintiffs' claims against it pursuant to Plaintiffs' Informed Consent Agreement with Pacific Fertility. Its motion to compel arbitration is therefore denied.

### III.   Should the Court Decline to Compel Plaintiffs to Arbitration Against Pacific Fertility?

While Plaintiffs concede that their claims against Pacific Fertility fall under the "Other Claims" arbitration provision, they nonetheless posit that the Court has discretion to decline to

United States District Court
Northern District of California

1    compel Plaintiffs to arbitrate their claims against Pacific Fertility.  In particular, Plaintiffs urge that

2    under the California Arbitration Act, Cal. Code Civ. P. 1281.2(c), (d), when "[a] party to the

3    arbitration agreement is also a party to a pending court action . . . with a third party[,]" and that

4    action "aris[es] out of the same transaction or series of related transactions and there is a

5    possibility of conflicting rulings on a common issue of law or fact[,]" the Court may, among other

6    case management options, "refuse to enforce the arbitration agreement and . . . order intervention

7    or joinder of all parties in a single action or special proceeding" or "stay arbitration pending the

8    outcome of the court action[.]"  (Dkt. No. 165 at 23:27-24:4 (quoting Cal. Code Civ. P. §§

9    1281.2(c), (d)).)  Plaintiffs argue that because Chart and Prelude are parties to this action but not

10   parties to the arbitration provision or otherwise permitted to compel arbitration, the Court should

11   exercise its discretion under the California Arbitration Act and retain the claims against Pacific

12   Fertility along with all the other claims.

13           The FAA does not permit a court to decline to enforce a valid arbitration provision, even if

14   some claims arising from the same transaction or occurrence cannot be compelled to arbitration.

15   9 U.S.C. § 4.  Under such circumstances the FAA "requires piecemeal resolution when necessary

16   to give effect to an arbitration agreement."  *Moses S. Cone Hospital v. Mercury Constr.*, 460 U.S.

17   1, 20 (1983) (emphasis removed).  "Nevertheless, parties may agree that the FAA will not govern

18   their arbitration even if the contract involves interstate commerce."  *Mastick v. TD Ameritrade,*

19   *Inc.*, 209 Cal. App. 4th 1258, 1263 (2012).  Thus, if Plaintiffs and Pacific Fertility agreed that

20   California law controls the Arbitration Agreement, then California Civil Code section 1281.2(c)

21   applies, and this Court has discretion to decline to compel Plaintiffs to arbitrate their claims

22   against Pacific Fertility.  *See Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior*

23   *Univ.*, 489 U.S. 468, 477 (1989).

24           Plaintiffs contend that the general choice-of-law provision in the Informed Consent

25   Agreement dictates that California law applies to the Arbitration Agreement.  The choice-of-law

26   provision, which is in a different section of the Informed Consent Agreement than the dispute

27   resolution section, states that "[t]he provisions of this Agreement shall be interpreted under, and

28   performance of the parties hereto shall be governed by, the laws of the Status of California without

United States District Court
Northern District of California

22

1    regard to California conflict of law provisions."  (Dkt. No. 51-4 at 22.)

2            In *Mount Diablo Med. Ctr. v. Health Net of California, Inc*., a case involving a motion to

3    compel arbitration, the court held that courts should "look first to the language of the contract to

4    determine what portions of state law the parties intended to incorporate, and then, if any ambiguity

5    exists, to determine whether the provision in question conflicts with the objectives of the FAA."

6    *Mount Diablo*, 101 Cal. App. 4th at 714.  There, the choice-of-law provision stated that "[t]he

7    validity, construction, interpretation and enforcement of this Agreement" shall be governed by

8    California law.  *Id*. at 722.  The court held that "[t]he explicit reference to *enforcement* reasonably

9    includes such matters as whether proceedings to enforce the agreement shall occur in court or

10   before an arbitrator."  *Id*.  (emphasis added) (noting that California Code of Civil Procedure

11   1281.2 is captioned "Enforcement of Arbitration Agreements").  In so doing, the court specifically

12   distinguished choice-of-law provisions that provide only that the contract shall be "governed by"

13   California law and the cases holding that such language does not evidence an intent to have

14   California law supplant the FAA.  *Id*. at 723.  Indeed, *Cronus Investments, Inc. v. Concierge*

15   *Servs*., and *Defrees v. Kirkland*, upon which Plaintiffs rely, both involved choice-of-law

16   provisions that referenced "enforcement."  *Cronus*, 35 Cal. 4th 376, 381 (2005) (choice-of-law

17   provision stated that the agreement "shall be construed and *enforced* in accordance with and

18   governed by the laws of the State of California") (emphasis added); *Defrees,* No. 11-4272 GAF,

19   2012 WL 12883971 at *5 (C.D. Cal. Jan. 17, 2012) (choice of law provision states "that the

20   agreement should be enforced pursuant to California law").

21           The Informed Consent Agreement's choice-of-law provision, in contrast, contains no

22   reference to enforcement.  (Dkt. No. 51-4 at 22.)  The Court acknowledges that in *Mastick* the

23   California Court of Appeals held that a choice-of-law provision providing that the agreement

24   would be "governed by" California law was sufficient to invoke the California Arbitration Act.

25   209 Cal. App. 4th 1258, 1265 (2012).  But *Mastick* did not acknowledge, let alone distinguish

26   *Mount Diablo*, and the court's reasoning relied largely on the choice-of-law provision in *Cronus*

27   as merely providing that the agreement would be governed by California law.  *Id.* at 1264.  The

28   *Cronus* agreement, however, provided that it would be "enforced" in accordance with California

United States District Court
Northern District of California

23

law.  35 Cal. 4th at 381.  The Court thus declines to follow *Mastick* and instead follows *Mount Diablo*, which explains that under California law, a choice-of-law provision that states that the agreement shall be governed by California law does not evince an intent to incorporate the California Arbitration Act.  *See Golden v. O'Melveny & Meyers LLP*, No. 14-8725 CAS, 2016 WL 4168853, at *15 (C.D. Cal. Aug. 3, 2016) (addressing a "governed by" choice-of-law provision and noting that "[n]othing in the clause evinces particular intent to incorporate state arbitration rules; rather, they resemble the clauses in *Mount Diablo* and other cases that merely include language 'to the effect that the agreement would be governed by the law of a particular jurisdiction, without reference to enforcement.'")  (quoting *Mount Diablo*, 101 Cal. App. 4th at 723)).

Accordingly, the Court concludes that the Informed Consent Agreement's choice-of-law provision does not incorporate the California Arbitration Act and thus California Code of Civil Procedure Section 1281.2 does not apply.  As the FAA controls, the Court lacks discretion to decline to enforce the Informed Consent Agreement's Arbitration Agreement.  Because Plaintiffs do not dispute that the "Other Claims" Arbitration Agreement encompasses their claims against Pacific Fertility, the Court GRANTS Pacific Fertility's motion to compel arbitration.

**IV.     Should Proceedings in This Court be Stayed?**

Having denied Chart and Prelude's motions to compel arbitration, the Court must determine whether the claims as to them should be stayed pending arbitration of the claims against Pacific Fertility.

"[I]f a court finds that the plaintiff asserts both arbitrable and nonarbitrable claims, district courts have 'discretion whether to proceed with the nonarbitrable claims before or after the arbitration and [have] . . . authority to stay proceedings in the interest of saving time and effort for itself and litigants.'"  *Jenkins v. Sterling Jewelers, Inc.*, No. 17-1999 MMA, 2018 WL 922386, at *7 (S.D. Cal. Feb. 16, 2018) (quoting *Wilcox v. Ho-Wing Sit*, 586 F. Supp. 561, 567 (N.D. Cal. 1984)); *see also Leyva v. Certified Grocers of Cal., Ltd.*, 593 F.2d 857, 863 (9th Cir. 1979) (holding that the defendant "was not entitled to a stay pursuant to section 3 of the Arbitration Act" on a nonarbitrable claim, but noting that "sound reasons may exist" for the district court to stay the

action based on its inherent authority to control its docket).

Courts generally focus on three factors when determining whether to exercise their discretion to stay non-arbitrable claims: "(1) the economy and efficiency that result from avoiding duplication of effort; (2) how suited the dispute is to the arbitration process; and (3) the interdependence of the arbitrable claims and the non-arbitrable claims." *Gray v. Conseco, Inc.*, No. SA CV 00-322DOC(EEX), 2000 WL 1480273, at *8 (C.D. Cal. Sept. 29, 2000) (citing *U.S. for Use & Benefit of Newton v. Neumann Caribbean Int'l, Ltd.*, 750 F.2d 1422, 1427 (9th Cir. 1985)*; Lake Communications, Inc. v. ICC Corp.*, 738 F.2d 1473, 1477 (9th Cir. 1984), overruled on other grounds by *Nghiem v. NEC Elec., Inc.*, 25 F.3d 1437, 1441 (9th Cir. 1994)); *see also United Commc'ns Hub, Inc. v. Qwest Commc'ns, Inc.*, 46 F. App'x 412, 415 (9th Cir. 2002) ("Expanding the stay, so as to encompass all of the nonarbitrable claims in the case, is [only] appropriate where the arbitrable claims predominate, or where the outcome of the nonarbitrable claims will depend upon the arbitrator's decision.").

Defendants insist that a stay is in the interests of judicial economy and is warranted because there are common questions of law and fact amongst the claims against Defendants and proceeding with arbitration and litigation in this Court simultaneously could lead to inconsistent results.

### A.  No Stay as to Chart

Plaintiffs plead claims for negligent failure to recall, violation of the UCL, and products liability against Chart.  (FAC ¶¶ 202-208, 226-32, 269-295.)   Only the UCL claim is pled as to the other defendants as well, although the allegations as to Chart within the UCL claim are specifically related to Chart's failures as to the design, manufacturing, warnings, and recall of Tank 4.  (*Id*. at ¶ 229.)  Chart nonetheless contends that Plaintiffs' claims against it are intertwined with those against the other defendants because they all arise out of the fertility services that Pacific Fertility provided and involve a common set of facts and the interplay of the acts and omissions of the various defendants.

In particular, Chart argues that Plaintiffs' failure to warn claim raises the question of whether the tank was used or misused by Defendants in an intended or reasonably foreseeable

1    way, whether any other Defendants had a duty to warn Plaintiffs, whether Plaintiffs received

2    warnings from Defendants or anyone else, and questions of comparative fault and negligence.

3    Chart also insists that the adequacy of Tank 4 should be decided by the arbitrator in the first

4    instance because it is relevant to the UCL claim.  Finally, Chart contends that because Pacific

5    Fertility will be required to participate in Plaintiffs' claims against Chart, allowing the claims

6    against Chart to proceed would allow Plaintiffs to circumvent their agreement to arbitrate their

7    claims against Pacific Fertility.

8         Plaintiffs counter that there is "zero" overlap in their claims against Chart and those against

9    Pacific Fertility.  Indeed, the only overlapping claim—for violation of the UCL—is based on

10   different factual obligations and duties.  Plaintiffs allege that Pacific Fertility failed to disclose

11   whether adequate safeguards and procedures existed for storage of their tissue, whereas they allege

12   that Chart failed to disclose or warn that its product was defective.  (*Compare* FAC ¶ 228 *with* ¶

13   229.)  The arbitrator will thus not be required to determine whether Tank 4 was defective to

14   adjudicate Plaintiffs' UCL, CLRA, and fraudulent concealment claims against Pacific Fertility.

15        Chart's lament that Pacific Fertility will nonetheless be involved in the litigation here as a

16   witness or because the defendants make cross-claims against it is not Chart's concern.  If Pacific

17   Fertility did not want to litigate in two forums at the same time it did not have to move to compel

18   arbitration.  But it chose to do so.

19        Plaintiffs' claims against Chart are not interdependent on the claims against Pacific

20   Fertility and judicial economy would not be served by staying litigation of the claims against

21   Chart until Plaintiffs' claims against Pacific Fertility are arbitrated.

22        **B.  No Stay as to Prelude**

23        Prelude also insists that the claims against Pacific Fertility and those against it overlap

24   substantially—likewise emphasizing that Plaintiffs make UCL claims against all of the

25   defendants.  In particular, they identify complaint allegations that Pacific Fertility and Prelude

26   allegedly fraudulently failed to disclose and actively concealed that the processes and systems in

27   place were not adequate to safeguard Plaintiffs' tissue, and that control of the tissue storage was

28   transferred to Prelude and Pacific MSO.  (Dkt. No. 169 at 18:24-27 (citing FAC ¶ 233).)  Prelude

1   also maintains that because Pacific Fertility was responsible for the storage until September 2017

2   and even after that date continued to control the policies and procedures, the UCL claims are

3   inherently inseparable.

4          While a closer question than whether to stay the claims against Chart, a stay is likewise

5   inappropriate as to the claims against Prelude.  At the time of the incident, Pacific Fertility had

6   transferred its tissue storage responsibilities to Prelude.  (Dkt. No. 174-3, FAC at ¶¶ 5, 9.)  Thus,

7   Plaintiffs' allegations of failure to disclose against Prelude relate to different and later omissions

8   than the failure to disclose claims against Pacific Fertility.  (*Compare* FAC ¶ 248 *with* ¶ 252.)  As

9   with Plaintiffs' claims against Chart, their claims against Prelude and Pacific Fertility are not

10  interdependent such that judicial economy would be served staying the claims as to Prelude while

11  the claims against Pacific Fertility are arbitrated.

12         Nor is the Court persuaded by Prelude's argument that the class nature of Plaintiffs' claims

13  warrants a stay, relying on *In re Samsung Galaxy Smartphone Mktg. & Sales Practices Litig*., 298

14  F. Supp. 3d 1285, 1304 (N.D. Cal. 2018) (noting that "stay of all claims is particularly warranted

15  in the class-action context because the complaint admits that common questions of fact and law

16  predominate").  Defendants' argument conflates common questions of law and fact predominating

17  on a particular claim against a particular defendant with common claims and allegations *among*

18  *the defendants*.  That Plaintiffs have pled that there are common questions of law and fact

19  predominating each claim against each defendant to support class treatment is not the same as

20  alleging that common questions of liability among the defendants predominate.  *See Broomfield v.*

21  *Craft Brew All., Inc*., No. 17-CV-01027-BLF, 2018 WL 4952519, at *9 (N.D. Cal. Sept. 25, 2018)

22  (noting that the court is required to "assess the predominance of common questions on a claim by

23  claim basis.").

24         Accordingly, the Court exercises its discretion to deny Prelude's motion to stay pending

25  arbitration of Plaintiffs' claims against Pacific Fertility.

26                                   **CONCLUSION**

27         For the reasons explained above, Pacific Fertility's motion to compel arbitration is

28  GRANTED.  Prelude and Chart's joinder in that motion and request to compel arbitration of all

claims against them is DENIED.  Chart and Prelude's motion to stay pending arbitration is also DENIED.

The Court will hold a case management conference with the parties on April 25, 2019 at 1:30 p.m. in Courtroom F, 450 Golden Gate Ave., San Francisco, California.  A Joint Case Management Conference Statement is due April 18, 2019.

This Order disposes of Docket No. 52.

**IT IS SO ORDERED.**

Dated: March 25, 2019

JACQUELINE SCOTT CORLEY
United States Magistrate Judge