UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: PACIFIC FERTILITY CENTER LITIGATION | Case No. 18-cv-01586-JSC<br><br>**ORDER RE: PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND CHART'S MOTION TO EXCLUDE EXPERT TESTIMONY**<br><br>Re: Dkt. Nos. 302, 350, 411, 413 |

Plaintiffs filed this putative class action against Pacific Fertility Center ("Pacific Fertility"), Prelude Fertility, Inc. ("Prelude"), and Chart Industries ("Chart") alleging various state law claims and jurisdiction under the Class Action Fairness Act. Plaintiffs thereafter filed a First Amended Complaint which added Pacific Fertility MSO, LLC, (Pacific MSO) a Prelude subsidiary, as a defendant. (Dkt. No. 143.) The Court compelled Pacific Fertility's claims to arbitration. (Dkt. No. 192.) Plaintiffs' motion for class certification of their claims for negligence and premises liability as to Prelude and Pacific MSO, and strict liability and negligent failure to recall as to Chart is now pending before the Court. (Dkt. No. 302.) After the motion was argued, the parties requested the Court delay issuance of a decision while they engaged in private mediation. The Ninth Circuit Court of Appeals then issued an order reversing the Court's order denying Prelude and Pacific MSO's motion to compel arbitration. (Dkt. No. 446.) Thus, at the moment, Chart is the only party whose claims are proceeding here rather than in arbitration and the parties have requested that the Court rule on the pending motion for class certification. Having considered the parties' briefs and having had the benefit of oral argument, the Court DENIES

Plaintiffs' motion for class certification.

## BACKGROUND

### A. Factual Background

Pacific Fertility provides fertility services including egg and embryo cryopreservation. (Dkt. No. 267 at ¶ 39.) Cryopreservation involves preservation of tissue using cooling techniques. (*Id*. at ¶ 3.) Plaintiffs engaged Pacific Fertility's services to cryopreserve their eggs and embryos between 2010 and 2016. (*Id*. at ¶ 5.) In 2017, Prelude, which runs a national network of egg and embryo storage facilities, took over operation of Pacific Fertility's egg and embryo storage facilities through its newly created operating subsidiary Pacific MSO. (Dkt. No. 283 at ¶ 31; Dkt. No. 301-14 at 2, 4.[1])

On March 4, 2018, Pacific Fertility laboratory director Dr. Joseph Conaghan observed liquid on the floor directly beneath one of the clinic's storage tanks: Tank 4. (Dkt. No. 301-15.) After removing the lid of the tank, the laboratory staff observed that the metal around the neck of tank was "broken and twisted and distorted." (Dkt. No. 301-7, Conaghan Depo. at 19:19-20.) Staff also discovered that the "liquid nitrogen level in the tank was very low." (*Id*. at 109:7-8.) Staff members added liquid nitrogen to Tank 4 and moved the eggs and embryos inside it to a back-up tank. (Dkt. No. 301-15 at 2-3.) Alden Romney, Pacific MSO's CEO and corporate designee described the tank as "look[ing] like there had been an explosion in the tank. The tank -- a tank would normally have flat walls vertically. And this tank had huge protrusions from those flat walls, extreme distortions of the metal which was shocking." (Dkt. No. 301-9, Romney Depo. at 42:3-7.)

At the time of the incident, Tank 4 contained eggs and embryos from 608 Pacific Fertility customers. (Dkt. No. 301-15 at 5.) All these eggs and embryos were exposed to the temperature increase. (*Id.*) According to Pacific MSO's CEO, "the number of successful thaws from frozen embryos [in Tank 4] is lower than historical averages of thaws of frozen embryos at PFC." (Dkt. No. 301-9, Romney Depo. at 231:23-25; *see also* Dkt. No. 301-23 at 2 ("[e]mbryos from the affected tank have a lower survival rate when compared against historical thaw data.") According to Pacific Fertility's president, the Tank 4 embryos and eggs that remain viable face "additional risks." (Dkt.

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.)

2

1  No. 301, Exhibit D, Herbert Depo at 236:15-239:8.)

2        On March 11, 2018, Plaintiffs were notified via email of "'a very unfortunate incident' in which the storage tank containing their cryopreserved eggs and embryos 'lost liquid nitrogen for a brief period of time,' [and] that a 'preliminary analysis' suggested some of the eggs and embryos in the tank may have been destroyed." (Dkt. No. 301-18 at 3.) A month later, Plaintiffs received a second email stating that a preliminary analysis suggested that the incident "likely involved a failure of the tank's vacuum seal." (Dkt. No. 301-19.)

8        Chart designed, manufactured, and sold Tank 4. (Dkt. No. 284 at ¶¶ 27-30.) Chart was aware of prior vacuum failures with its products prior to the March 4 incident. (Dkt. No. 301-12, Bies Depo. at 99:13-16, 101:3-5.) Chart was also aware of issues with the TEC controller in the Tank 4 system which it designed. (*Id*. at 222:24-223:4.) Prior to the March 4 incident, Pacific MSO staff had disabled the TEC 3000 controller in Tank 4 because "it produced erroneous alarms and did not properly record the amount of liquid nitrogen." (Dkt. No. 301-15 at 6.) In February 2018, staff noted that the eggs and embryos in Tank 4, "the malfunctioned tank," needed to be safely transferred to another tank and they were getting a spare tank ready for installation. (Dkt. No. 301-24 at 3.) In the meantime, staff manually monitored and refilled the liquid nitrogen in Tank 4 as necessary. (Dkt. No. 301-15 at 4.)

**B. Procedural Background**

Following the March 11 notification, Plaintiffs filed this putative class action, which was later consolidated with two other actions pending in the Northern District of California: *Bauer, et al. v. Pacific Fertility Center*, et al., No. 3:18-cv-01634 (N.D. Cal. filed Mar. 15, 2018) and *A.B., et al. v. Pacific Fertility Center, et al*., No. 3:18-cv-02298 (N.D. Cal. Filed April 17, 2018). (Dkt. No. 17.) These actions are now known as the *In re: Pacific Fertility Litigation*.

Shortly after the actions were consolidated, Pacific Fertility filed a motion to compel arbitration in which Prelude and Chart filed separate joinders. (Dkt. Nos. 52, 56, 67.) While those motions were pending, the Court granted Plaintiffs leave to file the FAC which added Pacific MSO, Prelude's subsidiary, as a defendant. After several rounds of briefing, the Court issued its Order granting Pacific Fertility's motion to compel arbitration, but denying Prelude, Pacific

1  Fertility MSO, and Chart's joinders, as well as their motions to stay proceedings pending
2  arbitration of the claims against Pacific Fertility. (Dkt. No. 192.) A month later, Prelude, Pacific
3  Fertility MSO, and Chart filed notices of appeal and motions to stay pending appeal, which the
4  Court denied. (Dkt. Nos. 201, 202, 204, 208, 250.)  Prelude, Pacific MSO, and Chart thereafter
5  moved to dismiss which the Court granted in part and denied in part.  (Dkt. No. 262.)  Plaintiffs
6  then filed the now operative second amended complaint pleading 10 claims for relief: (1) strict
7  products liability-failure to warn as to Chart; (2) strict products liability-manufacturing defect as to
8  Chart; (3) strict products liability-design defect-consumer expectations test as to Chart; and (4)
9  strict products liability-design defect-risk utility test as to Chart; (5) negligent failure to recall as to
10 Chart; (6) negligence and/or gross negligence as to Prelude and Pacific MSO; (7) premises
11 liability as to Prelude and Pacific MSO; (8) violation of California's Unfair Competition Law
12 (UCL), Cal. Bus. & Prof. Code § 17200 et seq. as to all Defendants; (9) violation of California's
13 Consumer Legal Remedies Act (CLRA), Cal. Civ. Code § 1750 et seq. as to Pacific Fertility; (7)
14 fraudulent concealment as to Pacific Fertility. (Dkt. No. 280.)  Chart then filed a third-party
15 complaint against Pacific Fertility, the laboratory director, and several Pacific Fertility physicians
16 for contribution and equitable indemnity.  (Dkt. No. 288.)  The Court granted a motion to dismiss
17 the third-party complaint with leave to amend.  (Dkt. No. 406.)
18       On October 15, 2019, Plaintiffs filed the underlying motion for class certification. (Dkt.
19 No. 302.)  That motion is now fully briefed and was heard on February 27, 2020.  Following the
20 hearing, the parties requested the Court delay issuance of a decision on class certification while
21 they engaged in further private mediation efforts.  The Ninth Circuit Court of Appeals thereafter
22 issued a decision reversing this Court's order denying Prelude and Pacific MSO's motion to
23 compel arbitration.  (Dkt. No. 446.)  At a subsequent Case Management Conference, the parties
24 requested that the Court issue the class certification decision.  (Dkt. No.  454.)

**DISCUSSION**

Plaintiffs seek certification of a class of

> All individuals, and their reproductive partners, whose eggs or embryos were in Tank 4 at Pacific Fertility Center in San Francisco, California on March 4, 2018.

4

Excluded from the class are (a) any class members who, prior to March 4, 2018, affirmatively directed PFC or any Defendant to discard their reproductive material stored at PFC; (b) Prelude, Pacific MSO, and Chart and their officers, directors, employees, subsidiaries, and affiliates; (c) all judges assigned to this case and any members of their immediate families; and (d) the parties' counsel in this litigation.

"Federal Rule of Civil Procedure 23 governs the maintenance of class actions in federal court." *Briseno v. ConAgra Foods, Inc*., 844 F.3d 1121, 1124 (9th Cir. 2017). To succeed on their motion for class certification, Plaintiffs must satisfy the threshold requirements of Federal Rule of Civil Procedure 23(a) which require the district court to find: (1) numerosity; (2) common questions of law or fact; (3) typicality; and (4) adequacy of the class representatives and counsel. In addition to satisfying FRCP 23(a)'s prerequisites, the party seeking class certification must show that the action is maintainable under Fed. R. Civ. P. 23(b)(1), (2), or (3). *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 613–14 (1997). Rule 23(b)(3) specifically requires predominance and superiority. *Amchem*, 521 U.S. at 615.

With respect to Chart, the only defendant whose claims have not been compelled to arbitration, Plaintiffs seek certification of their strict products liability and negligent failure to recall claims. While Plaintiffs' written motion seeks certification under Federal Rule of Civil Procedure 23(b)(3) and Rule 23(c)(4), Plaintiffs subsequently clarified that they only seek issue certification under Rule 23(c)(4); namely, certification of the issue of general causation on their strict liability and negligent failure to recall claims against Chart. *See Valentino v. Carter–Wallace, Inc*., 97 F.3d 1227, 1234 (9th Cir. 1996) ("Even if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted, Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4)(A) and proceed with class treatment of these particular issues."). In other words, according to Plaintiffs' proposal, and as for the certified class, the jury would decide whether Tank 4 was defective and whether that defect was capable of causing injury to the reproductive material stored in Tank 4 at the time of the March 4 incident. The jury would also decide whether Chart was aware of the defect such that it should have recalled Tank 4 prior to the

5

incident. If and when general causation is decided in favor of the certified class, then the remaining issues—specific causation, compensatory damages, and punitive damages—would be decided in individual trials for those class members who choose to pursue their claims.

"[A] Rule 23(c)(4) issues class must still meet the requirements of Rule 23(a) and (b)." *Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.*, 308 F.R.D. 630, 633 (N.D. Cal. 2015) (collecting cases). Courts considering a proposed issue class should also consider "whether the adjudication of the certified issues would significantly advance the resolution of the underlying case, thereby achieving judicial economy and efficiency." *Valentino*, 97 F.3d. at 1229. Certification of an issue class may be appropriate where it will "accurately and efficiently resolve the question of liability, while leaving the potentially difficult issue of individualized damage assessments for a later day." *Jimenez v. Allstate Ins. Co*., 765 F.3d 1161, 1164 (9th Cir. 2014) (affirming a district court order that took this approach, without explicitly citing Rule 23(c)(4)).

**A. Rule 23(a)**

Plaintiffs have met their burden of satisfying Rule 23(a).

### 1. Numerosity

A putative class satisfies the numerosity requirement "if the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Impracticability is not impossibility, and instead refers only to the "difficulty or inconvenience of joining all members of the class." *Harris v. Palm Springs Alpine Estates, Inc*., 329 F.2d 909, 913–14 (9th Cir. 1964) (internal citation omitted). Plaintiff estimates that the class contains approximately 600 individuals who had their eggs or embryos stored in Tank 4, not counting their reproductive partners. (Dkt. No. 301-15 at 5.) Chart does not dispute that the numerosity requirement is met. Accordingly, Plaintiffs have established that the class is sufficiently numerous.

### 2. Commonality

"[C]ommonality requires that the class members' claims depend on a common contention such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each [claim] in one stroke.'" *Mazza v. Am. Honda Motor Co*., 666 F.3d 581, 588 (9th Cir. 2012) (quoting *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350 (2011). "The plaintiff must

6

1  demonstrate the capacity of classwide proceedings to generate common answers to common
2  questions of law or fact that are apt to drive the resolution of the litigation." *Id*. (internal quotation
3  marks and citation omitted). To that end, the commonality requirement can be satisfied "by even a
4  single question." *Trahan v. U.S. Bank Nat'l Ass'n*, No. C 09-03111 JSW, 2015 WL 75139, at *5
5  (N.D. Cal. Jan. 6, 2015). It is not necessary that "[a]ll questions of fact and law ... be common to
6  satisfy the rule." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). "The existence
7  of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient
8  facts coupled with disparate legal remedies within the class." *Id*.  The commonality requirements
9  asks us to look only for some "shared legal issues" or "a common core of facts." *Id*.  Ultimately,
10 commonality "requires the plaintiff to demonstrate the class members have suffered the same
11 injury." *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1029 (9th Cir. 2012) (quoting
12 *Dukes*, 564 U.S. at 350).

For purposes of Plaintiffs' proposed general causation-only class, the questions of whether Chart manufactured and designed a defective system, and whether Chart had knowledge of the defect and acted timely on any such knowledge are all common questions which are applicable to all class members.

### 3. Typicality

Rule 23(a)(3) also requires that "the [legal] claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Typicality refers to the nature of the claim or defense of the class representative and not on facts surrounding the claim or defense." *Hunt v. Check Recovery Sys., Inc.*, 241 F.R.D. 505, 510 (N.D. Cal. Mar. 21, 2007) (citing *Hanon v. Dataprods. Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Evon*, 688 F.3d at 1030 (internal quotation marks and citation omitted). The typicality requirement ensures that "the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 n.13 (1982).

Plaintiffs contend that their claims are typical of those of the class because they all arise from the same incident and the same course of conduct by Chart. Chart insists that Plaintiffs' claims are not typical because the question of injury is not uniform across the class and emotional distress damages cannot be determined on a class-wide basis. "The requirement of typicality is not primarily concerned with whether each person in a proposed class suffers the same type of damages; rather, it is sufficient for typicality if the plaintiff endured a course of conduct directed against the class." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1118 (9th Cir. 2017). Plaintiffs' strict liability claims all arise from the same alleged course of conduct: they all had reproductive material stored in Tank 4 on the date of the March 2018 incident and all allege that defects in Chart's manufacture and design of Tank 4 caused them injury. They also all challenge the same conduct as to Chart's failure to recall the tank. Differences in whether and to the extent each named plaintiff was injured and the damages arising from such injuries do not defeat a finding of typicality as to the proposed issue—Chart's common course of conduct which allegedly caused the alleged injuries. *See Just Film*, 847 F.3d at 1117 (holding that the plaintiff's claim was "reasonably coextensive with that of the class because she alleges Leasing Defendants committed the same overall course of misconduct against other members of the class…and the class's alleged injuries also resulted from that course of misconduct."). The typicality requirement is met.

### 4. Adequacy

Rule 23(a)(4) imposes a requirement related to typicality: the class representative will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The Court must ask: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the actions vigorously on behalf of the class?" *Evon*, 688 F.3d at 1031 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)); *see also Brown v. Ticor Title Ins.*, 982 F.2d 386, 390 (9th Cir. 1992) (noting that adequacy of representation "depends on the qualifications of counsel for the representatives, an absence of antagonism, a sharing of interests between representatives and absentees, and the unlikelihood that the suit is collusive") (citations omitted); Fed. R. Civ. P. 23(g)(1)(B) (stating that "class counsel must fairly and adequately represent the interests of the class").

1    Chart does not challenge Plaintiffs or their counsels' adequacy. Instead, Chart makes an
2    Article III standing argument, contending that the class contains at least five categories of
3    individuals who lack standing: (1) those who have not paid their storage fees and thus relinquished
4    their rights to the material in Tank 4; (2) those who affirmatively donated their biological material;
5    (3) those who had chromosomally abnormal embryos which could be discarded under the
6    Informed Consent Agreements; (4) egg bank donors and reproductive partners who relinquished
7    their rights to their biological material; and (5) individuals whose material was damaged before the
8    March 4 incident. Chart's arguments, however, are not about the named plaintiffs' standing;
9    instead, it is arguing about who is properly included in the class and whether any particular named
10   plaintiff or class member suffered injury as a result of the March 4 incident. To the extent that
11   Chart has proof that individuals authorized their material to be discarded prior to the incident or
12   presumptively abandoned the material, Plaintiffs indicate that these individuals would be excluded
13   from the class. And as to whether a class member or named plaintiff actually suffered harm to the
14   stored reproductive material as a result of the March 4 incident, that question—which is one of
15   specific causation—is not being certified.

16   "Only conflicts that are fundamental to the suit and that go to the heart of the litigation
17   prevent a plaintiff from meeting the Rule 23(a)(4) adequacy requirement." *In re Online DVD-*
18   *Rental Antitrust Litig.*, 779 F.3d 934, 942 (9th Cir. 2015). Because Chart has not identified any
19   such conflict, the adequacy of representation requirement is met.

20   **B. Rule 23(b)(3)**

21   A Rule (c)(4) issue class must also satisfy either Rule 23(b)(1)(2) or (3). *Valentino*, 97
22   F.3d at 1234 (in reviewing certification of an issues class under Rule (c)(4) stating that the
23   plaintiffs must satisfy Rule 23(a) as well as "at least one of the alternative requirements of" Rule
24   23(b)). Here, Plaintiffs appear to allege that they have satisfied (b)(3) which requires establishing
25   the predominance of common questions of law or fact and the superiority of a class action relative
26   to other available methods for the fair and efficient adjudication of the controversy.

27       **1.    Predominance**

28   To meet Rule 23(b)(3)'s predominance requirement "the common questions must be a

significant aspect of the case that can be resolved for all members of the class in a single adjudication." *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014), abrogated on other grounds, *Microsoft Corp. v. Baker*, 137 S.Ct. 1702 (2017) (internal quotation marks and alterations omitted). "The predominance inquiry presumes that there is commonality and entails a more rigorous analysis." *Gold v. Midland Credit Mgmt., Inc.*, 306 F.R.D. 623, 633 (N.D. Cal. 2014) (quoting *Hanlon*, 150 F.3d at 1022).

Predominance is easily satisfied as to the proposed general causation issue class as framed by Plaintiffs. The questions presented are common to all class members: was Tank 4 defective? Did the defect cause the March 4 incident? Could the incident have damaged the reproductive material? Was Chart aware of the defect prior to the incident and therefore negligent in failing to recall the tank?

### 2. Superiority and Judicial Economy and Efficiency

The primary issue on Plaintiffs' motion is superiority, and the related question of "whether the adjudication of the certified issues would significantly advance the resolution of the underlying case, thereby achieving judicial economy and efficiency." *Valentino*, 97 F.3d. at 1229; *see also Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (The "purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy"). The Court is not persuaded that certifying a class as Plaintiffs propose would result in judicial economy and efficiency.

First, much of the evidence presented in the general causation trial would have to be presented again in the individual trials on the specific causation question. Given the evidence as to earlier incidents and circumstances that could have harmed the reproductive material, the individual trial juries will have to hear testimony as to how the tank works, how the material is properly stored, what happens when the temperature rises, and the like—duplicating the evidence presented to the first jury.

Second, much of the evidence presented in the general causation trial would have to be presented again in the individual trials on the punitive damages question. To determine whether Chart's conduct warrants punitive damages, and how much, the individual trial juries will hear

10

1  evidence as to what Chart knew and when and what it failed to do, as well as evidence of the
2  defect and what it could cause. All of this evidence will be presented in the general causation trial.
3  Even if the trial on the certified claims decides entitlement to punitive damages class-wide, Chart
4  has the right to present the evidence again in connection with the amount of punitive damages;
5  indeed, Plaintiffs no doubt want the individual trial juries to hear evidence as to Chart's conduct in
6  determining the amount of punitive damages. While Plaintiffs posit that its presentation of this
7  evidence will be briefer the second time around, Chart may not agree to a truncated presentation
8  given the potential amount of money at stake. Thus, there is little efficiency gained in certifying
9  the general causation question.

10  Plaintiffs' citation to *Watson v. Shell Oil Co.*, 979 F.2d 1014 (5th Cir. 1992), for the
11  proposition that the first trial can decide entitlement to punitive damages and award an amount to
12  the named plaintiffs, and then the individual trial jury merely apply the same compensatory
13  damages to punitive damages ratio, fails to persuade. The Fifth Circuit voted to rehear the case,
14  990 F.2d 805 (5th Cir. 1993), and then the appeals were voluntarily dismissed, presumably due to
15  settlement. 53 F.3d 663 (5th Cir. 1994). The cases cited by Plaintiffs do not support forcing Chart
16  to accept whatever ratio the jury applies to the named plaintiffs' punitive damages claims to the
17  subsequent individual class member trials.

18  The other cases Plaintiffs cite fail to persuade the Court that certification is appropriate. In
19  *Olden v. LaFarge Corp.*, 383 F.3d 495 (6th Cir. 2004), for example, homeowners brought a class
20  action against the owner of cement manufacturing plant, alleging personal and property damage
21  caused by toxic pollutants originating from the plant. The Sixth Circuit Court of Appeals rejected
22  the defendants' argument that individual issues related to establishing causation would overwhelm
23  the case finding that "the thrust of the plaintiffs' personal injury complaint appears to be related to
24  the general increased risk of the class suffering medical problems in the future," *id.* at 508; thus,
25  there was no finding, as the Court makes here, that the evidence presented in the first trial phase is
26  likely to be presented again in the individual trials.

27  Similarly, in *Slocum v. Int'l Paper Co.*, No. CV 16-12563, 2019 WL 2192099 (E.D. La.
28  May 21, 2019), the plaintiffs brought class claims for negligence, strict liability, and nuisance

11

based on injuries sustained after "black liquor" was allegedly discharged from a ruptured evaporator tank at the Bogalusa Paper Mill. *Id*. at *1. While the court there found that individualized issues predominated with respect to specific causation and damages, it also found certification of a general causation class was proper to address the issues: "(1) whether Defendant's negligence caused the incident, (2) what the chemical composition of black liquor is, and (3) whether black liquor has the potential to cause the kinds of damages of which Plaintiffs complain." *Id*. at *6, 9. The court thus certified a phase one liability class and left the question of specific causation and damages for a second phase. *Id*. at *9. But in *Slocum*, as in *Olden*, the plaintiffs' damages were primarily about continuing "to suffer emotional distress and fear about a recurrence of the event," a damage that does not pose the same specific causation question as this case. *Id.* at *1. Further, the amount of damages at stake individually were less given that the physical symptoms were a few days of itchy burning eyes and headaches with upper respiratory irritation. *Id.*

The lack of a significant efficiency gain from issue certification in this case is coupled with a serious question as to whether a general causation class action trial is superior in other respects to individual (or joined plaintiffs) trials on all issues. Given the potential amount of damages at stake, as well as the personal and private nature of the claims, each absent class member has a strong interest in individually prosecuting an action should the member so choose. *See* Fed. R. Civ. P. 23(b)(3); *Soares v. Flowers*, 320 F.R.D. 464, 485-85 (N.D. Cal. 2017). Indeed, as of January 10, 2020, at least 71 plaintiffs have filed their own actions in state court and at least 125 have initiated arbitration against Pacific Fertility. (Dkt. No. 418 at 28.) Further, given those cases, the risk of inconsistent results which often makes certification superior will exist regardless of whether the proposed issue class is certified in this action. *See Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1191 (9th Cir. 2001) ("if the court finds that several other actions already are pending and that a clear threat of multiplicity and a risk of inconsistent adjudications actually exist, a class action may not be appropriate"), opinion amended on denial of reh'g, 273 F.3d 1266 (9th Cir. 2001) (internal quotation marks and citation omitted). And given the amount of damages potentially at stake, and the personal and private nature of the claims, class notice

would be a significant issue. Before an absent class member "gives up" the right to individually prosecute the member's claims at least at the first phase, the Court would want to ensure that the member did more than read a mailed or emailed notice or maybe not even read the notice. While the Court has no doubt that class counsel would appropriately advise any class members that sought advice, that attorney consultation on claims of this significance is preferable suggests that individual prosecution, rather than class treatment, is superior. Similarly, that class counsel is in communication with many putative class members suggests that class treatment is not needed to vindicate the rights and desires of the absent class members.

Finally, the Court accepts that given the privacy implications of the claims many absent class members would prefer to wait until the first trial to decide whether to subject themselves to the invasion of their privacy that coming forward would require. And the Court further accepts that after a first trial these absent class members may be able to resolve their claims against Chart without ever having to sit for deposition. But that same result can be obtained even if the first trial is a bellwether trial rather than a trial of certified issues.

***

There is no per se bar to certification of product liability actions in the Ninth Circuit. *Valentino*, 97 F.3d. at 1231 ("[a]lthough *Dalkon Shield* [693 F.2d 847 (9th Cir.1982)] pointed out many of the problems common to products liability litigation in meeting Rule 23's class certification requirements, we cannot conclude that *Dalkon Shield* creates an absolute bar to such certification in this circuit."); *see also Zinser*, 253 F.3d at 1186 ("some products liability cases may satisfy Rule 23 and proceed as class actions, and we have not prohibited class certification of products liability actions per se"). Nonetheless, given the lack of judicial economy and efficiency gained by certifying the general causation issues, as well as the serious question as to whether issue class certification is a superior procedure, the Court in its discretion denies Plaintiffs' motion for class certification.

## CONCLUSION

For the reasons stated above, the Court in its discretion DENIES Plaintiffs' motion for class certification (Dkt. Nos. 302, 413) and dismisses as moot Chart's motion to exclude Plaintiffs'

13

biostatistician expert Richard Jewell and a portion of the opinion of Plaintiffs' embryologist expert Christine Allen (Dkt. Nos. 350, 411).

This Order disposes of Docket Nos. 302, 350, 411, and 413.

**IT IS SO ORDERED.**

Dated: June 23, 2020

JACQUELINE SCOTT CORLEY
United States Magistrate Judge