UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE PACIFIC FERTILITY CENTER LITIGATION | Case No. 18-cv-01586-JSC<br><br>**ORDER RE: CHART'S MOTIONS TO EXCLUDE PLAINTIFFS' EXPERTS**<br><br>Dkt. Nos. 629, 631 |

Plaintiffs bring product liability and failure to recall claims against Chart Industries following a March 2018 incident involving a Chart-manufactured cryopreservation tank which was storing Plaintiffs' eggs and embryos. In connection with summary judgment and in preparation for trial, the parties have each filed motions to exclude the other's expert testimony in whole or in part under the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).[1] (Dkt. Nos. 629, 631, 632.[2]) This Order focuses on Chart's motions to exclude Plaintiffs' experts Dr. Kasbekar, Dr. Wininger, and Dr. Grill. Having considered the parties' briefing regarding these motions and having had the benefit of oral argument on March 4, 2021, Chart's motions are DENIED for the reasons set forth below.

//

---

[1] All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). (Dkt. No. 553.)
[2] Record Citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the document.

**BACKGROUND**

Plaintiffs obtained fertility services from Pacific Fertility Center (PFC)[3], and in particular, as relevant here, cryopreservation of their eggs and embryos. On March 4, 2018, PFC's laboratory director, Dr. Joseph Conaghan, discovered that Tank 4 which contained 2,500 embryos and 1,500 eggs—including Plaintiffs' eggs and embryos—had lost liquid nitrogen. As a result of this incident, Plaintiffs filed the underlying action against Chart alleging manufacturing and design defects, as well as negligent failure to recall.[4] Chart denies any liability and insists that the Tank 4 incident occurred because of PFC's negligence.

Over 130 individual actions alleging these same claims against Chart have been consolidated with the Plaintiffs' claims here. The claims of the five original Plaintiffs, A.B., C.D., E.F., G.H., and I.J. are scheduled for trial May 3, 2021.

**LEGAL STANDARD**

Under Rule 702 of the Federal Rules of Evidence, a witness may offer expert testimony if the following requirements are met:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. These criteria can be distilled to two overarching considerations: "reliability and relevance." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). The inquiry does not, however, "require a court to admit or exclude evidence based on its persuasiveness." *Id*.

Scientific evidence is reliable "if the principles and methodology used by an expert are

---

[3] The Court uses PFC throughout this Order to refer to Pacific Fertility Center and all its associated entities and medical professionals, including Prelude Fertility, Inc., and Pacific MSO, LLC.

[4] The PFC entities were also named as defendants but the claims as to them have been compelled to arbitration.

grounded in the methods of science." *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1056 (9th Cir. 2003). The court's focus "must be solely on principles and methodology, not on the conclusions that they generate." *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993). The court's "task ... is to analyze not what the experts say, but what basis they have for saying it." *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 43 F.3d 1311, 1316 (9th Cir. 1995) (hereinafter *Daubert II*).

In deciding whether to permit an expert to testify, courts face the difficult task of "determin[ing] whether the analysis undergirding the experts' testimony falls within the range of accepted standards governing how scientists conduct their research and reach their conclusions." *Daubert II*, 43 F.3d at 1317. Among the factors courts consider in making this determination are: (1) whether the expert's theory or method is generally accepted in the scientific community; (2) whether the expert's methodology can be or has been tested; (3) the known or potential error rate of the technique; and (4) whether the method has been subjected to peer review and publication. *Id*. at 1316 (citing *Daubert*, 509 U.S. at 593-94). Consideration should also be given to whether the expert's testimony springs from research independent of the litigation. *Id*. at 1317. If not, the expert should point to other indicia of reliability, such as peer-reviewed studies or a reputable source showing that the expert "followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field." *Id*. at 1317-19. "These factors are illustrative, and they are not all applicable in each case." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1233 (9th Cir. 2017). The inquiry is "flexible," *Daubert*, 509 U.S. at 594, and "Rule 702 should be applied with a 'liberal thrust' favoring admission," *Messick*, 747 F.3d at 1196 (quoting *Daubert*, 509 U.S. at 588).

## DISCUSSION

Chart moves to exclude the opinions of three of Plaintiffs' experts: Dr. Kasbekar, Dr. Wininger, and Dr. Grill under Federal Rule of Evidence 702 and *Daubert*. (Dkt. Nos. 629, 631.)

### A. Dr. Anand David Kasbekar

Dr. Kasbekar is a mechanical engineer with over 35 years' experience working as a forensic engineer in the areas of failure analysis, materials science, product liability, accident

3

1   reconstruction, computer aided engineering, modeling, simulation, and visualization. (Dkt. No.
2   673-9 at 64.)   Plaintiffs retained Dr. Kasbekar to evaluate the current condition of Tank 4 and
3   investigate the cause of Tank 4's failure.

4   Chart moves to exclude Dr. Kasbekar's testimony because (1) he is not qualified; (2) he
5   used flawed methodology; and (3) his rebuttal Finite Element Analyses (FEA) is untimely and
6   relies on flawed methodology.

**1) Dr. Kasbekar is Qualified to Render a Causation Opinion**

With respect to his qualifications, Chart argues that Dr. Kasbekar lacks the expertise to testify regarding cryogenic storage devices because he is a "jack-of-all-trades mechanical engineer" and not a cryogenic engineer. (Dkt. No. 692 at 11.)  Plaintiffs insist that notwithstanding his lack of cryogenic specialization he is qualified to render a causation opinion here because of his experience analyzing failed metal and plastic components and his routine examination of "fractured components."  (Dkt. No. 673-6 at 9.)  The Court agrees.

Rule 702 states that a testifying expert be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "Rule 702 contemplates a broad conception of expert qualifications." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004) (internal citation and quotation marks omitted); *Schroeder v. Cty. of San Bernardino*, No. CV18-427 DMG-JCX, 2019 WL 3037923, at *3 (C.D. Cal. May 7, 2019) ("courts should not exclude expert testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate.") (internal citation and quotation marks omitted).  While Dr. Kasbekar may not be a cryogenic engineer, he has over 35 years of experience as a forensic engineer specializing in failure analysis among other things.  (Dkt. No. 633-8 at 66, Kasbekar Report at p. 65.)  In addition, he has experience with cryogenic tanks and has previously examined a failed cryogenic tank.  (Dkt. No. 674-3, Kasbekar Depo. at 19-20, 26.)  Dr. Kasbekar's experience and qualifications may be a subject for cross-examination, but they are not a basis for exclusion of his testimony.  *See Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010), as amended (Apr. 27, 2010).

Ultimately, "[w]hether an expert is the best qualified or has sufficient specialized

4

knowledge is [] a matter of weight, not admissibility." *LaCava v. Merced Irr. Dist.,* No. 1:10-CV-00853 LJO, 2012 WL 913697, at *5 (E.D. Cal. Mar. 16, 2012) (citing *Holbrook v. Lykes Bros. Steamship Co.*, 80 F.3d 777, 782 (3d Cir. 1996)).

### 2) Dr. Kasbekar's Methodology

Next, Chart insists that Dr. Kasbekar's opinion is premised on untested and unreliable hypotheses. In particular, it identifies his hypotheses that (1) Tank 4 contained approximately 14 inches of liquid nitrogen on the afternoon of March 3, 2018, and (2) that the liquid nitrogen evaporated by noon the following day, March 4. Chart maintains that Dr. Kasbekar should have tested whether it was possible for 14 inches of liquid nitrogen to evaporate in a MVE 808 Tank in less than 24 hours when a full vacuum seal loss exists. It contends that its cryogenic engineering expert, Dr. Miller, did complete this testing and found that it was not possible.

Plaintiffs counter that Dr. Kasbekar's methodology was sound and that he followed the process set forth in the ASM Handbook on Failure Analysis as did Chart's forensic engineer Ronald Parrington, which included a joint inspection and testing of Tank 4, review of background information regarding the tank failure, review of Chart's design specifications for Tank 4, observations of Chart's manufacturing process, and a comparison of the CT scan of Tank 4's weld to a CT scan of the same weld in a different Chart tank. (Dkt. No. 673-9, Kasbekar Report at pp. 7-23; *see also* Dkt. No. 673-15, Parrington Report at pp. 1-7.) Plaintiffs note that while Mr. Parrington's ultimate conclusion may differ from Dr. Kasbekar, this is immaterial because the critical question at this stage is the soundness of the process, not the result. Finally, Plaintiffs dispute Chart's argument that Dr. Miller tested and refuted the basis for Dr. Kasbekar's opinion.

"For scientific evidence to be admissible, the proponent must show the assertion is 'derived by [a] scientific method.'" *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) (quoting *Daubert*, 509 U.S. at 590) (alternation in original). The issue here is not whether Dr. Kasbekar's opinion is derived from a scientific method of testing—it was. Chart does not dispute that he—as Mr. Parrington—followed the steps outline in the ASM Handbook on Failure Analysis. Nor does it dispute that the ASM "steps define the general practice in failure analysis and represent a reliable method of failure investigation and analysis." *Schipp v. Gen.*

5

*Motors Corp.*, 443 F. Supp. 2d 1023, 1028 (E.D. Ark. 2006); *cf. Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1057 (8th Cir. 2005). Dr. Kasbekar's underlying analysis thus "falls within the range of accepted standards governing how scientists conduct their research and reach their conclusions." *Daubert II*, 43 F.3d at 1317.

At bottom, Chart's challenge to Dr. Kasbekar's causation opinion is to the basis for his opinion; that is, his acceptance of PFC's testimony regarding the fill level the day before the incident. Chart insists that PFC's version of events—that there were 14-inches of liquid nitrogen in the tank on the afternoon of March 3 and that this amount had evaporated by the following day—cannot be believed. This dispute, however, is a question for the jury. *See City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) ("Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. A district court should not make credibility determinations that are reserved for the jury.").

Likewise, Chart's argument that Dr. Miller's analysis disproves Dr. Kasbekar's theory provides a basis for cross-examination. Plaintiffs do not dispute that Dr. Kasbekar did not test whether a progressive interior weld failure could cause a cryogenic tank to lose 14 inches of liquid nitrogen within 22 hours. Instead, they maintain that it would be impossible to replicate the Tank 4 failure so Dr. Kasbekar did not attempt to do so. While Mr. Miller did test Dr. Kasbekar's hypothesis, by his own admission "I was not trying to duplicate the exact conditions of the Tank 4." (Dkt. No. 674-17, Miller Depo. at 114.) In any event, whether Dr. Kasbekar's opinion is credible in light of his decision not to attempt to recreate the conditions is an argument that Chart can make to the jury.

Finally, Chart's argument that Dr. Kasbekar did not consider other possible causes is, in effect, an argument that he did not test Charts' theory that after the controller was unplugged on February 15, 2018 PFC failed to manually apply enough liquid nitrogen on an ongoing basis and maintain cryogenic storage of Tank 4's contents. However, Dr. Kasbekar did test whether there was a monotonic fracture and the possibility that another leak was responsible for the Tank 4 failure. (Dkt. No. 633-8, Kasbekar Report, at 9-10, 20-21, 45-46.)

Chart has offered numerous arguments from which a trier of fact could reasonably

conclude that Dr. Kasbekar has reached an incorrect conclusion regarding the cause of the Tank 4 failure. However, "the question at this phase is not whether the plaintiffs' experts are right." *In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d 1102, 1109 (N.D. Cal. 2018). "Under *Daubert*, the district judge is a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558, 564-65 (9th Cir. 2010) (internal quotation marks and citation omitted). "When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony*." Id.* at 565. "So long as an opinion is premised on reliable scientific principles, it should not be excluded by the trial judge; instead the weaknesses in an unpersuasive expert opinion can be exposed at trial, through cross-examination or testimony by opposing experts." *In re Roundup*, 390 F. Supp. 3d at 1109.

### 3) Dr. Kasbeker's Finite Element Analyses

Finally, Chart insists that the results of Dr. Kasbekar's Finite Element Analyses (FEA) included in his rebuttal report should be excluded because (1) his analysis is flawed because he used an incorrect fill amount, and (2) it is not truly a rebuttal report and thus should be struck as untimely.

Chart's argument that Dr. Kasbekar's FEA methodology was flawed is similar to its argument that his causation opinion is unreliable. It is unavailing for the same reasons. Chart has identified ample grounds to cross-examine Dr. Kasbekar regarding his fill line input and why Mr. Parrington's analysis is more sound. But the fact that two experts disagree regarding the proper methodology or starting point for the analysis is not a basis to exclude an expert's opinion. *See Ditton v. BNSF Ry. Co.*, No. 12-6932J GBJCGX, 2014 WL 12928305, at *7 (C.D. Cal. Jan. 6, 2014) ("Ultimately, it is not the province of the Court to determine which set of data is correct. 'The factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.'") (quoting *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1017 n. 14 (9th Cir. 2004)).

With respect to Chart's procedural/timeliness objection, Plaintiffs contend that his FEA was conducted in response to Mr. Parrington's opinion. Indeed, according to Dr. Kasbekar's

7

1    Rebuttal Report "[i]n response to Mr. Parrington's opinions and to demonstrate the important of U
2    type bends in constrained tubing, thermal contraction calculations were done and finite element
3    modeling and analysis was conducted." (Dkt. No. 674-9, Kasbekar Rebuttal Report at 9.)  Given
4    that the analysis was undertaken in response to Mr. Parrington's opinion, it properly qualifies as a
5    rebuttal opinion. *See Wadler v. Bio-Rad Labs., Inc*., No. 15-CV-02356-JCS, 2016 WL 6070530, at
6    *3 (N.D. Cal. Oct. 17, 2016) ("The test of whether an expert's opinion constitutes rebuttal or a
7    new opinion, however, is not whether a rebuttal expert employs new testing or methodologies but
8    instead, whether a rebuttal attempts to put forward new theories outside the scope of the report it
9    claims to rebut.") (internal citation and quotation marks omitted).  Further, Chart has pointed to no
10   prejudice as its own experts subsequently submitted additional rebuttal reports to address Dr.
11   Kasbekar's opinion and Chart deposed him again following his supplemental report.

                                             ***

13   Accordingly, Chart's motion to exclude Dr. Kasbekar's opinion is denied.

14   **B.  Dr. David Wininger**

15   Dr. Wininger is an embryologist who has been an IVF lab director for more than 30 years
16   and has designed five IVF labs.  (Dkt. No. 671-15, Wininger Report at ¶ 1.)  Plaintiffs retained Dr.
17   Wininger to opine "as to (i) whether Tank 4 performed as safely as an ordinary user of cryogenic
18   vessels would expect; (ii) whether Plaintiffs' eggs and embryos were damaged by the Tank 4
19   incident; and (iii) whether Plaintiffs' eggs and embryos were exposed to dangerous conditions
20   prior to the Tank 4 incident." (*Id*. at ¶ 5.)  At oral argument, Chart confirmed that it does not move
21   to exclude Dr. Wininger's opinion as to whether the eggs or embryos were damaged; instead, it
22   moves to exclude Dr. Wininger's causation opinion because (1) he is unqualified to render a
23   product defect and causation opinion, (2) his opinion as an end-user lacks a reliable foundation,
24   and (3) he fails to account for alternative explanations for the tank failure.  None of its arguments
25   are availing.
26   First, Chart maintains that Dr. Wininger lacks experience with vacuum failures, an MVE
27   808 tank, or a computer controlled cryogenic tank such that he is unqualified to opine that Tank 4
28   failed to perform safely as an ordinary user would expect.  As with Chart's objection to Dr.

8

Kasbekar's qualifications, Chart can cross examine Dr. Wininger regarding his lack of experience regarding the particular tank and controller here, but this does not demonstrate that he lacks the "*minimal foundation* of knowledge, skill, and experience" required under Rule 702. *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (emphasis in original). "Rule 702 "contemplates a broad conception of expert qualifications." *Id*. (internal citation omitted). Dr. Wininger has been working with cryogenic storage containers for 30 years and he is currently responsible for the cryogenic storage containers used by four IVF labs. (Dkt. No. 671-27, Wininger Decl. at ¶ 2.) He works with cryogenic storage containers "daily." (*Id*. at ¶ 3.) The cryogenic storage containers at all the labs he oversees are Chart MVE products including two MVE 808's and he has personally used a Chart MVE 808 tank. (*Id*. at ¶ 4.) He concedes that all the MVE tanks are operated manually rather than with a controller, but, as Plaintiffs note, that is exactly how PFC was using Tank 4 at the time of the incident—Dr. Conaghan had disabled the controller over two weeks before the incident. Chart's arguments regarding Dr. Wininger's qualifications go to the weight to be given his testimony, not its admissibility.

Second, Chart's reliability argument is essentially a rehash of its summary judgment argument regarding the consumer expectation test, which the Court denies by separate order. "[T]he consumer expectation test is not based on minimum safety assumptions or expectations of consumers in general regarding a product but rather, on the minimum safety assumptions or expectations of the product's users." *Demara v. The Raymond Corp.*, 13 Cal. App. 5th 545, 559 (2017) (internal citation and quotation marks omitted). Dr. Wininger's opinion—as an end-product user—is thus relevant to help the jury understand whether the product performed as expected.

Third, Chart's argument that Dr. Wininger failed to consider alternative explanations for the Tank 4 failure again goes to the weight not the admissibility of his testimony. Dr. Wininger's opinion is based on PFC's testimony that Tank 4 lost 14 inches of liquid nitrogen overnight. If the jury does not believe that testimony, then they will likewise discount Dr. Wininger's opinion. That his opinion is based on a particular theory, however, is not a basis to disregard it outright. *See* Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert

9

1 has been made aware of or personally observed.").

### C. Dr. Elizabeth Grill

Dr. Grill is an Associate Professor of Psychology in the Department of Obstetrics and Gynecology, Reproductive Medicine, and Psychiatry of Weill Cornell Medical College. (Dkt. No. 674-14, Grill Report at 3.) She has worked as a clinical psychologist and medical researcher for over 20 years and her "daily responsibilities include the evaluation and treatment of individuals and couples managing the distress related to the diagnosis of infertility, reproductive medical treatment, and all aspects of assisted reproductive medicine and technology." (*Id.*) Dr. Grill "conducted a Comprehensive Psychosocial History for Infertility designed to provide a global impression of the patient's history, stressors, functioning, and current psychosocial status relevant to infertility and treatment" for each plaintiff. (*Id.* at 4.)

Chart moves to exclude Dr. Grill's opinion because (1) she is not qualified; (2) her methodology was flawed and based on incomplete data; and (3) she failed to reconcile conflicting data. None of these arguments are availing.

Dr. Grill, a clinical psychologist specializing in reproductive mental health, is qualified to provide an opinion regarding the Plaintiffs' emotional distress. Chart's argument that only a forensic expert would be qualified to render an opinion here is legally unsupported. Qualification does not depend on an expert's particular specialty. To the contrary, "Rule 702 contemplates a broad conception of expert qualifications." *Hangarter*, 373 F.3d at 1015. The Court is satisfied that, based on her education, training, and experience, Dr. Grill is qualified to offer opinions regarding the Plaintiffs' emotional distress. *See Primiano*, 598 F.3d at 566-67.

With respect to her methodology, Chart maintains that Dr. Grill's opinions are unreliable because she did not employ the proper standard of care for conducting a forensic evaluation. But Dr. Grill is not a forensic psychologist. Instead, she applied "the standard of care in my practice to assess those individuals with the comprehensive psychosocial interview and relying on depositions and records and peer-reviewed literature." (Dkt. No. 671-20, Grill Depo. at 36:5-8.) That is, just as in *Finley*, on which Chart so heavily relies, Dr. Grill "used h[er] many years of experience" and she "did not deviate in any way from [her] normal practice of conducting psychological

10

evaluations." *United States v. Finley*, 301 F.3d 1000, 1009 (9th Cir. 2002). Chart's own rebuttal expert described the use of "a standard comprehensive psychosocial history for infertility" as the "best example" "for what types of issues need to be assessed in working with fertility patients." (Dkt. No. 671-19, Lawson Depo. at 96:4-19.) "A trial court should admit medical expert testimony if physicians would accept it as useful and reliable." *Primiano*, 598 F.3d at 565.

Nor do the American Psychological Association (APA) Specialty Guidelines for Forensic Psychology support Chart's argument that only a forensic psychologist could provide expert testimony regarding Plaintiffs' emotional distress. According to the APA Guidelines, "[p]sychological practice is not considered forensic solely because the conduct takes place in, or the product is presented in, a tribunal or other judicial, legislative, or administrative forum." (Dkt. No. 633-6, Ex. E, at ECF 226.) Likewise,

> [p]roviding expert testimony about a patient who is a participant in a legal matter does not necessarily involve the practice of forensic psychology even when that testimony is relevant to a psycholegal issue before the decisionmaker. For example, providing testimony on matters such as a patient's reported history or other statements, mental status, diagnosis, progress, prognosis, and treatment would not ordinarily be considered forensic practice even when the testimony is related to a psycholegal issue before the decision maker.

(*Id.* at ECF 230.)

Although Chart objects to Dr. Grill's use of her clinical judgment to evaluate for malingering and deceit, rather than psychological testing, Dr. Grill testified that psychodiagnostic testing "is not part of the standard of care in reproductive medicine." (Dkt. No. 671-20, Grill Depo. at 18:7-10.) Further, Chart's own rebuttal expert testified that there was no evidence of malingering. (Dkt. No. 671-19, Lawson Depo. at 85.) Similarly, Chart's argument that Dr. Grill's opinion is unreliable because it was not based on "objective testing" misapprehends the nature of her opinion—which is not as a forensic expert, but as a clinical psychologist. "The fundamental defect with [plaintiff's] *Daubert* argument is that it is premised on the frankly peculiar notion that clinical psychologists must give controlling, decisive weight to objective test instruments in forming clinical diagnoses and recommendations, and that the failure to do so strips a psychologist's opinions of reliability to the point that his testimony flunks a *Daubert* analysis.

11

This contention is devoid of evidentiary or legal support." *Foreman v. Am. Rd. Lines, Inc*., 623 F. Supp. 2d 1327, 1334 (S.D. Ala. 2008). Finally, to the extent that Chart objects to the rigor of Dr. Grill's interviews of Plaintiffs and contends that her literature review was incomplete, it can raise these issues through cross-examination and presentation of rebuttal evidence.

Accordingly, Chart's motion to exclude Plaintiffs' expert Dr. Grill is denied.

## CONCLUSION

For the reasons stated above, the Chart's motions to exclude the opinions of Dr. Kasbekar, Dr. Wininger, and Dr. Grill are DENIED.

This Order disposes of Docket Nos. 629 and 631.

**IT IS SO ORDERED.**

Dated: March 5, 2021

JACQUELINE SCOTT CORLEY
United States Magistrate Judge

12