Eric H. Gibbs (State Bar No. 178658)
Amy M. Zeman (State Bar No. 273100)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, CA 94612
Tel: (510) 350-9700
Fax: (510) 350-9701
ehg@classlawgroup.com
amz@classlawgroup.com

Dena C. Sharp (State Bar No. 245869)
Adam E. Polk (State Bar No. 273000)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dsharp@girardsharp.com
apolk@girardsharp.com

Adam B. Wolf (State Bar No. 215914)
Tracey B. Cowan (State Bar No. 250053)
**PEIFFER WOLF CARR KANE &
CONWAY, APLC**
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Tel: (415) 766-3545
Fax: (415) 402-0058
awolf@peifferwolf.com
tcowan@peifferwolf.com

*Plaintiffs' counsel*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

IN RE PACIFIC FERTILITY CENTER
LITIGATION


This Document Relates to:

No. 3:18-cv-01586

(A.B., C.D., E.F., G.H., and I.J.)

Master Case No. 3:18-cv-01586-JSC

**PLAINTIFFS' MOTION TO
EXCLUDE EXPERT TESTIMONY**


Date: March 4, 2021
Time: 9:00 a.m.
Judge: Hon. Jacqueline S. Corley
Place: Courtroom F, 15th Floor

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ................................................................................................1

INTRODUCTION .............................................................................................................................2

BACKGROUND ...............................................................................................................................3

ARGUMENT ...................................................................................................................................4

    I.      Select portions of Chart's expert reports do not meet the standard for admissibility.......4

    II.     Eldon Leaphart: The Court should exclude opinions that venture beyond Leaphart's
           expertise in electrical engineering. ...................................................................................5

         A.     Leaphart is not qualified to opine that PFC had an early indication of
               impending issues with Tank 4...................................................................................6

         B.     Leaphart cannot reliably opine on the cause of Plaintiffs' loss of viable eggs
               and embryos. ............................................................................................................7

    III.    John Cauthen: The Court should exclude testimony that PFC manipulated data
           entries as irrelevant and prejudicial. ................................................................................8

    IV.    Grace Centola: The Court should exclude testimony regarding other safety
           violations as irrelevant and prejudicial ...........................................................................10

         A.     Centola's testimony that PFC backdated data entries and engaged in a pattern
               of inaccurate and untruthful statements is inadmissible under Rule 404............11

         B.     Centola's testimony that Tank 4's liquid nitrogen levels dropped to
               dangerously low levels in 2013 and 2014 is likewise inadmissible under
               Rule 404. .................................................................................................................12

         C.     Centola's testimony that PFC had problems with its supply tanks is
               inadmissible under Rule 404....................................................................................13

          D.     Centola's testimony about PFC's unsafe use of buckets is inadmissible
               under Rule 404. .......................................................................................................14

    V.     Franklin Miller: The Court should exclude opinions that venture beyond Miller's
           expertise, draw legal conclusions, or lack a reliable foundation. ...................................14

         A.     Miller's opinion that PFC spoliated the evidence is an improper and
               unsupported legal conclusion....................................................................................15

          B.     Miller's opinion that Tank 4 was out of warranty is an irrelevant legal
               conclusion. ..............................................................................................................16

C.     Miller's definition for manufacturing or design defects is not the same as the legal definition, making his conclusions irrelevant and confusing. ..............16

D.     Miller is not qualified to opine how experienced welders interpret design drawings. .................................................................................................17

E.     Miller should not be permitted to confuse the jury with testing conducted under different conditions than Tank 4 experienced. ...........................................18

F.     Like Centola, Miller should not be permitted to testify regarding low liquid nitrogen readings in 2013 and 2014. ........................................................21

G.     Miller's second rebuttal report should be stricken. ..............................................21

VI.     Angela Lawson: The Court should preclude any testimony or insinuations concerning malingering or symptom exaggeration. ........................................................22

CONCLUSION ..............................................................................................................................23

# TABLE OF AUTHORITIES

**Cases**

*Apple Inc. v. Samsung Elecs. Co.*
881 F. Supp. 2d 1132 (N.D. Cal. 2012) ......................................................................... 15

*Avon Prod., Inc. v. S.C. Johnson & Son, Inc.*
984 F. Supp. 768 (S.D.N.Y. 1997) ................................................................................. 21

*Beard v. United States Postal Serv.*
2019 WL 257978 (N.D. Cal. Jan. 18, 2019) ................................................................ 20

*Brighton Collectibles, Inc. v. Marc Chantal USA, Inc.*
2009 WL 10674074 (S.D. Cal. Apr. 1, 2009) ................................................................ 9

*Daubert v. Merrell Dow Pharm., Inc.*
43 F.3d 1311 (9th Cir. 1995) ......................................................................................... 20

*Daubert v. Merrell Dow Pharm., Inc.*
509 U.S. 579 (1993) ............................................................................................... passim

*Domingo ex rel. Domingo v. T.K.*
289 F.3d 600 (9th Cir. 2002) ........................................................................................... 5

*Dupuis v. Alaskan Shores F/V*
139 F.3d 904 (9th Cir. 1998) ......................................................................................... 11

*Friend v. Time Mfg. Co.*
2006 WL 2135807 (D. Ariz. July 28, 2006) ................................................................. 14

*Gen. Elec. Co. v. Joiner*
522 U.S. 136 (1997) ....................................................................................................... 21

*Glover v. Main St. Wholesale Furniture, LLC*
545 S.W.3d 245 (Ark. App. 2018) ................................................................................. 23

*Greenman v. Yuba Power Prod., Inc.*
59 Cal. 2d 57 (1963) ...................................................................................................... 16

*Grodzitsky v. Am. Honda Motor Co.*
957 F.3d 979 (9th Cir. 2020) ........................................................................................... 8

*In re PersonalWeb Techs., LLC Patent Litig.*
2020 WL 6821074 (N.D. Cal. Feb. 3, 2020) ................................................................ 22

*In re Pfizer Inc. Sec. Litig.*
288 F.R.D. 297 (S.D.N.Y. 2013) ................................................................................... 11

*Jinro Am. Inc. v. Secure Investments, Inc.*
266 F.3d 993 (9th Cir.) .................................................................................................. 10

*Jones v. S. Pac. R.R.*
  962 F.2d 447 (5th Cir. 1992).............................................................11, 13

*Jones v. Standard Ins. Co.*
  2013 WL 5549779 (N.D. Ill. Oct. 8, 2013).......................................................23

*Kumho Tire Co. v. Carmichael*
  526 U.S. 137 (1999)...........................................................................5

*Luke v. Family Care & Urgent Med. Clinics*
  323 F. App'x 496 (9th Cir. 2009)..............................................................22

*Lutron Elecs. Co., Inc. v. Crestron Elecs., Inc.*
  970 F. Supp. 2d 1229 (D. Utah 2013)............................................................6

*Marron v. Stromstad*
  2002 WL 34189740 (Alaska Super. Aug. 09, 2002)...............................................23

*Morris v. Long*
  2012 WL 3276938 (E.D. Cal. Aug. 9, 2012)
  *aff'd*, 592 F. App'x 579 (9th Cir. 2015).....................................................12

*Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*
  523 F.3d 1051 (9th Cir. 2008)..............................................................15, 17

*O'Connor v. Boeing N. Am., Inc.*
  2005 WL 6035256 (C.D. Cal. Aug. 9, 2005)......................................................12

*Pooshs v. Philip Morris USA, Inc.*
  904 F. Supp. 2d 1009 (N.D. Cal. 2012) ........................................................18

*Prasol v. Cattron-Theimeg, Inc., et al.*
  2011 WL 3897794 (E.D. Mich. Sept. 6, 2011)....................................................22

*Rovid v. Graco Children's Prod. Inc.*
  2018 WL 5906075 (N.D. Cal. Nov. 9, 2018)..............................................19, 21, 22

*S. Pac. Transp. Co. v. Builders Transp., Inc.*
  1993 WL 185620 (E.D. La. May 25, 1993)........................................................13

*Simplex, Inc. v. Diversified Energy Sys., Inc.*
  847 F.2d 1290 (7th Cir. 1988).................................................................12

*Small v. WellDyne, Inc.*
  927 F.3d 169 (4th Cir. 2019)...................................................................5

*Snyder v. Bank of Am., N.A.*
  2020 WL 6462400 (N.D. Cal. Nov. 3, 2020).......................................................6

*Sparks v. Gilley Trucking Co.*
  992 F.2d 50 (4th Cir. 1993)...................................................................14

*United States v. Geston*
    299 F.3d 1130 (9th Cir. 2002) .................................................................................23

*United States v. Ruvalcaba-Garcia*
    923 F.3d 1183 (9th Cir. 2019) ...................................................................................4

*United States v. Valencia-Lopez*
    971 F.3d 891 (9th Cir. 2020) .....................................................................................5

*Winters v. Fru-Con Inc.*
    498 F.3d 734 (7th Cir. 2007) .....................................................................................7

*Wise v. Southern Tier Express, Inc.*
    2017 WL 11488518 (D. Nev. July 10, 2017) ...........................................................23

**Rules**

Fed. R. Evid. 403 ...............................................................................................10, 23

Fed. R. Evid. 404 ...........................................................................................passim

Fed. R. Evid. 702 .....................................................................................................4

Fed. R. Evid. 704 .....................................................................................................7

**Statutes**

Cal. Evid. Code § 1101 ............................................................................................10

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that on March 4, 2021, at 9:00 a.m., before the Honorable Jacqueline Scott Corley, Plaintiffs A.B., C.D., E.F, G.H., and I.J. will and hereby do move to exclude expert testimony pursuant to the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993).

Plaintiffs seek an order excluding Chart from presenting the following expert witness testimony at the parties' upcoming trial:

A.     Eldon Leaphart's (i) opinion that PFC had an early indication of impending issues with Tank 4, and (ii) opinion that Tank 4's controller was safe in design and manufacture and did not cause Plaintiffs' loss.

B.     John Cauthen's opinion that PFC changed data in its Reflections databases.

C.     Grace Centola's (i) opinion that PFC backdated data entries and engaged in a pattern of inaccurate or untruthful statements, (ii) opinion that Tank 4's liquid nitrogen levels dropped to low levels in 2013 and 2014, (iii) opinion that PFC had problems with its liquid nitrogen supply tanks on other occasions, and (iv) opinion that PFC's use of buckets was a safety issue or deviation from the standard of care.

D.      Franklin Miller's (i) opinion that PFC spoliated evidence or prevented him from detecting a small leak in Tank 4, (ii) opinion that Tank was out of warranty, (iii) opinion that Tank 4 did not possess any design or manufacturing defects, (iv) opinion that an experienced welder would interpret Chart's design drawings to require seal welds, (v) vacuum failure test and results, (vi) opinion that Tank 4's liquid nitrogen levels dropped to low levels in 2013 and 2014, and (vii) supplemental report dated December 11, 2020.

E.     Angela Lawson's references to malingering or symptom exaggeration. Plaintiffs' motion is supported by the following points and authorities, as well as the accompanying declaration of Amy M. Zeman, and the exhibits attached thereto.

1

1

**INTRODUCTION**

2      In advance of the parties' upcoming trial, Defendant Chart has submitted reports from seven

3  proposed expert witnesses. These witnesses are all qualified, experienced in their respective fields, and

4  capable of presenting relevant testimony that may assist the jury in resolving a central issue in the case.

5  But there are several instances where the witnesses venture beyond their expertise and offer opinions

6  they are not qualified to present to a jury. For example, Eldon Leaphart is an electrical engineer who

7  possesses the experience and training necessary to examine Tank 4's electronic controller and testify

8  that it malfunctioned on February 15, 2018. But he lacks the expertise to say what caused Plaintiffs to

9  lose viable eggs and embryos the following month. Similarly, Franklin Miller is a cryogenic engineer

10  who can competently present his theory for why Tank 4 lost liquid nitrogen and imploded in March

11  2018. But he lacks the expertise to testify how an experienced welder would interpret Chart's design

12  documents. He also lacks the expertise to testify on legal matters, such as whether anyone spoliated

13  evidence in this case or whether Chart had any warranty obligations with respect to Tank 4.

14      There are also several other instances where the witnesses' testimony exceeds the bounds of

15  admissible evidence. Under Rule 404(b) of the Federal Rules of Evidence, Chart is not permitted to

16  present evidence that PFC may have acted negligently on other occasions in order to prove that PFC's

17  negligence—and not Chart's defective tank—caused Plaintiffs to lose viable eggs and embryos on

18  March 4, 2018. [1] But three of Chart's experts intend to testify to other instances where PFC allegedly

19  failed to live up to the high professional standards expected of IVF laboratories. Grace Centola, an

20  andrologist who will opine that PFC failed to meet the applicable standard of care in February and

21  March of 2018, also intends to testify that PFC engages in dishonest practices, handles liquid nitrogen

22  in an unsafe matter, and has allowed one or both of its liquid nitrogen supply tanks to run dry on prior

23  occasions. Centola and Miller both intend to testify that Tank 4's controller data suggests PFC allowed

24  the tank's liquid nitrogen levels to drop to dangerously low levels on multiple occasions between July

25  2013 and January 2014. And John Cauthen, a digital forensic examiner, intends to testify that after

26

27  [1]      Plaintiffs use PFC throughout this motion to refer to the Pacific Fertility Center and all associated
entities and medical professionals, including Prelude Fertility, Inc., and Pacific MSO, LLC.

28

Tank 4 lost liquid nitrogen and imploded, PFC backdated some of its electronic lab records and failed to disclose those changes in discovery. Rule 404(b) forbids the use of such evidence precisely because it could unfairly prejudice the jury against PFC, necessitate prolonged testimony on each of the other incidents in question, and distract the jury from the central issues in the case. Those central issues include whether PFC caused the March 4th incident through its negligent behavior in February and early March, but not whether PFC acted inappropriately on other occasions as well.

Plaintiffs accordingly request that the Court closely examine the opinions Chart's experts have disclosed in their reports, as required by *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993), and exclude those opinions—identified below—that do not meet the standard for admissibility. Chart will still be entitled to present its side of the case to the jury, and to do so through expert testimony. But by narrowing the scope of the opinions those experts are allowed to present, the Court will also ensure that the jury is not unduly influenced or confused by unreliable, unsupported, or irrelevant testimony that nonetheless carries the imprimatur of a Court-sanctioned expert.

## BACKGROUND

This litigation centers on the events of Sunday, March 4, 2018, when PFC's Lab Director discovered that a cryogenic tank containing 2,500 embryos and 1,500 eggs—including Plaintiffs' eggs and embryos—had lost liquid nitrogen and begun imploding. (*See* Third Am. Compl., ECF No. 578-1, ¶ 1.)  Subsequent analysis of the tank, referred to as Tank 4 by PFC, revealed a crack in an interior weld. (*Id.*, ¶ 4, 31-33.) Plaintiffs contend the tank was defective in manufacturing and design and will ask the jury to hold Chart strictly liable for the financial and emotional harm its defective tank has caused them. (*Id.*, ¶¶ 46-56.) Plaintiffs also contend Chart acted negligently by failing to recall Tank 4 prior to the March 4th incident. Chart knew Tank 4's controller was prone to "spontaneously go haywire," and knew that if the tank's weld cracked while the controller was malfunctioning, Tank 4 would suddenly lose nitrogen and damage the material stored inside. (*Id.*, ¶¶ 57-64.)

Chart denies that its cryogenic tank was defective or in any way caused the damage to Plaintiffs' eggs and embryos. (*See* Chart's Answer, ECF No. 597, ¶¶ 47-64.) It says that Tank 4 lost liquid nitrogen and exposed Plaintiffs' eggs and embryos to dangerously high temperatures solely because PFC's Lab Director and team of embryologists acted negligently. (*See id.* at 8.) According to

Chart, PFC's negligence caused Tank 4 to run out of liquid nitrogen and implode, and that implosion caused the tank's weld to crack. To support its position at trial, Chart intends to call seven expert witnesses:

- *Eve Feinberg*, a reproductive endocrinologist who reviewed Plaintiffs' medical records and testimony and concluded that the March 4th incident did not impact their reproductive potential;

- *Eldon Leaphart*, an electrical engineer who examined Tank 4's electronic controller and concluded it malfunctioned on February 15, 2018;

- *John Cauthen*, a digital forensic examiner who reviewed PFC's laboratory data and found that, following the March 4th incident, PFC altered some of the lab data originally entered in February 2018;

- *Grace Centola*, an andrologist who reviewed PFC's practices between February 15, 2018, and March 4, 2018, and concluded that they fell below the standard of care for IVF laboratories;

- *Ronald Parrington*, a metallurgical engineer who examined the weld fracture and concluded that it was a consequence of the March 4th incident rather than the cause of the incident;

- *Franklin Miller*, a cryogenic engineer who reviewed the facts of the case and concluded that a 7-step sequence of events caused Tank 4 to lose liquid nitrogen and implode; and

- *Angela Lawson*, a forensic psychologist who was retained to rebut the opinions presented by Plaintiffs' expert psychologist.

## ARGUMENT

**I.      Select portions of Chart's expert reports do not meet the standard for admissibility.**

Before admitting expert testimony into evidence, courts are required to perform a gatekeeping role to ensure the testimony satisfies three overarching requirements:

    (i)   *qualifications*:  the expert must be qualified as an expert by knowledge, experience, training, or education;

    (ii)   *reliability*:  the reasoning or methodology underlying the expert's testimony must be scientifically reliable; and

    (iii)   *relevance*:  the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue.

Fed. R. Evid. 702; *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188 (9th Cir. 2019).

The reliability requirement is a flexible one that varies with the nature of the expert's testimony. "Science-based" opinions can be evaluated, for example, by considering whether the underlying reasoning or methodology has been tested, subjected to peer review and publication, or widely accepted in the scientific community. *United States v. Valencia-Lopez*, 971 F.3d 891, 898 (9th Cir. 2020) (citing *Daubert*, 509 U.S. at 592-94). "Experience-based" opinions can be more difficult to evaluate, but the lack of objective benchmarks makes it even more important for courts to screen the opinions to ensure they are adequately explained and supported. *Valencia-Lopez*, 971 F.3d at 898. Without a proper explanation based on demonstrated knowledge and experience in the relevant discipline, expert opinion testimony can improperly devolve into nothing more than "because I say so." *Small v. WellDyne, Inc.*, 927 F.3d 169, 177 (4th Cir. 2019); *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002) (excluding opinion evidence connected to existing data only by the *ipse dixit* of the expert). The Court's ultimate goal is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Valencia-Lopez*, 971 F.3d at 898 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

Chart's seven expert witnesses largely satisfy the gateway requirements for opinion testimony. There are some relatively narrow aspects of Chart's expert reports that exceed the bounds of permissible expert testimony, however—either because they venture beyond the witness's field of expertise; pertain to irrelevant, confusing, or potentially prejudicial facts; or are not adequately explained and supported. Plaintiffs accordingly request that the Court preclude Chart's experts from offering the testimony discussed below.

## II. Eldon Leaphart: The Court should exclude opinions that venture beyond Leaphart's expertise in electrical engineering.

Eldon Leaphart is an electrical engineer who examined Tank 4's electronic controller following the March 4th incident. He concluded that the controller functioned properly up until February 15, 2018, but then lost the ability to accurately report Tank 4's temperature and liquid nitrogen level and repeatedly triggered false alarms. (Zeman Decl., Ex. 1 at 30-32.) These symptoms are consistent with the widespread "SN=0" defect that has plagued Chart's electronic controllers for years—causing the

controllers' serial numbers to reset to 0, the level to read 0, and the temperature to read -273° C. (*Id.*, Ex. 1 at 23, 32; Ex. 2 at 157.)

The majority of Leaphart's report concerns his examination of Tank 4's controller and a working exemplar controller. He reports on the exemplar controller's features and internal components, the Tank 4 controller's configuration settings as of March 2018, and various event codes and level readings logged by the Tank 4 controller between 2012 and 2018. (*Id.*, Ex. 1 at 10-32.) But in a few instances, Leaphart ventures beyond his expertise and opines regarding other matters. Plaintiffs request the Court preclude Chart from presenting these opinions at trial, but otherwise permit Leaphart to testify regarding his examination of the Tank 4 and exemplar controllers.

### A.     Leaphart is not qualified to opine that PFC had an early indication of impending issues with Tank 4.

At his deposition, Leaphart acknowledged he is not qualified to opine as to why Tank 4 failed and did not intend to do so at trial: "I am not opining on causation. And so nor am I opining on anything with the tank." (*Id.*, Ex. 2 at 141.) Leaphart has never worked with a cryogenic storage tank and before this case had never operated a cryo-storage tank controller either. (*Id.* at 52-53.) So while Leaphart's experience as an electrical engineer may qualify him to discuss the electronics at play in Tank 4's control system, he possesses no special knowledge or expertise that would allow him to competently opine how Tank 4 itself lost liquid nitrogen and imploded. *See Snyder v. Bank of Am., N.A.*, No. 15-CV-04228-KAW, 2020 WL 6462400, at *4 (N.D. Cal. Nov. 3, 2020) ("[E]xpertise in one subject does not necessarily mean the expert will be qualified to testify on all issues that could arise from that subject.") (quoting *Lutron Elecs. Co., Inc. v. Crestron Elecs., Inc.*, 970 F. Supp. 2d 1229, 1241 (D. Utah 2013)).

It stands to reason that if Leaphart is not qualified to testify why Tank 4 failed, he also lacks the expertise needed to opine PFC should have known about Tank 4's impending failure. Yet in his report, Leaphart claims that "changes in LN2 usage levels … served as an early indication of pending issues with Tank 4." (*Id.*, Ex. 1 at 36, ¶ 3 (third bullet); *see also id.* at 33 ("Greater awareness of the changing LN2 usage level by the PFC staff could have alerted them to an impending problem with the MVE 808 Tank 4 system.") He does not support this opinion in his report, say what "issues" he believes led Tank

4 to lose liquid nitrogen and implode, or explain how changes in Tank 4's usage levels presaged that failure. This lack of support, combined with Leaphart's lack of experience operating cryogenic tanks, renders his opinion inadmissible. Fed. R. Evid. 704(b); *Winters v. Fru-Con Inc.*, 498 F.3d 734, 743 (7th Cir. 2007) ("An expert must substantiate his opinion; providing only an ultimate conclusion with no analysis is meaningless").

### B. Leaphart cannot reliably opine on the cause of Plaintiffs' loss of viable eggs and embryos.

Despite Leaphart's representation that he is "not opining on causation," his report delves into causation yet again when it concludes that Chart was not responsible for Plaintiffs' loss of viable eggs and embryos. The report says that Tank 4's controller was "safe in design and manufacture … and its condition at the time of events at issue did not cause the loss of tissue or damages alleged by plaintiff." (Zeman Decl., Ex. 1 at 35, ¶ 1; *see also id.* at 6 ("I disagree that anything Chart did, or did not do, involving the TEC 3000 controller … caused or contributed to the alleged injuries.").)

This opinion is unsupported, outside the scope of Leaphart's assignment, and contrary to Leaphart's own admissions at deposition. Leaphart's report may say that Tank 4's controller was safe in design and manufacture, and so could not cause Plaintiffs' loss, but Leaphart himself called that "an overstatement" and acknowledged that the Tank 4 controller's inability to read temperature and liquid nitrogen levels "creates a potential for a hazard." (*Id.*, Ex. 2 at 80-81, 151.) When asked to explain why he believed the Tank 4 controller was not unreasonably dangerous, Leaphart stated that he believes Chart followed an appropriate design process, but that he lacks the expertise to opine what would be unreasonably dangerous in an embryology lab. (*Id* at 72-74; *see also* 75-76 ("It is not my position to define… what is dangerous and what is not dangerous in an embryology lab").)

Leaphart further acknowledged that he wasn't even asked to determine whether Chart's electronic controllers suffered from a systemic defect and that he did not perform a root cause analysis to determine why Tank 4's controller stopped working. (*Id.* at 27, 148.) Without a root cause analysis, there is simply no way that Leaphart can reliably testify that the Tank 4 controller was safe and did not cause Plaintiffs' to lose viable eggs and embryos. *See Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d

979, 986 (9th Cir. 2020) (excluding expert opinion where "the only testing [the expert] performed was not designed to identify any defects").

### III. John Cauthen: The Court should exclude testimony that PFC manipulated data entries as irrelevant and prejudicial.

John Cauthen is a digital forensic examiner who recovered data from Tank 4's electronic controller and analyzed the Reflections database used by PFC to digitally record its daily lab measurements. (Zeman Decl., Ex. 3 at 3-4.) Plaintiffs do not object to Cauthen testifying about the data he recovered from Tank 4's electronic controller. They also do not object to limited testimony regarding the Reflections data. For instance, Cauthen's forensic examination concluded that the day before the Tank 4 incident was discovered, one of PFC's embryologists, Jean Popwell, recorded that Tank 4 was filled with 14 inches of liquid nitrogen. (*Id.* at 21.) Popwell entered her measurement on one of the lab's iPad devices at approximately 2:39 p.m. PST on Saturday, March 3, 2018. (*Id.*) In other words, Cauthen's forensic examination confirmed that the digital evidence is consistent with Popwell's deposition testimony. Popwell testified that on March 3, she filled Tank 4 with 14 inches of liquid nitrogen before leaving for the day. (*Id.*, Ex. 12 at 129-31.) This evidence is relevant to a central issue in the case—whether Tank 4 failed because of a defective weld, as Plaintiffs contend, or because PFC negligently failed to fill Tank 4 with liquid nitrogen on March 3, 2018, as Chart contends.

Plaintiffs do object, however, to Cauthen presenting evidence that certain Reflections data entries were altered after the Tank 4 incident. (*See id.*, Ex. 3 at 23, ¶ 6; *see also id.* at 13-21, Ex. 4 at 58-59.) Plaintiffs do not intend to introduce the altered entries into evidence, and allowing Cauthen to nonetheless testify would create a substantial risk of unfair prejudice. The alterations discussed in Cauthen's report appear to have been made in preparation for an upcoming visit by the College of American Pathologists (CAP). Just a few days before, CAP had announced it was opening an investigation into whether PFC was complying with all applicable regulatory requirements—an investigation that could have effectively shut down PFC's business (the clinic's accreditation was ultimately placed on probation with immediate jeopardy). (*Id*, Ex. 13 (3/13/18 letter).) It appears that PFC was going through its digital lab-monitoring entries in preparation for that investigation, filling in entries that were inadvertently left blank, and clarifying comments so they would be more

comprehensible to an outside embryologist. (*See id.*, Ex. 3 at 13-21.) These changes were not limited to just Tank 4's data, but there are four entries related to Tank 4 that were changed:

- 2/8/18 comment changed from "Low on liquid nitrogen" to "Low on liquid nitrogen. Fill tomorrow when re-stocked on LN2"
- 2/15/18 [day controller failed] liquid nitrogen measurement changed from blank to 10.1
- 2/15/18 comment changed from "Low Level Showing in Tank 4" to "Low Level Showing in Tank 4 – Manually Measured"
- 2/28/18 liquid nitrogen measurement changed from blank to 12.2

(*Id.* at 23, ¶ 6(a)-(d).) Again, Plaintiffs do not intend to introduce any of these altered measurements as evidence, so there is no need for Cauthen to testify that they were entered after the fact. The parties can stipulate that no liquid nitrogen measurement was entered into the Reflections database on February 15, 2018, or February 28, 2018.

The danger with permitting Cauthen to testify regarding alterations made to the Reflections database is that it creates the appearance of improper conduct on the part of PFC and its lawyers that may unduly prejudice the jury against PFC. Even if PFC and its lawyers altered data entries in anticipation of a CAP inspection, that does not make it more likely that PFC engaged in negligent behavior that caused Plaintiffs' injuries. Similarly, even if PFC and its lawyers engaged in discovery misconduct when they produced maintenance records with backdated entries, as Cauthen suggests in his report, that too does not make it more likely that PFC contributed to the loss of Plaintiffs' eggs and embryos. (*See id.* at 18-20.) Any misconduct occurred after the fact, and while it may reflect poor judgment or a dishonest character, that sort of character evidence is inadmissible: Rule 404(a) of the Federal Rules of evidence precludes the use of character evidence to prove that PFC or its employees acted in accordance with that character trait. Fed. R. Evid. 404(a)(1). And Rule 404(b) similarly precludes Chart from introducing evidence of other wrongs or acts in pursuit of the same end. Fed. R. Evid. 404(b)(1); *see also Brighton Collectibles, Inc. v. Marc Chantal USA, Inc.*, No. 06-CV-1584 H, 2009 WL 10674074, at *2-3 (S.D. Cal. Apr. 1, 2009) (excluding evidence of behavior during discovery as irrelevant and prejudicial).

In addition to unfairly prejudicing the jury against PFC, Cauthen's testimony would also lead to extended proceedings on collateral issues and distract jury members from the central issues in the case. *See* Fed. R. Evid. 404, Note to 2006 amendments; Cal. Evid. Code § 1101, comment. If Cauthen is permitted to testify that he uncovered evidence of backdating, false entries, and discovery misconduct, PFC and its lawyers will of course wish to defend themselves. Plaintiffs likewise will want to ensure that the jury considers PFC's conduct in the appropriate context and separates whatever it might have done to prepare for the CAP inspection from the issues in the case. A great deal of time and testimony will be devoted to the collateral issues of why PFC audited its digital records prior to the CAP inspection and whether doing so was in anyway wrong or unusual.

Plaintiffs accordingly request that the Court preclude Cauthen from presenting evidence suggesting that PFC backdated entries in the Reflections database. Plaintiffs do not plan to enter those entries into evidence and any testimony concerning those entries would unnecessarily prolong the trial, distract the jury from the central issues in the case, and unfairly prejudice jury members against PFC. *See Jinro Am. Inc. v. Secure Investments, Inc.,* 266 F.3d 993, 1006 (9th Cir.) ("Otherwise admissible expert testimony may be excluded under Fed. R. Evid. 403 if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or undue delay.")

## IV. Grace Centola: The Court should exclude testimony regarding other safety violations as irrelevant and prejudicial

Grace Centola is a specialist in andrology and male fertility who considers herself an expert in embryology "[t]o a degree," though she has "not personally done embryology for many, many years." (Zeman Decl., Ex. 6 at 14.) She was asked to assess whether PFC met the standard of care for embryology labs in February and March of 2018, and concluded that PFC acted negligently in several respects. (*See id* at 26-28; *see also id.*, Ex. 5 at 3-44.) For the most part, Plaintiffs do not object to Centola presenting her opinions to the jury: she should be permitted to testify that, in her opinion, PFC's decision to unplug Tank 4's electronic controller, its failure to immediately service or repair the controller, and its method of manually monitoring Tank 4's liquid nitrogen levels after the controller malfunctioned were all violations of the applicable standards of care.

10

1   Plaintiffs do object, however, to Centola offering testimony concerning other instances where

2   PFC may have behaved negligently. That testimony, like the backdating testimony offered by Cauthen,

3   is inadmissible under Rule 404 and would unfairly prejudice PFC, divert the jury's attention from the

4   true issues in the case, and require Plaintiffs spend a significant amount of court time placing those

5   other incidents in the proper context. *See Jones v. S. Pac. R.R.*, 962 F.2d 447, 449–50 (5th Cir. 1992)

6   (evidence of prior safety infractions is inadmissible under Fed. R. Evid. 404(b)), *cited by Dupuis v.*

7   *Alaskan Shores F/V*, 139 F.3d 904 (9th Cir. 1998); *In re Pfizer Inc. Sec. Litig.*, 288 F.R.D. 297, 318

8   (S.D.N.Y. 2013) ("[defendant's] prior acts of negligence are not admissible to prove that it was

9   negligent here").

10   **A.    Centola's testimony that PFC backdated data entries and engaged in a pattern of**

11   **inaccurate and untruthful statements is inadmissible under Rule 404.**

12   Like Cauthen, Centola intends to testify that PFC backdated certain entries in its Reflections lab

13   management software. (Zeman Decl., Ex. 5, ¶¶ 17-21, 24-25.) Centola goes even further than Cauthen,

14   relying on his findings to opine "[a] pattern of inaccurate and/or untruthful statements from the PFC

15   Lab is evident." (*Id.*, ¶ 38.) In addition to filling in blank entries after the fact, she points to PFC's

16   inability to produce paper copies of the missing measurements and the Lab Director's testimony that a

17   manual fill line was installed in 2008 and remained available to PFC staff on March 4, 2018. (*Id.*, ¶¶

18   39-41.) In fact, that fill line was converted to a supply line in 2015 and the Lab Director was mistaken

19   when he stated that the manual fill line was still available in March 2018. (*Id.*, Ex. 14 at 3, Q7.)

20   Just as Rule 404 prohibits Cauthen from presenting evidence that PFC backdated data entries, so

21   too does it prohibit Centola from testifying that PFC's backdating was a serious deviation from the

22   applicable standard of care. Centola's testimony is an even clearer violation of Rule 404, as she

23   specifically acknowledges that she is relying on PFC's backdating to prove its character—namely, that

24   its embryologists are dishonest and cannot be trusted. (*Id.*, Ex. 5, ¶ 38, 42.) Centola claims PFC's

25   dishonesty is so pervasive as to constitute a "pattern," perhaps suggesting that her testimony should be

26   considered habit evidence that can be admitted under Rule 406. (*Id.*, ¶ 38.) But "[b]efore a court may

27   admit evidence of habit, the offering party must establish the degree of specificity and frequency of

28   uniform response that ensures more than a mere 'tendency' to act in a given manner, but rather, conduct

that is 'semi-automatic' in nature." *O'Connor v. Boeing N. Am., Inc*., No. CV 00-0186 DT RCX, 2005 WL 6035256, at *31 (C.D. Cal. Aug. 9, 2005) (quoting *Simplex, Inc. v. Diversified Energy Sys., Inc.,* 847 F.2d 1290, 1293 (7th Cir. 1988)). The evidence Centola proposes to present to the jury constitutes no more than a few isolated instances where PFC may have entered or conveyed inaccurate information. She has not established that PFC "semi-automatically" entered backdated entries into its lab-monitoring software, or that PFC provided untruthful statements "over substantially all occasions." *Id.* at *31; *see also Morris v. Long*, No. 1:08-CV-01422-AWI, 2012 WL 3276938, at *10–13 (E.D. Cal. Aug. 9, 2012) (excluding testimony where proponent failed to show conduct was reflexive or semi-automatic in nature), *aff'd,* 592 F. App'x 579 (9th Cir. 2015).

## B.    Centola's testimony that Tank 4's liquid nitrogen levels dropped to dangerously low levels in 2013 and 2014 is likewise inadmissible under Rule 404.

Centola intends to testify that Tank 4's controller logs "indicate a history of neglect of the samples and a deviation from the required daily monitoring of the liquid nitrogen levels in Tank 4." (*Id.*, Ex. 5, ¶ 46.) Her only support for this opinion are low-level readings that were reported by Tank 4's controller between July 2013 and January 2014, including two instances where the controller recorded a liquid nitrogen level of zero. (*Id.*, ¶ 45.) As another of Chart's experts explains, however, that does not mean Tank 4 actually ran out of liquid nitrogen: the level measurement port is about 2 inches above the bottom of the tank and so would not detect those 2 inches. (*Id.*, Ex. 7 at 23.) In addition, Tank 4's controller was programmed with a level offset of 1.3 inches, meaning that level readings below 1.3 inches would be recorded as zero; the controller may not have been properly calibrated at the factory (the exemplar tank Chart provided its experts gave readings that were "consistently 0.7 to 0.85 inches lower than the physical measurements"); and Chart's controllers are prone to malfunction and display inaccurate liquid nitrogen levels. (1/10/20 Gustafson report, ECF No. 418-4, ¶ 24; Zeman Decl., Ex. 7 at 15; *id.*, Ex. 1 at 23, 34.)

Chart's previous counsel took the position that Tank 4's controller readings meant that Plaintiffs' eggs and embryos "could very well have been adversely affected *prior to the March 4 Incident.*" (1/10/20 Chart Opp., ECF No. 352-4 at 11 (emphasis in original)*; see also id.* at 1, 13, 14, 16 (also asserting the 2013/14 incidents could have damaged Plaintiffs' tissue).) A statistical analysis

indicated otherwise, however, and Chart has abandoned the argument. Instead, Centola opines that "the period of February 14, 2018 and March 4, 2018 … was the cause of any damage to the samples stored in Tank 4" (Zeman Decl., Ex. 5 at 4.) When asked if she thought it was possible Tank 4's liquid nitrogen level actually dropped to zero inches in 2013/14, Centola answered, "That would be highly unlikely." (*Id.*, Ex. 6 at 246.) As she pointed out, if Tank 4 had in fact dropped to dangerous levels back then, "this whole event would have occurred in 2013 rather than in 2018." (*Id* at 240; *see also id.* at 256 (2013/14 incidents "were not a direct causative agent for what happened on March 4th").

Centola is instead using the alleged 2013/14 incidents to suggest that this past "history of neglect" makes it more likely PFC was also negligent in 2018. (*Id.*, Ex. 5, ¶ 46.) But as with PFC's alleged history of dishonest conduct, evidence of PFC's prior bad acts is not admissible to prove that PFC also acted inappropriately in 2018 and caused Tank 4 to lose liquid nitrogen. As the Fifth Circuit Court of Appeals observed in *Jones*, "prior safety infractions, nearly all of which occurred several years before the accident took place, [are] collateral to the issues involved," and are "not admissible to show that [a party] was negligent on the day of the accident, or that [it] had a habit of [acting] negligently." *Jones*, 962 F.2d at 450; *see also S. Pac. Transp. Co. v. Builders Transp., Inc.,* No. CIV. A. 90-3177, 1993 WL 185620, at *10 (E.D. La. May 25, 1993) (evidence of a "train crew's prior negligent acts is not admissible to prove that its members were negligent on [the date in question]").

## C.   Centola's testimony that PFC had problems with its supply tanks is inadmissible under Rule 404.

Centola also claims that the 2013/14 low-level readings reflect ongoing problems with PFC's supply tanks. (Zeman Decl., Ex. 5, ¶ 36.) Tank 4 and five other cryogenic tanks were supplied with liquid nitrogen through two supply tanks that are hooked up to a common plumbing system. (*Id.*, Ex. 15 at 37.) For the same reason that Centola cannot properly testify that the 2013/14 incidents suggest that PFC failed to monitor Tank 4 in March 2018, she also cannot properly testify that the 2013/14 incidents suggest PFC failed to monitor its supply tanks in March 2018.

Centola also should be precluded from mentioning four or five other instances when one of PFC's supply tanks may have run dry. (*See id.*, Ex. 5, ¶ 35; Ex. 16 at 48 ("four or five times … they were all after the Tank 4 incident").) These other alleged acts of negligence are all also inadmissible

13

under Rule 404(b). *See also Sparks v. Gilley Trucking Co.,* 992 F.2d 50, 53 (4th Cir. 1993) (error to admit extensive evidence of prior speeding to suggest defendant was speeding at the time of the accident).

### D.    Centola's testimony about PFC's unsafe use of buckets is inadmissible under Rule 404.

Centola's report briefly discusses PFC's use of buckets to refill its tanks with liquid nitrogen. (Zeman Decl., Ex. 5, ¶¶ 27-29.) PFC did not use buckets as a primary way of refilling Tank 4, but it did frequently use buckets to fill smaller dewars and to fill Styrofoam containers for use in day-to-day operations. (*See id.*, Ex. 17 at 225, 228.) On occasion, embryologists would use a bucket to top off one of the larger tanks, such as when liquid nitrogen is left over from other tasks. (*See id.*, Ex. 18 at 11-12, 13-14.) According to Centola, this is a deviation from the applicable standard of care and poses a safety issue because liquid nitrogen could spill from the bucket. (*Id.*, Ex. 5 ¶¶ 27-29.)

Centola acknowledged at her deposition, however, that she does not believe PFC's use of buckets caused the March 4th incident. (*Id.*, Ex. 6 at 230.) The testimony is intended only to paint PFC in a negative light and suggest that because its embryologists acted negligently on other occasions, they also negligently caused Tank 4 to lose liquid nitrogen on March 4, 2018. That type of evidence is precluded by Rule 404(b) and should be excluded. *See Friend v. Time Mfg. Co.*, No. 03-343-TUC-CKJ, 2006 WL 2135807, at *10 (D. Ariz. July 28, 2006) (excluding evidence offered "to prove that [party] has a habit of engaging in negligent working habits to show that [his] negligence was the sole cause of the accident").

## V.    Franklin Miller: The Court should exclude opinions that venture beyond Miller's expertise, draw legal conclusions, or lack a reliable foundation.

Franklin Miller is a mechanical engineer who specializes in cryogenics and has both designed and operated a wide variety of cryogenic vessels. (Zeman Decl., Ex. 7 at 1-2.) He intends to present an alternate theory of how Tank 4 lost liquid nitrogen and imploded. Whereas Plaintiffs contend that a crack in one of Tank 4's interior welds is responsible, Miller contends that the Tank imploded *before* the weld cracked. He has postulated a seven-step sequence of events that he believes would produce a spontaneous implosion. (*Id.* at 9-12.) Plaintiffs have no objection to Miller presenting his theory to the

14

jury, but some of the opinions that Miller wishes to present in conjunction with that theory—such as his opinion that PFC spoliated evidence—are improper and should be excluded.

**A.    Miller's opinion that PFC spoliated the evidence is an improper and unsupported legal conclusion.**

Miller's theory postulates that Tank 4 developed a "small leak" that caused the tank's molecular sieve to gradually load with nitrogen gas—gas that would then have been released if PFC allowed Tank 4 to run dry on March 3, 2018, and could ultimately apply enough pressure to deform the inner tank wall and crack the weld. (*Id.* at 9, steps 2-3.) One problem with that theory is that Tank 4 was tested extensively after the March 4th incident and no such "small leak" was ever identified—the crack in the weld is the *only* leak that has ever been detected. Chart's experts were present for that testing and, in fact, they directed much of the leak testing. They spent hours looking for a leak and found nothing. (*See id.*, Ex. 8 at 149-50.)

Miller would like to opine that no leak was ever found because "Pacific Fertility experts spoliated the evidence." (*Id.*, Ex. 7 at 24, ¶ 5.) But spoliation is a legal issue and "an expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law." *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.,* 523 F.3d 1051, 1058 (9th Cir. 2008). If Chart truly believed that PFC spoliated Tank 4 back in 2018, its remedy was to bring a motion for evidentiary sanctions against PFC *before* Tank 4 was thoroughly leak-tested and then—with Chart's consent—cut apart for further testing, rendering further leak testing impossible. *See Apple Inc. v. Samsung Elecs. Co.,* 881 F. Supp. 2d 1132, 1135 (N.D. Cal. 2012) (courts possess inherent authority to impose spoliation sanctions).

Miller's spoliation opinion is also unsupported by the evidence and undercut by his own deposition testimony. Miller believes that when PFC's experts sprayed Tank 4 with talcum powder (a standard component of 3D scanning and leak testing), the talc "plugged any small leaks that may have existed." (Zeman Decl., Ex. 7 at 7.) But he doesn't explain how that could possibly be irreversible (the talc was then rinsed off). (*Id.*, Ex. 8 at 145 ("I don't know for how long [the leak] would go away"). And he cites to no scientific authority or independent testing for his supposition. *See Daubert,* 509 U.S. at 590 (expert testimony must be based on more than "subjective belief or unsupported speculation").

In fact, Miller's only citation is to Chart's own discovery responses. (Zeman Decl., Ex. 7 at 8 nn.22-25.) Then when Plaintiffs asked what testing he was prevented from doing, Miller admitted that Chart could have done those same tests before the tank was cut up and he did not know why they chose not to. (*Id.*, Ex. 8 at 141-42 ("Q. Why didn't Chart do this test? A. I don't know."; 143-44 (acknowledging Chart examined the vacuum plug and found no degradation or leaks); 149-50 (opining Chart "didn't check for small leaks"). In short, Miller's opinion that Chart did not find his postulated "small leak" due to spoliation is an improper legal conclusion, unsupported by reliable scientific evidence, and undermined by the factual record.

**B.     Miller's opinion that Tank 4 was out of warranty is an irrelevant legal conclusion.**

Miller's report also strays into the legal realm when he opines that Tank 4 "was out of warranty at the time of the incident." (*Id.*, Ex. 7 at 24, ¶ 6; *see also id.* at 7-8.) Miller has no special expertise that allows him to opine as to Chart's warranty contract or as to Chart's obligations under that contract. More importantly, Chart's contractual obligations to PFC are not relevant to Plaintiffs or their third-party legal claims, which sound in strict liability, not in contract. Permitting Miller to opine that Tank 4 was out of warranty would only confuse the jury with irrelevant information and wrongly suggest to jury members that Chart is not strictly liable for injuries caused by its product—whether that harm occurs before or after the term of Chart's written warranty. *Greenman v. Yuba Power Prod., Inc.*, 59 Cal. 2d 57, 62 (1963) ("rules defining and governing warranties … cannot properly be invoked to govern the manufacturer's liability to those injured by their defective products").

**C.     Miller's definition for manufacturing or design defects is not the same as the legal definition, making his conclusions irrelevant and confusing.**

Miller opines that Tank 4 "does not possess any design or manufacturing defects" and that "[n]o design or manufacturing defects existed in its condition and functionality that resulted in the loss of any tissue." (Zeman Decl., Ex. 7 at 24, ¶ 1; *see also id.* at 2.) The issue of whether or not Tank 4 contained a design or manufacturing defect is ultimately one for the jury to decide based on the instructions from the Court. *See* CACI No. 1201-1204. Under California law, "[a] product contains a manufacturing defect if the product differs from the manufacturer's design or specifications or from other typical units of the same product line." CACI No. 1202. And a product is defective in design if it either does not

perform as safely as an ordinary user would have expected, or if the design is a substantial factor in causing harm and the manufacturer cannot prove the benefits of that design outweigh its risks. CACI No. 1203-1204.

Miller defines design and manufacturing defects differently than does California law. He considers a design defect to be "a design that doesn't meet the requirement specification for that product." (Zeman Decl., Ex. 8 at 235-36.) And he believes that a product can be free of manufacturing defects even if it deviates from the design specifications. (*Id.* at 238-39.) Using his own definitions, Miller is able to opine that Tank 4 was not defective in manufacture even after admitting during deposition that Tank 4's welding deviated from Chart's design specifications. (*Id.* at 238-39.) He's able to opine Tank 4 was not defective in design without conducting any testing or performing any analysis, basing his conclusion instead on his own experience designing tanks and opinion that Chart's tanks "apply all the standard practices that I would expect." (*Id.* at 235.) And he's able to opine that Tank 4 was free of any manufacturing and design defect, even as he admits that the "small leak" he believes led Tank 4 to fail could have been caused by a defect. (*Id.* at 216 ("Q. And how do you know it wasn't a defect in the tank that caused that small leak? A. I can't know that.").)

Under these circumstances, permitting Miller to testify at trial that Tank 4 was free of manufacturing and design defects would only confuse or mislead the jury. *See Nationwide,* 523 F.3d at 1059 (excluding expert from presenting legal conclusions that "would have been not only superfluous but mischievous"). Chart engaged a qualified metallurgist to actually examine Tank 4, and that expert will be permitted to present his factual findings to the jury to assist them in deciding whether Tank 4 suffered from any design or manufacturing defects. There is no need for Miller to opine on the same topic, particularly when he offers only legal conclusions that are not supported by any testing or analysis and are based on a misunderstanding of the law.

### D. Miller is not qualified to opine how experienced welders interpret design drawings.

Miller also should be precluded from testifying that, even though Chart's "design drawing contains a symbol apparently indicating a full penetration weld," in Miller's opinion "any experienced welder will interpret the drawing to require seal welds." (Zeman Decl., Ex. 7 at 7.) Miller admits he's "not a welding expert," and he has provided no other basis upon which he could reliably testify how

experienced welders interpret design documents. (*Id.*, Ex. 8 at 124.) The only support Miller supplies for his contention is the deposition testimony offered by one of Chart's welders, Buster Ingram. (*Id.*, Ex. 7 at 7 n.19.) If Chart wants to call Mr. Ingram to testify at trial, it can do so, but it should not be permitted to offer opinion testimony from a non-welder about how experienced welders interpret design documents. *See Pooshs v. Philip Morris USA, Inc.*, 904 F. Supp. 2d 1009, 1019-20 (N.D. Cal. 2012) (finding testimony that exceeded the bounds of expert's qualification would not assist trier of fact).

### E.  Miller should not be permitted to confuse the jury with testing conducted under different conditions than Tank 4 experienced.

One of Chart's other experts has testified that at 2:39 p.m. on Saturday, March 3, 2018, as the PFC laboratory was closing for the day, an embryologist named Jean Popwell entered a measurement of 14 inches for Tank 4 in the clinic's IVF lab monitoring software. (Zeman Decl., Ex. 3 at 21.) Ms. Popwell confirmed that the measurement was accurate: on March 3, 2018, she inserted a yardstick into Tank 4 and filled it up to the 14-inch mark—just as she had done on several prior occasions when she was responsible for filling Tank 4 before leaving for the day. (*Id.*, Ex. 12 at 129-32.) Everyone generally agrees on what happened next. Around 12:30 the next day, PFC's Lab Director discovered that Tank 4 had lost all or substantially all of its liquid nitrogen.

Miller conducted a test that he says "disproved Jean Popwell's LN2 measurement of 14 inches on March 3, 2018." (*Id.*, Ex. 7 at 24, ¶ 8; *see also id.* at 8.) He also claims the test disproved Plaintiffs' theory that a cracked weld on the inside of Tank 4 caused it to lose liquid nitrogen overnight and gradually implode. (*Id.*) Miller's test involved filling an empty tank with 14 inches of liquid nitrogen, spoiling the tank's vacuum insulation by pressurizing it from the outside, and measuring how long it took for all 14 inches of liquid nitrogen to evaporate. (*Id.* at 13.) Under those conditions, Miller found that it took 31-32 hours for the tank to lose all of its liquid nitrogen—considerably longer than the 22 hours that elapsed between the time that Ms. Popwell says she filled Tank 4 with 14 inches of liquid nitrogen and the time Tank 4 was found to have lost all its liquid nitrogen. (*Id.* at 20; Ex. 8 at 177)

1    But at deposition, Miller admitted that his test did not replicate Tank 4's conditions on March 3,

2    2018: "All right. So I didn't boil off the same amount of volume in this test as was boiled off in the

3    same amount of time in Tank 4…. [T]here was a different volume of liquid nitrogen contained in the

4    tank." (*Id.*, Ex. 8 at 113-14.) Miller used an empty tank, but Tank 4 was filled with 80 boxes, 1280

5    cryo-canes, 1280 goblets, and 3000-4000 cryotips or cryolocks, each holding biological tissue. (*Id.*, Ex.

6    19 at 119-20.) All that equipment takes up a substantial amount of space, as shown below:



*Contents of Tank 4 at the time of failure*
*(shown after relocation to replacement tank)*

20   (*Id.*, Ex. 20.) The tank that Miller used for his test was completely empty—he made no attempt to first

21   fill the tank with similar equipment to that used by PFC. So when Miller filled his tank up to the 14-

22   inch mark, it contained significantly more liquid nitrogen than Tank 4 contained when Ms. Popwell

23   filled Tank 4 up to the 14-inch mark—just as an empty cup can hold more liquid than if that same cup

24   is already full of ice cubes. Miller's test accordingly did not "disprove" Ms. Popwell's testimony—

25   corroborated by Chart's own forensic examination of Ms. Popwell's digital activity on that day—that

26   she filled Tank 4 to the 14-inch mark, and Miller should not be permitted to testify that it did. *See Rovid*

27   *v. Graco Children's Prod. Inc.*, No. 17-CV-01506-PJH, 2018 WL 5906075, at *8 (N.D. Cal. Nov. 9,

28   2018) (excluding expert test that "did not even attempt to simulate" the real-world accident at issue);

19

*compare with* Zeman Decl., Ex. 8 at 114 ("I was not trying to duplicate the exact conditions of the Tank 4").

        For similar reasons, Miller's test did not disprove Plaintiffs' theory that an interior weld crack was responsible for Tank 4 losing liquid nitrogen overnight. Miller did not even attempt to simulate the tank's behavior in the event of an interior weld crack, which would allow liquid nitrogen to leak into the tank's vacuum insulation layer. (*See id.* at 108.) Instead, he observed what would happen if gas were introduced into the vacuum space *outside* the tank and the inside remained free from leaks. (*Id.*, Ex. 7 at 15.) Not surprisingly, Miller's tank behaved differently than Tank 4 and did not implode. (*Id.* at 22.) That result says nothing about how a tank full of liquid nitrogen and equipment would behave in the event of an interior weld crack.

        Chart itself has recognized that there is a meaningful distinction between an interior leak and an exterior one. It has identified over 100 ways that its tanks could fail and analyzed those potential failure modes through a formal Design Failure, Modes, Effects & Criticality Analysis. (*Id.*, ¶ 21, Ex. 21.) In the event of an interior weld failure, Chart concluded: "Liquid [would] draw[] into vacuum space, expanding rapidly and causing an inner vessel implosion, total vacuum loss. Loss of function of the freezer." (*Id.*, Ex. 21, DEW-3, DEW-4.) The result for an exterior breach, like that simulated by Miller, is less severe: no liquid draws into the vacuum space; there is no rapid expansion; vacuum loss leading to a high evaporation rate is predicted, but not total vacuum loss; and an inner vessel collapse is described as only a possibility, not a certainty. (*Id.*, DEW-6.) In other words, Chart's own pre-litigation analysis undermines Miller's test and shows that he cannot reliably draw conclusions from a tank failure that does not accurately simulate an interior weld crack. *See Beard v. United States Postal Serv.,* No. 17-CV-03218-JCS, 2019 WL 257978, at *2 (N.D. Cal. Jan. 18, 2019) ("a federal judge should exclude scientific expert testimony … unless he is 'convinced that it speaks clearly and directly to an issue in dispute in the case.'") (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1321 n.17 (9th Cir. 1995).

1

2 *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply

3 too great an analytical gap between the data and the opinion proffered").

4 　　　Lastly, Miller's conclusions are suspect since they are the result of a single test. He did not

5 attempt to repeat his test to verify that his results are reliable, nor has he attempted to assign an error

6 rate to his results. *See Daubert*, 509 U.S. at 594 ("the court ordinarily should consider the known or

7 potential rate of error"). As Justice Sotomayor has observed, "[t]he results of any scientific test should

8 be repeatable at least three times in order to eliminate the possibility of results being skewed by

9 conditions specific to the time that the test was first conducted." *Avon Prod., Inc. v. S.C. Johnson &*

10 *Son, Inc.,* 984 F. Supp. 768, 787 (S.D.N.Y. 1997). Without running his test multiple times and under

11 different conditions, Miller cannot show that his method is reproducible or reliable. *Rovid*, 2018 WL

12 5906075 at *5. All opinions based on Miller's single test should accordingly be excluded as unreliable

13 and irrelevant to the conditions that actually existed inside Tank 4 and in the PFC laboratory.

14 Permitting Miller to testify what happened when another tank was filled with a different amount of

15 liquid nitrogen and exposed to different failure mode would only serve to confuse and potentially

16 mislead members of the jury.

17
18 　　**F.　　Like Centola, Miller should not be permitted to testify regarding low liquid
　　　　　nitrogen readings in 2013 and 2014.**

19 　　　Miller's report includes a short section that addresses the same 2013/14 low-level events that

20 Centola discusses in her report. (Zeman Decl., Ex. 7 at 22-23.) Like Centola, Miller recounts several

21 instances between July 2013 and January 2014 when Tank 4's controller recorded low levels of liquid

22 nitrogen. (*Id*.) And just as Centola claims that these 2013/14 events constitute a "history of neglect,"

23 Miller claims they constitute a "history of low liquid level events." (*Id*.; Ex. 5, ¶ 43; Ex. 7 at 22, 24, ¶

24 9.) This testimony is inadmissible under Rule 404(b), regardless of whether it comes from Centola or

25 from Miller, and so should be excluded for both experts. (*See* Section IV.B., *supra*.)

26 　　**G.　　Miller's second rebuttal report should be stricken.**

27 　　　On December 11, Miller submitted a second rebuttal report that responds to criticisms raised by

28 Plaintiffs in their rebuttal reports and during Miller's deposition. (Zeman Decl., ¶ 10, Ex. 9.) By

submitting this second rebuttal report after the deadline for initial and rebuttal reports, Miller tries to get the last word and to introduce three new tests that he claims support his initial opinions. (*Id.*) "That type of report is the exact type of supplemental report that the Ninth Circuit and courts across this Circuit have held should be excluded or struck under Rule 37(c)." *Rovid*, 2018 WL 5906075 at *11 (citing, e.g., *Luke v. Family Care & Urgent Med. Clinics*, 323 F. App'x 496, 499-500 (9th Cir. 2009)). Miller should not be permitted to gain an unfair advantage over the experts who complied with the Court's deadlines. His second rebuttal report should be stricken and Miller should be precluded from presenting any material raised for the first time in that report to the jury. *See In re PersonalWeb Techs., LLC Patent Litig.,* No. 18-MD-02834-BLF, 2020 WL 6821074, at *6 (N.D. Cal. Feb. 3, 2020) (striking untimely supplemental report: "It is not proper for [expert] to supplement his expert report to 'revise' his disclosures in light of [opposing party's] challenges to his analysis").

## VI.    Angela Lawson: The Court should preclude any testimony or insinuations concerning malingering or symptom exaggeration.

Angela Lawson is a psychologist who works in reproductive medicine and serves as a forensic consultant and expert. She submitted a rebuttal report critiquing the report, methodologies, and qualifications of one of Plaintiffs' experts, Elizabeth Grill. (Zeman Decl., Ex. 10.) Lawson criticizes Grill for having not conducted forensic testing on the Plaintiffs to assess malingering or symptom exaggeration, among other things. (*Id.* at 13). Lawson does not, however, render any opinion on the Plaintiffs' psychological conditions in her report. (*Id.* at 2 n.1.) And she confirmed in her deposition that she has not evaluated the Plaintiffs and has no intention of providing any opinions on the Plaintiffs' psychological conditions. (Zeman Decl., Ex. 11. at 13-14). Plaintiffs therefore ask the Court to preclude Lawson from discussing or alluding to malingering or symptom exaggeration. Lawson has no foundation for any such testimony, which would inappropriately suggest to the jury that Plaintiffs could be faking or exaggerating their emotional distress.

Where a defendant has not laid the foundation for an opinion concerning malingering or alleged exaggeration, any questions, comments, statements, or arguments concerning malingering or symptom exaggeration are improper. *See Prasol v. Cattron-Theimeg, Inc., et al.*, No. 9-10248, 2011 WL 3897794, at *1 (E.D. Mich. Sept. 6, 2011) (granting motion to exclude questions, comments, statements

22

or arguments concerning symptom magnification or malingering); *see also Glover v. Main St. Wholesale Furniture, LLC*, 545 S.W.3d 245, 249 (Ark. App. 2018) (abuse of discretion to "permit[] testimony suggesting that [plaintiff] was motivated by secondary gain" where the expert "testified that he was not expressing an opinion that [the plaintiff] was malingering"); *Marron v. Stromstad*, No. 3AN-00-10929CI, 2002 WL 34189740 (Alaska Super. Aug. 09, 2002) (expert "did not opine that [Plaintiff] is a malingerer. He may not testify that she is malingering."). Lawson admitted at her deposition that she had not done the foundational work necessary to render an opinion as to Plaintiffs' emotional distress, and confirmed that any Plaintiff-specific evaluations of malingering were outside the scope of her assignment. (Zeman Decl., Ex. 11. at 69-70). In fact, she testified that "[t]here is not any evidence present" to suggest any of the plaintiffs are malingering. (*Id.* at 85; *see also* 69-70 ("Q. [You're n]ot even insinuating that there is a concern about malingering here? A. No. There was not enough data to assess one way or another.")).

Allowing Chart to cast doubt on the authenticity of Plaintiffs' distress claims, particularly through use of pejorative concepts like "malingering" and "symptom exaggeration," would invade the province of the jury in assessing the Plaintiffs' credibility, severely prejudicing Plaintiffs while offering no probative value whatsoever. *See* Fed. R. Evid. 403; *Wise v. Southern Tier Express, Inc.*, No. 2:15-cv-0219-APG-PAL, 2017 WL 11488518, at *1 (D. Nev. July 10, 2017) (excluding testimony about or reference to malingering or desire for secondary gain because it "would invade the province of the jury to determine credibility") (citing *United States v. Geston*, 299 F.3d 1130, 1136 (9th Cir. 2002)); *Glover*, 545 S.W.3d at 249 ("To the extent the testimony had any relevance, it should [be] excluded because its probative value [is] substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury."); *see also Jones v. Standard Ins. Co.*, No. 12 C 328, 2013 WL 5549779, at *3 (N.D. Ill. Oct. 8, 2013) (malingering "is a pejorative term and need not be used.").

## CONCLUSION

For the reasons stated, Plaintiffs respectfully request that the Court grant their motion and exclude the expert testimony discussed above from the parties' upcoming trial. Chart will still be permitted to present its case through expert testimony, but the scope of that testimony should be limited to ensure that only relevant and reliable opinions are presented to the jury.

23

1    Dated: December 22, 2020                    Respectfully submitted,

2

3                                                By:    /s/ Amy M. Zeman

4                                                Eric H. Gibbs (State Bar No. 178658)
                                                 Amy M. Zeman (State Bar No. 273100)
5                                                **GIBBS LAW GROUP LLP**
                                                 505 14th Street, Suite 1110
6                                                Oakland, CA 94612
                                                 Tel: (510) 350-9700
7                                                Fax: (510) 350-9701
                                                 ehg@classlawgroup.com
8                                                amz@classlawgroup.com

9

10                                               Dena C. Sharp (State Bar No. 245869)
                                                 Adam E. Polk (State Bar No. 273000)
11                                               **GIRARD SHARP LLP**
                                                 601 California Street, Suite 1400
12                                               San Francisco, CA 94108
                                                 Tel: (415) 981-4800
13                                               Fax: (415) 981-4846
                                                 dsharp@girardsharp.com
14                                               apolk@girardsharp.com

15

16                                               Adam B. Wolf (State Bar No. 215914)
                                                 Tracey B. Cowan (State Bar No. 250053)
17                                               **PEIFFER WOLF CARR KANE &**
                                                 **CONWAY, APLC**
18                                               4 Embarcadero Center, Suite 1400
                                                 San Francisco, CA 94111
19                                               Tel: (415) 766-3545
                                                 Fax: (415) 402-0058
20                                               awolf@peifferwolf.com
                                                 tcowan@peifferwolf.com
21

22

23                                               *Plaintiffs' Counsel*

24

25

26

27

28

---

24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2020, I electronically filed the foregoing document using the CM/ECF system, which will send notification of such filing to all counsel of record registered in the CM/ECF system. I also caused an unredacted copy of the foregoing document to be served via email on counsel of record.

/s/ *Amy Zeman*

PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY
MASTER CASE NO. 3:18-cv-01586-JSC