Eric H. Gibbs (State Bar No. 178658)
Amy M. Zeman (State Bar No. 273100)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, CA 94612
Tel: (510) 350-9700
Fax: (510) 350-9701
ehg@classlawgroup.com
amz@classlawgroup.com

Dena C. Sharp (State Bar No. 245869)
Adam E. Polk (State Bar No. 273000)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dsharp@girardsharp.com
apolk@girardsharp.com

Adam B. Wolf (State Bar No. 215914)
Tracey B. Cowan (State Bar No. 250053)
**PEIFFER WOLF CARR KANE & CONWAY, APLC**
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Tel: (415) 766-3545
Fax: (415) 402-0058
awolf@peifferwolf.com
tcowan@peifferwolf.com

*Plaintiffs' counsel*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

IN RE PACIFIC FERTILITY CENTER LITIGATION

This Document Relates to:
No. 3:18-cv-01586
(A.B., C.D., E.F., G.H., and I.J.)

Master Case No. 3:18-cv-01586-JSC

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY**

Date: March 4, 2021
Time: 9:00 a.m.
Judge: Hon. Jacqueline S. Corley
Place: Courtroom F, 15th Floor

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................ 1

ARGUMENT ............................................................................................................................... 2

I. Expert testimony about PFC's alleged dishonesty is inadmissible under Rules 403 and 404. ........................................................................................ 2

II. Expert testimony regarding other negligent acts is inadmissible under Rules 403 and 404. ........................................................................................ 4

III. Miller's expert testimony should be excluded as requested. ........................................... 7

A. Miller should not be permitted to opine PFC spoliated evidence or otherwise offer legal conclusions to the jury. ............................................... 7

B. Miller has not established he is qualified to say how experienced welders think. ........................................................................................ 9

C. Miller has not shown his self-devised test is reliable or reproducible and he did not apply his test to the actual volume of liquid nitrogen that was in Tank 4. ........................................................................................ 10

D. Miller's second rebuttal report introduced new tests and should be struck. ........ 11

IV. Leaphart has not substantiated two opinions that stray from his field of expertise. ........ 13

V. Lawson should not be permitted to suggest Plaintiffs may be malingering. .................. 14

CONCLUSION ........................................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Apple Inc. v. Samsung Elecs. Co.*, 881 F. Supp. 2d 1132 (N.D. Cal. 2012) ........ 7

*Avon Prod., Inc. v. S.C. Johnson & Son, Inc.*, 984 F. Supp. 768 (S.D.N.Y. 1997) ........ 11

*Cardinal v. Lupo*, No. 18-CV-00272-JCS, 2019 WL 4450859 (N.D. Cal. Sept. 17, 2019) ........ 7

*Craig v. Xlear, Inc.*, No. 2:16-CV-00392-DB, 2019 WL 1119429 (D. Utah Mar. 11, 2019) ........ 9

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) ........ 1, 2

*Glover v. Main St. Wholesale Furniture, LLC*, 545 S.W.3d 245 (Ark. App. 2018) ........ 14

*Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387 (D. Or. 1996) ........ 2

*Hardesty v. Barcus*, No. CV 11-103-M-DWM-JCL, 2012 WL 5906797 (D. Mont. Nov. 26, 2012) ........ 2

*Higley v. Cessna Aircraft Co.*, No. CV 10-3345 JCG, 2013 WL 12112167 (C.D. Cal. July 8, 2013) ........ 11

*In re Pfizer Inc. Sec. Litig.*, 288 F.R.D. 297 (S.D.N.Y. 2013) ........ 4

*In re Viagra Prod. Liab. Litig.*, 424 F. Supp. 3d 781 (N.D. Cal. 2020) ........ 14

*Jimenez v. Superior Court*, 29 Cal. 4th 473 (2002) ........ 8

*Jones v. S. Pac. R.R.*, 962 F.2d 447 (5th Cir. 1992) ........ 6

*Luke v. Family Care & Urgent Med. Clinics*,
323 F. App'x 496 (9th Cir. 2009) .......... 12

*Marron v. Stromstad*,
No. 3AN-00-10929CI, 2002 WL 34189740 (Ala. Super. Aug. 09, 2002) .......... 14

*O'Connor v. Boeing N.* Am., Inc., No. CV 00-0186 DT RCX,
2005 WL 6035256 (C.D. Cal. Aug. 9, 2005) .......... 6

*Rovid v. Graco Children's Prod. Inc.*,
No. 17-CV-01506-PJH, 2018 WL 5906075 (N.D. Cal. Nov. 9, 2018) .......... 11, 12

*U.S. v. Pettee*,
101 Fed. Appx. 674 .......... 3

*U.S. v. Valencia-Lopez*,
971 F.3d 891 (9th Cir. 2020) .......... 13

**Statutes**

9 U.S.C. § 3 .......... 2

**Rules**

Fed. R. Evid. 403 .......... 3, 4

Fed. R. Evid. 404 .......... 2, 3

Fed. R. Evid. 406 .......... 5

Fed. R. Evid. 702 .......... 8, 11, 13, 14

Fed. R. Evid. 703 .......... 8

**Other Authorities**

CACI 1202 .......... 9

CACI 1207B, VF-1200 .......... 3

## INTRODUCTION

Defendant Chart contends Plaintiffs' motion to limit the testimony its experts will be permitted to present at trial "is a *Daubert* motion in name only." (Opp., ECF No. 668, at 1.) In particular, Chart criticizes Plaintiffs for raising objections under Rules 403 and 404 and insists those objections are premature and not an appropriate component of a proper *Daubert* analysis. (Opp. at 1, 8, 15, 17, 21.) But *Daubert* itself says otherwise. It stresses that "a judge assessing a proffer of expert testimony under Rule 702 should also be mindful of other applicable rules," and specifically mentions Rule 403 as one of those other applicable rules. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993). As the Ninth Circuit stated on remand, "Federal judges must … exclude proffered scientific evidence under Rules 702 and 403 unless they are convinced that it speaks clearly and directly to an issue in dispute in the case, and that it will not mislead the jury." *Daubert*, 43 F.3d 1311, 1321, n.17 (9th Cir. 1995).

That is precisely the problem with Chart's proposed expert testimony: too much of it is only tangentially related to the March 4th incident and instead seems calculated to confuse the issues and mislead the jury into assigning a disproportionate amount of the blame to PFC. Chart's experts can opine that PFC acted negligently in the days leading up to the March 4th incident and that those negligent acts caused Tank 4 to lose liquid nitrogen and implode. But expert testimony establishing PFC may have acted negligently in 2014 is not relevant to whether PFC acted negligently in 2018, and is inadmissible under Rules 403 and 404. So too is expert testimony that suggests PFC acted dishonestly *after* the March 4th incident by backdating some of its lab records. That testimony may create juror animosity toward PFC, but it has no bearing on the legitimacy of the lab records that will be entered into evidence at trial. Chart's own forensic analyst confirmed those records were entered contemporaneously and were not backdated. Nor should Chart's experts be permitted to opine that a test conducted at Chart's facilities proves PFC lied about filling Tank 4 the day before the March 4th incident. That test used substantially more liquid nitrogen than would fit in Tank 4; simulated an external breach rather than the more serious internal crack that afflicted Tank 4; and was run only once, so there is no way of knowing whether its results are reliable or reproducible.

Expert witnesses are authoritative figures in a courtroom. Their testimony can have an outsized impact on jurors, and when that testimony is unreliable, misleading, or unfairly prejudicial, it can have

serious consequences for the overall fairness of the trial. That is why courts are required to conduct a rigorous gateway analysis before expert testimony is allowed, and why "the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercise more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (1993). Plaintiffs accordingly ask the Court to carefully consider the potential prejudice from allowing Chart's experts to testify to otherwise inadmissible matters that appear calculated to besmirch PFC generally, rather than to show the specific incident in question was caused by PFC and not Chart.

## ARGUMENT

### I. Expert testimony about PFC's alleged dishonesty is inadmissible under Rules 403 and 404.

Plaintiffs requested that the Court preclude John Cauthen and Grace Centola from testifying that PFC backdated some of its digital laboratory records. (Mot., ECF No. 632, at 8-12.) Chart says the purpose of Cauthen's testimony is to "set the stage for other experts," namely Centola, "to opine on standard of care for making false, back dated entries in a medical record." (Opp. at 10.) Centola then intends to testify that backdating is "a dishonest practice that violates the standard of care," and part of a "pattern of inaccurate and/or untruthful statements from the PFC Lab." (12/22/20 Zeman Decl., Ex. 5 (Centola Supp. Rep.), ¶ 38.) But as Plaintiffs explained in their moving papers, this testimony would violate Rule 404, which precludes Chart from using other acts of negligence to prove PFC acted negligently in the days leading up to the March 4th incident. Fed. R. Evid. 404(a)(1), 404(b)(1). The backdating testimony is also excludable under Rule 403, as it is likely to unfairly prejudice jurors against PFC, lead to extended proceedings on a collateral issue, and distract jurors from the central issues in the case. *See Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387, 1407 n.43 (D. Or. 1996) ("Rule 403 remains in play during a *Daubert* hearing"); *Hardesty v. Barcus*, No. CV 11-103-M-DWM-JCL, 2012 WL 5906797, at *13 (D. Mont. Nov. 26, 2012) (limiting scope of expert testimony under Rule 404).

Chart offers several reasons why it believes the backdating testimony is nonetheless admissible. First, it says Plaintiffs have not cited a case where prejudice to a non-party was involved. (Opp. at 8.) PFC is technically still a party in this litigation, though the claims asserted against it have been stayed pending the conclusion of arbitration proceedings. *See* 9 U.S.C. § 3. But in any event, Rule 403's

"unfair prejudice" factor is not concerned with party status. It is concerned only with whether evidence has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403, Advisory Committee Note. Testimony that PFC backdated medical records and has a history of behaving dishonestly qualifies. Jurors could assign a larger percentage of the blame for the March 4th incident and a lesser percentage to Chart simply because they dislike PFC and consider PFC to be dishonest. *See* CACI 1207B, VF-1200 (requiring jurors to assign a percentage of responsibility to nonparty tortfeasor). That is precisely why character evidence is prohibited by Rule 404: "It tends to distract the trier of fact from the main question of what actually happened on the particular occasion. It subtly permits the trier of fact to reward the good man to punish the bad man because of their respective characters despite what the evidence in the case shows actually happened." Fed. R. Evid. 404(a), Advisory Committee Note.

Second, Chart says the Ninth Circuit held in *U.S. v. Pettee*, 101 Fed. Appx. 674, 676, that evidence is not character evidence when it merely confirms prior testimony. (Opp. at 10.) *Pettee* involved a criminal defendant charged with two counts of knowingly and unlawfully transferring a machine gun. The evidence at issue was testimony that the defendant had asked a friend to take guns from the defendant's house before his arrest. The Ninth Circuit gave several reasons that this was not inadmissible character testimony, including that it merely confirmed Pettee's own testimony that he had asked this friend to take guns from his house, and that it was offered as proof of Pettee's guilty knowledge rather than as proof that Pettee had criminal propensities in general. *Pettee*, 101 F. App'x at 676. There is no indication the Ninth Circuit intended to create a general rule that evidence is not character evidence if it merely confirms prior testimony, as Chart contends. If *Pettee* had established a new exception to Rule 404's ban on character evidence, one would have expected the Ninth Circuit to publish its decisions and other courts to have cited it for that principle. But *Pettee* is an unpublished decision and has never been cited by another court. Moreover, the testimony in *Pettee* was trial testimony and here Chart is relying on deposition testimony that may never be admitted into evidence.

Chart says its backdating testimony is being offered not as character evidence, but "as evidence of the accuracy of liquid nitrogen measurements produced by Pacific MSO." (Opp. at 11; *see also* Opp. at 9.) But Plaintiffs have confirmed they will only use measurements that Chart's own forensic expert

has verified were entered contemporaneously. (*See* Mot. at 8-9.) The backdated measurements will not be introduced at trial so there is no need for Chart to call their accuracy into question. Chart wants to present "key evidence of PFC's failure to conduct daily liquid nitrogen measurements on a freezer that was not connected to a controller or alarm system." (Opp. at 11.) It will be able to do just that. Chart can point to two days where PFC's lab records show no liquid nitrogen measurement was entered for Tank 4. Plaintiffs do not contest that fact. The issue is whether Chart should be able to introduce evidence that after the March 4th incident, while preparing for an inspection of its lab records by the College of American Pathologists, PFC altered those blank measurements. That after-the-fact deviation from the standard of care for IVF labs is irrelevant, as it could not have contributed to the March 4th incident. Its only purpose is to paint PFC as a dishonest laboratory and that is an improper use of evidence under Rules 403 and 404.

## II. Expert testimony regarding other negligent acts is inadmissible under Rules 403 and 404.

Plaintiffs also asked the Court to preclude Chart's experts from testifying to other instances where PFC may have acted negligently. (Mot. at 12-13, 21.) Both Grace Centola and Franklin Miller intend to testify that four years before the March 4th incident, Tank 4's controller indicated its liquid nitrogen levels dropped to zero—once on December 30, 2013, and once on January 20, 2014. (12/22/20 Zeman Decl., Ex. 5 (Centola Supp. Rep.), ¶¶ 36, 45; *id.*, Ex. 7 at 22.) These prior instances of potential negligence are inadmissible to show that PFC acted negligently in the days leading up to the March 4th incident. *See In re Pfizer Inc. Sec. Litig.*, 288 F.R.D. 297, 318 (S.D.N.Y. 2013) ("[defendant's] prior acts of negligence are not admissible to prove that it was negligent here").

Chart says that it plans to use the 2013/14 evidence for a different purpose: to establish that PFC had an ongoing practice of failing to address supply issues in its laboratory. (Opp. at 12.) But Chart's experts have provided no support for their contention that the 2013/14 incident arose from a supply issue or that this supply issue was ongoing. If a supply issue were to blame, all of Chart's large cryogenic storage tanks would have run low on liquid nitrogen—not just Tank 4. (*See* 12/22/20 Zeman Decl., Ex. 15 (11/13/20 Conaghan Dep.), Ex. 15 at 37 (six tanks were hooked up to a common supply system).) In fact, another Chart expert has previously testified that the 2013/14 incidents occurred for reasons unrelated to supply issues. Keith Gustafson, a cryogenic engineer who worked for Chart for

about forty years, described how Tank 4's settings did not allow enough time for Tank 4 to complete an automatic fill. (Gustafson Rep., ECF No. 418-4, ¶ 12.) This triggered repeated Fill Time Alarms that disabled Tank 4's autofill function until the alarm was manually cleared by the user. (*Id.*, ¶¶ 12, 14-16.) Gustafson testified that these Fill Time Alarms are what caused Tank 4's liquid nitrogen levels to drop—not supply issues. (*Id.*, ¶¶ 15-16; 2/12/21 Zeman Decl., Ex. 1 (Gustafson Dep.) at 181-82.) Notably, Gustafson acknowledged that PFC changed Tank 4's settings to correct this issue in June 2014, so it is of no relevance to the March 4th incident. (Gustafson Rep., ¶¶ 16, 24; 2/12/21 Zeman Decl., Ex. 1 (Gustafson Dep.) at 224.)

Centola and Miller now say the 2013/14 incidents were the result of ongoing supply issues, but unlike Gustafson, they offer no explanation or factual support for their theory. Nor have they established that the 2013/14 incidents were evidence of a habit or routine practice. *See* Fed. R. Evid. 406. As Plaintiffs explained in their moving papers, to be admissible as habit evidence, Chart must establish that supply issues at the PFC lab were so pervasive as to be "'semi-automatic" in nature. Fed. R. Evid. 406, Advisory Committee Notes. But during the four years between the 2013/14 incidents and the March 4th incident, Centola is only able to point to a few instances where one of PFC's two supply tanks might have run dry. (12/22/20 Zeman Decl., Ex. 5 (Centola Supp. Rep.), ¶¶ 34-35.) She can only speculate, however, as there is no evidence that Tanks 1-6's liquid nitrogen levels dropped, as one would expect if the supply tanks were chronically empty. Hana Lamb, a former embryologist at PFC, testified she recalled finding one of the two supply tanks empty only a few times. (12/22/20 Zeman Decl., Ex.16 (Lamb Dep.) at 47-48 ("Was it a frequent occurrence? No.").) She testified that it happened "[m]aybe, like, four or five times. And also they were all after the Tank 4 incident," though she then stated that it was possible some of the incidents occurred before the March 4th incident: "Maybe. I don't remember." (*Id.* at 48.) There is no evidence that both supply tanks were ever empty, though, and Lamb testified that on the few occasions she encountered an empty supply tank, "[w]e'd switch out the empty with the full." (*Id.* at 49.) Apart from Lamb's uncertain testimony, Centola can only point to two instances where PFC's records indicate low liquid nitrogen levels: one when Tank 4's controller malfunctioned and repeatedly sounded false alarms for low liquid nitrogen levels, and the other when the lab's sperm tank was low on liquid nitrogen and PFC staff indicated it would be refilled

when the lab was restocked. (12/22/20 Zeman Decl., Ex. 5 (Centola Supp. Rep.), ¶ 34.) These isolated instances are not enough to establish a habit routine practice under Rule 406. *O'Connor v. Boeing N. Am., Inc.*, No. CV 00-0186 DT RCX, 2005 WL 6035256, at *31 (C.D. Cal. Aug. 9, 2005) ("Evidence must be submitted showing regularity over substantially all occasions"). Neither Centola nor Miller should be permitted to use these other incidents to suggest to the jury that PFC habitually allowed its supply tanks to run dry or that it negligently caused the March 4th incident. *See Jones v. S. Pac. R.R.*, 962 F.2d 447, 449–50 (5th Cir. 1992) ("prior safety infractions … were not admissible to show that [a party] was negligent on the day of the accident, or that [the party] had a habit of [acting] negligently.")

Centola also intends to testify that PFC committed safety infractions by occasionally refilling Tank 4 using a bucket, although she acknowledged that this practice did not cause the March 4th incident. (12/22/20 Zeman Decl., Ex. 5 (Centola Supp. Rep.), ¶¶ 27-29.) Chart says that the testimony should nonetheless be admitted so that the "[t]he jury can then decide that PFC personnel are lying about filling Tank 4 with LN2" on two days when Tank 4's controller data shows an autofill cycle was not enabled. (Opp. at 14-15.) But PFC has never said Tank 4 was filled with liquid nitrogen on those days. The amount of liquid nitrogen an IVF tank consumes on any given day depends in large part on how frequently the tank is opened that day. (1/29/21 Ringel Decl., Ex. G (Centola Dep.) at 48.) Centola testified that in her experience, a tank loses between one and one-and-a-half inches each day, and that if a tank is not opened very frequently, it will lose less. (*Id.*) PFC's records show that on the two days in question, February 21 and February 24, 2018, Tank 4's recorded levels dropped by 0.6 inches and 1 inch, respectively, over the course of the day. (2/12/21 Zeman Decl., Ex. 2 (Extract from MSO026866, Reflections Metadata).) But in each case, Tank 4 still had 13 inches or more of liquid nitrogen and so did not require refilling under the lab's operating procedures. (1/29/21 Zeman Decl., Ex. 29 (Popwell Dep.) at 41.) If PFC were to testify at trial that it filled Tank 4 using buckets on February 21st or 24th, then it might be appropriate for Centola to question whether PFC really did use buckets to fill Tank 4 on those two dates. But that is not how PFC has testified to date; in fact, it has testified that it used buckets only sparingly and not as a primary way of refilling Tank 4. (12/22/20 Zeman Decl., Ex. 17 (Fischer Dep.) at 225, 228.) Unless PFC changes its testimony, Centola should not be permitted to testify PFC is lying or that it committed a safety infraction by using a bucket to fill its cryogenic tanks.

## III. Miller's expert testimony should be excluded as requested.

### A. Miller should not be permitted to opine PFC spoliated evidence or otherwise offer legal conclusions to the jury.

Plaintiffs requested that the Court preclude Franklin Miller from offering three legal conclusions at trial. (Mot. at 15-17.) The first is that PFC spoliated the evidence and prevented Chart from detecting a small leak that Miller thinks would explain the March 4th incident. (12/22/20 Zeman Decl., Ex. 7 (Miller Supp. Rep.) at 7, 24.) Chart contends both that Miller's spoliation opinion is the type of "facts or data" that Miller is permitted to rely upon under Rule 703, and that his opinion is not objectionable because it embraces an ultimate issue under Rule 704. (Opp. at 15-16.) But spoliation is neither a fact nor a matter at issue in this case. Spoliation is a legal conclusion that requires a Court to make three findings: (i) that the party having control over evidence had an obligation to preserve it; (ii) that the evidence was destroyed with a culpable state of mind; and (iii) that the evidence was relevant to a party's claim or defense. *Cardinal v. Lupo*, No. 18-CV-00272-JCS, 2019 WL 4450859, at *3 (N.D. Cal. Sept. 17, 2019).

If Chart believed that PFC somehow spoliated Tank 4 by spraying it with talcum powder, it should have brought a motion for spoliation sanctions *before* it agreed that Tank 4 should be cut up for further testing. *See id.* (a motion for spoliation sanctions "must be made as soon as practicable after the filing party learns of the circumstances that it alleges make the motion appropriate"). Had Chart brought that motion and proved PFC's talcum powder irreversibly altered Tank 4's condition and made it impossible for Chart to test for small leaks, the Court would have had discretion to issue a curative jury instruction. *Apple Inc. v. Samsung Elecs. Co.*, 881 F. Supp. 2d 1132, 1150 (N.D. Cal. 2012). Only then would jurors have the option to infer that Chart's testing could have revealed a small leak inside Tank 4 were it not for PFC's spoliation of the evidence. *See id.*

The facts suggest Chart could not have proven spoliation: there is no scientific evidence that talcum powder can irreversibly alter evidence and Miller acknowledged that Chart had the opportunity before Tank 4 was cut up to run the tests he is now suggesting, but chose not to. (*See* Mot. at 16; 12/22/20 Zeman Decl., Ex. 8 (Miller Dep.) at 141-45, 149-50.) That is likely why Chart did not object after it first learned PFC had sprayed Tank 4 with talcum powder, and why Chart agreed that Tank 4

should be cut apart for further testing. Chart had an opportunity to seek spoliation sanctions and elected not to bring the issue to the Court's attention. It should not now be permitted to implement its own sanction and invite jurors to conclude PFC altered evidence in a manner that harmed its case.

The second legal conclusion Miller plans to present to jurors pertains to Chart's obligations to repair or replace Tank 4 under its warranty contract with PFC. (*See* Mot. at 16.) Chart says this is not an opinion or legal conclusion, but rather a fact that Miller may rely upon under Rule 703. (Opp. at 16-17.) Miller's report suggests otherwise: He devotes an entire section of his report to Tank 4's warranty status, which he entitles "The MVE 808AF-GB Was Out of Warranty," and when he summarizes his nine principal opinions at the conclusion of his report, he includes "The subject MVE 808AF-GB was out of warranty at the time of the incident" as one of those opinions. (12/22/20 Zeman Decl., Ex. 7 (Miller Supp. Rep.) at 7-8 & 24, ¶ 6.) Plaintiffs oppose the admission of any expert testimony concerning Chart's warranty contract because that testimony is not relevant to Plaintiffs' strict liability claims and therefore will not be helpful to jurors. *See* Fed. R. Evid. 702(a). In fact, it is likely to confuse the issues by improperly suggesting that Chart had no further obligations at the conclusion of its warranty period—even though Plaintiffs are not bound by the warranty contract and California law does not allow a manufacturer to use warranty terms to avoid strict liability for injuries caused by its products. *Compare* 1/29/21 Ringel Decl., Ex. K (Miller Dep.) at 67 (testifying the warranty period is "certainly the timeline for when the company who produces the product is no longer responsible"), *with Jimenez v. Superior Court*, 29 Cal. 4th 473, 477 (2002) (California became the first state to allow recovery for strict products liability "because the law of contractual warranties developed for commercial transactions offered no protection to those harmed by defective products"). But even if Miller's warranty-related testimony were considered under Rule 703, as Chart urges, that would not make it admissible. To the contrary, Rule 703 was "amended to emphasize that when an expert reasonably relies on inadmissible information to form an opinion or inference, the underlying information is not admissible simply because the opinion or inference is admitted." Fed. R. Evid. 703, Advisory Committee Note to 2000 Amendment.

The third legal conclusion Miller intends to give at trial involves the presence of design or manufacturing defects in Tank 4. (*See* Mot. at 16-17.) Miller opines that Tank 4 was free of design or

manufacturing defects, but his understanding of those terms is different from their legal definitions. Miller believes a product is free of design defects if it "meet[s] the requirement specification for that product," or if the manufacturer "appl[ies] all the standard practices that [Miller] would expect." (1/29/21 Ringel Decl., Ex. K (Miller Dep.) at 235-36.) But California law provides that a product can still be defective in design if it failed to perform as safely as an ordinary user would expect, or if the design caused harm to a third party and the benefits of the design do not outweigh its risks. *See* CACI Nos. 1203-1204. California law also provides that a product contains a manufacturing defect if it differs from the manufacturer's specifications. *See* CACI 1202. But Miller acknowledges Tank 4 differed from Chart's specification and still thinks it was free of manufacturing defects. (1/29/21 Ringel Decl., Ex. K (Miller Dep.) at 238-39.) Chart responds, "That Dr. Miller's explanations do not word-for-word parrot the jury instructions is not a legitimate reason to bar his testimony." (Opp. at 18.) But the sine qua non of expert testimony is that it be helpful to the jury. And when an expert is using a different definition of legal terms than the jury will be asked to use, that expert's testimony is not helpful—it is confusing and potentially misleading. "The jury may not know whether to believe the judge's instructions concerning the law over [the] 'expert definition,' and it may not know how to reconcile the differences between the two. *Craig v. Xlear, Inc.*, No. 2:16-CV-00392-DB, 2019 WL 1119429, at *5 (D. Utah Mar. 11, 2019).

**B. Miller has not established he is qualified to say how experienced welders think.**

Plaintiffs objected to Miller opining that "any experienced welder will interpret [Chart's design] drawing to require seal welds," as opposed to a full penetration weld. (12/22/20 Zeman Decl., Ex. 7 (Miller Supp. Rep.) at 6-7.) Chart responds by insisting "Miller is qualified to interpret design drawings for Tank 4's welds." (Opp. at 18.) Plaintiffs agree. But the issue is not whether Miller is qualified to interpret a design drawing, but whether he is qualified to say how "any experienced welder" would interpret that design drawing. (Mot. at 18.) Miller himself says, "I'm not a welding expert," and while Chart claims Miller learned welding from a famous MIT professor, what Miller actually testified is that he learned how to design welds from that professor—not that he necessarily learned to weld or has much experience welding. (1/29/21 Ringel Decl., Ex. K (Miller Dep.) at 121, 124.) Miller's opinion about how experienced welders interpret design drawings appears to be based on nothing more than one Chart welder's deposition testimony. (12/22/20 Zeman Decl., Ex. 7 (Miller Supp. Rep.) at 7 n.19.)

**C. Miller has not shown his self-devised test is reliable or reproducible and he did not apply his test to the actual volume of liquid nitrogen that was in Tank 4.**

Miller intends to describe for the jury a test he conducted at Chart's warehouse: he filled a cryogenic tank with 14 inches of liquid nitrogen, pressurized the vacuum space with outside air, and observed what happened to that liquid nitrogen over the next 22 hours. (12/22/20 Zeman Decl., Ex. 7 (Miller Supp. Rep.) at 12-13.) Miller believes that test "disproved" Jean Popwell's testimony that she filled Tank 4 with 14 inches of liquid nitrogen prior to leaving for the day on March 3, 2018. (*Id.* at 8 & 24, ¶ 8.) Plaintiffs object on the basis that Miller's test is unreliable and did not replicate Tank 4's conditions: Miller's tank was empty rather than filled with thousands of pieces of IVF equipment; Miller simulated an exterior crack rather than an interior crack; and Miller did not verify that his results were reproducible (or otherwise attempt to establish a rate of error). (Mot. at 18-21.)

Chart responds that the fact "Miller did not include actual human tissue inside the exemplar tank is immaterial," and that "Plaintiffs' claim that Miller needed to fill the exemplar MVE 808 tank with live embryos and eggs … is too cute by half." (Opp. at 20.) The issue is not whether Miller filled his tank with live tissue, however; it is whether he used the same volume of liquid nitrogen that was in Tank 4 on March 3, 2018. An inch is not a unit of volume, so filling two tanks to the 14-inch mark does not mean the same amount of liquid nitrogen was added to each. As Plaintiffs noted in their moving papers, Tank 4 was filled with 80 plastic boxes, 1280 aluminum cryo-canes, 1280 plastic goblets, and 3000-4000 plastic cryotips or cryolocks. (Mot. at 19.) All that equipment takes up a substantial amount of space, and the resulting volume displacement means that substantially less liquid nitrogen was required to fill Tank 4 to the 14-inch mark than was used in Miller's test. Chart does not address that argument, nor does it address the fact that Tank 4 suffered an interior weld crack but Miller simulated an exterior crack. (*See* Mot. at 20.) With an interior crack, liquid nitrogen can leak out of the inner vessel and into the vacuum space, but in an exterior crack the liquid nitrogen is still fully contained.

Miller's test shows only that a tank filled with more liquid nitrogen than Tank 4 and exposed to a different kind of crack than Tank 4 will not behave the same as Tank 4 behaved. Miller's tank did not implode either, but that does not "disprove" PFC's testimony that Tank 4 imploded. (*See* 12/22/20 Zeman Decl., Ex. 7 (Miller Supp. Rep.) at 22.) Chart claims "this issue goes to weight, not

admissibility," and cites *Higley v. Cessna Aircraft Co.*, No. CV 10-3345 JCG, 2013 WL 12112167, at *3 (C.D. Cal. July 8, 2013). But *Higley* found the expert's "test experiment is sufficiently similar to those conditions experienced during the accident." *Id.* The difference is that here, Miller's tests are not sufficiently similar to the conditions experienced by Tank 4 between March 3 and 4, 2018. Miller's testimony therefore does not meet the "fit" requirement, as it is not sufficiently tied to the facts of the case. *Daubert*, 509 U.S. at 591.

Chart also contends Miller should not have to show his test yields reproducible results with a reasonable rate of error. (*See* Opp. at 20-21.) Miller's test appears to be *sui generis*: Miller cites to no instance where a similar test was subjected to peer review or publication, no known or potential rate of error, and no general acceptance of his test in the scientific community. *See id.* at 593-94. It was therefore crucial that Miller test his test and establish that it yields reliable, reproducible results. Chart disagrees and says that Justice Sotomayor's observation that the results of a scientific test should be repeatable "does not mention *Daubert* or Rule 702," and "is misleading because that quote was merely in reference to a declaration filed by one of the parties." (Opp. at 21.) In fact, that declaration was testimony submitted as part of a court trial and that quote concerned the reliability of a testing methodology—the same issue courts confront at the *Daubert* stage in jury cases. *Avon Prod., Inc. v. S.C. Johnson & Son, Inc.*, 984 F. Supp. 768, 787 (S.D.N.Y. 1997). But even if *Avon* is distinguishable, the other case Plaintiffs cited for the same principle is not. (*See* Mot. at 21.) In *Rovid v. Graco,* Judge Hamilton excluded an expert's proposed tests at the *Daubert* phase because "[w]ithout multiple tests, [the expert] cannot show that his results are reproducible or reliable," and cannot calculate an error rate. *Rovid v. Graco Children's Prod. Inc.*, No. 17-CV-01506-PJH, 2018 WL 5906075, at *5 (N.D. Cal. Nov. 9, 2018). The same result is called for here, where Miller came up with his own test, but neither applied it to the facts of the case nor demonstrated that his test yields reliable, reproducible results.

**D. Miller's second rebuttal report introduced new tests and should be struck.**

Miller submitted a second rebuttal report after the deadline for expert rebuttal reports, which Plaintiffs have requested be excluded or struck. (Mot. at 22.) Chart responds by claiming it had 30 days after Plaintiffs' rebuttal reports were served to offer a "final rebuttal" pursuant to Rule 26(a)(2)(D), and 30 days after Miller's first rebuttal report to supplement that report under Rule 26(a)(2)(E). (Opp. at

21.) Chart misreads both statutory provisions. Rule 26(a)(2)(D) provides for only one rebuttal report not two, and its 30-day schedule applies only "[a]bsent a stipulation or a court order." Here, Chart stipulated to simultaneous service of both initial expert reports and rebuttal reports. (*See* 6/8/20 Joint Stipulation, ECF No. 467.) Chart then also stipulated to a modification of that schedule that provided "The parties are to serve *all* rebuttal expert reports on December 4, 2020." (11/20/20 Order Granting Stipulation, ECF No. 593 (emphasis added).) That schedule and not the one in Rule 26(a)(2)(D) is the schedule that applies. And even though it specifically stated that all rebuttal expert reports were to be served on December 4, 2020, Chart submitted one Miller rebuttal on December 4, 2020, and then a second Miller rebuttal on December 11, 2020.

Rule 26(a)(2)(E) also does not justify Miller's second rebuttal report. It provides, "The parties must supplement [expert] disclosures when required under Rule 26(e)." Nothing in the rule gives Miller 30 days after serving his first rebuttal report to supplement it with a second, as Chart claims. (Opp. at 21.) As the Ninth Circuit put it, "Rule 26(e) creates a 'duty to supplement,' not a right." *Luke v. Family Care & Urgent Med. Clinics*, 323 F. App'x 496, 500 (9th Cir. 2009). Nor, as Plaintiffs emphasized in their moving papers, is the rule intended to be a loophole Miller can use to get the last word. (*See* Mot. at 22.) Chart says a second rebuttal was needed to address Kasbekar's finite element analysis, which Kasbekar had conducted in response to testimony given by another of Chart's experts. (*See* Opp. at 22; 1/29/21 Zeman Decl., Ex. 13 (Kasbekar Rbtl. Rep.) at 7.) But that is only the first section of Miller's second rebuttal report; Miller then proceeded to conduct three new experiments to buttress his original opinions. (12/22/20 Zeman Decl., Ex. 9 (2nd Miller Rbtl. Rep.) at 5-7.) That is exactly the type of material the Ninth Circuit and courts across this Circuit have held should be struck under Rule 37(c). *Luke*, 323 F. App'x at 500; *Rovid,* 2018 WL 5906075 at *11 (collecting cases). There is plenty of material in Chart's rebuttal reports that Plaintiffs' experts would have addressed if second rebuttals were permitted. And there are new tests Plaintiffs' experts could have done to respond to Chart's criticisms and further buttress their opinions. But the parties' stipulated expert discovery schedule provided for only one round of rebuttal reports, which were to be exchanged simultaneously. Plaintiffs' experts played by the rules; Chart's experts should be required to do the same.

**IV. Leaphart has not substantiated two opinions that stray from his field of expertise.**

Plaintiffs asked the Court to exclude two opinions from Eldon Leaphart: (i) his opinion that PFC had an early indication of impending issues with Tank 4, and (ii) his opinion that Tank 4's controller was safe in design and manufacture and did not cause Plaintiffs' loss. (Mot. at 5-8.) Both opinions are unsubstantiated and fall outside the scope of Leaphart's expertise as an electrical engineer.[1]

Chart responds by arguing that Leaphart "is qualified to testify about the controller's alarm system and information conveyed by the alarm system to the user." (Opp. at 4.) Plaintiffs agree and have not sought to preclude Leaphart from describing Tank 4's features or the information its alarm system conveys to users. They object only to Leaphart testifying that the high usage levels he observed from the controller's data "served as an early indication of pending issues with Tank 4." (1/29/21 Zeman Decl., Ex. 2 (Leaphart Rep.) at 36, ¶ 3.) Leaphart has never explained what "pending issues" he is talking about, much less how high usage levels served as an early indication of those issues. And when the reasoning underlying expert testimony is not adequately explained, that testimony is considered unreliable and inadmissible. *See U.S. v. Valencia-Lopez*, 971 F.3d 891, 900 (9th Cir. 2020).

Chart attempts to recast what Leaphart wrote in his report as an "opinion that an increase in LN2 usage levels *could serve* as an indication of a pending issue." (Opp. at 4 (emphasis added).) But Leaphart didn't just opine that high usage levels "could serve" as an indication of a pending issue, he opined that "changes in LN2 usage levels served as an early indication of pending issues with Tank 4." (1/29/21 Zeman Decl., Ex. 2 (Leaphart Rep.) at 36, ¶ 3.) The presence of an early indication and the presence of pending issues with Tank 4 are both presented as facts, not as merely theoretical possibilities. And even if Leaphart had meant to write that changing usage levels might have served as an early indication, that opinion would be speculative and therefore inadmissible as well. Fed. R. Evid. 702, Advisory Committee Notes on 2000 Amendment (an expert opinion must be "properly grounded, well-reasoned, and not speculative before it can be admitted").

With respect to Leaphart's opinion that Tank 4's controller was safe in design and manufacture and did not cause Plaintiffs' loss, Chart responds that Leaphart "did not need to perform a root cause

[1] Plaintiffs' motion inadvertently cited to Rule 704(b) instead of to Rule 702(b) for the proposition that unsubstantiated opinions are inadmissible. (Mot. at 7, line 6.)

analysis to reliably testify that the controller was safe." (Opp. at 6.) Chart's internal documents show that its TEC-3000 electronic controller suffers from a SN=0 defect that causes its settings to "go haywire," and that "customers are not comfortable keeping the controllers installed." (1/29/21 Zeman Decl., Ex. 63.) Leaphart himself acknowledges that at the time of the March 4th incident, Tank 4's controller was displaying SN=0, reporting inaccurate liquid nitrogen levels and temperatures, and constantly sounding false alarms. (1/29/21 Zeman Decl., Ex. 2 (Leaphart Rep.) at 23, 31-32.) When he was then asked how he could nonetheless say that "the TEC 3000 is not defective," and whether he was "saying there's no defect at all," Leaphart clarified, "that's an overstatement. I am opining on the failsafe capacity of the controller." (1/29/21 Ringel Decl., Ex. H (Leaphart Dep.) at 148, 150-51.) Leaphart should be permitted to testify regarding the failsafe capacity of Chart's TEC 3000 controller. But Leaphart has not provided sufficient facts or data to justify admitting his opinion that Tank 4's controller was safe and did not contribute to the March 4th incident. Fed. R. Evid. 702(b); *In re Viagra Prod. Liab. Litig.*, 424 F. Supp. 3d 781, 790 (N.D. Cal. 2020) (both unsound methods and unjustified extrapolations from existing data can require exclusion of an expert's testimony).

**V. Lawson should not be permitted to suggest Plaintiffs may be malingering.**

Plaintiffs requested that the Court preclude Angela Lawson from insinuating that they could be malingering or exaggerating their symptoms. (Mot. at 22-23.) Chart responds that "Plaintiffs' rely on case law that is readily distinguishable," and cites several cases of its own. (Opp. at 23-24.) But both sets of cases reach consistent conclusions: any suggestion of malingering is improper in the absence of some evidentiary foundation, but may be admissible if properly supported. For example, Plaintiffs rely on *Glover*, where the court concluded that "testimony suggesting [the plaintiff] was motivated by secondary gain" should have been excluded because the expert "was not expressing an opinion that Glover was malingering." *Glover v. Main St. Wholesale Furniture, LLC*, 545 S.W.3d 245, 249 (Ark. App. 2018). Conversely, Chart cites *Simonelli v. Univ. of California-Berkeley*, where the court admitted an expert's conclusion that the plaintiff was malingering "[b]ased on an eight-hour examination of [plaintiff,] review of 48 categories of documents," and an analysis under "the DSM-IV's definition of 'malingering.'" No. C 02-1107 JL, 2008 WL 11428249, at *7 (N.D. Cal. Feb. 14, 2008); *see also Marron v. Stromstad*, No. 3AN-00-10929CI, 2002 WL 34189740 (Ala. Super. Aug. 09, 2002)

(excluding testimony "that [plaintiff] is a malingerer" because expert did not reach that conclusion, but permitting testimony that plaintiff "is motivated by secondary gain" because that opinion was offered, based on the expert's evaluation of the plaintiff and review of records).

Chart argues that Plaintiffs' authority is inapposite because Lawson will not "opin[e] on the veracity of the plaintiffs' testimony" or "psychological conditions or credibility." (Opp. at 23-24.) But her proposed opinion, which strongly suggests that the plaintiffs are malingering, would do just that. Lawson opines that the fact that some women do not ultimately use their frozen eggs "highlights the possibility of participation in litigation for financial gain when a plaintiff may not have intended to use their frozen genetic material." (1/29/21 Zeman Decl., Ex. 26 (Lawson Rep.) at 10 n.16.) She testified that "it's possible that the woman . . . maybe heard about the lawsuit . . . and decided, Hey, maybe I want to jump in on this litigation; and even though I really wasn't going to use my eggs, maybe I could get a little money out of participating in the litigation." (12/22/20 Ringel Decl. re Grill, Ex. C (Lawson Dep.) at 164-65.) None of this testimony is grounded in any evidence to suggest that these plaintiffs planned not to use their eggs or exaggerated the impact of their loss to "get a little money." (*Id.*; *see also* Lawson Dep. at 85 ("There is not any evidence present" to suggest any of the plaintiffs are malingering); 69-70 ("Q. [You're n]ot even insinuating that there is a concern about malingering here? A. No. There was not enough data to assess one way or another.").) Just as the expert in *Glover* improperly suggested malingering by testifying "that the most common cause of chronic pain is the eligibility for compensation" without opining that the plaintiff actually was malingering, 545 S.W.3d at 249, Lawson should not be permitted to suggest or insinuate that Plaintiffs are exaggerating their symptoms for money based on nothing but their participation in litigation.

## CONCLUSION

Chart's proposed expert witnesses are well qualified and capable of helping jurors to understand the evidence and determine what caused the March 4th incident. But in several instances, Chart's experts exceed the bounds of permissible expert testimony and attempt to introduce matters that are irrelevant, unsupported, misleading, or unfairly prejudicial. Plaintiffs therefore ask that the Court grant their motion and limit the scope of Chart's intended expert testimony as requested.

Dated: February 12, 2021

Respectfully submitted,

By: *__/s/ Amy M. Zeman__*

Eric H. Gibbs (State Bar No. 178658)
Amy M. Zeman (State Bar No. 273100)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, CA 94612
Tel: (510) 350-9700
Fax: (510) 350-9701
ehg@classlawgroup.com
amz@classlawgroup.com

Dena C. Sharp (State Bar No. 245869)
Adam E. Polk (State Bar No. 273000)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dsharp@girardsharp.com
apolk@girardsharp.com

Adam B. Wolf (State Bar No. 215914)
Tracey B. Cowan (State Bar No. 250053)
**PEIFFER WOLF CARR KANE & CONWAY, APLC**
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Tel: (415) 766-3545
Fax: (415) 402-0058
awolf@peifferwolf.com
tcowan@peifferwolf.com

*Plaintiffs' Counsel*