John J. Duffy (SB No. 6224834)
Kevin M. Ringel (SB No. 6308106)
Margaret C. Redshaw (SB No. 6327480)
**SWANSON, MARTIN & BELL, LLP**
330 N Wabash, Suite 3300
Chicago, Illinois 60611
Tel: (312) 321-9100; Fax: (312) 321-0990
jduffy@smbtrials.com
kringel@smbtrials.com
mredshaw@smbtrials.com

Marc G. Cowden (SB No. 169391)
Adam Stoddard (SB No. 272691)
**SHEUERMAN, MARTINI, TABARI,
ZENERE & GARVIN**
1033 Willow Street
San Jose, California 95125
Tel: (408) 288-9700; Fax: (408) 295-9900
mcowden@smtlaw.com
astoddard@smtlaw.com

*Counsel for Defendant Chart Inc.*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE PACIFIC FERTILITY CENTER LITIGATION | Case No. 3:18-cv-01586-JSC |
| | **DEFENDANT CHART INC.'S MOTION IN LIMINE NO. 1: OTHER OCCURRENCE EVIDENCE** |
| | Pretrial Hearing: April 29, 2021<br>Time: 2:00 p.m.<br>Judge: Hon. Jacqueline Scott Corley<br>Place: Zoom |

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................................1

I.    INTRODUCTION ....................................................................................................................1

II.   STATEMENT OF FACTS ......................................................................................................2

     A.    Procedural History .....................................................................................................2

     B.    Background Facts Regarding Tank 4 ..........................................................................3

     C.    Plaintiffs' Alleged Defects and Causation Theories ...............................................4

          1.   The Chart Model MVE 808-AF-GB .............................................................4

          2.   The TEC 3000 Controller ..............................................................................4

     D.    Background Facts Regarding Purported "Other Occurrences" ...............................5

          1.   Emails Addressing Other Chart Tanks with Vacuum Seal Loss .....................5

          2.   Chart's Recall of Other Aluminum Tanks .......................................................7

          3.   Plaintiffs Declined to Investigate Other Purported Tank Failures ....................8

          4.   Purported "Other Occurrences" Regarding the TEC 3000 Controller..............8

III.   LEGAL STANDARD ...............................................................................................................9

     A.    The Substantial Similarity Requirement .....................................................................9

     B.    Rule 403 Requires Exclusion of Purported Other Occurrence Evidence .............11

     C.    Emails, Statements, or Reports by others of Alleged Other Occurrences are
          Inadmissible Hearsay under Rule 802 ......................................................................12

IV.   ARGUMENT .........................................................................................................................13

     A.    Evidence of Other Purported Vacuum Failures is Irrelevant and Inadmissible.....13

     B.    Plaintiffs Cannot Establish Any Purported Other Vacuum Failures In A Chart
          Dewar Occurred Under Substantially Similar Circumstances As What They Claim
          Occurred To Tank 4 In This Case..........................................................................13

C.      Emails of Customer Complaints Regarding TEC 3000 Controller
        Issues are Inadmissible .........................................................................................16

        1.   Other purported controller malfunctions cannot demonstrate Chart
             had knowledge of a dangerous condition or feature in the TEC 3000.............17

V.      CONCLUSION.........................................................................................................19

1

# TABLE OF AUTHORITIES

2

**CASES**                                                         **Page(s)**

3

*Beaty v. Ford Motor Co.*,
    2020 WL 639408 (W.D. Wash. 2020)........................................................9

4

5

*Cooper v. Firestone Tire and Rubber Company*,
    945 F.2d 1103 (9th Cir. 1991) .........................................................9, 16

6

7

*Daniel v. Coleman Co. Inc.*,
    599 F.3d 1045 (9th Cir. 2010) .........................................................9, 16

8

*Deutsch-Hollandische Tabakgesellschaft MBH & Co., v. Trendsettah USA, Inc.*,
    2018 WL 4849708 (C.D. Cal. 2018)........................................................12

9

10

*Gardner v. Ford Motor Company*,
    166 F. Supp. 3d 1261 (M.D. Fla. 2015) ...............................................10

11

12

*Genrich v. State of California*,
    248 Cal. Rptr. 303 (Ct. App. 1988).........................................................9

13

14

*Gumbs v. International Harvester, Inc.*,
    718 F.2d 88 (3d Cir. 1983) ...................................................................10

15

16

*Houghtailing v. Crown Equip. Corp.*,
    2014 WL 12641993 (N.D. Cal. 2014) ....................................................9

17

18

*Jackson v. Firestone Tire & Rubber Co.*,
    788 F.2d 1070 (5th Cir. 1986) ..............................................................9

19

20

*Johnson v. Ford Motor Corp.*,
    988 F.2d 573 (5th Cir. 1993) ..............................................................12

21

22

*McKinnon v. Skil Corp.*,
    638 F.2d 270 (1st Cir. 1981)................................................................11

23

*Palatka v. Savage Arms, Inc.*,
    535 Fed. Appx. 448 (6th Cir. 2013) .....................................................12

24

25

*Pau v. Yosemite Park & Curry Co.*,
    928 F.2d 880 (9th Cir. 1991) .........................................................10, 17

26

27

*Philadelphia Indem. Ins. Co. v. BMW of N. Am. LLC*,
    2016 WL 5340539 (D. Ariz. 2016)................................................10, 15

28

*Ponder v. Warren Tool Corp.*,
    834 F.2d 1553 (10th Cir. 1987) ...................................................................9

*Ramirez v. ITW Food Equip. Grp. LLC*,
    2018 WL 5816093 (C.D. Cal. 2018)...........................................................10

*Roberts v. Harnischfeger Corp.*,
    901 F.2d 42 (5th Cir. 1989) ................................................................11, 12

*Thomas v. Chrysler Corp.*,
    717 F.2d 1223 (8th Cir. 1983) ...................................................................10

*Uitts v. General Motors*,
    411 F. Supp. 1380 (E.D. Pa. 1974), *aff'd*, 513 F.2d 626 (3d Cir. 1975)...............11

*Wilson v. Bicycle South, Inc.*,
    915 F.2d 1503 (11th Cir. 1990) ..................................................................11

**FEDERAL RULES OF EVIDENCE**

    403.....................................................................................................11, 16

## CHART, INC.'S MOTION IN LIMINE NO. 1: OTHER OCCURRENCES

Defendant Chart Inc., in support of its Motion in Limine to Exclude Reference to Other Occurrences regarding Chart products, states as follows:

### I.      INTRODUCTION

Plaintiffs will attempt to offer evidence at trial of other occurrences involving customer complaints regarding Chart products.  California and the Ninth Circuit follow the "substantial similarity" test for admission of such evidence.  Plaintiffs carry the heavy burden of demonstrating substantial similarity and the admissibility of each alleged "other occurrence."  Through discovery, Chart produced numerous emails, containing internal and external communications related to customer concerns and customer service efforts to troubleshoot the issues in those correspondences.  These emails form the bulk of Plaintiffs' other occurrence evidence.

Any purported "other occurrence," however, cannot be admitted as evidence at trial because: (1) Plaintiffs cannot establish any other occurrence described in the emails involving a Chart product is substantially similar to what they allege occurred in this case concerning a specific Chart product, an MVE 808 cryogenic tank ("Tank 4") equipped with a TEC 3000 electronic controller (the "controller"); (2) the emails are irrelevant to Plaintiffs' claims in this case and admission of them would unnecessarily delay trial and confuse the jury; and (3) the emails of customer issues are inadmissible hearsay.  Plaintiffs have not investigated or identified the circumstances or causes of any purported other occurrences, or otherwise demonstrated any other occurrences are substantially similar to what they claim occurred in this case.

Moreover, any purported other occurrences with respect to a TEC 3000 controller did not result in injury to the contents of the tank, let alone the loss of genetic material as Plaintiffs allege occurred here.  As a result, Plaintiffs cannot meet their burden of establishing any past customer grievance or correspondence regarding Chart's products, or Chart's troubleshooting efforts in response, are relevant or substantially similar to the alleged defect, causation, or negligence theories they assert in this lawsuit.  Therefore, any purported "other occurrence" evidence should be excluded at trial.

## II.   STATEMENT OF FACTS

### A.  Procedural History

On March 4, 2018, Dr. Joseph Conaghan, the lab director at Pacific Fertility Center (PFC), discovered that one of PFC's cryogenic freezers, a Chart, Inc. model MVE 808 used to store cryopreserved eggs and embryos (Tank 4), had insufficient liquid nitrogen (LN2) and elevated temperatures.  Plaintiffs are individuals who had eggs and embryos stored in Tank 4.  They proffer a specific causation theory: the annular weld that attaches the fill port fitting to the inner tank wall was defective and developed a crack before the tank failed, which then caused Tank 4 to, immediately and completely, lose its vacuum seal (full vacuum failure), which caused damage to the eggs and embryos.

Plaintiffs further allege that Tank 4's computer controller, the TEC 3000, which monitored Tank 4's LN2 levels and temperature (among many other things), stopped fully functioning before the incident, and somehow contributed to Tank 4's failure.  They bring three claims:  (1) a strict products liability claim based on an alleged manufacturing defect in the tank; (2) a strict products liability claim alleging a design defect under both the consumer expectations test and the risk-benefit test with respect to the tank; and (3) negligent failure to recall the TEC 3000 controller.

On March 8, 2021, the Court entered its order denying Chart's motion for summary judgment on Plaintiffs' strict liability claims and negligent failure to recall claim.  With respect to Tank 4, the Court denied summary judgement primarily because it found Plaintiffs' engineering expert, Anand Kasbekar, could testify to his causation theory that a crack in the fill tube's weld caused a sudden and complete vacuum seal loss.  The Court then found that Plaintiffs' theory regarding Tank 4's controller was "that if Chart had retrofitted the controller prior to the incident, then it would have alerted PFC staff that the liquid nitrogen level was dropping on March 3/4 and they would have transferred the eggs and embryos to a backup tank thus avoiding the injury." (Order at 5:4-7, Mar. 8, 2021, ECF No. 712).

On March 16, 2021, the Court excluded Chart's expert, Franklin Miller, from testifying about the findings of his cryogenic experiments on an exemplar of Tank 4, which analyzed the boil-off rate of LN2 in a dewar with a full vacuum failure (Plaintiffs' theory of what occurred to

Tank 4), and the visual appearance of the dewar during a full vacuum seal failure.   Dr. Miller is the only witness in this case to have investigated, tested, and analyzed the conditions and outcomes of an occurrence where the subject model dewar experiences a full vacuum failure.

### B.   Background Facts Regarding Tank 4

Tank 4 is a Chart model MVE 808-AF-GB, a cryopreservation freezer in which biological material is immersed in LN2 for extreme cold storage.  (Miller Report at 2, Nov. 20, 2020, ECF 673-14).  Tank 4 is stainless steel and the system carries two primary design features.  First, Tank 4 is a double-walled, vacuum insulated tank (there is a vacuum space between the interior and exterior walls), which is more commonly known as a dewar. Second, Chart incorporated a supplier's computer controller, the TEC 3000, to operate the freezer under the supervision of lab personnel. (*Id*. at 2-3).

LN2 in the tank boils away over time, both from heat slowly leaking into the cold space, and from the occasional removal of the top lid to add or remove patient samples stored in the tank. (*Id*. at 2).  The controller senses the level of LN2 in the dewar.  (*Id*.)  When it drops to a level set by the user, the controller automatically opens a valve allowing LN2 to flow from a supply tank into the dewar through a connected, vacuum-insulated piping system.  (*Id*.; Conaghan Dep. 45:6-46:13, Oct. 9, 2019, ECF No. 671-33).  The controller also monitors temperature levels, calculates the rate of LN2 use by units of inches per day, and alarms if it observes the temperature rising. (Miller Report at 2-3).  And, the controller contains failsafe features such as a Sensaphone device that calls and text messages end users (*e.g.*, lab personnel) to alert them to a rise in temperature, an increase in LN2 usage, or a low LN2 level, thereby allowing the end user to remedy the condition and protect any biological material in the tank.  (Miller Report at 3; Conaghan Dep. at 56:5-57:2).  Tank 4's controller ran on a software firmware version of 2.01 during the relevant time period.  (Leaphart Report at 23, Nov. 6, 2020, ECF No. 673-11).

PFC purchased Tank 4 in 2011 through a third-party distributor.  (Conaghan Dep. at 65:9-22).  On February 15, 2018, the controller on Tank 4 lost its ability to measure the level of LN2 in the tank, causing it to alarm.  (*Id.* at 77:7-23).  It started making a beeping sound and also sent an electronic signal to PFC, alerting it to the alarm.  (*Id.* at 78:9-20).  Dr. Conaghan, PFC's lab director

since 1999, investigated and determined that the tank's nitrogen levels were at an acceptable level. (*Id.* at 67:18-21, 77:17-19, 78:5-8).  He decided to unplug the controller from the wall outlet.  (*Id.* at 79:19-20).  For the next 17 days, Dr. Conaghan instructed lab workers to plug in the controller once a day to top off LN2 in Tank 4 before closing the lab for the day.  (*Id.* at 90:23-91:4, 93:22-25, 148:25-149:2).

On March 4, 2018, Dr. Conaghan noted that the LN2 level in Tank 4 was not as high as the boxes stored inside – the level at which he usually noted it.  (*Id.* at 101:24-102:1, 105:25-3, 107:9-12).  He unsuccessfully attempted to get a dipstick reading of the LN2 level.  (*Id.* at 110:11-12). He did not notice any condensation on the exterior of Tank 4, but he noticed "a little water on the floor" under and around Tank 4.  (*Id.* at 115:20-116:5, 136:13-25).  A short time later, the tissue was removed from Tank 4 and placed in a backup tank.  (*Id.* at 113:12-20, 117:1-4, 119:3-8, 165:20-166:9).  According to Dr. Conaghan, by the following day, the interior of Tank 4 appeared mangled and distorted.  (*Id.* at 117:22-23).

### C.   Plaintiffs' Alleged Defect and Causation Theories

#### 1.   The Chart Model MVE 808-AF-GB (Tank 4)

Plaintiffs presented their causation theory with respect to Tank 4 through their mechanical engineer expert, Anand Kasbekar.  Kasbekar claimed there was a defect in "the annular weld that attaches the LN2 fill port fitting to the inner tank wall."  (Kasbekar Report at 60, Nov. 6, 2020, ECF No. 673-09).   He claimed a crack in that weld caused Tank 4 to fail when the interior wall was breached and LN2 leaked into the vacuum space, causing the space to fully lose vacuum seal. (*Id.*)  The tank eventually deformed.  (*Id.*)  This defect and causation theory is the only such theory advanced by Plaintiffs with respect to the manufacture and construction of Tank 4.

#### 2.   The TEC 3000 Controller

Plaintiffs' negligent failure to recall claim regarding the controller rests on the theory that the TEC 3000 controller somehow contributed to Plaintiffs' injury because Chart did not replace it.  But Chart also had in place a procedure by which PFC could immediately contact Chart if there was a controller issue, and Chart would troubleshoot and service the controller.  (Leaphart Report at 33).

Plaintiffs presented no expert testimony regarding the TEC 3000 controller, its software, or any theory for why the controller allegedly malfunctioned. Eldon Leaphart, Chart's electrical engineer, evaluated the controller, and determined it ran on 2.01 software at the relevant time period. (*Id.* at 23)  He also determined that the subject TEC 3000 controller demonstrated both control and failsafe design prior to February 15, 2018, when Dr. Conaghan unplugged the controller in response to concerns about the accuracy of the temperature and level readings coupled with an alarm. (*Id.* at 35)  When Leaphart examined the subject TEC 3000, he determined it displayed the serial number of 0.  Nonetheless, it maintained the ability to demonstrate failsafe functionality, by responding to abnormal conditions it sensed. (*Id.* at 35-37)  Although Chart engineers considered that electrical interference might accompany an abnormal serial number reading, Leaphart did not find anything abnormal about the TEC 3000's electromagnetic field strength. (*Id.* at 29).

### D.    Background Facts Regarding Purported "Other Occurrences"

#### 1.    Emails Addressing Other Chart Tanks with Vacuum Seal Loss

Plaintiffs have not identified any instance where an MVE 808 tank lost vacuum seal due to a cracked weld, or where a similar tank allegedly experienced an immediate vacuum failure.  In fact, they have not identified any MVE 808 tank that has lost vacuum seal while in service due to any alleged defect.  Nor have they identified any instance where any model of a Chart tank has immediately lost vacuum seal due to a cracked weld at the fill port.  Yet, Plaintiffs have attempted to relate certain other instances of tank failures to the Tank 4 occurrence at issue in this case.

In support of their opposition to Chart's motion for summary judgment, Plaintiffs made the following argument:

> Tank 4 was neither the first nor the last Chart tank to suffer total loss of vacuum
> and an inner vessel implosion. When the same thing has happened to other Chart
> containers, an interior crack or leak on the inside of the tank has been identified as
> the likely culprit. For example, when a cryogenic tank at Rutgers University lost
> vacuum overnight and imploded, damaging the biological samples stored inside,

Chart's authorized distributor wrote that the implosion "is an obvious sign of an internal weld leak."

(Pls. Opp. Def.'s Mot. Summ. J. at 10, ECF 673-04; Trial Ex. 274 at CHART70696). Plaintiffs have listed the exhibit cited in that argument on their trial exhibit list.

Further examination of the March 11, 2020 email referenced in that exhibit reveals the tank, which allegedly failed at Rutgers University, was not an MVE 808, the incident occurred *after* the Tank 4 incident, and the distributor merely "assumed" the implosion was a sign of an internal weld leak. (Trial Ex. 274 at CHART70696). The distributor further wanted to make sure the customer stayed "satisfied" and simply presumed it was an "obvious warranty situation." (*Id.*) He also acknowledge that Chart would want to first inspect the tank to "ensure that it wasn't due to misuse or customer damage." (*Id.*)

Kasbekar's November 6, 2020 report references the same exhibit, detailing the "Rutgers tank" that allegedly failed. He states:

> On October 28, 2020, Chart produced 29 pages of documents revealing its knowledge of other failed and deformed tanks. The two tank models involved are of the same general type as Tank #4, varying primarily in size and sample capacity, and the deformation visible in the documentation is very similar to Tank #4. Due to the late and incomplete production of information about these other deformed tanks, **the cause of their failure is not yet known** [.] (Kasbekar Report at 6).

Kasbekar clarified this statement at his deposition on November 25, 2020. He testified that his defect and causation opinion were partly based upon the emails from Chart about other vacuum seal loses. (Kasbekar Dep. at 28:25-29:12, Nov. 25, 2020, ECF No. 647-10). He then testified that he received the 29 pages regarding the other deformed tanks in October 2020. (*Id.* at 129:1-7). On direct examination by Plaintiff's counsel, Kasbekar testified the March 11, 2020 email regarding the "Rutgers tank" from a distributor, Christopher Smith, to Chart employees indicates "that somebody who works with these tanks…believes that that type of implosion is indicative of an internal weld leak. It's not a photograph of weld damage, but it certainly is yet another piece of evidence from a Chart-related document that suggests that this type of leak could create this type of damage." (*Id.* at 130:4-12).

Kasbekar then testified on cross examination that he does not know any of Smith's qualifications or training, and that no failure analysis was every performed on the "Rutgers tank" referenced in that email. (*Id.* at 130:17-131:10). Kasbekar further acknowledged that Smith stated it was only his "assumption" that an implosion was a sign of an internal weld leak, and Kasbekar agreed the reason to do failure analyses is to "not accept assumptions." (*Id.* at 131:16-132:11). Kasbekar ultimately admitted he did not perform a failure analysis on that other tank, and was not relying on Smith's email in any way. (*Id.* at 132:12-21).

Plaintiffs did not depose Smith and have provided no basis to validate his "assumption" that an internal weld leak could cause a tank implosion, or that the "Rutgers tank" actually had an internal weld leak at the time of implosion. Plaintiffs have identified no other emails discussing implosions of other Chart tanks allegedly related to internal weld leaks. In Kasbekar's December 4, 2020 rebuttal report, however, he again references "Chart documents related to previous tank implosions." (Kasbekar Rebuttal Report at 13, Dec. 4, 2020, ECF No. 647-06) He identified no such documents related to previous tank implosions or any cause of those purported implosions, or how any implosion related to his causation theory. Nor have plaintiffs presented evidence that an MVE 808 imploded prior to the allegation regarding Tank 4.

## 2.    Chart's Recall of Other Aluminum Tanks

Kasbekar's report also references an April 19, 2018 recall by Chart of different models of aluminum tanks due to failure of the tanks' vacuum seal:

> Chart recalled several of its **aluminum** cryopreservation tanks, citing "reports of a vacuum leak or failure that could compromise the product". Although **this notice does not include the MVE808 tank**, the recall notice emphasizes the need to immediately remove units from service due to the potential for a sudden vacuum seal leak or failure. (Kasbekar Report at p. 5-6) (emphasis added).

Kasbekar admits that the recall did not include the stainless steel MVE 808 tank, but models of different *aluminum* tanks. Franklin Miller confirmed the aluminum tank recall is irrelevant to the MVE 808 tank. (Miller Report at 8). Plaintiffs have performed no investigation or analysis into what might have caused a vacuum seal loss on those aluminum tanks, and have not identified how the recall relates in any way to Kasbekar's untested causation theory.

### 3. Plaintiffs Declined to Investigate Other Purported Tank Failures

At hearing on November 19, 2020, the Court granted Plaintiffs the opportunity to conduct discovery on the other Chart tanks that allegedly experienced vacuum failure and imploded. (Hr'g Tr. at 3-4, Nov. 19, 2020, ECF 623)  However, the Court acknowledged that an investigation of those other occurrences would require a modification of the case schedule. (*Id.* at 4)

However, on November 20, 2020, Plaintiffs' counsel emailed the Court and declined the opportunity to conduct discovery with respect to the other tanks and to take depositions of those individuals who examined the other tanks, stating:

> Plaintiffs appreciate Judge Corley's guidance regarding their request to inspect other imploded tanks in Chart's possession and depose the Chart employees who evaluated those tanks.  Plaintiffs do not wish to modify the trial schedule at this time and **will forgo pursuing further discovery on this topic for use in the trial set for May 3**.  Plaintiffs do plan to pursue such discovery for use in subsequent trials, however, and trust that Chart will preserve all evidence related to the other imploded tanks referenced by Mr. Adams and Mr. Eubanks.  (Ringel Decl. Ex. A, Email from Amy Zeman, Nov. 20, 2020).

To date, Plaintiffs performed no further investigation into any purported other occurrence where a Chart tank, specifically an MVE 808 tank, experienced a sudden lost vacuum seal because of a weld crack, which is Plaintiffs' theory in this case.

### 4. Purported "Other Occurrences" Regarding the TEC 3000 Controller

Plaintiffs will attempt to introduce other occurrence evidence through Chart emails regarding general customer concerns about their alleged controller malfunctions.  Plaintiffs, however, have neither investigated the alleged malfunction in the subject controller, nor investigated any circumstances surrounding the alleged issues of other controllers.  They did not elicit testimony about the specifics of the customer complaints, the cause of the issues with the other controllers, the environment of the controllers, the firmware used in the controller at issue, the settings imputed into the controller, or whether a TEC 3000 controller malfunction ever caused or contributed to any injuries or damage to genetic material in a Chart dewar.

Plaintiffs have also elicited testimony from Chart employees regarding other issues with controllers which happened *after* March 4, 2018.  (*See e.g.* Ringel Decl. Ex. B, Gonzalez Dep. at

35-46, Feb. 18, 2020).  Plaintiffs submitted these occurrences on their exhibit list, but have not further investigated these occurrences.  As a result, Plaintiffs have not and cannot establish that any such other occurrence meets the substantial similarity requirement and is otherwise admissible evidence in this case.

## III.  LEGAL STANDARD

### A.  The Substantial Similarity Requirement.

If a "Plaintiff wants to admit any evidence regarding other accidents, he will need to show a 'substantial similarity' between those accidents and the one at trial, as required by *Cooper v. Firestone Tire and Rubber Company*, 945 F.2d 1103, 1105 (9th Cir. 1991)."  *Houghtailing v. Crown Equip. Corp.*, 2014 WL 12641993,*2 (N.D. Cal. 2014); *Genrich v. State of California*, 248 Cal. Rptr. 303, 307 (Ct. App. 1988) ("The evidence must relate to accidents which are *similar* and which occur under *substantially the same* circumstances.").  The substantial similarity rule "rests on the concern that evidence of dissimilar accidents lacks the relevance required for admissibility under Federal Rules of Evidence 401 and 402."  *Cooper v. Firestone Tire & Rubber Co.*, 945 F.2d 1103, 1105 (9th Cir. 1991); *see also Beaty v. Ford Motor Co.*, 2020 WL 639408, *3 (W.D. Wash. 2020) (acknowledging the rule that "in order to introduce evidence of other accidents [even] involving the same product, the plaintiff must first establish substantial similarity between the accidents (not the products).").

In product liability cases, other accidents are substantially similar only if the product at issue, the specific defect alleged, and the factual circumstances, including accident causation, are shown by admissible evidence to be substantially similar to the product, the alleged defect, and the incident at issue.  *Ponder v. Warren Tool Corp.*, 834 F.2d 1553, 1560 (10th Cir. 1987).  Further, an incident must have occurred under substantially similar circumstances, involved substantially similar components, and involved substantially similar defect allegations.  *Jackson v. Firestone Tire & Rubber Co.*, 788 F.2d 1070, 1082 (5th Cir. 1986) (cited with approval by *Cooper v. Firestone Tire & Rubber Co.*, 945 F.2d at 1105); *Daniel v. Coleman Co. Inc.*, 599 F.3d 1045, 1048 (9th Cir. 2010) (district court properly excluded evidence of deaths allegedly caused by other propane heaters where plaintiffs did not present the evidence in admissible form, and the record

demonstrated the propane heaters involved in the other occurrences were not the same model as the heater at issues and plaintiff failed to show how they were substantially similar); *see also Ramirez v. ITW Food Equip. Grp. LLC*, 2018 WL 5816093, *6 (C.D. Cal. 2018) (excluding other incidents that did not involve the same allegedly defective machine as the machine at issue).

District courts should excluded evidence of other occurrences or accidents where the plaintiff has failed to establish a foundation demonstrating the other alleged accidents occurred under similar circumstances. *Pau v. Yosemite Park & Curry Co.*, 928 F.2d 880, 889 (9th Cir. 1991) (finding evidence concerning previous accidents was properly excluded where plaintiffs did not attempt to introduce evidence of another accident in a foundational hearing, but only at trial); *Philadelphia Indem. Ins. Co. v. BMW of N. Am. LLC*, 2016 WL 5340539, *1 (D. Ariz. 2016) (citing *Pau* and excluding plaintiff's liability expert from testifying about the "specifics of those other instances, any defects that may or may not have been present in those vehicles, or that any such defects allowed for chafing of the battery cable and caused a fire" as alleged in the instant case, where plaintiff did not provide "details regarding the vehicles or conditions involved in the other fires to which [the expert] refers in his Report.").

Even where plaintiffs have claimed the same product defect theory, courts have held that the surrounding circumstances of any other incident must be shown by admissible evidence to be substantially similar to the incident in question. *See*, *e.g.*, *Gardner v. Ford Motor Company*, 166 F. Supp. 3d 1261, 1270 (M.D. Fla. 2015) (finding that evidence of other incidents involving cars with "unknown mileages, unknown maintenance records, and unknown owner histories" was not admissible); *Gumbs v. International Harvester, Inc.*, 718 F.2d 88, 98 (3d Cir. 1983) (admission of evidence of other incidents was an abuse of discretion because they stemmed from a U-bolt that snapped rather than a U-bolt that loosened); *Thomas v. Chrysler Corp.*, 717 F.2d 1223, 1225 (8th Cir. 1983) (in case alleging vehicle was defective because the door opened while vehicle was in motion, court affirmed order excluding testimony of two other van owners who would have testified that their van doors opened while the vans were in motion because the evidence "[did] not demonstrate sufficient similarity of the conditions of the vans or the circumstances of the accidents").

### B. Rule 403 Requires Exclusion of Purported Other Occurrence Evidence.

Even if Plaintiffs could establish substantial similarity and common causation (which they cannot because they have not investigated other occurrences), the Court has discretion to exclude other occurrence evidence based on the dangers of unfair prejudice, confusion of the issues and undue expenditure of time in trial of collateral issues. Fed. R. Evid. 403. Plaintiffs' introduction of evidence of other alleged incidents would force Chart to introduce any available rebuttal evidence to show that each such other occurrence was either not substantially similar to the subject incident or was caused, not by a product defect, but by carelessness or misuse of other parties, or other unknown circumstances. In each instance, a mini-trial would be required to determine what did or did not happen with a different dewar or a difference controller, at a different time, under different conditions, when being handled in different facilities. As noted by the Eleventh Circuit:

> The parties in the instant case vigorously dispute the actual cause, demonstrating that even had the trial court reached the issue of whether the two incidents were similar, this issue would have required a trial within a trial.

*Wilson v. Bicycle South, Inc.*, 915 F.2d 1503, 1510, n. 10 (11th Cir. 1990). As a result, evidence of any other alleged incident should be excluded to avoid needless delay and confusing the jury with issues unrelated to the disputed cause of Plaintiffs' injuries in this case. *See Roberts v. Harnischfeger Corp.*, 901 F.2d 42, 45 (5th Cir. 1989) (evidence of other incidents may "inject [] collateral issues," particularly when their probative value is "slight"); *Uitts v. General Motors*, 411 F. Supp. 1380, 1383 (E.D. Pa. 1974), *aff'd*, 513 F.2d 626 (3d Cir. 1975) (excluding other accident evidence and noting if admitted:

> Defendant, in order to minimize the prejudicial effect of [the other accidents], would have to go through each one individually with the jury. The result would have been a mini-trial on each of the [other accidents] offered by plaintiffs. This would lengthen the trial considerably and the minds of the jurors would be diverted from the claim of the plaintiffs to the claims contained in these reports.

*Id.*; *McKinnon v. Skil Corp.*, 638 F.2d 270, 277 n.12 (1st Cir. 1981) (excluding non-similar accidents and noting that if they were admitted, "we are going to be trying a different case."). For these Rule 403 considerations alone, evidence of other incidents should be excluded at trial. *See McKinnon*, 638 F.2d at 277 (court has the power to exclude even similar accidents in consideration

of fairness, confusion of the issues and undue expenditure of time); *Palatka v. Savage Arms, Inc.*, 535 Fed. Appx. 448, 459 (6th Cir. 2013) (upholding exclusion of other occurrences because (1) although the other incidents identified by the plaintiffs involved the same product failures, they could not point to or rule-out any cause of those failures; (2) based on the plaintiffs' inability to describe the factual circumstances surrounding each failure, the other incidents were properly excluded because there was no showing that they were substantially similar to the subject incident; and (3) even if relevant, the other incidents were not admissible because they would confuse the jury, be misleading on the dispositive issues, and cause an undue delay in the trial while the facts of each failure were litigated).

### C.   Emails, Statements, or Reports by others of Alleged Other Occurrences are Inadmissible Hearsay under Rule 802

The mere fact that emails, statements or reporting of alleged incident by others are received and discussed by a manufacturer does not create an exception to the hearsay rule.  *See Roberts v. Harnnishcfeger Corp.*, 901 F.2d 42, 45 (5th Cir. 1989) (report inadmissible because defendant "did not prepare the notices and reports, and the allegations made were hearsay"); *Johnson v. Ford Motor Corp.*, 988 F.2d 573, 579 (5th Cir. 1993) (even though offered to show notice, the court upheld the trial court's exclusion of the summary of claims, lawsuits and complaints because it amounted to "nothing more than a summary of allegations by others which constitute hearsay").

Simply receiving and *maintaining* in its files a communication from another person does not transform the communication into a business record.  Even if a compilation of complaints might itself qualify as a business record, the complaints themselves were not prepared by the business and accordingly do not qualify for the business records exception. *See Deutsch-Hollandische Tabakgesellschaft MBH & Co., v. Trendsettah USA, Inc.*, 2018 WL 4849708, *2 (C.D. Cal. 2018) (finding customer complaints are double hearsay and do not qualify as business records).  Any email from customers regarding Chart products are clear hearsay, without exception.

IV.    **ARGUMENT**

    **A.**    **Evidence of Other Purported Vacuum Failures is Irrelevant and Inadmissible.**

Plaintiffs have proffered their specific causation theory with respect to Tank 4 through their expert.  They claim that Tank 4 had a crack in the annular weld, which caused Tank 4 to immediately and completely lose vacuum seal, *i.e.*, a full vacuum failure.  They claim this occurrence caused damage to eggs and embryos.  Substantial similarity of any purported other occurrence is defined by that theory, involving that product under those circumstances.  Plaintiffs have failed to identify a single other instance where a Chart MVE 808 tank has ever immediately lost vacuum seal because of a weld defect in the tank.  Nor have Plaintiffs or their expert attempted to create such an occurrence with an exemplar MVE 808 tank or otherwise, to see if this theory can cause the tank to lose significant quantities of LN2 in less than 24 hours.

On the other hand, Chart's expert, Franklin Miller, demonstrated what would happen when an MVE 808 tank experienced a full vacuum failure.  The Court determined Miller's testing of Plaintiff's causation theory on the same model MVE 808 tank, and the results of that occurrence, were inadmissible because those tests and results were not similar enough to the subject incident and thus irrelevant.  (Order at 13-14, Mar. 19, 2021, ECF No. 724).  While Chart moved for clarification and reconsideration of the Court's ruling, the framework of the analysis employed by the Court is pertinent to determining the admissibility of Plaintiffs' purported other occurrence evidence.  None of Plaintiffs' other occurrence evidence consisting of untested, uninvestigated, and otherwise unknown circumstances regarding alleged occurrences involving other Chart products is admissible.

    **B.**    **Plaintiffs Cannot Establish Any Purported Other Vacuum Failures In A Chart Dewar Occurred Under Substantially Similar Circumstances As What They Claim Occurred To Tank 4 In This Case.**

The "Rutgers tank" occurrence is an archetype of what Plaintiffs will attempt to submit to a jury with respect to other alleged Chart tank failures.  Plaintiffs did not investigate that occurrence.  They deposed certain Chart employees who knew little to nothing about the

circumstances of that occurrence.   Plaintiffs' expert, Kasbekar, admitted he did not know of any

failure analysis performed on the "Rutgers tank," and there was no evidence of a weld crack:

> Q.      You were provided 29 pages of documents; is that right?
> A.      Correct.
> Q.      You reviewed those documents; is that right?
> A.      I did.
> Q.      And you came to the conclusion that it revealed knowledge of other failed
>         and deformed tanks by Chart; is that right?
> A.      Correct.
> Q.      There were only two tanks involved in those 29 pages; is that correct?
> A.      That's correct.
> Q.      And there was no failure analysis performed on either one, correct?
> A.      Not to my knowledge based upon what I reviewed.  I don't know whether
>         Chart has done something beyond that.
> Q.      And one of the specialties that you hold is failure analysis, correct?
> A.      That's correct.
> **Q.      And in the 29 pages of documents there was no evidence that weld**
>         **cracks were reported; isn't that right?**
> **A.      Not that I could determine from those documents either way.**

(Kasbekar Dep. at 88:20-89:19)(emphasis added).

Even though Kasbekar claimed in his report the email discussing the Rutgers occurrence

was a basis for his opinion (Kasbekar Report at 5-6), he retracted that assertion on cross-

examination at his deposition:

> Q.      Well, [the distributer in the email] uses an important word I think in his
>         email that I'd like to draw your attention to.  At the end of the first paragraph,
>         in the last line of the first paragraph, Mr. Smith says, quote, "However, my
>         assumption is that an  implosion such as this is an obvious sign of an
>         internal weld leak, not damage from the outside of the tank," close  quote.
>         Do you see that?
> A.      I do see that.
> Q.      So he's telling you he's assuming that that is what happened, correct?
> A.      That's what his words are, and I am assuming that his logic is that an internal
>         leak is going   -- you have a basis for pressurization and implosion.  An
>         external leak, in my opinion, is a much less likely source for that to happen.
> Q.      And that's one of the reasons why we do failure analysis, right, is to not
>         accept assumptions  but  actually  apply  engineering  principles  to
>         determine the actual failure and its cause, correct?
> A.      I absolutely agree.  I believe that that's what I have done.
> Q.      But you haven't done it on this freezer [the distributer] is talking about,
>         correct?

A.      I have not.  I mean, this email is what it is.  It references a weld crack.  It a makes me think, **and I'm not relying upon this in any way**, which is why I answered your earlier question the way I did in the deposition.  It makes me think that this individual may have had experience where weld cracks have led to an implosion.  But that's an assumption on my part.

(Kasbekar Dep. at 131:16-132:21)(emphasis added).

Kasbekar's deposition testimony confirms Plaintiffs have neither performed analysis or testing of the "Rutgers tank," or any other occurrence, nor can they rely on it to support their claims.   Yet, they intend to offer evidence of this occurrence at trial, through email communications, under the false guise that the event was similar.  They intend to offer this evidence despite requesting the opportunity to conduct discovery on it, then declining that opportunity when the Court permitted it.  (Hr'g Tr., *supra*, at 8:8-19).

Plaintiffs have not performed any analysis, on any other purported vacuum failure of a Chart tank that failed in the field.  Without an inspection of the other purported tank failures, including a root cause analysis of a vacuum seal loss, we cannot know how probative any of the circumstances surrounding those tanks are with respect to the circumstances and theories at issue in this case.  As a result, of Plaintiffs cannot establish substantial similarity between those purported other occurrences and what they claim occurred to Tank 4 in this case.  Thus, evidence pertaining to those occurrences is inadmissible.  *See Philadelphia Indem. Ins. Co. v. BMW of N. Am. LLC*, 2016 WL 5340539, *1 (D. Ariz. 2016) (expert cannot testify about the specifics of other occurrences, any defects that may or may not have been present in those other products, or that any such defects existed and cause those other occurrences as alleged in the instant case, where plaintiff did not provide details regarding the other products or conditions involved in occurrences).

Likewise, Plaintiffs did not perform any failure analysis on certain aluminum tank models Chart recalled for vacuum failure issues.  Further, those models are not manufactured from the same material as the stainless steel MVE 808 model at issue, nor is the recall issue with those tanks similar to what Plaintiffs claim occurred to Tank 4 this case.  (Miller Report at 8).  Thus, evidence related to the recall is irrelevant and Plaintiffs cannot show substantial similarity between any vacuum failure related to those tanks involved in the recall and what they allege occurred in this

case.  *See Daniel v. Coleman Co. Inc.*, 599 F.3d 1045, 1048 (9th Cir. 2010) (affirming exclusion of other occurrences where propane heater models were not the same as the one at issue).  As such, evidence pertaining to the recall is inadmissible.

### C.  Emails of Customer Complaints Regarding TEC 3000 Controller Issues are Inadmissible.

In addition to the hearsay and Rule 403 grounds noted above, customer emails are inadmissible on several other grounds.  First, evidence of other model controllers on other model tanks functioning under different conditions and settings is irrelevant to Plaintiffs' lawsuit involving a model MVE 808 tank with a TEC 3000 controller running firmware version 2.01 software—Tank 4. (Leaphart Report at 9, 23, 35-37). Further, other purported occurrences involving a tank system and/or controller that are different than the tank system and/or controller in this case are not substantially similar to the subject occurrence.  *See Daniel v. Coleman Co. Inc.*, 599 F.3d 1045, 1048 (9th Cir. 2010) (affirming exclusion of other occurrences where propane heater models were not the same as the one at issue).  Importantly, Plaintiffs have not distinguished which email complaints discuss similar MVE 808 tank systems with TEC3000 controllers, from those that discuss different tank systems, with different controllers, using different software.  They intend to introduce this evidence whole hog because they have not performed the work to determine which emails depict occurrences that may be similar.  It is not Chart's burden, however, to uncover all the circumstances of those emails to prove dissimilarity.

Finally, "a showing of substantial similarity is required when a plaintiff attempts to introduce evidence of other accidents as direct proof of negligence, a design defect, or notice of the defect."  *Cooper*, 945 F.2d at 1105.  Here, Plaintiffs will likely attempt to introduce emails regarding customer claims that their tank controller had malfunctioned as direct proof of negligence against Chart.  However, Plaintiffs performed no investigation or analysis into the circumstances of those other purported malfunctions, as is required to show substantial similarity. Furthermore, none of those occurrences are substantially similar to what occurred in this case, *i.e.*, a Chart customer unplugged a malfunctioning controller from a tank and failed to notify Chart of

the malfunction to get the controller fixed.  Also, Plaintiffs have not presented any evidence of customer complaints regarding the TEC 3000 actually resulted in tissue loss, as alleged here.

### 1.   Other purported controller malfunctions cannot demonstrate Chart had knowledge of a dangerous condition or feature in the TEC 3000.

As discussed, Plaintiffs failed to present expert testimony regarding Tank 4's TEC 3000 controller, or any defect or causation theory for why the controller allegedly malfunctioned. Further, they also failed to investigate the circumstances of any customer complaint to determine under what conditions those purported malfunctions occurred, including the settings of the controller and the environment in which it functioned, the outcomes of those purported malfunctions.  For those reasons alone, the Court should exclude emails discussing those purported other occurrences.  *See Pau*, 928 F.2d at 889.  Further, they have to identify a single other occurrence where an alleged malfunctioning controller was dangerous such that it caused or contributed to any injury.

Plaintiffs likewise present no evidence to explain how the subject controller ever failed to maintain sufficient levels of LN2 in Tank 4 to protect their eggs and embryos—even if the LN2 level reading was incorrect. This is because, as Chart's expert Eldon Leaphart explained, the subject TEC 3000 demonstrated both control and failsafe design prior to February 15, 2018, when PFC unplugged the controller.  Indeed, the controller maintained the ability to demonstrate failsafe functionality, by responding to abnormal conditions it sensed.  (Leaphart Report at 9, 23, 35-37).

Leaphart's finding of failsafe functionality is undisputed.  Leaphart explained the premise of failsafe is "that when the failure occurs, it doesn't go undetected.  There is some method to acknowledge that there is an abnormal condition and then takes certain corrective measures to mitigate whatever harm there would be resulting from it."  (Leaphart Dep. at 88:3-88:7, Nov. 18, 2020, ECF No. 669-16).  This is important with respect to analyzing a TEC 3000 controller, or any controller with a similar failsafe design, because "a failsafe design that has been shown to function, that makes it not dangerous."  (*Id*. at 87:9-87:14).  In other words, as long as the failsafe design was functioning, the controller could not be dangerous because it would alert the user of

abnormalities with the tank.  Plaintiffs cannot show the failsafe design of the subject controller was malfunctioning.  Thus, they cannot show the controller itself was dangerous.

It is further undisputed that if PFC had notified Chart promptly of the controller malfunction issue on February 15, 2018, then Chart would have proceeded with troubleshooting recommendations, and service or return procedures.  (Leaphart Report at 1, 33).  Multiple Chart employees testified to those procedures demonstrating that "[w]hen notified of field issues such as Serial Number equal to 0, LN2 level equal to 0, or tanks not filling, customers were notified and instructed with guidelines to troubleshoot."  (*Id.* at 33).   Thus, beyond the failsafe function, there were additional safety procedures in place where PFC could have immediately contacted Chart to get a fix for the controller.

Accepting these undisputed facts as true, the only dangerous condition identified by Plaintiffs is PFC's decision to unplug the controller and failure to notify Chart of the malfunction so Chart could perform the fix.  The question, then, with respect to the validity of Plaintiffs' negligent failure to recall theory is whether Chart knew or reasonably should have known that a customer would unplug the TEC 3000 controller because of the malfunction, and then fail to notify Chart of the malfunction such that Chart could not troubleshoot and repair the controller.  *See* California Jury Instruction, CACI 1223.  The answer to that question is no.

While there is no dispute Chart is aware of emails describing customer issues with certain controllers (even the so-called "SN=0"), in all of those other cases, the customer contacted Chart to get the controller fixed, according to procedure.   Such dissimilar circumstances vitiate any contention that these other instances are substantially similar to the present case.  Indeed, Plaintiffs failed to identify a single other occurrence discussed in those emails where a customer unplugged the controller and then failed to contact Chart for a fix, and did so only after some injury occurred—which is what allegedly occurred in this case.  As a result, those other occurrences cannot be offered to show Chart had knowledge, or reasonably should have known of a dangerous condition with respect to the TEC 3000 controllers required to support Plaintiffs negligent failure to recall theory.

1

**V.** **CONCLUSION**

For the forgoing reasons, Defendants request this Court to enter and order *in limine* excluding evidence of other occurrences involving other Chart tank systems.

Dated: April 2, 2021

Respectfully submitted,

By: /s/ Kevin M. Ringel

John J. Duffy (SB No. 6224834)
Kevin M. Ringel (SB No. 6308106)
Margaret C. Redshaw (SB No. 6327480)
**SWANSON, MARTIN & BELL, LLP**
330 N Wabash, Suite 3300
Chicago, Illinois 60611
Tel: (312) 321-9100; Fax: (312) 321-0990
jduffy@smbtrials.com
kringel@smbtrials.com
mredshaw@smbtrials.com

Marc G. Cowden (SB No. 169391)
Adam Stoddard (SB No. 272691)
**SHEUERMAN, MARTINI, TABARI, ZENERE & GARVIN**
1033 Willow Street
San Jose, California 95125
Tel: (408) 288-9700; Fax: (408) 295-9900
mcowden@smtlaw.com
astoddard@smtlaw.com

*Counsel for Defendant Chart, Inc.*

CHART INC.'S MOTION IN LIMINE NO. 1: OTHER OCCURRENCE EVIDENCE
CASE NO. 3:18-CV-01586-JSC

John J. Duffy (SB No. 6224834)
Kevin M. Ringel (SB No. 6308106)
Margaret C. Redshaw (SB No. 6327480)
**SWANSON, MARTIN & BELL, LLP**
330 N Wabash, Suite 3300
Chicago, Illinois 60611
Tel: (312) 321-9100; Fax: (312) 321-0990
jduffy@smbtrials.com
kringel@smbtrials.com
mredshaw@smbtrials.com

Marc G. Cowden (SB No. 169391)
Adam Stoddard (SB No. 272691)
**SHEUERMAN, MARTINI, TABARI,
ZENERE & GARVIN**
1033 Willow Street
San Jose, California 95125
Tel: (408) 288-9700; Fax: (408) 295-9900
mcowden@smtlaw.com
astoddard@smtlaw.com

*Counsel for Defendant Chart Inc.*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE PACIFIC FERTILITY CENTER LITIGATION | Case No. 3:18-cv-01586-JSC |
| | **DECLARATION OF KEVIN RINGEL IN SUPPORT OF DEFENDANT CHART INC.'S MOTION *IN LIMINE* NO: 1: OTHER OCCURRENCE EVIDENCE** |

I, Kevin M. Ringel, declare as follows:

1.  I am a partner at the law firm of Swanson, Martin & Bell, LLP, which is counsel of record for Defendant Chart Inc. I am an attorney admitted to practice in the State of Illinois and am admitted pro hac vice before this Court. I submit this declaration in support of Chart Inc.'s Motion *in Limine* No: 1: Other Occurrence Evidence. I have personal knowledge of the matters stated herein.

2.  The following exhibits, attached hereto, are submitted in support of Chart's Motion *in Limine* No. 1 - Other Occurrence Evidence:

      a.  **Exhibit A is** a true and correct copy of a November 20, 2020 email from Ms. Zeman to the Court; and

      b.  **Exhibit B** is a true and correct copy of the transcript from the February 18, 2020 deposition of Ramon Gonzalez.

I declare under penalty of perjury under the laws of the United States that the foregoing in true and correct, and that this declaration was executed this 2nd day of April, 2021, in Chicago, Illinois.

              /s/   *Kevin M. Ringel*
              KEVIN M. RINGEL

# EXHIBIT A

**From:** Amy Zeman <amz@classlawgroup.com>
**Sent:** Friday, November 20, 2020 12:19 PM
**To:** Ada Means
**Cc:** Geoffrey Munroe; John Bicknell; Adam Polk; Dena C. Sharp; 'Adam Wolf'; John J. Duffy; Kevin Ringel; Margaret C. Redshaw; Andrew Lothson
**Subject:** In re Pacific Fertility Center Litig., Case No. 3:18-cv-01586

Ms. Means,

Plaintiffs appreciate Judge Corley's guidance regarding their request to inspect other imploded tanks in Chart's possession and depose the Chart employees who evaluated those tanks. Plaintiffs do not wish to modify the trial schedule at this time and will forgo pursuing further discovery on this topic for use in the trial set for May 3. Plaintiffs do plan to pursue such discovery for use in subsequent trials, however, and trust that Chart will preserve all evidence related to the other imploded tanks referenced by Mr. Adams and Mr. Eubanks.

Regards,

Amy M. Zeman | Attorney
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, CA 94612
Phone: (510) 350-9721 Direct
Fax: (510) 350-9701 Fax
amz@classlawgroup.com
www.classlawgroup.com

This message is intended only for the addressee, and may contain information that is privileged or confidential, and exempt from disclosure under applicable law. If you are not the intended recipient or agent of the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited; and you are asked to notify us immediately by return email, or by telephone at (510) 350-9700. Thank you.

# EXHIBIT B

Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE PACIFIC FERTILITY           Case Number:
CENTER LITIGATION                 3:18-cv-01586-JSC

CONFIDENTIAL
VIDEO DEPOSITION OF
RAMON GONZALEZ
February 18, 2020
9:33 a.m.
Hyatt Regency Suites Atlanta Northwest
2999 Windy Hill Road
Marietta, Georgia
Robyn Bosworth, RPR, CRR, CRC, CCR-B-2138

---

Page 2

1           INDEX TO EXHIBITS
2   EXHIBIT   DESCRIPTION                    PAGE
3   Exhibit 243 String of e-mails (CHART001747-55)   21
4   Exhibit 244 String of e-mails (CHART00664-65)    24
5   Exhibit 245 String of e-mails (CHART002854-55)   27
6   Exhibit 246 String of e-mails (CHART002210-19)   35
7   Exhibit 247 Meeting Minutes 4/18/18
8         (CHART002179)                      46
9   Exhibit 248 String of e-mails (CHART017944-47)   52
10  Exhibit 249 String of e-mails (CHART008143-50)   65
11  Exhibit 250 E-mail from Mr. Gonzalez to Mr.
12        Gonzalez (CHART002486)             68
13  Exhibit 251 String of e-mails (CHART001896-98)   76
14  Exhibit 252 String of e-mails (CHART007643-45)   84
15  Exhibit 253 String of e-mails (CHART007923-25)   87
16  Exhibit 254 String of e-mails (CHART008786-90)   91
17  Exhibit 255 String of e-mails (CHART008310-20)   93
18
19          INDEX TO EXAMINATION          PAGE
20  By Ms. Zeman                   5, 106
21  By Mr. Smith                   104,105
22
23
24
25

---

Page 3

1   APPEARANCES OF COUNSEL:
2   On behalf of the Plaintiffs:
3         AMY M. ZEMAN, ESQ.
4         Gibbs Law Group LLP
5         505 14th Street
6         Suite 1110
7         Oakland, California 94162
8         (510) 350-9700
9         amz@classlawgroup.com
10  On behalf of the Defendant Chart Industries, Inc.:
11        BENJAMIN P. SMITH, ESQ.
12        Morgan, Lewis & Bockius LLP
13        One Market Street
14        Spear Street Tower
15        San Francisco, California 94105
16        (415) 442-1000
17        benjamin.smith@morganlewis.com
18  On behalf of the Defendant Defendants Prelude
19  Fertility, Inc. and Pacific MSO, LLC:
20        WILLIAM F. TARANTINO, ESQ.
21        Morrison & Foerster LLP
22        425 Market Street
23        San Francisco, California 94105
24        (415) 268-7000
25        wtarantion@mofo.com

---

Page 4

1   APPEARANCES (Continued):
2   On behalf of the Defendant Pacific Fertility Center:
3         CHRISTOPHER TANIMASA, ESQ.
4         Galloway, Lucchese, Everson & Picchi
5         2300 Contra Costa Boulevard
6         Suite 350
7         Pleasant Hill, California 94523
8         (925) 930-9090
9         ctanimasa@glattorneys.com
10
11  Also Present:  Jonathan Miller, videographer
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1    THE VIDEOGRAPHER:  We are on the record
2  February 18th, 2020, at approximately 9:33 a.m.
3  This will be the videotaped deposition of Ramon
4  Gonzalez.
5    Would counsel please identify themselves
6  and who they represent for the record.
7    MS. ZEMAN:  Amy Zeman with Gibbs Law Group
8  for the plaintiffs.
9    MR. TARANTINO:  William Tarantino for
10  Prelude Fertility, Inc., and Pacific MSO, LLC.
11    MR. TANIMASA:  Christopher Tanimasa of
12  Galloway Lucchese Everson & Picchi on behalf of San
13  Francisco Fertility Centers d/b/a Pacific Fertility
14  Center, Eldon Schriock, M.D.; Carolyn Givens, M.D.;
15  Philip Chenette, M.D.; Carl M. Herbert, M.D.; Liyun
16  Li, M.D.; and Isabelle Ryan, M.D.
17    MR. SMITH:  Ben Smith on behalf of Chart,
18  Inc., and the witness.
19    THE VIDEOGRAPHER:  Would the court
20  reporter please swear in the witness.
21    RAMON GONZALEZ,
22  having been first duly sworn, was examined and
23  testified as follows:
24    EXAMINATION
25  BY MS. ZEMAN:

Page 6

1    Q    Good morning, Mr. Gonzalez.  Thank you for
2  joining us.  As I just said a moment ago, my name is
3  Amy Zeman, and I'll be asking you some questions
4  today.
5    First of all, could you state your full
6  name for the record?
7    A    Ramon Gonzalez.
8    Q    Thank you.
9    And, Mr. Gonzalez, have you ever sat for a
10  deposition before?
11    A    Yes.
12    Q    Okay.  How many times have you done that?
13    A    Once before.
14    Q    Okay.  When was that?
15    A    2018.
16    Q    Okay.  And what matter was that in?
17    A    It was for Xytex.
18    Q    What's -- was that for a lawsuit?
19    A    I am not entirely sure.  All I know is
20  that the facility had liquid nitrogen on the floor.
21    Q    And was that litigation against Chart?
22    A    I don't believe it was, no.
23    Q    Okay.  Do you know what capacity you were
24  deposed in?
25    A    I'm sorry, I don't understand.

Page 7

1    Q    Were you deposed as a representative of
2  Chart?
3    A    Yes.
4    Q    And were you deposed just to provide your
5  information about facts?
6    A    Correct.
7    Q    You weren't deposed as an expert witness,
8  by chance?
9    A    No.
10    Q    And where were you deposed?
11    A    Where?
12    Q    Uh-huh.
13    A    Buckhead maybe.  I'm not entirely sure.
14    Q    Was it here in Georgia?
15    A    Yes.
16    Q    And do you know where the litigation was
17  pending?
18    MR. SMITH:  Assumes facts.
19    A    I do not know.
20  BY MS. ZEMAN:
21    Q    Backing up a little bit.  So if you --
22  sounds like you were just deposed within the last
23  few years and may be familiar with some of the
24  process, but I'll go over a little bit of that.
25    I will be asking you questions today.

Page 8

1  You'll be providing answers.  If you need
2  clarification on any of my questions, just let me
3  know.  If you don't understand what I'm asking or
4  any definitions, just tell me that, and I'll be
5  happy to provide clarification.
6    A    Yes.
7    Q    Please make sure that your responses are
8  verbal and clear for the sake of the court reporter
9  as opposed to nodding a head or uh-huh.  Anything
10  like that, we want to try to avoid.
11    And you and I should try to avoid talking
12  over each other.  So I'll try to finish my questions
13  and let you finish your answers before I jump in to
14  my next one.
15    A    Yes.
16    Q    Thank you.
17    Last of all, let me know if you need a
18  break at any point, and I will do my best to
19  accommodate that.
20    A    Yes.  Thank you.
21    Q    Mr. Gonzalez, what did you do to prepare
22  for your deposition?
23    A    I met with my attorney yesterday a few
24  hours.
25    Q    Okay.  Was that meeting the only meeting

Page 9

```
 1    with counsel to prepare for this deposition?
 2        A   Yes.
 3        Q   Did you have any phone calls?
 4        A   No.
 5        Q   And who did you meet with?
 6        A   Benjamin.
 7        Q   No one else?
 8        A   No.
 9        Q   And did you talk to anyone else to prepare
10    for this deposition?
11        A   No.
12        Q   You didn't speak with any other Chart
13    representatives or employees?
14        A   No.
15        Q   Did you review any documents to prepare?
16        A   Only what was provided to me yesterday by
17    Ben.
18        Q   Did you request any documents in
19    preparation for the deposition?
20        A   No.
21        Q   Mr. Gonzalez, who is your employer?
22        A   Chart Industries.
23        Q   And how long have you been employed by
24    Chart Industries?
25        A   Since 2008 of February.  Wow.
```

Page 10

```
 1        Q   And what is your current position?
 2        A   Product specialist.
 3        Q   How long have you been a product
 4    specialist?
 5        A   Since 2014.
 6        Q   What were you before you were a product
 7    specialist?
 8        A   Technician.
 9        Q   And how long were you a technician?
10        A   Since 2008 to 2014.
11        Q   So when you joined Chart, you were a
12    technician?
13        A   Yes.
14        Q   Do you remember when in 2014 you switched
15    from being a technician to a product specialist?
16        A   March or April.
17        Q   And what does it mean to be a technician
18    at Chart?
19        A   Basically provide part numbers for lids,
20    for our products.
21        Q   Is there anything else you did as a
22    technician?
23        A   Aside from that, part number issuing,
24    maybe a little troubleshooting.
25        Q   What sort of troubleshooting?
```

Page 11

```
 1        A   Well, if the nitrogen in the freezer
 2    didn't match what's on the controller, we will guide
 3    the distributor to do a level calibration.
 4        Q   Was it common for the level on a
 5    controller to not match the actual level of liquid
 6    nitrogen in the tank?
 7        MR. SMITH:  Vague.
 8        A   No, that was just an example.
 9    BY MS. ZEMAN:
10        Q   Is that an example of something that would
11    sometimes actually happen with Chart tanks, though?
12        A   That would happen with the end user not
13    properly working the controller.
14        Q   Okay.  So in your experience, it's
15    possible for the controller on a tank to show an
16    inaccurate liquid nitrogen level?
17        MR. SMITH:  Incomplete hypothetical.
18        A   Depends on source supply, pressure.  I'm
19    not an engineer, so there are variables that can
20    happen that can cause a controller to read
21    incorrectly, such as simply disconnecting the clear
22    vinyl tubing.
23        THE REPORTER:  Such as disconnecting?
24        THE WITNESS:  The clear vinyl tubing.
25    BY MS. ZEMAN:
```

Page 12

```
 1        Q   But in your experience doing
 2    troubleshooting for Chart, you have seen instances
 3    where the liquid nitrogen level reported by the
 4    controller did not match the actual liquid nitrogen
 5    level in the tank?
 6        A   Very rarely.
 7        Q   But by "very rarely," that's a "yes,"
 8    correct?
 9        A   Yes.
10        Q   So as a technician, you would issue part
11    numbers and you would do some troubleshooting.
12            Is there anything else you did as a
13    technician?
14        A   Provided trainings.
15        Q   To who?
16        A   To technicians.
17        Q   To other Chart technicians?
18        A   To other Chart technicians, yes.
19        Q   Okay.  Anyone else?
20        A   And to distributor technicians.
21        Q   Anyone else?
22        A   No.
23        Q   What would you train other Chart techs on?
24        A   On the product.
25        Q   Anything more specific?
```

Page 13

1    A   Just basically the product.
2    Q   Which product?
3    A   The freezers and aluminum tanks.
4    Q   What do you mean by "freezers"?
5    A   The stainless steel freezers.
6    Q   Is that stainless steel cryogenic tanks?
7    A   Yes.
8    Q   So you would do trainings on stainless
9    steel freezers and aluminum tanks?
10   A   Yes.
11   Q   And what sort of trainings would you do
12   for the distributor technicians?
13   A   The same.
14   Q   What about the stainless steel freezers
15   would you provide training on?
16   A   I'm sorry, could you repeat the question?
17   Q   So when you would do a training on a
18   stainless steel freezer, what sort of topics would
19   you cover?
20   A   The controller and the freezer itself.
21   Q   Would you train people on how to load a
22   tank?
23   A   No.
24   Q   Would you train them on how to fill a
25   tank?

Page 14

1    A   Yes.
2    Q   What other things would you train them on
3    regarding a tank?
4    A   Learning how to navigate the controller.
5    Q   When you would train other technicians on
6    how to fill a tank, what would you teach them?
7    A   How to connect the transfer hose to the
8    freezer.
9    Q   Anything else?
10   A   No.
11   Q   Did you provide instruction on how to go
12   about adding liquid nitrogen to a tank?
13       MR. SMITH:  Vague.
14   A   Yeah, I'm not sure I understand that
15   question.
16   BY MS. ZEMAN:
17   Q   Did you provide instruction on how to
18   actually go about adding liquid nitrogen into a
19   tank?
20   A   Aside from connecting the transfer hose
21   and pressing start fill on the controller, that's
22   it.
23   Q   And so as a technician, you would issue
24   part numbers, do troubleshooting, do some trainings.
25       Anything else?

Page 15

1    A   That's it.
2    Q   And going back to the troubleshooting, you
3    gave one example regarding the liquid nitrogen level
4    on the controller not matching the level in the
5    tank.
6        Were there any other types of
7    troubleshooting you did?
8    A   No.
9    Q   You don't have any other examples of
10   issues that you would do troubleshooting for?
11   A   Well, aside from temperature calibration.
12   Q   So temperature calibration, liquid
13   nitrogen levels not matching or calibration.
14       Anything else?
15   A   No.
16   Q   And how would you go about doing that
17   troubleshooting?
18   A   Following the technical manual, the steps
19   in the technical manual.
20   Q   Would you go on site to where a tank was
21   experiencing problems to do troubleshooting?
22   A   No.
23   Q   You would do your troubleshooting at
24   Chart?
25   A   On the phone, yes.

Page 16

1    Q   On the phone.
2        And was that with end users or with
3    distributors?
4    A   Distributors.
5    Q   Did you ever do troubleshooting for end
6    users?
7        MR. SMITH:  Vague.
8    A   Through a distributor, yes.
9    BY MS. ZEMAN:
10   Q   And what do you do as a product
11   specialist?
12   A   Train distributors on how to use the
13   stainless steel products and aluminum tanks.
14   Q   Is that training any different from what
15   we discussed earlier?
16   A   It's more of a sales training.
17   Q   How does it differ?
18   A   It's nontechnical.
19   Q   Is use of the stainless steel tank not
20   technical?
21       MR. SMITH:  Vague.
22   A   Don't understand the question.
23   BY MS. ZEMAN:
24   Q   What are some of the specific things that
25   you train distributors on as a product specialist?

Page 17

1    A   Putting the controller on the freezer.
2    Q   When a tank is shipped to an end user, it
3  doesn't have the controller attached?
4    A   On some models, yes; and on some models,
5  no.
6    Q   And what else would you train a
7  distributor to do?
8    A   Check for the lid.
9    Q   What sort of check?
10   A   The gasket inspection.
11   Q   Is that to make sure the gasket is intact?
12   A   Correct.
13   Q   Anything else?
14   A   Any physical around the freezer.
15   Q   What does that mean?
16   A   Make sure there's no damage when it's
17  received.
18   Q   Understood.
19       Anything else?
20   A   No.
21   Q   Why do you characterize that as sales
22  training?
23   A   It's more the volume of tanks and pricing.
24   Q   Do you do any troubleshooting as a product
25  specialist?

Page 18

1    A   No.
2    Q   Do you do anything as a product specialist
3  other than training distributors?
4    A   Provide the pricing for the product.
5    Q   Anything else?
6    A   No.
7    Q   So since March or April of 2014 through
8  the present, your only role at Chart has been to
9  train distributors?
10   A   Yes.
11   Q   And provide pricing?
12   A   Yeah.  And the catalog, the cryo catalog.
13   Q   Uh-huh.
14       What do you do with the catalog?
15   A   We just publish our products on it.
16   Q   Do you help maintain that catalog?
17   A   Yes.
18   Q   That means keep it up to date?
19   A   Yes.
20   Q   Anything else?
21   A   No.
22   Q   Who do you report to?
23   A   Buzz Bies.
24   Q   Anyone else?
25   A   No.

Page 19

1    Q   Does anyone report to you?
2    A   No.
3    Q   Are you familiar with root cause analysis?
4    A   Yes.
5    Q   What is that?
6    A   Root corrective cause.
7    Q   Do you have any role in conclude -- in
8  doing root cause analysis?
9    A   I do not.
10   Q   Did you as a technician?
11   A   No.
12   Q   That wasn't part of your troubleshooting?
13   A   No.
14   Q   What was the goal of troubleshooting when
15  you were a technician?
16   A   Make sure the product works correctly.
17   Q   When you were troubleshooting, would that
18  occur when an end user or a distributor reported
19  some sort of problem or issue with a Chart product?
20   A   Yes.
21   Q   And then you would try to help resolve the
22  issue?
23   A   Yes.
24   Q   Are you aware of a problem reported with
25  the tank at Pacific Fertility Center on March 4th,

Page 20

1  2018?
2    A   I heard about it.
3    Q   When did you learn about it?
4    A   Sometime during March.
5    Q   How did you learn about it?
6    A   Later when an e-mail came in.
7    Q   Who did that e-mail come from?
8    A   Customer service.
9    Q   What was your reaction to learning about
10  it?
11   A   Well, the e-mail was requesting a
12  replacement tank.
13   Q   And did Chart provide a replacement tank?
14   A   Absolutely, yes.
15   Q   Did it provide that under warranty?
16   A   I would have to say yes.
17   Q   Why do you think it was provided under
18  warranty?
19   A   Because we provide a five-year warranty.
20       MR. SMITH:  And don't guess if you don't
21  know.  I'll just advise you, don't guess if you
22  don't know.
23  BY MS. ZEMAN:
24   Q   So I'd asked what your reaction was to
25  learning about it, and your response was to say that

Page 21

1   the e-mail was requesting a replacement tank.  I
2   appreciate the information about the e-mail, but I
3   do want to go back to find out what your reaction
4   was to learning about the tank problem.
5        MR. SMITH:  That may assume facts.
6    A   My reaction, I can't tell you how I was
7   feeling on that particular day, but when a request
8   comes in for a tank, I basically just chase
9   production to make sure we get the tank out as soon
10   as possible.
11   BY MS. ZEMAN:
12    Q   When you learned about the tank failure at
13   PFC, did you form any questions about the tank?
14        MR. SMITH:  Assumes facts not in evidence.
15    A   Only what's stated on the e-mail.
16        (Exhibit Number 243 was marked for
17   identification.)
18   BY MS. ZEMAN:
19    Q   Mr. Gonzalez, I've handed you a document
20   that's been marked as Exhibit 243.  It's a document
21   marked as CHART001747 through 1755.
22        Do you recognize this document?
23    A   Don't remember this e-mail.
24    Q   Do you recognize it as an e-mail chain
25   between you and other Chart representatives and

Page 22

1   perhaps other individuals?
2    A   I see that, yes.
3    Q   And do you have any reason to believe this
4   is anything other than an accurate e-mail chain kept
5   within the normal course of business at Chart?
6    A   Yes.
7    Q   What reason is that?
8    A   Because it made it to the tech service
9   manager and made it to the vice president.
10    Q   So you do think this would be an accurate
11   copy of an e-mail chain within Chart's records?
12    A   Again, I don't recognize this e-mail, so I
13   really can't say if it's accurate or not.
14    Q   But --
15    A   Is that what you're asking me, if it's
16   accurate?
17    Q   My question was whether you have any
18   reason to believe it's not accurate.
19    A   I can't -- I don't know.  I don't know
20   what to say on this e-mail.
21    Q   On the first page, the third e-mail down,
22   are you included on the "to" line there?
23        MR. SMITH:  She's on the first page.
24   She's right here.
25    A   Yes, my name is on there.

Page 23

1   BY MS. ZEMAN:
2    Q   And is that your accurate e-mail address?
3    A   Yes.
4    Q   And is this the e-mail that you were
5   referring to that informed you about the tank
6   problem at PFC?
7    A   No.
8    Q   There's a separate e-mail that you were
9   referring to?
10    A   Yes.
11    Q   And did you say you don't recall who the
12   other e-mail came from?
13    A   No, I do not recall.
14    Q   Once you learned about the tank at PFC,
15   was there anything that you wanted to know about the
16   situation there?
17    A   Other than expediting the tank is what my
18   involvement was.
19    Q   Did you want to review the controller data
20   for the PFC tank?
21    A   Now that you mention that, I think there's
22   another e-mail of me requesting that.
23    Q   Why did you want to review the tank data,
24   controller data, I should say?
25    A   To let engineering evaluate the data.

Page 24

1    Q   Why did you want engineering to review the
2   data?
3    A   To verify controller performance.
4    Q   Did you personally want to review the data
5   or did you want engineering to review the data?
6    A   I want engineering to review the data.
7    Q   Did you personally review it?
8    A   No.
9        (Exhibit Number 244 was marked for
10   identification.)
11   BY MS. ZEMAN:
12    Q   I've handed you a document marked as
13   Exhibit 244, and it is marked with Bates numbers
14   CHART001664 through 1665.
15        Do you recognize this as an e-mail that
16   you would have received at Chart?
17    A   Okay.  So here is when I'm asking for the
18   controller's download, and I also wanted to
19   understand what rack design that we're using.
20    Q   And why was that?  Why did you want to
21   understand the rack design?
22    A   It's possibility -- I'm just assuming
23   here -- the corner of the racks may have penetrated
24   maybe the inner vessel, maybe.
25    Q   And so you wanted to understand what the

Page 25

1  rack design was so that you could assess whether
2  that was a possible factor?
3      A   Correct.  Or let engineering assess that.
4      Q   And did you get an understanding of what
5  the rack design is?
6      A   No.
7      Q   As you sit here today, do you know what
8  the rack design was --
9      A   No.
10     Q   -- being used at PFC?
11     A   I do not.
12     Q   Mr. Gonzalez, are you familiar with an
13  issue with the TEC 3000 controller where the serial
14  number would display as zero, liquid levels would
15  read as zero, and temperature readings would be
16  inaccurate?
17     A   Yes.
18     Q   Did you do any testing in relation to that
19  issue?
20     A   No.
21         MR. SMITH:  Vague.  Sorry.  Vague as to
22  "testing."
23  BY MS. ZEMAN:
24     Q   What do you know about that issue?
25     A   Just that the serial number equaled zero.

Page 26

1      Q   Did you know anything about the liquid
2  levels also reading as zero?
3      A   That was also reported, yes.
4      Q   That was reported in conjunction with the
5  serial number displaying as zero?
6      A   It can be, but it's also reported at other
7  times where it's a user error.
8      Q   And in the instances where the serial
9  number was displayed as zero, were there also
10  instances where temperature readings were reported
11  to be inaccurate?
12     A   Yes.
13     Q   And was that combined issue something that
14  Chart was working to resolve?
15         MR. SMITH:  Vague.
16     A   I don't understand the question.
17  BY MS. ZEMAN:
18     Q   Was that issue something Chart was trying
19  to understand and fix?
20     A   Yes.
21     Q   Were you involved in that effort?
22     A   No.
23     Q   You didn't have any involvement in that?
24     Q   Aside from trying to get a resolution.
25     Q   What did you do to try to get resolution?

Page 27

1      A   Have our supplier evaluate.
2      Q   Was the supplier Extron?
3      A   Yes.
4      Q   Did you coordinate with Extron to have
5  them evaluate the situation?
6      A   Between myself and tech service and
7  engineering, yes.
8          (Exhibit Number 245 was marked for
9  identification.)
10  BY MS. ZEMAN:
11     Q   I've handed you a document marked as
12  Exhibit 245.  It's Bates stamped CHART002854 through
13  2855.
14         And do you recognize this as an e-mail
15  chain that included your -- you as a Chart employee?
16     A   Yeah, I see I was copied on it.
17     Q   And in the first e-mail at the top of the
18  first page, it refers to:  Customers report the
19  freezers spontaneously read zero of liquid and temps
20  way off.  And then it refers to:  The event log and
21  SN recorded in the software are erased.
22         Does that match the -- your understanding
23  of the issue we were just discussing?
24         MR. SMITH:  Vague.
25     A   It appears to be.

Page 28

1  BY MS. ZEMAN:
2      Q   And then further down in that same
3  paragraph, it refers to:  Ramon did some side
4  testing regarding RF interference.
5          Do you see that?
6      A   Yes.
7      Q   Did you do any side testing regarding RF
8  interference?
9      A   No.
10     Q   Do you know if this Ramon might be
11  referring to anyone else at Chart?
12     A   No.  But I think he's referring to a test
13  that one of our distributors may have done.
14     Q   What distributor was that?
15     A   Brooks Life Science.
16         But even then, their design was different.
17     Q   Their design of what?
18     A   Their design is different.
19     Q   Their design of what?
20     A   Their design is different.
21     Q   I'm sorry, their design of what, though?
22  Their design of what is different?
23     A   Oh, their freezer design is different.
24     Q   Does Brooks manufacture tanks?
25     A   No, we manufacture the tanks for them, but

Page 29

1   the design is different.
2       Q   From what?
3       A   From a regular standard freezer.  It has a
4   robotic attachment to it.
5       Q   And were you involved in whatever testing
6   Brooks Life Science did?
7       A   I was not involved, but I was shown.
8       Q   You were shown the testing that was done
9   by Brooks Life Science?
10      A   Yes.  It was a lab test that he was doing.
11      Q   Was that testing relevant to the SN
12  displaying zero issue?
13      A   It may have been.
14      Q   How might it have been?
15      A   Because he was sending signals through the
16  temp probes, and the control would just lightly dim
17  and then come bright again.
18      Q   Would it alter the information displayed
19  on the controller during testing?
20      A   Not when I saw it, no.
21      Q   Why would sending signals through the
22  temperature probes potentially be relevant to the SN
23  displaying zero issue?
24      A   That's only what I saw at the -- his lab.
25          MR. SMITH:  May call for an expert

Page 30

1   opinion.
2       A   I defer to engineering on that.
3   BY MS. ZEMAN:
4       Q   But you thought the testing might be
5   relevant to the SN displaying at zero issue,
6   correct?
7       A   I was trying to be helpful and brought
8   this to light.
9       Q   Is that a yes, you thought the testing
10  might be relevant?
11      A   Yes.
12      Q   And why did you think it might be
13  relevant?
14      A   Because I saw the flicker on display, so
15  kind of assumed that it would -- it would mean
16  something.
17      Q   Did you think that RF interference might
18  be causing the SN displaying as zero issue?
19      A   Based on Extron's evaluation, it was a
20  possibility.
21      Q   And what is RF interference?
22      A   Radio frequency interference.
23      Q   And did Chart or Extron determine whether
24  RF interference was causing the SN displaying as
25  zero issue?

Page 31

1       A   It's my understanding we could not even
2   duplicate the issue.
3       Q   Has Chart ever been able to duplicate it?
4       A   No.
5       Q   Was Extron able to duplicate it?
6       A   No.
7       Q   But it was an issue reported to Chart by
8   multiple distributors or end users, correct?
9           MR. SMITH:  Vague.
10      A   A handful, yes.
11  BY MS. ZEMAN:
12      Q   How do you define "a handful"?
13      A   Three or four.
14      Q   You're only aware of three instances of
15  the -- three or four instances of the serial number
16  displaying as zero issue?
17      A   No, there are more.
18      Q   How many?
19      A   I would have to let quality look that up
20  in our complaint system.
21      Q   Do you have an estimate from what you've
22  seen?
23      A   Seven.
24      Q   You're aware of approximately seven
25  instances of a social -- serial number displaying as

Page 32

1   zero issue?
2           MR. SMITH:  Vague as to time.
3       A   The thing is that they would complain
4   about it, but when we receive it, it's still
5   displayed, so we don't understand.  Again, we
6   couldn't duplicate it.
7   BY MS. ZEMAN:
8       Q   When a controller would get to you
9   following a complaint about the serial number
10  displaying as zero and you would see it as something
11  other than zero, had those controllers been reset?
12      A   Restored to defaults, yes.
13      Q   They had been restored to default?
14      A   Yes.
15      Q   Would that affect whether the serial
16  number would display as zero or as a full number?
17      A   I have to defer to engineering on that.
18      Q   How many complaints did Chart receive
19  about that issue?
20          MR. SMITH:  Vague as to time and issue.
21      A   About seven maybe.
22  BY MS. ZEMAN:
23      Q   Earlier when you referred to seven, I
24  thought what you were indicating was there were
25  seven instances you were aware of that Chart could

Page 33

1    see the serial number as zero but that there had
2    been more complaints that Chart could not verify.
3        With that background, is it your testimony
4    that Chart received only about seven complaints
5    about the serial number displaying as zero?
6        MR. SMITH:  Vague.
7    A    Again, we have to assess that from a
8    quality standpoint, see what the report shows, but
9    personally myself, I'm aware of about a handful,
10   seven.
11   BY MS. ZEMAN:
12   Q    Of complaints about the serial number
13   displaying as zero?
14   A    Correct.
15   Q    When did you first learn about those
16   issues -- that issue?
17   A    Maybe 2016 or 2015.
18   Q    And when was the most recent time you
19   learned of a complaint to Chart about that issue?
20   A    I have not heard anything since 2016 or
21   '17.
22   Q    Is there a touchscreen version of the TEC
23   3000 controller?
24   A    I like the way they say that.
25        The touchscreen you could say is a version

Page 34

1    of the TEC 3000, but it's a totally different
2    controller.
3    Q    When did it go onto the market?
4    A    2017.
5    Q    Roughly when in 2017?
6    A    May.  Around May of 2017.
7    Q    Has Chart received any complaints about
8    the serial number displaying as zero with the
9    touchscreen controller?
10        MR. SMITH:  Vague, calls for speculation.
11   A    You have to check quality to see if there
12   are any reports on that, but to my knowledge, no.
13   BY MS. ZEMAN:
14   Q    You're not aware of any such complaints?
15   A    Right.  Correct.  Yes.
16   Q    Does Chart still sell a TEC 3000 version
17   that is not a touchscreen?
18   A    Yes.
19   Q    Does the TEC 3000 controller record when
20   an auto fill starts and stops?
21   A    We have to ask engineering to evaluate,
22   but I believe there is a -- I believe that it does,
23   yes.
24   Q    Do you know what code the controller would
25   display to show that an auto fill started?

Page 35

1    A    I believe F for filling.
2    Q    And what code would it show when the auto
3    fill stops?
4    A    No code.  You would just see the level.
5    Q    And in addition to the auto fill feature
6    on the controllers, it's possible to manually press
7    a fill button to initiate a fill, correct?
8    A    Yes.
9    Q    And would the controller record when the
10   button was manually pressed to initiate a fill?
11   A    Yes.
12   Q    What would be the code for that?
13   A    F.
14   Q    The same code as when the auto fill would
15   initiate?
16   A    Yes.
17   Q    And would it record a code when the
18   manually initiated fill was manually terminated?
19   A    I have to defer to engineering on that
20   one, but I don't believe so.
21        (Exhibit Number 246 was marked for
22   identification.)
23   BY MS. ZEMAN:
24   Q    I've handed you a document marked as
25   Exhibit 246, and it has Bates numbers CHART002210

Page 36

1    through 2219.
2        Do you recognize this as a series of
3    e-mails that include you on -- includes you on the
4    chain?
5        You're included on the "to" line on the
6    initial e-mail on the first page, correct?
7    A    Yes.
8    Q    And on the second page, the majority of
9    the page, is that an e-mail from you?
10   A    Yes.
11   Q    And that e-mail from you refers to rapid
12   changes on the temperature recorded on a particular
13   controller, correct?
14        MR. SMITH:  Vague.
15   A    Are you asking me what page 2211 says?
16   BY MS. ZEMAN:
17   Q    I'm asking about the e-mail from you on
18   April 4th, 2018, at 9:27 p.m., which is included on
19   page CHART002211 about the subject of that e-mail.
20        Within that e-mail in the third paragraph,
21   for instance, it refers to temp A probe shows it
22   warmed to negative 117 Celsius and in the same
23   minute went to negative 187 Celsius.
24        Do you see that?
25   A    Yes.

1      Q    That would be a fairly rapid warming,
2  correct?
3      A    Yes.
4      Q    And then it also in the next paragraph
5  refers to going from negative 192 Celsius up to
6  negative 129.4 Celsius in about a minute, correct?
7      A    Yes.
8      Q    And that would be a fairly rapid warming?
9      A    Yes.
10      Q    And for both of those instances, in the
11  e-mail you suggest that the probe was moved or might
12  have come in contact with a warmer object, correct?
13      A    Yes, specifically on 3/29 when it's
14  showing at 1:52 and also says may indicate the
15  actual temp probe itself that's in the freezer --
16      Q    Uh-huh.
17      A    -- may have been -- because there's a wire
18  that comes out at the end of it, so when the rack is
19  pulled out, that wire may have caught on the rack,
20  so maybe the probe came up to a warmer state.
21      Q    So you were hypothesizing what might have
22  explained the rapid warming, correct?
23      A    Correct.  But the controllers all appear
24  to be running as designed, and we were unable to
25  duplicate the concern.

1      Q    Okay.  And in the paragraph referencing
2  the change from negative 192 up to negative 129.4,
3  you say:  Aside from probe or controller error.
4          What were you referring to there?
5      A    Meaning if there's a disconnect on the
6  cable to the temp probe on the controller --
7      Q    Uh-huh.
8      A    -- or the controller port -- temp ports
9  maybe.  Or making like -- like, hooking up your
10  power to your laptop --
11      Q    Uh-huh.
12      A    -- so that's an intermittent power
13  connection, something like that.
14      Q    But there's some sort of controller error
15  that could result in temperature readings being
16  inaccurate, correct?
17      A    Not an error, you get an alarm; a temp A
18  high alarm or temp B high alarm.
19      Q    When would you get an alarm?
20          MR. SMITH:  Vague, overbroad.
21      A    I defer to engineering, but there's a
22  setting on the controller that users can change to
23  trigger the high temp A alarm.
24  BY MS. ZEMAN:
25      Q    What does a temperature alarm have to do

1  with whether the controller could result in a
2  temperature reading being inaccurate?
3          MR. SMITH:  Vague.  I think you guys are
4  talking past one another.
5          THE WITNESS:  Oh.
6          MS. ZEMAN:  Go ahead.
7          MR. SMITH:  She asked the question is
8  there some sort of controller error that could
9  result in temperature readings being inaccurate, and
10  I think you're asking about an error or something
11  wrong with the controller.
12          MS. ZEMAN:  Correct.
13      A    Right.  And I'm saying there's a
14  possibility that the temp probe itself could be --
15  could be at fault, the temperature probe --
16  BY MS. ZEMAN:
17      Q    Okay.
18      A    -- on the freezer.
19          Since we suspected that maybe it was being
20  touched by the cable and the racking, I thought
21  maybe there was some kind of intermittent connection
22  between that temperature probe itself.
23      Q    Okay.  And so in that fourth paragraph
24  where it refers to a controller error, and it seems
25  to refer to both a -- aside from a probe or

1  controller error, what were you referring to by
2  "controller error"?
3      A    The connection port on the controller.
4      Q    Just the physical connection?
5      A    Yes.  I was really trying to be helpful
6  here as I could.
7      Q    And so this example here, it's possible
8  that the liquid nitrogen level in the tank didn't
9  change at all, it's simply that the temperature
10  probe was moved?
11      A    That sounds about right.
12      Q    Or those temperature readings could also
13  indicate some sort of error with either the probe or
14  the controller?
15          MR. SMITH:  Asked and answered.
16      A    In this -- in this context here, I was
17  trying to be helpful.  So if we can understand a
18  freezer, the volume of liquid and then the
19  displacement of a rack and extraction of a rack,
20  that changes liquid level, right?
21          So engineering should get involved in
22  this.  I didn't get involved in this, but I got them
23  involved later with Extron, and these controllers
24  were all sent to Extron.
25          But, nonetheless, that's basically what

Page 41

1    I'm trying to deliver the message here as far as the
2    issue.
3    BY MS. ZEMAN:
4        Q   But within this e-mail, you suggested a
5    couple possible explanations for the warming
6    temperatures displayed by the controller, correct?
7        A   Yes.
8        Q   It could have been caused by the probe
9    being moved, correct?
10       A   Yes.
11       Q   It could have been caused by the probe
12   coming in contact with a warm object, correct?
13       A   Yes.
14       Q   Or it could have been caused by a probe or
15   a controller error, correct?
16           MR. SMITH:  Vague as to controller error.
17       A   I have to defer to engineering on this
18   one.
19   BY MS. ZEMAN:
20       Q   But your own e-mail says:  Also an
21   indication, aside from probe or controller error,
22   that temp A probe must have been moved or made
23   contact with a warm object.
24           You can't tell me now whether a potential
25   cause of the changing temperatures displayed by that

Page 42

1    controller was a probe or controller error?
2            MR. SMITH:  Same objection.
3        A   Here I'm just basically still talking
4    about the temp probe connection to the controller
5    and the controller ports, so that's essentially all
6    I'm talking about here.
7    BY MS. ZEMAN:
8        Q   So is that a yes, that the change in the
9    temperature could be explained by a probe or a
10   controller error?
11           MR. SMITH:  Same objection.
12       A   I have to defer to engineering.
13   BY MS. ZEMAN:
14       Q   Why do you need to defer to engineering
15   now but you were able to state an opinion about
16   possible causes in this e-mail?
17       A   Because in this context here, I'm talking
18   about the temp probe connection to the controller,
19   so a physical connection to the controller itself
20   could have possibly -- could possibly be attributed
21   to this.
22       Q   And do you consider that to be something
23   other than a probe or a controller error?
24       A   Which is why I stated controller error
25   because of the port on the controller.

Page 43

1        Q   So do you consider that to be something
2    other than a probe or a controller error?
3        A   No, just a connection on the controller.
4        Q   Okay.  And in the next paragraph, you
5    indicate that the event log shows someone is present
6    at the freezer.
7            Do you see that?
8            MR. SMITH:  She's on the second page.
9            THE WITNESS:  Here?
10           MR. SMITH:  Yeah, fourth paragraph down.
11   BY MS. ZEMAN:
12       Q   Fifth paragraph.
13           MR. SMITH:  Sorry, fifth paragraph down.
14   Begins:  In both of these instances.
15           THE WITNESS:  Oh, okay.
16   BY MS. ZEMAN:
17       Q   Why did you think that someone was present
18   at the freezer?
19       A   Again, defer to engineering, but AM means
20   alarm mute, and the only way that happens is
21   somebody's physically on the freezer.
22       Q   Physically pressing a button on the
23   controller?
24       A   Pressing alarm mute.
25       Q   Okay.  And what about the stop fill

Page 44

1    button?
2        A   FD.  Again, refer that to engineering, but
3    I believe that's fill disabled.
4        Q   And based on what you said earlier, is it
5    correct that you don't know if that code would also
6    display for an auto fill -- for an auto fill
7    terminating?
8        A   I have to defer that to engineering.
9        Q   Just to clarify, is that to say you're not
10   sure whether fill disabled would be indicated when
11   an auto fill is terminated?
12       A   I have not seen it on the event code.
13       Q   And do you know if that code is indicated
14   when a manual fill is terminated?
15       A   In this instance here, it looks like it is
16   fill disabled.
17       Q   And if you turn back to page that has the
18   Bates number in the lower right corner of
19   CHART002215, the top e-mail on that page, that's an
20   e-mail from you to Rick Griffin with a copy to a few
21   other individuals, correct?
22       A   Yes.
23       Q   And your e-mail says:  Regardless, I would
24   like to replace it under warranty.
25           Correct?

1    A   Yes.
2    Q   And what's that referring to?
3    A   Replacing the controller.
4    Q   Why did you want to replace the controller
5  under warranty?
6    A   So that we can have that one back for
7  evaluation.
8    Q   Why did you want it to be evaluated?
9    A   Just in case.
10   Q   Just in case of what?
11   A   Just in case there's an issue with it.
12   Q   What was the issue being reported?
13   A   It was complaining about temp A and temp B
14  open, and obviously right here, level reading zero.
15   Q   And that's where it was reading zero but
16  manually being confirmed as having 21 inches of
17  liquid nitrogen present?
18   A   That's what the customer is saying, yeah.
19   Q   What analysis did you have in mind to be
20  done to the controller?
21   A   I wanted to send it back to Extron for
22  evaluation.
23   Q   And what did you expect Extron would do
24  with it?
25   A   Evaluate it and let us know why it did

1  what it did.
2    Q   Did you expect Extron to try to replicate
3  the problem?
4    A   Yes.
5    Q   And then try to identify the cause?
6    A   Yes.
7    Q   Do you know whether the controller was
8  replaced under warranty?
9    A   Yes.
10   Q   It was replaced?
11   A   Yes.
12   Q   You can set that aside.
13       (Exhibit Number 247 was marked for
14  identification.)
15  BY MS. ZEMAN:
16   Q   I've handed you a document marked as
17  Exhibit 247.  It has Bates number CHART002179.
18       Do you recognize what this document is?
19   A   Yes.
20   Q   What is it?
21   A   Meeting minutes.
22   Q   Was this for a meeting held on April 18th
23  of 2018?
24   A   Yes, that's what the date shows.
25   Q   And did you attend this meeting?

1        MR. SMITH:  May assume -- sorry, vague as
2  to "attend."  It just looks like it's a -- it was a
3  call.
4    A   I don't remember if I attended this
5  meeting or not.
6  BY MS. ZEMAN:
7    Q   Do you recall if you participated in a
8  conference call for this meeting?
9    A   I don't recall.
10   Q   You're listed as one of the Chart
11  attendees, though, correct?
12   A   Yes, that's what it shows on there.
13   Q   Do you recall attending any meetings
14  regarding the TEC 3000 freezer controller or
15  participating on any conference calls regarding the
16  TEC 3000 freezer controller?
17   A   Yes.
18   Q   How often would you attend such meetings
19  or calls?
20   A   As traveling permitted me to do so.
21   Q   Why would you attend those meetings or
22  calls?
23   A   To hear information.
24   Q   Any other reasons?
25   A   Progress of their evaluation.

1    Q   Whose evaluation?
2    A   Extron's.
3    Q   Any other reasons?
4    A   No.
5    Q   Would you provide information at these
6  calls and meetings?
7    A   No, I would listen.
8    Q   Why did you need that information?
9        MR. SMITH:  Vague.
10   A   Yeah, I don't understand the question.
11  BY MS. ZEMAN:
12   Q   Chart has a lot of employees, correct?
13       MR. SMITH:  Vague.
14   A   Yes.
15  BY MS. ZEMAN:
16   Q   But not every employee attended these
17  calls and meetings, correct?
18   A   I guess so.
19   Q   So why did you attend these meetings as
20  opposed to other Chart employees?
21       What was the purpose of the meetings for
22  you?
23   A   To hear what Greg Mueller has to say.
24   Q   Why did you need to know what Greg Mueller
25  had to say?

Page 49

1    A   What the results of his evaluation was.
2    Q   What would you do with that information?
3    A   I guess engineering would be the one to do
4  what they need to do with that information to help
5  provide assistance on what may be happening to the
6  controller.  That's...
7    Q   Are you part of engineering?
8    A   No.  I'm in marketing.  I make the tank
9  look pretty and sell it.  Help sales sell.
10   Q   Why did marketing need to be included on
11 these calls or meetings?
12       MR. SMITH:  May assume a fact.
13   A   Just to be involved with the progress.
14 BY MS. ZEMAN:
15   Q   How would the progress impact your role in
16 marketing?
17   A   I'm not sure I understand that question.
18   Q   You said marketing might be included in
19 the calls or meetings in order to be involved with
20 the progress, correct?
21   A   The progress of their evaluation on Greg
22 Mueller's part, yes.
23   Q   Why would marketing need to be involved
24 with that progress?
25       MR. SMITH:  Same objection.

Page 50

1    A   Yeah, I don't understand the question.
2  BY MS. ZEMAN:
3    Q   You didn't randomly attend the calls or
4  meetings, correct?
5    A   I did not attend all of them.
6    Q   Understood.
7    A   Okay.
8    Q   But you didn't randomly attend them,
9  right?  You attended them for a purpose?
10   A   Yes.
11   Q   What was that purpose?
12   A   To hear what Extron's evaluation was of
13 the controller.
14   Q   Why did you need to hear that?
15   A   I was -- just wanted to know.
16   Q   Did you do something with that
17 information?
18   A   Engineering is the one that does what they
19 have to do with that information.  On my behalf, I
20 just want to make sure that the controller is okay.
21   Q   The first paragraph of these meeting
22 minutes refers to memory malfunctions.
23       What does that mean?
24   A   I'll defer that to engineering.
25   Q   And further down, it states:  There was

Page 51

1  agreement that all internal data memory shall be
2  assumed susceptible to corruption.
3        Do you see that?
4    A   Okay.  I see that sentence.
5    Q   Do you know what it's referring to?
6    A   No, I have to defer to engineering on
7  that.
8    Q   Do you recall if you agreed to that?
9    A   I do not recall.
10   Q   Does that indicate that data within a TEC
11 3000 controller could be unreliable?
12   A   I have to defer to engineering.
13   Q   And the next paragraph refers to ESD
14 events.
15       Do you know what ESD events are?
16   A   Defer that to engineering.
17   Q   And the next paragraph refers to:  Chart
18 wants to evaluate and implement an enhanced
19 firmware.
20   A   Are you asking me about this or -- I have
21 to defer to engineering on that.  I'm sorry.  I'm
22 not an engineer, so...
23   Q   Was an enhanced firmware ever implemented?
24   A   Defer to engineering.  I believe that's
25 their own evaluation.

Page 52

1    Q   So to your knowledge, enhanced firmware
2  has not been implemented?
3    A   I defer that to engineering.  They would
4  know.
5    Q   But are you aware of any being
6  implemented?
7    A   Not since Firmware 2.03, no.
8    Q   And was Firmware 2.03 intended to resolve
9  the serial number displaying as zero issue?
10   A   I defer that to engineering.
11   Q   To your knowledge, was it?
12   A   Again, I have to defer that to
13 engineering.  To my knowledge, no.
14       MR. SMITH:  Want to do a break before the
15 next document?
16       MS. ZEMAN:  Sure.
17       THE VIDEOGRAPHER:  The time is 10:52 a.m.
18 We're off the record.
19       (Recess 10:52-10:59 a.m.)
20       THE VIDEOGRAPHER:  The time is 10:59 a.m.
21 We're back on the record.
22       (Exhibit Number 248 was marked for
23 identification.)
24 BY MS. ZEMAN:
25   Q   There you go, Mr. Gonzalez.

1    A   Thank you.
2    Q   All right.  I've handed you a document
3  marked as Exhibit 248.  This is an e-mail chain.
4        And do you recognize yourself being
5  included on several e-mails in this chain?
6        This is marked as Bates number CHART017944
7  through 17947.
8    A   Okay.  Yes.
9    Q   And in the e-mail at the bottom of the
10  first page, that's an e-mail from yourself on
11  November 17th, 2015, correct?
12    A   I'm sorry, repeat that again.
13    Q   The e-mail at the bottom of the first
14  page, that's an e-mail from yourself on
15  November 17th, 2015, correct?  Starting from about
16  halfway down the page.
17    A   Okay.  To Greg.  Okay.  Yes.
18    Q   So that's an e-mail from you to Greg
19  Mueller --
20    A   Yes.
21    Q   -- correct?
22        And in that e-mail, you refer to needing
23  to know what is happening on these controllers --
24  needing to know what is happening on these
25  controllers can be controlled, slash, contained to a

1  minimum.
2        What are you referring to there?
3    A   Okay.  So we're looking for evaluation
4  results of these controllers.
5    Q   What was the issue with the controllers?
6        MR. SMITH:  Overbroad.
7    A   There were a number of issues.
8  BY MS. ZEMAN:
9    Q   Were these TEC 3000 controllers that were
10  experiencing the serial number displaying as zero
11  issue along with other related issues?
12        MR. SMITH:  Assumes facts.
13    A   That's what it shows on 7945 -- document
14  7945, so yes.
15  BY MS. ZEMAN:
16    Q   So essentially they were having the issue
17  that I've been referring to as serial number
18  displaying as zero?
19        MR. SMITH:  Document speaks for itself.
20    A   Yes.
21  BY MS. ZEMAN:
22    Q   And your e-mail refers to those -- these
23  issues coming up global wide, correct?
24        MR. SMITH:  That may misstate evidence.
25  BY MS. ZEMAN:

1    Q   I'm looking at the second sentence of your
2  e-mail on the first page of the exhibit.
3    A   Oh, marketing tactic.  I was trying to get
4  an urgency out of Extron or Greg Mueller into
5  providing evaluation for the controllers.
6    Q   So was the issue coming up global wide?
7    A   It was -- I'll defer that to the quality
8  analyst with the reports on the failures in the
9  field, but I believe so.
10    Q   And why did you want it to be controlled
11  or contained to a minimum?
12    A   So that together Greg and engineering can
13  provide a solution.
14    Q   Were you referring to keeping information
15  about the issue controlled or contained or were you
16  referring to preventing the issue from spreading to
17  other end users and distributors?
18        MR. SMITH:  Vague.
19    A   Yeah, I was merely just trying to isolate
20  what could have been the issue and having Greg
21  provide an evaluation on them.
22  BY MS. ZEMAN:
23    Q   That's because you wanted the issue fixed?
24    A   Yes.
25    Q   Why did you want the issue fixed?

1    A   To minimize the -- minimize the issue.
2    Q   Why would you want to minimize the issue?
3  Was it causing problems for customers?
4    A   Not that I recall, but I just wanted,
5  basically, Extron to evaluate those controllers.
6    Q   You said you wanted the issue fixed to
7  minimize the issue.
8        Why did you want to minimize the issue?
9    A   Keep it from spreading.
10    Q   That second sentence of your e-mail says:
11  We tried containing this by replacing controllers.
12        What does that mean?
13    A   I'm sorry, where are you seeing that?
14  Here?  Oh, I see it.  That's right.
15        So replacing controllers under warranty
16  and then bringing the controllers back that
17  supposedly had this issue for evaluation.
18    Q   Not sure that explains what "we tried
19  containing this by replacing controllers" means.
20    A   If a customer exhibited this perceived
21  issue, which is the serial number zero that we're
22  talking about, I wanted the controller back to
23  Extron and just replace the controller under
24  warranty.
25    Q   So the end user would end up with a new

1  controller?
2      A   Yeah, the distributor would get a new
3  controller and then help the end user install it.
4      Q   With the goal being that the new
5  controller would not suffer from the same issue as
6  the one returned to Chart?
7      A   That is correct.
8      Q   And your e-mail indicates that that wasn't
9  working, correct; that, in fact, replacements were
10  turning out to display the same problem; is that
11  right?
12      A   That's unconfirmed.  I'm using a marketing
13  tactic here to try to get Extron to give me results
14  on evaluation.
15      Q   Your e-mail says:  Even when we offer
16  replacements, they come up with the same issues.
17          Isn't that saying that even when you
18  provide replacement controllers, those replacement
19  controllers have ended up having the same issue?
20      A   Similar issues.
21      Q   It says the same issues in your e-mail,
22  right?
23      A   "Come up with the same issues."  Well, I
24  was regarding to what was in this e-mail here,
25  serial number zero.

1      Q   And you were pushing Extron to provide a
2  permanent solution, correct?
3      A   Yes.
4      Q   Did Extron develop a permanent solution?
5      A   They're working on it.
6      Q   So to date, they have not provided a
7  solution?
8      A   I have to defer that to engineering, but
9  that is my understanding.
10      Q   Has Chart implemented a solution?
11      A   I have to defer that to engineering, but
12  that is my understanding.
13      Q   As far as you're aware, Chart has not
14  implemented a solution for the serial number
15  displaying as zero issue?
16      A   At this time, I defer that to engineering.
17      Q   And you'd defer to engineering, but you
18  are not -- you personally are not aware of a
19  solution having been implemented by Chart, correct?
20      A   I know that we're working on a solution.
21      Q   So at this point in time, Chart is aware
22  of an issue with the controllers where the serial
23  number is displaying as zero along with some other
24  symptoms and has not implemented a solution.
25          Did Chart ever notify distributors or end

1  users about this potential problem with the
2  controllers?
3      A   Well, during the distributor meetings when
4  we're talking about the controller and navigating to
5  the menus, we discussed it.
6      Q   When was that?
7      A   The regular meetings, when was that?
8      Q   Uh-huh.
9      A   The once or twice annual meetings that we
10  would hold.  We hold it on an annual basis.
11      Q   So you hold an annual meeting with
12  distributors?
13      A   Yes.
14      Q   When does that occur?
15      A   Any time during the year.  We do not have
16  one set.
17      Q   There's not a normal time period for it;
18  it floats throughout the year?
19      A   Right.  Correct.
20      Q   When was the most recent one?
21      A   Last year in August.
22      Q   When was the one before that?
23      A   The year prior in March.
24      Q   And the one before that?
25      A   I have to look at my records.

1      Q   But the two most recent that you recall
2  would have been August of 2019 and March of 2018?
3      A   Correct.
4      Q   And is the annual meeting -- who attends
5  the annual meeting?
6      A   Mostly all the distributors.
7      Q   And representatives from Chart?
8      A   Yes.
9      Q   Anyone else?
10      A   No.
11      Q   And what's discussed at the annual
12  meetings?
13      A   The product.
14      Q   Which product?
15      A   The stainless steel products and the
16  aluminum products.
17      Q   Is this a cryobio meeting?
18      A   Yes.
19      Q   Any other divisions or departments of
20  Chart?
21      A   I'm sorry, repeat that again.
22      Q   Are there any other departments or
23  divisions of Chart that participate in this
24  particular annual meeting or is it only the cryobio?
25      A   No, it's the cryobio.  Or cryobiological.

1    Q   What's the purpose of the meetings?
2    A   Sales.
3    Q   Anything else?
4    A   Just basic explanation of the product.
5    Q   And at the annual meeting in August of
6  2019, were problems that had been reported with the
7  TEC 3000 controller discussed?
8    A   No.
9    Q   And at the annual meeting in March of
10  2018, were problems that had been reported with the
11  TEC 3000 controller discussed?
12    A   No.
13    Q   Were problems that had been reported with
14  the TEC 3000 controller discussed at any prior
15  annual meeting?
16    A   Not that I'm aware of.
17    Q   Did Chart ever issue any sort of technical
18  service bulletin about problems that had been
19  reported with the TEC 3000 controller?
20    A   We have done in December a technical tips,
21  tech tips.
22    Q   Is that December of 2019?
23    A   Yes.
24    Q   And what did that tech tips say about the
25  TEC 3000?

1    A   Essentially just to make sure that a
2  freezer is operated with a controller.
3    Q   Anything else?
4    A   Aside from these symptoms here that you're
5  seeing here.
6    Q   That tech tips discussed these symptoms?
7    A   Yeah. Says serial number zero, if this
8  happens or that happens by any chance, contact your
9  distributor.
10    Q   Anything else?
11    A   No.
12    Q   Did the tech tips discuss anything other
13  than the TEC 3000?
14    A   Yes.
15    Q   What else did it talk about?
16    A   I have to look it up. I believe a
17  selection of aluminum dewars and then a selection of
18  some accessories.
19    Q   And who was the tech tip in December 2019
20  distributed to?
21    A   All the distributors.
22    Q   How was it distributed?
23    A   E-mail. Marketing -- I defer to marketing
24  on that because they distribute that.
25    Q   But your understanding is e-mail?

1    A   Yes.
2    Q   When was a tech tip published prior to
3  December 2019?
4    A   You have to look at the website. I
5  believe 2017.
6    Q   So there was a gap from 2017 until
7  December of 2019 where there was no tech tips
8  published?
9        MR. SMITH: Best evidence.
10    A   Yes. There was a divestiture --
11        THE WITNESS: Should I talk about that?
12    A   -- divestiture with the company.
13  BY MS. ZEMAN:
14    Q   Uh-huh.
15    A   Chart sold off the respiratory portion of
16  the business.
17    Q   Okay.
18    A   And then the cryobio business joined
19  together with D&S. So that tech service team, the
20  whole entire tech service team, went with the
21  respiratory. And they were responsible to keep up
22  the tech tips, and they did not.
23    Q   So you're not aware of any tech tip being
24  published between 2017 and December of 2019?
25    A   I have to defer to my notes, but that I

1  know of at this time, yes.
2    Q   Okay. Is that why y'all sent them to the
3  other company?
4    A   Yeah. Fired. No, I'm just kidding.
5    Q   Did Chart receive any questions about that
6  tech tip that was published in December of 2019?
7    A   I'm sorry, say that again.
8    Q   Did Chart receive any questions in
9  response to that tech tip that was published in
10  December of 2019?
11    A   At this time, we'll have to check with our
12  current tech service team to see, but I haven't
13  gotten any myself.
14    Q   Okay.
15        MS. ZEMAN: Ben, I don't think that tech
16  tip has been produced. Do you happen to know?
17        MR. SMITH: I do not know.
18        MS. ZEMAN: We'll need to follow up on
19  that.
20        MR. SMITH: I do believe it's -- I think
21  it's on the website.
22    A   It is on the website.
23  BY MS. ZEMAN:
24    Q   Are you aware of any other technical
25  service bulletins or tech tips being distributed

1    regarding the TEC 3000 controller?
2        MR. SMITH: Vague.
3        A   Not that I'm aware of, no.
4    BY MS. ZEMAN:
5        Q   If you want to use this to clip that
6    exhibit together.
7        A   Sure.
8        (Exhibit Number 249 was marked for
9    identification.)
10   BY MS. ZEMAN:
11       Q   I've handed you an exhibit marked as -- a
12   document marked as Exhibit 249.  It has Bates number
13   CHART008143 through 8150.
14       And this appears to be an e-mail chain
15   that includes you on at least some of the e-mails,
16   correct?
17       You're on the "from" line on the initial
18   e-mail on the first page, correct, the initial
19   e-mail on page 8143?
20       A   Yes.
21       Q   And in the e-mail below that, which
22   appears to be an e-mail from -- e-mail -- an e-mail
23   from Ian Pope to you on May 11th, 2016, Ian asks:
24   Any general troubleshooting guide for level zero
25   readings.

1        Correct?
2        A   Yeah, that's what he's asking here.
3        Q   Okay.  And then your response is providing
4    guidelines, correct?
5        A   Yes.
6        Q   And these guidelines are essentially
7    providing explanations for why a controller might
8    indicate a liquid nitrogen level of zero when that's
9    not actually the level of liquid nitrogen in the
10   tank, correct?
11       A   No, this is actually guidelines for a
12   freezer to be calibrated to the controller and to
13   check for that possibility.
14       Q   To check for what possibility?
15       A   For the -- for no liquid level in the
16   freezer.
17       Q   I'm sorry, did you say that these are
18   guidelines to check whether there is no liquid level
19   in the freezer?
20       A   Well, he's asking me for any general
21   troubleshooting guide for level zero readings, and
22   this is what I supplied him to help troubleshoot
23   that.
24       Does that make sense?
25       Q   Right.

1        Could you explain again what it's helping
2    troubleshoot?
3        A   It's helping to troubleshoot why level
4    zero is being on the controller?
5        Q   Uh-huh.
6        A   And in this case here, I was giving him
7    guidelines based on the technical manual --
8        Q   Uh-huh.
9        A   -- that's what this is from, to verify.
10       Q   It's troubleshooting a mismatch between
11   the actual level of liquid nitrogen in the tank and
12   what the controller is reading as the level,
13   correct?
14       A   That is correct.
15       Q   And your e-mail seems to be giving a set
16   of explanations for what might cause that mismatch
17   as well as some suggestions of how to evaluate
18   whether those might explain the discrepancy,
19   correct?
20       A   Correct.
21       Q   So in other words, if there's a mismatch
22   between the actual liquid nitrogen level and the
23   level being displayed by the controller, one
24   potential reason for that is that the supply source
25   is empty and sending warm gas into the freezer,

1    correct?
2        A   Yes.
3        Q   Okay.  And you identify, it looks like,
4    one, two, three, four, five, six -- seven reasons
5    that the level displayed by the controller might not
6    be an accurate match to the true level of liquid
7    nitrogen in the tank, correct?
8        A   That is correct.
9        Q   You can set that aside.
10       (Exhibit Number 250 was marked for
11   identification.)
12   BY MS. ZEMAN:
13       Q   I've handed you a document marked as
14   Exhibit 250.  It has Bates number CHART002486.
15       Do you recognize this as an e-mail from
16   yourself?
17       A   Yes.
18       Q   Is this an e-mail from yourself to
19   yourself?
20       A   It appears so.
21       Q   Do you know why you would have done that?
22       A   To keep notes.
23       Q   And is that what this e-mail is?
24       A   Apparently, yes.
25       Q   Okay.  Do you know what it's notes about?

1    A   The specifications of the MVE 808 freezer.
2    Q   And where it refers to "my notes 032018,"
3  do you know what that's a reference to?
4    A   The date.
5    Q   Is that March of 2018?
6    A   Yes.
7    Q   Okay.  And is this --
8        MR. SMITH: Let me just make sure.  Let me
9  talk to him for one second and make sure this isn't
10  something -- I don't think it is, let me just make
11  sure it's not, that it was done at the direction of
12  counsel.  I don't think it was, but let me make
13  sure.
14        MS. ZEMAN:  That's fine.
15        THE VIDEOGRAPHER:  The time is 11:32 a.m.
16  We're off the record.
17        (Recess 11:32-11:32 a.m.)
18        THE VIDEOGRAPHER:  The time is 11:32 a.m.
19  We're back on the record.
20  BY MS. ZEMAN:
21    Q   Are these notes of a meeting that was held
22  in March of 2018?
23    A   No, this is notes to Ramon --
24    Q   Okay.
25    A   -- because of the issue that happened,

1  right.
2    Q   The issue that happened with the tank at
3  PFC?
4    A   Correct.
5        So my mind, I was writing some notes to
6  myself; what are the possibilities, what are the
7  questions that we can ask.
8    Q   And item number 1 refers to when the last
9  maintenance service was performed.
10        Is that referring to the last maintenance
11  that had been performed to the tank that -- tank at
12  PFC that had had an issue on March 4th of 2018?
13    A   That was a question to myself about that,
14  yes.
15    Q   Uh-huh.
16        Why did you want to know about the last
17  maintenance service?
18    A   Because maintenance is part of the regular
19  servicing that should be done to the freezers.  So
20  it's like you maintain your car --
21    Q   Uh-huh.
22    A   -- oil changes every three months, well,
23  the same thing with the freezers.
24    Q   Was there any maintenance in particular
25  that you were wondering if it had been done to that

1  tank?
2    A   No, that was just a general question to
3  myself, what sort of maintenance was done.
4    Q   How would the answer one way or another
5  have impacted your assessment of the incident?
6        MR. SMITH:  Incomplete hypothetical.
7    A   Well, if a component was never replaced as
8  it was supposed to be replaced, maybe that
9  attributed to the issue.
10  BY MS. ZEMAN:
11    Q   What components are supposed to be
12  replaced on the tanks?
13    A   There's a list of maintenance items in the
14  technical manual.  I'll defer that to engineering as
15  well, but there's a list here.
16    Q   Are you aware of any item -- any parts of
17  the tank that need to be replaced?
18    A   One in particular is the inline filter.
19    Q   What's the inline filter?
20    A   Well, for the engineering explanation,
21  I'll defer that to engineering, but it basically --
22  it's a filter that's placed on the plumbing stack
23  after the transfer hose.
24    Q   What is it filtering?
25    A   Any particles that may cause a valve --

1  again, I'll defer that to engineering, but my take
2  is something can go in and cause a valve to stay
3  open.
4    Q   Is it filtering the liquid nitrogen?
5    A   Yes.
6    Q   And how often is that supposed to be
7  replaced?
8    A   Annually.
9    Q   Are there any other parts you're aware of
10  that need to be replaced?
11    A   Additional components on the plumbing
12  stacks, but I'll defer that to engineering.
13        There it is right there, has the inline
14  filter been replaced, yeah.
15    Q   Why did you want to know when the last
16  fill cycle was?
17    A   I was just curious.
18    Q   And at number 7, you say:  When the
19  controller alarmed.
20        What are you referring to there?
21    A   When the controller alarmed, essentially
22  that alerts the user, right.  So what was done at
23  that point?  I don't know.
24    Q   Were you aware of the controller on the
25  PFC tank having alarmed?

Page 73

1    A   Well, I know that the controller on the
2  freezer must have alarmed.
3    Q   How do you know that?
4    A   Because the controller would never allow a
5  freezer -- my take is that the controller is there
6  for a reason, to alert the user in case there's an
7  issue.
8        So I was just curious here to wondering if
9  an alarm did occur, what was it, and what did the
10  end user do or the distributor do for that alarm to
11  correct it.
12    Q   Had Chart ever received any complaints
13  about this tank?
14    A   And that was my other question to myself
15  too.  I was, like -- I was wondering, but I've never
16  gotten that information from quality or the reviews
17  in E-1s.  There's been no complaints historically.
18    Q   So Chart had not received any complaints
19  or reports of problems with the tank?
20    A   Yeah.  We have to, again, defer to quality
21  and -- to make sure that there wasn't, but to my
22  knowledge at this time, no, there wasn't any.
23    Q   Had Chart received any complaints or
24  reports of problems with any tank at PFC?
25    A   I can't -- I can't testify.  I don't know.

Page 74

1  I wouldn't know.  I don't know.
2    Q   Did you get answers to your questions in
3  this e-mail?
4    A   No.
5    Q   Did you ask anyone to provide you this
6  information?
7    A   I believe --
8        MR. SMITH:  Exclude any communications you
9  had with any counsel.
10        THE WITNESS:  Okay.  Okay.
11    A   No.
12  BY MS. ZEMAN:
13    Q   You didn't ask anyone at Chart to provide
14  this information to you?
15        MR. SMITH:  If you did ask counsel to
16  provide this information to you -- I don't know if
17  you did --
18        THE WITNESS:  No, counsel --
19        MR. SMITH:  Okay.
20        THE WITNESS:  I did not ask counsel this
21  information.
22        Can I say about Kevin trying to get a
23  download?
24        MR. SMITH:  Sure.
25        THE WITNESS:  Oh, okay.

Page 75

1    A   So we were curious -- and these are
2  questions in my mind.  So we wanted to send someone
3  from Chart --
4  BY MS. ZEMAN:
5    Q   Uh-huh.
6    A   -- preferably our engineering team --
7    Q   Uh-huh.
8    A   -- to go and take a download from this
9  controller --
10    Q   And who --
11    A   -- so that engineering can evaluate it.
12    Q   And was Kevin Gilliland asked to do that?
13    A   How did you know his last name?
14        He was, and I never heard back from that.
15  It was my understanding that he was not even allowed
16  to go in.
17    Q   Did you talk to Kevin about your questions
18  that you have noted in this e-mail?
19    A   No.
20    Q   Did you talk to anyone else about the
21  questions you have noted in this e-mail?
22    A   No.
23        THE WITNESS:  Can I say --
24        MR. SMITH:  Wait for a question.
25        THE WITNESS:  I'm sorry.

Page 76

1  BY MS. ZEMAN:
2    Q   My question is:  What did you want to say?
3    A   These were notes to myself, and I didn't
4  want to mislead anyone by asking these to myself, so
5  I wanted that question to come automatically from
6  the site or the distributor that was handling the
7  site.
8        Does that make sense?
9    Q   It does.
10        You can set that aside.
11    A   I like that e-mail; it's mine.
12        (Exhibit Number 251 was marked for
13  identification.)
14  BY MS. ZEMAN:
15    Q   I have handed you a document marked as
16  Exhibit 251, which has Bates numbers CHART001896
17  through 1898.
18        And this is an e-mail chain within Chart
19  that includes you on some of the e-mails, correct?
20        You're carbon copied, for instance, on the
21  e-mail at the top of the first page, correct?
22    A   Yes.
23    Q   And the second e-mail on that page is an
24  e-mail from you, correct?
25    A   Yes.

Page 77

1    Q   Do you have anything -- any reason to
2  believe this is not an accurate copy of this e-mail
3  chain?
4    A   I believe it looks correct.
5    Q   And in the e-mail from you on that first
6  page, that was sent on April 25th, 2018, correct?
7    A   I'm sorry, say that again.
8    Q   The e-mail from you that's the second
9  e-mail down on the first page, that's an e-mail that
10 was sent on April 25th of 2018, correct?
11   A   Yes.
12   Q   Okay.  And that e-mail refers to -- you
13 say:  We need to replace this new freezer.
14       Correct?
15   A   Yes.
16   Q   Why did you need to replace it?
17   A   According to -- and I'm sure engineering
18 can evaluate this -- help evaluate it, but this
19 here, according to the distributor, this freezer was
20 losing about an inch and a half per day of liquid.
21   Q   And why is that relevant?
22       MR. SMITH:  Vague.
23   A   Well, my understanding is that HE freezers
24 don't lose an inch and a half per day.
25 BY MS. ZEMAN:

Page 78

1    Q   So that's significant or relevant because
2  it was losing liquid nitrogen faster than it should
3  have been?
4    A   It's a little higher than we like to see.
5    Q   Why were you included on these e-mails?
6        MR. SMITH:  May call for speculation.
7    A   It looks like Bruce copied me on it or
8  sent -- or forward it to me or sent it to me or copy
9  me.
10 BY MS. ZEMAN:
11   Q   Did you make the decision to replace the
12 freezer?
13   A   Yes.
14   Q   Do you know, was any analysis done to
15 determine what was causing this freezer to lose
16 liquid nitrogen at this rate?
17   A   I believe so.  Quality should be able to
18 pull that report.
19   Q   Do you know what the cause was determined
20 to be?
21   A   Trying to think back.  I have to look at
22 my records.
23   Q   So as you sit here today, you don't recall
24 what the cause was determined to be?
25   A   I have to -- I have to look at my records.

Page 79

1  I don't even believe this was a freezer issue or a
2  controller issue, but I have to look at my records.
3    Q   Do you have any idea what else it could
4  have been?
5    A   I have to look at my records.  I'd be
6  guessing right now.
7    Q   Are you aware of any instances where Chart
8  has replaced a tank where the underlying problem was
9  neither a freezer issue nor a controller issue?
10   A   Not that I can recall.
11   Q   Do you normally make the decision whether
12 to replace the freezer where there's been a
13 complaint about it?
14   A   It usually escalates up to Buzz Bies or
15 myself.
16   Q   How often do you decide to replace a
17 freezer?
18   A   Very rare.
19   Q   How often per year?
20   A   I'd be speculating right now without
21 looking at quality reports.
22   Q   Is it more than 10 freezers a year?
23   A   No.  But, again, quality can let you know.
24   Q   Why would those requests be escalated to
25 you?

Page 80

1        MR. SMITH:  May call for speculation.
2    A   Yeah, I'm just looking at the dates.
3  BY MS. ZEMAN:
4    Q   What about the dates?
5    A   January 15, 2018, and then --
6    Q   January or April?
7    A   January 15, 2018, and then a few months
8  later, the freezer is suspected of having an issue.
9  There must have been a discussion with the
10 customer -- actually with the distributor because
11 now that I'm thinking about this, this is coming
12 back to me.  It was just installed a few weeks, so
13 that information was not in the e-mail trail.  That
14 information must have come from the distributor that
15 was letting me know that.
16       So the distributor told me that, and on
17 the basis of that, took the data, and I made a
18 decision to have it brought back for evaluation.
19   Q   Speaking more generally, I had asked
20 earlier if you're normally the one who makes the
21 decision about whether to replace a freezer -- to
22 replace the freezer where there has been a
23 complaint, and you responded that it usually
24 escalates up to Buzz Bies or to you.
25   A   Correct.

Page 81

1    Q   Does anyone else other than you or Buzz
2  Bies make the decision about whether to replace
3  freezers where there's been a complaint?
4    A   No.
5    Q   So earlier when we went over what your
6  role is as a product specialist, you talked about
7  training, providing pricing, and maintaining the
8  catalog.
9    A   Uh-huh.
10   Q   How does making decisions about whether to
11 replace freezers fit into those roles?
12   A   From a marketing standpoint and completely
13 satisfying the customer.  That's our goal.
14   Q   Is one of your roles as a product
15 specialist handling customer service?
16   A   No.  There's a customer service manager.
17   Q   Do you review warranty claims for tank
18 replacements?
19   A   Yes.
20   Q   That's part of your normal role at Chart?
21   A   Yes.
22   Q   What do you do when you review those
23 claims?
24   A   Ask engineering or -- what the evaluation
25 is.  I guess you're asking me about the -- if a tank

Page 82

1  comes back in for evaluation or...
2    Q   Whether the tank comes back in or not, if
3  a customer makes a claim under the warranty to get a
4  tank replaced, what are you looking for when you
5  review those claims?
6      MR. SMITH:  May assume facts.
7    A   Typically we ask for a download of the
8  controller.  That's usually the first step.
9  BY MS. ZEMAN:
10   Q   Why is that?
11   A   So that engineering can evaluate data.
12   Q   How many claims have you reviewed that
13 were made under the five-year vacuum warranty on
14 stainless steel freezers?
15   A   Maybe one.
16   Q   When was that?
17   A   Last year.
18   Q   What tank model was that for?
19   A   HEco tank.
20   Q   The exhibit you have in front of you, is
21 that -- was that a warranty claim -- ultimately a
22 warranty claim under the five-year vacuum warranty?
23   A   This one here?
24   Q   Correct.
25   A   Again, I have to look on my notes, but I

Page 83

1  don't believe this was a vacuum issue.
2    Q   Does Chart offer a service where it
3  redraws the vacuum on a stainless steel tank?
4    A   At this time, no.
5    Q   Did they in the past?
6    A   I'm sorry, say that again.
7    Q   Did Chart do so in the past?
8    A   Like a re-vac service?
9    Q   Correct.
10   A   Yes.
11   Q   Are there -- were there any occasions
12 where you recommended that service to a customer or
13 distributor?
14   A   No.
15   Q   Were there any circumstances where you
16 would have recommended it to a customer or to a
17 distributor?
18   A   No.
19   Q   Why not?
20   A   The customers will come to us as a
21 preventative maintenance, request that we pull the
22 vacuum, and we would do so.
23   Q   And you're not -- you're not aware of any
24 instances where a tank issue made its way to you and
25 you recommended in response that a vacuum be -- that

Page 84

1  the tank be re-vacked?
2    A   No, not that I'm aware of.
3    Q   And to do a re-vac, would the customer
4  ship the freezer back to Chart?
5    A   Yes.
6    Q   Do you know how often that happens?
7    A   Gosh.
8      MR. SMITH:  Vague and misstates --
9    A   Yeah, we have to --
10     MR. SMITH:  -- testimony.
11   A   We have to look at historical data on
12 that.  Very, very few.
13 BY MS. ZEMAN:
14   Q   So when the tank would be shipped back, it
15 would be empty of liquid nitrogen, correct?
16   A   Yes.
17   Q   And then it would be re-vacked and shipped
18 back to the customer?
19   A   Yes.
20   Q   With the expectation that the customer
21 would put it back into use?
22   A   Yes.
23     (Exhibit Number 252 was marked for
24 identification.)
25 BY MS. ZEMAN:

1   Q   I've handed you a document marked as
2   Exhibit 252.  It has Bates number CHART007643
3   through 7645.
4        And, again, this is an e-mail chain that
5   includes you on a number of e-mails, including
6   in the "from" line on the first e-mail on the first
7   page, correct?
8   A   Yes.
9   Q   And the second e-mail down on the first
10  page is an e-mail from you on May 2nd of 2018,
11  correct?
12  A   Yes.
13  Q   And one of the things being discussed in
14  this e-mail chain is re-vacking a freezer, correct?
15  A   Yes.
16  Q   Do you know whether that re-vac was
17  completed?
18  A   To my recollection, yes.
19  Q   And in that second e-mail down on the
20  first page at the end of the first paragraph, you
21  state:  There will be a number of freezers coming in
22  for this same service.
23       What were you referring to?
24  A   I'm referring to this company's standard
25  operating procedure that they normally will send in

1   freezers for service.  That's their practice,
2   whether the freezer fail or not.
3   Q   Was there a particular time period where
4   they would send those in, a particular period of
5   use -- time period they would use them for and then
6   send them back in?
7   A   Yeah, I have to defer to the -- we'll have
8   to ask them because I'm not involved in that
9   procedure.
10  Q   Okay.  And so I think you said that to
11  your knowledge, this re-vac discussed in the e-mail
12  was completed, right?
13  A   That's my understanding.
14  Q   And the tank was returned to the customer?
15  A   That is my understanding.
16  Q   Do you know what type of freezers these
17  were?
18  A   XLC 1830s.
19  Q   Where do you see that?
20  A   I've seen it.  I've seen the freezer.
21  Q   That's just based on your knowledge of
22  this --
23  A   Yeah.
24  Q   -- particular case?
25  A   Yeah.  The freezer's over 10 years old.

1   Q   Okay.
2        (Exhibit Number 253 was marked for
3   identification.)
4   A   Thank you.
5   BY MS. ZEMAN:
6   Q   I've handed you a document marked as
7   Exhibit 253.  It has Bates number CHART007923
8   through 7925.  And, again, this appears to be an
9   e-mail chain within Chart including you on at least
10  some of the e-mails including as the -- on the
11  "from" line on the e-mail at the top of the first
12  page; is that correct?
13  A   Yes.
14  Q   And in the e-mail at the top of the first
15  page -- do you know what incident is being referred
16  to in this e-mail chain?
17  A   Yeah, I have to defer back to my notes on
18  this one.
19  Q   Looking at the e-mail at the top of the
20  second page with Bates number ending in 7924, the
21  issue is described as a tank or controller showing
22  a -- potentially a significant temperature spike and
23  asking if Chart can evaluate the controller logs,
24  correct?
25  A   Yes.

1   Q   And then in response, Justin Junnier
2   writes an e-mail where it appears that he's reviewed
3   the log data and has some opinions about what it
4   shows, correct?
5   A   We'll have to ask Justin on this.
6   Q   Well, his e-mail says:  It definitely
7   appears the supply tank was empty.
8        Correct?
9   A   Okay.  I see that here.
10  Q   Okay.  And then he refers to being
11  concerned about the drop below the glass transition
12  phase which could destroy the cell structure of
13  their samples.
14       Then in your e-mail, you ask him not to
15  mention the temp dropping below glass transition,
16  correct?
17  A   That is correct.
18  Q   And not to mention that samples may have
19  been compromised, correct?
20  A   That's correct.
21  Q   Who did you not want him to mention that
22  to?
23  A   We can't make assumptions.  So he -- he's
24  concerned about that, and I told him that in
25  reference to that, there is no -- there is no report

Page 89

1    on that.  We cannot assume that that's what
2    happened.  That's why I asked him not to mention
3    that.  But based on engineering's evaluation when we
4    looked at this download, it appears that the supply
5    tank went empty.
6        Q   Why would you not want Justin to even
7    mention the possibility of the temperature dropping
8    below the glass transition point and samples
9    possibly being compromised?
10       A   Because we're not an expert in that.  We
11   can't say that.
12       Q   You regularly communicate with your
13   colleagues within Chart by e-mail, correct?
14       A   Yes.
15       Q   And so this e-mail chain would have been
16   something that you wrote and kept within the normal
17   course of business, correct?
18       A   I'm looking at the date and the time.  19.
19   Yes.
20       Q   Are you familiar with vacuum failures
21   occurring with the HEco tanks, the H-E-C-O, tanks?
22       A   Only with the fiberglass neck design.
23       Q   Are those sometimes referred to as the
24   green neck tanks?
25       A   Yes.

Page 90

1        Q   What caused those failures?
2        A   You have to defer to engineering on that.
3    They have an explanation for that.
4        Q   Was it essentially something at that neck
5    joint was failing or not sealing properly such that
6    there wasn't a proper vacuum?
7        A   Again, that sounds right, but you have to
8    defer to engineering.  We no longer manufacture that
9    tank, by the way.
10       Q   Uh-huh.
11           Were those tanks deforming in any way?
12           MR. SMITH:  Overbroad.
13       A   Deforming?  I -- not that I -- I don't
14   understand the question.
15   BY MS. ZEMAN:
16       Q   Was there any physical deformation of the
17   HEco tanks that were experiencing vacuum failures?
18       A   Physically, no.  But, again, should defer
19   to engineering on that.
20       Q   And was the vacuum failure at the neck
21   occurring on the outer vessel?
22       A   Was it occurring where?
23       Q   Was it occurring on the exterior of the
24   tank?
25       A   You have to ask engineering.

Page 91

1        Q   Was there frost forming on those HEco
2    tanks that were experiencing vacuum failures?
3        A   Not that I recall.
4            (Exhibit Number 254 was marked for
5    identification.)
6    BY MS. ZEMAN:
7        Q   I've handed you a document marked as
8    Exhibit 254 and has Bates number CHART008786 through
9    8790.
10           Do you recognize this as an e-mail chain
11   that includes you on at least some of the e-mails?
12       A   Yes.
13       Q   And it's an e-mail chain you would have
14   received or sent within the normal course of
15   business at Chart, correct?
16       A   Yes.
17       Q   And is this e-mail chain generally
18   referring to a vacuum failure on a HEco tank?
19       A   Suspect vacuum loss.  Everything has to be
20   evaluated at the factory in order to verify that it
21   is a vacuum loss, but we wrote:  Suspect vacuum
22   loss.
23       Q   And Buzz Bies determined that the tank
24   should be replaced under warranty, correct, per the
25   e-mail at the bottom of the first page?

Page 92

1        A   Oh, yeah, I see.
2        Q   Is that correct?
3        A   Yes.  This is also the one with the glass
4    neck.
5        Q   Is this one of the green top --
6        A   Yes.
7        Q   -- tanks?
8            And does the photo at the end refresh your
9    recollection of whether those tanks were
10   experiencing frost when the vacuum would apparently
11   fail?
12       A   Yeah, this one shows frost.
13       Q   You can set that aside.
14       A   Oh, sorry.
15       Q   Are you aware of any instances where the
16   inner walls of a stainless steel freezer imploded?
17       A   Can you repeat that question?  I'm sorry.
18       Q   Are you aware of any instances where the
19   inner walls of a stainless steel freezer imploded?
20       A   No.
21       Q   Are you aware that that's what happened to
22   Tank 4 at PFC on March 4th, 2018?
23           MR. SMITH:  And if your only basis is what
24   counsel told you --
25           THE WITNESS:  That's it, yeah.

Page 93

1    BY MS. ZEMAN:
2       Q   And other than -- we're setting aside
3    Tank 4 at PFC.
4          You're not aware of any other instance of
5    the inner walls of a stainless steel freezer
6    imploding?
7       A   Correct.  Not that I recall.
8       Q   Are you aware of the inner walls of any
9    other stainless steel tank deforming in any way?
10      A   Not that I recall.
11         (Exhibit Number 255 was marked for
12    identification.)
13    BY MS. ZEMAN:
14      Q   I've handed you a document marked as
15    Exhibit 255.  It has Bates stamps CHART008310
16    through 8320.
17         And, again, this appears to be an e-mail
18    chain within Chart that includes you on at least
19    some of the e-mails; is that correct?
20         For instance, you are on the cc line on
21    the e-mail at the top of the first page.
22      A   Okay.
23      Q   Is that correct, what I described about
24    this e-mail chain?
25      A   That I'm on it, yes.

Page 94

1       Q   And is this an e-mail chain you would have
2    either sent or received within the normal course of
3    business at Chart?
4       A   Yes.
5       Q   And is this chain generally talking about
6    a Chart tank that suffered an implosion of the inner
7    vessel?
8       A   Yes, it appears so.  Don't think I really
9    got to see this freezer; may have.  I don't
10    remember.  I don't recall.
11      Q   Did you see photos of it?
12      A   I don't recall.
13      Q   On the page with Bates stamp ending in
14    8315, towards the top of the page, there's an e-mail
15    from Toni Bowers, and it says:  I received the
16    attached two photos of the freezer today.
17         Do you expect he would have looked at
18    those two photos?
19      A   I have to look at the case notes on here
20    to see the photos again to recollect my memory.
21      Q   What case notes would those be?
22      A   Quality report.
23      Q   What's a quality report?
24      A   Quality, you know, the pictures get posted
25    inside the case notes.

Page 95

1       Q   So they're -- so this e-mail chain refers
2    to Case 336375.
3          Are you saying there would be a file with
4    that case number that would include the photos?
5       A   Right.
6       Q   And going to the first page of the
7    exhibit, the second e-mail down is an e-mail from
8    yourself on March 14th of 2016, correct?
9       A   Yes.
10      Q   And in the third paragraph of that e-mail,
11    you describe what you suspect happened with the
12    tank, correct?
13      A   Based on the evaluation from engineering,
14    yes.
15      Q   And so when you say "we suspect" there,
16    are you referring to Chart generally?
17      A   Yes.
18      Q   What gas do you -- did Chart think had
19    leaked into the vacuum space?
20      A   Atmosphere.  But I have to defer that to
21    engineering because I got the explanation from
22    engineering.
23      Q   And then in that same sentence a little
24    further along, you refer to vaporization from a
25    liquid to a gas.

Page 96

1          So was the thought that a gas had gotten
2    into the vacuum space or that a liquid had gotten
3    into the vacuum space?
4       A   I have to defer this to engineering
5    because this explanation that I got, this freezer
6    was actually -- was actually moved.
7       Q   Uh-huh.
8       A   It says dismembered them off -- suspect
9    some sort of mechanism has dismembered them off.  So
10    this freezer was actually damaged.
11      Q   Physically damaged?
12      A   Yes.  The outer vessel was missing --
13    according to what I'm reading here -- missing its
14    handles.
15      Q   And who is Toni Bowers?
16      A   The customer.
17      Q   The customer or distributor?
18      A   The distributor.
19      Q   And in this e-mail on March 14th, you were
20    providing the distributor an explanation of what
21    Chart thought had happened to the tank, correct?
22      A   Correct.
23      Q   Why were you providing that explanation
24    instead of someone in engineering?
25      A   Because engineering doesn't talk to

Page 97

1    customers.
2        Q    Did engineering draft the explanation for
3    you to provide or was this your -- did you draft
4    this e-mail?
5        A    The explanation of what impacted the tank,
6    yes.
7        Q    Engineering drafted that or you did?
8        A    Engineering did.  So the rest -- the rest
9    of it is myself, but also --
10        Q    So, for instance, the paragraph that
11    starts "as far as the vacuum failure," did you write
12    that paragraph or did engineering write that
13    paragraph?
14        A    Engineering did.
15        Q    And how are you so sure of that?
16        A    Because I'm not an engineer.  So I ask
17    questions, and then they give me the answers, and
18    then I formulate the discussion for the customer.
19        Q    Is it possible that you drafted the
20    paragraph based on information that engineering
21    supplied to you?
22        A    Based on the evaluation of the freezer,
23    yes.
24        Q    All right.  What I'm trying to understand
25    is whether you actually drafted these exact

Page 98

1    sentences or if it was something that engineering
2    drafted and you copied and pasted, for instance,
3    into an e-mail as opposed to you taking something
4    that engineering explained to you and then drafting
5    a summary of it to provide to the distributor.
6        A    It's a combination of both.
7        Q    By it being a combination, I'm
8    understanding you to say that you're the one who
9    typed these particular words in this e-mail; is that
10    right?
11        A    Yes.
12        Q    Using information that engineering
13    supplied to you?
14        A    Yes.
15        Q    And so it's possible you didn't -- it's
16    possible you may have slightly misstated something
17    that engineering had explained?
18        A    It's a possibility.
19        Q    But what you're describing there is
20    essentially that either a liquid or a gas got into
21    the vacuum space, expanded, and then that caused the
22    inner vessel to deform; is that accurate?
23        A    That sounds right.
24        Q    Did any frost form on this tank?
25        A    Not that I recall.

Page 99

1        Q    Was the deformation on this tank similar
2    to the deformation on Tank 4 from PFC?
3        MR. SMITH:  No foundation.
4        THE WITNESS:  I have not seen Tank 4.
5    BY MS. ZEMAN:
6        Q    You haven't seen photos of Tank 4?
7        A    No.
8        Q    And this document is regarding an MVE 1839
9    tank, correct?
10        A    Yes.
11        Q    Is that tank similar to the MVE 808?
12        MR. SMITH:  Vague.
13        A    No.  I'll defer to engineering on that;
14    but physically speaking, no, it's different.
15    BY MS. ZEMAN:
16        Q    How are they different?
17        A    It's a larger vessel.
18        Q    Any other differences?
19        A    Yes, large lid.
20        Q    So it's a larger vessel with a larger lid?
21        A    Yes.
22        Q    Anything else?
23        A    Other than it being large.
24        Q    And this tank had approximately 10 inches
25    of liquid nitrogen in it at the time that it -- that

Page 100

1    it suffered the deformation, correct, according to
2    information included in the e-mail chain?
3        MR. SMITH:  Foundation.
4        The e-mail actually says 10 feet of liquid
5    in it.
6        THE WITNESS:  Where does it show that?
7        MR. SMITH:  I was looking at the page
8    ending 8319.
9        THE WITNESS:  319.
10        A    Well, that's a no-no right there.  So the
11    freezer was transferred from one building to another
12    with liquid.
13    BY MS. ZEMAN:
14        Q    And they shouldn't have transported it
15    with the liquid nitrogen --
16        A    That's correct.
17        Q    -- present, right?
18        A    That is correct.
19        Q    But according to the information in the
20    e-mail, they did so, correct?
21        A    That's what it looks like, yeah.
22        Q    Okay.  We're done with that exhibit.
23        Are you familiar with the level offset --
24    with the level offset on the TEC 3000 controller?
25        A    I've seen the level offset on the

Page 101

1    controller.  Engineering can provide a better
2    explanation as to what that does.
3        Q    What's your sense of its purpose?
4        A    Basically where the height of liquid level
5    line that's going into the freezer sits.  So if it's
6    1.3, the height of the level fill line or the -- you
7    have to check with engineering on that.
8        Q    Okay.  The level offset is a setting that
9    the end user can modify, correct?
10       A    Distributors should be setting that.
11       Q    It would be something the distributor
12   would set for the end user?
13       A    Yes.
14       Q    And it can be set to different levels
15   according to what the distributor determines is
16   appropriate for the end user, correct?
17       A    Yes.
18       Q    Is it possible for an MVE 808 tank to lose
19   13 inches of liquid nitrogen in 23 hours?
20       MR. SMITH:  Incomplete hypothetical, calls
21   for expert opinion.
22       A    Yeah, I defer to engineering.
23   BY MS. ZEMAN:
24       Q    Are you aware of that ever happening?
25       A    No.

Page 102

1        Q    Are you aware of any tank failures that
2    were caused by the gettering system?
3        MR. SMITH:  That's --
4        A    Gettering?
5        MR. SMITH:  -- vague.
6        A    Engineering.
7    BY MS. ZEMAN:
8        Q    It's not -- that's not --
9        A    Gettering.
10       Q    -- a term you're familiar with?
11       A    I've heard it --
12       Q    Okay.
13       A    -- but it's an engineering term, and I'll
14   let engineers discuss that.
15       Q    Okay.  But you sometimes deal with
16   customer complaints about problems with tanks,
17   correct?
18       A    Distributors, yeah.
19       Q    And are you familiar with any instances
20   where a distributor reported a problem that was
21   found to be associated with the gettering system?
22       MR. SMITH:  No foundation.
23       A    Not that I can recall.
24   BY MS. ZEMAN:
25       Q    You don't recall any discussion of getter

Page 103

1    problems or -- of getter problems resulting in any
2    tank issues?
3        A    Not that I recall.
4        Q    Have you ever approved a tank replacement
5    because of a problem associated with a gettering
6    system?
7        A    No, not that I'm aware of.
8        Q    Have you ever approved a tank replacement
9    where molecular sieve was discussed as part of the
10   problem?
11       A    What -- what?
12       Q    Have you ever approved a tank replacement
13   where molecular sieve was discussed as part of the
14   problem?
15       A    That's an engineering term.  I defer to
16   engineering on that.
17       Q    You're not familiar with the term being
18   raised in the course of approving any tank
19   replacements?
20       A    I know it absorbs moisture.
21       Q    Okay.
22       A    That's it.
23       Q    So just one more time.  So you're not
24   familiar with that term being raised in the course
25   of approving any tank replacements?

Page 104

1        A    Not that I can recall.
2        MR. SMITH:  I have to do a call at some
3    point.
4        MS. ZEMAN:  I think we're almost done.
5        MR. SMITH:  Okay.
6        MS. ZEMAN:  We might even be done right
7    now.
8        MR. SMITH:  Oh, okay.
9        MS. ZEMAN:  Give me just a minute.
10       THE VIDEOGRAPHER:  Would you like to go
11   off the record, Counsel?
12       MS. ZEMAN:  Yeah, why don't we.
13       THE VIDEOGRAPHER:  The time is 12:36.
14   We're off the record.
15       (Recess 12:36-12:42 p.m.)
16       THE VIDEOGRAPHER:  The time is 12:42 p.m.
17   We're back on the record.
18       MS. ZEMAN:  I have no further questions.
19       THE WITNESS:  Okay.
20       MS. ZEMAN:  Anyone else?
21       MR. TANIMASA:  No questions.
22       MR. TARANTINO:  No.
23       MR. SMITH:  I have a few redirect
24   questions.
25       EXAMINATION

1    BY MR. SMITH:
2        Q   Mr. Gonzalez, do you recall testifying
3    with Ms. Zeman about distributor meetings that
4    occurred in March of 2018 and August of 2019?
5        A   Yes.
6        Q   And do you recall testifying that you
7    didn't discuss problems with the TEC 3000 controller
8    during those meetings?
9        A   That is correct.
10       Q   Did you discuss anything about the TEC
11   3000 controller during those meetings with the
12   distributors?
13       A   Yes.  Should they experience the SN equals
14   0, to go ahead and restore the controller to
15   defaults.
16       Q   And so was that a part of the meeting that
17   you gave?
18       A   Yes.
19       Q   Second area of questioning, I think you
20   testified previously that you were not aware of any
21   instances where Chart had replaced a tank or
22   controller where the underlying issue was neither a
23   freezer or a controller problem; is that right?
24       A   Yeah, that's correct.
25       Q   Okay.  Are you aware of any instances

1    where Chart has approved a warranty claim for a
2    freezer or a controller where subsequent analysis
3    showed that there was not a freezer or controller
4    problem?
5        A   Yes.
6        Q   And does that happen often?
7        A   No.
8        Q   Are you aware of instances where Chart has
9    approved a warranty request and then subsequently
10   determined that there was an error of some other
11   type, a user error, for example?
12       A   Yes.
13       MR. SMITH:  Okay.  Those are all the
14   questions I had.
15       MR. TANIMASA:  No questions still.
16       MR. TARANTINO:  None.
17       FURTHER EXAMINATION
18   BY MS. ZEMAN:
19       Q   I'd like to get just clarification of the
20   meetings.
21       Did you discuss the resetting controllers
22   if the serial number displayed as zero issue
23   appeared at both the August 2019 and the March 2018
24   meeting?
25       A   I explained to them how to do a restore to

1    defaults.
2        Q   That occurred at both of the meetings?
3        A   Yes.
4        Q   And was that part of some affirmative
5    presentation you gave or was it in response to
6    questions?
7        A   No, that was me just telling them if you
8    should experience it.
9        Q   Were you giving a presentation at the
10   time?
11       A   Yes.
12       Q   What was your presentation on generally?
13       A   General troubleshooting.
14       Q   And was that presentation open to all
15   individuals attending the meeting?
16       A   Correct.
17       Q   The broader meeting?
18       A   Yes.
19       Q   And had you provided those instructions at
20   any time prior to the March 2018 meeting?
21       A   The instructions are in the technical
22   manual.
23       Q   For how to reset a controller, correct?
24       A   Yeah, how to restore the controller, yes.
25       Q   But not specifically in relation to the

1    serial number displaying as zero, correct?
2        A   Correct.
3        Q   Had you given any instructions on what to
4    do when the serial number displays as zero prior to
5    March of 2018?
6        A   Not that I recall.  I possibly could have
7    because that's part of the maintenance and
8    troubleshooting in the technical manual, and restore
9    to defaults is one of them.
10       Q   Is it possible that you could have given
11   those instructions in relation to the serial number
12   displaying as zero at a distributor meeting prior to
13   March of 2018?
14       A   It's possible.
15       Q   But you don't recall doing so?
16       A   Correct.
17       MS. ZEMAN:  No further questions.
18       THE WITNESS:  Okay.
19       THE VIDEOGRAPHER:  This concludes the
20   videotaped deposition.  The time is approximately
21   12:47 p.m.  We're off the record.
22       (Deposition concluded at 12:47 p.m.)
23       (Signature reserved.)
24
25

## Page 109

1  The following reporter and firm
disclosures were presented by me at this proceeding
2  for review by counsel:
3  REPORTER DISCLOSURES
4  The following representations and
disclosures are made in compliance with Georgia Law,
5  more specifically:
Article 10 (B) of the Rules and
6  Regulations of the Board of Court Reporting
(disclosure forms)
7  OCGA Section 9-11-28 (c) (disqualification
of reporter for financial interest)
8  OCGA Sections 15-14-37 (a) and (b)
(prohibitions against contracts except on a
9  case-by-case basis).
10  - I am a certified court reporter in the State of
Georgia.
11  - I am a subcontractor for Veritext.
- I have been assigned to make a complete and
12  accurate record of these proceedings.
- I have no relationship of interest in the matter
13  on which I am about to report which would disqualify
me from making a verbatim record or maintaining my
14  obligation of impartiality in compliance with the
Code of Professional Ethics.
15  - I have no direct contract with any party in this
action, and my compensation is determined solely by
16  the terms of my subcontractor agreement.
17
18  FIRM DISCLOSURES
19  - Veritext was contacted to provide reporting
services by the noticing or taking attorney in this
20  matter.
- There is no agreement in place that is prohibited
21  by OCGA 15-14-37 (a) and (b).  Any case-specific
discounts are automatically applied to all parties,
22  at such time as any party receives a discount.
- Transcripts:  The transcript of this proceeding as
23  produced will be a true, correct, and complete
record of the colloquies, questions, and answers as
24  submitted by the certified court reporter.
- Exhibits:  No changes will be made to the exhibits
25  as submitted by the reporter, attorneys, or

## Page 110

1  - Password-Protected Access:  Transcripts and
exhibits relating to this proceeding will be
2  uploaded to a password-protected repository, to
which all ordering parties will have access.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 111

1  CERTIFICATE
2  STATE OF GEORGIA:
COUNTY OF FULTON:
3
4  I hereby certify that the foregoing
transcript was taken down, as stated in the caption,
5  and the colloquies, questions and answers were
reduced to typewriting under my direction; that the
6  transcript is a true and correct record of the
evidence given upon said proceeding.
7  I further certify that I am not a relative
or employee or attorney of any party, nor am I
8  financially interested in the outcome of this
action.
9  I have no relationship of interest in this
matter which would disqualify me from maintaining my
10  obligation of impartiality in compliance with the
Code of Professional Ethics.
11  I have no direct contract with any party
in this action and my compensation is based solely
12  on the terms of my subcontractor agreement.
Nothing in the arrangements made for this
13  proceeding impacts my absolute commitment to serve
all parties as an impartial officer of the court.
14
15  This the 2nd day of March, 2020.
16
17
18  _____
19  ROBYN BOSWORTH, RPR, CRR, CRC, CCR-B-2138
20
21
22
23
24
25

## Page 112

1  To: Benjamin Smith, Esq.
2  Re: Signature of Deponent Ramon Gonzalez
3  Date Errata due back at our offices:        }
4
5  Greetings:
6  This deposition has been requested for read and sign
by the deponent.  It is the deponent's
7  responsibility to review the transcript, noting any
changes or corrections on the attached PDF Errata.
8  The deponent may fill out the Errata electronically
or print and fill out manually.
9
Once the Errata is signed by the deponent and
10  notarized, please mail it to the offices of Veritext
(below).
11
When the signed Errata is returned to us, we will
12  seal and forward to the taking attorney to file with
the original transcript.  We will also send copies
13  of the Errata to all ordering parties.
If the signed Errata is not returned within the time
14  above, the original transcript may be filed with the
15  court without the signature of the deponent.
16
17  Please send completed Errata to:
18  Veritext Production Facility
19  20 Mansell Court, Suite 300
20  Roswell, GA 30076
21  (770) 343-9696
22
23
24
25

Page 113

1    ERRATA for ASSIGNMENT #
2    I, the undersigned, do hereby certify that I have
     read the transcript of my testimony, and that
3
4    ____ There are no changes noted.
5    ____ The following changes are noted:
6
     Pursuant to Rule 30(7)(e) of the Federal Rules of
7    Civil Procedure and/or OCGA 9-11-30(e), any changes
     in form or substance which you desire to make to
8    your testimony shall be entered upon the deposition
     with a statement of the reasons given for making
9    them.  To assist you in making any such corrections,
     please use the form below.  If additional pages are
10   necessary, please furnish same and attach.
11   Page No._____Line No._____Change to_____
12   _____
13   Reason for change_____
14   Page No._____Line No._____Change to_____
15   _____
16   Reason for change_____
17   Page No._____Line No._____Change to_____
18   _____
19   Reason for change_____
20   Page No._____Line No._____Change to_____
21   _____
22   Reason for change_____
23   Page No._____Line No._____Change to_____
24   _____
25   Reason for change_____

Page 114

1    Page No._____Line No._____Change to_____
2    _____
3    Reason for change_____
4    Page No._____Line No._____Change to_____
5    _____
6    Reason for change_____
7    Page No._____Line No._____Change to_____
8    _____
9    Reason for change_____
10   Page No._____Line No._____Change to_____
11   _____
12   Reason for change_____
13   Page No._____Line No._____Change to_____
14   _____
15   Reason for change_____
16   Page No._____Line No._____Change to_____
17   _____
18   Reason for change_____
19
20           _____
             DEPONENT'S SIGNATURE
21   Sworn to and subscribed before me this_____day of
     _____, 20__.
22
23   _____
     NOTARY PUBLIC
24
25   My Commission Expires:_____

Eric H. Gibbs (State Bar No. 178658)
Amy M. Zeman (State Bar No. 273100)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, CA 94612
Tel: (510) 350-9700
Fax: (510) 350-9701
ehg@classlawgroup.com
amz@classlawgroup.com

Adam B. Wolf (State Bar No. 215914)
Tracey B. Cowan (State Bar No. 250053)
**PEIFFER WOLF CARR KANE &
CONWAY, APLC**
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Tel: (415) 766-3545
Fax: (415) 402-0058
awolf@peifferwolf.com
tcowan@peifferwolf.com

Dena C. Sharp (State Bar No. 245869)
Adam E. Polk (State Bar No. 273000)
Nina R. Gliozzo (State Bar No. 333569)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dsharp@girardsharp.com
apolk@girardsharp.com
ngliozzo@girardsharp.com

*Plaintiffs' counsel*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE PACIFIC FERTILITY CENTER LITIGATION<br><br><br>This Document Relates to:<br>No. 3:18-cv-01586<br>(A.B., C.D., E.F., G.H., and I.J.) | Master Case No. 3:18-cv-01586-JSC<br><br>**PLAINTIFFS' OPPOSITION TO CHART'S MOTION IN LIMINE NO. 1: OTHER OCCURRENCE EVIDENCE**<br><br>Pretrial Hearing: April 29, 2021<br>Time: 2:00 p.m.<br>Judge: Hon. Jacqueline S. Corley<br>Place: Courtroom F, 15th Floor<br><br>Trial Date: May 20, 2021 |

**INTRODUCTION**

Chart's first motion in limine asks the Court to exclude all evidence relating to other tank failures or other controller failures. Although Chart's motion is more than 18 pages long, it specifies only one trial exhibit that it believes should be excluded: Trial Exhibit 274. That exhibit discusses another tank failure, but it is admissible because of the general statements made by Chart and its distributor, which support Plaintiffs' contention that internal weld cracks are known within the cryogenic equipment industry to cause tank implosions. It is also admissible to impeach Chart, whose documents identify only cracks or leaks as a potential cause of a tank implosion, but who now claims that something else could have caused Tank 4 to implode. And it is admissible to impeach Chart's expert who has testified that Chart's use of partial-penetration welds in its cryogenic tanks is reasonably safe. Plaintiffs therefore request that the Court deny Chart's motion to exclude Trial Exhibit 274.

The remainder of Chart's motion should be denied as well. Chart's request for a blanket of exclusion of any other evidence that may mention another tank failure or another controller failure is excessively broad and does not provide the Court with the information it needs to determine whether specific trial exhibits are admissible. The Court has already found that several of the trial exhibits that discuss other controller failures are relevant to Plaintiffs' failure-to-recall claim—specifically citing those exhibits as a basis for denying Chart's motion for summary judgment. Other exhibits may also discuss tank or controller failures, but because Chart has not identified which exhibits its motion is intended to address, neither Plaintiffs nor the Court are in a position to evaluate the admissibility of those exhibits. Chart will have an opportunity to raise objections to specific exhibits during trial; it should not be permitted to broadly object to all evidence that might mention other tanks or controllers now—without first identifying the specific exhibits it would have the Court exclude.

**ARGUMENT**

**A.  Trial Exhibit 274 is admissible to support Plaintiffs' argument that internal weld cracks are known to cause tank implosions and to impeach Chart's witnesses.**

Chart's motion identifies only one exhibit that it believes should be excluded: Trial Exhibit 274. (*See* Mot. at 10.) That exhibit is an email exchange between Chart and one of its distributors, Princeton Cryotech. A cryogenic tank at Rutgers University had imploded and the distributor wrote that "my

1

assumption is an implosion such as this is an obvious sign of an internal weld leak." (*Id.* at 2.) Chart did not disagree and asked for an address to ship a replacement tank. (*Id.*)

Chart argues this email should be deemed inadmissible because Plaintiffs cannot establish the Rutgers tank was substantially similar to Tank 4. (Mot. at 19.) Chart is correct that if Plaintiff intended to introduce the Rutgers tank implosion as "direct proof of negligence, a design defect, or notice of the defect," they would be required to make a showing of substantial similarity. *Cooper v. Firestone Tire & Rubber Co.*, 945 F.2d 1103, 1105 (9th Cir. 1991). But Plaintiffs are not introducing the Rutgers incident as direct proof that Tank 4 suffered from a similar design defect, that Chart was negligent, or that a 2020 tank implosion could have provided notice to Chart back in 2018. Regardless of why the Rutgers tank failed, it is revealing that a Chart distributor would instinctively assume that a cryogenic tank implosion was caused by an internal weld leak and that Chart would not contest that assumption. Chart's own failure-modes analysis shows why: when a Chart cryogenic tank (regardless of the model of the tank) suffers an internal weld leak, Chart has determined that the tank's inner vessel will implode. (*See* ECF No. 671-12 (DFMECA) at DEW-3, 4.) That document contains over 100 possible ways Chart's tanks can fail, but the only failures that lead to tank implosions all involve a weld crack or leak. (*Id.*, DEW-3, 4, 6.) The email chain between Chart and its distributor is relevant for the same reason that Chart's failure-modes analysis is relevant: it supports Plaintiffs' contention that internal leaks are known within the cryogenic equipment industry to cause inner vessel implosions. *Benson Tower Condo. Owners Ass'n v. Victaulic Co.*, 702 F. App'x 537, 541 (9th Cir. 2017) (other incidents admissible when not used as "direct proof," but rather to rebut defendants' alternate theory of causation).

Plaintiffs are likely to use the Rutgers email chain to impeach the credibility of Chart's experts and employees, who have taken the position in this litigation that something other than a crack or leak could cause its tanks' inner vessel to implode. Before litigation, the only potential causes of tank implosions discussed in Chart emails and documents involve a breach of the tank wall. But after a weld crack was identified in Tank 4's inner tank wall, Chart has come up with a new causal mechanism that it says could be responsible for a tank implosion. For instance, Chart employee Keith Gustafson now says that the molecular sieve, or getter, that's installed in the bottom of Chart's tanks can cause an

implosion. (Zeman Declaration, Exhibit 1 (Gustafson Depo.) at 335-36.) And Chart's cryogenic expert, Dr. Franklin Miller, says that PFC caused Tank 4 to implode by failing to keep it filled with liquid nitrogen, which triggered a release of gas from Tank 4's molecular sieve that crumpled the tank's inner vessel. (ECF No. 673-14 (Miller Report) at 9-11.) Miller has also testified that in his opinion, Chart's use of partial-penetration welds on its cryogenic tanks was appropriate and reasonably safe. (*Id.* at 6-7, 24 ¶ 4.)

The Ninth Circuit has confirmed that the substantial similarity requirement does not apply when evidence is used for impeachment purposes, as Plaintiffs intend to do. *Cooper*, 945 F.2d at 1105. Even dissimilar incidents can be used, for example, to impeach the credibility of an expert who testifies that a product is safe. *Id.*; *see also In re Bard IVC Filters Prod. Liab. Litig.,* No. CV-16-00263-PHX-DGC, 2019 WL 1880029, at *5 (D. Ariz. Apr. 26, 2019) (denying motion to exclude evidence of other incidents under *Cooper* where "Defendants clearly will assert in this case that the [product at issue] was safe and effective").

Lastly, even if the substantial similarity requirement did apply to Trial Exhibit 274, "[t]he degree of substantial similarity [required] is dependent on how the evidence is to be used." *Maiorano v. Home Depot U.S.A., Inc.*, No. 3:16-cv-02862-BEN-MDD, 2018 WL 2128609, at *3–4 (S.D. Cal. May 9, 2018). The underlying concern is whether the proffered evidence is relevant to an issue of consequence in the litigation. *Cooper*, 945 F.2d at 1105. Here, issues of consequence include whether an inner vessel implosion is a symptom consistent with a weld leak. The Rutgers tank may have been a different model than Tank 4, but Chart's failure-modes analysis does not draw a distinction between its models—it applies to all cryogenic freezers, whether MVE models, HECO models, Vario models, or Cryosystem models. (DFMECA.) Both tanks imploded, and the fact that Chart's distributor immediately recognized the implosion as indicative of a weld leak is both consistent with Chart's own failure-modes analysis and probative of what it generally means when a cryogenic tank's inner vessel implodes.

**B.     Chart's request for a blanket exclusion of evidence involving other tanks should be denied as overly broad and premature.**

Chart also seeks a blanket exclusion of all evidence relating to any other tank failure and all evidence related to its recall of aluminum cryogenic tanks shortly after Tank 4 failed in March 2018. Motions in limine to exclude broad categories of evidence are disfavored, and the underlying issues are better dealt with during trial as the admissibility of evidence arises in context. *Branch v. Umphenour*, No. 1:08-cv-01655-SAB-PC, 2017 WL 220129, at *2 (E.D. Cal. Jan. 18, 2017). As Judge Tigar put it in the *CRT Litigation*, "Defendants have not placed the evidence in question before the Court, and the Court cannot rule in a vacuum." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944 JST, 2016 WL 7803893, at *2 (N.D. Cal. Nov. 15, 2016); *see also Martin v. City of Barstow*, No. ED CV 13-02193-AB (SPx), 2015 WL 12743591, at *2 (C.D. Cal. Nov. 5, 2015) ("Motions in limine to exclude broad categories of evidence are usually improper 'as the court is almost always better situated to rule on evidentiary issues in their factual context during trial.'")

Here, Chart has not identified any exhibits that refer to other tank failures or to Chart's recall of aluminum tanks, making it difficult to assess the merits of Chart's objection. Plaintiffs do not intend to submit evidence that suggests the same issues that led to the aluminum tank recall also caused Tank 4 to fail. But that recall does have some relevance to Plaintiffs' failure-to-recall claim, as it shows that Chart is capable of conducting a product recall and recognizes the hazard that a sudden vacuum failure can pose to biological samples if defects are not promptly addressed through an appropriate recall or retrofit. Jurors will ultimately be asked whether a reasonable manufacturer in Chart's position would have recalled or retrofitted its TEC 3000 controllers to prevent the irreversible harm that can result from a sudden vacuum failure. (*See* CACI No. 1223.) The aluminum tank recall may assist jurors in making that assessment, and as it would not be offered to prove that Tank 4 suffered from a similar defect, it would not be subject to the substantial similarity requirement that forms the basis for Chart's exclusion request. *See Cooper*, 945 F.2d at 1105; *Benson*, 702 F. App'x at 541.

Exhibits and testimony regarding other tank failures could also prove relevant, and so Plaintiffs ask the Court to defer ruling on Chart's objection until any such evidence is properly before it. *See Houghtailing v. Crown Equip. Corp.*, No. 11-CV-05040-TEH, 2014 WL 12641993, at *1–2 (N.D. Cal.

1    Nov. 18, 2014) (denying "blanket exclusion of all evidence of other accidents"); *Snyder v. Bank of Am.,*

2    *N.A.*, No. 15-CV-04228-KAW, 2020 WL 6462400, at *11 (N.D. Cal. Nov. 3, 2020) ("without knowing

3    what evidence Plaintiff intends to introduce, it appears premature to rule on this motion in limine").

4            For instance, Trial Exhibit 263 (CHART062204-213), which was cited in Plaintiffs' Opposition

5    to Chart's Motion for Summary Judgment, is another email chain between Chart and one of its

6    authorized distributors. (*See* ECF No. 673-04 (Pls. MSJ Opp.) at 7.) The distributor wrote "two

7    consecutive HECO units experience VACUUM FAILURE in [city]! Wow, I have never seen this

8    before. … This is very serious and we don't want this to get around." (Trial Ex. 263 at

9    CHART062211.) Chart agreed, replying, "This is definitely an unusual circumstance." (*Id.*) While the

10   email chain references other tank failures, and so would be covered by Chart's request for a blanket

11   exclusion, the purpose for which it was offered during summary judgment proceedings was to show

12   that Chart and its distributors expect the vacuum insulation layer in Chart tanks to fail gradually rather

13   than suddenly and all at once. (Pls. MSJ Opp. at 7.) Plaintiffs are not, in other words, introducing the

14   document to prove that Tank 4 and the HECO units in Texas suffered from a common defect, which

15   would require a showing of substantial similarity. They are introducing it to support their claim that

16   ordinary users of cryogenic tanks do not expect a tank to lose vacuum overnight. That is relevant under

17   the consumer-expectations test for a design defect. *See* CACI 1203. And it is also probative of Chart's

18   contention that PFC's negligence caused or contributed to the March 4th incident. If Chart admits that it

19   is "definitely an unusual circumstance" for a vacuum to fail overnight and implicitly agrees "we don't

20   want [it] to get around" that sudden vacuum failures have occurred in Chart tanks, that could make

21   PFC's reliance on manual monitoring alone seem more like a reasonable interim measure to a jury and

22   less like negligence. PFC apparently did not believe it was possible for a tank to lose vacuum and fail

23   overnight, and that belief appears more reasonable when viewed alongside an email chain where Chart

24   and its authorized distributor express great surprise that a customer's tanks would suddenly lose their

25   vacuum insulation.

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## C.     Chart's request for a blanket exclusion of evidence involving prior TEC-3000 controller failures should also be denied as overly broad and premature.

Chart also seeks to exclude any evidence referring to prior controller failures in Chart's TEC-3000 controller. That evidence is critical to Plaintiffs' failure-to-recall claim, as it shows that Chart learned its TEC-3000 controller was defective prior to the March 4th incident but failed to address that defect through a retrofit campaign or a recall notice. (*See* ECF No. 712 (3/8/21 Order on MSJ) at 5-6.) Chart claims the evidence is hearsay, but it does not specify which exhibits it is referring to or which statements it believes constitute inadmissible hearsay. Plaintiffs therefore suggest that the Court deny Chart's motion in limine as overly broad. Chart will have an opportunity to object to specific exhibits and identify the statements it believes constitute inadmissible hearsay during trial. *See United States v. Kail*, No. 18-CR-00172-BLF-1, 2021 WL 261135, at *4 (N.D. Cal. Jan. 26, 2021) (denying motion in limine where movant had "not identified any specific [hearsay] statements it seeks to bar, preventing the Court from conducting the fact-based, particularized analysis that these rules require").

Plaintiffs do note, however, that they submitted several emails discussing other TEC-3000 controllers in opposition to Chart's motion for summary judgment. (*See* ECF Nos. 675-09, 675-10 thru 675-16, and 675-33 (1/29/21 Zeman Decl., Exs. 51, 53-59, 78).) Those emails were entered into evidence without objection and appear to be admissible as statements of a party opponent, statements that Chart manifested that it adopted or believe to be true, business records, or statements that are being offered to show Chart's knowledge rather than for the truth of the matter. *See* Fed. R. Evid. 801(c)(2), (d)(2)(A)-(D); 803(6); *White v. Ford Motor Co*., 312 F.3d 998, 1009 (9th Cir. 2002) ("As for the customer reports, they were clearly admissible under the business records exception to the hearsay rule to show that Ford had notice of rollaways").

For example, it was a Chart employee, not a customers, who wrote "SN=0 is usually accompanied by settings going haywire, level reading zero and both temps reading -273° C." (ECF No. 675-09.) Chart employees likewise stated that "the controllers (Tec3000) have very high return rates" (*id.*, Ex. 55); "we are receiving additional cases global wide relating to this issue" (ECF No. 675-12); "[e]ven when we offer replacements they come up with the same issues" (ECF No. 675-15); and "We should plan to take action immediately as we have just experienced another 10 or so controllers that

failed" (ECF No. 675-16). None of these statements are considered hearsay, as they were made by an opposing party's employees on matters that fell within the scope of their employment. Fed. R. Evid. 801(d)(2)((D).

Chart also argues that any evidence Plaintiffs might present regarding the SN=0 issue do not meet the substantial similarity requirement because other customers who experienced the SN=0 issue may not have unplugged their controllers. (Mot. at 22.) Chart has acknowledged, however, that other customers *did* continue to use their controllers after the SN=0 manifests, just like PFC. (ECF No. 674-22 (Brooks Dep.) at 165-66.) And because a malfunctioning controller will repeatedly sound false alarms when plugged in, the only practical way to continue using a malfunctioning controller is to plug it in when the tank needs to be refilled but otherwise to keep the controller unplugged. (ECF No. 671-33 (10/09/19 Pacific MSO 30(b)(6) and Conaghan) at 76-77, 79, 187-189; ECF No. 671-34 (Pacific MSO 30(b)(6) and Romney Dep.) at 112-113; ECF No. 674-35 (MSO001984) at 1986.)

Even if Chart were correct that other customers did not unplug their controllers, it misinterprets the substantial similarity requirement. Chart argues that Plaintiffs must establish identical circumstances—not only the same TEC-3000 controller and the same symptoms, but the same tank, same firmware version, same controller settings, same surrounding environment, same loss of tissue, same customer reaction to the symptoms. (Mot. at 20-22.) But the substantial similarity requirement is not so demanding. In fact, "the degree of substantial similarity is relaxed when the evidence of other incidents is used to demonstrate notice or awareness of a potential defect." *Maiorano*, 2018 WL 2128609, at *4 (citing *Four Corners Helicopters, Inc. v. Turbomeca, S.A.,* 979 F.2d 1434, 1440 (10th Cir. 1992)). Chart's emails show that its TEC-3000 controller suffers from a common "SN=0" issue that causes the controller to inaccurately report the liquid nitrogen levels of zero and temperature readings of 273° C. That is exactly what happened to Tank 4, so it is relevant that Chart had numerous reports of the same symptoms in the same TEC-3000 controller as far back as 2015, and even had an internal abbreviation for those symptoms, and yet did nothing about it. *See Beaty v. Ford Motor Co.*, No. 20-35141, --- Fed. Appx. ----, 2021 WL 1235844, at *2 (9th Cir. Apr. 2, 2021) (reversing district court's finding that incidents involving other model lines were not substantially similar; plaintiffs

1  "presented evidence based on customer complaints that [sunroofs] in Ford-manufactured cars were

2  prone to shatter for no apparent reason—the specific defect at issue").

3       The substantial similarity requirement is at bottom a requirement that evidence be relevant.

4  *Cooper*, 945 F.2d at 1105. And here the Court has already determined that exhibits discussing the SN=0

5  issue in other TEC-3000 controllers is relevant to Plaintiffs' failure-to-recall claim, citing several of

6  those exhibits as a basis for denying Chart's motion for summary judgment. (3/8/21 Order on MSJ at 5-

7  6.) Chart had argued that these exhibits were not relevant to show Chart had knowledge of a defect in

8  Tank 4's controller and that because PFC had unplugged Tank 4's controller, it did not fall within the

9  scope of other customers' controller issues—essentially the same argument it is making again here—

10  but the Court found otherwise. (*See* ECF No. 685 (2/12/21 MSJ Reply) at 10.) If Chart wants to raise

11  objections to specific other exhibits, it can do so before they are introduced at trial, but the Court's

12  summary judgment order illustrates why a blanket exclusion of all evidence related to other controller

13  failures is unwarranted here. *See Miranda v. U.S. Sec. Assocs., Inc.*, No. 18-CV-00734-LHK, 2019 WL

14  2929966, at *3 (N.D. Cal. July 8, 2019) ("A motion in limine is not an opportunity to relitigate a

15  summary judgment order.")

16  **CONCLUSION**

17       Plaintiffs respectfully request that the Court deny Chart's request to exclude Trial Exhibit 274,

18  and deny the remainder of Chart's motion as excessively broad. Chart will have an opportunity to

19  object to specific exhibits and testimony during trial, but Chart's request for a blanket exclusion of all

20  evidence that might mention other tanks or other controllers is improper and unwarranted.

21

22  Dated: April 14, 2021          Respectfully submitted,

23            By:    */s/ Amy M. Zeman*

24            Eric H. Gibbs (State Bar No. 178658)
             Amy M. Zeman (State Bar No. 273100)

25            **GIBBS LAW GROUP LLP**

26            505 14th Street, Suite 1110
             Oakland, CA 94612

27            Tel: (510) 350-9700
             Fax: (510) 350-9701

28            ehg@classlawgroup.com

1

amz@classlawgroup.com

2

Dena C. Sharp (State Bar No. 245869)
Adam E. Polk (State Bar No. 273000)

3

Nina R. Gliozzo (State Bar No. 333569)

4

**GIRARD SHARP LLP**
601 California Street, Suite 1400

5

San Francisco, CA 94108

6

Tel: (415) 981-4800
Fax: (415) 981-4846

7

dsharp@girardsharp.com

8

apolk@girardsharp.com
ngliozzo@giradsharp.com

9

Adam B. Wolf (State Bar No. 215914)

10

Tracey B. Cowan (State Bar No. 250053)

11

**PEIFFER WOLF CARR KANE &
CONWAY, APLC**

12

4 Embarcadero Center, Suite 1400
San Francisco, CA 94111

13

Tel: (415) 766-3545

14

Fax: (415) 402-0058
awolf@peifferwolf.com

15

tcowan@peifferwolf.com

16

*Plaintiffs' Counsel*

17

18

19

20

21

22

23

24

25

26

27

28

9

Eric H. Gibbs (State Bar No. 178658)
Amy M. Zeman (State Bar No. 273100)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, CA 94612
Tel: (510) 350-9700
Fax: (510) 350-9701
ehg@classlawgroup.com
amz@classlawgroup.com

Adam B. Wolf (State Bar No. 215914)
Tracey B. Cowan (State Bar No. 250053)
**PEIFFER WOLF CARR KANE &
CONWAY, APLC**
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Tel: (415) 766-3545
Fax: (415) 402-0058
awolf@peifferwolf.com
tcowan@peifferwolf.com

*Plaintiffs' counsel*

Dena C. Sharp (State Bar No. 245869)
Adam E. Polk (State Bar No. 273000)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dsharp@girardsharp.com
apolk@girardsharp.com

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE PACIFIC FERTILITY CENTER LITIGATION<br><br><br>This Document Relates to:<br>No. 3:18-cv-01586<br>(A.B., C.D., E.F., G.H., and I.J.) | Master Case No. 3:18-cv-01586-JSC<br><br>**DECLARATION OF AMY M. ZEMAN IN SUPPORT OF PLAINTIFFS' OPPOSITION TO CHART'S MOTION IN LIMINE NO. 1: OTHER OCCURRENCE EVIDENCE**<br><br>Pretrial Hearing: April 29, 2021<br>Time: 2:00 p.m.<br>Judge: Hon. Jacqueline S. Corley<br>Place: Courtroom F, 15th Floor<br><br>Trial Date: May 20, 2021 |

I, Amy M. Zeman, declare as follows:

1.      I am a partner at the law firm Gibbs Law Group LLP, counsel for Plaintiffs in the above captioned action, and submit this declaration in support of Plaintiffs' Opposition to Chart's Motion in Limine No. 1.  I make this declaration upon personal knowledge and am competent to testify to the facts set forth herein.

2.      Attached as **Exhibit 1** are excerpts from the deposition of Keith Gustafson taken on February 21, 2020.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 14th day of April 2021 in Oakland, California.


                                          /s/ Amy M. Zeman
                                          Amy M. Zeman

1

# EXHIBIT 1

1               UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF CALIFORNIA
2                   SAN FRANCISCO DIVISION

3

4

5

6   IN RE PACIFIC FERTILITY      Case No. 3:18-cv-01586-JSC
    CENTER LITIGATION
7

8   ~~~~~~~~~~~~~~~~~~~~~~~~~~

9

10                   CONFIDENTIAL

11              VIDEO DEPOSITION OF

12

             KEITH WARNER GUSTAFSON
13

14                   VOLUME II

15

16

                 February 21, 2020
17
                   9:33 a.m.
18

19

20              Board Meeting Room
                710 Transit Avenue
21               Canton, Georgia

22

23

24   S. Julie Friedman, CCR-B-1476

25

                        298

1    little transition piece; and the neck is 25 inches in

2    diameter.  It's the top -- top uppermost 8 inches of

3    the vessel.

4         Q.    So the neck on an 808 would be the top

5    8 inches?

6         A.    Yeah.

7         Q.    Do you know --  Do you know what caused

8    the neck or inner vessel to implode on the three or

9    four tanks where you saw that?

10        A.    Annular space was pressurized.  This is

11   generally caused by the getter in the dewar giving

12   off the gases it adsorbed when the dewar is taken out

13   of service.

14        Q.    Are you saying it typically happens after

15   a tank is taken out of service or before?

16        A.    After.

17        Q.    And why would it happen after a tank is

18   out -- taken out of service?

19        A.    'Cause the getter has to warm up for it to

20   give off the gas.

21        Q.    How much does it need to warm up?

22        A.    Depends upon how saturated with gas it is.

23   As a guess, I would say it would have to get up

24   above, oh, maybe minus 150 Farenheit, something like

25   that.  That would be my best guess without data in

BARKLEY
Court Reporters

1    front of me.

2         Q.    Did you say minus 150 Farenheit?

3         A.    Minus 150 Farenheit.  Yeah.  It's

4    somewhere -- minus 200, minus 150, in that area.

5         Q.    So most of us laypeople would consider it

6    to be still very cold?

7         A.    Most laypeople would consider that to be

8    pretty chilly.  Yeah.

9         Q.    But that would only happen if there were

10   contamination in the vacuum space, correct?

11        A.    No.  Like I say, the gettering system is

12   there to adsorb all gases, so depending upon how long

13   the dewer had been in service, conditions of the

14   dewar, it -- it will give off whatever gas it has

15   adsorbed over the life of the dewar.

16        Q.    How old were the three or four tanks that

17   you saw with the imploded --

18        A.    I don't --

19        Q.    -- outer vessel?

20        A.    -- know.  I couldn't tell you.

21        Q.    Do you have any sense of whether they were

22   new tanks?

23        A.    No.  They wouldn't be new tanks.

24        Q.    Were they fairly old tanks?

25               MR. SMITH:  And --

336

BARKLEY
Court Reporters

1           THE WITNESS:  Well, like I say, I don't

2      know.  I mean, literally, I don't know the

3      answer to your question.  It's -- I didn't --

4      It's interesting to look at, but it's --

5      There's not much to be learned from it.

6      Q.    (By Ms. Zeman)  So you don't think they

7  were new tanks.  But other than that, you don't have

8  any sense of what their age would have been?

9           MR. SMITH:  Asked and answered.

10          THE WITNESS:  I mean, that's correct.

11      The -- I'm trying to think back to the --

12          Where we do see it is on the very, very

13      old tanks.  That was one of the complaints that

14      American Type Tissue Culture had, was if they

15      take a 40-year-old dewar out of service, that

16      they'll get the neck -- that they'll implode the

17      neck, so they don't like to do it.

18          I admit it's anecdotal, but it's --

19      Q.    (By Ms. Zeman)  I appreciate that.

20          Going back a ways to where we talked about

21  if a tank had been returned to Chart and you were

22  tasked with evaluating whether it had suffered a

23  vacuum failure and determining the root cause --

24      A.    Yes.

25      Q.    -- you walked through a couple of steps

337

BARKLEY
Court Reporters

Page 386

1

2

3                          C E R T I F I C A T E

4

5

6    STATE OF GEORGIA:

7    COUNTY OF FULTON:

8

9          I hereby certify that the foregoing

10    transcript was taken down, as stated in the

11    caption, and the questions and answers thereto

12    were reduced to typewriting under my direction;

13    that the foregoing pages 1 through 88 represent

14    a true, complete, and correct transcript of the

15    evidence given upon said hearing, and I further

16    certify that I am not of kin or counsel to the

17    parties in the case; am not in the regular

18    employ of counsel for any of said parties; nor

19    am I in anywise interested in the result of said

20    case.

21          This, the 9th day of March, 2020.

22

23

24

25          S. JULIE FRIEDMAN, CCR-B-1476