Pages 1 - 66

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Magistrate Judge

IN RE PACIFIC FERTILITY CENTER )
LITIGATION.                     )
                                )   **NO. 18-01586 JSC**
                                )
_____ )


                         San Francisco, California
                         Thursday, April 29, 2021


                **TRANSCRIPT OF PROCEEDINGS BY ZOOM WEBINAR**


**APPEARANCES BY ZOOM WEBINAR:**


For Plaintiffs:
                    GIRARD SHARP LLP
                    601 California Street - Suite 1400
                    San Francisco, California  94108
             BY:    **DENA C. SHARP, ATTORNEY AT LAW**
                    **ADAM E. POLK, ATTORNEY AT LAW**
                    **NINA GLIOZZO, ATTORNEY AT LAW**

                    GIBBS LAW GROUP LLP
                    505 14th Street - Suite 1110
                    Oakland, California  94612
             BY:    **AMY M. ZEMAN, ATTORNEY AT LAW**
                    **JOHN E. BICKNELL, ATTORNEY AT LAW**

                    SHEUERMAN, MARTINI, TABARI, ZENERE
                     & GARVIN
                    1033 Willow Street
                    San Jose, California  95125
             BY:    **MARC G. COWDEN, ATTORNEY AT LAW**


            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

1    **APPEARANCES BY ZOOM WEBINAR**:   (CONTINUED)

2    For Defendant Chart Industries, Inc.:
                         SWANSON, MARTIN & BELL LLP
3                        330 N. Wabash - Suite 3300
                         Chicago, Illinois  60611
4                    BY:   **JOHN J. DUFFY, ATTORNEY AT LAW**
                           **KEVIN M. RINGEL, ATTORNEY AT LAW**
5                          **ANDREW LOTHSON, ATTORNEY AT LAW**
                           **KRISTINE C. REVEILLE, ATTORNEY AT LAW**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**Thursday - April 29, 2021**</u>                                   <u>**2:00 p.m.**</u>

<u>**P R O C E E D I N G S**</u>

---oOo---

**THE CLERK:**  Good afternoon.  Court is now in session.

Calling Civil action C 18-1586, In Re Pacific Fertility Litigation.

And you can begin.

**MS. SHARP:**  Would you like us to make appearances, Ms. Means?

**THE CLERK:**  Oh, no.  Ms. Bryce doesn't need you to.

**THE COURT:**  Oh, okay.  Great.

All right.  Good afternoon, everyone.

So the first thing is the Survey Monkey questionnaire I believe is going out today or tomorrow.  So we are moving ahead with selecting our jury on May 20th.

So I thought in terms of an agenda for today, first that we discuss the *motions in limine*, the motion for reconsideration, time limits; and then on May 18th, which we'll kind of call our third pretrial conference, some of the things that we'll discuss then.

So let's first start -- and anything else you want to discuss.

First let's start with Chart's *motion in limine*.  So the first motion is exclude evidence of other occurrences.  The only really other occurrence that is identified as Trial

1  Exhibit 274, which is the e-mail from the distributor with

2  regard to that distributor's assumption, and I don't know why

3  that isn't hearsay not subject to any exception and, therefore,

4  not admissible.

5      So whoever wants to take that for the plaintiffs.  For the

6  plaintiffs because, Mr. Duffy, I think I'm saying I would grant

7  the motion and exclude it.

8      So I don't know for the plaintiffs --

9          **MS. ZEMAN:**  Your Honor --

10         **THE COURT:**  Yes.

11         **MS. ZEMAN:**  Yes, Your Honor.  This is Amy Zeman and I

12  am looking at that now.

13      You know, we do think that this goes pretty much to

14  showing what the industry expectations were regarding --

15         **THE COURT:**  Well, but it's hearsay.  I have no idea

16  what was in the distributor's mind and why he said that; right?

17  You're offering it for the truth of what he's saying.  You're

18  offering it for the truth that that was his assumption.

19         **MS. ZEMAN:**  I think we're offering it to some extent

20  regarding what Chart's knowledge is for what assumptions exist

21  within its distributors network and within the consumers.  For

22  instance, it's, you know, within the business records of Chart

23  as an e-mail communication with Mr. Gonzales.

24         **THE COURT:**  It's not a business record.  It's not a

25  business record.  It's an out-of-court statement you're

offering for the truth.

Now, there may be some impeachment, not the impeachment you identified in your opposition, but perhaps -- I have no idea.  If someone testified "I've never heard of anybody ever say that before" and the person had seen that e-mail, then that might be impeachment.  It wouldn't be substantive evidence at that point, but what I see you're seeking is for substantive, so...

**MS. ZEMAN:**  I do think that previously, though, Chart has assented to the use of this record.  It was used at summary judgment without objection.

**THE COURT:**  I don't think that you waive your right at trial to not object on summary judgment.  Let me tell you a very good policy reason why.

If I was to hold otherwise, my summary judgment record would be like this (indicating) and I'd see all sorts of objections that aren't really material to summary judgment, and I don't want that.  So they've raised it now I think fairly.  They've brought a *motion in limine*, and I'm going to grant it.

As with everything pretrial, of course it's always subject to revision depending on how things come in in the trial, but for now I'm going to grant the motion.

So the motion to exclude the reptile theory, I have never heard of that before; and my response would be -- let's see, I think it was a judge in Montana that said (reading):

1          "The Court will not categorically prohibit a form of

2      trial strategy, particularly given the absence of any

3      reason to believe that reptile theory is likely to rear

4      its head here or that the Court would be unable to

5      identify it if it did."

6      So the plaintiffs had said -- well, maybe Mr. Duffy or

7  someone, Mr. Ringel, I couldn't even really -- what is the

8  reptile theory?

9          **MR. DUFFY:**  I'll defer to my colleague, Mr. Lothson,

10  Your Honor.

11          **THE COURT:**  All right.  Mr. Lothson.

12          **MR. LOTHSON:**  Judge, thank you for raising this, and

13  we raised it of course.

14      It's really a variant of the Golden Rule.  It's an attempt

15  to, you know, put the plaintiffs -- it's a "conscience of the

16  community" argument is how you see it from time to time.  And

17  if you go all the way back to what the reptile theory is, it's

18  this notion that a reptile is going to protect their own and,

19  therefore, you try and instill this fear in the jury so that

20  they put themselves in this "conscience of the community" type

21  of protective mode where they then, you know, react that way as

22  opposed to just taking the evidence as a neutral fact finder --

23          **THE COURT:**  Ah.

24          **MR. LOTHSON:**  -- and determining based on admissible

25  evidence, and --

1          **THE COURT:**  Okay.  I'm not worried that these counsel

2    would make that argument, so you made your record.

3          **MR. LOTHSON:**  Yes.

4          **THE COURT:**  The other thing is it's the type of case

5    that's not really -- you know, given the narrow issue that

6    we're talking about, most of the people aren't really going to

7    be able to put themselves, I think, in the plaintiffs' shoes

8    that way.

9          **MR. LOTHSON:**  They have this punitive damage claim.

10   You see it come in in that sense on the negligent theory to

11   recall claim.

12      I do agree with you.  I'm looking at all the screens here,

13   and I'm not seeing that counsel are going to go this direction.

14         **THE COURT:**  Exactly.

15         **MR. LOTHSON:**  I would also add that plaintiffs'

16   response here was somewhat validating in that they say there's

17   no reason to believe that they are going to go down this path.

18   So, you know, based on that representation, it seems like if

19   we're not at an agreement, we're close to an agreement.  I

20   think that everybody would basically know the ground rules on

21   that.

22         **THE COURT:**  Right.  So I'll deny it without prejudice.

23   If they should stray there -- if they do, it will be

24   unintentional -- you can object and certainly that objection is

25   not waived.

1              **MR. LOTHSON:**  Makes sense.

2              **THE COURT:**  Okay.  So, let's see, and then the same

3        thing with the sort of reference to insurance policy.  I think

4        the same thing.  Plaintiff said -- well, I don't even know

5        really what Chart is referring to.

6              **MS. REVEILLE:**  Yes, Your Honor.  I can take that if

7        you like.

8              **THE COURT:**  Sure.

9              **MS. REVEILLE:**  So a number of witnesses testified that

10       they viewed egg freezing and embryo banking as an insurance

11       policy, and the experts referred to that phrase in their

12       depositions as well, and the --

13             **THE COURT:**  So can I stop you for a second?  "A number

14       of people," do you mean plaintiffs?

15             **MS. REVEILLE:**  Plaintiffs and plaintiffs' experts as

16       well, Your Honor.

17             **THE COURT:**  Okay.  So let's keep them separate for a

18       second.  What's the basis for excluding the plaintiffs from

19       testifying as to how they viewed it?

20             **MS. REVEILLE:**  It's not relevant and it's unduly

21       prejudicial.  The phrase "insurance policy" carries with it a

22       very specific particular meaning that has a connotation of a

23       guarantee; that when you're harmed, you will have a guarantee

24       and when you're harmed, you will have compensation for that

25       harm.

1          And all of the experts, all the witnesses in the case have

2    acknowledged that this IVF process is a process of attrition.

3    It's not one embryo equals one live birth, one egg equals one

4    live birth.  So it's completely inaccurate to refer to it as an

5    insurance policy.  It creates a completely inaccurate meaning

6    and there's zero probative value, and I don't think --

7          **THE COURT:**  No, I don't think so.  I mean, that is --

8    if that's what they testified to, that's how they viewed it.

9    Their view may be mistaken, and you'll argue that and you'll do

10   that, but that just goes to the weight or the argument.  It's

11   not, I mean, that.

12         But the experts is a different matter, and I think there

13   was only one expert that you identified.  Maybe it was the

14   psychologist expert.

15         **MS. REVEILLE:**  I believe that's right, Your Honor.

16         And I think to your point about weight and credibility, if

17   it's an expert testifying to that phrase, then it holds even --

18   there's even more prejudicial value and there's even more risk

19   that is --

20         **THE COURT:**  Well, it depends.  If it was your expert

21   as to -- it depends.  This is the psychologist expert who's

22   testifying as to the emotional distress -- if I'm correct --

23   the emotional distress that the plaintiffs -- again, I think

24   that's probably then just an issue for cross-examination as to

25   her.  It's not really, you know, as to if they felt that way,

1    that was an unreasonable belief.  They shouldn't have thought

2    that.  They couldn't have, I think.

3         All right.  So I think I'll deny the motion then.  Again,

4    everything -- if a different expert -- an expert as to -- I

5    don't even know -- as to the likelihood of a live birth

6    testified to it as an insurance policy, the whole process, that

7    would be a different matter; right?  But I don't think they

8    have any of that testimony.

9              MS. REVEILLE:  Understood, Your Honor.

10             THE COURT:  Okay.  So the motion to exclude evidence

11   of lost chance damages.  So I do believe, as I ruled -- maybe I

12   ruled earlier -- that G.H. cannot offer evidence -- cannot

13   argue that she gets damages for the diminished possibility of

14   achieving a live birth because everyone agrees that that

15   possibility was less than 50 percent before the incident.

16        However, I do think *Duarte*, which supports that, that she

17   can't ask -- I don't know if it's a she, I assume she --

18   yeah -- that she can't ask for that damage says I think she

19   could ask.  And I know this is nuanced, but she could argue for

20   compensation for damage to her eggs to the extent -- right? --

21   and we have to see if the evidence comes in that there is

22   evidence from which a trier of fact could find damage to her

23   eggs.  Just like in *Duarte*, the plaintiff was able to argue for

24   compensation for damage to her bone marrow even though she

25   couldn't say that the damage to her -- even though she couldn't

1  get damages for that preventing her from getting the

2  chemotherapy, which may have reduced the likelihood of a

3  recurrence.

4       Mr. Ringel, I think that must be you.

5            **MR. RINGEL:**  It is.  Yeah.

6       I'm trying to pick apart exactly what you're saying,

7  Your Honor, because I think it is very nuanced and I'm just

8  trying to be clear that I understand what the Court's saying

9  because our motion does seek to preclude the emotional distress

10 damages that would have come from not being able to have a live

11 birth as a result of the tank-fail incident.  That comes

12 directly from Your Honor's order, right.

13           **THE COURT:**  Yes, that's granted.

14           **MR. RINGEL:**  Right.  And so I understand that part of

15 it.  Now, I'm trying to understand the second part you just

16 raised because I think in plaintiffs' opposition, they raise a

17 little bit different aspect of it, and I don't think they

18 provide any authority that *Duarte* would not cover this for the

19 fact that she can seek emotional distress damages flowing from

20 damage to her property.

21           **THE COURT:**  Yeah.

22           **MR. RINGEL:**  So -- and I don't believe that --

23           **THE COURT:**  To get the eggs in the first place, you

24 have to pay money and you have to go through, I assume the

25 evidence is going to show, a lot; right?

1          **MR. RINGEL:**  Certainly.

2          **THE COURT:**  Physically or whatever.  And if the eggs

3    are damaged, there's an argument that that was all for naught.

4    There's going to be some emotion -- it's reasonable to assume

5    that some emotional distress flows from that, and I don't see

6    how the case law would prevent that.

7          **MR. RINGEL:**  Well, and I don't think that there's any

8    support that plaintiffs can provide in their opposition that

9    support that proposition specifically because we've researched

10   this in depth when it came up for the MSJ hearing certainly.

11   And so we would argue that actually those damages -- the

12   damages are precluded -- sorry.

13       Emotional distress damages are precluded from loss of

14   property.  There's no California law that provides for that --

15   case that provides for that.

16         **THE COURT:**  Well, how is it any different from the

17   bone marrow?  It's her eggs.

18         **MR. RINGEL:**  Right.  And to the extent they're seeking

19   economic damages regarding damage to the egg, that's a little

20   bit different I think than the emotional distress that flows

21   from the egg.

22         **THE COURT:**  But so, again, let's go back to the bone

23   marrow.  She was able to get emotional distress for damage to

24   the bone marrow.  I realize the eggs have been removed.  Let's

25   just say they weren't removed -- well, anyway.

1      I mean, it is kind of tantamount, as you often argue, to

2   medical malpractice.  In fact, that's why we adopted the rule

3   that applies in medical malpractice about the greater than

4   50 percent chance of the successful live birth.

5          **MR. RINGEL:**  Really this all -- when we're looking at

6   what the material is, material is used for the purposes of

7   achieving a live birth.  That's really what the damage claimed

8   is.

9          **THE COURT:**  Yes.

10          **MR. RINGEL:**  So whether or not the eggs or embryos --

11   putting aside their property value, economic value, which is a

12   separate issue, the issue that's being raised for our emotional

13   distress is:  "Am I going to be able to have a child from this

14   property, from this tissue?"  And that's what the -- what *Dumas*

15   says is not allowed because it's not --

16          **THE COURT:**  Yes.

17          **MR. RINGEL:**  -- and as Your Honor has correctly ruled.

18          **THE COURT:**  And we'll instruct the jury on that.  But

19   here G.H. even knew that, I assume, before she went and

20   harvested the eggs that her likelihood of having a live birth,

21   if I recall, was only 17 percent even then.  But, nonetheless,

22   she went and did it; right?  And so there must be or there

23   could be or it's reasonable to infer that there would be some

24   emotional distress that would come.  I mean, she went through

25   that even so.

1          What you're saying is she gets nothing.  That's not

2     supported by *Dumas*.  I think what we would do, and this is what

3     we're going to have to do, is work on a jury instruction that

4     would be given to the jury that makes it clear they cannot

5     award damage for the diminished possibility of achieving a live

6     birth.  They will be instructed as to that, but I think that's

7     all that *Dumas* says.

8          **MR. DUFFY:**  Your Honor, we actually have another trial

9     brief on this when we get to the jury instructions that talks

10    about economic versus noneconomic.

11         **THE COURT:**  Okay.

12         **MR. DUFFY:**  I think we're a little ahead of that right

13    now.  I'd like to defer that to just the jury instructions

14    because obviously it affects recoverable damages, and there's a

15    good bit of case law that would contradict the bone marrow

16    holding.  We have personal property here.  Emotional damage

17    doesn't attach to personal property.

18         **THE COURT:**  Maybe.  We'll have see.  Maybe.  I

19    certainly know there are a lot of people, many of them on the

20    Supreme Court, that would disagree with that.  So, anyway.

21         Okay.  That's fair enough, but -- fair enough.  But in

22    terms of now at least -- and it may be that we will work out

23    something on the verdict form that somehow separates it out to

24    the extent there's a dispute so that we can avoid a retrial;

25    right?

1          **MS. SHARP:**  Your Honor, may I be heard just very

2    briefly on this?

3          **THE COURT:**  Sure.

4          **MS. SHARP:**  To the extent that Mr. Duffy is trying to

5    extend the relief that's sought in this *motion in limine* to the

6    jury instruction issue that's raised by Jury Instruction 19, we

7    would take the position those are very different issues; and we

8    can get to those at the right time because that Instruction 19

9    issue is really relevant only, as we read it, to whether

10   emotional distress damages are available for our negligent

11   failure to recall claim as opposed to the strict liability

12   claims.  So it's related but it's a separate issue.

13         **THE COURT:**  All right.  I'll deal with that

14   instruction at the time, and we'll get to that at the end.  But

15   as for now, I'm granting the motion as to she cannot argue and

16   ask for and give testimony about diminished -- distress from

17   diminished -- however I said it.  There, however you said it

18   before.  And I know this actually is going to be hard, I get

19   it, to separate it out, but there we are.

20       Okay.  I think that takes care of Chart's motions.

21         **MS. ZEMAN:**  Your Honor?

22         **THE COURT:**  Yes.

23         **MS. ZEMAN:**  Can I ask just one clarification question?

24       On Chart's Motion Number 1, is your intention to rule

25   regarding only the Exhibit 274 or to grant the motion

1   otherwise?

2           **THE COURT:**  I can't grant it otherwise because I don't

3   know what the evidence is otherwise.  So we'll just have to

4   deal with that if and when it comes up.

5       Okay.  As to plaintiffs' motion, the first, to extend the

6   Court's expert rulings to lay witnesses, I think the reason --

7   as much as Chart disagrees with it, the reasoning for the

8   rulings as to the experts applies equally to the lay witnesses.

9           So I think Chart's objection is preserved unless,

10  Mr. Duffy, you wanted to say something.

11          **MR. DUFFY:**  If I might, Your Honor.

12      With regard to the first point they raise on the freezer

13  running dry on two separate prior occasions in 2013 and 2014,

14  one of the things obviously a party can do under 404(b) is use

15  evidence to show various exceptions.  For purposes of this, it

16  goes to motive.

17          **THE COURT:**  No, no.  But you know what the reason I

18  exclude it, it's just too remote in time.

19          **MR. DUFFY:**  Well, Your Honor --

20          **THE COURT:**  So it's probative value -- just we'll get

21  to the other.  It's probative value.  I just have to draw the

22  line and when you get your hours, you're going to have to draw

23  the line too in order to be within your hours.  So it's too

24  long ago.  It would open up a whole can of worms and that, so

25  I'm excluding that.

1          I agree that there are exceptions to 404(b), and we'll get

2     to that with respect to the other exhibit, which is

3     January 2017 and, therefore, much more closer in time and I

4     think more probative.

5          **MR. DUFFY:**  Okay.  With regard to the buckets, I'd

6     like to discuss that if I may, Your Honor, because --

7          **THE COURT:**  Yes.

8          **MR. DUFFY:**  -- there's a 17-day period of time where

9     PFC is claiming that they filled the freezer every day.  Now,

10    there's a data download that came with this freezer and two

11    times in those 17 days it was not plugged in.  So it had to be

12    filled somehow, and the only way you could have done it is with

13    a bucket.

14         **THE COURT:**  So I think -- yeah.  So that's fair.  I

15    think that's different, that they can -- the witnesses can

16    testify as to what they did.  I mean, that's just --

17         **MR. DUFFY:**  Or what they didn't do.

18         **THE COURT:**  -- the truth.  Or didn't do, just like how

19    did they do it.  We're not going to say --

20         **MR. DUFFY:**  Okay.

21         **THE COURT:**  -- "Oh, I can't tell you how I did it

22    because the judge ruled I can't tell you"; right?

23         I don't know.  Do the plaintiffs have any other view about

24    that?  I mean, the experts aren't going to be able to testify

25    to it as the negligence.

1          **MR. DUFFY:**  Okay.

2          **THE COURT:**  But certainly the witnesses should be able

3    to testify as to what they did if that is, in fact, what they

4    did.

5       Okay.  I don't hear any objection to that, Mr. Duffy.

6          **MR. DUFFY:**  And then, Your Honor, the other issue that

7    we had was in Number 6.  I just wanted to make a point of

8    clarification about it because I think there's a little

9    confusion in the briefing.

10      The only thing that we're agreeing not to do with regard

11   to malingering and exaggeration is not call a medical expert to

12   oppose Dr. Grill.  Obviously symptom exaggeration or

13   malingering in a case without a catastrophic injury is fairly

14   normal, and Chart obviously is going to go ahead and probe any

15   testimony where we think there's exaggeration or malingering.

16         **THE COURT:**  In terms of your cross-examination, but

17   you're not offering expert testimony on that.

18         **MR. DUFFY:**  That's right.

19         **THE COURT:**  I think that's fair.

20      Do the plaintiffs have any disagreement with that?

21         **MR. BICKNELL:**  No, Your Honor.

22         **THE COURT:**  No.  Okay.  Thank you for those

23   clarifications, Mr. Duffy.

24         **MR. DUFFY:**  Thank you, Your Honor.

25         **THE COURT:**  All right.  So the *Motion in Limine*

 1  Number 2 to exclude subsequent remedial efforts.  And I do

 2  believe this motion, the relief that plaintiffs seek is barred

 3  by the Ninth Circuit's ruling that Rule 407 only applies to

 4  subsequent remedial measures taken by the defendant.

 5      PFC is not a defendant in this case and the reason they

 6  give, of course, for the ruling -- it's relevant.  We know it's

 7  relevant, but it doesn't come in because the policy is we don't

 8  want to discourage tortfeasors from taking these remedial

 9  actions because they fear that it will be used to hold them

10  liable.

11      Admitting that evidence in this case will not make PFC

12  liable because this case, whatever the verdict is, has no legal

13  impact -- there's other impact perhaps, but no legal impact on

14  PFC.

15      So the question is:  At the time they took it, would --

16  you know, so a defendant, a tortfeasor, notwithstanding it

17  being admitted in this case, could rest assured that it still

18  would not -- that such evidence would not be used against them

19  in a case.

20      So let me hear from the plaintiffs if they want to, but

21  that's my tentative view in any event.

22      **MR. BICKNELL:**  Well, Your Honor, we find that these

23  cases are distinguishable from the present matter.  Here,

24  although PFC -- although PFC is not a defendant here for

25  purposes of trial, their behavior is an issue.  So, for

example, in *Pau*, the United States Park Service, who placed the sign, the subsequent remedial measure, their behavior was not an issue in the case.  Here, PFC's behavior is an issue.

     **THE COURT:**  Okay.  But how is that tethered to the policy reason for the rule as articulated by the Ninth Circuit?

     **MR. BICKNELL:**  Because --

     **THE COURT:**  Because what the Ninth Circuit said in *In Re Air Crash in Bali* was (reading):

     "Where the defendant has not voluntarily participated in the subsequent measure at issue, the admission of that measure into evidence does not punish the defendant for his efforts to remedy his safety problems."

PFC will not be punished by the admissibility of that in here.  I mean, to be honest, I have questions about plaintiffs even have standing to make the argument because, of course, the rule isn't there to protect the plaintiffs.  It's not there -- I mean, I understand that it's an unusual situation and that they're not together in the same case.

I think actually it's more almost like the Sixth Circuit case, I think that you cited, another air crash disaster -- I don't know why these always come up in air crash disasters -- but if you recall there, there was a -- or maybe -- no, it was a different case -- sorry -- a different one in which there was a dissent, the Tenth Circuit in *Mehoja vs. Drummond*, and there was a dissent in which the dissent argued, "You know what?  It

1    should apply to anyone who's a potential defendant," like the

2    Park Service could have been in that other case but for

3    whatever reason they didn't sue the Park Service.

4         Like here it could be, if they didn't sue

5    Pacific Fertility but they were a potential defendant, you

6    could argue that a tortfeasor might be reluctant to do a

7    subsequent remedial measure if they thought it could even be

8    used in a case in which they might be on the verdict form, as

9    you said.  But that was the dissent that was rejected because,

10   of course, if you're not being held financially liable, if

11   there's no legal consequence to the admission of that evidence

12   in that case, then the whole policy reason for the reason of

13   exclusion of relevant evidence doesn't apply.

14        What would be your best case, Mr. Bicknell?  Would it be

15   that Sixth Circuit case?

16        **MR. BICKNELL:**  Yes, Your Honor.

17        **THE COURT:**  Yeah.  And they, of course, distinguished

18   that case where you had a party that was seeking to use it.

19   And, arguably, I think you could say that the Sixth Circuit was

20   wrong, but let's just assume they were correct.

21        So, I mean, the plaintiffs are in a difficult position.

22   It's almost like -- well, in any event, I can't remember

23   that -- where you have two defendants in a criminal case and

24   they're tried separately and they each blame the other, and you

25   can get some evidence in against the one and not the other.

1    That is true, that is the case, but that is an artifact of, A,

2    there being an arbitration agreement with Pacific Fertility;

3    and, B, the plaintiffs deciding rather than allow Chart, who

4    argued mightily "We want to be in that arbitration," the

5    plaintiffs decided not to.

6        And that is simply something that flows from it, but I

7    understand it but I don't think I can -- I think I'm bound and

8    the Ninth Circuit case with the *Pau* case, the Ninth Circuit

9    didn't -- they said that judge abused his discretion on an

10   evidentiary matter.  Actually abused.  I think it would be an

11   abuse of discretion for me to actually exclude the evidence.

12       So it's an interesting argument.  Your objection is

13   preserved.

14           **MR. BICKNELL:**  Thank you, Your Honor.

15           **THE COURT:**  Let's see, the bad acts evidence, that's

16   Motion Number 3, and this has to do with the report from

17   January of 2017.

18       So let me ask Chart first.  Who's the witness that you're

19   going to use this with?

20           **MR. DUFFY:**  Dr. Conaghan, Your Honor.

21           **THE COURT:**  Dr. Conaghan, all right.  So I do think

22   that it is relevant to show Dr. Conaghan's knowledge of his

23   lab's failures -- right? -- to comply with the rules that

24   they're supposed to be complying with.  It's close in time and,

25   therefore, supports Chart's argument that in March of 2018 when

 1   the controller failed, that it was unreasonable -- or

 2   especially unreasonable for him just to rely on his employees

 3   to simply by hand and eye or by hand monitor and record.

 4        Now, Chart tries to go a little farther than that; and,

 5   again, now we're getting lines.  I don't think Chart can argue,

 6   and they agree, that the rule -- that because they were found

 7   to have violated in January 2017, they had to have violated the

 8   standard of care where negligent in March 2018.  They can't do

 9   that.

10        And whether they can do anything more than what I just

11   said was that Dr. Conaghan certainly had knowledge that his lab

12   was not operating at the highest level in terms of complying

13   with the rules, that it was especially unreasonable for him

14   then to simply rely on his staff to manually keep track of what

15   was in there.

16        Whether they could argue anything more, I don't know.  I

17   just have to see how the evidence comes in.  I'd let it in for

18   that limited purpose with that witness only.

19        And I don't think you have any experts -- right? -- who

20   talk about that.  It's just with Dr. Conaghan being offered so

21   I think it could come in for that.

22        That is my ruling if anyone wants to be heard on that.

23        **MR. BICKNELL:**  Your Honor, I would like to say a

24   couple things.

25        So Chart here is trying to analogize the minor infractions

1   in 2017 to the backdating, but we think that that is clearly

2   distinguishable for a couple of reasons.

3        So unlike the backdating, no Chart expert has alleged that

4   these minor infractions in 2017 led to the taint in March of

5   2018.  And you obviously previously ruled that the backdating

6   came in because of the after-the-facts nature led to an

7   inference of a guilty mind.

8        But here, these are all acts that occurred prior to the

9   incident and no Chart witness, no Chart expert has drawn a

10  causal connection between these acts and the incident.

11        **THE COURT:**  Yeah, no, I agree.  That's why I say Chart

12  can't argue that which is what the rule is designed to

13  prohibit, which is that because they had these violations,

14  which you call minor and technical -- and you can call minor

15  and technical at trial -- in January of 2017, or at least as

16  reported in January 2017, that, therefore, what they did in

17  March 2018 was negligent, and their experts haven't done that.

18        But I do think it sort of sets the -- it goes to

19  Dr. Conaghan, who's a key witness, it goes to his knowledge as

20  to the operation -- the recent operation -- this is why the

21  2013-2014 I just think is too remote -- to the recent operation

22  of his lab.  But I imagine we'll have to look carefully how

23  it's used at trial, but if it's just asking Dr. Conaghan.

24        All right.  The informed consent forms.  Okay.  I would

25  exclude to the extent that Chart seeks to use them to somehow

1   show Pacific Fertility's negligence.  That, I don't get the

2   argument or why it's necessary.  I think that would be

3   confusing.  You can ask them all those things about that.  I

4   suppose if someone -- yeah, they are.

5        But to the extent they want to ask the plaintiffs, and

6   this goes to damages -- I don't know why it doesn't go to

7   emotional distress damages -- if the plaintiffs were aware of

8   something; right?  What's in their head is certainly at issue

9   with respect to damages.

10       I think Chart only is arguing about specific provisions of

11  the informed consent form so perhaps we can just admit instead

12  of the entire thing, the relevant provisions at least

13  surrounded to avoid or reduce the confusion issue that the

14  plaintiffs seem concerned about.

15            MS. REVEILLE:  Your Honor, if I might respond to your

16  comments on that.

17            THE COURT:  Yes, please.

18            MS. REVEILLE:  Sorry.  My screen is freezing.

19            THE COURT:  Yes.

20            MS. REVEILLE:  The informed consent forms --

21            THE COURT REPORTER:  Pardon me, Counsel --

22            MS. REVEILLE:  My screen seems to be freezing, but

23  just raise your hand.  It seems to keep freezing so just let me

24  know if you can't hear me.

25       First, Your Honor, I believe that you've separated these

1  issues really into two buckets, the first bucket being PFC's

2  negligence and the second bucket being the issue of damages.

3       And, first, turning to your arguments or your statement

4  about using the informed consent forms to establish PFC's

5  negligence, I would disagree and argue that they are incredibly

6  relevant to establish PFC's negligence.  Even as plaintiffs'

7  counsel referenced in responding to the subsequent remedial

8  measures motion, PFC's behavior is absolutely an issue in this

9  case, and I think --

10       **THE COURT:**  Oh, I know, but how does the informed

11  consent -- how those exhibits go to that, that's what I'm

12  saying is not tethered.  Of course, PFC is at issue.

13       **MS. REVEILLE:**  Certainly, Your Honor.  So one or two

14  of the provisions in the informed consent form identifies the

15  fact that PFC knows that the tank might fail and that this

16  failure, including a power outage, might damage the eggs and

17  embryos stored in the tank.

18       **THE COURT:**  Okay.  So let me stop you for a minute.

19  And PFC when you deposed them, do they deny knowledge?  Is that

20  an issue?

21       **MS. REVEILLE:**  Deny knowledge that the tank would

22  fail?

23       **THE COURT:**  No.  Might fail.

24       **MS. REVEILLE:**  Might fail?

25       **THE COURT:**  Yeah.

1          **MS. REVEILLE:**  No, Your Honor.

2          **THE COURT:**  They don't deny it.  So you don't need the

3    informed consent form then; right?  All you have to do is

4    question them.

5          **MS. REVEILLE:**  Your Honor, the provision after that in

6    the informed consent form specifically addresses the fact that

7    they input certain mechanisms to prevent against this damage;

8    and so when coupled with the fact that they then disengaged the

9    mechanism that was created to prevent against damage to the

10   eggs in the event of a power outage or a failure to the tank,

11   that absolutely establishes PFC's negligence.

12         **THE COURT:**  Okay.  So tell me what -- I have it in

13   front of me -- what page and paragraph am I looking at.

14         **MS. REVEILLE:**  Okay.  Well, I'm looking at plaintiffs'

15   motion, Your Honor.  They have highlighted a specific portion

16   of the informed consent form, and it's about six or eight

17   bullet points.

18         **THE COURT:**  Is it -- so the Bates numbers are on the

19   bottom?  Can you tell me the Bates number?

20         **MS. REVEILLE:**  Bates Number 1 of Plaintiffs' *Motion in*

21   *Limine* Number 4.

22         **THE COURT:**  So this is Exhibit -- I'm looking at

23   Exhibit 291, which is what it is; right?  That's what I'm

24   looking at.  So I think I went to the exhibits.  I'm looking at

25   Exhibit 291, which is the informed consent form.

1          **MS. REVEILLE:**  Okay.  You know, I'm looking at the

2   subset that's included in plaintiffs' *motion in limine*.   I

3   don't think I have the same Bates number on that.

4          **THE COURT:**  Maybe do plaintiffs know which page Chart

5   is referring to?

6          **MR. BICKNELL:**  Yes.  I'm pulling it up right now,

7   Your Honor.

8          **THE COURT:**  Thank you, Mr. Bicknell.

9          **MS. REVEILLE:**  Because I agree with Your Honor that

10  there might be a way that we can identify the specific

11  provisions from the informed consent form if you'd like to

12  narrow it in some way because it's the provision that plaintiff

13  references on the bottom of page 1 and 2 of their motion.

14  There's bullet-pointed indented sections that talk about the

15  types of failures and it's directly after that.  I believe it's

16  page 18 actually of the exhibit itself where it references the

17  fact that backup systems and staff training decrease the

18  likelihood of any malfunction but unforeseen situations can

19  occur that risk loss or damage to cryopreserved eggs.

20          So it's a combination of the fact that they are

21  acknowledging that the tanks can fail.  They're further

22  acknowledging that they've put in place backup systems and

23  staff training to decrease this likelihood coupled with the

24  fact that the jury will then hear that they actually disengaged

25  the backup system.

1       And I think probably the best way to demonstrate the

2   relevance of this is to look exactly to the jury instructions

3   that the jury is going to hear.  In 1207B, which was stipulated

4   by the parties, that's Comparative Fault of a Third Person, and

5   Chart also submitted Jury Instruction 406, which is

6   Apportionment of Responsibility, it says directly that Chart

7   claims the negligence of PFC contributed to plaintiffs' harms;

8   and to succeed in that claim Chart must show, must prove that

9   PFC and its employees and agents was negligent and that this

10  negligence was a substantial factor in causing plaintiffs'

11  harm.

12      So I think that the informed consent form is what show

13  that PFC knew the risks of tank failure when they unplugged it,

14  PFC then unplugged the safety mechanism despite knowing the

15  risks, kept it unplugged for 17 days, is relevant information

16  that the jury will need to consider in determining that PFC was

17  negligent and that the negligence was a substantial factor.

18          **THE COURT:**  Well, this doesn't say anything about

19  unplugging or plugging it, but what about -- let me ask the

20  plaintiffs if when they're -- whatever witness they have, and

21  they're just showing them that one paragraph and they're saying

22  "Isn't it true that in your informed consent you actually

23  admitted this" and had the plaintiffs see this or something.

24          **MR. BICKNELL:**  Actually, Your Honor, if Your Honor is

25  inclined to admit parts of this document, we would actually ask

```
 1   that the entire document be allowed in because we find it to be
 2   sort of only circumstantially relevant to their knowledge, and
 3   we think that it would be apt to show the full scope of the
 4   document and how dense it is to the jury.
 5           THE COURT:  Well, that's probably fair for the
 6   damages -- right? -- as well because they're going to argue
 7   "You were aware of this" and they're going to say "I'm just
 8   like every other person out there that signs these things
 9   without reading them."  Maybe.  Not me.
10       Okay.  Well, what about that?  I think that's actually --
11   because at a minimum, I would admit it.  I think it's fair for
12   the damages because it goes to the plaintiffs' state of mind;
13   but then we admit the whole thing and then Chart could use it
14   with PFC subject to, as plaintiffs said, no argument as to --
15   there's not going to be any argument here that the plaintiffs
16   are at fault.
17       The plaintiffs are not at fault here, and that was
18   somewhat, I think, what the plaintiffs' concern was, but that's
19   not an argument that's going to be made; right?
20           MS. REVEILLE:  Absolutely.
21           THE COURT:  They didn't do anything wrong.
22           MS. REVEILLE:  Correct.  Correct.  It will be used to
23   show PFC's negligence and then as -- and PFC's -- the fact that
24   PFC's negligence was a proximate cause of the injury; and also
25   to Your Honor's point it will be shown to establish damages,
```

1   the emotional distress, and the plaintiffs' state of mind.

2          **THE COURT:**  All right.  So I think that -- so I think,

3   then, the *motion in limine* is going to be denied.

4       I do think, though, Chart should be limited to using it

5   for the purposes that they articulated here with respect to

6   PFC; and to the extent you decide you want to use it more

7   broadly than that, you need to let plaintiffs know so we can

8   address that.

9          **MR. BICKNELL:**  And, Your Honor --

10         **MS. REVEILLE:**  The negligence of PFC, the causation

11   with respect to PFC's negligence causing injury, and then the

12   damages specifically in relation to the emotional distress

13   claims?

14         **THE COURT:**  No.  I mean actually the provisions that

15   you identified; right?  So it's an 18-page document.  So you've

16   identified particular provisions that are relevant you said and

17   that you want to question the witnesses about.  So I think it

18   should be limited to that.

19       I don't think you -- again, you're not going to have time,

20   frankly, to be asking them about other stuff anyway, but I just

21   want to -- because I haven't adjudicated the relevance.

22   Plaintiffs have indicated the only reason they want the whole

23   thing in is just to show it's really long and dense, and

24   they're not going to be questioning them about specific

25   provisions either.

1          **MS. REVEILLE:**  Okay.  And so, then, to Your Honor's

2   point, if there's specific provisions that we intend to use

3   with the witness, give plaintiffs' counsel that information

4   before the witness goes on the stand?

5          **THE COURT:**  In addition -- no.  Only if it's different

6   from what you identified in your opposition.

7          **MS. REVEILLE:**  Okay.  Understood, Your Honor.

8          **THE COURT:**  Yeah.

9          **MR. DUFFY:**  Your Honor, I think there's one other

10  point of clarification I wanted to make.  In the bad acts

11  motion, Number 3, there was an argument about Ms. Ballasone.

12         **THE COURT:**  Yeah.  Sorry.  She's out.  She's out.

13  It's cumulative.  Rule 403.  Prejudice.  No.  Out.

14     Yeah, thank you for reminding me, Mr. Duffy.

15         **MR. DUFFY:**  No, no, no.  I just wanted to make sure.

16  It's important so...

17         **THE COURT:**  No.  She's out.

18         **MR. DUFFY:**  Can I make any argument on it or no?

19         **THE COURT:**  No.  No.  No.  No.  No lawyers are

20  testifying.

21     Okay.

22         **MR. BICKNELL:**  Your Honor, if we may take a quick step

23  back to the informed consent question.

24         **THE COURT:**  Yes.

25         **MR. BICKNELL:**  I have one additional request.  What

1   are your thoughts on potentially introducing another

2   instruction that the jury may not use it for liability

3   purposes?  And I apologize --

4           **THE COURT:**  Boy, I had -- well, hmm.  We have to be

5   careful because they can for Pacific Fertility's share, if any,

6   of liability but not Chart.  But certainly at the time that

7   it's being admitted, I could do that, give a cautionary

8   instruction that it's not being admitted -- well, hmm.

9        But you mean that it's not being admitted to show that

10  plaintiff is somehow -- hmm.

11       Well, maybe talk to Chart and see if you can work out

12  something.  I see what you're saying.  At the time it's being

13  admitted, it's being admitted for this purpose and this purpose

14  only or these two purposes, damages and PFC's potential

15  liability.

16       I think you want to think about that, you don't have to do

17  it now, because at the moment, at the time you may not want

18  that; right?  Because sometimes those instructions then

19  highlight something more than you actually want to highlight

20  it.

21       But I'd absolutely be open to an instruction that it's

22  being offered for these limited purposes.  I think you want to

23  think about whether you want that or not.

24           **MR. BICKNELL:**  Okay.

25           **MS. REVEILLE:**  And, Your Honor, if I could just

 1   address that briefly.  I think it does go to Chart's liability

 2   as well because if the jury finds that PFC was the sole

 3   proximate cause of the injury, then that absolves Chart of

 4   liability.  So I think --

 5         **THE COURT:**  Well, yeah, yeah.  Exactly.  I get that.

 6   That's why we have to be careful the way we would do it, but --

 7   yeah, it's the plaintiffs that the plaintiffs were concerned

 8   about, that somehow the jury would be confused that because

 9   they signed this informed consent form, somehow Chart is off

10   the hook, or Pacific Fertility for that matter.  Well, Chart

11   doesn't want that so it would have to be that Chart is off the

12   hook, but Chart didn't even sign the agreement as it well

13   knows, which is why we're here.

14         So, yeah, I think we'll think about it.  We'll deal with

15   it.  Dr. Conaghan I imagine -- well, I don't know when he's

16   going to testify, but so somehow in advance of his testimony we

17   know this is coming -- no, no, no.  This is coming with the

18   plaintiffs who are testifying early.

19         So probably you should think about -- well, I don't know

20   if they're testifying early.  They're testifying in the

21   plaintiffs' case anyway so somehow you should think about in

22   advance of that whether you want an instruction or not so that

23   day we can be ready to go with what the instruction is I will

24   give them at the time.

25         **MR. BICKNELL:**  Yes, Your Honor.

1          **MS. REVEILLE:**  Understood, Your Honor.  Thank you.

2          **THE COURT:**  Okay.  So I don't think Chart claims that

3    Pacific Fertility offered to pay for medical expenses is

4    relevant; right?

5          **MR. DUFFY:**  Mr. Ringel.

6          **MR. RINGEL:**  Your Honor, I would say that these

7    e-mails are being classified by plaintiff overly broad.

8          **THE COURT:**  No, no, no, but first this narrow question

9    I asked you.

10         **MR. RINGEL:**  Yeah.

11         **THE COURT:**  You're not taking the position that

12   Pacific Fertility offered to pay certain medical expenses is

13   relevant; right?

14         **MR. RINGEL:**  That very narrow position, right.

15   Correct.

16         **THE COURT:**  All right.  So tell me which of these

17   e-mails, then, is otherwise relevant and why.

18         **MR. RINGEL:**  So our motion, our opposition to the

19   motion, provides a nice laundry list for Your Honor and

20   provides citations to each of these exhibits.  They contain

21   references to potential and unknown viability of eggs and

22   embryos.  So whether or not they're going to --

23         **THE COURT:**  Yeah, but there's ways of getting that in

24   that's better than an e-mail; right?

25         **MR. RINGEL:**  But we have statements from the

1   plaintiffs themselves about whether or not they're going to be

2   using them, what their desired family size is, whether they

3   want to attempt now to use these eggs or embryos, which goes to

4   their claimed damages.  They contain reactions to the incident

5   and what their state of mind was for that.  There's several --

6        **THE COURT:**  Okay.  But that's more limited than what

7   you have there.  Certainly if it's a statement that the

8   plaintiffs made, it's nonhearsay and we can redact; but I don't

9   know --

10        **MR. RINGEL:**  Well, I think that's maybe the solution,

11   Your Honor, is, yes, Chart does not dispute that the offer to

12   pay medical expenses -- we'll stipulate that the offer itself

13   is not relevant.  However, these exhibits contain much more

14   than that.

15        **THE COURT:**  Okay.

16        **MR. RINGEL:**  They contain much more than a simple

17   offer.

18        **THE COURT:**  Well, but do you stipulate that that will

19   not be shown to the jury then?

20        **MR. RINGEL:**  If we could redact the offer of the --

21   the offer to pay and use the exhibits for the other purposes

22   which are outlined in our opposition, then, yes, I think we

23   would agree.

24        **THE COURT:**  So let's look at, like, Exhibit 330.

25   Let's do sort of a --

1        **MR. RINGEL:**  If you'll give me a moment, Your Honor,

2   to pull that up.

3        **THE COURT:**  Of course.  It's not fair to you because I

4   knew what I was going to discuss.

5        **MR. RINGEL:**  I've just got to do a few clicks.

6                    (Pause in proceedings.)

7        **MS. ZEMAN:**  Your Honor, I do have that exhibit in

8   front of me, and I would say plaintiffs' position is there's

9   nothing in this e-mail chain that isn't covered elsewhere and

10  it really can't be redacted in a way that would make it useful.

11       **THE COURT:**  I would agree.

12       **MS. ZEMAN:**  As I would actually say the same for

13  Exhibit 324.

14       **THE COURT:**  Okay.  Well, we'll just use this as an

15  exemplar.

16       **MR. RINGEL:**  Yeah.  Well --

17       **THE COURT:**  I'm starting at the top, the 5:26 p.m.

18  e-mail, not really useful.

19                    (Pause in proceedings.)

20       **MS. ZEMAN:**  And then, frankly, the entire chain is

21  about questions about what they're going to have to pay for in

22  the course of --

23       **THE COURT:**  Yeah.  So I think what you should do,

24  Mr. Ringel, is you should go through all of these.  I'm going

25  to grant the motion without prejudice to Chart showing

1  plaintiffs specific e-mails or unredacted or portions of

2  e-mails that they believe they need to use and with what

3  witness.

4      **MR. RINGEL:**  And to clarify, so if, Your Honor, I

5  could provide I guess redacted copies of these e-mails, which

6  would redact, as you point out, statements in here "We will pay

7  this, this, or that," we redact that portion and include other

8  things such as the plaintiffs saying "I want to use my eggs and

9  embryos for this purpose" or "Here's my reaction to the

10  incident," that's what we want to kind of include.

11      **THE COURT:**  Yeah.  I mean, I don't think they moved to

12  exclude that.  This first chain, the one I started with, 330,

13  there's nothing like that in there.

14      **MR. RINGEL:**  Yeah.  We provided --

15      **THE COURT:**  There might be other ones.  Yeah, you

16  know, I started with the one that was -- but -- so what I'm

17  going to do is I'm just going to, as I said, grant it without

18  prejudice to you identifying those things within them.

19      And I bet, Plaintiffs, you'll be able to come to agreement

20  then if that's the case, those limited portions.

21      **MS. ZEMAN:**  We'll certainly look at the redactions

22  proposed.

23      **THE COURT:**  Okay.  Let's see, the nonparty finances

24  and ownership.  I'll just say Chart can't offer without first

25  getting my permission outside the jury's presence.  I can't

1    imagine why it would come up; but if you think it came up,

2    before you offer anything, you'll have to raise it outside the

3    jury's presence with me.

4        And the same for *Motion in Limine* Number 7 about nonparty

5    insurance coverage.  It's out until it's in.

6        Okay.  Remote testimony.  Who's taking that one for the

7    plaintiffs?

8            **MS. ZEMAN:**  Ms. Sharp.

9            **THE COURT:**  Ms. Sharp.

10       Ms. Sharp --

11           **MR. POLK:**  Sorry.  That's me, Your Honor.

12           **THE COURT:**  -- I think what you're asking for would,

13   like, eviscerate Rule 45.

14           **MS. ZEMAN:**  My apologies.  It's actually Mr. Polk.

15           **THE COURT:**  Oh.  Sorry.

16           **MS. SHARP:**  I was just about to say I didn't want you

17   to think I tossed it to him only after a question like that,

18   Your Honor.  We do see it a little differently, but he's

19   prepared to address that.

20           **THE COURT:**  All right.  Go ahead, Mr. Polk, take your

21   shot.

22           **MR. POLK:**  Yeah.  Your Honor, we know that we have to

23   have good cause, compelling reasons.  We think we have them

24   here.

25       The best case before you ask me is the *Vioxx* case with

1   Judge Fallon which similarly involved a failure to warn claim.

2       There's one point -- I know you've read these papers, and

3   I know I hear you did -- you know, there's a big deal that's

4   made out of the control over these former employees and, you

5   know, that comes as a very big surprise to me and I want to

6   tell you why.

7       It's because, you know, in late fall -- they're not

8   really -- they're formers -- these witnesses were produced.

9   There was an acquisition in late fall 2020 where Chart was

10  acquired by Cryoport.  Naturally we inquired of Mr. Ringel,

11  Mr. Duffy, is this going to be a problem with witness

12  availability for trial, and we were given a resounding no.  We

13  memorialized that in the CMC statement, and just for the record

14  it's Docket 580, and I just want to read it into the record.

15  This is what the parties submitted to the Court (reading):

16          "Plaintiffs have asked Chart to discuss the

17          implications of the sale on the litigation, including

18          identification of the entity or entities with control of

19          relevant evidence and the mechanisms in place to ensure

20          such evidence is preserved.  On October 20th, 2020, Chart

21          informed plaintiffs that the sale of its Cryo-Bio segment

22          to Cryoport will have no impact on the litigation and will

23          not affect the availability of witnesses, documents,

24          things, for discovery or trial."

25      So I think that's material.

1      The other thing I want you to know, Your Honor, is that --

2  because it doesn't come through clearly in the briefing -- what

3  this is about is control of witnesses.  Mr. Adams -- the

4  witnesses Chart has decided to make available for trial in

5  person are tank production witnesses.  The witnesses -- so

6  that's Seth Adams and Buster Ingram.

7           THE COURT:  These are also no longer Chart employees?

8           MR. POLK:  That's my understanding, Your Honor.  The

9  whole --

10           THE COURT:  Let me ask Mr. Duffy.

11           MR. DUFFY:  They are no longer Chart employees.

12  They're no longer Chart employees, that's correct.

13           THE COURT:  And they're working for the same -- the

14  company that purchased Chart?

15           MR. DUFFY:  That's correct.

16           THE COURT:  Okay.  So they're willing to come and

17  testify at trial, but these other witnesses are not?

18           MR. DUFFY:  Correct.

19           THE COURT:  Why is that?  Okay.  So I need a

20  declaration and I also think, Chart, I want to know that you've

21  asked.

22      See, here's the problem.  I hear what you're saying and

23  that gives me a lot of pause.  That actually gives me a lot of

24  pause I have to say.  I didn't realize that from the papers.

25      So these three witnesses -- and I don't even know if

1   Chart, Mr. Duffy, if you've actually asked for them, if they

2   would testify remotely.  Have they been asked?

3          **MR. DUFFY:**  No, Your Honor.  We're standing on --

4   we're standing on the rules.  That's why -- these depositions

5   were all taken previously.

6          **THE COURT:**  You can ask.

7          **MR. DUFFY:**  Okay.  Certainly.

8          **THE COURT:**  Is there a rule that prohibits you from

9   asking?

10          **MR. DUFFY:**  No.  No.  Of course not.

11          **THE COURT:**  No.  So I think you could ask, and I think

12   you should also say it would be the Court's preference that

13   they do so.  And I think you should tell whatever the company

14   is that acquired you that it seems -- so all these witnesses

15   we're talking about, they all work for the -- currently work

16   for the company that acquired Chart; is that right?

17          **MR. DUFFY:**  Mr. Lothson I know has dealt with that

18   detail on this.

19          **MR. LOTHSON:**  Judge, none of this -- this is not in

20   plaintiffs' brief and it's not in ours about other witnesses

21   that aren't discussed.

22          **THE COURT:**  Just answer the question.

23          **MR. LOTHSON:**  I don't know the answer as we sit here

24   today because it's not even part of the briefing.

25          **MR. POLK:**  It's in your brief.  You said they're

```
 1   former employees not in your control.

 2              MR. LOTHSON:  Those are --

 3              MR. POLK:  The other thing I would add to this --

 4              THE COURT:  Wait.  Wait.  Wait.  So you said they're

 5   former employees.  They no longer work for Chart.

 6              MR. LOTHSON:  Correct.

 7              THE COURT:  Is that because they went with the

 8   acquiring company?

 9              MR. LOTHSON:  I would have to go back to the

10   deposition transcripts to know for sure.

11              THE COURT:  Well, who defended their depositions?

12              MR. LOTHSON:  There's been a few of them taken in the

13   case.

14              THE COURT:  Do you, Mr. Ringel?  I mean, you had to

15   have known who they were.

16              MR. RINGEL:  Our firm wasn't involved in the case at

17   that time.

18              THE COURT:  Oh.  Fair.  Fair.  Fair.  That's fair.

19   That's fair.

20        All right.  I want -- so, Mr. Polk, is it your belief they

21   all work for the acquirer or not?

22              MR. POLK:  It is.

23        And let me just add that, because I read the cases, I

24   think when you do ask if they're available, you can also

25   represent the plaintiffs will cover all the costs of any remote
```

```
 1    testimony.  We'll rent the conference room.  We'll pay for the
 2    vendor.  We'll do everything to ease any burden.
 3         But, you know, we think it's important that the jury is
 4    able to observe live testimony in the assistance of their
 5    true-calling function and there are compelling reasons here.
 6              THE COURT:  Okay.  So first I want Chart to figure out
 7    if there are witnesses who no longer work for Chart and work
 8    for the -- that are in the same position as to these other
 9    witnesses.  I mean, how is it that those witnesses have agreed
10    to testify remotely but these other ones you didn't ask?
11         Like, I don't know.  I'm not asking you to answer me now.
12    I'm just telling you that raises red flags; right?  And, yeah,
13    that just raises red flags because my assumption was that these
14    witnesses were witnesses that plaintiff wanted to call.  And,
15    of course, if defendant wanted to call them, I'd say, "No, no,
16    no.  You can't do it that way."  But now it's kind of that, is
17    what I'm hearing, it may not be the case, I'll let you go
18    figure it out, there are some the defendant wants to call,
19    those will appear remotely but those that plaintiff wants to
20    call --
21              MR. RINGEL:  No.
22              THE COURT:  No.  Okay.
23              MR. LOTHSON:  They're coming live, those other
24    witnesses.
25              THE COURT:  Oh, live.
```

1          **MR. LOTHSON:**  -- and we worked out an agreement on

2    this, and we're going to be able to put them on in their case

3    so they only have to appear once.

4          But this notion that a nonparty, nonemployee -- I mean,

5    we're getting really far outside of Rule 45 and Rule 43.

6          **THE COURT:**  But are those non -- the ones that are

7    coming here in person, are they nonemployees?  We're not

8    talking about Chart employees.  I get that.

9          **MR. LOTHSON:**  They are not employees.

10         **THE COURT:**  And they -- okay.  So the question is:

11   Why did -- all right.

12         This is what I want you to investigate.  First, you have

13   to ask; right?  You have to ask.  See, the issue is I can't

14   compel and you may be right, I can't compel; or I can order and

15   if they don't follow it, what do I do because they're beyond?

16   But you I can order and you I can order.

17         **MR. LOTHSON:**  But what happens if they don't -- if

18   they don't show?  This is a huge problem.

19         **THE COURT:**  Mr. Lothson, why would you not ask?

20         **MR. LOTHSON:**  Let's say we ask and they don't show --

21         **THE COURT:**  No.  First tell me why you would not ask.

22         **MR. LOTHSON:**  There's been testimony taken of them

23   with video and the case law says so to that.

24         **THE COURT:**  Then I don't want you to do it then.

25   Mr. Duffy, I want you to be the one to ask because I don't --

1    Mr. Lothson, I don't actually like the way he's responding.

2    You're an officer of this court and I know you will ask.

3        I want you to ask them and I do think it's your obligation

4    to do so; and if you represented them -- not you, the previous

5    firm represented them at deposition, then I actually believe,

6    you took that upon yourself and represented them, you have an

7    obligation to ask them if they will appear at trial in person

8    or remotely.  And plaintiffs have said they will pay all their

9    expenses even in person I think probably.  Yeah.

10            **MR. POLK:**  Yes.

11            **THE COURT:**  They will pay their expenses.

12        So I want you to go ahead and ask them that; and then I

13   want you to figure out if they're in the same position as those

14   other witnesses who are coming here, which is they're all

15   employed by the same employer, which is the --

16            **MR. POLK:**  Cryoport.

17            **THE COURT:**  Yes.  Because if some are coming and not

18   others, that raises red flags.  I'm just telling you, and I

19   know you don't want red flags to be raised because that's not

20   how you've been litigating this case at all.

21        So that matter is just -- I'm not going to rule on that

22   right now and we'll see where we are with that.

23        Okay.  And so plaintiffs' anonymity.  Here's the issue.  I

24   do think no one should publicly have to testify as to whether

25   they've had an abortion or as to their sexual life; right?  No

 1   one has an interest in that.  So why can't we just seal the

 2   court when that is being done?  In other words, there will be

 3   no audio or Zoom when that testimony is being elicited and the

 4   transcript will be marked sealed as well.

 5           **MR. POLK:**  That, I think is a solution that would work

 6   for us, Your Honor.  The reason we didn't ask for it was

 7   because we thought it would be a more significant step, but I

 8   think it would work.

 9           **THE COURT:**  It's a pretty significant step I think to

10   say even to the jury -- right? -- "You're not going to get to

11   know who these people are."  Like, you don't know their last

12   name or --

13           **MR. POLK:**  Well, can I clarify that, Your Honor?

14       In preparing for this, I thought I was going to clarify

15   the ask.  So the ask is not what you just said.  The ask is the

16   jury, potential jurors and impaneled jurors, will receive full

17   names.  They're going to know who these people are because

18   otherwise they can't vet for conflict as Mr. Duffy pointed out.

19       It's only in the public proceedings, when they're going to

20   be examined and for the people who are watching on Zoom, that

21   they'll be referred to as first name, last initial.  So the

22   jury --

23           **THE COURT:**  Yeah.

24           **MR. POLK:**  -- is going to have full access to it.

25           **THE COURT:**  Okay.  The other reason, though, is then

1  we're calling them by their first names but we refer to

2  everyone else by their last name, and then that looks -- that

3  just creates an atmosphere, even like to the judge, "Why are

4  you using their first name, that seems disrespectful, or

5  someone else's last name?"

6      But I think if we just seal the courtroom, and let me --

7  that reminds me, let me tell you something else.

8      So the Zoom Video will be available only for parties and

9  litigants and counsel.  And by "parties" I mean parties in all

10 of the cases -- right? -- all the litigants.  And "counsel" I

11 mean, of course, the interested counsel, including PFC, the

12 witnesses, and the like.  So it will be a different Webinar

13 than the public Webinar, otherwise it will be audio available.

14      **MR. POLK:**  So the public gets the audio?  Because this

15 was a question that the clients are interested in.  So the

16 public gets audio only, not video?

17      **THE COURT:**  Correct.

18      **MR. POLK:**  Okay.  All right.

19      **THE COURT:**  Correct.  And then --

20      **MR. DUFFY:**  Your Honor, one point of clarification.

21 PFC obviously is going to play a big role in the trial; and if

22 their lawyers are allowed to watch, I'd ask the Court to enter

23 an order as part of the orders that are entered today under

24 Rule 615 that they are barred from discussing the testimony so

25 that their witnesses don't shape it.

```
 1              THE COURT:  Yeah.  So we should probably -- that is a
 2    problem.
 3              MR. DUFFY:  Yes.
 4              THE COURT:  Well, so any witness should not be
 5    watching other than experts -- right? -- should not have
 6    access, just like if we were -- well, we are -- just like if
 7    the courtroom was fully open, we would exclude all witnesses
 8    other than experts from the trial; right?  So that same rule
 9    should apply.
10         And then what you're saying is the lawyers then -- well,
11    that's interesting.  I don't know.  Do the plaintiffs -- I
12    mean, because I've never done that type of ruling before
13    because lawyers obviously come and they watch the trial, and
14    I've never said -- I mean, a lawyer, of course, has an
15    obligation not to --
16              MR. POLK:  I think we should talk about it.
17              THE COURT:  Yeah.
18              MR. POLK:  We haven't really had that chance yet, and
19    I'd like to put some meat on the bones.
20              THE COURT:  Yeah, why don't you talk about that.
21              MR. POLK:  Okay.
22              THE COURT:  But certainly it will be the order, and
23    I'll put that in my order, that no witnesses other than experts
24    should watch the trial and, therefore, should not be given
25    access, or they shouldn't listen either, yeah.
```

1           **MS. REVEILLE:**  Your Honor, if I just might ask a

2    clarification question or respond briefly to what I think you

3    said, which was that references to abortion and I think you

4    said sexual history would be the areas.

5           **THE COURT:**  Yes.

6           **MS. REVEILLE:**  I think a distinction can be drawn

7    between those two topics.  I mean, there's references to the

8    sexual history of the plaintiffs throughout their testimony,

9    and I think that the public does have the right to accessing

10   that.

11          I totally understand abortion is a topic that just incites

12   emotion, but I think that this is a trial that is very closely

13   tied to the sexual history and their efforts to get pregnant

14   and the frequency with which they were intimate, and that came

15   out --

16          **THE COURT:**  I don't know why the public has a right to

17   that.  The jury it may be relevant.  I don't know why the

18   public has a right to that.

19          And, again, I go back to this:  The plaintiffs didn't do

20   anything wrong, and so, no, I completely disagree.  I

21   completely disagree and to sort of put them to that choice,

22   "Oh, you can't sue or you're going to have to discuss public

23   for the whole world," and it could end up on Gawker or

24   whatever, you know, "how often you have sex with your partner,"

25   or something, huh-uh, I don't think so.

1          **MS. REVEILLE:**  We will just identify, then, for the

2  videographer beforehand the portions that will be off camera.

3          **THE COURT:**  Yeah.  And we're going to have a

4  discussion, then, about closing arguments to the extent you're

5  going to reference any of that.

6          **MS. REVEILLE:**  Okay.

7          **THE COURT:**  But, again, any reference I think would

8  probably be fleeting just given time constraints, but we'll

9  have to address that at the time.  I'm not in any way limiting

10 Chart from arguing or offering evidence relevant to the jury.

11 It's merely going to seal it for certain things.

12         **MS. REVEILLE:**  Understood, Your Honor.

13         **THE COURT:**  Frankly, I think the jury would appreciate

14 that and would appreciate Chart's cooperation with that as

15 well.  I think that actually works to your advantage.

16         **MR. DUFFY:**  Your Honor, just from a logistical

17 standpoint, how is it that the court staff can sort of block

18 access to the proceedings?  Is that something that --

19         **THE COURT:**  Yeah.  We can just turn it off.

20         **MR. DUFFY:**  Okay.

21         **THE COURT:**  We turn the audio off and we would, I

22 think -- and we'll go through this on May 18th.

23         **MR. DUFFY:**  Okay.

24         **THE COURT:**  I think we just would -- well, so some of

25 these people would be -- well, and since the access to the

1   video is only going to be counsel and litigants, party

2   litigants, counsel already know this information in any event

3   or will, and I'll leave it up to the plaintiffs to the

4   extent -- the other plaintiffs whether they want them to have

5   access to that.  I mean, that's just up to you there; but the

6   public, we would just turn the audio off.  Just turn it off.

7          MR. DUFFY:  Okay.  With regard to the barring

8   witnesses and so forth from watching, if PFC's attorneys are

9   not part of these proceedings, which they're not, what would be

10  the basis for allowing them to watch?

11         THE COURT:  This is a bellwether trial.  My hope and

12  your hope is that once the trial is done and there's a verdict,

13  that Chart and PFC and the plaintiffs can get together and

14  resolve the case; and if PFC's lawyers are kept out from

15  watching the trial, that is not going to happen.  That's the

16  basis.  That's the basis.

17         MR. DUFFY:  Your Honor --

18         THE COURT:  But you can work something out with what

19  they can do.  They're all officers of the court.  They're not

20  going to do anything that they're prohibited from doing.

21         MR. DUFFY:  Right.

22         THE COURT:  If we had a fully open court without

23  limit, they would be sitting here anyway.  I couldn't bar them

24  from the courthouse; right?  I could not bar them from the

25  courthouse; but then because of the bellwether nature, that's

1  an additional reason to give them access.

2         **MR. DUFFY:**  Right.

3         **THE COURT:**  Okay.

4         **MS. SHARP:**  Your Honor?

5         **THE COURT:**  Yes.

6         **MS. SHARP:**  If we may, can we come back to the issue

7  of the remote testimony and the Chart witnesses?  I think it

8  would be very helpful for us in terms of preparation,

9  especially deposition designations and the like, if we had a

10  date --

11         **THE COURT:**  Yes.

12         **MS. SHARP:**  -- for that declaration.

13         **THE COURT:**  Yes.  Mr. Duffy, how much time would you

14  like to figure out, A, where these witnesses all work and all

15  that kind of stuff, the relationship, and then get back to the

16  plaintiffs?  A week?

17         **MR. DUFFY:**  Sure.  Yeah.  That's fine, Your Honor.

18         **THE COURT:**  All right.  In a week.  And then if you

19  need to raise something again with me, just raise it again with

20  me.

21      And then, Mr. Polk, within the same week or within a

22  week -- within -- actually, can you then get back to Chart

23  about excluding the witnesses and maybe submitting a

24  stipulation?

25         **MR. POLK:**  Yes.

1          **THE COURT:**  How about submit a stipulation as to what

2     the direction will be.

3          **MR. POLK:**  Yeah.  That makes sense, yes.

4          **THE COURT:**  Okay.  I think that takes care of the

5     *motions in limine*, and we'll issue a written order so it will

6     be there.

7          Okay.  The motion for reconsideration I'm going to deny.

8     And here's the thing:  I just don't find that test reliable,

9     but I can't remember his name, doctor whatever his name, he can

10    testify as to what he would expect to see.  "In my experience

11    and what I've seen," he can testify to that all he wants.  What

12    he can't testify is "And I saw it on this test," because I just

13    don't think that's reliable -- the test is reliable and the

14    jury is going to put too much on it.

15         **MR. DUFFY:**  Your Honor, if I might, just for a little

16    clarification on that part of your ruling.

17         When he did conduct the test, one of the things that he

18    does is he produces a complete vacuum seal loss which creates

19    the conditions that you would see in a freezer.  So photographs

20    of that and video, which is really important, because what

21    we're saying here now is all this is is a freezer that has lost

22    vacuum seal.  What does it look like?

23         So it has a vent path in the back.  What happens?  It

24    chugalugs like a chimney and there's an ice ball there and then

25    what happens is water streaks down the side.  So that part of

1  the test is just limited to show the jury this is what a

2  freezer looks like when it loses complete vacuum seal.

3          THE COURT:  When it did in this one time.  When it did

4  this one time.

5          MR. DUFFY:  Well, all the witnesses, Your Honor, in

6  the case, all of them at PFC, they all agree that that's the

7  way it looks.  They all agree.  So this is a video to show

8  everyone live, hey, you get plumes of nitrogen gas coming out.

9  You get a little bit of air mixed in there.  You get an ice

10  ball and then it streaks down with water.  Every witness agrees

11  with that.  Every one.

12          THE COURT:  So it's not going to come in as

13  substantive evidence.  Now, whether you could use it as a

14  demonstrative --

15          MR. DUFFY:  Yes.

16          THE COURT:  -- in which you didn't say this was a test

17  that I ran --

18          MR. DUFFY:  Okay.

19          THE COURT:  -- but it's just a demonstrative

20  illustrating the testimony --

21          MR. DUFFY:  Okay.

22          THE COURT:  -- I think if it was limited to that

23  purpose, it's not substantive evidence.  It's not going back.

24  He can't talk about it being a test.  It's an illustration of

25  the other testimony.

1        What about that obviously from the plaintiffs?

2        **MS. ZEMAN:**  Your Honor, I would say I do think

3   Mr. Duffy is overstating the case that everyone agrees.  He's

4   suggesting that everyone agrees that that exact test is, you

5   know, indicative of how every failure occurs.

6        You know, I'm open to the Court's suggestion.  I do

7   believe there needs to be very clear parameters set that there

8   cannot be any indication made to the jury that that video or

9   those photos are coming from anything that was done as part of

10  this litigation or was done in any way, shape, or form to, you

11  know, recreate what happened with Tank 4.  It would be no

12  different from any other photo Mr. Miller might have during his

13  career as a cryogenic engineer.

14        **THE COURT:**  And it was done as far as the litigation.

15  It's a demonstrative.  It was created as part of the litigation

16  to illustrate Chart's view of the evidence, and that's it and

17  it's not substantive evidence.

18        So why don't you work with Chart to see if that -- but,

19  you know, parties get leeway with respect to demonstratives

20  unless they're misleading, and you haven't seen it or -- well,

21  you've seen it but you don't know what Mr. Duffy is proposing

22  or how.  So we'll leave that open, but I'm open to that.

23        **MS. ZEMAN:**  So the idea there is it might be used as a

24  demonstrative and we should discuss what that demonstrative

25  might look like?

1          **THE COURT:**  Exactly.

2          **MS. ZEMAN:**  Thank you.

3          **MR. DUFFY:**  Thanks, Your Honor.

4          **THE COURT:**  I don't know that you disagree that as a

5    demonstrative it reflects what their expert says.  You just

6    disagree that their expert is correct as to what would have

7    happened.

8          Okay.  Time limits.  You're going to get, excluding

9    openings and closings, 25 hours each, which is for your direct

10   and cross, which is really a lot of time I have to say.  I

11   can't remember a civil trial around here that's had that much

12   more time; and it's going to make sure, then, that it's going

13   to be well presented here and that no one has to worry about

14   someone going off on a tangent and then no one's going to have

15   time.

16        And so let me ask you about openings for the plaintiffs,

17   how long you think your opening will be.

18          **MS. SHARP:**  Rough estimate, Your Honor, an hour.

19          **THE COURT:**  Yeah.  Okay.

20        And Mr. Duffy for Chart?

21          **MS. SHARP:**  I'll defer to my colleagues if they think

22   that, you know, we should be suggesting something longer.

23          **MS. ZEMAN:**  I think we might want to say one to two

24   hours.

25          **THE COURT:**  Nah, not two.  Two is too long.

1          **MS. ZEMAN:**  Okay.

2          **THE COURT:**  You know, one hour to an hour and 15

3     minutes or so.

4       And the same for you, Mr. Duffy?

5          **MR. DUFFY:**  That's fine, Your Honor.  Thank you.

6          **THE COURT:**  Yeah.  Let's do that, an hour and 15.

7       Closings I would give you two each.  There's a lot of

8     evidence and stuff to summarize.

9       But okay.  So none of that counts towards your 25 hours.

10      And, as I said, we'll start at 8:00 a.m. every day and I

11    will really figure things out.  I just plan on taking

12    essentially two 10-minute breaks to the extent we can.  When I

13    say "10," that means they end up being 15, so that we get four

14    and a half hours at least of testimony in a day because I just

15    want our jurors' time here to be almost all evidence.

16      What I would like you to do is to the extent -- I like to

17    usually wait jury instructions, verdict form, until we've seen

18    more of the evidence.  I have a better feel.  However, if there

19    are particular instruction disputes or particular exhibits that

20    I said, like -- I think you raised a lot with respect to these

21    *motions in limine* so if there's other authenticity or

22    objections, things that you think I can and should decide in

23    advance of openings, then I can address it on May 18th.  So if

24    you could let me know, say, within a week as well what those

25    are, if there are particular instructions.

```
 1              MS. SHARP:   Thank you, Your Honor.

 2         One question on that with regard to the use of exhibits or

 3    documents and testimony that we think is going to be admitted.

 4    You know, that seems like a good candidate for the kind of

 5    thing that we would want to get rulings on on the 18th so that

 6    we don't have, you know, disputes about whatever demonstratives

 7    we might use in openings.  Is that --

 8              THE COURT:  For sure the openings, yeah.  So exchange

 9    in advance, well in advance of the 18th --

10              MR. DUFFY:  We're going to do that.

11              THE COURT:  -- what your demonstratives would be for

12    your openings.

13              MS. SHARP:  Great.

14              THE COURT:  Great.

15         Okay.  I think maybe I covered everything.  And we have a

16    time for the 18th; right?

17              MR. DUFFY:  What time is it?

18              MS. ZEMAN:  We have 9:30, Your Honor.

19              THE COURT:  9:00.

20              MS. REVEILLE:  9:30.

21              THE COURT:  9:30.

22              MR. DUFFY:  Okay.

23              THE COURT:  And first we'll do our walk-through.

24         And, you know, one question really for you guys is, and

25    now that you know it's not published to the public but
```

1   published to people within the cases, is whether you want the

2   lawyers to be on screen at least partially because then you

3   would have your laptop on the podium.  But, of course, your

4   attention is not going to really be directed at the laptop.

5   It's going to be really directed at the jury, but the jury is

6   around.

7        So, anyway, you should probably bring your laptop so we

8   can try that out and you can decide what to do.

9            MR. DUFFY:  Your Honor, when you say whether the

10  lawyers want to be on camera, would we have, like, our laptops

11  on the podium?  Is that what you're suggesting?

12           THE COURT:  Exactly.

13           MR. DUFFY:  I see.

14           THE COURT:  Exactly.  Sometimes you might be to the

15  side because you're really talking to jury, depending on which

16  way you're turning, but I still think that might be better --

17           MR. DUFFY:  Okay.

18           THE COURT:  -- for our stakeholders who will be

19  watching.

20           MR. DUFFY:  One other thought was, has there been any

21  revision to the mask policy in terms of lawyers?  I was

22  watching the Derek Chauvin trial and I saw that they didn't

23  have them so I figured I would ask.

24           THE COURT:  There has not.  Yeah, there has not been

25  any revision.

1          **MR. DUFFY:**  Okay.

2          **THE COURT:**  We do have another judges meeting before

3     our trial starts --

4          **MR. DUFFY:**  Okay.

5          **THE COURT:**  -- at which much of this will be

6     discussed, and I'll let you know if any of the policies change.

7          **MR. DUFFY:**  Okay.  Great.

8        Just so they can see our faces, would a face shield be --

9          **THE COURT:**  We do have clear masks available that the

10    witnesses will be using, and I don't -- I will ask --

11         **MR. DUFFY:**  Okay.

12         **THE COURT:**  -- if the lawyers can -- I don't know if

13    you watched any of Judge Chesney's trial, but the witnesses

14    when they used the clear mask, you could see -- I mean, it was

15    pretty good I thought.

16       Did you agree, Ms. Sharp, that you kind of forgot they

17    were wearing a mask?

18         **MS. SHARP:**  Yeah.  The only ones who had trouble were

19    the ones that were wearing glasses that would kind of go up and

20    down with the mask, but we could advise our witnesses about

21    that.

22         **THE COURT:**  So what you might want to do is look into

23    the clear masks.

24         **MR. DUFFY:**  Okay.  Sure.

25         **THE COURT:**  I'll have to ask to make sure that the

1   attorneys could wear clear masks, but I think that might be a

2   good compromise.

3        **MR. DUFFY:**  Yeah, just so they can see.  I just

4   thought at certain points when they were wearing a mask, it's

5   very impersonal and it's hard to gauge demeanor.

6        **THE COURT:**  You are going to be trying a case in

7   San Francisco, not Minnesota, and so that's a bit of a

8   difference.

9        **MR. DUFFY:**  True.  True.  We don't even have trials

10  right now in our state court at all.

11       **THE COURT:**  Is that right?

12       **MR. DUFFY:**  No.

13       **THE COURT:**  I must say San Francisco, I read the other

14  day, 70 percent of eligible adults 16 and older have been

15  vaccinated.  70.

16       **MR. DUFFY:**  That's great.

17       **THE COURT:**  Yeah.

18       **MR. DUFFY:**  That's great.

19       **THE COURT:**  So you would say so that would mean you

20  shouldn't have to wear the mask, but we have people like you

21  not from San Francisco coming into our courthouse.

22       **MR. DUFFY:**  True.

23       **THE COURT:**  All right.  Great.  Anything else then?

24       **MS. SHARP:**  A couple other questions if we may,

25  Your Honor.

1          **THE COURT:**  Of course.

2          **MS. SHARP:**  One for us is whether the Court has any

3   reaction to a suggestion from the plaintiffs that we defer any

4   dispositive briefing until the close of evidence just so that

5   we can keep going with the evidence.  In other words, any

6   dispositive motions would be filed, you know, after both the

7   plaintiffs and the defense rest.

8          **THE COURT:**  Like what kind of dispositive motions?

9          **MS. SHARP:**  You know, motion for directed verdict --

10          **THE COURT:**  Oh, yeah.

11          **MS. SHARP:**  -- motions for judgment as a matter of

12   law.

13          **THE COURT:**  Oh, yeah.  Usually you can just do it

14   orally -- right? -- and so you can preserve it on the record.

15          **MS. SHARP:**  All right.

16          **THE COURT:**  Yeah.

17          **MS. SHARP:**  And with regard to any briefing that's

18   filed during trial, would Your Honor be inclined to impose some

19   limits?  You know, like a five-page limit or something so that

20   we don't have people staying up all night.

21          **THE COURT:**  Yes.  I would actually be inclined for

22   before we depart for the day, you tell me what you -- you need

23   to tell me -- right? -- so I would know it's come and then we

24   can discuss what the limits are if we even need briefing and

25   that type of thing.

1          **MS. SHARP:**  Great.

2      On the COVID front, we've, you know, heard different

3   things from different folks who've been trying cases.  Does

4   the -- and I know in the last hearing I think Your Honor said

5   there would be -- you know, we'd be spaced out at counsel

6   table.  Does the Court have requirements as to the lawyers on

7   any given grouping or pod?  In other words, what we'd like to

8   do is be able to lean over and whisper to each other.

9          **THE COURT:**  I don't think you can.  I will find out.

10  And, again, we have a judges meeting before May 20th at which

11  everything is going to be revisited so I'll find out everything

12  there.  I'll find out everything there, but I'm going to go

13  with whatever the court decides --

14          **MS. SHARP:**  Of course.

15          **THE COURT:**  -- because I think it's important that we

16  all be consistent.

17          **MS. SHARP:**  Absolutely.  We're not trying to break the

18  rules.  We're just trying to understand what they are.

19          **THE COURT:**  Yeah.

20          **MS. SHARP:**  And two other things on sort of the

21  administrative front from our perspective.

22      One is, you know, with regard to a tech order.  I mean, we

23  would usually just submit I think a template just so we can

24  bring in our printers and, you know, whatever else.  I can't

25  anticipate that, especially given the Court's comments today,

1   that the nature of the Zoom trial is going to affect that.

2   Does Your Honor see any need for us to do a special tech order?

3          **THE COURT:**  No.

4          **MS. SHARP:**  Okay.  Great.

5          **THE COURT:**  I mean, just do whatever -- I don't know

6   what the -- the court security officers may stop you as well so

7   you should get the order.

8          **MS. SHARP:**  Yeah.  Right.  Exactly.  Yeah.  I've

9   tangled with the deputies before.  I don't want to do that

10  again.

11         **THE COURT:**  Yeah.  Go ahead and submit your order.

12         **MS. SHARP:**  All right.

13     Okay.  And the last thing, at least from my perspective

14  right now, is that we are hoping to bring in the tank itself

15  and possibly an exemplar as well.  Does the Court have any

16  guidance on who we should contact to get a pretty large item

17  like that into the courtroom?

18         **THE COURT:**  Contact Ms. Means and she'll find who you

19  should be in touch with.

20         **MS. SHARP:**  All right.  We figured that was the case.

21  We didn't want to put her on the spot, though.

22         **THE COURT:**  She's my boss.

23         **MS. SHARP:**  All of our boss.

24         **MR. DUFFY:**  With regard to that last point about

25  bringing in the freezers, would we be able -- I mean, I'm

1    figuring the courtrooms are largely empty.  Could we store them

2    in a locked courtroom overnight?  Because, I mean, moving these

3    things --

4         **THE COURT:**  I believe Ms. Means is there; but when we

5    do trials, yeah, you leave all the exhibits, everything, there

6    and we lock the courtroom.

7         **MR. DUFFY:**  In the courtroom, okay.

8         **THE COURT:**  Yeah.  Even for the jurors -- right? --

9    because they're using Judge Illston's courtroom next-door and

10   they can leave their stuff in there when they come into court,

11   and then we just lock the door behind them.  They'll be using

12   the hallway back and forth, yeah.  So, no, you don't have to

13   take your boxes or any of that stuff back.

14        **MR. DUFFY:**  Okay.

15        **MS. SHARP:**  We'd have to bring the tank in and out

16   every day.

17        **THE COURT:**  No, no, no.

18        **MS. SHARP:**  Just joking.

19        **THE COURT:**  The courtrooms are quite large.

20      Okay.  Great.  Thanks everyone.

21        **MR. DUFFY:**  Thank you, Your Honor.

22        **MS. SHARP:**  Thank you, Your Honor.

23        **MR. POLK:**  Thank you, Your Honor.

24              (Proceedings adjourned at 3:22 p.m.)

25

<u>**CERTIFICATE OF REPORTER**</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Monday, May 3, 2021

_____

Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
U.S. Court Reporter