Eric H. Gibbs (State Bar No. 178658)
Amy M. Zeman (State Bar No. 273100)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, CA 94612
Tel: (510) 350-9700
Fax: (510) 350-9701
ehg@classlawgroup.com
amz@classlawgroup.com

Adam B. Wolf (State Bar No. 215914)
Tracey B. Cowan (State Bar No. 250053)
**PEIFFER WOLF CARR KANE &
CONWAY, APLC**
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Tel: (415) 766-3545
Fax: (415) 402-0058
awolf@peifferwolf.com
tcowan@peifferwolf.com

*Plaintiffs' counsel*

Dena C. Sharp (State Bar No. 245869)
Adam E. Polk (State Bar No. 273000)
Nina R. Gliozzo (State Bar No. 333569)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dsharp@girardsharp.com
apolk@girardsharp.com
ngliozzo@girardsharp.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE PACIFIC FERTILITY CENTER LITIGATION<br><br><br>This Document Relates to:<br>No. 3:18-cv-01586<br>(A.B., C.D., E.F., G.H., and I.J.) | Master Case No. 3:18-cv-01586-JSC<br><br>**PLAINTIFFS' TRIAL BRIEF REGARDING DEPOSITION TESTIMONY AND EXHIBITS FOR MAY 25, 2021** |

1   Plaintiffs have designated 2 hours and 27 minutes of testimony from seven witnesses that they

2   would like to play for the jury on Tuesday, May 25, 2021. In response, Chart objected to Plaintiffs

3   playing 13 minutes of testimony from Ramon Gonzalez; counter-designated 4 hours and 7 minutes of

4   testimony; and objected to the jury seeing 10 exhibits that were discussed by the witnesses during their

5   depositions. Plaintiffs briefly address the global issues raised by Chart's response below. In addition,

6   both parties' designations and line-by-line objections are attached hereto as Exhibits A-G.

7   **A.      The deposition testimony of Ramon Gonzalez should be permitted.**

8        Chart objects to Plaintiffs playing brief excerpts from Mr. Gonzalez's deposition testimony

9   because he was not included on Plaintiffs' original witness list. When that witness list was submitted,

10  however, Chart had designated two former employees, Seth Adams and Buster Ingram, who would be

11  appearing for live testimony, and had agreed both witnesses would be available for Plaintiffs to call live

12  in their case in chief. The Court subsequently ordered that Chart make one of its current employees,

13  Brandon Wade, available for live testimony via Zoom. It was not until Tuesday, May 18, 2021, that

14  Plaintiffs learned none of these Chart witnesses would in fact be testifying at trial and that Plaintiffs

15  would instead need to rely exclusively on prior deposition testimony.

16       So while Plaintiffs previously had seen no need to use Mr. Gonzalez's deposition testimony

17  other than for impeachment—given that the issues and documents he had discussed during his

18  deposition could be raised with the Chart witnesses who were set to testify live—that changed when

19  Plaintiffs learned no Chart witnesses would be appearing at trial after all. For example, Ramon

20  Gonzalez was asked about an email at his deposition that stated Chart's new controller had the issues

21  that plagued its TEC-3000 controller—and caused the SN=0 defect—"designed out of it at the board

22  level." (Trial Ex. 197.) If Chart still had live witnesses appearing at trial, those witnesses could have

23  been asked about the document and testified that Chart had designed the SN=0 defect out of its

24  retrofitted controller. If they refused, Mr. Gonzalez's deposition testimony could have then been

25  introduced for impeachment purposes. But without live witnesses, that method of getting the "designed

26  out at the board level" document into the record is no longer feasible. The only effective way of

27  introducing that important document into evidence is now to read Mr. Gonzalez's prior deposition

28  testimony about the document into the record.

Because the need for Mr. Gonzalez's deposition testimony has only just arisen, the fact that he does not appear on the witness list the parties submitted over a month ago should not preclude Plaintiffs from offering Mr. Gonzalez's testimony now. Rule 37(c)(1) provides that if a party fails to identify a witness, the party is not allowed to use that witness to supply evidence at a trial "unless the failure was substantially justified or is harmless." Here, Plaintiffs' failure to identify Mr. Gonzalez before last Thursday was substantially justified. Not until Plaintiffs learned that Chart witnesses would not be appearing in person as previously represented, did it become necessary for them to play a small portion of Mr. Gonzalez's deposition testimony for the jury. Identifying Mr. Gonzalez now is also harmless, as Chart may counter-designate his deposition testimony if it wishes—Plaintiffs do not anticipate that his deposition will be played until Tuesday, May 25 at the earliest.

In addition, none of the factors that courts are required to consider when determining whether to exclude the testimony of previously unidentified witnesses favor exclusion of Mr. Gonzalez's deposition testimony. *See Reno Air Racing Ass'n., Inc. v. McCord*, 452 F.3d 1126, 1139–40 (9th Cir. 2006). Chart will not be prejudiced if Plaintiffs play 13 minutes of Mr. Gonzalez's deposition: Chart's counsel was present during that deposition, the exhibits that Mr. Gonzalez is discussing were identified in Plaintiffs' exhibit list, and if Chart was making Mr. Adams or Mr. Ingram available to Plaintiffs at trial—as they previously represented they would—the same testimony could have been elicited from them or used for impeachment. Playing Mr. Gonzalez's testimony also would not disrupt the orderly and efficient trial of the case. Due to Chart's manipulation of witness availability, hours of deposition testimony from several prior depositions was already going to be necessary. Adding 13 more minutes of deposition testimony to that video presentation should make little practical difference, and is needed to ensure the jury is able to review  evidence that can only be introduced through Mr. Gonzalez's deposition. The late addition of Mr. Gonzalez is not the result of a willful failure to comply with Court orders; it is the result of the sudden unavailability of other Chart witnesses. Plaintiffs accordingly request that the Court overrule Chart's objection and permit Plaintiffs to play approximately 13 minutes of Mr. Gonzalez's deposition testimony for the jury.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B.      Chart's counter-designations are excessive, calculated to confuse the jury, and should largely be played separately from Plaintiffs' shorter designations.**

The testimony that Plaintiffs intend to play for the jury consists of relatively short and targeted excerpts from the depositions of six Chart witnesses and one Extron witness. They range in length from 4 minutes to 41 minutes, and average about 20 minutes per witness. Because no Chart witnesses will be testifying live at trial, the primary intent of playing these depositions is to enter internal Chart documents into evidence, along with Chart's explanation of the documents' significance.

Chart has countered with much longer excerpts that largely do not address the same subject matter and appear calculated to distract from the exhibits and testimony Plaintiffs wish to introduce by surrounding them with hours of irrelevant and confusing material. For instance, Plaintiffs wish to provide the jury with 20 minutes from Seth Adams' deposition, but Chart wants to dilute that testimony by adding over an hour and a half to the video that the jury sees. And while Plaintiffs intend to show the jury only 19 minutes from Jeff Brooks' deposition, Chart wants to surround that testimony with nearly an hour of additional, largely unrelated testimony.

| Witness | Plaintiffs' Designations | Chart's Designations |
|---|---|---|
| Seth Adams | 20 mins | 1 hr, 34 min |
| Jeff Brooks | 19 mins | 52 mins |
| Kyle Eubanks | 29 mins | 5 mins |
| Ramon Gonzalez | 13 mins | - |
| Justin Junnier | 41 mins | 45 mins |
| Gregory Mueller | 4 mins | 26 mins |
| Brendon Wade | 21 mins | 25 mins |
| **Total** | **2 hrs, 27 mins** | **4 hrs, 7 mins** |

Chart has already prejudiced Plaintiffs' case by denying them access to live witnesses who it had previously represented would be attending the trial proceedings and by refusing to make even current employees available for live testimony. To avoid further prejudicing Plaintiffs' ability to enter

internal Chart documents into evidence in an effective manner, Plaintiffs request that Chart be directed to play most of its much longer video excerpts separately from Plaintiffs' excerpts.

This could be accomplished by playing Plaintiffs' excerpts as a "direct examination," and then instructing the jury that additional excerpts will be shown as Chart's "cross examination." Or it could be accomplished by requiring Chart to play most of its excerpts during its case-in-chief, where it will be clear that Chart is offering the testimony for a different purpose and in support of its defense. Had Chart produced live witnesses, it would have made sense to complete both side's examination of the witness in one sitting—both for the convenience of the witness and to reduce the risk of any potential COVID exposure. But with video testimony, those concerns are not present. Chart would suffer no prejudice if required to play its video excerpts during its own case-in-chief, and Plaintiffs' video excerpts will make far more sense to the jury if they are not diluted by confusing and mostly unrelated testimony.

Where Chart is merely extending Plaintiffs' designations by a few lines while still addressing the same exhibit or topic, Plaintiffs have no objection to playing Chart's counter-designations at the same time as Plaintiffs' designated testimony. But where Chart is adding large segments of unrelated testimony regarding other exhibits or topics than those addressed in Plaintiffs' designated testimony, Plaintiffs believe it would be inappropriate and confusing to the jury to mix the two.

**C.     Chart's objections to Plaintiffs' exhibits should be overruled.**

Out of the 16 exhibits that Plaintiffs intend to introduce into evidence through the Chart and Extron deposition testimony, Chart objects to 10 of them. Even though the Court has repeatedly denied Chart's attempts to exclude its own failure-modes analysis and its own emails about the SN=0 controller defect, Chart continues to make the same objection. Plaintiffs request that the Court deny Chart's "other occurrence" objection to these exhibits as well.

**1.     Exhibit 192**

Exhibit 192 is Chart's Design Failure Mode Effects and Criticality Analysis (DFMECA), which contains a pre-litigation admission that the type of cracked weld Tank 4 suffered would cause exactly what happened to Tank 4. The Court has already overruled Chart's objection to Exhibit 192. (5/19/21 Order at 2, EF No. 806.)

### 2.    Exhibit 208

The Court has also already overruled Chart's objection to Exhibit 208. (5/19/21 Order at 2, EF No. 806.) Plaintiffs request that it do so again and direct Chart to refrain from re-raising objections that have already been ruled on.

### 3.    Exhibit 216

Exhibit 216 is another branch of the email chain found in Exhibit 217, which the Court has already ruled is admissible. (5/19/21 Order at 2, EF No. 806.) Exhibit 216 contains four of the same emails as Exhibit 217, plus three additional emails, where Chart reiterates that the SN=0 issue was increasing globally in 2015, that when Chart offers replacements they come up with the same issues, and that neither Chart nor its supplier had a solution to the problem. As the Court found with respect to Exhibit 217, "These emails are relevant to Chart's knowledge of a defect with the controller and as they are emails between Chart employees, to the extent they are offered for the truth of the matter, they are admissible as statements of an employee of a party opponent." (*Id.*)

### 4.    Exhibit 284

Exhibit 284 consists of two emails from Chart employees. One email reports that Chart "just lost a large quantity of freezer sales in Europe because of TEC3000 issue," and both emails describe that issue as the serial number and liquid nitrogen level dropping to zero all of a sudden—exactly what happened to Tank 4. The emails are relevant because they show that Chart was aware of that issue way back in 2015 but failed to address it through a recall or retrofit campaign. One email also states that "Chart hierarchy" wanted answers, which indicates that one or more officers, directors, or managing agent knew about Chart's failure to recall its defective controllers and adopted or approved that failure—a required element of Plaintiffs' claim for punitive damages. (*See* Joint Proposed Jury Instructions at 32, Stipulated Instruction No. 20, ECF No. 762.)

### 5.    Exhibit 200

Exhibit 200 is another string of emails from Chart employees regarding the SN=0 issue that afflicted Tank 4. Chart employee Brendan Wade's email confirms the issue being discussed is SN=0: he states that many of the returned controllers he examined in 2015 had lost their serial number and that "this is only a fraction of the total controller returns." (Trial Ex. 200 at 4551.) And a Quality Analyst at

5

Chart, Daphne Maddox, reports that Chart's upper management will want to know why Chart had to replace 10 TEC 3000 controllers for a single customer at the same time and that she will make sure everyone is aware of the controller issue—again suggesting that one or more of Chart's officers, directors, or managing agents knew about the SN=0 defect an approved of Chart's failure to address it through a recall or retrofit. (*Id.* at 4551, 4553.)

### 6.    Exhibit 197

Exhibit 197 consists of two more Chart emails concerning the SN=0 issue. Chart employee Brendon Wade confirms the email string concerns the same issue experienced by Tank 4: "the SN going to zero on the TEC 3000," where "the freezers spontaneously read 0" of liquid [nitrogen] and temps are way off."  (Trial Ex. 197 at 2854.) And Chart employee Alex Burnett reports that Chart's "new touch-screen controller has these issues designed out of it at the board level." (*Id.* at 2855.) This shows not only that Chart was aware of the SN=0 issue in 2016, but that it was already working on a fix that it could have used to retrofit existing controllers.

### 7.    Exhibit 225

Exhibit 225 is a 2017 email from Chart employee Justin Junnier, who states that it is not that crucial for Chart to figure out the range of the interference issue behind SN=0 because the touch screen controller was due to be launched later that year. In his deposition testimony concerning the email, Mr. Junnier explained that "[i]t was our thought process that this touch screen controller would be the end -- hopefully the end-all, be-all to fix these interference issues." (Junnier Dep. at 94-95.) He also admitted that Chart had upgrade kits available that Chart could have used to retrofit existing TEC-3000 controllers, but that Chart did not do so. (*Id.* at 95-96.) The exhibit and Mr. Junnier's testimony are therefore relevant to show that Chart had the ability to retrofit Tank 4's defective controller but chose not to do so, which a jury could find constituted a negligent failure to retrofit under the circumstances.

Elsewhere Chart has objected that the touch screen controller is irrelevant because it was "not yet available for Chart customers as of March 2018." (*See* Adams Dep. at 25, Defense Objections.) But Chart has previously admitted that the "TEC3000 to Touch Screen Upgrade Kit (Part Number 21127230) was available for purchase as of January 1, 2018." (Trial Ex. 5, Answer to RFA #1.) And Ramon Gonzalez testified during his deposition that the touchscreen controller went to market around

1  May 2017. (Gonzalez Dep. at 34.) Notably, Chart did not receive SN=0 complaints about that upgraded
2  controller.

3      **8.     Exhibit 266**

4      Exhibit 266 is an email string concerning "a spate of TEC3000 controllers in Australia going
5  into the error of not showing any level on the display." (Trial Ex. 266 at 67352.) Chart employee Justin
6  Junnier responded by telling a Chart Industries employee that electrical interference issues may be
7  responsible and suggested the customers check whether the controller was still displaying the correct
8  serial number. (*Id.* at 67350, 51.) When asked at his deposition whether he was concerned by these
9  controller malfunctions, Mr. Junnier responded that he "was not necessarily in alarm … [for lack] of a
10 better term, wigging out, if you will, because those freezers can maintain LN2 and temperature for quite
11 a while, for weeks on end." (Junnier Dep.at 72-73.) That response undermines Chart's contention that
12 PFC acted negligently and irresponsibly when it had a similar response to Tank 4's malfunctioning
13 controller. Like Mr. Junnier, PFC believed it wasn't essential to immediately replace Tank 4's
14 malfunctioning controller because Tank 4 could maintain its liquid nitrogen level and temperature for
15 weeks on end. Had Mr. Junnier or PFC been told that an interior weld could crack and immediately
16 compromise the tank's ability to maintain its liquid nitrogen level and temperature, they surely would
17 have responded differently. But Mr. Junnier's response shows that PFC's belief was not necessarily
18 unreasonable under the circumstances as PFC understood them.

19     **9.     Exhibit 220**

20     Exhibit 220 is similar to the prior exhibit in that it reports that a customer's TEC-3000
21 controller was "reading 0" of liquid [nitrogen] when there was actual liquid in the freezer" and both
22 temperature probes were reading -273℃. (Trial Ex. 220 at 20479.) Chart employee Justin Junnier
23 responded that "we were able to determine the TEC 3000 was malfunctioning due to electrical
24 interference," (*Id.* at 20476.) When asked at his deposition whether the malfunctioning controller was
25 concerning given that the product stored inside the tank was "irreplaceable," Mr. Junnier reiterated that
26 he was only somewhat concerned because "then again, if these samples were in the freezer, if there is
27 LN2 in the freezer, that can last for a couple of weeks." (Junnier Dep. at 83.) As with the prior exhibit,
28 this exhibit and Mr. Junnier's reaction to it are relevant because they tend to undermine Chart's

7

contention that it was unreasonable for PFC to respond similarly to its malfunctioning controller rather than replace it immediately.

### 10.   Exhibit 263

Trial Exhibit 263 (CHART062204-213) is an email chain between Chart and one of its authorized distributors that was cited in Plaintiffs' Opposition to Chart's Motion for Summary Judgment. (*See* ECF No. 673-04 (Pls. MSJ Opp.) at 7.) The distributor wrote "two consecutive HECO units experience VACUUM FAILURE in [city]! Wow, I have never seen this before. … This is very serious and we don't want this to get around." (Trial Ex. 263 at CHART062211.) Chart employee Justin Junnier agreed, replying, "This is definitely an unusual circumstance." (*Id.*) Chart objects that the HECO units at issue in that email are not substantially similar to Tank 4, which is an MVE 808 model tank. But Plaintiffs are not introducing the document to prove that Tank 4 and the HECO units in Texas suffered from a common defect. They are introducing it to support their claim that ordinary users of cryogenic tanks do not expect a tank to lose vacuum overnight. That is relevant under the consumer-expectations test for a design defect. (*See* Joint Proposed Jury Instructions at 32, Disputed Instruction No. 4, ECF No. 762.) And it is also probative of Chart's contention that PFC's negligence caused or contributed to the March 4th incident. If Chart admits that it is "definitely an unusual circumstance" for a vacuum to fail overnight and implicitly agrees "we don't want [it] to get around" that sudden vacuum failures have occurred in Chart tanks, that could make PFC's reliance on manual monitoring alone seem more like a reasonable interim measure to a jury and less like negligence. PFC apparently did not believe it was possible for a tank to lose vacuum and fail overnight, and that belief appears more reasonable when viewed alongside an email chain where a Chart employee and a Chart authorized distributor express great surprise that a customer's tanks would suddenly lose their vacuum insulation.

Dated: May 23, 2021

Respectfully submitted,

By:   */s/ Amy M. Zeman*

Eric H. Gibbs (State Bar No. 178658)
Amy M. Zeman (State Bar No. 273100)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, CA 94612

8

Tel: (510) 350-9700
Fax: (510) 350-9701
ehg@classlawgroup.com
amz@classlawgroup.com

Dena C. Sharp (State Bar No. 245869)
Adam E. Polk (State Bar No. 273000)
Nina R. Gliozzo (State Bar No. 333569)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dsharp@girardsharp.com
apolk@girardsharp.com
ngliozzo@giradsharp.com

Adam B. Wolf (State Bar No. 215914)
Tracey B. Cowan (State Bar No. 250053)
**PEIFFER WOLF CARR KANE &
CONWAY, APLC**
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Tel: (415) 766-3545
Fax: (415) 402-0058
awolf@peifferwolf.com
tcowan@peifferwolf.com

*Plaintiffs' Counsel*

PLAINTIFFS' TRIAL BRIEF RE DEPOSITION TESTMIONY AND EXHIBITS FOR MAY 25, 2021
MASTER CASE NO. 3:18-cv-01586-JSC