Volume 1

Pages 1 - 112

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JACQUELINE SCOTT CORLEY, MAGISTRATE JUDGE

IN RE PACIFIC FERTILITY CENTER )   **No. 18-1586 JSC**
LITIGATION                     )
_____)
                                   San Francisco, California
                                   Thursday, May 20, 2021

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                        GIRARD SHARP LLP
                        602 California Street, Suite 1400
                        San Francisco, California 94108
               BY:  **DENA C. SHARP, ESQ.**
                    **ADAM E. POLK, ESQ.**
                    **NINA R. GLIOZZO, ESQ.**

                        GIBBS LAW GROUP LLP
                        505 14th Street, Suite 1110
                        Oakland, California 94612
               BY:  **AMY M. ZEMAN, ESQ.**
                    **JOHN BICKNELL, ESQ.**
                    **GEOFFREY A. MUNROE, ESQ.**


           (APPEARANCES CONTINUED ON FOLLOWING PAGE)



Reported By:   Katherine Powell Sullivan, CSR #5812, RMR, CRR
               Marla F. Knox, CSR, RMR, CRR
               Official Reporters - U.S. District Court

**<u>APPEARANCES:</u>** (continued)

For Defendant Chart Industries:

                        SWANSON, MARTIN AND BELL, LLP
                        330 N Wabash, Suite 3300
                        Chicago, Illinois 60611
          **BY:  JOHN J. DUFFY, ESQ.**
               **KEVIN M. RINGEL, ESQ.**
               **ANDREW LOTHSON, ESQ.**
               **KRISTINE C. REVEILLE, ESQ.**

                        SHEUERMAN, MARTINI, TABARI,
                         ZENERE & GARVIN
                        1033 Willow Street
                        San Jose, California 95125
          **BY:  MARC G. COWDEN, ESQ.**

| | |
|---|---|
| 1 | **Thursday - May 20, 2021**                                    **8:34 a.m.** |

2                    **P R O C E E D I N G S**

3                         **---o0o---**

4        **THE COURT:**  All right.  Good morning, everyone.  I

5   know the jury's not ready yet, but I wanted to go over some

6   things with you and let you know how I intended the process to

7   go.

8        I know that the jurors got the phone calls that they had

9   to show up today.  They have to do that COVID-symptom

10  questionnaire.  I think there were at least three that had

11  symptoms, so the jury commissioner added three people, three

12  more.  And then, of course, some people are not going to show

13  up.

14       So that's just to say when we get the list it will be a

15  little different than you think.  It will go a little farther

16  into our jury pool.

17       So the way it's going to work is -- and, actually, you

18  only have five people at counsel table.  Is that what it's

19  going to be?

20        **MR. POLK:**  No, Your Honor, I think there's two more.

21        **THE COURT:**  So this is what I want to do because,

22  actually, someone commented yesterday, when they saw all the

23  people there, it made them uncomfortable.

24       But first what I'm going to do is I'm going to tell the

25  jury that everyone on this side is vaccinated, fully

PROCEEDINGS

```
 1   vaccinated, also, to give them some comfort.

 2        But I also do think, in terms of I think we should limit

 3   it to five so you can spread out a little more.  Before we do

 4   our challenges or anything the jury is going to go away, and

 5   then we can all be together.

 6        But the CDC's announcement last week was a bit abrupt.  I

 7   was talking to Judge Cousins.  He did, like, a 3-day jury

 8   trial.  And he said he had one juror, and she said this is the

 9   first time she had been in a room; she's really anxious.  Then

10   she got selected for the jury, and she made it through.

11        But I want to be sensitive to that for a lot of people

12   this is going to be the first time they have been with this

13   many people indoors.  And so I think that we should do that.

14        MS. SHARP:  Makes sense.

15        THE COURT:  So I'm going to tell them all that we're

16   vaccinated; thank them.  Tell them a little bit.  Remind them,

17   again.

18        Of our safety precautions our their safety is our

19   priority.  Tell them the reason that you guys aren't socially

20   distanced, is you have created your own pods and are all fully

21   vaccinated.  Tell them our goal is to select the jury by

22   1:00 o'clock today.  That's our goal.

23        And then I'll introduce my staff; ask them if they know

24   any of us.  And then I'm going to give each side, you introduce

25   your teams.
```

PROCEEDINGS

```
 1        Do either of you have clients here?

 2            MS. SHARP:  Not today, Your Honor.

 3            THE COURT:  Not today.

 4            MR. DUFFY:  Not today.

 5            THE COURT:  Great.  Just introduce yourselves then.

 6            MS. SHARP:  Your Honor, one question if we may.

 7            THE COURT:  Can you hold on one second.

 8            MS. SHARP:  Of course.

 9            THE COURT:  Ms. Means says she knows somebody, so

10   we'll see.

11            MS. SHARP:  Just one question, Your Honor.  Given the

12   fact there are going to be three new prospective jurors, if we

13   could have just a moment after we get the list so we could

14   adjust our seating charts, that would be ideal.

15            THE COURT:  Sure.  I think -- they're going to bring

16   it down, and I'm sure it will be a while before they can make

17   their way down here.

18            MR. DUFFY:  Your Honor, for the folks who have the

19   symptoms, do we know the numbers or anything?

20            THE COURT:  I don't know anything.  Yeah, I don't know

21   anything other than she just asked if I wanted three more

22   people put into the 40 called in, and I said yes.

23            MR. DUFFY:  Do we move them up from below?

24            THE COURT:  They move up from below.  They would be in

25   order.  I just don't know which ones would be removed.  It's
```

PROCEEDINGS

1  not random.  It's in order.

2         **MR. DUFFY:**  Got it.  Okay.

3         **THE COURT:**  So I'll have you introduce yourselves but,

4  of course, the questionnaire already asked them if they knew

5  any of you, and no one said they did.

6         **MR. DUFFY:**  Okay.

7         **THE COURT:**  And then I'm going to go again through our

8  schedule and ask again -- I hate to do it, but give them a

9  chance, because I don't want to have someone come up at the

10  end, after they have been selected, ask them again if there's a

11  reason they cannot serve.  We will not excuse anyone now.  Just

12  after the end we'll just discuss that person.

13      Yeah, so then when I'm done with all that, I'll tell them

14  each side is going to have 30 minutes.

15      Did either of you want to reserve time in your questioning

16  to come back after the other?

17         **MS. SHARP:**  Yes, Your Honor, a few minutes for the

18  plaintiffs.

19         **THE COURT:**  You want five minutes of your 30?

20         **MS. SHARP:**  Yes.  Thank you.

21         **THE COURT:**  Would the defense like to reserve five

22  minutes of their 30?

23         **MS. REVEILLE:**  Two minutes should be good, Your Honor.

24  Thank you.

25         **THE COURT:**  All right.  So that's a bit of our

**PROCEEDINGS**

1   process.

2        Then when we're done with that and you're done with that,

3   I'm going to have the -- oh, I'll also let the jurors know that

4   if any of them are not comfortable answering any of your

5   questions in this room in front of the jurors that we will

6   speak to them privately.  We'll do that at the end, though,

7   when you're both done.  We'll excuse the jury to the room next

8   door and then talk to them.  Then that's when we'll do in here

9   the for-cause challenges.

10       If we have, after the for-cause challenges, 16 left, then

11  we'll do our peremptories.  If we don't, then we'll move on to

12  the next panel of 20 or however many came.  Same process.  And

13  then I'm hopeful that after that we'll have at least 16 left,

14  and then we'll do peremptories.

15       Does that make sense?

16            **MS. SHARP:**  Yes.  Thank you.

17            **THE COURT:**  All right.

18            **MR. DUFFY:**  Just for tracking purposes and

19  recordkeeping, and so forth, could we have the jurors announce

20  their numbers, their juror numbers?

21            **THE COURT:**  When they --

22            **MR. DUFFY:**  When they speak maybe.

23            **THE COURT:**  Sure.

24            **MR. DUFFY:**  It might be helpful.

25            **THE COURT:**  Well, so they're not going to speak unless

1  you ask them a question.  Oh, you mean what you would like me

2  to ask the jurors is when they speak --

3          **MR. DUFFY:**  Yes.

4          **THE COURT:**  -- if they could first give their number

5  and their name?

6          **MR. DUFFY:**  Yes.  Thank you.

7          **THE COURT:**  Okay.  That's a good idea.

8      I'm also going to let them know that we are broadcasting

9  the proceedings by audio.

10     All right.  Then one issue came up last night.  Chart

11 filed a brief on the arbitration agreement, and I have to tell

12 you, what I was going to do was instruct the jury that they're

13 not -- at the appropriate time we can discuss when that would

14 be, either in the preliminary instructions or closing

15 instructions -- instruct the jury that they are not to

16 speculate as to why any entity or person is not a party to this

17 trial and that they're instead just to decide the case based on

18 my instructions and the evidence that they hear in trial.

19 That's what we do when somebody isn't present.

20     So I don't know if you want to be heard on that.

21         **MS. REVEILLE:**  Yes, Your Honor, if I can be heard

22 briefly, I would appreciate that.

23     Your Honor, there's been no motion *in limine* to bar

24 reference to the arbitration proceeding.  There's no federal

25 rule of evidence that prohibits it.  Under rule 401, I believe

1    it is relevant to -- to avoid confusion with the jurors.

2         And it doesn't fall under rule 408, which pertains to

3    settlement.  There's been no settlement in this case.  And I

4    believe the case law interpreting Federal Rule of Evidence 408

5    allows -- even in the situation after settlement, allows

6    reference to it to explain to the jury why the empty chair is

7    not there.

8         And in this case I do believe that that would help clear

9    up some confusion among the jurors, since they're going to be

10   hearing a lot about Pacific Fertility Center in this case.

11        **THE COURT:**  I guess I'll hear from the plaintiffs.

12   Maybe they agree with you.  So before I'm off on my own...

13        **MS. SHARP:**  Yes, Your Honor.  Dena Sharp for the

14   plaintiffs.

15        **THE COURT:**  Microphone.

16        **MS. SHARP:**  Our position, Your Honor, is, at least

17   preliminarily, that we don't object to an instruction or to

18   information about the fact that the Pacific Fertility

19   defendants are in arbitration proceedings; perhaps with just a

20   little bit of explanation that that's a different kind of legal

21   proceeding.

22        Where we draw the line, however, is any evidence relating

23   to liability or the theories for liability in that proceeding.

24   That's consistent with Rule 408 and the exclusion of evidence

25   on liability and theories.

**PROCEEDINGS**

1        Frankly, we don't think 408 is really apposite here.

2   We've been thinking about this issue a lot, and 408 applies

3   only as far as it goes, the *Belton* case that Chart cited --

4        **THE COURT:**  I don't know that it's 408.  I think it's

5   401.

6        **MS. SHARP:**  That's exactly right.

7        **THE COURT:**  I don't think anything more is relevant,

8   but I understand the parties want to explain because they're

9   obviously going to be on the verdict form.

10       **MS. SHARP:**  That's right.  And they're not settled

11  parties, and so it is different than the usual 408 kind of

12  empty-chair situation.  So, from our perspective, an

13  instruction just that those defendants are subject to a

14  different set of proceedings is acceptable, but nothing more.

15       In other words, we don't want evidence coming in, through

16  Chart at trial about the theories that are being asserted or

17  the status of the arbitration or anything like that.

18       **THE COURT:**  I don't think they're asking for that

19  argument.

20       **MS. REVEILLE:**  Yes, Your Honor.  That would be our --

21       **THE COURT:**  Do you think you could come up, with the

22  plaintiffs, with an instruction?  And would you want it read at

23  the beginning, on Monday, when I do my preliminary

24  instructions?

25       **MS. SHARP:**  Yes, Your Honor.

1          **MR. DUFFY:**  Yes.

2          **THE COURT:**  Well, I'm going to file today a draft of

3    the preliminary instructions.  Maybe what I'll try to do is

4    craft something, and then on Monday morning you guys can edit

5    it.

6          **MR. DUFFY:**  Okay.

7          **MS. SHARP:**  Fantastic.

8          **THE COURT:**  We can edit it together.

9          **MS. REVEILLE:**  Thank you, Your Honor.

10         **MS. SHARP:**  Thank you.

11         **THE COURT:**  But today, for purposes of your

12   questioning, I don't think -- there's no reason to ask about

13   it; correct?

14         **MS. REVEILLE:**  Correct, Your Honor.

15         **THE COURT:**  All right.  I think you got your list now.

16         **MS. SHARP:**  Your Honor, one question from the

17   plaintiffs about the replacement jurors.

18        We just got the list, and it appears that one of the

19   jurors who's coming in is not the first or second group of 20.

20   In other words, not the first 40 jurors.  It's Juror Number 49,

21   Mr. Toole.

22        And if we could have a little bit -- I know I asked for

23   extra time.  If we could have a little bit more time, because

24   we have not yet kind of really run him through our process

25   because we anticipated he would come in tomorrow, on Friday, if

PROCEEDINGS

 1  at all.

 2          THE COURT:  Okay.  I mean, they're not going to be

 3  here before 9:00.

 4          MS. SHARP:  All right.  So we'll take some time.

 5      Your Honor, for the record, the plaintiffs would note that

 6  Juror Number 39 -- excuse me, 49, who I just referenced,

 7  Mr. Toole, is not in either group.  So we would like to place

 8  an objection on the record to bringing him in, in this first

 9  two pools today, to preserve that, because it's not part of the

10  random order that we had anticipated.

11          THE COURT:  All right.  I don't even know what's going

12  on.  He's the second group, so we'll figure it out.

13          MS. SHARP:  Actually, Your Honor, according to this

14  list, he's coming in in the first group, the first group of 20,

15  Mr. Toole is.  That's why we're raising it.

16          THE COURT:  I see.

17          MR. COWDEN:  Your Honor, this is Marc Cowden.  How do

18  we tell which of these jurors are the ones tested positive for

19  the COVID symptoms?

20          THE COURT:  I don't think you can.

21          THE CLERK:  I think it says, page 2, Number 18 it says

22  "SS 5/19.  Shows symptoms."

23          THE COURT:  "Shows symptoms."

24          MR. COWDEN:  For example, Number 18 would be one of

25  them.  Got it.  Thank you.

PROCEEDINGS

```
1              (Recess taken at 8:48 a.m.)

2              (Proceedings resumed at 8:58 a.m.)

3         THE COURT:  Mr. Duffy, you had a question?

4         MR. DUFFY:  Yes, Your Honor.  We were studying the

5    replacements, and I think there might be just a question that I

6    have.  If you go to Juror Number 50, Ms. Phyllis Louise Press,

7    it says she's replacing number 38.  I think she's replacing

8    number 33.

9         I think we're going in sequential order, right, for

10   replacements?

11        THE COURT:  That would seem, yes, number 33.  I don't

12   know.  I don't know.  Unfortunately for you, this is my first

13   COVID trial.

14        MR. DUFFY:  Unfortunately for us, too, in a way.

15        THE COURT:  I haven't seen.

16        I do, Ms. Sharp, have the answer as to Mr. Toole, Juror

17   Number 49.

18        MS. SHARP:  Yes.

19        THE COURT:  He was the next on the list to replace a

20   person from -- it was from the 8:00 a.m. group.

21        MS. SHARP:  Uh-huh.

22        THE COURT:  And they couldn't take someone from the

23   10:00 a.m. group and push them to the 8:00 a.m. group --

24   right? -- because people had already been told what time to

25   appear.  So he's the next on the list, so that's why he's
```

PROCEEDINGS

```
 1   coming in to the 8:00 a.m. group.

 2           MS. SHARP:  Understood.  Thank you, Your Honor.

 3           MR. DUFFY:  Got it.  And these folks will be coming in

 4   the 10:00 o'clock grouping, Ms. Press and Ms. Sekine?

 5           THE COURT:  The people with green.  Do you have the

 6   colored list?

 7           MR. DUFFY:  Yeah, I do.

 8           THE COURT:  The people in green are in our 10:00 a.m.

 9   list.

10           MR. DUFFY:  10:00 a.m.

11           THE COURT:  So Mr. Toole is the only one --

12           MR. DUFFY:  Who's in the 8:00 a.m. group.

13           THE COURT:  -- who's in the 8:00 a.m.

14           MR. DUFFY:  And he takes Number 18 spot.  Very well.

15           MS. SHARP:  And so, Your Honor, the question for us

16   that flows from that is where Mr. Toole --

17           THE COURT:  Oh, where is he, that is the question.

18           MS. SHARP:  In the line of peremptories.

19           THE COURT:  No, I understand.  I see.

20           MR. DUFFY:  I think my question, Your Honor, then is,

21   according to the document it says he's replacing Number 18.

22           THE COURT:  Right.

23           MR. DUFFY:  So he's in the first.  And he's here

24   because he's in the 8:00 a.m. group.

25           THE COURT:  The question is, what letter has he been
```

 1   given?  That's the question.  I guess we'll see --

 2            **MS. SHARP:**  That's one question.

 3            **THE COURT:**  -- when he gets here.

 4       I think, you know, it's all random.

 5       (Pause)

 6            **THE COURT:**  Mr. Duffy, the answer to your question is

 7   the people who say "SS 5/20" they self-screened this morning so

 8   they have not been replaced.  So that's why the other one says

 9   replacing Number 38, because they self-screened yesterday and

10   were able to be replaced.  So we will have fewer than 40 people

11   today.

12            **MR. DUFFY:**  Okay.

13            **THE COURT:**  As to Mr. Toole, we can either put him at

14   the very -- as the last number 20 or we could put him Number

15   18.

16            **MR. DUFFY:**  I think 18 he replaces the juror that was

17   symptomatic.

18            **THE COURT:**  And the plaintiffs don't want that.

19            **MS. SHARP:**  We think 20, given the Court's ruling on

20   how peremptories work.  And we will reserve on the question

21   whether we would like to reserve the peremptories until after

22   the second group, depending on how things go this morning.

23            **THE COURT:**  I think normally -- if we were normal

24   times, they would just come at the end, be the next person.  So

25   he'll be our number 20.

PROCEEDINGS

1      What is the 20th letter of the alphabet?  T.  He'll be our

2   letter T.  Well, except that we may not have 20, so.

3           MS. SHARP:  Your Honor, may I make a suggestion I

4   think, too, make things easier on the seating chart for all of

5   us?  I would suggest we make Mr. Tool letter M so he replaces

6   old Number 18.  And that keeps the seating chart intact for

7   everybody.  But for purposes of peremptories, either he's

8   Number 20 or reserve on the question of whether we want him to

9   be considered later in the line.

10      Is that acceptable?  So just for administrative purposes

11   just to put him in seat M instead of readjusting our whole

12   seating chart.

13           THE COURT:  No objection?

14           MR. DUFFY:  I don't care.

15           THE COURT:  Great.

16           MR. DUFFY:  Fine.

17           THE COURT:  I'm not a hundred percent confident that

18   they're going to come in with letters that match this.

19      (Laughter)

20           MR. DUFFY:  Sounds like Sesame Street.

21           MS. SHARP:  Best-laid plans.

22           THE COURT:  I think Ms. Means is going to be bringing

23   our jury pool in.

24      (Prospective jurors enter courtroom at 9:12 a.m.)

25           THE COURT:  Counsel, you may be seated.

1        Good morning.  I am standing -- I have this thing here --
2    so you can see me.

3        My name is Jacqueline Scott Corley.  I'm a magistrate
4    judge here in the Northern District of San Francisco.  This is
5    federal court.  You're in federal court in San Francisco.

6        First, I want to sincerely thank you for being here today
7    and for showing up for jury service.

8        Since last March, 2020, the Court had to shut down all our
9    jury trials.  In fact, even criminal, criminal trials as well.

10       We started and had, I think, a couple just in October, and
11   then we had to shut down again because of the surge.

12       We recently have started jury trials again because, of
13   course, it is so important; it is a bedrock off our democracy,
14   the civil and criminal trial proceedings.

15       As you know from the questionnaire, you're here today for
16   a civil jury trial and to select our jury for the jury trial.
17   But, again, I want to thank you for coming during these
18   extraordinary, extraordinary times.

19       Just for your comfort level, we have now, I think,
20   completed three or four jury trials just in the past month.  We
21   are only doing, in this particular courthouse, only two at a
22   time so that we can make sure the elevators aren't too crowded.

23       The jury room is next door, in another courtroom this size
24   so that everyone can socially distance.

25       We are maintaining the mask policy consistent with the

 1    state of California's directives at the moment.  So you'll have

 2    to wear masks, at all times unless you're eating or drinking.

 3        I just want to advise you that everyone you see here, this

 4    side of the bench, has been fully vaccinated.  So the lawyers,

 5    everyone has been fully vaccinated.

 6        And if at any time today, or you're fortunate enough to be

 7    selected for the jury, you see something that makes you

 8    uncomfortable, please, please, alert us.  Our safety and your

 9    comfort is our highest priority.

10        So the first step today is we're going to be selecting ten

11    people for our jury.  And what this process is called is the

12    voir dire examination.

13        And the purpose of voir dire is to find out if any of you

14    have some experiences, background, beliefs that make you not an

15    appropriate person for serving on the jury.  Not that you're a

16    bad person or you're biased or prejudiced, just that you have

17    some experiences, values, beliefs, perhaps, that make you not a

18    good fit for this trial.

19        So as a result of this process this morning, some of you

20    will be excused.

21        For your planning purposes, we do expect and hope to have

22    the jury selected by 1:00 p.m.  That's our hope anyway.

23        So we are going to begin by having Ms. Means swear all of

24    you in.

25            THE CLERK:  Can I ask you to all please stand and

 1   raise your right hand.

 2       (Oath administered to the prospective jurors.)

 3       **THE COURT:**  Okay.  You can be seated.

 4       Now that you're under oath, we're going to be asking you

 5   some questions.  I just have a few because, of course, you

 6   already filled out that detailed questionnaire.  And then the

 7   lawyers for each side are going to have the opportunity to

 8   question you, as well, to follow-up on some of your answers.

 9       To begin with, I want to introduce -- I already introduced

10   myself, and I want to introduce my staff.

11       Ada Means is our courtroom deputy.  Katherine Sullivan is

12   one of our court reporters.  And we have another one, Marla

13   Knox.  And then I have a law clerk, Caroline Jacobs.

14       Here's the first question.  It's going to be really hard.

15   Do any of you know me or any of these people?  Just raise your

16   hand.

17       No.  Okay.  Great.

18       Now, even though you did answer questions about whether

19   you knew lawyers, in your questionnaire, I'm going to have them

20   introduce themselves again so you can put names to faces.

21       And we'll start with the plaintiffs.

22       **MS. SHARP:**  Good morning, everyone.  My name is Dena

23   Sharp.  I represent the plaintiffs in this case.

24       I would like to introduce my team.  Amy Zeman, is my

25   co-counsel.  She represents the plaintiffs too.  This is Adam

 1  Polk, from my law firm; Nina Gliozzo, from my law firm; and

 2  Sonia Chopra, who is working with us today.

 3       Thank you for being here.

 4       **MS. REVEILLE:**  Good morning, ladies and gentlemen.  My

 5  name is Kristine Reveille, and I represent the defendant,

 6  Chart, along with my colleagues John Duffy, Brian Edelman, and

 7  Marc Cowden.  Nice to meet you all.

 8       **THE COURT:**  All right.  Now that you have seen most of

 9  their faces, do any of you know any of these lawyers?

10       No.  Okay.  Great.

11       So I just want to remind you again of what the schedule is

12  going to be.  A court day -- and trial will actually begin with

13  opening statements and evidence on Monday.  We'll begin at 8:30

14  a.m., and we plan on ending around 1:30 p.m., maybe a little

15  bit later if we have a witness on the stand, so that the

16  witness doesn't have to come back the next day.

17       We have a couple short breaks, but we don't take a lunch

18  break.  We want to maximize the amount of time that you spend

19  in the courthouse actually hearing evidence, so we're not going

20  to take a lunch break.  And, also, then you don't have to have

21  your mask off, either, for that.

22       We will be going, next week, Monday, Tuesday, Wednesday,

23  Thursday; but no trial on Friday, which is the Friday of the

24  Memorial Day weekend.  The following week, because Monday's a

25  holiday, Tuesday, Wednesday, Thursday, Friday.  And then again

 1   the following week we expect that the case will be given to the

 2   jury for its deliberations by Friday.  That is our goal.  Of

 3   course, sometimes trials take a little bit longer and may spill

 4   over into a little bit of the following week.

 5        Now, you all already answered questions about your

 6   availability, but having heard that again, do any of you find

 7   it impossible -- not inconvenient; we all understand it's a

 8   tremendous inconvenience and great service to be here -- but

 9   impossible to serve on the jury during that period?

10        No one.  Oh, one person.

11        All right.  So here's -- yeah, you can come forward, and

12   there's a microphone here.

13        When you speak, you'll each come forward.

14        So, first, just say your name.  And do you know your jury

15   number or your letter?  If you can remember what it is.

16        **PROSPECTIVE JUROR HAMILTON:**  My number is 102861855.

17        **THE COURT:**  What letter are you sitting at?  You're

18   Ms. Hamilton?

19        **PROSPECTIVE JUROR HAMILTON:**  So it's ---

20        (Microphone issues resolved off the record.)

21        **THE COURT:**  All right.  Ms. Hamilton, if you could

22   just speak slowly.

23        **PROSPECTIVE JUROR HAMILTON:**  Thank you.

24        So I'm a school nurse.  One of my schools is nearby.  I

25   work at two elementary schools.  And it's the pandemic time,

 1   and we are in a very short situation to run transition meeting

 2   with kids with severe health condition.   My substitute has

 3   quit, and I have to run this in the upcoming week.   I mean take

 4   care of their needs, the family needs and the child's needs.

 5   So that's my situation.

 6            **THE COURT:**   Okay.   Great.   Thank you.   Thank you very

 7   much.   So you can have a seat there.   Thank you.

 8        Okay.   All right.   So now what we're going to do is we're

 9   going to start with the plaintiffs, the lawyers will ask you

10   some questions, and then defense, each for a total of not more

11   than 30 minutes.

12        Some of these questions, if any of you -- I should let you

13   know, a trial is a public proceeding.   We're not allowing the

14   public into the courtroom because we limit the number of people

15   that can be here, and that number isn't high enough to allow

16   members of the public to come in.

17        In order to, therefore, make public access to these

18   proceedings, it is being played by audio.   So it is available

19   to the public by audio, including jury selection this morning.

20        If there is any question that you are asked, that you're

21   not comfortable answering among all of us, and also knowing

22   that it's being available by audio, just let us know and we'll

23   take your -- speak to you later more privately.

24        All right.   Ms. Sharp, would you like to begin?

25            **MS. SHARP:**   Good morning, again.

1      Thank you, all, for being here.  Again, my name is Dena

2   Sharp.  And we're very grateful that you've all come here,

3   hopefully, at the tail end of the pandemic.

4      This is a time in these proceedings for brutal honesty.

5   Please don't worry about my feelings or our feelings, anyone

6   else's.  There are really no right or wrong answers, only

7   honest ones.  This is what the process is all about.

8      This is not about whether you're a fair person, as

9   Judge Corley said.  I have no doubt that you are all fair

10   people.  This is about whether there may be some life

11   experiences that would affect your ability to be entirely

12   neutral or entirely impartial juror in this case with these

13   issues.

14      Thank you, all, for completing the questionnaire.  That

15   will help this process move along a lot more efficiently.  I

16   have a few additional questions for the whole group, to start

17   out with, then I may have some individual follow-ups for you

18   based on your questionnaire responses.

19      We're going to try to move quickly.  As Judge Corley said,

20   we don't have a lot of time.  This is a little bit like speed

21   dating.  I'm lucky enough to be old enough that I didn't have

22   to do speed dating, but I understand it's a pretty good way to

23   share information quickly, figure out if people are a good

24   match for each other.  So we're going to move along as quickly

25   as we can.

1    As you know, this case involves issues which many people

2  have very strong opinions about.  That is the use of

3  technologies known as in vitro fertilization, or IVF, or

4  assisted reproductive technology, ART, to retrieve or harvest

5  eggs from women for later use, or to create fertilized embryos

6  for later implantation.

7    Some of you have expressed that because of religious,

8  moral, political, or just personal beliefs and experiences

9  you're opposed to those kinds of procedures, and because of

10  those beliefs you would not be able to be a fair and impartial

11  juror in this cause.

12    Now, I'm not trying to put anybody on the spot, but in the

13  interest of time we're going to jump right in.

14    And I'm going to start with you, Ms. Nishimoto, in seat C

15  and ask you a few questions.  May I ask you to come up to the

16  microphone, please.

17         **THE COURT:**  Perfect, yeah, that one.

18         **MS. SHARP:**  Thank you.

19  Good morning.  How are you?

20         **PROSPECTIVE JUROR NISHIMOTO:**  Good.  How are you?

21         **MS. SHARP:**  Good.

22  Thank you for being here.

23  So on your questionnaire you told us that you have a

24  negative opinion of the use of IVF; is that right?

25         **PROSPECTIVE JUROR NISHIMOTO:**  Sure.

1          **MS. SHARP:**  And you also said that you disapproved of

2     married or partnered couples using IVF to have a child and that

3     you also disapprove of single women using IVF to have a child.

4     Is that right?

5          **PROSPECTIVE JUROR NISHIMOTO:**  I think "disapprove" is

6     a strong word, but when I was answering the questionnaire at

7     the time, yeah.

8          **MS. SHARP:**  Fair enough.

9          You also told us you have a negative opinion of women

10    choosing to harvest or store their eggs to have children when

11    they're older, and you have a negative views of the use of

12    sperm donors.

13         Thank you, so much for your honest answers.  I want to say

14    to everybody that there are a number of people who feel exactly

15    the same way you do, and that's part of the process as well.

16         You also agreed with the statement on the questionnaire

17    that using assisted reproductive technology or IVF is unnatural

18    or like playing God.  Is that right?

19         **PROSPECTIVE JUROR NISHIMOTO:**  Sure.

20         **MS. SHARP:**  Along the same lines, when asked if there

21    were any ethical, religious, political, or other beliefs that

22    would prevent you from being an impartial juror in a case like

23    this you did say, "Yes, religious beliefs"; right?

24         **PROSPECTIVE JUROR NISHIMOTO:**  Correct.

25         **MS. SHARP:**  You were also asked if you feel, if chosen

1  to serve, that you can fairly and impartially decide this case

2  based on the evidence at trial and instructions on the law --

3  and you were honest; thanks for that -- and said no because of

4  your religious beliefs; right?

5        **PROSPECTIVE JUROR NISHIMOTO:**  Correct.

6        **MS. SHARP:**  Again, thank you for that.  That's what

7  the process is all about.

8        I'm assuming your religious beliefs have not changed from

9  when you filled out the questionnaire?

10       **PROSPECTIVE JUROR NISHIMOTO:**  Yeah.

11       **MS. SHARP:**  You still believe you cannot be an

12  entirely fair and impartial juror in this case because the case

13  involves IVF?

14       **PROSPECTIVE JUROR NISHIMOTO:**  Correct.

15       **MS. SHARP:**  And this is based on your strongly held

16  religious views; is that true?

17       **PROSPECTIVE JUROR NISHIMOTO:**  Uh-huh.

18       **MS. SHARP:**  Thanks very much, Ms. Nishimoto.  That's

19  all I have for now.

20       Okay.  Next we're going to ask Ms. Rowe, Juror Number 20,

21  in seat O to come on up.

22       Good morning, Ms. Rowe.

23       **PROSPECTIVE JUROR ROWE:**  Good morning.

24       **MS. SHARP:**  How are you?

25       **PROSPECTIVE JUROR ROWE:**  Good.  Thanks.

 1          **MS. SHARP:**  Good.  On your questionnaire, Ms. Rowe, in

 2   response -- excuse me, we asked:  "Is there anything not

 3   already covered by this questionnaire that might affect your

 4   ability to be a fair and impartial juror?"

 5        And you wrote:  "I was my mother's support during a very

 6   stressful time with her sibling.  Frivolous lawsuit was filed

 7   by unscrupulous attorneys supporting baseless claims, and it

 8   never should have happened."

 9          **PROSPECTIVE JUROR ROWE:**  That's correct.

10          **MS. SHARP:**  Your mother was sued by her sibling, and

11   you believe that was a baseless claim; right?

12          **PROSPECTIVE JUROR ROWE:**  It was.

13          **MS. SHARP:**  And you were part of that situation and

14   saw your mother's distress firsthand?

15          **PROSPECTIVE JUROR ROWE:**  Yes.

16          **MS. SHARP:**  And you now believe that because of that

17   personal, very emotional experience that you could not be a

18   fair and impartial juror in this case where the plaintiffs are

19   suing for money damages?  Did I get that right?

20          **PROSPECTIVE JUROR ROWE:**  I mean, you know, bias, I

21   don't really have any concerns with the case, what it's about.

22   I just think it has to do with previous experience with

23   mediation and attorneys and what really should never have

24   happened, so.

25          **MS. SHARP:**  Sure.  And it sounds like that -- that

1   experience is going to be at least in the back of your mind --

2           PROSPECTIVE JUROR ROWE:  Yes, uh-huh.

3           MS. SHARP:  -- in trying to be impartial; is that

4   true?

5           PROSPECTIVE JUROR ROWE:  Probably, yes.

6           MS. SHARP:  That circumstance was a little too close

7   to home, maybe a little too emotional?

8           PROSPECTIVE JUROR ROWE:  Yes.

9           MS. SHARP:  Is that fair?

10          PROSPECTIVE JUROR ROWE:  Correct.

11          MS. SHARP:  Okay.  You also answered the

12  questionnaire -- let's see.  You were asked whether you've

13  heard of the case, and you wrote:  "I recall hearing about a

14  couple upset because there was an issue with the freezer

15  housing their eggs."

16          MS. REVEILLE:  Objection, Your Honor.  I think this

17  could be heard in the back.

18          THE COURT:  This could be heard in the back?

19          MR. DUFFY:  It's pretrial publicity, Your Honor.

20          THE COURT:  I think just ask her about --

21          MS. SHARP:  Sure.

22          THE COURT:  Yeah, fair enough.  Just ask her about if

23  she's heard about the case and if she could put anything that

24  she read aside.

25          MS. SHARP:  Have you heard about this case?  Do you

 1  know one way or the other?

 2          **PROSPECTIVE JUROR ROWE:**  I wrote what I had heard, and

 3  I don't know if that is the case, but that is what I have heard

 4  before.

 5          **MS. SHARP:**  Sure.  And what opinions have you formed,

 6  if any, about what happened in this case?

 7          **PROSPECTIVE JUROR ROWE:**  I don't know that I have an

 8  opinion.  It's just I was honestly answering if I had heard

 9  something, and I recall hearing what I wrote.

10          **MS. SHARP:**  And we appreciate that.  Sometimes the

11  lawyers will object; we'll have a little exchange.  But not to

12  worry; that's us just being lawyers.

13          **PROSPECTIVE JUROR ROWE:**  That's okay.

14          **MS. SHARP:**  Thank you.

15          **PROSPECTIVE JUROR ROWE:**  I'm trying to say it

16  neutrally.

17      (Laughter)

18          **MS. SHARP:**  So are we.  All right.

19      Now, coming back to the -- coming back to IVF and your

20  views on IVF, in your questionnaire you also told us that you

21  have negative views about women harvesting eggs for use when

22  they're older and negative views about using sperm donors for

23  IVF.  Did I get that right?

24          **PROSPECTIVE JUROR ROWE:**  That's correct.

25          **MS. SHARP:**  And knowing this case involves some women

1  who have harvested eggs for use when they're older, would you

2  agree that your personal beliefs against this practice would

3  prevent you from being entirely impartial or neutral in a case

4  with these issues?

5       **PROSPECTIVE JUROR ROWE:**  Sure.

6       **MS. SHARP:**  You also said you believe that using IVF

7  to conceive is unnatural or like playing God.  Is that right?

8       **PROSPECTIVE JUROR ROWE:**  Yes.

9       **MS. SHARP:**  So, again, because this case is all about

10  the use of IVF, and then adding in your experience with your

11  mother, are you telling us that this is maybe just not the

12  right case for you?

13       **PROSPECTIVE JUROR ROWE:**  Yes.

14       **MS. SHARP:**  Would you agree that my side, the

15  plaintiffs, would start out with a disadvantage because of your

16  strong beliefs?

17       **PROSPECTIVE JUROR ROWE:**  Sure.

18       **MS. SHARP:**  Thank you very much.

19       **THE COURT:**  Wait.  Ms. Rowe, before you go.

20       **PROSPECTIVE JUROR ROWE:**  Yes.

21       **THE COURT:**  You said "Sure."  You sort of hesitated a

22  little bit.  "Sure."

23       **PROSPECTIVE JUROR ROWE:**  I also wrote -- I mean, the

24  questions preceding that asked more about my feelings about

25  IVF.  And I know people, and I have no opinions about that.  I

 1  think it's perfectly fine.  It's their choice.  And it's just

 2  my personal belief, being an older person, I wouldn't do that

 3  for myself.  And so that's -- some of the questions were to

 4  piece it out, and, yeah.

 5          THE COURT:  So the question is, in this case,

 6  regardless of your own beliefs and what you would choose to do

 7  for yourself, would you be able to follow all my instructions

 8  and, as Ms. Sharp said, be fair to the plaintiffs, or do you

 9  think they would be starting a little bit behind?

10          PROSPECTIVE JUROR ROWE:  I could be fair.  Yes, I

11  could be fair.

12          THE COURT:  And I guess my other question is, this

13  lawsuit, of course, is not a probate action.  It has nothing to

14  do with siblings.  These lawyers, I assume, were not involved

15  in that case whatsoever.  Is it your belief that all lawsuits

16  are frivolous?

17          PROSPECTIVE JUROR ROWE:  No.

18          THE COURT:  So do you think, based on that experience

19  that you had, very negative experience in particular with

20  lawyers, that you could not hold -- that you would hold that

21  experience against either side in this case?

22          PROSPECTIVE JUROR ROWE:  No.

23          THE COURT:  Thank you.

24          MS. SHARP:  One follow-up question for you, if I may,

25  Ms. Rowe.

```
 1        What are your thoughts about people seeking money damages

 2   for the loss of eggs or embryos that they've harvested?

 3        PROSPECTIVE JUROR ROWE:  I don't have an opinion on

 4   that.

 5        MS. SHARP:  No opinion.  Thank you very much.

 6        PROSPECTIVE JUROR ROWE:  You're welcome.

 7        MS. SHARP:  All right.  Next I would like to call on

 8   Ms. Low, Juror Number 22, in seat Q.

 9        Good morning, Ms. Low.

10        PROSPECTIVE JUROR LOW:  Good morning.

11        MS. SHARP:  On your questionnaire you wrote, in

12   response to a question about whether there are ethical,

13   religious, political, or other beliefs that may prevent you

14   from serving as a juror, you wrote:  "Yes.  I am not entirely

15   sure my religious beliefs would allow me to be impartial."

16        So you said you weren't sure your religious beliefs would

17   allow you to be impartial.  Why is that, if I may ask?

18        PROSPECTIVE JUROR LOW:  I guess I feel a little

19   conflicted.

20        MS. SHARP:  Can you tell us more about that?

21        PROSPECTIVE JUROR LOW:  Uhm, well, I like to think

22   that I try to be an open-minded person and open to all things,

23   especially as a teacher.  But I just -- I have a little concern

24   that -- that this particular issue is difficult for me.

25        MS. SHARP:  When you say "this particular issue," are
```

1  you referring to IVF and the use of those technologies?

2         PROSPECTIVE JUROR LOW:  Yeah.  Not IVF, but what's the

3  other one, ART?

4         MS. SHARP:  That's right.  That's right.  I'm going to

5  use those terms interchangeably, which might be a little

6  imprecise, but people are comfortable with both terms, I hope.

7         PROSPECTIVE JUROR LOW:  Uh-huh.

8         MS. SHARP:  So is what you're telling us that your

9  feelings but ART or IVF may be in the back of your mind no

10 matter what the evidence may show?

11        PROSPECTIVE JUROR LOW:  I've tried to, you know,

12 really think about it, and I -- I don't know.  I guess the --

13 like I said, I try to be open-minded, so I guess that's the

14 best answer I could give you.

15        MS. SHARP:  And we very much appreciate that.  In

16 response to another question on the questionnaire, that asked

17 do you feel, if chosen to serve, you can fairly and impartially

18 decide this case based on the evidence presented at trial and

19 the instructions on the law given by the judge you wrote:  "No

20 same reason as stated above; religion."

21     Now, as you stand here today, do you believe that your

22 religious views will prevent you from being able to be an

23 impartial juror in this case with these issues?

24        PROSPECTIVE JUROR LOW:  I guess the best answer I

25 could give is I'm not sure until I heard it.

1      **MS. SHARP:**  Absolutely fair.  Thank you very much.

2      Now, in addition to those who I've already spoken to about

3  this, does anyone else have any religious, philosophical, or

4  political views against people harvesting and freezing eggs and

5  embryos for future use?

6      And may I see a show of hands, please.  Anyone else have

7  those kinds of feelings?

8      Record reflects no hands raised in response to this

9  question.

10      Now I want to ask the whole group a slightly different

11  question about IVF.  Some people have some reservations or

12  concerns, maybe even negative impressions about the companies

13  that provide egg and embryo harvesting and storage services for

14  money.

15      How many of you share that opinion?  If I may see hands.

16  Anyone have negative feelings about the companies that provide

17  those services?

18      No hands.  Okay.

19      Now, some people think if a woman cannot have a child

20  biologically or naturally they should explore other options,

21  like adoption, instead of IVF.

22      How many of you feel that same way?  How many?

23      Ms. Hamilton, I see your hand.  That's juror -- the juror

24  in seat P as in Peter.

25      Anyone else have hands up?

1      Thank you.

2      Next question.  I do not need to pry into anybody's

3  personal beliefs, but the issue of abortion may come up in this

4  trial.  Can I see a show of hands, please, of who here would

5  consider themselves to be against abortion for moral,

6  religious --

7            MS. REVEILLE:  Objection, Your Honor.  It won't be

8  raised at this trial.

9            THE COURT:  Having heard that, Ms. Sharp, do you wish

10  to still ask the question?

11            MS. SHARP:  We do, yes, Your Honor.

12            THE COURT:  All right.  Go ahead.

13            MS. SHARP:  Thank you.

14      Who here would consider themselves to be against abortion

15  for moral, religious, philosophical, or personal reasons?

16      Okay.  Thank you.  I see one hand.  Any other hands?

17      All right.  Ms. Fredricksen.  May I ask you to come to the

18  microphone, if you would.

19      Thank you.  Could you tell us a little bit more about your

20  feelings on abortion.

21            PROSPECTIVE JUROR FREDRICKSEN:  Mostly it refers to

22  late-term abortion.

23            MS. SHARP:  Late-term abortion.

24            PROSPECTIVE JUROR FREDRICKSEN:  I have issues with

25  that.

1          **MS. SHARP:**  And would your views on late -- would your

2     views on late-term abortion have any impact on your ability to

3     listen to the evidence and to listen to the judge's

4     instructions about the law?

5          **PROSPECTIVE JUROR FREDRICKSEN:**  No, I don't think so.

6          **MS. SHARP:**  You don't think it would be in the back of

7     your mind when you're considering how to decide the case?

8          **PROSPECTIVE JUROR FREDRICKSEN:**  I don't know.  I mean,

9     obviously at the back of my mind.

10         **MS. SHARP:**  Sure.  That's a very fair response.

11         I think that's all for now.  Thank you very much.  One

12     more question on that.  If -- well, strike that.

13         All right.  I'm going to change topics now.  In this case

14     we're also alleging -- well, we are alleging that a cryogenic

15     freezer tank that Chart manufactured and sold to Pacific

16     Fertility Center was defective and malfunctioned.

17         Some people, when they hear about claims that a product

18     was defective or malfunctioned, their first thought is there

19     must have been user error involved.  Right?  In other words,

20     the person using the product or device probably did something

21     wrong to cause the problem.

22         Who here shares that view, even just a little bit?  Even a

23     little bit, user error is often involved.

24         Oh, we have one hand.  Please keep your hand up, just for

25     a moment.  We'll note your name.  Dr. Meldorf in seat A as in

 1   apple.

 2        Anyone else?  Thank you.  I'm going ask you a series of

 3   questions.

 4        I'm sorry, we've got one other.  Yes, Mr. Hanson.  Thank

 5   you.  In seat K.

 6        **PROSPECTIVE JUROR EWING:**  Can I ask you to repeat the

 7   question.

 8        **MS. SHARP:**  Absolutely.  Happy to do that.  Some

 9   people, when they hear claims that a product was defective or

10   malfunctioned, their first thought is it must have been user

11   error involved.

12        And so the question for you is, who shares that view even

13   a little bit?  In other words, a person using a product or

14   device probably did something wrong to cause the problems with

15   that.

16        Okay.  Ms. Ewing in seat J.

17        **MS. SHARP:**  Anyone else?

18        Now, how many of you think if a product is defective or

19   malfunctioning a responsible consumer, a smart consumer would

20   always be able to find that out ahead of time?  Can I see a

21   show of hands, please.  Smart consumer could find that out

22   ahead of time.

23        Who here shares the belief that if a product is truly

24   faulty or defective it would be common knowledge; there would

25   be media coverage or you would have heard about it before?

1  Anyone share that view?

2      I've also heard people say if a company is really putting

3  out a defective product, they wouldn't be in business anymore.

4  So the fact that the company is still in operation must mean

5  they haven't doing anything wrong or there's nothing wrong with

6  their products.  Can I see a show of hands of who agrees with

7  that.

8      All right.  I'm going to change gears just a little bit

9  here and I will call on you, Dr. Meldorf, if I may, to come up

10  to the microphone.

11      Good morning, Dr. Meldorf.

12          **PROSPECTIVE JUROR MELDORF:**  Good morning.

13          **MS. SHARP:**  You said in your questionnaire that your

14  medical training gives familiarity with IVF.  Have you ever

15  performed or participated in those types of procedures?

16          **PROSPECTIVE JUROR MELDORF:**  No.

17          **MS. SHARP:**  No.  And you raised your hand when we

18  talked about user error just a second ago.

19          **PROSPECTIVE JUROR MELDORF:**  Yes.

20          **MS. SHARP:**  Can you tell me a little bit more about

21  your views on that.

22          **PROSPECTIVE JUROR MELDORF:**  Sure.  I've worked in the

23  biotech/pharma industry over 20 years now, and I've been

24  involved with safety reports and product issues and had to

25  evaluate those.

1          So it all gets down to it depends.  There's a possibility

2     of someone not behaving in the right way and not using

3     something appropriately that results in adverse outcome.

4          **MS. SHARP:**  Thank you.

5          And you also said in your questionnaire that you strongly

6     agree most lawsuits are about people looking for deep pockets.

7     Why do you think that?

8          **PROSPECTIVE JUROR MELDORF:**  This is my own, probably,

9     personal bias given my experience working in large pharma and

10    biotech that quite often people are looking to find a way to

11    make some money from frivolous lawsuits.  Doesn't happen all

12    the time, but it does happen.

13         **MS. SHARP:**  And do you start out thinking that's

14    what's happening in this case?

15         **PROSPECTIVE JUROR MELDORF:**  No.  Not necessarily.  It

16    depends.  I would have to hear all the information.

17         **MS. SHARP:**  Fair enough.

18         You also said in your questionnaire you agree lawsuits

19    against product manufacturers unfairly drives up consumer

20    costs.  Because of that view, do you start out thinking this

21    case is unfair and likely to drive up costs?

22         **PROSPECTIVE JUROR MELDORF:**  Not necessarily.  Once

23    again, I'd have to hear all the information.

24         **MS. SHARP:**  Thank very much, Doctor.

25         **PROSPECTIVE JUROR MELDORF:**  Sure.

1          MS. SHARP:  Next I would like to call Dr. Hanson, if I

2    may, please.

3      Good morning, Doctor.

4          PROSPECTIVE JUROR HANSON:  Good morning.

5          MS. SHARP:  In the questionnaire -- well, let me start

6    with user error.  I think you raised your hand about user error

7    as well.  Can you tell us about your views on that, please.

8          PROSPECTIVE JUROR HANSON:  Absolutely.  I'm a nuclear

9    chemist, and I'm currently working for a company licensing a

10   advanced nuclear reactor with the NRC.

11     So I'm heavily involved with safety analysis and, you

12   know, root cause of errors.  And so I took the question to be a

13   general question about when there's a failure are their human

14   elements to it, and I think almost always there are.

15         MS. SHARP:  And I take it that you have conducted

16   failure analyses in your career?

17         PROSPECTIVE JUROR HANSON:  I have.

18         MS. SHARP:  And, if so, are the vulnerabilities that

19   were exposed by those failure analyses, in your experience,

20   communicated to the customers of those products?

21         PROSPECTIVE JUROR HANSON:  I don't understand the

22   question.  Can you repeat that.

23         MS. SHARP:  Let me try it again.

24         PROSPECTIVE JUROR HANSON:  Okay.

25         MS. SHARP:  The question is, if you have conducted a

1  failure analysis and it revealed a vulnerability in a product,

2  the question is, would that vulnerability be exposed to the

3  customers of that product necessarily, in your experience?

4        **PROSPECTIVE JUROR HANSON:**  Uhm, yes, I think so.

5        **MS. SHARP:**  Okay.  Have any of the companies you've

6  worked for ever been sued over a design or a product defect?

7        **PROSPECTIVE JUROR HANSON:**  No.

8        **MS. SHARP:**  Because of your experience, would you tend

9  to see the case through the lense of the product manufacturer,

10 do you think?

11       **PROSPECTIVE JUROR HANSON:**  I would have no opinion

12 about that, I guess.  I think I could see it through both

13 lenses.

14       **MS. SHARP:**  You don't think you'd identify a little

15 bit more on the side of the product manufacturer?

16       **PROSPECTIVE JUROR HANSON:**  Not necessarily.  You know,

17 you mean in terms of a positive bias?

18    No, I think, you know, I would be very critical of any

19 failure analysis, you know.  Of the product, you know.  And I

20 would be supportive of the product, though, of the technology

21 that went forward, you know, that supported the product.

22       **MS. SHARP:**  Thank you very much.

23       **PROSPECTIVE JUROR HANSON:**  Sure.

24       **MS. SHARP:**  Now, many people have strong beliefs about

25 people who file lawsuits for money damages?  They think people

 1   are too quick to sue; lawsuits are just about deep pockets.

 2        But before that I want to talk a little bit about the

 3   types of monetary damages, the compensation being sought in

 4   this lawsuit.

 5        The people who have brought this lawsuit are seeking

 6   financial compensation for the loss of frozen eggs and embryos;

 7   and there are two types of damages that they're allowed to

 8   recover.

 9        The first is the loss of property.  May seem strange,

10   maybe even a little bit callous to refer to eggs and embryos as

11   property.  I don't mean to offend anyone by doing so.  I'm just

12   going by what the law says.

13        The plaintiffs can seek to recover for the loss of the

14   money that they spent engaging in the IVF process and the

15   storage egg fees and the financial value of the loss and the

16   end result.

17        Now, the second kind of damages that the plaintiffs are

18   allowed to seek compensation for is emotional distress, mental

19   suffering that they experienced as a result of the experience

20   of losing the eggs and embryos.

21        Now, some people may think it doesn't make sense or it's

22   not right to ask for monetary compensation for the loss of eggs

23   or embryos because they're not actual children; they are not

24   human lives.

25        Who here shares that opinion even just a little bit?

 1   They're not human lives.  Anyone?

 2       Other people say because of the IVF -- I should say no

 3   hands were raise raised.

 4       Other people say because the IVF process is so uncertain

 5   or speculative, they would not be able or willing to award

 6   money damages for the loss of eggs or embryos.  Who agrees?  A

 7   show of hands, please.  Couldn't award damages for those

 8   losses.

 9       Now, there are also people -- and let the record reflect

10   no hands were raised.

11       There are also people who just don't agree with the whole

12   concept of awarding money for things like emotional distress,

13   mental suffering.

14       When it comes to hard costs like medical bills they agree,

15   but they think emotional distress or mental suffering is too

16   subjective and even that it's too often abused in our system.

17       Let's see a show of hands, please, how many of you have

18   concerns with the idea or the concept of awarding money damages

19   for emotional distress and mental suffering?  Who has a problem

20   with that idea?

21       No hands are raised.

22           MS. REVEILLE:  Your Honor, I believe time has elapsed.

23           THE COURT:  I'm watching the clock.  You're almost at

24   five minutes.

25           MS. SHARP:  Thank you.

1          Juror Number 9, Ms. Mahoney, if I may call you up very

2     quickly.

3          Good morning.  Ms. Mahoney, you wrote that you strongly

4     agree most lawsuits are about people looking for deep pockets.

5     Can you tell us why you think that's so?

6          **PROSPECTIVE JUROR MAHONEY:**  It's no personal

7     experience; it's just media.  It's just what I thought of when

8     I filled it out quickly.

9          **MS. SHARP:**  Sure.  And based on what you've heard so

10    far, do you think that's what's happening in this case?

11         **PROSPECTIVE JUROR MAHONEY:**  No.

12         **MS. SHARP:**  You also said you strongly agree that

13    lawsuits against product manufacturers unfairly drive up

14    consumer costs.  What caused you to form that opinion?

15         **PROSPECTIVE JUROR MAHONEY:**  Again, nothing personal,

16    but -- I mean, like PG&E, all our PG&E prices have gone up even

17    though -- because of the fire in San Bruno.  Everybody -- I

18    mean, that's what I'm trying to say.  Nothing personal.

19         **MS. SHARP:**  Everybody can relate to that, I think.

20         And because of your views on that issue, would you say we

21    start out a little bit behind or disadvantaged because we're

22    suing a product manufacturer?

23         **PROSPECTIVE JUROR MAHONEY:**  No.

24         **MS. SHARP:**  One more.  Thank you very much.

25         Dr. Sutherland, Juror Number 13.  Good morning.

**JURY VOIR DIRE**

1        **PROSPECTIVE JUROR SUTHERLAND:**  Good morning.

2        **MS. SHARP:**  Dr. Sutherland, you have also been

3   involved in research and development in your career.  Have you

4   had the opportunity to conduct any failure analyses in your

5   work?

6        **PROSPECTIVE JUROR SUTHERLAND:**  Software failure.

7        **MS. SHARP:**  Software failure.

8        **PROSPECTIVE JUROR SUTHERLAND:**  But not physical

9   devices.

10       **MS. SHARP:**  All right.  Thank you.

11       And given that experience, would you tend to see the case

12   through the lens of a product manufacturer, do you think?

13       **PROSPECTIVE JUROR SUTHERLAND:**  No, but I would want to

14   see an accurate failure analysis.

15       **MS. SHARP:**  Thank you.  You also said you agreed most

16   lawsuits are about people looking for deep pockets.  Why do you

17   think so?

18       **PROSPECTIVE JUROR SUTHERLAND:**  I think maybe "most

19   lawsuits" is too strong, but many appear to be.

20       **MS. SHARP:**  Do you start out thinking that's what's

21   happening in this case here?

22       **PROSPECTIVE JUROR SUTHERLAND:**  I have no basis to make

23   a judgment on.

24       **MS. SHARP:**  Thank you.

25       You also said that you agree that lawsuits against product

 1    manufacturers unfairly drive up consumer costs.  How did you

 2    form that opinion?

 3              PROSPECTIVE JUROR SUTHERLAND:  Oh, let's start with

 4    the products liability textbook when I was in undergrad.  You

 5    all -- you're lawyers.  You know all about the lawnmower

 6    lawsuits, okay.

 7         So what I would say there is my opinion is that if the

 8    manufacturer has really messed up, they should pay.  And if the

 9    user has really messed up, the manufacturer shouldn't pay.  And

10    that's why I want to see a decent failure analysis.

11              MS. SHARP:  What about shared responsibility?  What

12    about a circumstance in which there may be more than one actor

13    or person who's involved?

14              PROSPECTIVE JUROR SUTHERLAND:  That's a place where I

15    would need instruction from the Court on how one is supposed to

16    deal with that.

17              MS. SHARP:  Understood.

18              PROSPECTIVE JUROR SUTHERLAND:  I --

19              MS. SHARP:  Depends on --

20              PROSPECTIVE JUROR SUTHERLAND:  I don't know what the

21    law says, so I don't know how to deal with it.

22              MS. SHARP:  Thank you very much, Doctor.

23              THE COURT:  All right.  Thank you.

24              MS. SHARP:  Thank you, all.

25              THE COURT:  Ms. Reveille.

1          **MS. REVEILLE:**  Yes, Your Honor.  Thank you.

2          **THE COURT:**  Members of the jury, just so you know,

3     just to help keep things moving along, I give each side time

4     limits for various things.  So occasionally you may hear me,

5     just like when you're taking a test or something and you get a

6     warning of the time and things like that.  You may hear that

7     throughout the trial.

8          **MS. REVEILLE:**  Good morning, ladies and gentlemen.  I

9     introduced myself to you all earlier.  My name is Kristine

10    Reveille, and I represent the defendant, Chart, along with my

11    partners and colleagues John Duffy, Brian Edelman, and Marc

12    Cowden.

13         And this case involves a cryogenic freezer that Chart

14    manufactured, that stored the plaintiffs' eggs and embryos at a

15    fertility center called Pacific Fertility Center.

16         First and foremost, we would like to sincerely thank each

17    and every one of you for taking the time, your valuable time,

18    away from your personal and professional lives to fulfill your

19    civic duty, especially during a pandemic.

20         If there was anything that was made clear by going through

21    all of your questionnaires, it's that you all have very

22    interesting things going on in your lives.

23         You're going to hear from the plaintiffs in this case,

24    which are four women and one man, as they describe their

25    fertility journeys prior to and following an incident that

1   occurred on March 4th, 2018.

2        Now, there is no question that those journeys have been

3   physically and emotionally taxing on each and every one of

4   those plaintiffs.  And there is no question that hearing what

5   they have all been through will be difficult and will elicit

6   sympathy.  These individuals did absolutely nothing wrong, and

7   it is natural to empathize with them.  I know as a young woman,

8   myself, I certainly do.

9        So the question I have for each of you to think about is

10  this:  If you believe that the plaintiffs have been injured or

11  harmed by this incident, but you believe that another party who

12  is not at this trial, such as the fertility center, misused the

13  cryogenic freezer and caused the harm, would you be able to

14  send those plaintiffs away with no money damages?

15       I'd like you all to take a minute to think about that.  If

16  you believe they have a claim, they have been injured, but the

17  party that caused that harm is not here at the trial, would you

18  be able to send them away with nothing?  Or would that be

19  difficult for you?  Would you hesitate?

20       Can you please raise your hand if that's something that

21  would cause you to hesitate.

22       Let the record reflect no one has raised their hands.

23       Okay.  I have some follow-up questions for each of you.

24  And, as Ms. Sharp, said we're short on time, so if we don't get

25  to everyone then I apologize.

1      Let's see.  First, we left off with Ms. Mahoney, Juror

2  Number 9.  If you wouldn't mind returning to the microphone, I

3  just have a couple of follow-up questions for you.

4      Now, Ms. Mahoney, I see that you're a retired kindergarten

5  teacher.

6          **PROSPECTIVE JUROR MAHONEY:**  Correct.

7          **MS. REVEILLE:**  And what do you do with your free time

8  now that you're retired?

9          **PROSPECTIVE JUROR MAHONEY:**  Well, June 11th I'm going

10  to teach summer school.  But I have a pretty good life.  Well,

11  because of the pandemic, I'm home a lot.  But I read, get

12  dinner on the table, get the laundry done at a relaxed pace.

13          **MS. REVEILLE:**  Wonderful.  So having heard, now, what

14  I just said, how would sympathy, emotion, and empathy for these

15  individuals impact you in this case if at all?

16          **PROSPECTIVE JUROR MAHONEY:**  I definitely have sympathy

17  for people that lost their hopes and dreams of having a baby.

18          **MS. REVEILLE:**  You said that you understand they've

19  lost their hopes and dreams from losing a baby?

20          **PROSPECTIVE JUROR MAHONEY:**  Yes.

21          **MS. REVEILLE:**  When you feel that way, do you feel

22  like that would make it difficult for you to turn them away

23  with nothing, when you believe that they have, in fact, lost

24  their hopes and dreams due to the negligence of some party?

25          **PROSPECTIVE JUROR MAHONEY:**  I don't know if -- I don't

 1  know who should exactly have to pay for it, so I don't -- I'd

 2  have -- I don't really understand the situation to know who

 3  would need to -- if they have to be paid from people here, I

 4  don't know.

 5       **MS. REVEILLE:**  Do you feel that some party should have

 6  to pay for it because, otherwise, if no one pays for it in

 7  reality or in essence the plaintiffs are paying for it?

 8       **PROSPECTIVE JUROR MAHONEY:**  No.

 9       **MS. REVEILLE:**  Okay.  Thank you so much for your

10  candor, Ms. Mahoney.

11       Okay.  Let's see.  Dr. Meldorf, Juror Number 1, if you

12  would return, please.  Thank you.

13       Now, Dr. Meldorf, I know you have told us that you have

14  worked in the biotech industry, and you have been involved in

15  safety reports and products issues.  Is that right?

16       **PROSPECTIVE JUROR MELDORF:**  Correct.

17       **MS. REVEILLE:**  And it sounds like when you were

18  talking about user error, whether or not that is involved, you

19  said you would have to hear all of the information; right?

20       **PROSPECTIVE JUROR MELDORF:**  Well, all of the

21  information that's available, yes.

22       **MS. REVEILLE:**  All of the evidence, you would wait to

23  hear all the evidence before making any decisions or

24  formulating any opinions in this case; true?

25       **PROSPECTIVE JUROR MELDORF:**  Yes.

1          **MS. REVEILLE:**  You would wait to hear all of the

2    evidence, you would follow the law the judge instructs you on,

3    and you would deliberate with your fellow jurors to come to a

4    fair verdict; is that true?

5          **PROSPECTIVE JUROR MELDORF:**  Correct.

6          **MS. REVEILLE:**  A couple of follow-up questions about

7    your work experience.  Have you worked on a product in the

8    biotech industry that had customer complaints?

9          **PROSPECTIVE JUROR MELDORF:**  Undoubtedly, but I haven't

10   been on the front lines of that, in terms of having to deal

11   with them personally, in my professional career.

12         **MS. REVEILLE:**  And what was your role to the extent

13   you had one at all?

14         **PROSPECTIVE JUROR MELDORF:**  I've had multiple roles.

15   I worked at multiple companies, small biotech, large pharma.

16      I've primarily focused on clinical research, but I've also

17   been involved with research that happens once a product is out

18   on the market.

19      I've also worked on the safety side, so evaluating safety

20   information as it comes in from products that are on the

21   market.  And, in addition, I worked with the regulatory group.

22   So interacting with FDA and other global health authorities.

23         **MS. REVEILLE:**  Now, did you have any involvement in

24   investigating the customer complaints when there were customer

25   complaints?

1        **PROSPECTIVE JUROR MELDORF:**  I wasn't personally

2   involved, but I would hear the information.  Any -- if a

3   product issue was raised, if there was a product complaint with

4   a fairly serious outcome, we would do, obviously, a very

5   thorough analysis.  So I would hear information, and some of

6   that information undoubtedly had come from interactions either

7   with consumers or with physicians.

8        **MS. REVEILLE:**  And do you know, when those complaints

9   were investigated, do you know whether they were investigated

10  over email, at all, or whether emails were exchanged about the

11  investigation?

12       **PROSPECTIVE JUROR MELDORF:**  Knowing how we do that

13  type of investigation, I would assume that, yes, some of it was

14  done over email.

15       **MS. REVEILLE:**  Okay.  And this is a question you might

16  have an opinion on; you might not.  Just let me know.  Would

17  you consider a product defect to be different than a

18  malfunction?  And if so, why or why not?

19       **PROSPECTIVE JUROR MELDORF:**  So just shooting from the

20  hip here, a product defect would be some inherent issue with a

21  product, itself; whereas, a malfunction could occur because of

22  something inherently wrong with the product or one of the users

23  or something outside of the product itself.

24       **MS. REVEILLE:**  Okay.  Thank you very much,

25  Dr. Meldorf.  I have nothing further for you.  Thank you.

1          Let's see, Dr. Sutherland, Juror I, if you can please

2     return.

3          Okay.  Doctor, welcome.  I know that you were asked some

4     questions by Ms. Sharp about software failures.  And I believe,

5     if I heard you correctly, you said that you would be able to

6     see the case -- both parties would start at the same starting

7     line; true?

8               PROSPECTIVE JUROR SUTHERLAND:  That's right.

9               MS. REVEILLE:  And you said that you have no basis to

10    make a judgment as to any of the parties in this case until you

11    hear the evidence; true?

12              PROSPECTIVE JUROR SUTHERLAND:  That's also correct.

13              MS. REVEILLE:  You would listen to all of the

14    evidence; true?

15              PROSPECTIVE JUROR SUTHERLAND:  Uh-huh.

16              MS. REVEILLE:  You would follow the judge's

17    instructions on the law; true?

18              PROSPECTIVE JUROR SUTHERLAND:  Yes.

19              MS. REVEILLE:  And you would deliberate with your

20    fellow jurors to come to a fair verdict?

21              PROSPECTIVE JUROR SUTHERLAND:  Absolutely.

22              MS. REVEILLE:  Okay.  Question for you with respect to

23    your work experience.  Well, what has your experience been in

24    product development within that industry?

25              PROSPECTIVE JUROR SUTHERLAND:  Okay.  Let's see.  I

1    started out as a compiler back end developer.  Did that for 15

2    years.  Went back to grad school, in software engineering, and

3    moved sideways into, first, analysis of software and then

4    security.

5         MS. REVEILLE:  And in your industry, are there

6    circumstances where customers report malfunctions with the

7    software?  Is that something that occurs?

8         PROSPECTIVE JUROR SUTHERLAND:  Absolutely.

9         MS. REVEILLE:  And what responsibility does your team

10   have when customers report a malfunction or a bug?

11        PROSPECTIVE JUROR SUTHERLAND:  My current team, we

12   have only internal customers inside the company, so there's no

13   consumer out there.

14        But let's see.  We operate the software and hardware

15   that's the root trust in production for our company.  And if we

16   mess that up and a bad guy is able to own those systems, we

17   have past evidence that the cost of that is likely to be

18   measured in hundreds of millions of dollars.

19        MS. REVEILLE:  Understood.

20        PROSPECTIVE JUROR SUTHERLAND:  Yeah.  So we take it

21   very seriously.

22        MS. REVEILLE:  And what responsibility does the

23   customer have when product stops working properly?

24        PROSPECTIVE JUROR SUTHERLAND:  My customers, who are

25   all internal, are responsible for making sure that their

 1  systems are correctly configured to use my team's stuff.  And

 2  if they've configured it wrong, we tell them and tell them they

 3  have to fix it.

 4       MS. REVEILLE:  So communication is very important

 5  sounds like.

 6       PROSPECTIVE JUROR SUTHERLAND:  Uh-huh.

 7       MS. REVEILLE:  All right.  Thank you so much,

 8  Dr. Sutherland.

 9       Juror Number 15, Dr. Hanson, a couple of follow-up

10  questions for you as well.  Thank you.

11       I understand, if I heard you right, you're a nuclear

12  chemist; is that right?

13       PROSPECTIVE JUROR HANSON:  Yes.

14       MS. REVEILLE:  Sounds like you're a data person and

15  you find data very important; true?

16       PROSPECTIVE JUROR HANSON:  Yes.

17       MS. REVEILLE:  You said in situations when you find

18  user error it's after you've analyzed the data in the failure

19  analysis; right?

20       PROSPECTIVE JUROR HANSON:  Uhm, I'm presented with a

21  failure, and I'm tasked with finding what the, I guess,

22  physical -- the physics of how that failure happened.  And so

23  strictly in the technical part of the failure.

24       MS. REVEILLE:  Sure.  So in this case you will wait to

25  hear all of the evidence before drawing any conclusions in the

 1 | case; true?

 2 |     **PROSPECTIVE JUROR HANSON:**  True.

 3 |     **MS. REVEILLE:**  And you will listen to the Judge's

 4 | instructions and follow the law; true?

 5 |     **PROSPECTIVE JUROR HANSON:**  Yes.

 6 |     **MS. REVEILLE:**  And then you will go back with your

 7 | fellow jurors and come back with a fair verdict; true?

 8 |     **PROSPECTIVE JUROR HANSON:**  True.

 9 |     **MS. REVEILLE:**  A couple of follow-up questions about

10 | your work experience.

11 |     Did I see that you led a team of ten in the development of

12 | a chemical technology necessary to develop the molten chloride

13 | fast reactor.  Have I got that right?

14 |     **PROSPECTIVE JUROR HANSON:**  Yes.

15 |     **MS. REVEILLE:**  And in that circumstance with the team

16 | were there instances where you had to rely upon other people to

17 | follow policies and communicate issues that they encountered?

18 |     **PROSPECTIVE JUROR HANSON:**  Yes.

19 |     **MS. REVEILLE:**  Did you have circumstances where any

20 | members of the team failed to do that?

21 |     **PROSPECTIVE JUROR HANSON:**  No.

22 |     **MS. REVEILLE:**  Sounds like you had a good team.

23 |     **PROSPECTIVE JUROR HANSON:**  I had a good team.

24 |     **MS. REVEILLE:**  Wonderful.  Okay.  Thank you so much

25 | for your time.  I appreciate it.

1          **PROSPECTIVE JUROR HANSON:**  Thank you.

2          **MS. REVEILLE:**  Let's see.  Juror 17, Mr. McClung, in

3    the back.  Yes, Juror L.

4          **PROSPECTIVE JUROR McCLUNG:**  I'm Mark.

5          **MS. REVEILLE:**  Sorry, we're using letters not -- oh,

6    Mark McClung.

7          **PROSPECTIVE JUROR McCLUNG:**  Okay.  Letter L.

8          **MS. REVEILLE:**  Letter L, yes.  I was referring to 17,

9    but we're using letters instead of numbers.  Sorry about that.

10       Okay.  Good morning.

11         **PROSPECTIVE JUROR McCLUNG:**  Good morning.

12         **MS. REVEILLE:**  Could you please tell us a little bit

13   about your work experience in product development.

14         **PROSPECTIVE JUROR McCLUNG:**  Repeat the question again.

15         **MS. REVEILLE:**  Sure.  The masks are so difficult.

16       Did I see correctly on your questionnaire that you're a

17   director of engineering?

18         **PROSPECTIVE JUROR McCLUNG:**  That's correct.

19         **MS. REVEILLE:**  And you've had some involvement in

20   product design?

21         **PROSPECTIVE JUROR McCLUNG:**  Yes.  Software product

22   design.

23         **MS. REVEILLE:**  Can you tell us a little bit about what

24   your experience has been in software product design.

25         **PROSPECTIVE JUROR McCLUNG:**  I've been a career

1  engineer since 1982, so --

2        **MS. REVEILLE:**  You've had a lot of experience.

3        **PROSPECTIVE JUROR McCLUNG:**  Yeah.  So I've spent five

4  years building control systems and automated -- factory

5  automation systems.  And I spent another 25 years building

6  general purpose motion controllers or robotics.

7        **MS. REVEILLE:**  Okay.  And have you had occasions to

8  experience product malfunctions in your industry?

9        **PROSPECTIVE JUROR McCLUNG:**  Repeat the question,

10  please.

11        **MS. REVEILLE:**  Have you had occasions to experience

12  product malfunctions in your industry?

13        **PROSPECTIVE JUROR McCLUNG:**  It's the nature of our

14  business. There's errors all over the place, in requirements,

15  in architecture, the design, the code, the test, the

16  deployment, the application.  There's, you know, an endless

17  source of errors.

18        **MS. REVEILLE:**  And who are your customers?

19        **PROSPECTIVE JUROR McCLUNG:**  Today?

20        **MS. REVEILLE:**  Currently, yes.

21        **PROSPECTIVE JUROR McCLUNG:**  Currently, our customers

22  are ventech (phonetic) firms that do predictive analytics.

23        **MS. REVEILLE:**  And what responsibility do your

24  customers have if they determine that a product stops working

25  properly?

1      **PROSPECTIVE JUROR McCLUNG:**  They're involved from the

2   very beginning, from the requirements.  They guide everything,

3   so we want to make sure we get it correct all the way through,

4   so from day one.

5      **MS. REVEILLE:**  So it's important that they communicate

6   to you what they're seeing on their end?

7      **PROSPECTIVE JUROR McCLUNG:**  Yes, yes.  We don't want

8   wait until the very end, yes.  It's at the very beginning.

9      **MS. REVEILLE:**  How do you decide if the problem should

10  be escalated to senior leadership?

11     **PROSPECTIVE JUROR McCLUNG:**  Repeat the question,

12  please.

13     **MS. REVEILLE:**  How do you decide if the problem should

14  be escalated up, up the senior --

15     **PROSPECTIVE JUROR McCLUNG:**  Yeah, usually there's a --

16  well, at our company today there's an incident management

17  process.  You know, so a customer may discover an issue, and so

18  typically it, you know, goes to our IT group, you know.  And

19  they'll decide, you know, how -- you know, how serious the

20  issue is, how urgent it is.  And if it's a serious and urgent

21  issue it gets escalated.  So it might be a call has to be made

22  like, you know, whose problem is this?  Is it in the IT

23  infrastructure?  Is it in the software development?  Is it in

24  the machine learning algorithm?  You know, it goes through

25  these steps.

 1          **MS. REVEILLE:**  And discussions about this

 2   investigation, whenever you have an equipment error like that,

 3   does that occur over email?

 4          **PROSPECTIVE JUROR McCLUNG:**  It can.  Usually, if it's

 5   something serious, there's an all-hands meeting, you know, any

 6   hour of the day.

 7          **MS. REVEILLE:**  Okay.

 8          **PROSPECTIVE JUROR McCLUNG:**  It's that important.

 9          **MS. REVEILLE:**  I think I saw you were a prior juror on

10   a trial before?

11          **PROSPECTIVE JUROR McCLUNG:**  Excuse me?

12          **MS. REVEILLE:**  Were you a prior juror on a trial

13   before?  Did I see that on your questionnaire?

14          **PROSPECTIVE JUROR McCLUNG:**  A fire?

15          **MS. REVEILLE:**  Were you a juror on another trial

16   before?

17          **PROSPECTIVE JUROR McCLUNG:**  I'm sorry.

18          **THE COURT:**  Have you served on a jury before?

19          **PROSPECTIVE JUROR McCLUNG:**  Oh, yes, long ago.

20          **MS. REVEILLE:**  Okay.

21          **PROSPECTIVE JUROR McCLUNG:**  I'm sorry.

22          **MS. REVEILLE:**  Were you the foreperson?

23          **PROSPECTIVE JUROR McCLUNG:**  This was a criminal trial.

24          **MS. REVEILLE:**  Okay.

25          **PROSPECTIVE JUROR McCLUNG:**  Yeah, and, also -- well,

1    I'll let you ask questions.

2          **MS. REVEILLE:**  Okay.  So if you were called to be a

3    juror in this case, would you listen to all the evidence?  Is

4    that a yes?

5          **PROSPECTIVE JUROR McCLUNG:**  That is a yes.

6          **MS. REVEILLE:**  And would you follow the instructions

7    that the Judge gives you on the law?

8          **PROSPECTIVE JUROR McCLUNG:**  Yes.

9          **MS. REVEILLE:**  And would you go back and deliberate

10   with your fellow jurors and come to a fair verdict?

11         **PROSPECTIVE JUROR McCLUNG:**  Again, repeat that.

12         **MS. REVEILLE:**  Would you deliberate with your fellow

13   jurors and come to a fair verdict?

14         **PROSPECTIVE JUROR McCLUNG:**  I believe I could, yes.

15         **MS. REVEILLE:**  Thank you so much.  That's all we ask

16   for.

17         **PROSPECTIVE JUROR McCLUNG:**  Sure.

18         **MS. REVEILLE:**  Okay.  Next I'd like to call, let's

19   see, Ms. Nishimoto, which is Juror C or 4.

20         Good morning.  Thank you, Ms. Nishimoto.

21         **PROSPECTIVE JUROR NISHIMOTO:**  Good morning.

22         **MS. REVEILLE:**  I just have a couple of follow-up

23   0questions.  I know Ms. Sharp asked you some questions earlier.

24         So you mentioned that you have some negative opinions on

25   IVF, if I heard you correctly.

1        **PROSPECTIVE JUROR NISHIMOTO:**  Yeah.

2        **MS. REVEILLE:**  So the difficult part is that, you

3   know, our experiences, our opinions, our beliefs shape us all.

4   And that's what makes us who we are.  And that's okay.  We want

5   the jurors -- we want all of you to come here with your

6   experiences, your beliefs, and your opinions.  That's what

7   makes you unique.

8        That being said, it's important to say that the issues in

9   this case, you know, the plaintiffs are not on trial relevant

10   to why they did or didn't select IVF.  The trial, the issues in

11   the trial, as Ms. Sharp said, are whether our product was

12   defective and whether it was misused.

13        So knowing that additional information, that those are

14   going to be the issues that you're asked to decide, can you put

15   aside your personal beliefs and listen to the evidence and

16   start both parties at the same playing field at the same

17   starting line?

18        **PROSPECTIVE JUROR NISHIMOTO:**  I don't think I could

19   put aside my personal biases.

20        **MS. REVEILLE:**  Well, can you listen to what the

21   witnesses have to say when they get on the witness stand?

22        **PROSPECTIVE JUROR NISHIMOTO:**  Yeah, but in the back of

23   my mind I would probably be thinking about my personal and

24   religious beliefs which would probably cloud my judgment.

25        **MS. REVEILLE:**  If the Judge asks you to follow the

 1   law, would you be able to do that?

 2              **PROSPECTIVE JUROR NISHIMOTO:**  Yes.

 3              **MS. REVEILLE:**  And would you be able to listen to all

 4   of the evidence and all of the law that the Judge gives you and

 5   then take that back to the jury room and deliberate with your

 6   jurors?

 7              **PROSPECTIVE JUROR NISHIMOTO:**  I would be able to

 8   listen.

 9              **MS. REVEILLE:**  And you would be able to follow the law

10   that the Judge tells you to follow?

11              **PROSPECTIVE JUROR NISHIMOTO:**  Yes.

12              **MS. REVEILLE:**  And then you would be able to apply the

13   law to the facts that you've heard in the case and come to a

14   fair verdict with your fellow jurors?

15              **PROSPECTIVE JUROR NISHIMOTO:**  Yes.

16              **MS. REVEILLE:**  Okay.  Thank you, Ms. Nishimoto.

17       Okay.  How about, let's see, juror -- Juror Number D,

18   Juror 5, D.  Ms. Lorna Fredricksen.  Thank you so much.

19       Ms. Fredricksen, I don't think we got to hear much about

20   your background.  Did I see in the questionnaire that you work

21   at a law firm?

22              **PROSPECTIVE JUROR FREDRICKSEN:**  I used to.

23              **MS. REVEILLE:**  Okay.  What type of law firm was that?

24              **PROSPECTIVE JUROR FREDRICKSEN:**  We did consumer class

25   action work.

1          **MS. REVEILLE:**  Okay.  And were you on the side of the

2    plaintiffs bringing the class actions or on the defense?

3          **PROSPECTIVE JUROR FREDRICKSEN:**  Plaintiffs.

4          **MS. REVEILLE:**  How many years did you work at that law

5    firm?

6          **PROSPECTIVE JUROR FREDRICKSEN:**  That particular law

7    firm was about ten years.

8          **MS. REVEILLE:**  Did you work at other firms doing

9    plaintiffs' class action work?

10         **PROSPECTIVE JUROR FREDRICKSEN:**  Prior to that I did

11   plaintiffs' work in asbestos litigation.

12         **MS. REVEILLE:**  Okay.  And in your consumer class

13   action cases, what types of cases were there?

14         **PROSPECTIVE JUROR FREDRICKSEN:**  Usually, they were

15   cases against banks, credit cards.

16         **MS. REVEILLE:**  Okay.  And what was your role in the

17   litigation?

18         **PROSPECTIVE JUROR FREDRICKSEN:**  I was a paralegal.  I

19   worked with our class representatives, did a lot of discovery

20   work.

21         **MS. REVEILLE:**  Okay.  Have you ever had any defective

22   product cases?

23         **PROSPECTIVE JUROR FREDRICKSEN:**  No.

24         **MS. REVEILLE:**  Did I see in your questionnaire that

25   you're self-employed and that you may have some hardship?

1          **PROSPECTIVE JUROR FREDRICKSEN:**  Only that I'm selling

2     my insurance agency.  It closes on June 1st, so this is my last

3     week of owning it.

4          **MS. REVEILLE:**  I'm sorry, I don't think I heard the

5     end there with the mask.

6          **PROSPECTIVE JUROR FREDRICKSEN:**  This is my last week

7     of being the agency owner, so it's a little tricky.

8          **MS. REVEILLE:**  This is your last week, currently?

9          **PROSPECTIVE JUROR FREDRICKSEN:**  Yes.  Well, next week

10    is.

11         **MS. REVEILLE:**  Given the hours that the Judge stated

12    that the court would be in session, would there be a way to

13    work your last week of work around that?

14         **PROSPECTIVE JUROR FREDRICKSEN:**  Yes.  I talked to the

15    agency buyer, and she's willing to coordinate with me.

16         **MS. REVEILLE:**  Okay.  And --

17         **THE COURT:**  That was very civic of you.

18         (Laughter)

19         **PROSPECTIVE JUROR FREDRICKSEN:**  Yes, and her.

20         **THE COURT:**  We appreciate it.

21         **PROSPECTIVE JUROR FREDRICKSEN:**  Mostly her.

22         **MS. REVEILLE:**  And would you be able to listen to all

23    of the evidence in this case?

24         **PROSPECTIVE JUROR FREDRICKSEN:**  Yes.

25         **MS. REVEILLE:**  And would you be able to follow the

1    Judge's instructions on the law?

2              **PROSPECTIVE JUROR FREDRICKSEN:**  Yes.

3              **MS. REVEILLE:**  And would you be able to go back with

4    your fellow jurors and come to a fair verdict?

5              **PROSPECTIVE JUROR FREDRICKSEN:**  Yes.

6              **MS. REVEILLE:**  Thank you so much, Ms. Fredricksen.

7         Okay.  Let's see, Juror E, Ms. Cheung.  Thank you.

8              **PROSPECTIVE JUROR CHEUNG:**  Yep.

9              **MS. REVEILLE:**  Thank you.  Did I see that you are an

10   accountant at Deloitte?

11             **PROSPECTIVE JUROR CHEUNG:**  Yes, I am.

12             **MS. REVEILLE:**  And your husband is a physician.

13             **PROSPECTIVE JUROR CHEUNG:**  He is.

14             **MS. REVEILLE:**  I think I saw, also, that he does some

15   cancer research; is that right?

16             **PROSPECTIVE JUROR CHEUNG:**  He has in the past.  He's

17   not currently doing that.

18             **MS. REVEILLE:**  Has he worked in a laboratory when he's

19   been in that role?

20             **PROSPECTIVE JUROR CHEUNG:**  Yes, he has.

21             **MS. REVEILLE:**  Does he talk to you about his job and

22   things like the conditions in the lab in which he works?

23             **PROSPECTIVE JUROR CHEUNG:**  In the past he has, yes.

24             **MS. REVEILLE:**  Was he doing procedures, or all

25   research?

1    **PROSPECTIVE JUROR CHEUNG:**  On cancer, he was doing all

2    research.  Under his current role, he does procedures.

3        **MS. REVEILLE:**  Okay.  What is his current role?

4        **PROSPECTIVE JUROR CHEUNG:**  He's an international

5    radiology medical resident.

6        **MS. REVEILLE:**  Would you consider yourself to be more

7    emotional, more logical, neither, both?

8        **PROSPECTIVE JUROR CHEUNG:**  More logical.

9        **MS. REVEILLE:**  Okay.  Would you be able to listen to

10   all the evidence in this case?

11       **PROSPECTIVE JUROR CHEUNG:**  Yes.

12       **MS. REVEILLE:**  Would you be able to follow the Judge's

13   instructions on the law?

14       **PROSPECTIVE JUROR CHEUNG:**  Yes.

15       **MS. REVEILLE:**  And would you be able to go back to the

16   jury room with your fellow jurors and come to a fair verdict?

17       **PROSPECTIVE JUROR CHEUNG:**  Yes.

18       **MS. REVEILLE:**  Wonderful.  Thank you so much,

19   Ms. Cheung.

20       **PROSPECTIVE JUROR CHEUNG:**  Thank you.

21       **MS. REVEILLE:**  Okay.  Let's see, Juror Number 2, which

22   is Q, Ms. Low.  Yes, 22 is Q, Ms. Low.  Thank you.  Oh, yes,

23   thank you.  Okay.

24       Hi.  Okay.  So I know that you were up earlier when

25   Ms. Sharp was asking questions, and if I heard you correctly, I

1  think you said that although initially you felt conflicted, you

2  said you were not sure; you would have to hear all of the

3  evidence.

4      Did I hear you correctly?

5          **PROSPECTIVE JUROR LOW:**  Yes.

6          **MS. REVEILLE:**  So that's important to you, that you

7  will sit and you will listen to all the evidence in the case

8  from the first day to the last if you're selected?

9          **PROSPECTIVE JUROR LOW:**  Yes.

10         **MS. REVEILLE:**  Sorry, it's so difficult to hear with

11 the masks.

12         **PROSPECTIVE JUROR LOW:**  I know.

13         **MS. REVEILLE:**  Of course, at this point you haven't

14 heard anything in the case.  Some of Ms. Sharp's questions, I

15 think I sensed some hesitation.  And is that because you

16 haven't heard any of the evidence in the case yet?

17         **PROSPECTIVE JUROR LOW:**  I think so, yes.

18         **MS. REVEILLE:**  And you will be able to listen to the

19 Judge and follow the Judge's instructions on the law; is that

20 true?

21         **PROSPECTIVE JUROR LOW:**  Yes.

22         **MS. REVEILLE:**  And then you will be able to go back in

23 the jury room with your fellow jurors and come to a fair

24 verdict?

25         **PROSPECTIVE JUROR LOW:**  Yes.

 1          **MS. REVEILLE:**  Okay.  Thank you so much, Ms. Low.

 2          **THE COURT:**  Ms. Low, sorry, before you sit down can I

 3   just ask you, when you were up before, the first time, you

 4   seemed -- I'm not saying -- a little -- it was hard to speak a

 5   little bit.  Is that because you were nervous, or the case

 6   makes it a little emotional for you?

 7          **PROSPECTIVE JUROR LOW:**  A little bit of both.  I think

 8   it's been a really crazy year, I think we can all agree.

 9          **THE COURT:**  Agree.

10          **PROSPECTIVE JUROR LOW:**  All the stress that's just

11   getting to me, being a distance-learning person, all that.

12   It's just, yeah.

13          **THE COURT:**  So do you think you're in a frame of mind

14   to actually sit and pay attention and give both parties your

15   full attention in this case in light of -- which is fair

16   enough -- everything else going on?

17          **PROSPECTIVE JUROR LOW:**  I would absolutely do my best.

18   I think that's the best answer I could give.

19          **THE COURT:**  But do you think your best would be good

20   enough for either party?  I guess I'd say, would you feel

21   comfortable with you on the jury not -- just knowing your

22   stress level, which a lot of people have right now --

23          **PROSPECTIVE JUROR LOW:**  Right.

24          **THE COURT:**  -- that you have.

25          **PROSPECTIVE JUROR LOW:**  Could you repeat the question?

1    Because at this point I'm not quite sure.

2         **THE COURT:**  Sure.  No, I'm just wondering, because you

3    did, when you came up the first time, not actually this time --

4    and sometimes it's just nervousness -- right? -- because jury

5    selection we ask all you strangers to get up and answer these

6    personal questions in front of everyone.  I'm always astounded

7    everyone really does it, which is wonderful.  But, as you said,

8    you did seem a little emotional or stressed.

9         **PROSPECTIVE JUROR LOW:**  Right.

10        **THE COURT:**  And there are a lot of things going on in

11   the world or even minutely in our little world.

12        So my question is, knowing what you're dealing with

13   personally, do you feel like you can give each side the

14   attention their case deserves and be a fair juror?

15        **PROSPECTIVE JUROR LOW:**  Yes.

16        **THE COURT:**  Okay.  Thank you.

17        **MS. REVEILLE:**  Let's see, Juror R, Mr. Kafele.  Thank

18   you.  This is R, and this is Juror Number 23.

19        Good morning, Mr. Kafele.

20        **PROSPECTIVE JUROR KAFELE:**  Good morning.

21        **MS. REVEILLE:**  Am I saying your last name correctly?

22        **PROSPECTIVE JUROR KAFELE:**  Kafele.

23        **MS. REVEILLE:**  Okay.  So not quite.  Thank you.

24        First, is your wife currently undergoing IVF.

25        **PROSPECTIVE JUROR KAFELE:**  That is correct.

1    Interesting timing.

2           **MS. REVEILLE:**  We may have some additional questions

3    for you outside the presence of the other jurors.

4        I think I saw on your questionnaire that you worked in a

5    biology lab previously.

6           **PROSPECTIVE JUROR KAFELE:**  That was an internship in

7    college, so like 20 years ago.  And it was a teaching lab, so

8    all the outcomes of the experiments were known.  It wasn't a

9    real lab.

10          **MS. REVEILLE:**  Okay.  You said it was a long time ago,

11   in college?

12          **PROSPECTIVE JUROR KAFELE:**   (Nods head)

13          **THE COURT:**  Ms. Reveille, you have one minute.

14          **MS. REVEILLE:**  Oh, I think your questionnaire said you

15   were a vegie-powered handyman.

16          **PROSPECTIVE JUROR KAFELE:**  That's true.

17          **MS. REVEILLE:**  I was going to say, what is that?  What

18   do you do in your role?

19          **PROSPECTIVE JUROR KAFELE:**  Well, I'm just regular

20   handyman, but I'm vegetarian and my vehicle runs on bio diesel.

21          **MS. REVEILLE:**  Oh, wonderful.  Okay.  Thank you so

22   much, Mr. Kafele.

23       Okay.  That's all I have for now.  Thank you so much,

24   everyone.

25          **THE COURT:**  Ms. Sharp, you have one minute for any

 1 | follow-up.

 2 |          **MS. SHARP:**  Ms. Nishimoto, I'm sorry to pick on you

 3 | again.  May I ask you just another couple of questions, please?

 4 | Thank you.

 5 |     You said that you could listen to the evidence.  You would

 6 | be listening, though, through the lens of your religious

 7 | biases, which you said you could not set aside in this trial;

 8 | is that right?

 9 |          **PROSPECTIVE JUROR NISHIMOTO:**  Correct.

10 |          **MS. SHARP:**  All right.  Thank you.

11 |     Ms. Low, if I may ask you to come up one more time.

12 |     Thank you for coming up again.

13 |     Ms. Low, you -- would you be able to set aside your

14 | religious beliefs to be impartial in this case?

15 |          **PROSPECTIVE JUROR LOW:**  I think so.

16 |          **MS. SHARP:**  And with regard to money damages, I

17 | asked --

18 |          **PROSPECTIVE JUROR LOW:**  With regard to?

19 |          **MS. SHARP:**  Money damages.  As I said earlier, the

20 | plaintiffs would be asking for money damages in this case, for

21 | the loss of eggs and embryos.  What is your perspective on

22 | that, please?

23 |          **PROSPECTIVE JUROR LOW:**  Well, in a way I think of it

24 | as the loss of life.  It's difficult.

25 |     I feel I should share that I -- I had a child that died

 1   when she was three months old.

 2          THE COURT:  Oh, we're so sorry.

 3          PROSPECTIVE JUROR LOW:  It was a long time ago.  And

 4   so I guess I'm thinking in terms of that we don't get paid for

 5   losing lives.

 6          MS. SHARP:  Yes, I understand.  Thank you very much

 7   for your candor.

 8          PROSPECTIVE JUROR LOW:  Uh-huh.

 9          MS. SHARP:  Thank you.

10       One more, if I may.  Mr. Davis, there you are.

11          PROSPECTIVE JUROR DAVIS:  Hello.

12          MS. SHARP:  Hello, Mr. Davis.  We haven't heard from

13   you today.  Thank you.

14       In the questionnaire you said that you'd be a hundred

15   percent honest, you have so much going on in your life.  Are

16   you saying you would not be able to give the case your full

17   attention because of what's going on in your personal life?

18          PROSPECTIVE JUROR DAVIS:  Yeah.  I am in the middle of

19   moving.  Excuse me.  I've been sleeping very little.  It took

20   me about 2 hours and 30 minutes to get here today.  It's just

21   kind of rough to sit and listen to everything.  And I kind of

22   yawned about six or seven times sitting over there already.

23   It's just really hard to stay away and listen to everything.

24          MS. SHARP:  Thank you.

25       Can you tell us a little bit about your thoughts on

 1   awarding money damages for the loss of eggs and embryos in a

 2   case like this?

 3          **PROSPECTIVE JUROR DAVIS:**  I think my thoughts would be

 4   based on how much they're asking for and for what -- like, if

 5   it's the loss of the money for storing the eggs and taking the

 6   eggs or is it -- are they asking for monetary compensation for

 7   their emotional damages and how much so.  That's pretty much

 8   it.

 9          **MS. SHARP:**  So it sounds like you separate out those

10   two issues.

11          **PROSPECTIVE JUROR DAVIS:**  Yeah.

12          **MS. SHARP:**  Is it the awarding of damages for

13   emotional distress that gives you some pause?

14          **PROSPECTIVE JUROR DAVIS:**  It's just how much would

15   they be asking.  Would the person be asking for $10 million for

16   emotional damages, or emotional damages for having to take time

17   off of work?

18          **MS. SHARP:**  Right.  So is there an upper limit, in

19   your mind, of what you could not award more than for emotional

20   distress damages?

21          **PROSPECTIVE JUROR DAVIS:**  Not really.

22          **MS. REVEILLE:**  Objection, Your Honor.  Argumentative.

23   Misleading.  The jury hasn't heard any evidence yet.

24          **THE COURT:**  Overruled.

25          **PROSPECTIVE JUROR DAVIS:**  One more time.

**JURY VOIR DIRE**

1          **MS. SHARP:**  Happily.

2      Is there an upper limit that, in your mind, you could not

3   award more than for emotional distress damages?  And, again,

4   those are for pain and suffering.

5          **PROSPECTIVE JUROR DAVIS:**  Yeah, I guess there would be

6   a limit.

7          **MS. SHARP:**  There would?  Do you know what it is?

8          **PROSPECTIVE JUROR DAVIS:**  Not off the top of my head.

9          **MS. REVEILLE:**  Objection, Your Honor.

10         **THE COURT:**  He said he didn't know.

11         **PROSPECTIVE JUROR DAVIS:**  Is that it?

12         **MS. SHARP:**  Thank you very much.

13         **THE COURT:**  Before you go -- but, Ms. Sharp, you are

14   out of time.

15         **MS. SHARP:**  Okay.

16         **THE COURT:**  Mr. Davis, I want to follow-up.  Do you

17   feel like you could or could not be a fair juror in this case?

18         **PROSPECTIVE JUROR DAVIS:**  I feel that I could be fair

19   listening to both sides and evidence and all that.  I'm just

20   very tired, very stressed.

21         **THE COURT:**  That's what I mean.  With what's going on

22   in your life, do you feel like you couldn't give each side a

23   fair shot?

24         **PROSPECTIVE JUROR DAVIS:**  If I was chosen and coming

25   in every day for the next three weeks, I don't think I would,

 1    one, be on time every day.  I was late today.  Even though I

 2    left Vacaville at 6:00 a.m., I got here just before 8:30.

 3         Yeah, I don't think I would be able to be fair and listen

 4    four days a week, five days a week, for the whole time and be

 5    here and attentive and on time.

 6         **THE COURT:**  All right.  Thank you.

 7         **PROSPECTIVE JUROR DAVIS:**  Yeah.

 8         **THE COURT:**  Ms. Reveille, did you have any follow-up?

 9         **MS. REVEILLE:**  Just briefly, Your Honor.

10    Mr. Kafele, if you wouldn't mind stepping up very briefly.

11    Thank you so much.

12         **THE COURT:**  If you wanted to speak to him separately,

13    we can do that.

14         **MS. REVEILLE:**  Okay.  Thank you, Your Honor.  We will

15    do that then.  Thank you.

16    Never mind.

17    No further questions.  Thank you, Your Honor.

18         **THE COURT:**  All right.  Great.  So thank you very

19    much, members of the jury pool.  If you didn't get asked a

20    question, don't be offended at all.  We did those detailed

21    questionnaires to sort of again try to speed the process, limit

22    the time that you necessarily have to be here.

23         What I'm going to do now is, if I could have all of you,

24    except for Mr. Kafele, Ms. Means will take you into our jury

25    room, which is just another courtroom this size.

1        But let me give you a couple of instructions, which is

2    you've heard a little bit, very little, almost nothing about

3    this case.  Please don't discuss it at all with anyone, all

4    right.  It's going to be very important, especially if you're

5    chosen for the jury, that you keep an open mind, that you only

6    hear about the case what we tell you here in court.

7        So that even begins now just with each other.  What you

8    can discuss is how sad it is that Steph Curry wasn't able to

9    get the Warriors past the Lakers yesterday, if you even knew

10   there was an MBA season going on.  You can share that or

11   anything else.

12       Ms. Means will bring you to the courtroom next door, and

13   then hopefully we will tell you by 11:00 or so what we're doing

14   next.

15       (Prospective jurors exit courtroom at 10:34 a.m.)

16           **THE COURT:**  Okay.  Thank you.

17       Mr. Kafele, if you can come forward.  I think you

18   recognize the coincidence there.  The lawyers want to ask you

19   some questions.

20           **PROSPECTIVE JUROR KAFELE:**  I could have done this in

21   front of -- it's almost even weirder it's just me here.

22           **THE COURT:**  I don't know what they're going to ask.

23           **PROSPECTIVE JUROR KAFELE:**  I don't want to interfere

24   with the process.

25           **THE COURT:**  I think our audio is still on.  I don't

 1  know where Ms. Means is.  So why don't we wait a moment.  Or

 2  maybe Ms. Jacobs can turn it off.

 3      Go ahead and ask your question.  If it's not a question

 4  you want available to the public, let us know and we'll turn

 5  the audio off.  Go ahead, Ms. Reveille.

 6      **MS. REVEILLE:**  Thank you.

 7      Thank you, Mr. Kafele.  We just wanted to ask you about

 8  your experience and whether the fact that your wife is

 9  currently undergoing IVF would make this a difficult case for

10  you to sit on or whether you think that you would be able to

11  sit and listen to the evidence and follow the law and

12  deliberate with the jurors?

13      **PROSPECTIVE JUROR KAFELE:**  I think being in the

14  process just gives me a little bit more background than I would

15  have ever had reason to research before, especially now if I'm

16  supposed to not research anything.

17      I know for a lot of people it's very emotional but, like,

18  it wasn't our last resort.  It was our first child we had

19  naturally.  But there was a few miscarriages, and we were

20  hoping to, like, make the process a little -- a little easier.

21  But we didn't even try to do it naturally the second time.  We

22  also tried adopting.

23      I actually would have answered a lot of this differently

24  if it was, like, four or five years ago, before I learned that

25  adopting is actually not easy or inexpensive at all.  The

1  question you asked about people should adopt first, I actually

2  felt that way, and realize that's not necessarily an option for

3  everyone.

4      I've gotten way off track of your question.

5          **MS. REVEILLE:**  No, you didn't.  Not at all.  This is

6  all very, very helpful.  We appreciate it.

7      So what I've picked up so far is that you have more

8  knowledge about the process now having been through it.  You

9  said your first child you had naturally and then after that you

10 had a few miscarriages, which led you to actually moving

11 forward with IVF.

12     In terms of your emotions, do you feel like it would be

13 too emotional to sit on the jury, or would you be able to get

14 through the experience without being overcome with emotion?

15         **PROSPECTIVE JUROR KAFELE:**  As long as I avoid the

16 temptation to talk about it with my wife and see her reaction,

17 I think I can stay neutral.

18         **MS. REVEILLE:**  Wonderful.  And if the Judge instructs

19 you on the law and says you're not allowed to talk about the

20 evidence and that you need to wait until you get in the jury

21 box with your fellow jurors, to discuss the evidence and

22 deliberate, would you be able to follow her instructions?

23         **PROSPECTIVE JUROR KAFELE:**  Yes.  She asked me right

24 away, but she doesn't press because she's a lawyer and --

25         **MS. REVEILLE:**  Your wife's a lawyer?

1          **PROSPECTIVE JUROR KAFELE:** -- she takes it seriously.

2          **MS. REVEILLE:** So she'll help you; she will not ask.

3    She knows that is off limits.

4          **PROSPECTIVE JUROR KAFELE:** Exactly.

5          **MS. REVEILLE:** Okay.  All right.  We just wanted to

6    make sure you are comfortable, but it sounds like you are

7    comfortable and you will be able to get through the trial and

8    fulfill your duty.

9          **PROSPECTIVE JUROR KAFELE:** That's the goal.

10         **MS. REVEILLE:** And do you believe you would be able to

11   do that, to listens to the evidence first, as a first step?

12         **PROSPECTIVE JUROR KAFELE:** At least as well as anyone.

13         **MS. REVEILLE:** Okay.  And you would be able to follow

14   the Judge's instructions on the law?

15         **PROSPECTIVE JUROR KAFELE:** Yes.

16         **MS. REVEILLE:** And then you would be able to

17   deliberate with your fellow jurors and come to a fair verdict?

18         **PROSPECTIVE JUROR KAFELE:** Fair is subjective, but at

19   least at fair as anyone.

20         **MS. REVEILLE:** Understood.  Thank you very much,

21   Mr. Kafele.

22         **THE COURT:** You can go to the courtroom next door with

23   your fellow jurors.  Thank you so much.

24         **THE CLERK:** The courtroom on your left, once you go

25   out.

1          **THE COURT:**  I think we're ready now.

2      I guess first would be hardship.  Let me just propose,

3   Ms. Hamilton I would excuse as a hardship.  It seems that she

4   filled out the questionnaire her sub is unable to sub.

5      Is there any objection to excusing Ms. Hamilton for

6   hardship?

7          **MS. SHARP:**  Not from the plaintiffs, Your Honor.

8          **MS. REVEILLE:**  None from us either, Your Honor.  Thank

9   you.

10          **THE COURT:**  So Ms. Hamilton, Juror P, number 21, is

11   excused for hardship.

12      We'll start with the plaintiff.  Do you need more time, I

13   guess I should ask?

14          **MS. SHARP:**  One minute would be great if we could have

15   it, Your Honor.

16          **THE COURT:**  Sure.  Yes.

17          **MS. SHARP:**  Just to get our thoughts organized.

18          **MR. DUFFY:**  Sorry, Your Honor, cause now?

19          **THE COURT:**  Yes, cause.  No, no, believe me, I'll give

20   you more time before peremptories.

21      (Pause)

22          **THE COURT:**  All right.  Are we ready for our cause?

23          **MS. SHARP:**  We are.  Thank you, Your Honor.

24          **THE COURT:**  All right.  With the plaintiff, let's go

25   in order.  So that would the plaintiff like to excuse anyone

 1    for cause?

 2          **MS. SHARP:**  Yes.  We'll start with Ms. Nishimoto.

 3    She's Juror Number 4, in seat C, Your Honor.

 4          **THE COURT:**  Okay.  I think she should be excused, but

 5    I'll hear from Ms. Reveille.

 6          **MS. REVEILLE:**  I would just say, Your Honor, that I

 7    think that when she was asked additional questions she said

 8    that she could follow the law, listen to the evidence, and

 9    deliberate.

10          **THE COURT:**  She did.  You did an excellent job at

11    trying to rehabilitate her.  But she was also clear that her

12    religious beliefs were going to interfere.

13       So I'm going to excuse Juror Number 4, Ms. Nishimoto, for

14    cause.

15          **MS. SHARP:**  Second cause challenge --

16          **THE COURT:**  I wonder if we should go back and forth.

17    Maybe it doesn't matter.  Go ahead, Ms. Sharp.

18          **MS. SHARP:**  Great.  Thank you.

19       The second cause challenge for us is Ms. Low, who is juror

20    22, in seat Q.  As the Court heard, she couldn't commit to

21    setting aside her religious views or at least of them having no

22    impact on her decision-making.  She was quite emotional in

23    response to the Court's questions.  She said she doesn't

24    believe that she can put a price on human life.

25          And in response to questionnaire question number 53,

 1   regarding religious beliefs, she said clearly, "I'm not

 2   entirely sure my religious beliefs would allow me to be

 3   impartial."  She confirmed that in questioning here.

 4        Likewise, in question 56 on the questionnaire she said

 5   again, "Same reason as stated above.  Religion."  And from our

 6   perspective she confirmed quite clearly that she's not going to

 7   be able to set aside those views in deciding the case.

 8        **MS. REVEILLE:**  Your Honor, I would disagree.  Although

 9   Ms. Low answered in that way on the questionnaire, when I

10   brought her up -- actually, first, when Ms. Sharp was

11   questioning her she said, "I'm not sure until I've heard all of

12   the evidence.  I haven't heard anything in the case."

13        She said that she would be open-minded and said that she

14   could be fair; she could listen to all the evidence, follow the

15   law, and deliberate with her fellow jurors to come to a fair

16   verdict.  So I don't think she rises to the level necessary for

17   cause.

18        **THE COURT:**  Yeah.  She's a -- she's a close question.

19   That's why I asked her, because she was so emotional.

20        And then I think, actually, she revealed, actually, I

21   think there's the stress but, also, the stress of this bringing

22   up -- which must have been a very long time ago -- the death of

23   her 3-month old.

24        I think she very much wants to believe that she could be

25   fair and impartial.  She's absolutely not trying to get off the

1  jury.  But I'm -- I'm satisfied or I should say this.  I have

2  enough doubt -- she did say "Not until I heard it," but then,

3  to me, that leaves the question in my mind of when she hears

4  what whether she could then, in fact, be fair and impartial.

5      If she hears certain evidence then I think there's a risk

6  that she could not be fair and impartial.  I mean, it very well

7  could be that when she heard the evidence, even saying she

8  couldn't obviously put a value on the death of her child, that

9  she may be able to do that here, but there's enough uncertainty

10  that I'm going to go ahead and excuse Ms. Low for cause.

11      **MS. REVEILLE:**  Understood, Your Honor.

12      **MS. SHARP:**  Third cause challenge for the plaintiffs,

13  Your Honor, is Mr. Davis.  He was Juror Number 2 in seat B.

14      Under the Court's questioning and under ours, he confirmed

15  that, first of all, hardship; he believes he can't pay

16  attention; he's very tired; took him hours to get here today.

17  He also said that he believed that he couldn't be fair.  And,

18  finally, he did say that he would not be able to go above an

19  upper limit for money damages, contrary to the law.

20      **THE COURT:**  All right.  Ms. Reveille.

21      **MS. REVEILLE:**  I don't think that this rises to the

22  level for cause, Your Honor.  Everyone has a hardship.

23  Everyone has personal and professional lives.  And getting here

24  isn't going to be easy for anyone.

25      And I don't think that he can't be fair just because it

1  will be difficult for him to get here.

2          THE COURT:  Okay.

3          MS. SHARP:  Your Honor, the last thing I would add, if

4  I may, is that on question 55 on the questionnaire he was

5  asked:  "Can you impartially decide the case?"  And in a

6  somewhat long answer he basically said, no, he said, I'm not

7  going to be a hundred percent -- well, he said, "I'm going to

8  be a hundred percent" but I think he meant not.

9          THE COURT:  All right.  So, as to Mr. Davis, he just

10  doesn't want to be a juror in this case.  And my concern is

11  we're going to lose him.  Something's going to happen because

12  he -- I mean, I think he was probably exaggerating a bit about

13  yawning and not sleeping, but I find he is -- he's too

14  distracted or at least he wants to come across as too

15  distracted to be a fair and impartial juror.

16      So while I agree with Ms. Reveille -- I mean, it is a

17  hardship, but not a hardship that would justify excusing him,

18  I'm going to excuse him for cause.  He's just not appropriate

19  for a jury for either side.

20          MS. REVEILLE:  Thank you, Your Honor.

21          THE COURT:  So Juror Number 2, Mr. Davis, is excused

22  for cause.

23          MS. SHARP:  Last cause challenge for the plaintiffs

24  for now, Your Honor, is Ms. Rowe, Juror Number 20, seat O.

25      In response to the question 48 on the questionnaire,

 1  Ms. Rowe confirmed that she believes that IVF is unnatural or

 2  like playing God.

 3      Under questioning she did say that she's opposed,

 4  conceptually, to these issues.  And, of course, IVF is central

 5  to the case.  The plaintiffs in the case have all undergone IVF

 6  processes.  And so the notion of a juror who is conceptually

 7  opposed to something that is so foundational to the issues in

 8  the case, from our perspective, supports a dismissal for cause.

 9          **THE COURT:**  Ms. Reveille.

10          **MS. SHARP:**  I'm sorry.

11          **THE COURT:**  Go ahead.

12          **MS. SHARP:**  One last thing.  She also agreed, when I

13  asked her if our side would start out with a disadvantage

14  because of her strong beliefs, her answer was "Sure."  That's

15  it.

16          **THE COURT:**  Thank you.

17          **MS. REVEILLE:**  Your Honor, I would disagree.  You

18  called her up to ask some follow-up questions yourself, when

19  Ms. Sharp was finished her questioning, and she said

20  unequivocally "I can be fair."  No, not all lawsuits are

21  frivolous.  She's not saying that.  She has to listen to the

22  evidence first and that she can listen to the evidence, follow

23  the law and deliberate; and that her comment about frivolous

24  lawsuits was only with respect to her own personal situation

25  with her mother's lawsuit with the sister.

1      So I believe she was completely rehabilitated and said she

2    can be fair, she will be fair in this case; she does not

3    believe this lawsuit is frivolous just because of that prior

4    experience; and she will follow the law and deliberate with her

5    jurors.

6          **THE COURT:**  The reason I followed up with her is

7    because I didn't find her answer, like the sure whatever.  So

8    I'm not going to excuse her for cause.  I think just because

9    the questionnaire -- right? -- limits you.  It's not a

10   narrative.  And so I'm not going to excuse her for cause.

11         **MS. REVEILLE:**  Thank you, Your Honor.

12         **THE COURT:**  Do the -- does Chart have any additional

13   requests?

14         **MR. DUFFY:**  Can we just have a minute, Your Honor?

15         **THE COURT:**  Of course.

16         **MR. DUFFY:**  Thank you.

17         **THE COURT:**  Does Chart have any for-cause challenges?

18         **MS. REVEILLE:**  Thanks, Your Honor.

19      Our first would be Juror Number 9, Barb Mahoney.

20   Ms. Mahoney seems emotional in her responses to questions.  She

21   said she understands what it's like to lose a child, having

22   lost one herself.  She thinks an embryo is a child.  And I do

23   not think that she would be able to separate her emotion and

24   listen to the evidence and follow the law and come to a fair

25   verdict.  Chart would start behind the starting line.

1           **MS. SHARP:**  Your Honor, we don't have anything in the

2    transcripts, that we can see, that says she lost a child.

3           **THE COURT:**  I think it was in the survey.

4           **MS. SHARP:**  Was it?

5           **MS. REVEILLE:**  It's in the questionnaire.

6           **MR. DUFFY:**  She was so emotional she couldn't get it

7    out.

8           **MS. SHARP:**  She said "I have sympathy for people who

9    lost their hopes and dreams of having a baby."

10          **THE COURT:**  Yes.  She didn't say -- was it in her

11   survey?  She didn't say she had lost a child.

12          **MS. SHARP:**  No.

13          **THE COURT:**  She's the retired kindergarten teacher.

14          **MS. SHARP:**  The transcript also reflects she did not

15   say that the defense would start behind.

16          **THE COURT:**  No, no, she didn't.

17          **MS. REVEILLE:**  That's my argument.

18          **MS. SHARP:**  Okay.  Sorry.

19          **MS. REVEILLE:**  That's okay.

20          **THE COURT:**  All right.  I take it the plaintiffs

21   object?

22          **MS. SHARP:**  We do.

23          **THE COURT:**  Thank you.

24      I don't find there's cause to excuse Ms. Mahoney.

25          **MS. REVEILLE:**  Okay.  And then our final cause

1    challenge would be Juror Number 12, Ms. Missildine.  In her

2    questionnaire she said that damages are too low and Chart would

3    be prejudiced, she would be prejudiced --

4            **THE COURT:**  Wait.  Did you question her?

5            **MS. REVEILLE:**  No, Your Honor.

6            **THE COURT:**  So overruled.

7            **MS. REVEILLE:**  Thank you.

8            **THE COURT:**  All right.  So if I did my math correct,

9    that leaves us with exactly 16?

10           **MS. SHARP:**  Yes, Your Honor.

11           **THE COURT:**  Three peremptories for each side.  We will

12   have our jury.  All right.  So, yeah.  Why don't we take --

13   well, so is 15 minutes enough time?

14           **MR. DUFFY:**  Yes.

15           **MS. SHARP:**  Yes, Your Honor.

16           **THE COURT:**  And, Ms. Jacobs, you can let the jury

17   commissioner know -- well, not to let them go yet, just in case

18   we pick someone, and then sometimes they tell you something.

19   Just let her know that we're pretty sure we're going to get it

20   out of this 20.

21       All right.  So we'll resume at 11:15.

22           **MS. SHARP:**  Your Honor, is it okay if the rest of our

23   team come back to the courtroom now?

24           **THE COURT:**  Yes, for the peremptories, absolutely.

25           **MS. SHARP:**  Thank you very much.

PROCEEDINGS

```
 1                (Recess taken at 10:58 a.m.)

 2                (Proceedings resumed at 11:22 a.m.)

 3           (Proceedings were heard outside the presence of the jury:)

 4           THE COURT:  Thank you to the Chart team for being the

 5    one to vacate.

 6           All right.  So, if you recall, we will start -- we will go

 7    Plaintiff, Defendant.  And anybody skipped by both sides is

 8    going to be on our jury.

 9           All right.  Let's start with the -- and each side has

10    three peremptories.

11           So we will start with the Plaintiff.  Would you like to

12    exercise your first peremptory?

13           MS. SHARP:  Yes, Your Honor.  Juror number 1,

14    Dr. Meldorf.

15           THE COURT:  All right.  Juror number 1, Dr. Meldorf,

16    is excused.

17                (Pause in the proceedings.)

18           THE COURT:  And for Chart?

19           MS. REVEILLE:  Juror number 9, Ms. Mahoney.

20           THE COURT:  Okay.  Juror number 9, Ms. Mahoney, is

21    excused.

22           MS. SHARP:  All right.  Juror number 13, is the

23    Plaintiffs' second peremptory, Your Honor, Dr. Sutherland.

24           THE COURT:  All right.  Juror number 13,

25    Dr. Sutherland is excused.
```

PROCEEDINGS

1          **MS. REVEILLE:**  Juror number 12, Ms. Missildine.

2          **THE COURT:**  Okay.  Juror number 12, Ms. Missildine is

3     excused.

4          **MS. SHARP:**  Your Honor, the third peremptory for the

5     Plaintiff is Ms. Rowe, juror number 20.

6          **THE COURT:**  Okay.  Juror number 20, Ms. Rowe, is

7     excused.

8          **MS. REVEILLE:**  Juror number 25, Mr. Graves.

9          **THE COURT:**  Juror number 25, Mr. Graves, is excused.

10    All right.  So let me then go through who I believe our

11    jury is.

12    Juror number 5, Ms. Fredricksen, will be juror A.

13    Juror number 6, Ms. Cheung, is E.

14    Juror number 11, Mr. Singh.

15    Juror number 14, Ms. Ewing.

16    Juror number 15, Mr. Hanson.

17    Juror number 17, Mr. McClung.

18    Juror number 19, Ms. Betancourt, who maybe will cook for

19    us.

20                    (Laughter)

21         **THE COURT:**  Juror number 23, Mr. Kafele.

22    Juror number 24, Mr. Van Boldrik.

23    Juror -- wait.  That's 10; right.

24         **MS. GLIOZZO:**  Number 49.

25         **THE COURT:**  Oh, number 49, Mr. Toole, great.

PROCEEDINGS

1      All right.  Does everyone agree that's our jury?

2           **MS. SHARP:**  Yes, Your Honor.

3           **MS. REVEILLE:**  Yes, Your Honor.

4           **MR. DUFFY:**  Yes.

5           **THE COURT:**  All right.  So we will bring them in.  I

6      will thank them, and I will list who our jurors are and excuse

7      everyone else.

8           I will give them the admonition about not talking to

9      anyone over the weekend.

10          We can tell them how lucky they are they got selected.

11          Ms. Means, will show them next door, and then are going

12     to -- we will take a little break and then practice the Zoom.

13          **MR. DUFFY:**  Oh, okay, great.

14          **THE COURT:**  Great.  Good job, everybody.

15     (Proceedings were heard in the presence of the jury:)

16          **THE COURT:**  All right.  Thank you, everyone, for your

17     patience.  You may be seated.

18          And I'm pleased to say that we were able to select our

19     jury.  So like a restaurant, we under promised and over

20     performed in terms of how quickly we would be.

21          Unfortunately, we were only able to select ten of you.  So

22     for the rest of you, I'm sorry you weren't able to be selected.

23          I'm going to go ahead and read the names of those who have

24     been selected, the ten.

25          So if your name is not selected, we thank you so much for

**PROCEEDINGS**

 1   coming in today.  And hopefully at some time in the future you

 2   will have the opportunity to serve on the jury.

 3       So I'm going to list you -- I'm going to call you by

 4   letter.

 5       Ms. Means, those who are on the jury, where would you like

 6   them to go?

 7           **THE CLERK:**  Oh, you can go back to the jury assembly

 8   room and just tell them that --

 9           **THE COURT:**  No, no.  I need them to stay down here for

10   me to talk to them.  I'm just trying to think because some

11   people are leaving and some people are going.

12       Here is this:  If I call your name and you are on the

13   jury, don't leave.  Just stay here.  And then we are going to

14   figure out the seating.

15       All right.  So our first juror will be Lorna Fredricksen.

16       Our next juror is Elise Cheung.

17       And our next juror after that, number 3, is Bobby Singh.

18       And then we have Nicole Ewing; Michael Hanson; Marc

19   McClung; Alexis Betancourt; Bakari Kafele; Hans Van Boldrik;

20   and Mark Toole.

21       So if you can all remain.  And the rest of you, again,

22   thank you so much.

23       Your service to the Northern District of California for

24   this term is over.

25       And do they need to go back to the jury room?

**PROCEEDINGS**

1          **THE CLERK:**  You can go back to the jury assembly room

2     and tell them that you were excused.  I don't know if you guys

3     need paperwork to verify the day you were here.

4          **THE COURT:**  If you need any paperwork.

5          **THE CLERK:**  Yeah.  Just go back up.

6          **THE COURT:**  But thank you.  Thank you so much.

7          (Excused jurors exited courtroom.)

8          **THE CLERK:**  Ms. Fredricksen, can I have you move to

9     letter A, spot A.

10         And then Ms. Cheung, can you move to B.

11         Mr. Singh, can you move up to C.

12         Mr. or Ms. Ewing -- I only wrote down the last name.  I

13     apologize -- if I can have you move to D.

14         Mr. Hanson, will you move up to E.

15         Mr. McClung, you can move to F.

16         Mr. Toole, you can stay -- you are at -- can you move to

17     G, letter G.

18         Mr. Betancourt, you are going to move to H.

19         And Mr. Kafele is I.

20         And Mr. Van Boldrik is J.

21         **THE COURT:**  Okay.  Members of the Jury, I'm now going

22     to have Ms. Means swear you in as your -- as our jury.

23         **THE CLERK:**  Can I have you stand up one more time and

24     raise your right hand.

25         (Jury duly sworn.)

1          **THE COURT:**  Thank you.  You may be seated.

2      As I said, trial is going to start Monday, so that gives

3  you a day and a half, a workday anyway, to figure out things.

4  Monday at 8:30 a.m. sharp.

5      Just so you know, I and the parties will be here every day

6  at 8:00 a.m. beginning to work with the goal of trying to work

7  out everything in advance so that the trial will go as smoothly

8  as possible.  And, again, that we maximize your time here

9  hearing the evidence in court.

10     Ms. Means will give you some contact information if

11  anything comes up or you have questions or things like that.

12     But now, it is super important that I tell you -- and then

13  what we are going to do is we are going to begin Monday

14  morning.

15     I'm going to give you some preliminary instructions, and

16  then you are going to hear oral argument from each side or

17  opening statements where each side tells you what they expect

18  the evidence to show.  It is not evidence.  Just what they

19  expect.

20     And then we are going to start with our first witness.

21  And as I said, we intend to end every day around 1:30 -- maybe

22  a little later if someone is on the stand that we want to

23  finish off with -- but around then.  So at least hopefully you

24  can avoid the commute traffic on the way home to the extent

25  there is commute traffic anymore, which sometimes there isn't

PROCEEDINGS

1   so much.

2        It is super important, though, between now and Monday --

3   in fact, throughout the trial -- that you not discuss the case

4   with anyone.

5        So what is going to happen, of course, is you need to let

6   your employers, your family know -- maybe some friends -- that

7   you have been selected for service on this jury.

8        And, of course, the next question they are going to ask

9   you is:  What is the case?  Tell me all about it.

10       And what you need to say is:  I can't.  I'm under orders

11  from the Judge that I can't.

12       And the reason we do that is not because if you said:  Oh,

13  it is just a civil trial or if you said just the name of the

14  case, that that in itself is wrong.  But when you do that, of

15  course, what is the response from the person you are speaking

16  to?

17       Oh, maybe I read about it.  Oh, tell me what it is about.

18  Oh, this is what I think.  And now you have become

19  contaminated, right, with information and views from other

20  people.

21       And it is so critical to the parties, right, that they get

22  a fair trial; and we have been -- worked on this for a long

23  time to culminate in presenting the evidence to you here.

24       And we have carefully decided what evidence should be

25  presented to you.  And so it is so important that you don't

PROCEEDINGS

```
1   hear other outside things.  There is other outside things.

2       So you are going to be in this little cone for the next

3   three weeks where all you hear or discuss about it will be in

4   this courtroom.

5       Even among yourselves, the jurors, I'm going to instruct

6   you not to talk about it among yourselves because we want to

7   wait until your deliberations after you have heard all the

8   evidence.

9       I'm going to give you an instruction on Monday about

10  keeping an open mind.

11      The other thing -- because we are in the age of the

12  Internet -- is just to remind you to not -- not even post,

13  right, on your Facebook or WhatsApp or Tik Tok.  I don't know

14  if any of you do Tik Tok.

15                      (Laughter)

16      THE COURT:  Don't do a dancing Tik Tok -- I'm on jury

17  duty -- for the same reason it will just elicit the same

18  comments or questions or things like that; right.

19      Just I'm on jury duty.  When it is all done and you are

20  excused, you can talk about it.  But just -- from now until the

21  end, just keep quiet.  No reading.  Nothing; right.

22      Enjoy this fabulous weather that we are having now today

23  and through the weekend, and then we will see you on Monday

24  morning.

25      So thank you so much again.  I look forward to spending
```

**PROCEEDINGS**

 1  some time with all of you.

 2      And, Ms. Means, are you going to take them to the --

 3          **THE CLERK:**  I'm just going to take them back next

 4  door.

 5          **THE COURT:**  Oh, the other thing I should say is:  For

 6  social distancing these are your seats.  As you can see, those

 7  people back there, these are a little more comfortable.

 8      So if somebody has an issue with that, we can try to

 9  switch up and maybe among yourselves, as a matter of fairness,

10  you are going to want to switch things up.

11      The other thing is exhibits are going to be shown on the

12  screens here and there.  And so if someone has problems seeing

13  something during the trial, you should let us know.  And,

14  again, we will try to switch things up.

15      But we are -- the reason we have you spread out this way

16  is to maintain the social distancing.

17      All right.  With that, thank you so much.  And we look

18  forward to seeing you all on Monday at 8:30 sharp.

19      (Proceedings were heard outside the presence of the jury:)

20          **THE COURT:**  Okay.  So I think someone from IT is going

21  to come so we can see how the Zoom -- did you all get the Zoom

22  link?

23          **MR. DUFFY:**  Yes.

24          **THE COURT:**  And the people who need it have it?

25          **MR. DUFFY:**  I have one issue that -- the Rule 615

1   exclusion of witnesses issue.

2        **THE COURT:**  Yes.

3        **MR. DUFFY:**  When we were talking about Zoom, it

4   brought it back to me.

5        We sent a proposed stipulation.  There was an objection

6   from the Plaintiffs.  Before we start opening statements, I

7   think we have to resolve that.

8        **THE COURT:**  Sure.  Why don't we -- while we are

9   waiting for Ms. Means to come back and the IT people -- and we

10  have Ms. Knox, who is fresh -- we can address what we want.

11       **MR. POLK:**  Sure.  I can address --

12       **THE COURT:**  You are going to have to speak into the

13  microphone.

14       **MR. POLK:**  We are not opposed in principle to doing a

15  stipulation that tracks the rule.

16       So I think what we had yesterday -- there was a couple

17  places that deviated from the rule barring people from opening

18  statement, barring Counsel from talking to their clients.

19       And so I think what we would be prepared to agree to --

20  also it wasn't clear on whether parties could be present.  I

21  think the rule is pretty clear about that.

22       **MR. DUFFY:**  Yeah, they can.  I said witnesses.  So it

23  is as to witnesses.

24       **THE COURT:**  Parties, yes, non-party witnesses.

25       **MR. POLK:**  We haven't met and conferred on this just

PROCEEDINGS

1  because this -- like Mr. Duffy said, it just kind of percolated

2  to the surface yesterday.

3      And so, yeah, what we would stipulate to is that witnesses

4  don't get to sit in on other witnesses testimony.

5      Parties can sit in.  Counsel can talk to their clients.

6  People can sit in on opening statement.

7      That's -- you know, what the rule says.

8          MR. DUFFY:  I guess the only objection from the

9  Plaintiffs then is that non-party witnesses' attorneys can

10  speak to them about the evidence.  Is that your objection?

11         MR. POLK:  Yeah.  I just don't see anything in the

12  rule that would --

13         MR. DUFFY:  That defeats the purpose.

14         MR. POLK:  -- that would allow us to --

15         THE COURT:  Well, they certainly have -- they have the

16  professional responsibility.

17      I mean, normally an attorney representing a non-party

18  witness would come and monitor the trial.

19         MR. DUFFY:  But would be prohibited from sharing the

20  information they learn as an ethical rule.

21      And what I would just like the Court to make sure we have

22  a record here is that attorneys come and watch evidence --

23  whether it is here or on Zoom -- it doesn't really matter.

24  They are bound by Rule 615 as well.

25         THE COURT:  They are bound by their ethical rules.

PROCEEDINGS

1          **MR. DUFFY:**  Yes.

2          **THE COURT:**  What Rule 615 are we referring to?

3          **MR. POLK:**  The Federal Rules of Evidence 615.

4          **MR. DUFFY:**  Yeah.

5          **MR. POLK:**  The rule doesn't say anything about

6     counsel.  I mean, they are bound by their ethical rules like

7     Your Honor says.  I mean, yeah, I think we can look at it.

8          The other thing I would like to just clarify, I don't

9     think I mentioned experts.  And I think I have heard from my

10    colleagues that experts can --

11         **MR. DUFFY:**  Yes.  I would like experts as well,

12    Your Honor.

13         **THE COURT:**  Yes, experts.

14         **MR. DUFFY:**  I think that makes a lot of sense.  But,

15    you know, obviously, there are -- so Rule 615 itself bars a

16    witness from coming in and watching.

17         And the attorney can't end-run the rule by showing up to

18    watch the proceedings then leak all of it to his client.

19         **THE COURT:**  Okay.  Of course, that's a given; right.

20         **MR. DUFFY:**  Yeah.

21         **THE COURT:**  If we exclude the witness so that they

22    don't hear the testimony, the attorney can't go and then

23    essentially tell them everything that they heard.

24         The attorney can, of course, meet with their client; but

25    they can't tell their client:  Oh, you know what, the witness

**PROCEEDINGS**

1  actually testified to this.

2      **MR. DUFFY:**  Right.

3      **THE COURT:**  Right, yeah.  I think we are all in

4  agreement as to that.  So witnesses are -- non-party witnesses

5  are excluded.  By non-party, though --

6      **MR. POLK:**  Other than experts, yeah.

7      **THE COURT:**  -- we should be clear.  So the Plaintiffs

8  can watch.

9      **MR. DUFFY:**  Of course.

10      **THE COURT:**  And from Chart, who are we talking about?

11      **MR. POLK:**  We are talking about, I think -- this is

12  basically a PFC witness.

13      **MR. DUFFY:**  PFC, but there are other witnesses that

14  may come in.  I'm trying to think, Adam.

15      It mainly concerns PFC obviously, but it's any attorney

16  who is representing a witness.

17      **THE COURT:**  Oh, I see, because all of the Chart people

18  are by video.

19      **MR. DUFFY:**  Correct.

20      **THE COURT:**  So it is not an issue.

21      **MR. DUFFY:**  Correct.

22      **THE COURT:**  Who is coming?

23      **MS. ZEMAN:**  Your Honor --

24      **THE COURT:**  Oh, someone is coming from IT.

25      **MR. DUFFY:**  Oh, okay, great.

PROCEEDINGS

1          **MS. ZEMAN:**  Your Honor, can I just address a few other

2   housekeeping issues?

3          **THE COURT:**  Of course.

4          **MS. ZEMAN:**  One is regarding experts, do you want us

5   to formally tender experts on the stand?

6          **THE COURT:**  What do you want to do?  Mr. Duffy is

7   shaking his head no.

8          **MS. ZEMAN:**  He is a little formal for us.

9          **MR. DUFFY:**  That's old fashioned.  I have the white

10  hair, but that is still old fashioned to me.

11         **THE COURT:**  No, you do not have to do that.  We have

12  addressed that already.

13         **MS. ZEMAN:**  And then the second, I had asked earlier

14  about the feasibility for our opening statement and the first

15  witness, if we might move the tanks to this area in front of

16  the juror box so that they are actually visible from the

17  witness stand and to the jurors as opposed to tucked away.

18         **THE COURT:**  Do you have any objection to that?

19         **MR. DUFFY:**  I have no objection.  I will do the same

20  in my opening, Your Honor.

21         **THE COURT:**  Yes.  But with a different tank?

22         **MR. DUFFY:**  Yeah.  I may use both.  I don't know yet.

23         **THE COURT:**  Okay.

24         **MS. ZEMAN:**  We can move back of them over here so

25  that --

PROCEEDINGS

```
 1            THE COURT:  Oh, you are going to move both.  Okay.
 2    Great.
 3            MR. DUFFY:  And in my opening I may use those water
 4    bottles that are being used over there, Your Honor, the empty
 5    ones.  Does anyone have an objection on that?
 6            MS. SHARP:  I'm sorry.  What was the question?
 7            MR. DUFFY:  The water bottles that are right there
 8    next to the cooler.
 9            MS. SHARP:  What about them?
10            MR. DUFFY:  I want to use them in my opening.  Is
11    there any objection?
12            THE COURT:  How are you going to use them?
13            MS. SHARP:  It is a demonstrative that hasn't been
14    disclosed until now.
15            MR. DUFFY:  It would be to show volume of water or
16    liquid going into the freezer to help them understand the
17    volume.
18            MS. ZEMAN:  We would object, Your Honor.  This has not
19    been disclosed.  We don't see the relevance of water bottles
20    from the Court's supply.
21            MR. DUFFY:  I wouldn't even tell them it is the
22    Court's supply.  I would just pull them --
23            THE COURT:  No.  I understand it wouldn't be from the
24    Court's supply.  Like, are you going to fill them?  Are they
25    going to be empty?
```

**PROCEEDINGS**

1      **MR. DUFFY:**  No, no, no, it's too much water.  Yeah,

2  too much water.

3      **THE COURT:**  Are you using it as a measurement or are

4  you just talking about --

5      **MR. DUFFY:**  To demonstrate volume.

6      **THE COURT:**  Just that it is volume.  Not tethered to

7  how much in this particular case, the evidence -- just that --

8  you are not going to say that there were this many bottles?

9      **MR. DUFFY:**  Yes, I would.  What I would do is use this

10  to show them physically what volume of liquid looks like

11  because those are about 18 or 19 liters.

12      And, according to Plaintiffs' expert, there is a minimum

13  of 122 liters in the freezer that gets dissipated, evaporated,

14  leaked out in about 20 hours.

15      And so what I want to show the jury is physically -- and

16  it is just here in the courtroom.  I didn't want to do this

17  without asking the Court -- is to show them that.  That's the

18  concept we are talking about.

19      **MS. ZEMAN:**  We actually don't know the volume of those

20  bottles, for one thing.

21      **MR. DUFFY:**  It is on the bottles.  You can read it.

22      **THE COURT:**  It is what?

23      **MR. DUFFY:**  You can read it.  It is on the bottles.

24      **THE COURT:**  How much is it?

25      **MR. DUFFY:**  It is 18 liters, I believe.

PROCEEDINGS

```
 1                    (Pause in the proceedings.)

 2          MR. DUFFY:  It is 18 liters, I believe, and there are

 3   three of them here.

 4          MS. ZEMAN:  Doesn't appear to be that obvious.

 5                    (Pause in the proceedings.)

 6          MR. DUFFY:  Yeah -- yeah, it is 5 gallons, which is

 7   18.9 liters.  And it says so on the label which I can show

 8   Counsel.

 9          MS. ZEMAN:  It says gallons on the label, it sounds

10   like.  Oh, it does say the liters as well?

11          THE COURT:  Okay.  I think it is demonstrative.

12          MS. ZEMAN:  Well, it is undisclosed.  But if,

13   Your Honor --

14          THE COURT:  Well, now it is disclosed.

15          MS. ZEMAN:  -- is determined to bring it, then --

16          THE COURT:  No more.  No more.  That's it.

17          MR. DUFFY:  Thank you, Your Honor.

18      One other issue is:  How is the Court -- and I know you

19   told us before that we would have scheduling coming from each

20   side of the witnesses being called.

21      What is the Court's ruling, again, on that or how are we

22   supposed to be told about witnesses and that sort of thing?

23          THE COURT:  Oh, I think they e-mail you.

24          MR. DUFFY:  They did.  But we are looking for a

25   resting date as well so that we can schedule the out-of-town
```

PROCEEDINGS

1   experts that are coming.

2          THE COURT:  Well, that's you just meet and confer and

3   try to figure that out the best you can.

4          MR. DUFFY:  Okay.  We haven't heard yet, so --

5          MS. ZEMAN:  And then we would say it would depend to

6   some extent on the length of their cross as well.  So it is

7   difficult for us to estimate.

8          THE COURT:  Yeah.  You should meet and confer on that

9   and just tell them what their estimate is, and they will know

10  what their cross is and --

11         MS. REVEILLE:  One clarification question, Your Honor.

12  I know that the -- Your Honor's instruction was to inform us 72

13  business hours in advance of our witnesses going by video.  But

14  how many hours in advance should we be letting each other know

15  about live witnesses?

16         THE COURT:  Oh, I think that's in the order, isn't it?

17         MS. ZEMAN:  It is in the pretrial order.  It is two

18  days ahead.

19     So, Your Honor, Plaintiffs did tender an e-mail this

20  morning at 8:00 a.m. indicating our first witness and --

21  actually our witnesses for the 24th and 25th and our exhibits.

22  And so we are expecting responses on those by 8:00 a.m.

23  tomorrow.

24         MS. REVEILLE:  Understood.  So 48 hours in advance for

25  live witnesses?

PROCEEDINGS

1          MS. ZEMAN:  I believe it is two trial days per the

2    pretrial order.

3          MS. REVEILLE:  Okay.  Thank you, Your Honor.

4          THE COURT:  Yeah, for Monday you can't do Saturday

5    morning.

6          MS. SHARP:  Your Honor, may I be heard on one more

7    thing on the water bottles?

8          THE COURT:  Yes.

9          MS. SHARP:  Demonstratives don't go back to the jury

10   room.  Those are going to be in the jury room.

11         THE COURT:  Oh, that's a point.

12         MR. DUFFY:  The jury room has a water cooler?

13         THE COURT:  Sure.  It is a courtroom, just like this.

14         MS. SHARP:  Just like this.

15         THE COURT:  Yeah, that is an issue.

16         MR. DUFFY:  Can I move it out?

17         THE COURT:  No.  They need their water.

18         MR. DUFFY:  Oh, oh, it is not prison, is it; right.

19   But I don't think -- oh, that's right.  You know what,

20   Your Honor, the water cooler doesn't show the water bottle.  It

21   just has the water machine.  So the bottles won't be there.

22   The machine will.

23         MS. ZEMAN:  I think they will have water over there.

24         MS. SHARP:  Are we going to start dictating how the

25   water supply in the jury room is going to be?

**PROCEEDINGS**

1          **MR. DUFFY:**  They won't know.

2          **THE COURT:**  But the water bottles are there to be put

3     back in.

4          **MR. DUFFY:**  Correct.  But if that bottle is not in the

5     room where they are deliberating, then it doesn't go back to

6     them.

7          **THE COURT:**  Well, it is not just deliberating.  It is

8     where they go every day.  It is where they come in the morning.

9     It is where they go at the breaks; right.

10         So those water bottles are there.  Otherwise, court staff

11    has to monitor and then bring the bottles in and out.  And

12    Ms. Means can't do that.

13         **MR. DUFFY:**  Can we just check in there when they are

14    not there to make sure they are gone?

15         As an Officer of the Court, I will get them out of there.

16         **THE COURT:**  No, but -- it is not just for their

17    deliberations because then the problem is it is there all the

18    time; right.

19         **MR. DUFFY:**  Right.

20         **THE COURT:**  So that's the issue is that -- yeah.  No.

21    I mean, it was an idea.  But maybe you should have come up

22    with -- got something else other than what is going to be in

23    the jury room.

24         I think that's a good -- a good point.  So can't use that

25    one.

**PROCEEDINGS**

1          **MS. SHARP:**  Your Honor, if I may, one other

2     question -- I'm done with that.  I promise.  No more water

3     bottles.

4          For the openings on Monday, given the social distancing

5     requirements, we would like to have our Plaintiffs here, all

6     five of them.

7          **THE COURT:**  Yes.  Yes.

8          **MS. SHARP:**  Where shall we put them?

9          **THE COURT:**  Well, so there is no jury over there

10    (indicating).

11         **MS. SHARP:**  Right.

12         **THE COURT:**  So they can be back there.

13         **MS. SHARP:**  All right.  So we will distance them in

14    that area of the courtroom.

15         **THE COURT:**  Yeah.  And any other observers you have

16    within your allotment, I think over on that side.

17         **MS. SHARP:**  Fantastic.  Thank you.

18         **THE COURT:**  Is there going to be a Chart

19    representative here?

20         **MR. DUFFY:**  Not for openings, Your Honor.

21         **THE COURT:**  Okay.  All right.

22         **MS. ZEMAN:**  And one more, redacted documents.

23         There were a handful of documents that were redacted and

24    put under seal as part of the summary judgment briefing.

25         Some of those will now be used as trial exhibits, and we

PROCEEDINGS

1  are wondering if those can be used in an unredacted form at

2  trial?

3          THE COURT:  Well, did I -- I mean, what did I rule?

4          MS. ZEMAN:  For summary judgment purposes, you put

5  some of them under seal with redactions.

6      Again, with it now being at trial and for the jury to be

7  able to see them in full whether that --

8          THE COURT:  Are they, like, redactions related to the

9  Plaintiffs?

10         MS. ZEMAN:  They are generally identifying customer

11  names within Chart.  Although for one of them, the redaction

12  actually covers IVF, which is a part of the Plaintiff's name,

13  which is relevant to that document.  So at a minimum, we would

14  like to unredact the IVF from that document.

15         MR. DUFFY:  I think we need to have a meet and confer

16  on that just so we can get to the details of what they are

17  talking about.

18         THE COURT:  Yeah, why don't you show them.

19         MR. DUFFY:  Yeah, just show us and we will talk it

20  through.

21         THE COURT:  Since the trial is only being -- well you

22  know who -- the people who it's being displayed -- the exhibits

23  are being displayed to are lawyers or parties who would be

24  aware of it in any event.

25      But the public doesn't have access to the exhibits.  They

**PROCEEDINGS**

 1   only hear the audio.

 2        **MR. DUFFY:**  Okay.

 3        **THE COURT:**  So if there isn't an actual true concern

 4   about competitive harm, then let's unredact it.

 5        **MR. DUFFY:**  Okay.  Thank you, Your Honor.

 6        **MS. ZEMAN:**  Thank you, Your Honor.

 7        **THE COURT:**  All right.  So I think we are ready to

 8   practice our Zoom.

 9        And, Marilyn, thank you for coming.

10        **THE CLERK:**  We are off the record now.

11             (Proceedings adjourned at 11:50 a.m.)

12        (At 11:50 a.m. the proceedings were adjourned, to resume

13   on Monday, May 24, 2021.)

14                          ---oOo---

15

16

17

18

19

20

21

22

23

24

25

1

2

3                          <u>**CERTIFICATE OF REPORTERS**</u>

4              We certify that the foregoing is a correct transcript

5       from the record of proceedings in the above-entitled matter.

6

7       DATE:   Thursday, May 20, 2021

8

9

10

11       _____

12                    Marla F. Knox, CSR, RMR, CRR
                          U.S. Court Reporter
13

14

15

16       _____

17            Katherine Powell Sullivan, CSR #5812, RMR, CRR
                          U.S. Court Reporter
18

19

20

21

22

23

24

25