Amy M. Zeman (State Bar No. 273100)
Geoffrey A. Munroe (State Bar No. 228590)
John E. Bicknell (State Bar No. 331154)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, CA 94612
Tel: (510) 350-9700
Fax: (510) 350-9701
amz@classlawgroup.com
gam@classlawgroup.com
jeb@classlawgroup.com

Dena C. Sharp (State Bar No. 245869)
Adam E. Polk (State Bar No. 273000)
Nina R. Gliozzo (State Bar No. 333569)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dsharp@girardsharp.com
apolk@girardsharp.com
ngliozzo@girardsharp.com

*Plaintiffs' Counsel*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE PACIFIC FERTILITY CENTER LITIGATION<br><br>This Document Relates to:<br><br>No. 3:20-cv-05047 (A.J. and N.J.)<br>No. 3:20-cv-04978 (L.E. and L.F.)<br>No. 3:20-cv-05030 (M.C. and M.D.)<br>No. 3:20-cv-04996 (O.E.)<br>No. 3:20-cv-05041 (Y.C. and Y.D) | Master Case No. 3:18-cv-01586-JSC<br><br>**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON ISSUES RESOLVED IN PRIOR TRIAL**<br><br>Date: November 4, 2021<br>Time: 9:00 a.m.<br>Judge: Hon. Jacqueline S. Corley<br>Place: Courtroom F, 15th Floor |

# NOTICE OF MOTION

**PLEASE TAKE NOTICE** that on November 4, 2021, at 9:00 a.m., before the Honorable Jacqueline Scott Corley, Plaintiffs A.J., N.J., L.E., L.F., M.C., M.D., O.E., Y.C., and Y.D. will and hereby do move for partial summary judgment.

Plaintiffs' motion is made on the grounds that the following factual issues were resolved in a prior jury trial. The jury's findings on these issues should be given preclusive effect and Chart collaterally estopped from relitigating them in this action or any other action in these consolidated proceedings.

    A.  Whether Tank 4 was misused or modified after it left Chart's possession

    B.  Whether Tank 4 contained a manufacturing defect when it left Chart's possession

    C.  Whether a manufacturing defect was a substantial factor in causing the March 4th incident

    D.  Whether Tank 4 contained a design defect when it left Chart's possession

    E.  Whether a design defect was a substantial factor in causing the March 4th incident

    F.  Whether Chart negligently failed to recall or retrofit Tank 4's controller

    G.  Whether the failure to recall or retrofit was a substantial factor in causing the March 4th incident

    H.  What percentage of responsibility Chart has for the March 4th incident

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
MASTER CASE NO. 3:18-cv-01586-JSC

## **TABLE OF CONTENTS**

Page

INTRODUCTION ........................................................................................................ 1

BACKGROUND ......................................................................................................... 3

    A.    The lead case against Chart was tried to verdict in May and June 2021. ............................... 3

    B.    The Related Actions still pending against Chart arise from the same March 4th incident as the lead case and assert the same legal claims. .................................... 6

ARGUMENT ............................................................................................................. 7

    A.    Plaintiffs are entitled to summary adjudication of issues decided in the prior trial. ............... 7

        1.    The issues in question are identical to those decided in the lead trial. ................................ 9

        2.    Each issue was actually litigated in the lead trial .................................................. 10

        3.    Each issue was necessarily decided in the former proceeding ................................ 11

        4.    The decision in the lead trial is final and on the merits. ...................................... 12

        5.    Chart was a party to the lead trial. ................................................................ 12

        6.    Issue preclusion is consistent with public policy. .............................................. 12

           i.    Issue preclusion would not be unfair to Chart. ......................................... 12

          ii.    Issue preclusion would promote judicial economy. ................................... 13

        iii.    Issue preclusion would avoid inconsistent results. ................................... 16

CONCLUSION ........................................................................................................ 18

i

# TABLE OF AUTHORITIES

Page(s)

Cases

*Adams v. United States*,
  No. CV 03-49-E-BLW, 2010 WL 4457452 (D. Idaho Oct. 29, 2010) ....................................... 15, 16

*Daewoo Elecs. Am. Inc. v. Opta Corp.*,
  875 F.3d 1241 (9th Cir. 2017) ........................................................................................................8

*DKN Holdings LLC v. Faerber*,
  61 Cal. 4th 813 (2015).....................................................................................................................7

*Dunson v. Cordis Corp.*,
  854 F.3d 551 (9th Cir. 2017) .......................................................................................................16

*Hart v. Am. Airlines, Inc.*,
  61 Misc. 2d 41 (N.Y. Sup. Ct. 1969) ...........................................................................................17

*Hernandez v. City of Pomona*,
  46 Cal. 4th 501 (2009)...............................................................................................................9, 10

*In re Air Crash at Detroit Metro. Airport, Detroit, Mich. on Aug. 16, 1987*,
  776 F. Supp. 316 (E.D. Mich. 1991) ............................................................................................17

*In re E. I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*,
  No. CV 2:13-MD-2433, 2019 WL 6310731 (S.D. Ohio Nov. 25, 2019) ..................................8, 16

*Jacobs v. CBS Broadcasting, Inc.*,
  291 F.3d 1173 (9th Cir. 2002) .....................................................................................................12

*Lucido v. Superior Court*,
  51 Cal. 3d 335 (1990)..............................................................................................................8, 12

*Murphy v. Murphy*,
  164 Cal. App. 4th 376 (2008) .............................................................................................9, 10, 11

*Parklane Hosiery Co. v. Shore*,
  439 U.S. 322 (1979) .................................................................................................................12, 13

*Rodriguez v. City of San Jose*,
  930 F.3d 1123 (9th Cir. 2019) .......................................................................................................8

*Roos v. Red*,
  130 Cal. App. 4th 870 (2005) ...................................................................................................12, 13

*Silvia v. EA Tech. Servs., Inc.*,
  No. 15-CV-04677-JSC, 2018 WL 3093454 (N.D. Cal. June 22, 2018) ........................................12

ii

*Sosa v. DIRECTV, Inc.,*
    437 F.3d 923 (9th Cir. 2006) ............................................................................................ 12

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
MASTER CASE NO. 3:18-cv-01586-JSC

**INTRODUCTION**

When this litigation was first filed, it started as a proposed class action on behalf of over 250 fertility patients whose eggs or embryos were stored in the same cryogenic tank. That tank suffered a catastrophic failure that was discovered on Sunday, March 4, 2018, and Plaintiffs alleged that the tank's manufacturer, Chart Inc., was responsible in whole or part for the emotional distress and property damage that resulted. Chart knew from the very beginning that it was not just preparing to defend itself against the five lead plaintiffs—it was preparing to defend itself with respect to the entire March 4th incident.

Even after class certification was denied, it remained apparent that the trial of the lead plaintiffs' claims could impact the related claims brought by other victims of the March 4th incident. More than a hundred related cases were filed and consolidated with the lead action following the denial of class certification, and the Court informed the parties that it intended to resolve those related cases expeditiously. The Court specifically mentioned that a verdict against Chart in the lead trial could have preclusive effects in the related actions. (*See* Zeman Decl., Ex. 1 (Transcript of 09/24/2020 CMC) at 16-17 ("[W]e'll do our best to get these [cases] resolved expeditiously. And, of course, we do need to resolve, once the first trial happens – at least assuming if there's a verdict against Chart – any issue preclusion or issues or things like that").) Chart accordingly remained well aware that the lead trial could have wide-reaching implications and was preparing to defend itself against any allegation that a defect in its cryogenic tank was responsible for the March 4th incident.

And defend itself Chart did. The failed cryogenic tank was found with a cracked weld following the March 4th incident, but Chart devised a multi-faceted alternative explanation that, if successful, would have placed all blame for the March 4th incident on Pacific Fertility Center (PFC). Chart claimed that its cracked weld was not the cause of the March 4th incident, but rather a consequence of the incident. It maintained that PFC's embryologists had failed to fill the tank in the weeks leading up to the March 4th incident and that's why the tank lost liquid nitrogen. Only after the tank had run out of liquid nitrogen did it then begin imploding as a result of off-gassing from the tank's getter. And it was that implosion—and not any pre-existing defect—that caused the tank's interior weld to crack. It did not matter that digital records recovered following the incident showed that PFC had regularly filled the

tank and checked its levels in the weeks leading up to the incident; Chart claimed those records were the result of a concerted cover-up by the seven embryologists working in PFC's fertility lab. Chart retained five experts who prepared detailed reports in support of its theory and conducted extensive and wide-ranging discovery into PFC. For instance, it deposed PFC's Lab Director two different times, deposed the lab entity through two depositions by written questions, deposed the embryologist in charge of some of the lab's digital records three times, deposed six other PFC embryologists and a former lab assistant, and subpoenaed digital records from the company who provided the lab's monitoring software.

After more than three years of pre-trial litigation and trial preparation, the lead trial was held over three weeks in May and June 2021. Roughly 75% of the trial was devoted to general liability issues and only 25% to plaintiff-specific issues. Much of it was concerned with a single, central question: What exactly happened on March 4, 2018—did a defective weld crack or did the tank run out of liquid nitrogen because of PFC's negligence? Ultimately, the jury did not credit Chart's alternate explanation. It concluded the March 4th incident was caused by manufacturing and design defects in Chart's tank, and that Chart's failure to recall the tank's defective controller also contributed. And while the jury did agree that PFC acted negligently in the weeks leading up to the March 4th incident, it concluded that on the whole, Chart was 90% responsible and PFC was only 10% responsible. (ECF No. 858 (Verdict Form).)

Plaintiffs now request that the Court apply the jury's factual findings to the related cases involving the March 4th incident and collaterally estop Chart from relitigating the cause of that incident in future trials. All the elements of issue preclusion are met. Identical factual issues will be raised by each trial involving other victims of the March 4th incident. Those factual issues have already been actually litigated and necessarily decided following a three-week jury trial. Chart was a party to that trial and the judgment against it is now final for purposes of issue preclusion. And most importantly, issue preclusion is consistent with the doctrine's underlying policies—to promote judicial economy by minimizing repetitive litigation and to prevent inconsistent judgments that undermine the integrity of the judicial system. Chart had a full and fair opportunity to litigate the cause of the March 4th incident. Relitigating that central question in upcoming trials would more than triple the length of those trials,

leading to unnecessary delay, a series of largely repetitious proceedings, and potentially a contradictory result for certain plaintiffs. Each plaintiff's claims stem from the same catastrophic event; in the eyes of the law, that event should not have different causes depending on the identity of the plaintiff.

## BACKGROUND

### A.   The lead case against Chart was tried to verdict in May and June 2021.

This consolidated litigation arises out of the events of March 4, 2018, when a cryogenic tank at the Pacific Fertility Center lost liquid nitrogen and began imploding. That tank was called "Tank 4" and it contained 2,500 embryos and 1,500 eggs from patients who had undergone egg-retrieval or IVF procedures. (*See* ECF No 578-1 (Third Am. Compl.) ¶1.) Over 250 of those patients have filed suit in this Court, alleging that the March 4th incident was caused by manufacturing and design defects in Chart's cryogenic tank, as well as by Chart's failure to recall the tank's defective electronic controller prior to the incident. (*See* ECF Nos. 526, 608, 622, 648, 663, 879, and 900 (Orders Granting Admin. Mots. To Consider Whether Cases Should be Related).) They each seek to hold Chart liable for the emotional distress and property damage caused by the March 4th incident.

The lead plaintiffs' claims against Chart were tried over three weeks between May 20, 2021 and June 10, 2021. Approximately 75% of that trial was devoted to general liability issues that do not depend on the identity of the named plaintiffs. In particular, the parties heavily disputed what exactly happened to Tank 4 on March 4, 2018. Plaintiffs' expert witness testified that one of Tank 4's interior welds cracked due to defective manufacturing and design, causing the tank to lose substantially all of its liquid nitrogen and begin imploding. (Zeman Decl., Ex. 2 (Transcript of 05/24/21 Trial Proceedings) at 212, 250-254, 276-284.) Chart and its experts countered that the cracked weld was not the cause of the March 4th incident, but rather a consequence of the incident. (*Id.*, Ex. 3 (Transcript of 06/03/21 Trial Proceedings) at 1326-1329.) It blamed PFC's embryologists, who Chart claimed failed to refill Tank 4 for several weeks, causing the tank to eventually run out of liquid nitrogen. (*Id.* at 1286-1292.) When it did, Chart argued that off-gassing from the tank's getter triggered an implosion that caused the weld crack found on the inside of Tank 4 during post-mortem testing. (*Id.* at 1369-1372.) Chart also blamed PFC for failing to promptly replace the tank's malfunctioning controller in the weeks leading up the March 4th incident, which could have sounded preventative alarms had it been working at the

time. (*Id.* at 1295-1296.) Plaintiffs established through testimony from Chart's employees, however, that Chart knew Tank 4's controller was defective for several years and yet neither recalled nor retrofitted the controller. (ECF No. 869-4 (Junnier Dep.) at 96:3-96:7; ECF No. 869-5 (Brooks Dep.) at 203:14-204:18.) So while Plaintiffs acknowledged the malfunctioning controller played a role in the March 4th incident, they argued the lion's share of the responsibility for the March 4th incident should be allocated to Chart rather than to PFC. (Zeman Decl., Ex. 4 (Transcript of 06/09/21 Trial Proceedings) at 1874-1879.)

More than 27 hours of witness time was devoted to these general liability issues, as shown in the table below. Multiple expert witnesses, former Chart employees, Chart suppliers, and PFC embryologists all offered testimony pertaining to the cause of the March 4th incident.

## Witness Time Devoted to General Liability Issues

| Name | Description | Time |
|---|---|---|
| Anand Kasbekar, Ph.D. | Expert in failure analysis | 2:55 |
| Seth Adams | Former Chart employee | 0:22 |
| Kyle Eubanks | Former Chart employee | 0:15 |
| Brendon Wade | Current Chart employee | 0:40 |
| Justin Junnier | Former Chart employee | 1:03 |
| Jeff Brooks | Former Chart employee | 0:48 |
| Ramón Gonzalez | Former Chart employee | 0:19 |
| Gregory Mueller | Chart supplier | 0:18 |
| Joseph Conaghan, Ph.D. | PFC Lab Director | 5:16 |
| Jean Popwell, Ph.D. | PFC Senior Embryologist | 1:06 |
| Gina Cirimele | PFC Embryologist | 0:56 |
| Erin Fischer | PFC Lab Supervisor | 0:58 |
| Frank Bies | Former Chart officer | 0:15 |
| Franklin Miller, Ph.D. | Expert in cryogenic engineering | 5:28 |
| Ronald Parrington, P.E. | Expert in failure analysis | 3:00 |
| Buster Ingram | Former Chart employee | 1:06 |
| John Cauthen | Expert in digital forensic analysis | 1:51 |
| William Pickell | Chart supplier | 0:02 |
| Hana Lamb | Former PFC Lab Assistant | 0:48 |
| *Total witness time on general liability issues:* | | ***27 hours, 26 mins*** |

4

Far less time was devoted to plaintiff-specific issues, which included the impact of the March 4th incident on the plaintiffs' eggs and embryos, the value of those eggs and embryos, and the emotional distress suffered by the plaintiffs as a result of the March 4th incident. In total, only about 9 hours of witness time was devoted to those topics—and that time estimate is likely overstated, as some of the plaintiff-specific experts also offered testimony bearing on general liability issues. The table below shows the witnesses who offered testimony specific to the named plaintiffs, including several experts in the fertility process and each of the named plaintiffs themselves.

**Witness Time Devoted to Plaintiff-Specific Issues**

| Name | Description | Time |
|------|-------------|------|
| Stephen Somkuti, M.D. | Expert in reproductive endocrinology | 2:24 |
| Nicholas Jewell, Ph.D. | Expert in biostatistics | 0:53 |
| David Wininger, Ph.D. | Expert in embryology | 2:03 |
| Adrienne Sletten | Plaintiff | 0:58 |
| Rosalynn Enfield | Plaintiff | 0:44 |
| Kevin Parsell | Plaintiff | 0:36 |
| Laura Parsell | Plaintiff | 0:23 |
| Chloe Poynton | Plaintiff | 0:31 |
| Elizabeth Grill, Psy.D. | Expert in reproductive psychology | 0:40 |
| *Total witness time on plaintiff-specific issues:* | | ***9 hours, 12 mins*** |

At the conclusion of the trial, the jury deliberated for portions of two days before submitting a special verdict that was entered into the record on June 10, 2021. (Verdict Form.) The special verdict provided answers to several questions of general applicability, including:

- Tank 4 was not misused or modified after it left Chart's possession (Question 1);

- Tank 4 contained a manufacturing defect when it left Chart's possession (Question 3);

- Tank 4 failed to perform as safely as an ordinary user of cryogenic storage tanks would have expected when used or misused in an intended or reasonably foreseeable way (Question 5);

- The benefits of Tank 4's design did not outweigh its risk (Question 6);

5

- Chart knew or should reasonably have known that tank 4's controller was dangerous or likely to be dangerous when used in a reasonably foreseeable manner (Question 8);

- Chart became aware of that defect after Tank 4 was sold (Question 9);

- Chart failed to recall or retrofit Tank 4's controller (Question 10);

- A reasonable manufacturer under the same or similar circumstances would have recalled or retrofitted Tank 4's controller (Question 11); and

- Pacific Fertility Center was negligent with respect to Tank 4 (Question 14).

The jury also concluded that the manufacturing and design defects in Tank 4, Chart's failure to recall Tank 4's controller, and Pacific Fertility Center's negligence were each substantial factors in causing the plaintiffs' harm, which necessarily required jurors to first determine whether those potential causes were a substantial factor in causing the March 4th incident. (*See id.*, Questions 4, 7, 12, 15.) The jury allocated 90% of the overall responsibility for the plaintiffs' harm to Chart and 10% to Pacific Fertility Center. (*See id.*, Question 16.)

Based on the plaintiff-specific testimony that was provided during trial, the jury then awarded economic damages for the value of lost or damaged eggs, as well as noneconomic damages for the plaintiffs' pain, suffering, and emotional distress. (*Id.*) Rosalynn Enfield was awarded $100,000 in economic damages and $2.5 million in noneconomic damages; Laura and Kevin Parsell were awarded $200,000 in economic damages and $7.0 million in noneconomic damages; Chloe Poynton was awarded $100,000 in economic damages and $3.0 million in noneconomic damages; and Adrienne Sletten was awarded $75,000 in economic damages and $2.0 million in noneconomic damages. (*Id.*, Question 13.) The jury's special verdict was reduced to judgment and entered by the Court clerk on August 13, 2021. (ECF No. 902 (Final Judgment as to Defendant Chart Inc.).)

**B.    The Related Actions still pending against Chart arise from the same March 4th incident as the lead case and assert the same legal claims.**

The lead trial resolved the claims of five of the fertility patients affected by the March 4th incident, but more than 140 other cases remain pending against Chart arising from that same March 4th incident. (*See, e.g.,* Orders Granting Admin. Mots. To Consider Whether Cases Should be Related.) The Court previously deemed these other cases to be Related Actions and ordered them consolidated

6

with the lead case for pretrial and trial purposes. (*See* ECF No. 554 (09/15/20 Consolidation Order).) The first five of the Related Actions are scheduled for trial on January 31, 2022, with further trials to follow. (ECF No. 881 (Order Granting Stip. Re: Trial Schedule).) If each trial continues to include five households, roughly thirty additional trials will be needed to resolve all of the Related Actions.

The operative complaints in each of the Related Actions are nearly identical to the complaint in the lead case against Chart—only the names of the plaintiffs and their places of residence differ from complaint to complaint. (*See, e.g.,* Complaint and Demand for Jury Trial, *M.C. and M.D. v. Chart Inc.*, No. 3:20-cv-05030 (N.D. Cal. Jul. 24, 2020), ECF No. 1; Third Am. Compl.) Like the plaintiffs in the lead trial, the plaintiffs in the Related Actions all allege they had biological tissue stored in Tank 4 on March 4, 2018, and suffered both property damage and emotional distress as a result of the March 4th incident. (*See, e.g.,* M.C. and M.D. Compl.) Like the plaintiffs in the lead trial, the plaintiffs in the Related Actions all allege that Tank 4 was defectively designed and manufactured; that those defects led to a cracked interior weld, which caused the March 4th incident; and that Chart also contributed to the March 4th incident by failing to recall a known defect in its TEC-3000 electronic controllers. (*See, e.g., id.*) And as in the lead case, Chart continues to claim that Tank 4's cracked weld was a consequence of the March 4th incident rather than its cause; that PFC caused the March 4th incident by failing to keep Tank 4 filled with liquid nitrogen; and that PFC also contributed to the March 4th incident by failing to promptly replace Tank 4's electronic controller when it malfunctioned. (*See* ECF Nos. 592 and 594 (Chart's Answers to July 23, 2020 Complaints); Zeman Decl., Ex. 5 (05/07/21 Miller Report) at 29; *id.*, Ex. 6 (04/23/21 Parrington Report) at 14; *id.*, Ex. 7 (04/23/21 Centola Report) at 4-7.)

## ARGUMENT

### A.   Plaintiffs are entitled to summary adjudication of issues decided in the prior trial.

Issue preclusion, also referred to as collateral estoppel, is a legal doctrine that prohibits the relitigation of issues argued and decided in a previous case. *DKN Holdings LLC v. Faerber*, 61 Cal. 4th 813, 824 (2015). Here, Chart's liability to Plaintiffs depends on several issues that were argued and decided in the preceding jury trial, specifically:

A.  Whether Tank 4 was misused or modified after it left Chart's possession;

7

B. Whether Tank 4 contained a manufacturing defect when it left Chart's possession;

C. Whether a manufacturing defect was a substantial factor in causing the March 4th incident;

D. Whether Tank 4 contained a design defect when it left Chart's possession;

E. Whether a design defect was a substantial factor in causing the March 4th incident;

F. Whether Chart negligently failed to recall or retrofit Tank 4's controller;

G. Whether the failure to recall or retrofit was a substantial factor in causing the March 4th incident; and

H. What percentage of responsibility Chart has for the March 4th incident.

As this is a diversity case, California collateral estoppel rules apply. *See Daewoo Elecs. Am. Inc. v. Opta Corp.,* 875 F.3d 1241, 1246-47 (9th Cir. 2017). And under California law, a party is collaterally estopped from relitigating an issue when six criteria are satisfied:

1. "the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding";

2. the issue to be precluded "must have been actually litigated in the former proceeding";

3. the issue to be precluded "must have been necessarily decided in the former proceeding";

4. "the decision in the former proceeding must be final and on the merits";

5. "the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding"; and

6. application of issue preclusion must be consistent with the public policies of "preservation of the integrity of the judicial system, promotion of judicial economy, and protection of litigants from harassment by vexatious litigation.

*Rodriguez v. City of San Jose,* 930 F.3d 1123, 1131-32 (9th Cir. 2019) (quoting *Lucido v. Superior Court,* 51 Cal. 3d 335 (1990)). Each of these six requirements is satisfied here, and as a result, partial summary judgment should be entered in Plaintiffs' favor on the issues identified above. *See In re E. I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, No. CV 2:13-MD-2433, 2019 WL 6310731, at *14 (S.D. Ohio Nov. 25, 2019) (summary judgment is a proper procedure for asserting issue preclusion).

1

**1.      The issues in question are identical to those decided in the lead trial.**

"The 'identical issue' requirement addresses whether 'identical factual allegations' are at stake in the two proceedings, not whether the ultimate issues or dispositions are the same." *Hernandez v. City of Pomona*, 46 Cal. 4th 501, 511–12 (2009). "If the rule were otherwise, 'litigation finally would end only when a party ran out of counsel whose knowledge and imagination could conceive of different theories of relief based upon the same factual background." *Murphy v. Murphy*, 164 Cal. App. 4th 376, 401 (2008).

Here, Plaintiffs' factual allegations regarding the March 4th incident are identical to the factual allegations made by the plaintiffs in the lead trial. In fact, Plaintiffs' complaints are nearly a verbatim copy of the lead trial plaintiffs' complaint, and Chart's answer is nearly a verbatim copy of its answer to the lead trial plaintiffs' complaint. (*See, e.g.,* M.C. and M.D. Compl.; Third Am. Compl.; Chart's Answers to July 23, 2020 Complaints; ECF No. 597 (Chart's Answer to Third Am. Compl.).) Issues A-H would require a jury to unnecessarily resolve the same factual disputes that the first jury has already adjudicated—namely, what exactly happened to Tank 4 on March 4, 2018, and who or what was responsible for that event. Like the lead trial plaintiffs, Plaintiffs claim that Tank 4 failed due to a cracked interior weld; that the weld cracked because the weld was poorly designed and did not conform to Chart's specifications; and that Chart's failure to recall Tank 4's electronic controller also contributed to the March 4th incident. (*See, e.g.,* M.C. and M.D. Compl., ¶¶ 23-59.) And as it did in the lead trial, Chart claims that Tank 4 failed on March 4th because PFC negligently failed to monitor Tank 4, which caused it to run completely out of liquid nitrogen and implode. (05/07/21 Miller Report at 3-4; 04/23/21 Centola Report at 4-8; *See* Chart's Answers to July 23, 2020 Complaints.) Alternatively, even if Chart's weld was responsible for the March 4th incident, Chart contends that PFC is also at fault because it failed to promptly repair Tank 4's electronic controller, which would have issued warning alarms if it had been functioning properly. (Chart's Answers to July 23, 2020 Complaints.) These are the same factual contentions that were presented in the lead trial and adjudicated through a special jury verdict. (*See* Verdict Form.) There is no reason for another jury to repeat that process.

9

### 2. Each issue was actually litigated in the lead trial.

For purposes of collateral estoppel, an issue was actually litigated in a prior proceeding if it was properly raised, submitted for determination, and determined in that proceeding. *Hernandez*, 46 Cal. 4th at 511. Assessing whether an issue has been actually litigated can be difficult if the judgment entered in the prior proceeding does not show on its face that a particular issue was decided. *Murphy*, 164 Cal. App. 4th at 400. The entire record in the prior proceeding may be considered, including the pleadings, the evidence, the jury instructions, and any special jury findings or verdicts. *Id.* at 401; *Hernandez*, 46 Cal. 4th at 512.

Here, the jury's special verdict and trial transcripts confirm that Issues A-H were actually litigated in the lead trial. Each issue was resolved by the jury's answers to the questions posed on the verdict form:

A. *Whether Tank 4 was misused or modified after it left Chart's possession*: Answered with a "No" response to Question 1.

B. *Whether Tank 4 contained a manufacturing defect when it left Chart's possession*: Answered with a "Yes" response to Question 3.

C. *Whether the manufacturing defect was a substantial factor in causing the March 4th incident*: Answered with a "Yes" response to Question 4, which asked whether the manufacturing defect was a substantial factor in causing harm to the trial plaintiffs.

D. *Whether Tank 4 contained a design defect when it left Chart's possession*: Answered with "Yes" responses to Questions 5 and 6, which set forth the two tests for a design defect. (*See* ECF No. 853 (Final Jury Instructions, Nos. 19-20).)

E. *Whether the design defect was a substantial factor in causing the March 4th incident*: Answered with a "Yes" response to Question 7, which asked whether the Tank's design was a substantial factor in causing harm to the trial plaintiffs.

F. *Whether Chart negligently failed to recall or retrofit Tank 4's controller*: Answered with "Yes" in response to Questions 8-11, which set forth the factual elements the jury was required to find to hold Chart liable for failing to recall or retrofit Tank 4's controller. (*See* Final Jury Instructions, No. 22.)

10

G.   *Whether the failure to recall or retrofit was a substantial factor in causing the March 4th incident*: Answered with a "Yes" response to Question 12, which asked whether Chart's failure to recall or retrofit Tank 4's controller was a substantial factor in causing harm to the trial plaintiffs.

H.   *What percentage of responsibility Chart has for the March 4th incident*: Answered with a "90%" response to Question 16, which asked the jury to apportion responsibility for the trial plaintiffs' harm between Chart and PFC.

Several of the verdict form questions asked the jury to determine whether and to what extent Chart caused the trial plaintiffs' harm. (Verdict Form, Questions, 4, 7, 12, 16.) The harm at issue was property damage and emotional distress resulting from the March 4th incident, when Tank 4 was found low on liquid nitrogen. (Final Jury Instructions, Nos. 30-31.) There was no dispute during those trial proceedings that any harm suffered by the lead plaintiffs was caused by the March 4th incident. (*See e.g.,* Transcript of 05/24/21 Trial Proceedings at 185, 190-192, 203-205; Transcript of 06/03/21 Trial Proceedings at 1286; Transcript of 06/09/21 Trial Proceedings at 1935-1936.) The only dispute was over who or what caused the March 4th incident, an issue that the parties addressed at trial through the testimony of numerous witnesses. (*See* Background, section A, *supra*.) When the jury answered that Chart did indeed cause the trial plaintiffs' harm, it therefore was deciding that Chart caused the March 4th incident. (*See* Verdict Form.) Plaintiffs accordingly request that the Court find each of Issues A-H were actually litigated in the lead trial.

**3.   Each issue was necessarily decided in the former proceeding**

Whether an issue was "necessarily decided" has been interpreted by California courts to mean that the issue was not "entirely unnecessary" to the judgment in the prior proceeding. *Murphy*, 164 Cal. App. 4th at 400. Here, each of the jury's factual findings was highly relevant to an essential element of one of Plaintiffs' claims or Chart's defenses, and each of Issues A-H are based on one or more of those findings. (*See* Verdict Form; Final Jury Instructions.) None of those issues can be viewed as "entirely unnecessary" to the final judgment.

**4.**     **The decision in the lead trial is final and on the merits.**

Final judgment was entered as to Chart on August 13, 2021. (Final Judgment as to Defendant Chart Inc.) The judgment was entered on the merits following a three-week trial and entry of a special jury verdict. (Verdict Form.) And although Chart has stated it intends to appeal the judgment, that will not affect the finality of the judgment for purposes of collateral estoppel. *See Sosa v. DIRECTV, Inc.,* 437 F.3d 923, 928 (9th Cir. 2006) ("[I]n federal courts, a district court judgment is final for purposes of res judicata. This is so even during the pendency of an appeal.") (internal quotation marks and citation omitted); *Silvia v. EA Tech. Servs., Inc.*, No. 15-CV-04677-JSC, 2018 WL 3093454, at *3 (N.D. Cal. June 22, 2018) (applying *Sosa* in a diversity case because "[u]nder California law, the preclusive effect of a prior federal judgment is a matter governed by federal law") (quoting *Jacobs v. CBS Broadcasting, Inc.*, 291 F.3d 1173, 1177 (9th Cir. 2002)).

**5.**     **Chart was a party to the lead trial.**

A party may only be collaterally estopped from relitigating issues that were decided in a prior proceeding if that party was also a party in the prior proceeding or in privity with a party to the prior proceeding. *Lucido*, 51 Cal. 3d at 341. Here, Chart was the defendant in the lead trial, and so may be precluded from relitigating issues that were resolved through that trial.

**6.**     **Issue preclusion is consistent with public policy.**

The final consideration is whether application of collateral estoppel comports with basic fairness and the public policies underlying the doctrine. Those policies include promoting judicial economy by minimizing repetitive litigation, preventing inconsistent judgments which undermine the integrity of the judicial system, and protecting against vexatious litigation. *Roos v. Red*, 130 Cal. App. 4th 870, 887 (2005).

**i.**     **Issue preclusion would not be unfair to Chart.**

None of the factors that sometimes make the use of offensive issue preclusion unfair to defendants are present here. *First*, Plaintiffs did not "adopt a 'wait and see' attitude, in the hope that the first action by another plaintiff will result in a favorable judgment." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 330 (1979). They filed their lawsuits shortly after the Court denied class certification in the lead action, and due to the large number of plaintiffs affected by the March 4th incident, they did not

have the option of participating in the lead trial through an individual joinder. *Second*, Chart had every incentive to vigorously litigate the cause of the March 4th incident in the lead trial and did just that over the course of the three-week trial. *See Roos*, 130 Cal. App. 4th at 880 (citing *Parklane*, 439 U.S. at 330). Chart presented extensive expert testimony in support of its own theory of causation, forcefully cross-examined the PFC embryologists it blames for the March 4th incident, and presented impassioned opening and closing statements in an effort to convince the jury that Chart was not responsible for the March 4th incident. *Third*, the judgment against Chart is not inconsistent with previous judgments for Chart concerning the March 4th incident. *See id.* (citing *Parklane*, 439 U.S. at 330). And *fourth*, a second bite at the apple would not afford Chart "procedural opportunities unavailable in the lead action that could readily cause a different result." *See id.* (citing *Parklane*, 439 U.S. at 330-31.) Chart conducted full-scale discovery over several years, hired seven expert witnesses to support its position, and was given a full and fair opportunity to call witnesses and present its case to the jury. In addition, the Court specifically advised Chart that the outcome of the lead trial could have preclusive effects on ensuing trials. (*See* Transcript of 09/24/20 CMC at 16 ("And, of course, we do need to resolve, once the first trial happens … any issue preclusion or issues or things like that.").) Under these circumstances, an order collaterally estopping Chart from relitigating the cause of the March 4th incident would fully comport with fundamental notions of litigation fairness. *See Parklane*, 439 U.S. at 331-33 (endorsing use of offensive collateral estoppel when none of the four considerations discussed above are present).

### ii.    Issue preclusion would promote judicial economy.

The use of collateral estoppel here would also promote judicial economy by minimizing repetitive litigation. About 75% of witness testimony in the lead trial was devoted to issues that had nothing to do with the identity of the named plaintiffs. (*See* Background, section A, *supra*.) The jury was called upon, first and foremost, to answer fundamental questions that affect everyone who had eggs or embryos stored in Tank 4 on March 4, 2018: What exactly happened to Tank 4 on March 4, 2018? Was the weld crack found on the inside of Tank 4 the cause of the March 4th incident, or a consequence of the incident? Did the tank's interior weld crack first, causing the tank to lose liquid nitrogen and begin imploding? Or did the tank run out of liquid nitrogen first, following weeks of neglect by PFC, only then triggering an implosion that cracked the tank's inner weld? Was Tank 4's

weld manufactured according to specification, or was an inferior weld type used that left Tank 4 susceptible to a fatigue crack due to repetitive thermal stresses? Did certain other elements of Tank 4's design also make Tank 4's weld susceptible to fatigue cracks? Or was the weld perfectly safe and PFC instead covered up the true cause of the March 4th incident by falsifying records that appear to indicate that Tank 4's fill function was regularly activated and its liquid nitrogen levels regularly checked in the days leading up to the March 4th incident? And even if PFC wasn't solely responsible for the March 4th incident, did it contribute to the incident by failing to address the tank's malfunctioning TEC-3000 controller quickly enough? Did Chart know before the March 4th incident that its TEC-3000 controllers were defective and prone to malfunctioning in the same way Tank 4's controller malfunctioned? Did Chart have a retrofit available that would have fixed the TEC-3000 defect and avoided the March 4th incident? Would a reasonable manufacturer in Chart's position have recalled or retrofitted Tank 4's controller prior to the March 4th incident? (Transcript of 05/24/21 Trial Proceedings at 143-177; Transcript of 06/09/21 Trial Proceedings at 1827-1882.)

Numerous expert witnesses testified about the extensive testing and failure analysis that was conducted on Tank 4 following the March 4th incident. (*See* Background, section A, *supra*.) The parties also called PFC's Lab Director, Lab Supervisor, one of the lab's Senior Embryologists, and one of the lab's Junior Embryologists to testify about the March 4th incident. (*See id.*) One Chart employee, seven former Chart employees, and two employees from one of Chart's suppliers also testified via video deposition. (*See id.*) More than 140 Related Actions remain to be tried, and without collateral estoppel, the same witnesses would need to be called over and over again to offer the same testimony. (*See, e.g.,* Orders Granting Admin. Mots. To Consider Whether Cases Should be Related.) That would more than triple the length of each of these trials. It would require expert witnesses from around the country to repeat the same scientific analyses at each trial—at considerable expense to the parties. It would disrupt PFC's ability to provide treatment to its fertility patients as at least four of its seven embryologists, including the Lab Director and Lab Supervisor, would be required to devote a day or two to repeating their testimony at each subsequent trial. And it would significantly delay the conclusion of these consolidated proceedings as a whole, requiring the families affected by the March 4th incident—who

have already waited more than three years for their day in court—to wait much longer for the trials scheduled ahead of them to conclude and their own trial to commence.

By collaterally estopping Chart from relitigating issues that have already been decided, a large amount of repetition could be avoided and future trials could be adjudicated in a matter of days rather than a matter of weeks. The issues pertaining only to the five individual plaintiffs in the lead trial took only nine hours of witness time to present—compared to more than 27 hours for the testimony concerning the cause of the March 4th incident. The remaining issues for adjudication in the Related Actions would be relatively few in number: Did each plaintiff have eggs or embryos stored in Tank 4 on March 4? Did the March 4th incident damage or destroy each plaintiff's eggs or embryos? What was the value of those eggs and embryos? Did each plaintiff suffer emotional distress as a result of the March 4th incident? What is a reasonable amount of compensation for that emotional distress?[1]

This is precisely the type of situation where judges presiding over other mass torts have found that issue preclusion can play a vital role in the efficient and economical adjudication of the remaining trials. The common issues that have already been decided are easily divisible from the individualized issues that remain to be tried and a great deal of time can be saved by applying collateral estoppel. For instance, *Adams v. United States* involved cases brought by 134 farmers, who each claimed an herbicide that the Bureau of Land Management had applied to federal lands caused significant damage to their private farmland. During the first bellwether trial, the jury reached a special verdict that resolved several issues of general causation—including that the herbicide was transported by wind-blown dust to areas outside the application area and that the dust was capable of damaging crops in down-wind locations—and allocated 40% fault to the Bureau of Land Management and 60% fault to the herbicide's manufacturer. *See Adams v. United States*, No. CV 03-49-E-BLW, 2010 WL 4457452, at *2-3 (D. Idaho Oct. 29, 2010). The district court afforded several of the jury's special verdict findings preclusive effect in subsequent trials, concluding that the "findings do not depend on the individual circumstances of particular plaintiffs," and therefore resolved key elements of each farmer's

---

[1] The plaintiffs in the Related Actions may also have a claim for punitive damages if they can show one or more of Chart's officers knew about and approved Chart's failure to recall the TEC-3000 controller, but that issue did not go to the jury in the lead trial.

liability claims as well as the proper allocation of fault between the two defendants. *Id.* at 4, 7; *see, e.g., id.* at 6 ("[Manufacturer] had a full and fair opportunity to litigate apportionment of fault, and vigorously did so. All of the criteria for issue preclusion have been satisfied, and the Court will therefore accord preclusive effect to the apportionment of fault."). That ruling allowed the ensuing trials to address a far more limited set of issues that did vary from farmer to farmer and trial to trial, including whether the contaminated dust settled on the other plaintiffs' fields as well and whether it damaged their crops, and the value of those specific crops. *See id.* at 2.

Issue preclusion was also recently applied in a multidistrict proceeding against DuPont, where 50-plus cases had been filed by residents of Ohio and West Virginia who drank water contaminated by releases from the company's Washington Works facility. *See In re E. I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 2019 WL 6310731, at *1. By granting the plaintiffs' motion for issue preclusion, the Court was able to avoid repetitive litigation on the issues of duty, breach, general causation, and interpretation of a prior settlement agreement. Although DuPont continued to "demand that these issues be decided again," the presiding court determined that the prerequisites for issue preclusion had all been met, and that justice and efficiency demanded that DuPont be collaterally estopped from relitigating already decided issues. *Id.* at 29 (brackets omitted). Future trials would therefore be limited to issues of specific causation, damages, and punitive damages, thus fulfilling the court's obligation to resolve plaintiffs' claims in a "just and efficient" manner, as well as its commitment to offer the other cases on its docket with similarly prompt and efficient administration of justice. *Id.*; *see also Dunson v. Cordis Corp.*, 854 F.3d 551, 555 (9th Cir. 2017) (observing that "a verdict favorable to the plaintiff in [a] bellwether trial might be binding on the defendant under ordinary principles of issue preclusion").

### iii. Issue preclusion would avoid inconsistent results.

Relitigating issues that have already been adjudicated through a three-week jury trial would not just waste a great deal of time. It might also undermine the integrity of the judicial system by yielding contradictory results. Each of the 147 cases in this consolidated proceeding arises from the same tragic event. For more than three years, it has been publicly disputed what exactly happened to Tank 4 on March 4th and who or what was responsible for that catastrophe. We now have an answer: Tank 4 failed after one of its internal welds cracked, causing the tank to lose liquid nitrogen and begin

16

imploding. (*See* Verdict Form.) The crack was the cause of the March 4th incident, not a consequence. (*Id.*) Everyone who had eggs or embryos stored in Tank 4 on March 4th should be able to rely on that determination. It would be manifestly unfair and potentially embarrassing for the judicial system if the cause of the March 4th event were to change from case to case. The cause of the March 4th event should not be a defective weld for purposes of compensating some victims but something entirely different for others.

The potential for contradictory jury findings is particularly jarring in mass torts featuring a single catastrophic event, as opposed to cases where many plaintiffs suffer similar injuries but under different circumstances. Perhaps the closest analogy for this consolidated proceeding is an air disaster, where all plaintiffs' claims arise from the same tragic plane crash. Because it would be strange and unjust for the cause of the crash to change depending on the victim, the presiding courts in those cases often use issue preclusion so that the cause of a crash is litigated only once. For instance, when American Airlines sought to relitigate its liability for a plane crash that killed 58 passengers, the New York Supreme Court refused "to tolerate a condition where, on relatively the same set of facts, one fact-finder, be it court or jury may find a party liable while another exonerates him leading to the inconsistent results which are always a blemish on a judicial system." *Hart v. Am. Airlines, Inc.*, 61 Misc. 2d 41, 44 (N.Y. Sup. Ct. 1969) (internal quotation marks omitted). Likewise, after Northwest Airlines was found 100% responsible for the crash of Flight 255, which killed 156 people and injured numerous others, the presiding judge precluded Northwest from relitigating the cause of the crash in later suits filed by passengers and bystanders. *In re Air Crash at Detroit Metro. Airport, Detroit, Mich. on Aug. 16, 1987*, 776 F. Supp. 316, 325-26 (E.D. Mich. 1991).

A similar result is called for here. Chart had a full and fair opportunity to convince a jury its faulty weld was not responsible for the catastrophic failure of Tank 4 on March 4, 2018. It should now be bound by the jury's factual findings in all subsequent cases involving that same event. In the eyes of the law, the cause and responsibility for a singular event should be the same for all victims affected by that event. The jury's special verdict leaves no room for a genuine dispute of fact over who or what caused the March 4th incident, and as a result, partial summary judgment should be entered in Plaintiffs' favor as requested.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court grant their motion for partial summary judgment and order that Chart be collaterally estopped from relitigating the following issues in Plaintiffs' upcoming trial or in any other Related Action in these consolidated proceedings:

A. Whether Tank 4 was misused or modified after it left Chart's possession;

B. Whether Tank 4 contained a manufacturing defect when it left Chart's possession;

C. Whether a manufacturing defect was a substantial factor in causing the March 4th incident;

D. Whether Tank 4 contained a design defect when it left Chart's possession;

E. Whether a design defect was a substantial factor in causing the March 4th incident;

F. Whether Chart negligently failed to recall or retrofit Tank 4's controller;

G. Whether the failure to recall or retrofit was a substantial factor in causing the March 4th incident; and

H. What percentage of responsibility Chart has for the March 4th incident.

Dated: August 24, 2021

Respectfully submitted,

By:   _/s/ Amy M. Zeman_
Amy M. Zeman (State Bar No. 273100)
Geoffrey A. Munroe (State Bar No. 228590)
John E. Bicknell (State Bar No. 331154)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, CA 94162
Tel: (510) 350-9700
Fax: (510) 350-9701
amz@classlawgroup.com
gam@classlawgroup.com
jeb@classlawgroup.com

Dena C. Sharp (State Bar No. 245869)
Adam E. Polk (State Bar No. 273000)
Nina R. Gliozzo (State Bar No. 333569)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846

dsharp@girardsharp.com
apolk@girardsharp.com
ngliozzo@girardsharp.com

Adam B. Wolf (State Bar No. 215914)
Tracey B. Cowan (State Bar No. 250053)
**PEIFFER WOLF CARR KANE &
CONWAY, LLP**
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Tel: (415) 766-3545
Fax: (415) 402-0058
awolf@peifferwolf.com
tcowan@peifferwolf.com

*Plaintiffs' Counsel*

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
MASTER CASE NO. 3:18-cv-01586-JSC