Amy M. Zeman (State Bar No. 273100)
Geoffrey A. Munroe (State Bar No. 228590)
John E. Bicknell (State Bar No. 331154)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, CA 94612
Tel: (510) 350-9700
Fax: (510) 350-9701
amz@classlawgroup.com
gam@classlawgroup.com
jeb@classlawgroup.com

Dena C. Sharp (State Bar No. 245869)
Adam E. Polk (State Bar No. 273000)
Nina R. Gliozzo (State Bar No. 333569)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dsharp@girardsharp.com
apolk@girardsharp.com
ngliozzo@girardsharp.com

*Plaintiffs' Counsel*

[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE PACIFIC FERTILITY CENTER LITIGATION<br><br>This Document Relates to:<br><br>No. 3:20-cv-05047 (A.J. and N.J.)<br>No. 3:20-cv-04978 (L.E. and L.F.)<br>No. 3:20-cv-05030 (M.C. and M.D.)<br>No. 3:20-cv-04996 (O.E.)<br>No. 3:20-cv-05041 (Y.C. and Y.D.) | Master Case No. 3:18-cv-01586-JSC<br><br>**PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY FROM TRIAL OF RELATED ACTIONS**<br><br>Date: November 4, 2021<br>Time: 9:00 a.m.<br>Judge: Hon. Jacqueline S. Corley<br>Place: Courtroom F, 15th Floor |

## NOTICE OF MOTION

**PLEASE TAKE NOTICE** that on November 4, 2021, at 9:00 a.m., before the Honorable Jacqueline Scott Corley, Plaintiffs A.J., N.J., L.E., L.F., M.C., M.D., O.E., Y.C., and Y.D. will and hereby do move to exclude expert testimony pursuant to the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

Plaintiffs seek an order precluding Chart from presenting expert testimony at trial of the Related Actions that the Court previously excluded in the lead action in these consolidated proceedings. In particular, Plaintiffs seek exclusion of:

    A.    Eldon Leaphart's opinion that PFC had early indication of impending issues with Tank 4.

    B.    Any opinion by Dr. Angela Lawson concerning malingering or symptom exaggeration.

    C.    Dr. Grace Centola's opinions that (i) PFC engaged in a pattern of inaccurate or untruthful statements, and (ii) Tank 4's liquid nitrogen levels dropped to low levels in 2013 and 2014.

    D.    Dr. Franklin Miller's opinions that (i) PFC spoliated evidence; (ii) Tank 4 was out of warranty; (iii) Tank 4 did not possess any design or manufacturing defects; (iv) an experienced welder would interpret Chart's design drawing to require seal welds; (v) vacuum failure tests indicate Tank 4 could not have run out of liquid nitrogen in less than 24 hours; (vi) Tank 4's liquid nitrogen levels dropped to low levels in 2013 and 2014; and (vii) the tests reported in Miller's second rebuttal report dated December 11, 2020, support Chart's theory of general causation.

Plaintiffs also seek an order striking Dr. Miller's rebuttal report dated July 29, 2021, and precluding Dr. Miller from presenting the results of his most recent set of tests at trial of the Related Actions, including at the trial of Plaintiffs' claims scheduled for January 31, 2022.

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................................ 1

ARGUMENT .................................................................................................................................. 1

    I.    The Court should confirm that previously excluded expert opinions remain excluded. .......... 1

        A.    Eldon Leaphart's excluded opinions ................................................................................ 1

        B.    Excluded opinions concerning malingering ..................................................................... 2

        C.    Dr. Grace Centola's excluded opinions ........................................................................... 2

        D.    Dr. Franklin Miller's excluded opinions .......................................................................... 3

    II.    The Court should exclude Dr. Miller's four newest tests: None of them address Plaintiff-specific issues and none were disclosed until the rebuttal phase of these Related Actions ............................................................................................................... 5

        A.    Dr. Miller's new tests are not appropriate rebuttal material. ........................................... 5

        B.    Chart should not be permitted to submit new opinions on general causation issues .......... 7

CONCLUSION ............................................................................................................................... 9

**TABLE OF AUTHORITIES**

Page(s)

Cases

*Claar v. Burlington N. R. Co.*,
    29 F.3d 499 (9th Cir. 1994) ................................................................................................... 7

*Dunson v. Cordis Corp.*,
    854 F.3d 551 (9th Cir. 2017) ................................................................................................. 8

*E.E.O.C. v. Freeman*,
    778 F.3d 463 (4th Cir. 2015) ................................................................................................. 6

*Hall v. Hall*,
    138 S. Ct. 1118 (2018) ........................................................................................................... 8

*In re Toy Asbestos*,
    No. 19-CV-00325-HSG, 2021 WL 1056552 (N.D. Cal. Mar. 19, 2021) ........................... 6, 7

# INTRODUCTION

Over 250 fertility patients filed lawsuits against Defendant Chart following the catastrophic failure of one of Chart's cryogenic tanks at Pacific Fertility Center on March 4, 2018. Each of these plaintiffs had frozen eggs or embryos stored inside that cryogenic tank and each alleges that defects in Chart's design and manufacturing of that tank caused the March 4th incident. The Court consolidated all these Related Actions for both pre-trial and trial purposes and ordered that any discovery completed in the consolidated action is deemed produced in the Related Actions as well. (ECF No. 554 (9/15/20 Consolidation Order).)

The lead case in the consolidated proceeding was recently tried to a jury verdict, which resolved several common liability questions that are at issue in each of the Related Actions as well. Chart was on notice prior to that trial that the jury's findings may have preclusive effects and Plaintiffs have now formally moved to collaterally estop Chart from relitigating those issues in the Related Actions. If the Court affords the jury's findings preclusive effect, this motion will be largely mooted. But if general liability issues are to be relitigated in each of the Related Actions, Plaintiffs request that the Court preclude Chart from presenting expert opinions that the Court previously ruled were inadmissible. In addition, Plaintiffs request that the Court preclude Chart from presenting the results of new expert testing that Chart conducted after the lead trial concluded. This testing was included in a recent rebuttal report from Dr. Franklin Miller, but it is not proper rebuttal material. Nor is it consistent with the Court's consolidation order, which does not contemplate re-doing fact or expert discovery on general liability issues in each Related Action.

# ARGUMENT

**I.    The Court should confirm that previously excluded expert opinions remain excluded.**

    **A.    Eldon Leaphart's excluded opinions**

Eldon Leaphart is an electrical engineer who was retained by Chart to examine Tank 4's controller following the March 4th incident. (*See* ECF No. 724 (03/19/21 Order) at 4.) In his initial expert report, Mr. Leaphart disclosed he intended to offer the opinion that Tank 4's controller did not cause Plaintiffs' loss of eggs and embryos. The Court ruled that testimony inadmissible and when Chart re-served the report in these Related Actions, it appropriately removed that excluded testimony. (*See id.*

at 6; Zeman Decl., Ex. 8 (Leaphart Report) at 6 & 36, ¶ 1].) But it left in other testimony that the Court also found was inadmissible—namely, Mr. Leaphart's conclusion that "changes in LN2 usage levels preceding the incident of February 15, 2018 served as an early indication of pending issues with Tank 4." (Leaphart Report at 37, ¶ 3 (third bullet).) The Court previously ruled that Mr. Leaphart is "not qualified to testify as to what the controller's information meant with respect to an impending issue with the Tank," and observed that the "opinion that the controller's outputs put PFC on notice … is not within Mr. Leaphart's expertise." (3/19/21 Order at 5.) Plaintiffs request that the Court affirm its prior exclusion of Mr. Leaphart's testimony and confirm that Chart is barred from presenting that testimony during the upcoming trial.

### B.  Excluded opinions concerning malingering

Dr. Angela Lawson is a forensic psychologist who was retained as a rebuttal witness to Plaintiffs' expert in reproductive psychology, Dr. Elizabeth Grill. (3/19/21 Order at 6.) The Court previously ruled that "neither Dr. Grill nor Dr. Lawson determined whether any Plaintiff was or was not malingering; thus, neither expert shall opine on that subject." (*Id.*) Dr. Lawson's report in these Related Actions, like her report in the lead action, does not express any opinion on whether any Plaintiff was or was not malingering. (Zeman Decl., Ex. 9 (Lawson Report) at 2, n.1 ("I am not rendering an opinion on the plaintiffs' psychological conditions in this report."); Ex. 10 (Lawson Dep.) at 34 (confirming that she is "not offering an opinion on whether any of these plaintiffs in Trial 2 are malingering"); *see also id.* at 37 ("No intention to testify at trial about malingering or symptom exaggeration, correct? A. Correct. Q. All right. You're not even insinuating it, right? A. No, I'm saying it wasn't evaluated.").) Plaintiffs therefore expect that Dr. Lawson will not opine on the subject. Before the lead trial, "[a]t oral argument, Chart clarified that it does not intend to have Dr. Lawson testify that Plaintiffs are malingering." (3/19/21 Order at 6.) If Chart takes a different position now, Plaintiffs respectfully request that the Court enter the same ruling limiting Dr. Lawson's testimony in the Related Actions.

### C.  Dr. Grace Centola's excluded opinions

In her first report, Chart's embryology expert, Dr. Grace Centola, opined that PFC had a pattern of untruthful statements and dishonest practice. (*See* 3/19/21 Order at 8 (citing ECF No. 630-9 (Centola

report) at ¶¶ 38, 42.) The Court excluded this testimony as "character evidence that is not helpful to the jury and beyond the scope of [Dr. Centola's] expertise." (*Id.* at 9.) Dr. Centola has now submitted a revised report prior to the trial of these Related Actions that includes her previous opinions as well as some additional opinions pertaining to the named plaintiffs' unique facts. (Zeman Decl., Ex. 7 (Centola Report.) That revised report includes the same character opinions that the Court previously excluded, including the same reference to "untruthful statements from the PFC Lab," "dishonest practice," and "untruths in statements made by PFC Lab staff." (*Id.*, ¶¶ 38, 42.)

Dr. Centola's revised report also continues to include testimony related to certain low-level readings recorded by Tank 4's controller in 2013 and 2014, which Dr. Centola believes "indicate a history of neglect" and a "History of Failure to Properly Monitor [the] Freezer Dating Back to 2012." (*Id.* at 14, ¶ 46 & heading.) The Court previously excluded these opinions as well, reasoning that "[t]he inferential leap Chart makes from the 2013/2014 readings to the cause of the 2018 accident is too attenuated to be probative." (3/19/21 Order at 9-10.) Plaintiffs request that the Court confirm this prior ruling continues to apply and that Dr. Centola's previously excluded testimony remains excluded for purposes of the Related Actions.

### D. Dr. Franklin Miller's excluded opinions

Dr. Franklin Miller previously presented seven opinions that the Court excluded:

*First*, after Dr. Miller wrote in his report that PFC "spoliated the evidence," the Court ruled that while Dr. Miller may testify regarding post-accident testing performed by PFC or other parties, "he may not testify or imply that PFC or any other party did anything wrong by spraying the Tank with powder or any of the other Tank testing that was done." (3/29/21 Order at 10-11.)

*Second*, the Court ruled Dr. Miller could not testify Tank 4 was out of warranty because it was not relevant to any issue in the case and was likely to confuse the jury. (*Id.* at 11.)

*Third*, the Court precluded Dr. Miller from testifying that Tank 4 did not suffer from a manufacturing or design defect, as "experts cannot testify to the legal conclusions to be drawn (or not drawn) from the evidence." (*Id.* at 11.)

*Fourth*, the Court found Dr. Miller did not have sufficient personal knowledge to testify how an experienced welder would interpret design drawings, and so could not opine that "any experienced welder will interpret [Tank 4's] drawing to require seal welds." (*Id.* at 12.)

*Fifth*, the Court found that a test Dr. Miller conducted to show that Tank 4 could not have lost 14 inches of liquid nitrogen in less than 24 hours was "unreliable and did not replicate Tank 4's conditions at the time of the incident." (*Id.* at 12.) In particular, Dr. Miller's test tank was empty rather than filled with IVF equipment and thus contained too much liquid nitrogen; he simulated an exterior crack rather than an interior crack; and he did not verify that his results were reproducible. (*Id.*) After Chart moved for reconsideration, the Court affirmed its ruling and clarified that Dr. Miller's visual observations during the test were "excluded for the same reasons the remainder of his testimony regarding the test is excluded—it is not reliable." (ECF No. 777 (4/30/21 Order) at 8.)

*Sixth*, the Court excluded Dr. Miller's testimony regarding 2013/14 low-level readings for the same reason that it excluded Dr. Centola's testimony concerning those same events. (3/29/21 Order at 14.)

*And seventh*, the Court excluded three new tests that Dr. Miller conducted to buttress his original opinions. Those tests were included in a second rebuttal report, but the Court found that only a narrow portion of that report constituted appropriate rebuttal material. (*Id.* at 14-15.)

Dr. Miller has now submitted another expert report in these Related Actions that includes each of the seven opinions that the Court previously excluded. Some effort was made to address the Court's ruling with respect to spoliation, as one portion of Dr. Miller's report now refers to alteration of evidence rather than spoliation (*See* Zeman Decl, Ex. 5 (5/7/2021 Miller Report) at 7, section C.) Dr. Miller also slightly modified his opinion that Tank 4 "[w]as out of [w]arranty" to state that it "had a 5 [y]ear [w]arranty on the [v]acuum" and PFC "did not thaw the tank at the recommended 5-year interval." (*Id.* at 7-8.) But Dr. Miller's final conclusions still include the opinions that "Pacific Fertility experts spoliated the evidence" and the tank "was out of warranty at the time of the incident." (*Id.* at 29, ¶¶ 5 & 6.) And Dr. Miller's other excluded opinions are reproduced in full. (*See id.* at 2 ("It is my opinion that [Tank 4] was not defective or unreasonably dangerous in either design or manufacture"), 29, ¶ 1 ("[n]o design or manufacturing defects existed . . . . [The tank] did not possess any defective or

unreasonably dangerous conditions"), 7 ("any experienced welder will interpret the drawing to require seal welds"), 12-21 & 29 ¶ 8 (describing "Exemplar Tank Full Vacuum Failure Test" and conclusion drawn from that test); 24-25, 28, & 29 ¶ 9 (repeating prior report statements regarding fill levels in 2013 and 2014), 34-43 (repeating Dr. Miller's 12/11/2020 rebuttal report).) Plaintiffs request that the Court confirm those opinions remain excluded and cannot be introduced in the upcoming trial.

In the event that the Court concludes that the tests it previously excluded as inappropriate rebuttal material are now admissible, Plaintiffs have disclosed a rebuttal expert who can explain to a jury why those tests are flawed and do not support Chart's alternate explanation for the March 4th incident. For example, Dr. Miller did a test that he says confirms his opinion that Tank 4's getter could absorb enough nitrogen gas to cause an implosion if the tank was later thawed. (*Id.* at 38.) But his test used more Cryosiev than was in Tank 4 and he did not allow that material to first adsorb water vapor, which would occur over the six years that Tank 4 was in service and would diminish the getter's ability to adsorb other molecules, like nitrogen gas. If trials in the Related Actions are limited to issues not previously litigated and decided in the lead case, or if the Court limits expert testimony on general causation to the expert opinions properly disclosed prior to the lead trial, it will not be necessary for Plaintiffs' rebuttal expert to testify. But if Dr. Miller is allowed to present additional tests and additional opinions at each successive trial, Plaintiffs intend to respond with additional tests and opinions as well.

**II.     The Court should exclude Dr. Miller's four newest tests: None of them address Plaintiff-specific issues and none were disclosed until the rebuttal phase of these Related Actions.**

**A.     Dr. Miller's new tests are not appropriate rebuttal material.**

Since his prior expert reports, Dr. Miller has conducted several more tests that he says support his opinion that PFC and getter off-gassing caused the March 4th incident. In three of the tests, Dr. Miller attempted to measure how long it would take for 14 inches of liquid nitrogen to evaporate in a MVE 808 tank that suddenly lost vacuum. (Zeman Decl., Ex. 11 (7/29/21 Miller Report) at 2.) Unlike the previous time that Dr. Miller ran this test, this time he filled the tank with IVF equipment and attempted to simulate an internal breach. Dr. Miller reports that on average it took about 26 hours for all the liquid nitrogen to boil off, and he concludes that it would not be possible for Tank 4 to have lost

all its liquid nitrogen in under 24 hours. There are serious reasons to doubt the reliability and precision of these tests, however. Dr. Miller still used more liquid nitrogen than was in Tank 4 on March 4th. (*Id.* at 2 (using 130 liters instead of 122-125 and 70 sample boxes instead of 80).) And even though Dr. Miller submitted over 70 hours of video footage from his tests, conspicuously missing is any clear video or narration of Dr. Miller spoiling the vacuum to mark the start of his tests. (Zeman Decl., ¶ 16.) Dr. Miller didn't even report what time two of his three tests supposedly started, so it is impossible for Plaintiffs to verify that Dr. Miller is reporting accurate results. (7/29/21 Miller Report at 7 (Boiloff Test 2 description), 13 (Boiloff Test 3 description); Zeman Decl., Ex. 12 (Miller Test Data) (providing data only for Boiloff Test 1 conducted 6/30/21-7/1/21).) In addition, Chart's counsel instructed Dr. Miller not to answer whether he had conducted other tests that Dr. Miller did not report—and that may have indicated it can take less than 24 hours for substantially all liquid nitrogen to evaporate. (Zeman Decl., Ex. 13 (Miller Dep.) at 17.); *see E.E.O.C. v. Freeman,* 778 F.3d 463, 469–70 (4th Cir. 2015) (Agee, J., concurring) ("[C]ourts have consistently excluded expert testimony that "cherry-picks" relevant data.") (collecting cases).

But the most serious problem with Dr. Miller's tests is that they were not disclosed until the rebuttal phase of these Related Actions. "[R]ebuttal expert testimony is limited to unforeseen facts brought out in the other side's case." *In re Toy Asbestos*, No. 19-CV-00325-HSG, 2021 WL 1056552, at *3 (N.D. Cal. Mar. 19, 2021). "If the purpose of expert testimony is to contradict an expected and anticipated portion of the other party's case-in-chief, then the witness is not a rebuttal witness." *Id.* Dr. Miller claims in his rebuttal report that he is responding to the claim made by Plaintiffs' expert Anand Kasbekar in his April 23rd report that a cracked weld caused the Tank 4 incident. (7/29/21 Miller Report at 2.) But at deposition, Dr. Miller admitted he could not identify any new material in that April 23rd report—that report was simply a reproduction of the opinions Dr. Kasbekar had disclosed in the lead case. (Miller Dep. at 13-14 ("Q. Is there any new material you can identify from Dr. Kasbekar's 4/23 report that you relied on for your July 29 report? A. Not as I sit here right now, no. No.").) There were in other words, no unforeseen facts brought out in Dr. Kasbekar's April 23rd report that could justify a brand-new rebuttal report. Dr. Miller's new tests are simply a belated attempt to support an opinion that he has held since last November: that Tank 4 could not have lost all its liquid nitrogen in

1  less than 24 hours. (*See* Zeman Decl., Ex. 14 (11/20/20 Miller Report) at 8-21 (describing exemplar
2  tank testing with boiloff over 32 hours).) The original bases for that opinion were flawed and Dr.
3  Miller's opinions were ultimately not credited by the jury in the lead trial. But that does not mean Dr.
4  Miller is now free to belatedly conduct new validating tests and substitute those new tests in as if they
5  were the bases for his opinion all along. In fact, the Ninth Circuit has indicated that "scientists whose
6  conviction about the ultimate conclusion of their research is so firm that they are willing to aver under
7  oath that it is correct prior to performing the necessary validating tests could properly be viewed by the
8  district court as lacking the objectivity that is the hallmark of the scientific method." *Claar v.*
9  *Burlington N. R. Co.*, 29 F.3d 499, 503 (9th Cir. 1994).

10  By waiting so long to conduct the testing needed to support his opinion, Dr. Miller has not only
11  undermined his own credibility, but has strategically denied Plaintiffs' experts the ability to respond to
12  Miller's new tests. *See In re Toy Asbestos*, 2021 WL 1056552, at *4 (excluding rebuttal report; parties
13  "should not be allowed to manufacture a tactical advantage by waiting to disclose critical information
14  about their case"). Plaintiffs accordingly request that Dr. Miller's rebuttal report be stricken and Dr.
15  Miller precluded from presenting the results of his most recent set of tests to the jury.

16  **B.   Chart should not be permitted to submit new opinions on general causation issues.**

17  Dr. Miller's new tests are not just improper rebuttal material. They are also an impermissible
18  attempt to alter Chart's expert opinions on general liability issues after those opinions were supposed to
19  be fully disclosed in the lead action of these consolidated proceedings. After the Related Actions
20  scheduled to be tried in January were filed, the Court ordered them consolidated with the lead action for
21  all pretrial and trial proceedings. (9/15/20 Consolidation Order, Sec. A, ¶ 2.) And it specified that "[a]ll
22  discovery completed in the consolidated action is deemed produced in the Related Actions," and set a
23  schedule for completion of plaintiff-specific discovery in each of the Related Actions. (*Id.*, Sec. B, ¶¶ 1,
24  2-3.) Accordingly, the expert discovery conducted in the lead action is deemed completed in the
25  Related Actions as well, which means that Chart and the plaintiffs in the Related Actions have already
26  had a full and fair opportunity to conduct expert discovery on general liability issues. Further expert
27  discovery is only appropriate when it concerns issues specific to the named plaintiffs in each Related
28  Action, which could not have been addressed in the lead action.

1   District courts enjoy substantial discretion in deciding whether and to what extent to consolidate
2   cases. *Hall v. Hall*, 138 S. Ct. 1118, 1131 (2018). Individual cases maintain their separate identities, but
3   one or more phases are merged together to enable more efficient case management and avoid
4   inconsistent results, while also ensuring that the parties are not deprived of substantial rights they might
5   have possessed had a given action proceeded separately. *See id.* at 1125, 1130; *Dunson v. Cordis Corp.*,
6   854 F.3d 551, 556 (9th Cir. 2017) (consolidating cases for pretrial proceedings avoids the risk of
7   conflicting rulings concerning the admissibility of key evidence). Here, interpreting the case's
8   consolidation order to allow renewed expert discovery on all issues—including issues related to the
9   cause of the March 4th incident, which were already addressed in the lead action—would be highly
10  inefficient, increase the risk that the cause of the March 4th incident is decided differently depending on
11  the plaintiff, and confer on Chart substantially *more* rights than it would enjoy in a single action. Rather
12  than having one opportunity for its experts to disclose opinions on each material issue in the case, Chart
13  would end up with as many as 30 opportunities to update or modify its experts' opinions on general
14  liability issues. A sort of arms race would ensue, with each set of Related Actions yielding more testing
15  and more expert opinions on the same general liability issues. And because the expert evidence
16  presented to the jury could vary from case to case, there would be a greater risk of inconsistent
17  judgments: the cause of the March 4th incident could be found to be a cracked weld for some plaintiffs,
18  but something entirely different for other plaintiffs.
19      Plaintiffs do not believe the Court intended such a result when it issued its consolidation order
20  and set schedules for discovery in the Related Actions. Nor does it appear that Chart interpreted the
21  Court's order to allow for such a result—at least at first. When the parties first exchanged expert reports
22  in these Related Actions, both parties' general liability experts disclosed substantially the same
23  opinions as in the lead action. Only those experts opining on plaintiff-specific issues presented
24  markedly different reports. It was not until after the lead trial concluded that Chart changed its mind
25  and, on the deadline for the disclosure of rebuttal experts in these Renewed Actions, disclosed a new
26  28-page report on the issue of general causation. That report can be stricken as improper rebuttal, but
27  Plaintiffs also request that the Court ensure this issue does not continue to arise by clarifying that its
28  consolidation order does not provide for new expert reports on issues addressed in prior reports. Both

factual and expert discovery in the Related Actions should be limited to plaintiff-specific issues absent a showing of exceptional circumstances.

## CONCLUSION

For the reasons stated, Plaintiffs respectfully request that the Court grant their motion and exclude the expert testimony discussed above from the parties' upcoming trial, currently scheduled to start January 31, 2022.

Dated: August 24, 2021            By:   */s/ Amy M. Zeman*

Amy M. Zeman (State Bar No. 273100)
Geoffrey A. Munroe (State Bar No. 228590)
John E. Bicknell (State Bar No. 331154)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, CA 94162
Tel: (510) 350-9700
Fax: (510) 350-9701
amz@classlawgroup.com
gam@classlawgroup.com
jeb@classlawgroup.com

Dena C. Sharp (State Bar No. 245869)
Adam E. Polk (State Bar No. 273000)
Nina R. Gliozzo (State Bar No. 333569)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dsharp@girardsharp.com
apolk@girardsharp.com
ngliozzo@girardsharp.com

Adam B. Wolf (State Bar No. 215914)
Tracey B. Cowan (State Bar No. 250053)
**PEIFFER WOLF CARR KANE & CONWAY, LLP**
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Tel: (415) 766-3545
Fax: (415) 402-0058
awolf@peifferwolf.com

tcowan@peifferwolf.com

*Plaintiffs' Counsel*