UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| IN RE: PACIFIC FERTILITY CENTER LITIGATION<br><br>This Document Relates to:<br><br>No. 3:18-cv-01586 (A.B., C.D., E.F., G.H., and I.J.) | Case No. 18-cv-01586-JSC<br><br>**ORDER RE: CHART'S POST-TRIAL MOTIONS**<br><br>Re: Dkt. Nos. 936, 937 |
|---|---|

Plaintiffs A.B., C.D., E.F., G.H., and I.J. filed a putative class action alleging products liability and failure to recall claims against Chart Industries.[1] Following the Court's denial of class certification, the named Plaintiffs proceeded to trial on their individual claims.[2] After the jury returned a verdict in their favor on all claims and awarded damages of more than $30 million, Chart filed the now pending motions for a new trial and renewed motion for judgment as a matter of law. (Dkt. Nos. 936, 937.) Having considered the briefs and having had the benefit of argument on November 4, 2021, the Court DENIES the motions. The jury's verdict was supported by substantial evidence and none of the reasons advanced in favor of Chart's motion for a new trial provide a basis to set aside the jury's verdict, allocation of fault, or award of noneconomic damages.

**DISCUSSION**

**A. Chart's Motion for Judgment as a Matter of Law**

A Rule 50(b) motion for judgment as a matter of law is appropriate when the evidence

---

[1] Plaintiffs also brought other claims against Pacific Fertility Center and its related entities, but those claims have been compelled to arbitration.
[2] All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). (Dkt. No. 553.)

1    permits only one reasonable conclusion, and that conclusion is contrary to that of the jury. *Martin*

2    *v. Cal. Dep't of Veterans Affairs*, 560 F.3d 1042, 1046 (9th Cir. 2009). The court must view the

3    evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in

4    that party's favor, *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009), and the

5    court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson*

6    *Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). A "jury's verdict must be upheld if it is

7    supported by substantial evidence, which is evidence adequate to support the jury's conclusion,

8    even if it is possible to draw a contrary conclusion." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir.

9    2002).

10   Chart insists that it is entitled to judgment as a matter of law on Plaintiffs' claim that Chart

11   negligently failed to recall or retrofit its TEC controller.  Chart's argument is two-fold: (1)

12   Plaintiffs failed to offer evidence, in the form of expert testimony, that a reasonable manufacturer

13   under the same or similar circumstances would have recalled or retrofitted the controller; and (2)

14   Plaintiffs failed to offer evidence that a governmental agency issued a recall directive.   Neither

15   argument is availing.

16   First, Chart's contention that Plaintiffs' negligent failure to recall or retrofit claim requires

17   proof of what other manufacturers would do is legally unsupported.  Plaintiff's negligent failure to

18   recall or retrofit claim required them to prove: (1) that Chart sold the TEC 3000 electronic

19   controller; (2) that Chart knew or reasonably should have known that the controller was dangerous

20   or was likely to be dangerous when used in a reasonably foreseeable manner; (3) that Chart

21   became aware of this defect after the controller was sold; (4) that Chart failed to recall or retrofit

22   the controller; (5) that a reasonable seller under the same or similar circumstances would have

23   recalled or retrofitted the controller; (6) that Plaintiffs were harmed; and (7) that Chart's failure to

24   recall or retrofit the controller was a substantial factor in causing Plaintiffs' harm.  CACI 1223.

25   (Dkt. No. 853 at 23.)

26   Chart—as in its motion for summary judgment and motion for judgment as a matter of law

27   during trial—has not identified any authority which requires expert testimony to establish the

28   standard of care for Plaintiffs' negligence claim. (Dkt. No. 712 at 5 ("Chart identifies no case—

2

and the Court is aware of none—which holds that to prove this claim and, in particular, the fifth element, Plaintiffs must rely on expert testimony."); Dkt. No. 841 at 1401 ("Chart you didn't cite any cases").) Chart's motion rests on language from a district court decision granting an unopposed motion for summary judgment on a negligent failure to recall or warn claim which noted that the unrepresented plaintiff failed to "proffer any evidence, expert or otherwise, regarding the standard of care to which the manufacturer of a complex product such as the device at issue here should be held." *Kamerik v. Depuy Orthopaedics, Inc*., 2013 WL 12322041, at *6 (C.D. Cal. Jan. 28, 2013). From this, Chart extrapolates that "expert testimony is required because such information is not within the knowledge of lay jurors." (Dkt. No. 936 at 6.) However, the general rule under California law is that it is only "[w]here the complexity of the causation issue is beyond common experience, [that] expert testimony is required to establish causation." *Garbell v. Conejo Hardwoods, Inc*., 193 Cal. App. 4th 1563, 1569 (2011). Chart has failed to cite any authority suggesting that this general rule is not equally applicable to Plaintiffs' negligent failure to recall or retrofit claim. The causation issue presented at trial was not beyond a lay jury's common experience.

Chart's insistence at oral argument that *Hernandez v. Badger Constr. Equip. Co*., 28 Cal. App. 4th 1791 (1994), supports its argument that evidence in support of the standard of care is required overstates the court's ruling. While the *Hernandez* jury did heard evidence of industry standards, the *Hernandez* court did not hold that such evidence was required; instead, the court noted that "[c]ompliance with regulations, directives or trade custom does not necessarily eliminate negligence but instead simply constitutes evidence for jury consideration with other facts and circumstances." *Id*. at 1830-31. The court emphasized that the determination of negligence under a failure to recall or retrofit theory "focuses on due care and the reasonableness of the defendant's conduct." *Id*. at 1831. California law is in accord that it is defendant's knowledge of the defect and the serious risk of harm that gives rise to a duty of care. *See Lunghi v. Clark Equip. Co*., 153 Cal. App. 3d 485, 494 (1984) ("Clark's knowledge of the injuries caused by these features imposed a duty to warn of the danger, and/or a duty to conduct an adequate retrofit campaign.").

3

Second, Chart's insistence that a governmental agency's directive to recall is required is unpersuasive. Chart's argument relies on Section 11 of the Restatement (Third) of Torts. Chart highlights the Ninth Circuit's statement in *Oswalt v. Resolute Indus., Inc.*, 642 F.3d 856, 860 (9th Cir. 2011), that "we should look to the Restatement (Third) of Torts: Products Liability to guide our assessment of Resolute's products liability claims, and we therefore apply its principles below." (Dkt. No. 974 at 4.) The *Oswalt* plaintiff's claim arose under the federal common law of maritime torts; Plaintiffs' claim, however, arises under California law. Chart has not cited any California authority for the proposition that the Court should look to the Restatement of Torts for assessment of Plaintiffs' product liability claims.

Nor has Chart cited to authority suggesting that a governmental directive is required to trigger a duty to recall or retrofit. In fact, the cases cited in CACI 1223 are to the contrary. In *Lunghi*, the California court of appeals concluded that the jury should have been instructed on negligent failure to recall or retrofit based on defendant's "knowledge of the injuries caused by [the at-issue] features"—there was no hint of a requirement of a government required recall. 153 Cal. App. 3d at 494. Likewise, in *Hernandez*, the California court of appeals concluded that the jury could reasonably infer that retrofitting a crane could have prevented the accident given the evidence that the defendant knew of the dangers, the foreseeable possibility of a serious injury, and defendant's president knew that the retrofit at-issue could be used as a safety aid to a good operator and would work if properly maintained. 28 Cal. App. 4th at 1831. Chart's argument is inconsistent with this holding.

Finally, substantial evidence supports the jury's finding that Chart negligently failed to retrofit or recall the controller including, but not limited to, the following:

- Chart knew that its TEC 3000 controllers suffered from a "SN=0" defect which caused the controllers to lose the ability to accurately monitor the liquid nitrogen levels (Trial Exs. 197; 219; 223);

- Chart internally identified the issue as a "critical issue" about which it "needs an answer urgently why this is occurring" and that "needless to say this has turned into a high priority" (Trial Ex. 284);

- Two years before the incident, Chart identified this as something about which it needed to "take action immediately" (Trial Ex. 239; Dkt. No. 869-5 at 22-23);

4

- Although Chart had a retrofit available, it did not notify PFC or other customers of the issue, offer to retrofit PFC or other customer's controllers, or issue a recall notice to PFC or other customers (Dkt. No. 869-6 at 34; Trial Ex. 5 at RFA 12-13; Dkt. No. 869-3 at 22);

- Chart knew that the controllers were used with cryogenic tanks storing "irreplaceable" biological material that could be damaged (Dkt. No. 869-4 at 36-37; Trial Ex. 220);

- Chart knew that the tanks could suddenly lose vacuum insulation and the ability to maintain cryogenic temperatures and that a functioning controller would notify a user of a sudden temperature drop (Dkt. No. 826 (Trial Tr. 276:5-279:16); Trial Exs. 192; 219; 220).

It was within the jury's common understanding to conclude that a reasonable manufacturer under similar circumstances would have recalled the controller. Accordingly, Chart's motion for judgment as a matter of law is DENIED. Substantial evidence supports the jury's finding that Chart negligently failed to retrofit or recall the controller.

**B. Motion for New Trial**

Under Rule 59, a court has the discretion to grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). The grounds for a new trial include: (1) a verdict that is contrary to the weight of the evidence; (2) a verdict that is based on false or perjurious evidence; or (3) to prevent a miscarriage of justice. *Molski v. M.J. Cable, Inc*., 481 F.3d 724, 729 (9th Cir. 2007) (quotation marks and citation omitted). Erroneous evidentiary rulings and errors in jury instructions are also grounds for a new trial. *See Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995). A new trial should be granted where, after "giv[ing] full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed" by the jury. *Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1365 (9th Cir. 1987).

Chart insists that it is entitled to a new trial because of (1) erroneous evidentiary rulings; (2) to cure the error in submitting Plaintiffs' negligent failure to recall claim to the jury; (3) attorney misconduct; (4) issues with the allocation of fault; and (5) the noneconomic damages are excessive. The Court addresses each in turn.

**1. Erroneous Evidentiary Rulings**

A party seeking a new trial based on unfavorable evidentiary rulings must establish that the

5

court's rulings were both erroneous and substantially prejudicial. *See Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995). Put differently, the moving party must show that the court's error more probably than not "tainted the verdict." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1030 (9th Cir. 2008). Chart identifies four erroneous evidentiary rulings which it contends warrant a new trial here.

***First***, Chart insists that the Court erred in excluding Dr. Miller's exemplar testing. The Court previously excluded Dr. Miller's exemplar testing as unreliable because he failed to simulate the conditions of Tank 4 at the time of the incident. (Dkt. No. 724.) The Court denied Chart's subsequent motion for reconsideration because Chart had not provided a basis to revisit the Court's prior finding. (Dkt. No. 777.) This remains equally true now with respect to Chart's motion for a new trial.

Scientific evidence is reliable "if the principles and methodology used by an expert are grounded in the methods of science." *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1056 (9th Cir. 2003). The court's "task ... is to analyze not what the experts say, but what basis they have for saying it." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995) (hereinafter *Daubert II*). The court must "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).

While Dr. Miller used the same model tank and the same level of liquid nitrogen for his test, he neither accounted for the contents inside the tank—the boxes of genetic material and equipment inside the tank—nor did he attempt to simulate the same type of crack—an interior weld crack versus an external breach. Chart has not cited to anything which persuades the Court that it's reasoning that "Dr. Miller's failure to simulate the conditions of Tank 4—either with respect to the volume of liquid nitrogen in the tank or the source of leak—undermines the usefulness of his test" was in error.[3] (Dkt. No. 724 at 13-14 (citing *Rovid*, 2018 WL 5906075 at

---

[3] This is equally true with respect to the Court's finding that Dr. Miller's performance of a single test precluded him from providing error rates. (Dkt. No. 724 at 13 ("Dr. Miller's "use of a single test prevents him from calculating averages or error rates." (citing *Rovid v. Graco Children's Prod. Inc.*, No. 17-CV-01506-PJH, 2018 WL 5906075, at *5 (N.D. Cal. Nov. 9, 2018) ("Without

6

*8 (excluding expert testimony in part based on relevancy where the expert's "testing did not even attempt to simulate" the underlying incident); *see also Daubert*, 509 U.S. at 592–93 (the threshold question is "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.").) Rather, Chart merely reiterates the same arguments the Court previously considered and rejected. Chart does not cite any evidence elicited at trial which alters the Court's conclusion that Dr. Miller's exemplar testing did not rest on a reliable foundation and was not relevant to rebut Plaintiffs' theory given its dissimilarities. *See McKnight By & Through Ludwig v. Johnson Controls, Inc.*, 36 F.3d 1396, 1404 (8th Cir. 1994) (finding that the district court erred in failing to exclude a test where the conditions were not substantially similar).

Nor is the Court persuaded by Chart's argument that a lesser standard than substantial similarity should apply because the test was aimed at rebutting Plaintiff's theory rather than replicating what actually happened. While "substantially similar" does not mean "identical," "[b]ecause this type of evidence can be quite persuasive, in order to avoid unfair prejudice, the conditions under which an experiment is performed must be 'substantially similar' to those surrounding the simulated event." *United States v. Jackson*, 479 F.3d 485, 489 (7th Cir. 2007). As part of the Court's gatekeeping role, it is charged with ensuring that expert testimony submitted to the jury is both reliable and relevant. Dr. Miller's test was too dissimilar to either the real-world conditions or Plaintiffs' theory to render it sufficiently reliable and relevant to present it to the jury.

***Second***, Chart contends that the Court erred in allowing Plaintiffs to impeach Chart's expert Ron Parrington using Trial Exhibit 276. Trial Exhibit 276 is an email between Chart and a distributor regarding a cryogenic tank implosion at Rutgers's University in 2020. (Dkt. No. 939-4 at 3.) Before trial, the Court excluded this exhibit under Federal Rules of Evidence 402 and 403. (Dkt. No. 810 at 13-15.) At trial, the Court allowed Plaintiffs to question Mr. Parrington regarding the document after he testified that he was not aware of any other similar tank failures (to Tank 4)

---

multiple tests, [the expert] cannot show that his results are reproducible or reliable.")).)

7

1    because he had testified at deposition that he had seen Trial Exhibit 276 (which discussed a tank

2    implosion).  (Dkt. No. 851 at 1605-1607.)  When Mr. Parrington confirmed at trial that he had

3    seen the exhibit before, Plaintiffs were allowed to question him about whether he had asked Chart

4    about the tank implosion described in the email or investigated whether the crack described in the

5    email was due to an internal weld leak.  (*Id*. at 1627-1629.)  The exhibit, however, was not

6    admitted.

7          The Court did not err in allowing Plaintiffs to question Mr. Parrington regarding the

8    exhibit because Chart opened the door by eliciting testimony from Mr. Parrington that the Tank 4

9    incident was the only weld crack that he was aware of in Chart's tanks.  (Dkt. No.  841 (Trial Tr.

10   at 1565:4.)  *See Cooper v. Firestone Tire & Rubber Co*., 945 F.2d 1103, 1105 (9th Cir. 1991)

11   ("When an expert testifies that a product is generally safe, as appellants' experts did, the witness's

12   credibility can be undermined by showing the witness had knowledge of prior accidents caused by

13   the product. The evidence of other accidents, whether similar or not, tends to show the witness's

14   claims of product safety are overstated and the witness therefore may not be reliable.") (internal

15   citation omitted). Further, Chart was able to question Mr. Parrington about the email again on

16   redirect and elicit his testimony that to his understanding the email did not say anything about

17   cracks or welds, nor did it indicate that a root cause analysis had been performed. (Dkt. No.  851

18   (Trial Tr. at 1660:10-19).)  As such, even if the Court erred in allowing Plaintiffs to question Mr.

19   Parrington about Trial Exhibit 276, such error was inconsequential because the exhibit was not

20   admitted and Chart had the opportunity to allow Mr. Parrington to explain himself.

21         ***Third***, Chart insists that the Court erred by failing to allow Chart to question PFC

22   witnesses regarding low liquid nitrogen levels in Tank 4 in 2013 and 2014.  The Court excluded

23   this evidence pretrial under Rule 404(b) as too attenuated to the 2018 incident with Tank 4. (Dkt.

24   Nos. 724, 777.)  Chart now insists that Plaintiffs opened the door to this prior bad acts evidence

25   when PFC embryologist Erin Fisher, who has worked at PFC since 2005, testified that she had

26   never observed low liquid nitrogen levels in Tank 4 or any other freezer tanks in the lab prior to

27   March 4, 2018.  (Dkt. No. 829 (Trial Tr. at 778-779).)  And when Dr. Conaghan, the PFC lab

28   director, testified that he believed that Tank 4 never dropped below six inches prior to March 4,

2018.  (Dkt. No. 828 (Trial Tr. at 492).)  However, unlike what Plaintiffs did with Mr. Parrington, Chart did not lay a foundation that these witnesses were aware of the 2013 or 2014 low liquid nitrogen level readings.  The evidence was thus not relevant to rebut a false impression left by their testimony.  *See United States v. Sine*, 493 F.3d 1021, 1037 (9th Cir. 2007) ("the opening the door principle allows parties to introduce evidence on the same issue to rebut any false impression that might have resulted from the earlier admission.") (internal citation and quotation marks omitted).

Nor is the 2013/14 evidence admissible as evidence of prior bad acts.  "The test for admitting such evidence is whether: 1) it tends to prove a material fact; 2) the prior act is not too remote in time; 3) the evidence is sufficient to support a finding that the defendant committed the act; and 4) where knowledge and intent are at issue, the act is similar to that charged." *United States v. Hanson*, 936 F.3d 876, 882 (9th Cir. 2019).  The evidence of low liquid nitrogen readings from 2013 and 2014—four to five years prior to the incident—is not probative because it is simply too remote in time.  Chart's argument that courts have allowed evidence from 13 years prior as bad act evidence is unavailing.  While the Ninth Circuit has stated that there is "not a particular number of years after which past conduct becomes too remote," it noted that it depends on "the theory of admissibility and the similarity of the acts." *United States v. Johnson*, 132 F.3d 1279, 1283 (9th Cir. 1997).  Put simply, attenuation is a fact specific question.  Under the facts here, the incidents from 2013 and 2014 are too remote in time to be of probative value and instead could have potentially misled or distracted jurors.

*Fourth*, Chart insists that the Court erred in permitting Plaintiffs' expert, Dr. Kasbekar, to "offer opinions about the content and meaning of Chart's discovery responses, historical Chart documents and emails, and what those documents allegedly revealed about Chart's actions and motives."  (Dkt. No. 937 at 17.)  The Court has reviewed the portions of Dr. Kasbekar's testimony cited by Chart and does not find any examples of Dr. Kasbekar providing improper state-of-mind testimony.  (Dkt. No. 937 at 17 (citing (Trial Tr. Vol. 2 at 276:22-24, 285:12-286:11; *Id*. Vol. 3 at 333:11-334:4, 334:24-335:18, 336:12-338:2).)  To the extent that Chart objects to Plaintiffs offering opinion testimony from Dr. Kasbekar regarding Chart's discovery responses, the Court

denied Chart's objection to such testimony as an untimely attempt to limit expert testimony. (Dkt. No. 806 at 2.) The same remains true now. Chart was free to cross-examine Dr. Kasbekar regarding his opinion testimony and his knowledge or lack thereof of Chart's state-of-mind.

*\*\*\**

"A district court is vested with broad discretion to make ... evidentiary rulings conducive to the conduct of a fair and orderly trial." *S.M. v. J.K.*, 262 F.3d 914, 919 (9th Cir. 2001), as amended, 315 F.3d 1058 (9th Cir. 2003). Chart has not shown either that the Court's evidentiary rulings were in error or that even if they were that they tainted the jury's verdict.

### 2. Allowing the Jury to Consider the Negligent Failure to Recall Claim

Chart's argument here dovetails with its motion for judgment as a matter of law and fails for the same reasons it fails in that context as discussed above. Substantial evidence supports the jury's finding that Chart negligently failed to retrofit or recall the controller.

### 3. Attorney Misconduct

Chart argues nine instances of attorney misconduct by Plaintiffs' counsel. In particular, Chart insists that counsel violated two of the Court's pretrial rulings: (1) excluding Dr. Miller's exemplar test, and (2) that it could not compel Chart or Cryoport witnesses to provide live or remote testimony at trial and Chart's subsequent decision have all Chart and Cryoport witnesses testify via video deposition. (Dkt. No. 802; Dkt. No. 810 at 4-5.)

"Generally, misconduct by trial counsel results in a new trial if the flavor of misconduct sufficiently permeates an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1192 (9th Cir. 2002) (cleaned up). In evaluating the possible prejudice from attorney misconduct, courts consider "the totality of circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case, and the verdict itself." *Id.* at 1193 (internal quotation marks omitted) (quoting *Puerto Rico Aqueduct & Sewer Auth. v. Constructora Lluch, Inc.*, 169 F.3d 68, 82 (1st Cir. 1999); *Cooper v. Firestone Tire & Rubber Co.*, 945 F.2d 1103, 1107 (9th Cir. 1991) (declining to find reversible error where "the alleged

misconduct occurred only in the argument phase of the trial ... the remarks were isolated rather than persistent, ... most of counsel's comments were not objected to at trial and appellants did not move for a mistrial at the end of the argument")). "Where offending remarks occurred principally during opening statement and closing argument, rather than throughout the course of the trial, we are less inclined to find the statements pervaded the trial and thus prejudiced the jury." *Settlegoode v. Portland Pub. Sch.*, 371 F.3d 503, 518 (9th Cir. 2004) (internal citation and quotation marks omitted).

### a) Counsels' Comments on Video Deposition Testimony

Eight of the nine instances of misconduct that Chart identifies relate to instances where Plaintiffs' counsel commented on or alluded to the fact that Chart's witnesses appeared via video deposition rather than live. First, in their opening statement, Plaintiffs stated that "What you will not see in this trial is a single person from Chart, Incorporated who could be bothered to come and testify live in this courtroom." (Dkt. No. 826 (Trial Tr. at 147:1-3).) The Court sustained Chart's objection and later denied Chart's contemporaneous motion for a mistrial. (*Id*. at 147:6-7; 178:21-179:3.) As the Court noted in denying Chart's motion for a mistrial, while argument is improper during opening statements, the comment did not prejudice Chart given that the Court sustained the objection. (*Id*. at 178:7-12.)

Next, Chart highlights counsel's questioning of Dr. Conaghan wherein counsel asked Dr. Conaghan if it was important to testify in person. Chart did not object to this question. Chart likewise did not object to the next alleged instances of misconduct—counsel's four references during closing argument to Chart witnesses appearing by video deposition. Nor did Chart object to counsel's argument during closings that the jury should "hold a corporation like Chart to account for what it won't answer for itself." (Dkt. No. 859 (Trial Tr. at 1849:5-9).) Counsels' questioning of Dr. Conaghan and references to Chart's witnesses appearing by video deposition rather than live does not warrant a new trial. Chart did not object at the time, the question to Dr. Conaghan did not reference Chart, and counsel's references to Chart's witnesses appearing by video deposition were factual statements. *See Hemmings*, 285 F.3d at 1195 ("The fact that counsel did not object before the jury was instructed strongly suggests that counsel made a strategic

11

decision to gamble on the verdict and suspected that the comments would not sway the jury."). While counsel may have intended the jury to draw an inference from these factual statements, the inference was tangential to the main issues in the case. *Id.* at 1193.

Finally, Chart argues that counsel's statement during her rebuttal closing that "cross-examination is exactly what not one Chart employee experienced during this trial" warrants a new trial. (Dkt. No. 859 (Trial Tr. at 1940:22-24).) The Court sustained Chart's objection to this argument. (*Id*. at 1940:25-1941:2.) On reflection, the Court is not convinced that this statement was improper. Chart's counsel emphasized repeatedly during his closing argument that "[c]ross-examination is one of the most effective ways to get to the truth. When people want to get up there and shy away or lie to you, you don't let them do it." (Dkt. No. 859 (Trial Tr. at 1894:14-16; 1910:4-6; 1917:22-1918:14).) That Plaintiffs' counsel argued on rebuttal that "Mr. Duffy is right. Cross-examination is effective. Cross-examination is exactly what not one Chart employee experienced during this trial," was directly responsive to Chart's emphasis on its cross-examination of Plaintiffs' experts and Dr. Conaghan at trial. (*Id*. at 1940:22-24.) Even if the argument was improper, however, this argument, like the others discussed above, was not directed to one of the main issues in the case and the fact that the Court sustained Chart's objection mitigated any prejudice. *See Hemmings*, 285 F.3d at 1193. Further, the jury was instructed on at least two occasions that "the arguments of the lawyers are just argument, not evidence." (Dkt. No. 859 (Trial Tr. at 1943:23-24); Dkt. No. 853 at 5 ("Arguments and statements by lawyers are not evidence…What they have said in their opening statements, closing arguments and at other times is intended to help you interpret the evidence, but it is not evidence.").) The comment does not rise to the level of misconduct warranting a new trial.

  b) **Counsel's Comment Regarding Dr. Miller's Test**

The Court thus turns to Chart's final argument of attorney misconduct—counsel's statement during her rebuttal closing that "Dr. Miller did not conduct any tests in this case." (Dkt. No. 859 (Trial Tr. at 1941:18.) Chart objected to this statement and the Court sustained Chart's objection. (*Id*. at 1941:19-21.) The Court also instructed the jury that "whether any test was conducted is irrelevant and should not be considered by you." (*Id*. at 1943:23-24.) While the

12

1  Court later noted that counsel's statement was improper given that Dr. Miller had conducted a test,
2  but that the Court had excluded evidence of it, it denied Chart's motion for a mistrial noting that
3  the corrective instruction resolved the error and that in any event it was just attorney argument.
4  (*Id*. at 1948:1-20.)  Chart's motion for new trial does not give the Court reason to conclude
5  otherwise now.  The comment itself was tangential as neither expert conducted a test—it is not as
6  if counsel was arguing that only Plaintiffs' expert conducted a test—there was no evidence of any
7  test by any expert here.  Further, considering the totality of circumstances—the improper
8  statement came in the context of closing arguments, the Court sustained the objection and
9  promptly gave a curative instruction, and the jury was repeatedly instructed that attorney argument
10  was not evidence—counsel's conduct did not rise to the level of misconduct that "sufficiently
11  permeate[s] an entire proceeding to provide conviction that the jury was influenced by passion and
12  prejudice in reaching its verdict." *Hemmings*, 285 F.3d at 1192.

13  The cases Chart relies upon do not persuade the Court otherwise.  In *County of Maricopa
14  v. Maberry*, 555 F.2d 207 (9th Cir. 1977), during cross-examination of an expert witness, the
15  plaintiff's counsel asked the expert if during his deposition he had told counsel "[y]ou've got a
16  damned good cause you know it." *Id*. at 217.  The Ninth Circuit concluded that the question was
17  highly prejudicial to the other side, unethical under the Code of Professional Responsibility, and
18  clearly improper and that a new trial was required "because . . . the non-medical question
19  propounded to the expert medical witness was an intentional act, done with the sole purpose of
20  bringing to the jury something it should not have heard. The question was grossly improper,
21  highly devastating to the defense, carefully planned, and was an attempt to place an alleged
22  Opinion as to a legal matter by a non-legal expert . . . before the jury." *Id*. at 219.  Counsel's
23  misconduct here was nowhere near the same level.  Nor was it akin to counsel's repeated
24  solicitation of impermissible testimony in violation of the court's in limine rulings and references
25  "to matters previously ruled inadmissible 'with the sole purpose of bringing to the jury something
26  it should not have heard'" as in *Anheuser-Busch, Inc. v. Nat. Beverage Distributors*, 69 F.3d 337,
27  347 (9th Cir. 1995).

28  Accordingly, while counsel may have strayed outside the line in her rebuttal closing, the

1    misconduct was not such that it prejudiced Chart or influenced the jury's verdict here.

### 4. Allocation of Fault

Chart next argues that the record does not support the jury's allocation of fault. The jury allocated 90% of the fault to Chart and 10% to PFC. Chart insists this was in error because "[t]he evidence showed PFC bore a significant portion of responsibility for the harm to Plaintiffs." (Dkt. No. 937 at 25.) Chart, however, identifies no such evidence. It is only in reply to Plaintiffs' opposition that Chart includes argument and citation regarding PFC's share of responsibility. (Dkt. No. 975 at 16.) The Court does not consider issues raised for the first time in the reply brief. *Zamani v. Carnes*, 491 F3d 990, 997 (9th Cir. 2007) ("district court need not consider arguments raised for the first time in a reply brief"); *see also Dytch v. Yoon*, No. C-10-02915-MEJ, 2011 WL 839421, at *3 (N.D. Cal. Mar. 7, 2011) ("It is improper for a moving party to introduce new facts or different legal arguments in the reply brief than those presented in the moving papers.") (internal citation omitted).

Even if the Court were to consider Chart's arguments on reply, they would be unavailing as they all require the Court to substitute its judgment for that of the jury and draw the inferences in the light most favorable to Chart. The Court must give the nonmoving party "the benefit of every reasonable inference and resolve[] conflicts in support of the judgment" and cannot set aside the allocation of fault "if there is any evidence which under any reasonable view supports the jury's apportionment." *Pfeifer v. John Crane, Inc.*, 220 Cal. App. 4th 1270, 1286 (2013), as modified on denial of reh'g (Nov. 27, 2013).

### 5. Excessive Noneconomic Damages

Chart insists that the noneconomic damages award here was excessive. To warrant a new trial on the ground that the jury awarded "excessive damages," the award must be "grossly excessive or monstrous," *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1041 (9th Cir. 2003). Under California law, a new trial may be granted on the basis of an excessive award only if "after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision." Cal. Civ. Proc. Code § 657; *see also Seffert v. L.A. Transit Lines*, 56 Cal. 2d 498, 507,

(1961) (explaining that the trial judge has "the power to weigh the evidence and judge the credibility of the witnesses" when assessing an award). "[T]here is no fixed or absolute standard by which to compute the monetary value of emotional distress," and a "jury is entrusted with vast discretion in determining the amount of damages to be awarded." *Plotnik v. Meihaus*, 208 Cal.App.4th 1590, 1602 (2012). The court will not overturn a jury's determination in the absence of a showing that the damages are incorrect as a matter of law or the product of "passion, prejudice, or corruption on the part of the jury." *Id*.

There is ample evidence to support the jury's non-economic emotional distress damages here. Each Plaintiff testified at length regarding the trauma and anguish they experienced as a result of the incident. Ms. Poynton, who is now 39, testified that she desperately wants children and she fears that may never become a reality, that she developed chronic hives after the incident, and that it has impacted her relationships with her friends and her search for a partner. Ms. Sletten, who is now 43, testified about her desire to have a family, but her feelings of paralysis and inability to move forward with her life after the incident. Ms. Enfield, who was pregnant with her second child at the time of the incident, but who later miscarried, talked about how shocked and disappointed she was and about how she was crushed when the eggs were not there when she needed them after the incident. The Parsells testified about how they viewed each embryo as a child and a member of their family, they planned to return for each of them, and were devastated after the incident. Mr. Parsell testified about how he no longer trusts anyone and Ms. Parsell testified about how her grief was ongoing and how it felt like having four of her family members ripped from her life one by one. There is no basis for questioning the jury's valuation of this suffering. *See Velez v. Roche*, 335 F. Supp. 2d 1022, 1038 (N.D. Cal. 2004). Nor has Chart provided a basis on which the Court could conclude as a matter of law that the damages are excessive. Further, the jury awarded different amounts of non-economic damages for each plaintiff, indicating that it carefully considered the evidence as to each plaintiff.

## CONCLUSION

For the reasons stated above, Chart's motion for a new trial and motion for judgment as a matter of law are DENIED.

This Order disposes of Docket Nos. 936, 937.

**IT IS SO ORDERED.**

Dated: November 5, 2021

_____
JACQUELINE SCOTT CORLEY
United States Magistrate Judge